# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**WALTER STEPHEN JACKSON, et al.,**

    **Plaintiffs,**

**vs.**                                                     **No. CIV 87-839 JP/LCS**

**LOS LUNAS CENTER FOR PERSONS
WITH DEVELOPMENT DISABILITIES, et al.,**

    **Defendants,**

**and**

**THE ARC OF NEW MEXICO,**

    **Intervenor,**

**and**

**MARY TERRAZAS, et al.,**

    **Intervenors pro se.**

## MEMORANDUM OPINION AND ORDER

This case is a class action brought by and on behalf of a group of developmentally disabled plaintiffs who lived at two institutions, Los Lunas Center for Persons with Developmental Disabilities ("Los Lunas") and Fort Stanton Hospital and Training School ("Fort Stanton"), that were run by the State of New Mexico. After a lengthy non-jury trial held during 1989 and 1990, this court entered a Memorandum Opinion and Order on December 28, 1990 finding violations of the Plaintiffs' rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and under the substantive due process clause of the Fourteenth Amendment to the United States Constitution.

Jackson v. Fort Stanton, 757 F.Supp. 1243, 1298-99, 1305-13 (D.N.M. 1990), rev'd in part on other grounds, 964 F.2d 980 (10th Cir. 1992). The State of New Mexico made the decision to close Fort Stanton in 1995 and Los Lunas in 1997, opting to move their residents into community-based care facilities. The parties then filed their Joint Stipulation on Disengagement ("JSD"), which is designed to ensure that the Plaintiffs' rights are not violated in the community settings. After a fairness hearing regarding the JSD on November 20, 1997, I entered the "Order Approving Stipulation on Disengagement" on December 19, 1997.

Then, on April 2, 1999, Defendants filed their motion for relief from the December 19, 1997 Order (Doc. No. 1101). In essence, the Defendants argue that under the Supreme Court's recent opinion in Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 117 S.Ct. 2028 (1997), the "exception" to Eleventh Amendment immunity contained in Ex parte Young, 209 U.S. 123 (1908), had been narrowed such that it is no longer applicable to Defendants in this case. Defendants request that the JSD be vacated and this case be dismissed.

Plaintiffs contend that the State of New Mexico has waived its Eleventh Amendment immunity, that there has been no change in law or fact sufficient to justify relief from the order approving the JSD, that the Ex parte Young doctrine still applies to this case after Coeur d'Alene Tribe, and that the statutes on which the Court's orders and the JSD are based expressly abrogate the State's Eleventh Amendment immunity.

I. **Waiver of Eleventh Amendment Immunity**

Plaintiffs argue that Defendants have waived their sovereign immunity by waiting twelve years after the commencement of this lawsuit to raise that defense, and by entering into the Joint

Stipulation on Disengagement. Plaintiffs also point out that representatives of the Defendants have stated, on the record, their intention to fulfill the Defendants' obligations under the JSD and argue that all of these actions amount to a waiver of sovereign immunity. I tend to agree.

However, I am bound by precedent to conclude that Defendants have not waived their Eleventh Amendment immunity because they have not done so explicitly. In its recent opinion in College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Board, 119 S.Ct. 2219 (1999), the Supreme Court clearly stated that waiver of Eleventh Amendment immunity must be strictly construed:

> We have long recognized that a State's sovereign immunity is a personal privilege which it may waive at pleasure. The decision to waive that immunity, however, is altogether voluntary on the part of the sovereignty. Accordingly, our test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. Generally, we will find a waiver either if the State voluntarily invokes our jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to our jurisdiction. Thus, a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation. Nor does it consent to suit in federal court merely by stating its intention to sue and be sued, or even by authorizing suits against it in any court of competent jurisdiction. We have even held that a State may, absent any contractual commitment to the contrary, alter the conditions of its waiver and apply those changes to a pending suit.

Id. at 2226 (internal citations and quotation omitted). The Supreme Court then rejected the notion that the defendant had "impliedly" or "constructively" waived its immunity, noting that it had decided a series of cases on the principle that a State's express waiver of sovereign immunity must be unequivocal. Id. at 228. The court cited its opinion in Edelman v. Jordan, in which it stated that "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights." Id. at 229 (quoting Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347

3

(1974). Finally, the court concluded that even voluntary conduct of the State, such as participation in economic activities for profit, Id. at 2230, or participation in a federal program, Atascadero State Hospital v. Scanlon, 473 U.S. 234, 246-247, 105 S.Ct. 3142, 3149-3150 (1985); Edelman v. Jordan, 415 U.S. at 673, 94 S.Ct. at 1360-1361, is insufficient to constitute constructive waiver of Eleventh Amendment immunity.

Thus, the Supreme Court's opinion in College Savings Bank is consistent with its earlier rulings on waiver of state sovereign immunity. For example, the Court has said that the Eleventh Amendment bar may be asserted for the first time on appeal, so a State which is sued in federal court does not waive the Eleventh Amendment simply by appearing and defending on the merits. See Florida Dept. of State v. Treasure Salvors, Inc., 458 U.S. 670, 683, n.18, 102 S.Ct. 3304, 3314 n.18 (1982) (plurality opinion); see also Calderon v. Ashmus, 523 U.S. 740, ----, n.2, 118 S.Ct. 1694, 1697 n.2 (1998); Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 99, n. 8, 104 S.Ct. 900, 907 n.8 (1984); Edelman v. Jordan, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363 (1974); Ford Motor Co. v. Department of Treasury of Ind., 323 U.S. 459, 467, 65 S.Ct. 347 (1945). Moreover, the fact that a state defendant has entered into a settlement agreement with a plaintiff does not act as a waiver of the defendant's constitutionally protected immunity unless the settlement agreement clearly expresses the State's unequivocal intent to waive the immunity by the agreement. See Ellis v. University of Kansas Medical Center, 163 F.3d 1186, 1195 (10th Cir. 1998); Johns v. Stewart, 57 F.3d 1544, 1554 (10th Cir.1995).

In this case, the JSD constitutes an "agreement" between the parties. Paragraph 49 of the JSD provides, "The court retains the inherent authority to interpret, clarify, modify, or enforce this Stipulation." (Joint Stipulation on Disengagement, attached to the December 19, 1997 Order

4

Approving Stipulation on Disengagement, Doc. No. 1064). The JSD makes no mention of the Eleventh Amendment, of sovereign immunity, or of waiver of rights by the Defendants. In view of the strict manner in which waiver and abrogation of Eleventh Amendment immunity have been interpreted by the appellate courts, I cannot say that the JSD "clearly expresses the State's unequivocal intent" to waive its immunity.

Given the weight of this legal authority and the absence of any legal authority to the contrary, I conclude that, despite their failure to raise the issue at an earlier stage of this case, the Defendants have not expressly waived their Eleventh Amendment immunity.

## II.     Change in Law or Fact

Defendants contend that both the legal and the factual landscapes of this case have changed[1], thereby justifying a modification of the Order approving the JSD under <u>Agostini v. Felton</u>, 521 U.S. 203, 214-17, 117 S.Ct. 1997, 2006-08 (1997) and <u>Rufo v. Inmates of Suffolk County Jail</u>, 502 U.S. 367, 390-93, 112 S.Ct. 748, 763-64 (1992).

In <u>Rufo v. Inmates of Suffolk County Jail</u>, 502 U.S. 367 (1992), the Supreme Court held

---

[1] Defendants' brief does not clearly define the baseline from which this court should determine whether there has been a change in law or fact sufficient to modify the "judgment," or even which "judgment" in the case (the December 28, 1990 Memorandum Opinion and Order or the December 19, 1997 JSD) should be modified. Defendants appear to contend that there have been significant changes in factual circumstances since this court entered its December 28, 1990 Memorandum Opinion and Order finding both constitutional and statutory violations by the Defendants. See, e.g., Defendants' Brief at 8 n.5-6. However, the reasoning of the Supreme Court in both <u>Rufo</u> and in <u>Agostini v. Felton</u> focused on changes of law and fact that had occurred since the entry of the consent judgments in those cases. In this case, the JSD—which is the functional equivalent of a consent judgment—controls the actions and responsibilities of the parties at this time. Consequently, logic dictates that the "judgment" from which the Defendants would request relief is the JSD, and I should therefore determine whether there have been significant changes in law or fact since the JSD was approved on December 19, 1997.

5

that a party seeking modification of an institutional reform consent decree bears the burden of establishing that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances. Id. at 383; 112 S.Ct. at 760. The court also stated that modification may be warranted when changed factual conditions make compliance with the decree substantially more onerous, when the decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest. Id. at 384; 112 S.Ct. at 760. Where a party relies upon events that actually were anticipated at the time it entered into a decree, modification should be granted only if the party satisfies the heavy burden of convincing the court that it agreed to the decree in good faith, made a reasonable effort to comply, and should be relieved of the undertaking under Rule 60(b). Id. at 385; 112 S.Ct. at 761.

Defendants identify no significant changes in factual circumstances since the JSD was entered on December 19, 1997. Instead, Defendants express dissatisfaction with the breadth of the JSD and the Plan of Action. Defendants' Brief at 17. However, these are the terms that Defendants agreed to abide by, and Defendants do not point to any changes in the facts which now make those terms unfair.

Defendants also argue that Coeur d'Alene Tribe and recent cases decided by the Tenth Circuit Court of Appeals under Coeur d'Alene Tribe constitute a change in the law warranting modification of the Order approving the JSD. Essentially, Defendants acknowledge that they did not have a colorable argument in support of their claim to Eleventh Amendment immunity under traditional Ex parte Young analysis. Instead, they contend that Coeur d'Alene Tribe and its progeny have created a right to immunity that did not exist before. It is difficult to imagine how

6

Defendants could make this argument with respect to Coeur d'Alene Tribe itself, which was decided on June 23, 1997, roughly six months before this court approved the JSD and five months before the November 20, 1997 fairness hearing at which Defendants urged the court to approve the JSD.

However, Defendants contend that they could not have known that Coeur d'Alene Tribe constituted a change in the law until the following year, when the Tenth Circuit decided ANR Pipeline Co. v. Lafaver, 150 F.3d 1178 (10th Cir. 1998) and interpreted Coeur d'Alene Tribe as "imposing an important new requirement on federal courts as part of the Ex parte Young analysis." Id. at 1190. In ANR Pipeline, the Tenth Circuit stated that a court must consider whether relief being sought against a state official "implicates special sovereignty interests" and whether the relief sought is the "functional equivalent" to legal relief against the State. Id. See also Ellis, 163 F.3d at 1198. Defendant's argue that this pronouncement constitutes a change in the law that, when applied to the facts of this case, shields Defendants from federal court jurisdiction under the Eleventh Amendment.

Even if we were to assume that ANR Pipeline and other Tenth Circuit interpretations of Coeur d'Alene Tribe have transformed Eleventh Amendment immunity jurisprudence, that change in the law would not alter the fact that Defendants do not have immunity in this case.

### III.     *Ex parte Young* Analysis

Defendants have acknowledged that, under the traditional analysis of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441 (1908), they are not entitled to sovereign immunity. See Defendants' Brief at 3 n.1. Under that traditional analysis, where a plaintiff alleges on ongoing violation of

7

federal law and seeks prospective injunctive relief against state officials, Ex parte Young denies the state officials the protection of Eleventh Amendment immunity. Coeur d'Alene Tribe, 117 S.Ct. at 2040. Defendants argue that Ex parte Young has been narrowed by the Supreme Court and the Tenth Circuit Court of Appeals.

Recently, the Tenth Circuit repeated that an analysis of Eleventh Amendment immunity under Ex parte Young must now include a two part inquiry:

> first, whether the relief being sought against a state official implicates special sovereignty interests; second, if the answer to the first question is in the affirmative, we then ask whether the requested relief is the functional equivalent to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment.

Ellis v. University of Kansas Med. Center, 163 F.3d 1186, 1198 (10th Cir. 1998) (internal quotations omitted) (citing ANR Pipeline, 150 F.3d at 1190). Application of this two-part test does not alter the outcome. Defendants in this case still are not entitled to Eleventh Amendment immunity.

### A. The State's Special Sovereignty Interest

Those courts that have examined the issue of whether a state's interest rises to the level of a "special sovereignty interest" have found such an interest only sparingly. In Idaho v. Coeur d'Alene Tribe, 117 S.Ct. 2028 (1997), the Supreme Court found that the State of Idaho had a special sovereignty interest in its control over lands underlying navigable waters, which have historically been considered uniquely "sovereign lands." Id. at 2040-43. One year later, the Tenth Circuit Court of Appeals found that a state has a "special and fundamental interest in its tax collection system," ANR Pipeline, 150 F.3d at 1193, which "has been a hallmark of the western legal tradition." Id. at 1193 n.16. The court also noted that "it is impossible to imagine that state

8

government could continue to exist without the power to tax." Id. at 1193.

On the other hand, the Tenth Circuit Court of Appeals has declined to find a "special sovereignty interest" in several other important state functions. In Buchwald v. University of New Mexico Sch. of Medicine, 159 F.3d 487, 495 (10th Cir. 1998), the Tenth Circuit refused to find that such an interest existed in the State's admissions standards and policies for its only medical school. The court explained, "There is certainly no threat that the New Mexico government would cease to exist without UNMSM's disputed policy. Moreover, most government policies do not affect core aspects of a state's sovereignty." Id. at 495 n.6. In Elephant Butte Irrigation District of New Mexico v. Department of the Interior, 160 F.3d 602 (10th Cir. 1998), the Tenth Circuit concluded that the state did not have a special sovereignty interest in the profits from the lease of recreational lands. Id. at 612. Finally, in Ellis v. University of Kansas Med. Center, 163 F.3d 1186 (10th Cir. 1998), the court declined to find that a state employee's claims under 42 U.S.C. §§ 1981, 1983, and 1985 affected a special sovereignty interest. Id. at 1198.

In this case, the Defendants argue that the State of New Mexico has a special sovereignty interest in its right to manage its social services programs, particularly where the state must administer those programs with limited financial resources. See Defendants' Brief at 9-11. Defendants then make the broad generalization that "[i]nstitutional reform class actions by their nature are cases invading the state's sovereign interests and, no matter how they are otherwise constituted, they can not qualify as an Ex Parte Young exception to the Eleventh Amendment." Defendants' Brief at 4.

Although the State of New Mexico certainly does have a strong interest in the

9

administration of its social services programs, even Defendants would be hard-pressed to argue that the State might cease to exist without those programs, as it would without the power to tax. See ANR Pipeline, 150 F.3d at 1193. Similarly, social services programs, unlike the State's interest in the land underlying its navigable waters, do not go to the core of state sovereignty. Coeur d'Alene Tribe, 117 S.Ct. at 2040-43.

Undoubtedly, this is the reason that the Supreme Court has not balked in permitting lawsuits in federal court, through the Ex parte Young doctrine, against state officials regarding other types of significant social programs, such as the administration and desegregation of public schools, Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749 (1977), the distribution of disability benefits, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347 (1974), the operation and administration of prison facilities, Pennsylvania Dep't of Correction v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952 (1998), and the provision of adequate care to involuntarily confined disabled persons. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452 (1982).

To accept the Defendants' argument would require me to acknowledge that the Supreme Court, in essence, has overruled cases such as Milliken, Edelman, Yeskey, and Youngberg with its decision in Coeur d'Alene Tribe. I am not willing to so broadly interpret Coeur d'Alene Tribe—in which a majority of the court was unable to agree on the proper interpretation of Ex parte Young and the Eleventh Amendment.

### B. The Form of Requested Relief

If a defendant sufficiently identifies a special state sovereignty interest that is implicated by a plaintiff's claim, the reviewing court must then ask whether the form of relief requested by the

10

plaintiff is barred by the Eleventh Amendment. ANR Pipeline, 150 F.3d at 1190; Ellis, 163 F.3d at 1198. Where the form of relief requested by a plaintiff is analogous or equivalent to a form of legal relief, the state officials who are defendants in a case are entitled to sovereign immunity. See Coeur d'Alene Tribe, 117 S.Ct. at 2040 (stating that plaintiffs' claim was the "functional equivalent" of a quiet title action regarding real property owned by the state).

In this case, Defendants argue that the relief requested by the Plaintiffs (which is, in fact, relief agreed to by the Defendants via the JSD), constitutes the "functional equivalent" of improper legal relief against the State of New Mexico. Defendants' Brief at 16-18. Defendants contend that the comprehensiveness and "intrusiveness" of the JSD, along with the fact that the services that must be performed for plaintiff class members cost money, support their assertion that the relief is the "functional equivalent" of legal relief.

Defendants' argument is unpersuasive. As the Tenth Circuit has made clear, "In many instances, even prospective relief will burden the state's treasury to some degree. The overriding question is not whether the relief will require the payment of state funds, but whether the relief will remedy future rather than past wrongs." Elephant Butte, 160 F.3d at 611 (internal citations and quotations omitted). An examination of the JSD in this case reveals that the agreement does not seek a remedy for past violations of Plaintiffs' constitutional and statutory rights, but rather seeks to prevent future harm. Thus, despite the fact that it may be costly for the State to comply with the provisions of the JSD, that fact "does not transform Plaintiffs' claim into an impermissible request for retrospective relief or damages." Id. Nor will such a transformation take place merely because the relief sought burdens state officials' "discretionary acts." Id.

Consequently, Defendants' motion for relief from the judgment should be denied because

11

the relief granted to the Plaintiffs in the JSD does not impinge upon a "special sovereignty interest" and does not constitute the "functional equivalent" of retrospective legal relief.

IV. **Express Statutory Abrogation of Eleventh Amendment Immunity**

In support of their motion for relief from the judgment, Defendants argue that institutional reform cases in which a federal court finds violations of a plaintiff's due process[2] rights under Youngberg v. Romeo, 457 U.S. 307 (1982) always impinge upon a State's "special sovereignty interest" and therefore violate the Eleventh Amendment.

On the other hand, Plaintiffs urge me to find that, because Defendants' liability and Plaintiffs' relief are based, at least in part, on the Rehabilitation Act and the Americans with Disabilities Act ("ADA")[3], Defendants are not entitled to Eleventh Amendment immunity. Plaintiffs argue that Congress has abrogated the Eleventh Amendment immunity of the States under both of those statutes. However, the validity of Congress' abrogation of the Eleventh

---

[2] Defendants erroneously assert that "[t]his Court's factual findings and order granting relief were entirely based upon substantive due process claims under Youngberg." Defendants' Brief at 5.

Defendants overlook the fact that, in addition to finding various due process violations, I expressly found that Defendants' actions had violated Section 504 of the Rehabilitation Act in two ways. First, I stated that the Defendants had discriminated against severely handicapped individuals by refusing to allow them access to community programs that were reserved for their less severely handicapped peers. Jackson, 757 F.Supp. at 1298-99. Second, I found that Defendants had unlawfully segregated more handicapped individuals in contravention of Section 504. Id. at 1299. Consequently, the factual findings and the relief granted were based in large part on Section 504 of the Rehabilitation Act.

[3] In 1994, several years after the trial of this case and the entry of findings of fact and conclusions of law, I permitted Plaintiffs to amend their complaint to include the Americans with Disabilities Act with respect to the relief afforded to Plaintiffs. See Order entered January 27, 1994.

12

Amendment under § 504 of the Rehabilitation Act and under the ADA is a matter of some dispute, particularly since the Supreme Court issued its opinion in Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S.Ct. 1114 (1996).[4] Although courts seem to be in accord that in the two statutes Congress expressed its unequivocal intent to abrogate Eleventh Amendment immunity, there is disagreement as to whether the statutes are valid exercises of Congress' power under the Fourteenth Amendment. Compare Bradley v. Arkansas Dept. of Education, No. 98-1010, 98-1830, 1999 WL 673228 at *8-11(8th Cir. Aug. 31, 1999) (finding that Rehabilitation Act did not properly waive the States' Eleventh Amendment immunity because the statute reaches beyond the scope of Congress' power under Section 5 of the Fourteenth Amendment) and Alsbrook v. City of Maumelle, No. 97-1825, 1999 WL 521709 at *6 (8th Cir. July 23, 1999) (en banc) (finding that the scope of the ADA exceeds the scope of Congress' power under Section 5, and therefore does not waive Eleventh Amendment immunity) with Amos v. Maryland Dept of Pub. Safety and Correctional Services, 178 F.3d 212, 215, 222-23 (4th Cir. 1999) (finding that ADA and Rehabilitation Act are valid exercises of Congress' enforcement powers under Section 5 of the Fourteenth Amendment) and Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 487 (7th Cir. 1997) ("[T]he Americans with Disabilities Act is an exercise of Congress's power under section 5 of the Fourteenth Amendment") and Clark v. California, 123 F.3d 1267, 1269-71 (9th Cir. 1997) (finding that the ADA and the Rehabilitation Act are valid under Section 5 of the Fourteenth Amendment), cert. denied, 118 S.Ct. 2340 (1998) and Coolbaugh v. Louisiana, 136

---

[4] Seminole Tribe stated that "[i]n order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has unequivocally expressed its intent to abrogate the immunity; ... and second, whether Congress has acted pursuant to a valid exercise of power." Seminole Tribe of Florida v. Florida, 517 U.S. at 55, 116 S.Ct. 1114 (internal quotations and citations omitted).

F.3d 430 (5th Cir.) (stating that Congress had abrogated Eleventh Amendment immunity in the ADA, which was a constitutional exercise of its powers under Fourteenth Amendment), cert. denied, Wilson v. Armstrong, 119 S.Ct. 58 (1998).

Because I have already decided that the JSD does not invade a "special sovereignty interest" of the State and does not provide for a form of improper legal relief, I need not reach the constitutional issues of whether the Rehabilitation Act and the ADA constitute valid exercises of Congress' powers under the due process clause of the Fourteenth Amendment. A court should refrain from deciding constitutional issues whenever possible. It is a "fundamental and longstanding principle of judicial restraint" to avoid the premature and unnecessary resolution of constitutional issues. Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445, 108 S.Ct. 1319, 1323 (1988); United States v. Kelly, 1 F.3d 1137, 1139-40 (10th Cir.1993) (quoting Lyng), cert. denied, 513 U.S. 939, 115 S.Ct. 342 (1994).

## V.  Conclusion

The court does not doubt that Defendants' motion for relief was made in good faith. Yet the court is concerned that its filing may reflect a change in the State's view of its obligations toward the Plaintiff class members. A measure of a state's greatness is how it cares and provides for the most needy and vulnerable of its citizens. Over most of the course of the remedial stage of this action, after entry of the December 28, 1990 Memorandum Opinion and Order, the State of New Mexico has demonstrated a sincere regard for improvement of the class members' circumstances and lives. The court trusts that this attitude will continue until the State has satisfied its responsibilities to which it agreed in the Joint Stipulation on Disengagement.

IT IS THEREFORE ORDERED that Defendants' motion for relief from the judgment (Doc. No. 1101) is DENIED.

_____
**UNITED STATES DISTRICT JUDGE**