IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WALTER STEPHEN JACKSON, et al.,

      Plaintiffs,

vs.                                                                  Civ. No. 87-0839 JP/KBM

LOS LUNAS CENTER FOR PERSONS WITH
DEVELOPMENTAL DISABILITIES, et al.,

      Defendants,

and

ARC OF NEW MEXICO,

      Intervenor,

and

MARY TERRAZAS, et al.,

      Intervenors *pro se*.


FINDINGS OF FACT AND CONCLUSIONS OF LAW

AND ORDER

## <u>TABLE OF CONTENTS</u>

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.      Pertinent Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
         A.    The Court's December 28, 1990 MEMORANDUM OPINION AND
              ORDER (Doc. No. 679). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
         B.    Relevant Portions of the JSD and POA. . . . . . . . . . . . . . . . . . . . . . . . . 6
         C.    APPENDIX A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
         D.    Appointment of Sue Gant, Ph.D, as the Rule 706 Expert. . . . . . . . . . . . 11

    II.     Recent Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

FINDINGS OF FACT AND CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.      Standard for Determining Substantial Compliance. . . . . . . . . . . . . . . . . . . . . . 16

    II.     Whether Defendants have Substantially Complied with General Directives and
           Whether Defendants have Attempted to Comply with Recommendations by the
           706 Expert and by the Community Monitor. . . . . . . . . . . . . . . . . . . . . . . . . . . 17
         A.    Discussion of General Directives and Recommendations by the 706
              Expert and by the Community Monitor. . . . . . . . . . . . . . . . . . . . . . . . . 17
             1.    JSD ¶ 31: Defendants to implement the systemic recommendations
                   of the 1998 community audit or CPR. . . . . . . . . . . . . . . . . . . . . . 18
             2.    JSD ¶ 33: If Defendants do not meet the rate of continuous
                   improvement required in the JSD, Defendants will develop
                   regional corrective action plans approved by the Community
                   Monitor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
             3.    Communication guidelines require Defendants to report actions
                   they have taken to implement individual audit or CPR
                   recommendations every 30, 60, and 90 days. . . . . . . . . . . . . . . . 19
             4.    Compliance with the 706 Expert's Findings and
                   Recommendations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
             5.    Compliance with the Community Monitor's Findings and
                   Recommendations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
         B.    Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
         C.    Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    III.    Whether Defendants have Substantially Complied with Their Obligations under
           the JSD, POA, and APPENDIX A to Provide Adequate Health Care to Class
           Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

A.   Defendants' Obligations under the JSD, POA, and APPENDIX A to Provide Adequate Health Care to Class Members................. 31
    1.   Medical Services. ....................................... 33
    2.   Quality Enhancement.................................... 41
    3.   Summary of Issues Affecting Defendants' Ability to Comply with Health Care Obligations.................................. 78
B.   Findings of Fact........................................... 80
C.   Conclusions of Law.......................................... 84

IV.   Whether Defendants have Substantially Complied with Their Obligations under the JSD, POA, and APPENDIX A to Provide a Reasonably Safe Environment to Class Members.......................................... 86
A.   Defendants' Obligations under the JSD, POA, and APPENDIX A to Provide a Reasonably Safe Environment to Class Members........... 86
    1.   Quality Enhancement................................... 89
    2.   Incident Management................................... 90
    3.   Summary of Issues Affecting Defendants' Ability to Comply with Safety Obligations. .................................. 116
B.   Findings of Fact.......................................... 117
C.   Conclusions of Law....................................... 120

V.   Whether Defendants have Substantially Complied with Their Obligations under the JSD, POA, and APPENDIX A to Provide Supported Employment to Class Members. .......................................... 122
A.   Defendants' Obligations under the JSD, POA, and APPENDIX A to Provide Supported Employment to Class Members. ............... 122
    1.   JSD and POA Provisions............................... 125
    2.   APPENDIX A. ....................................... 138
    3.   JSD ¶¶ 32 and 33: Continuous Improvement of Supported Employment Services. ................................. 149
    4.   Summary of Issues Affecting Defendants' Ability to Comply with Supported Employment Obligations. ...................... 150
B.   Findings of Fact.......................................... 151
C.   Conclusions of Law....................................... 157

VI.   Whether Defendants have Violated § 504 of the Rehabilitation Act and Title II of the ADA by Discriminating Against Severely Disabled Class Members with Respect to the Provision of Health Care Services and Supported Employment Services. .......................................... 159
A.   Discussion of Rehabilitation Act and ADA Claims. ............... 159
    1.   Standards for Discrimination Based on Disability Under the Rehabilitation Act and the ADA. ........................ 160
    2.   Health Care Services. ................................. 164
    3.   Supported Employment Services........................ 170
    4.   Summary of Rehabilitation Act and ADA Issues. ........... 176

B. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178
  1. Health Care Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178
  2. Supported Employment Services. . . . . . . . . . . . . . . . . . . . . . 179
C. Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
  1. Health Care Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
  2. Supported Employment Services. . . . . . . . . . . . . . . . . . . . . . 181

VII. Remedies for Substantial Noncompliance with the JSD, POA, and APPENDIX A
in the Areas of Health Care, Safety, and Supported Employment. . . . . . . . . . . 182
 A. Appointment of a *Jackson* Compliance Administrator. . . . . . . . . . . . . 183
 B. Other Remedies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
 C. Final Comments on Plaintiffs' Requests for Remedies. . . . . . . . . . . . . 195
 D. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
 E. Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

<u>INTRODUCTION</u>

Plaintiffs contend that Defendants have not complied with the November 19, 1997

JOINT STIPULATION ON DISENGAGEMENT (JSD) and accompanying PLAN OF ACTION

(POA)[1] and with the 2005 APPENDIX A[2] by failing to provide class members with (1) adequate

health care, (2) a reasonably safe environment, and (3) supported employment services.  *See*

PLAINTIFFS' RENEWED MOTION FOR FURTHER REMEDIAL RELIEF TO REMEDY

NONCOMPLIANCE (Doc. No. 1888) (Renewed Noncompliance Motion), filed Nov. 14, 2011.

Plaintiffs also assert that Defendants' failure to provide adequate health care to severely disabled

class members and to afford those class members supported employment opportunities violates §

504 of the Rehabilitation Act of 1973 (Rehabilitation Act) and the Americans with Disabilities

Act (ADA) by discriminating against persons with severe disabilities.  *See id*.; PLAINTIFFS'

MEMORANDUM IN SUPPORT OF THEIR MOTION FOR FURTHER REMEDIAL RELIEF

BASED UPON VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT AND

THE AMERICANS WITH DISABILITIES ACT (Doc. No. 1896), filed Dec. 9, 2011.  In

response, Defendants proclaim they have substantially complied with the provisions of the JSD,

POA, and APPENDIX A that are at issue here and that they have not violated the Rehabilitation

Act or the ADA.  *See* DEFENDANTS' RESPONSE TO PLAINTIFFS' RENEWED MOTION

FOR FURTHER REMEDIAL RELIEF TO REMEDY NONCOMPLIANCE AND

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR FURTHER

---

[1]The JSD and POA are both attached to the December 19, 1997 ORDER APPROVING STIPULATION ON DISENGAGEMENT (Doc. No. 1064))

[2]APPENDIX A is attached to the May 20, 2005 JOINT STIPULATION ON AGREED ACTIONS TO COMPLY WITH JOINT STIPULATION ON DISENGAGEMENT AND PLAN OF ACTION AND TO RESOLVE PENDING MOTIONS TO SHOW CAUSE AND TO RE-ENGAGE (Doc. No. 1473), which the Court adopted on May 20, 2005.

REMEDIAL RELIEF BASED UPON VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT AND THE AMERICANS WITH DISABILITIES ACT (Doc. No. 1899), filed Dec. 23, 2011.

Plaintiffs ask the Court to appoint a *Jackson* Compliance Administrator to ensure that Defendants fully comply with the JSD, POA, and APPENDIX A, if the Court determines that Defendants have not substantially complied with the JSD, POA, and APPENDIX A. *See* PROPOSED ORDER APPOINTING JACKSON COMPLIANCE ADMINISTRATOR (Doc. No. 1882-1), filed Nov. 2, 2011. *See also* PLAINTIFFS' MEMORANDUM CONCERNING THE COURT'S AUTHORITY TO APPOINT A *JACKSON* COMPLIANCE ADMINISTRATOR (Doc. No. 1882), filed Nov. 2, 2011; DEFENDANTS' MEMORANDUM REGARDING THE COURT'S AUTHORITY TO APPOINT A JACKSON COMPLIANCE ADMINISTRATOR (Doc. No. 1885), filed Nov. 2, 2011.  In addition, Plaintiffs want the Court to order Defendants to fully implement the Community Monitor's 2009-2010 health, safety, and supported employment recommendations and the Rule 706 Expert's 2010 and 2011 health and safety recommendations.  Plaintiffs also request an order requiring Defendants to identify promptly all deficiencies in nursing and medical care coordination at provider agencies which need corrective action.  Moreover, Plaintiffs petition the Court to make Defendants complete, within 18 months, all of the outstanding outcomes and activities in the JSD and POA and the outstanding actions in APPENDIX A which relate to health, safety, and supported employment. These include the implementation of Ellen Ashton's medical and nursing care recommendations[3]

---

[3]Ms. Ashton was a consultant for Defendants.

and Elin Howe's recommendations in her October 2003 report,[4] and the resolution of the medical "areas of concern" identified in the December 2003 report by Dr. James Willcox, a national expert on medical care for developmentally disabled persons who worked with Ms. Howe.[5] Finally, Plaintiffs seek an award of reasonable attorneys' fees and costs for litigating their noncompliance issues.

## BACKGROUND

I.   *Pertinent Orders.*

   A.   *The Court's December 28, 1990 MEMORANDUM OPINION AND ORDER (Doc. No. 679).*

In July 1987, the Supporters of Developmentally Disabled New Mexicans, Inc. and twenty-one developmentally disabled persons filed this civil rights class action lawsuit to challenge the institutionalization of developmentally disabled persons at the Fort Stanton Hospital and Training School (FSH & TS) and at the Los Lunas Hospital and Training School (LLH & TS), facilities operated by the State of New Mexico.[6]  Plaintiffs sought "the expansion of community services for the developmentally disabled and the transfer of the residents of LLH & TS and FSH & TS to community residential settings."  *Jackson*, 757 F.Supp. at 1252.  In June

___

[4]Defendants had retained Ms. Howe as the Internal Monitor.  She resigned in 2007 from that position.  Since then, the position of Internal Monitor has remained vacant.

[5]Dr. Willcox worked through the Columbus Organization and conducted death reviews for Plaintiffs until July 2010.  Physicians from the University of New Mexico now conduct those death reviews.

[6]The Jackson class consists of all persons who were residents at FSH & TS and LLH & TS on the date of the filing of the complaint on July 8, 1987, all persons who became residents of those institutions during the pendency of the litigation, and "all persons who have been transferred from FSH &TS or LLH & TS to skilled nursing facilities, intermediate care facilities, homes for the aged and similar facilities, and whose services are funded in whole or in part by defendants." *Jackson by Jackson. v. Fort Stanton Hosp. and Training School,* 757 F.Supp. 1243, 1257 (D.N.M. 1990), *reversed in part by* 964 F.2d 980 (10th Cir. 1992).

3

1988, the Court allowed more than 125 parents and guardians of FSH & TS and LLH & TS

residents to intervene in the lawsuit.  The Court also permitted ARC of New Mexico to

intervene.  The intervenors sought "to require defendants to bring the institutions into

compliance with constitutional and statutory mandates, but they oppose[d] plaintiffs' efforts to

close LLH & TS and FSH & TS and to force the transfer of residents of those institutions into

community-based facilities."  *Id*. at 1255.  On May 23, 1989, the Court certified the class and

divided the class into two subclasses: (1) thirteen named Plaintiffs who sought to close LLH &

TS and FSH & TS and to have residents transferred to community placements, and (2)

intervenors who opposed the closure of LLH & TS and FSH & TS but sought to improve those

institutions.

 After a prolonged trial, the Court entered a MEMORANDUM OPINION AND ORDER

on December 28, 1990.  The Court determined that Defendants had violated both § 504 of the

Rehabilitation Act and the substantive due process clause of the Fourteenth Amendment of the

United States Constitution.[7]  Specifically, the Court ruled that Defendants violated the

Rehabilitation Act by denying LLH & TS and FSH & TS residents "access to community

programs on the basis of physical as well as mental handicaps" and by excluding certain LLH &

TS and FSH & TS residents "from qualitatively different facilities which are being provided to

their less severely handicapped peers, despite IDT (Interdisciplinary Team) determinations that

particular severely handicapped residents can live in community settings if defendants make

reasonable accommodations in those settings."  *Jackson*, 757 F.Supp. at 1297, 1299.  The Court

concluded that Defendants violated the substantive due process clause of the Fourteenth

---

 [7]The Court later allowed Plaintiffs to amend their complaint to add by interlineation an
ADA claim.  MEMORANDUM OPINION AND ORDER (Doc. No. 831) at 13, filed Jan. 27,
1994.  The ADA had not been in effect at the time of trial.  *Id*.

Amendment by failing to provide residents of LLH & TS and FSH & TS with minimally

adequate medical care, by failing "to provide reasonable conditions of safety for the residents of

LLH & TS and FSH & TS," by physically restraining residents resulting from understaffing, by

failing to provide "minimally adequate training" to the residents of LLH & TS and FSH & TS,

and by failing to implement recommendations by the IDTs for community placement.[8]  *Id*. at

1306-1307, 1312.

 The Court said that Defendants must address deficiencies in the following areas:

1. Individual program plans,
2. Medical records,
3. Discharge plans,
4. Data collection,
5. Qualified mental retardation professional services,
6. Behavior management,
7. Use of physical restraints,
8. Prevention of abuse of residents,
9. Reduction of accidents and injuries to residents,
10. Reports of abuse, accidents and injuries,
11. Staff supervision,
12. Preservice training of staff,
13. In-service training of staff,
14. Sufficiency of professional staff,
15. Adaptive equipment,
16. Functional and chronologically age appropriate programming,
17. Coordination between residential areas and training program areas,
18. Inadequate space in training program areas.

*Id*. at 1315-16.  To correct these deficiencies, the Court ordered the parties to formulate, by

agreement, a plan of correction.  The Court stated that the plan of correction should address, at a

---

[8]The Court also determined that Defendants violated the substantive due process clause
of the Fourteenth Amendment by allowing IDT determinations regarding community placement
to be based on the unavailability of community services.  Consequently, the Court permanently
enjoined Defendants "from permitting IDTs to take into account the availability or lack of
availability of community services in reaching a recommendation as to whether a resident should
be served in the community."  *Id*. at 1318.  The Tenth Circuit Court of Appeals, however,
reversed the Court's decision to enter that permanent injunction.  *Jackson by Jackson v. Fort
Stanton Hosp. and Training School*, 964 F.2d 980 (10th Cir. 1992).

minimum, the following:

1. Formulation of a detailed written policy to be adopted by and followed at each institution,

2. Designation of a representative or representatives of each institution who will be primarily responsible for assuring implementation of the policy,

3. A description of strategies to be adopted by each institution to achieve the goals of the correction plans,

4. A detailed timetable establishing deadlines by which specific components of the correction plan for each deficiency will be achieved[,]

5. Means of assuring continued compliance with appropriate standards after correction of the deficiencies has been achieved.

*Id*. at 1316.  A detailed plan of correction was to be submitted to the Court by April 1, 1991 and Defendants were to correct the deficiencies by September 10, 1991.  The Court further set forth a schedule for transferring certain residents of LLH & TS and FSH & TS to community settings.

      B.    *Relevant Portions of the JSD and POA.*

In response to subsequent compliance issues with the 1990 MEMORANDUM OPINION AND ORDER, on December 19, 1997, the Court entered an ORDER APPROVING STIPULATION ON DISENGAGEMENT (Doc. No. 1064) which approved what is known as the JOINT STIPULATION ON DISENGAGEMENT or JSD.  The JSD notes that in response to the Court's 1990 MEMORANDUM OPINION AND ORDER, Defendants had promulgated various rules and "worked to develop a statewide capacity for responding to the medical, behavioral, vocational, sexual and other special needs of classmembers in the community."  JSD at ¶ 2.  Defendants also had "established five regional offices to manage the community service system and [had] conducted annual audits of the community service system for the past three years through the community monitor,[9]  using the data from this process to improve and expand

---

[9]Linda Glenn was the Community Monitor at that time. Ms. Glenn resigned as Community Monitor after completing the 2002 community audit or community practice review (CPR).  Lyn Rucker replaced Ms. Glenn as Community Monitor.

that system." *Id*.

The JSD further observes that in March 1995 Defendants closed the FSH & TS and in July 1997 Defendants phased out residential services at the LLH & TS. The Court never ordered that FSH & TS or LLH & TS be closed. Rather, the State of New Mexico made the decision to close those institutions.

The JSD's purpose is to "define[] the further actions and requirements which the defendants must complete and the services, supports, and benefits which must be provided to classmembers in order for the defendants to comply with their obligations to classmembers under the Court's orders in this case." *Id*. at ¶ 5. The JSD states that to fulfill this purpose the parties must develop a PLAN OF ACTION (POA) "which contains a narrative, desired outcomes, and specific activities for thirteen components of the Community Service System." *Id*. at ¶ 12. The thirteen components or desired outcomes are referred to in the POA as the following appendices:

Appendix 1: Quality Enhancement,

Appendix 2: Community Incident Management System,

Appendix 3: Training

Appendix 4: Management Information Systems,

Appendix 5: Individual Service Planning,

Appendix 6: Case Management,

Appendix 7: Behavioral Services,

Appendix 8: Crisis Response,

Appendix 9: Sexuality,

Appendix 10: Supported Employment,

7

Appendix 11: Assistive Technology,

Appendix 12: Medical Services, and

Appendix 13: Regional Offices.

POA at 2.  The POA also includes an Appendix 14 which consists of recommendations from the

1996 community audit or CPR. The parties subsequently stipulated in August 2010 that

Appendix 12, Desired Outcome A, Activity #5, "DD Division will implement the relevant

recommendations of Ellen Ashton from her audits performed at Los Lunas," will become

Appendix 15 of the POA.  UNOPPOSED MOTION FOR PARTIAL DISENGAGEMENT OF

PLAN OF ACTION, APPENDIX 3, TRAINING AND TECHNICAL SERVICES DESIRED

OUTCOME L, AND APPENDIX 12, AMENDED DESIRED OUTCOME A OF THE JOINT

STIPULATION ON DISENGAGEMENT (Doc. No. 1754) at 3, filed Aug. 23, 2010.

According to the JSD, desired outcomes can be modified only by agreement of the

parties or by order of the Court.  If Defendants wish to add, delete, or modify a specific activity

for a desired outcome, Defendants must provide notice to Plaintiffs and to the Community

Monitor.  Plaintiffs then have three days to review the proposed modification and to comment on

it.  Proposed modifications of specific activities "must be approved by the community monitor,

but may be implemented pending approval by the monitor."  JSD at ¶ 13.  Defendants can in

their "professional judgment" modify "[t]he timeliness, persons responsible, and measurements

of the [POA]...." *Id*.

The JSD indicates that Defendants retained Elin Howe as the Internal Monitor, Ruby

Moore as a supported employment consultant, and Sheela Stuart as an assistive technology

consultant.  Moreover, Defendants were required, for the next four years, to conduct the

"community audit in substantially the same form as done in 1994-1996, with the addition of

8

specific components for evaluating behavior and supported employment services." *Id*. at ¶ 30.

The JSD also requires Defendants to "demonstrate continued improvement by region" of individual service planning and supports, behavior supports, and supported employment, "as determined by the community audit." *Id*. at ¶ 32.  Continued improvement is defined as either:

(1)     an increase in compliance of 15% for each of three years beginning with the 1998 audit with respect to those items which remain below 50% of full compliance; or

(2)     an increase of 10% for each of three years with respect to those items which remain above 50% of full compliance.  In no event shall the [Defendants] have to exceed 80% for any single item in any region.

*Id*.  Moreover,

[i]f the level of improvement for a particular item in one region in a given year exceeds the level of required improvement for that item in that region for three years, the [Defendants] will have met the required continued improvement level for that item in that region.  In that event, the [Defendants] will substantially maintain that level of compliance for an additional year.  If the rate of improvement does not equal or exceed these percentages in a particular year, the [Defendants] will develop a corrective action plan for each region that is approved by the community monitor.  The data generated by the community audit shall be conclusive evidence for determining the extent of future compliance and continued improvement [in the areas of individual service planning and supports, behavior supports, and supported employment].

*Id*. at ¶ 33.

In addition, the JSD includes a process for Defendants to disengage from their obligations under the POA.  The JSD contemplated that Defendants would complete all of the POA activities by December 31, 2000 and established quarterly meetings among Defendants, Plaintiffs, the Internal Monitor, and the Community Monitor to discuss Defendants' progress in completing POA outcomes and activities.  The JSD provides that if a party challenges a systemic recommendation under a community audit or CPR as unreasonable, the disagreement will be submitted to a mediator.  If mediation is unsuccessful, the mediator may recommend a decision. The parties then have ten days to challenge the mediator's recommendation before the Court.  If

no challenge is made, the recommended decision will be implemented.  Defendants may appeal

a mediator's recommended decision to the Court for *de novo* review.  Defendants may also file

at any time a motion for partial or full disengagement with respect to compliance with a POA

appendix or desired outcome, or a provision of the JSD.  Plaintiffs, likewise, can file a motion

for noncompliance as provided in ¶ 44 of the JSD.  Finally, "[a]ny party may seek a modification

of, or relief from, this [JSD] pursuant to Fed. R. Civ. Pro. 60."  *Id.* at ¶ 49.

    *C.    APPENDIX A.*

    As a result of further compliance issues raised by Plaintiffs, the parties on May 20, 2005

filed a JOINT STIPULATION ON AGREED ACTIONS TO COMPLY WITH JOINT

STIPULATION ON DISENGAGEMENT AND PLAN OF ACTION AND TO RESOLVE

PENDING MOTIONS TO SHOW CAUSE AND TO RE-ENGAGE (Doc. No. 1473) (Joint

Stipulation).  This Joint Stipulation was

> intended to obligate Defendants to take certain actions outside the Plan of Action as more
> specifically outlined in Appendix A to this Stipulation.  More specifically, the actions
> identified in Appendix A are intended to facilitate compliance with the JSD, to promote
> completion of certain 1998 Audit Recommendations, to further address Case
> Management even though Plan of Action Desired Outcomes related to Case Management
> have been previously disengaged by an order of the Court and to address certain aspects
> of Vocational Rehabilitation.

*Id.* at ¶ 2.  APPENDIX A contains required actions in the following areas: case management,

quality enhancement, incident management, behavior, crisis, sexuality, supported employment,

vocational rehabilitation, and day services.  Each action had a completion deadline with the last

action to be completed by fiscal year 2007.  APPENDIX A does not affect Defendants'

obligations under the JSD and POA.

    Under the Joint Stipulation, the Internal Monitor and the Community Monitor are to

assist the parties in developing plans as required by certain APPENDIX A actions and to

informally assist the parties in resolving any conflicts concerning APPENDIX A.  The parties

may also submit to the Court any unresolved disputes for *de novo* review.  Additionally, the

disengagement procedure under the JSD applies to APPENDIX A and the 1998 audit

recommendations.  STIPULATED AGREEMENT ON DISENGAGEMENT PROCESS FOR

1998 AUDIT RECOMMENDATIONS AND APPENDIX A AREAS (Doc. No. 1688), filed Feb.

18, 2010.  APPENDIX A, along with the JSD and POA, comprise all of the Court orders with

which Defendants are obligated to comply.

> D.     *Appointment of Sue Gant, Ph.D, as the Rule 706 Expert.*

Because noncompliance issues continued to exist past the deadlines described in

APPENDIX A, the Court on December 21, 2007 entered an ORDER APPOINTING RULE 706

EXPERT (Doc. No. 1610) in which the Court appointed Dr. Sue Gant as the 706 Expert.  Dr.

Gant's role as the 706 Expert is "to substantially assist the Court in the determination of

compliance with the orders of the Court, including the Joint Stipulation on Disengagement, the

Plan of Action, the 1998 audit recommendations, and the May 21 [sic], 2005 Stipulation and

Appendix A."  *Id*. at 1.  The ORDER APPOINTING RULE 706 EXPERT outlines Dr. Gant's

duties, responsibilities, and authority.  Since her appointment as the 706 Expert, Dr. Gant has

issued reports in 2008, 2010, and 2011.  The 2011 report includes an assessment by Dr. Gant's

medical consultant, Dr. Wayne Zwick, of the deaths of 17 class members.

II.     *Recent Procedural History.*

On July 15, 2010, Plaintiffs filed PLAINTIFFS' MOTION FOR FURTHER REMEDIAL

RELIEF TO REMEDY NONCOMPLIANCE (Doc. No. 1731) (Motion for Remedial Relief) in

which Plaintiffs complain Defendants have not substantially complied with the JSD, POA, and

APPENDIX A with respect to providing (1) adequate health care to class members, (2) safe

environments for class members, and (3) adequate supported employment.  Having reviewed the

Motion for Remedial Relief and the accompanying briefs, the Court determined that an

evidentiary hearing would be necessary to decide the issues raised by Plaintiffs.  Hence, the

Court set a pretrial conference on April 27, 2011 and an evidentiary hearing on June 13, 2011.

The parties were allowed to engage in discovery to prepare for the evidentiary hearing.  On

February 9, 2011, the Court denied the Motion for Remedial Relief without prejudice because it

was clear that the factual record would not be complete until after the evidentiary hearing and

that the Motion for Remedial Relief would need to be rewritten to reflect that factual record.

AMENDED ORDER (Doc. No. 1805), filed Feb. 9, 2011.

On April 26, 2011, the day before the pretrial conference, Defendants filed

DEFENDANTS' RULE 60(b)(5) MOTION AND SUPPORTING MEMORANDUM TO

TERMINATE ALL REMAINING ORDERS IN JACKSON et al. v. FSH & TS et al. (Doc. No.

1830) (Defendants' Rule 60(b)(5) Motion).  The Court informed Defendants at the pretrial

conference that the briefing on Defendants' Rule 60(b)(5) Motion would be suspended until after

the evidentiary hearing so that the briefing could cite to the evidence presented at the hearing.

The Court subsequently entered a PRETRIAL ORDER (Doc. No. 1832) on April 28, 2011.

Prior to the evidentiary hearing which was held from June 13, 2011 through June 17,

2011, Plaintiffs filed on June 3, 2011 PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE THE

2010 AND 2011 REPORTS OF DAVIS DESCHAIES LLC (Doc. No. 1841) and PLAINTIFFS'

MOTION *IN LIMINE* TO EXCLUDE TESTIMONY AND REPORT OF RIC ZAHARIA, PH.D.

(Doc. No. 1842).  On June 6, 2011, Defendants filed DEFENDANTS' MOTION TO EXCLUDE

THE TESTIMONY OF PLAINTIFFS' REMEDY EXPERT LEWIS H. SPENCE REGARDING

REMEDY (Doc. No. 1843).  The Court decided to defer ruling on these motions in limine until

after hearing the testimony of Norman Davis, Dr. Zaharia, and Mr. Spence at the evidentiary hearing. Having now heard the testimony of these experts and having read their expert reports, the Court will, in making its findings of fact, consider only those portions of their testimony or reports that contain admissible evidence.

In addition to hearing the testimony of both expert and fact witnesses at the evidentiary hearing, the Court admitted into evidence numerous exhibits. The parties also submitted deposition designations and counter-designations. Moreover, Plaintiffs filed objections to various portions of Defendants' deposition designations. *See* PLAINTIFFS' OBJECTIONS AND COUNTER-DESIGNATIONS TO DEFENDANTS' DEPOSITION DESIGNATIONS (Doc. No. 1846), filed June 9, 2011. If, in making a finding of fact, the Court relies on any part of a designated deposition to which Plaintiffs objected, the Court will address Plaintiffs' objection in its discussion of that finding of fact. The parties further filed trial memoranda setting forth their positions on the compliance issues and alleged statutory violations.

At the June 2011 evidentiary hearing, Peter Cubra, Steven Schwartz, Cathy Costanzo, Philip Davis, Ann Sims, and J. Kate Girard represented Plaintiffs; Jerry Walz, Kathyleen Kunkel, and Anne Alexander represented Defendants. Also present at the evidentiary hearing were Maureen Sanders, counsel for intervenor ARC of New Mexico, and Eva Peets, a *pro se* intervenor.

Upon receiving the completed transcript of the evidentiary hearing, the Court sent to counsel a letter dated August 19, 2011 setting an October 3, 2011 deadline for filing proposed findings of fact and conclusions of law. The Court also advised counsel to organize the proposed findings of fact into three sections: health care, safety, and supported employment. The Court further indicated that 1) Plaintiffs' counsel must "specify which POA outcomes and

accompanying activities and which Appendix A actions they believe Defendants have failed to comply with"; 2) counsel could include updated evidence in the proposed findings of fact, if counsel stipulated to its admissibility; 3) counsel should brief the issue of whether the Court has the authority to appoint a *Jackson* Compliance Administrator; and 4) counsel should address the issue of termination of the case.  Aug. 19, 2011 letter at 3.  Finally, the Court advised counsel: "Should you have any questions, please state them in a letter.  If you believe it would be helpful to discuss, in more detail, the format and content of the proposed findings of fact and conclusions of law, I could schedule a status conference for that purpose."  *Id.*

On August 30, 2011, the Court received a letter from Mr. Schwartz requesting that the health and safety sections of the proposed findings of fact be combined and that the parties refer only to the desired outcomes in the POA.  Mr. Walz responded in a September 1, 2011 letter that he preferred the health and safety sections to be distinct and that the parties identify both the disputed desired outcomes and accompanying activities in the POA.   In a September 9, 2011 letter to counsel, the Court determined that the health and safety sections should remain separate and that Plaintiffs should identify both the desired outcomes and accompanying activities in the POA with which Plaintiffs believed Defendants had not complied.

On September 20, 2011, Mr. Cubra wrote a letter to the Court regarding Defendants' request to add evidence to the June 2011 evidentiary hearing record.  Ms. Kunkel responded with a September 22, 2011 letter.  As a result of this correspondence, the Court vacated the October 3, 2011 deadline for filing proposed findings of fact and conclusions of law and set a status conference which was held on October 25, 2011.[10]  Mr. Cubra and Ms. Sims represented

---

[10]Mr. Cubra submitted yet another letter, dated October 20, 2011, addressing the evidentiary issues raised in the previous correspondence.

Plaintiffs at the status conference; Mr. Walz, Ms. Kunkel and Ms. Alexander represented

Defendants.  Also present at the status conference were Ms. Sanders, representing the ARC of

New Mexico, Ms. Peets, and Ms. Gabrielle Sanchez-Sandoval, the representative for the New

Mexico Department of Health. The Court denied Ms. Kunkel's request to submit new evidence

regarding United States Census employment data and allowed limited use of the Jackson

Quarterly Report for the fourth quarter of fiscal year 2011.  The Court said that, if warranted,

Mr. Walz may file a renewed Rule 60(b) motion to terminate the lawsuit after the Court has

resolved the compliance issues raised by Plaintiffs; and the Court observed that additional

limited discovery would be necessary to fully brief a renewed Rule 60(b) motion.  Furthermore,

the Court rescheduled to November 2, 2011 the deadline for counsel to file proposed findings of

fact and conclusions of law.  Those proposed findings of fact and conclusions of law have now

been filed.

          In addition, on November 14, 2011, Plaintiffs filed PLAINTIFFS' RENEWED MOTION

FOR FURTHER REMEDIAL RELIEF TO REMEDY NONCOMPLIANCE (Doc. No. 1888)

(Renewed Noncompliance Motion). Defendants responded to the Renewed Noncompliance

Motion on December 23, 2011.[11]  In a letter dated November 17, 2011, the Court instructed

counsel to submit supplemental briefing on the effect of *Cohon ex rel. Bass v. New Mexico Dept.*

*of Health*, 646 F.3d 717 (10th Cir. 2011) on Plaintiffs' ADA and Rehabilitation Act claims;

---

[11]*See* DEFENDANTS' RESPONSE TO PLAINTIFFS' RENEWED MOTION FOR
FURTHER REMEDIAL RELIEF TO REMEDY NONCOMPLIANCE AND PLAINTIFFS'
MEMORANDUM IN SUPPORT OF THEIR MOTION FOR FURTHER REMEDIAL RELIEF
BASED UPON VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT AND
THE AMERICANS WITH DISABILITIES ACT (Doc. No. 1899) (Response to Renewed
Noncompliance Motion).

counsel have now done so.[12]

FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.      *Standard for Determining Substantial Compliance.*

The Court is mindful that

> [a]s public servants, the officials of the State must be presumed to have a high degree of
> competence in deciding how best to discharge their governmental responsibilities.  A
> State, in the ordinary course, depends upon successor officials, both appointed and
> elected, to bring new insights and solutions to problems of allocating revenues and
> resources.  The basic obligations of federal law may remain the same, but the precise
> manner of their discharge may not.

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004).  Nevertheless, consent decrees (like the

JSD, POA, and APPENDIX A) are treated like contracts.  *See Joseph A. by Wolfe v. New Mexico*

*Dept. of Human Services*, 69 F.3d 1081, 1085 (10th Cir. 1995) (citing *United States v. ITT*

*Continental Baking Co.*, 420 U.S. 223, 236-38 (1975)).  Contract law includes the doctrine of

substantial compliance which "assist[s] the court in determining whether conduct should, in

reality, be considered the equivalent of compliance under the contract."  *Id*. at 1086.  "[T]he

touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of

the consent decree--i.e. its essential requirements."  *Id*.  In determining if Defendants have

substantially complied with a consent decree, the Court should first consider "the essential

purposes of the consent decree" and "then consider the specific steps set forth in the consent

decree by which those purposes may be satisfied."  *Id*. at 1086.  Next, "[t]o the extent that any

stipulated criteria has not been met, the court must determine whether that failure is immaterial

---

[12]*See* PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
FURTHER REMEDIAL RELIEF BASED UPON VIOLATIONS OF SECTION 504 OF THE
REHABILITATION ACT AND THE AMERICANS WITH DISABILITIES ACT (Doc. No.
1896) (Plaintiffs' Memorandum on Rehabilitation Act and ADA) and Defendants' Response to
Renewed Noncompliance Motion.

to the overall objectives or, on the other hand, whether it had a material adverse impact upon the overall" purpose of the consent decree.  *Id.*  "Because the consent decree sets forth specific criteria to be met, those criteria must be respected unless a deviation can be shown not to have a material effect upon the overall performance" of Defendants in attaining the goals of the consent decree.  *Id.*  Defendants carry the burden of showing by a preponderance of the evidence "that they had substantially complied with the requirements of the consent decrees, and that any deviation from literal compliance did not defeat the essential purposes of the decrees."  *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011).  Factors that a court may consider in deciding if a defendant has complied with a consent decree include whether the defendant has made "sufficient progress" in complying with the goals of the consent decree and whether the defendant has a less than exemplary history of compliance with the consent decree.  *Id.* at 288

II.   *Whether Defendants have Substantially Complied with General Directives and Whether Defendants have Attempted to Comply with Recommendations by the 706 Expert and by the Community Monitor.*

   A.   *Discussion of General Directives and Recommendations by the 706 Expert and by the Community Monitor.*

Plaintiffs first complain that Defendants have failed to comply with the following general directives: (1) JSD ¶ 31, which states that Defendants must "implement the systemic recommendations of the ... 1998 community audit[], unless a specific recommendation is determined to be unreasonable in the mediation process or by the Court," (2) JSD ¶ 33, which requires that if Defendants do not meet the rate of continuous improvement mandated by the JSD, Defendants "will develop a corrective action plan for each region that is approved by the community monitor," and (3) the communication guidelines adopted by the Honorable United States Magistrate Judge Leslie Smith in 2007, which direct Defendants to report to the

17

Community Monitor the actions Defendants have taken to implement individual audit or CPR recommendations every 30, 60, and 90 days.   Moreover, Plaintiffs contend that Defendants' frequent rejection of the findings and recommendations by the 706 Expert and by the Community Monitor demonstrate overall systemic noncompliance and irreparable harm to class members.

        1.      *JSD ¶ 31: Defendants to implement the systemic recommendations of the 1998 community audit or CPR.*

Defendants admit that only half of the 1998 community audit or CPR recommendations have been disengaged.  *See* FIRST STIPULATION ON 1998 AUDIT RECOMMENDATIONS (Doc. No. 1387), filed Feb. 10, 2003.  However, Defendants contend that they have sent a JSD ¶ 44 notification to Plaintiffs proposing to disengage the remaining 13 recommendations, although Defendants expect that Plaintiffs will not agree to disengage those recommendations.[13] Response to Renewed Noncompliance Motion at 9.  Because half of the 1998 audit or CPR recommendations have been disengaged and Defendants have initiated the process for disengaging the remaining 13 recommendations, the Court determines it is more efficient for the parties to proceed with the disengagement process and, if necessary, to later raise with the Court (with the exception of recommendation # 25 of the 1998 community audit) any compliance issues regarding the 1998 recommendations.

        2.      *JSD ¶ 33: If Defendants do not meet the rate of continuous improvement required in the JSD, Defendants will develop regional corrective action plans approved by the Community Monitor.*

Although regional corrective action plans were rarely submitted to the Community

---

[13]Plaintiffs specifically contend elsewhere in their Renewed Noncompliance Motion that Defendants have not substantially complied with recommendation # 25 of the 1998 community audit recommendations.  Consequently, the Court will address separately recommendation # 25, *infra*.

Monitor from 2004 to 2009, tDefendants and the Community Monitor have developed a new process for completing regional corrective action plans.  That new process, however, is complicated and the timelines are short in view of the annual CPR schedule.  Accordingly, it is difficult to get the regional corrective plans approved by the Community Monitor.  Trial Transcript (TT) Vol. I, 82:14-23; TT Vol. IV, 754:23-756:21.  Clearly, further refinement of the process for producing those plans for approval is necessary.  Nonetheless, timely approved regional corrective action plans are central to ensure that continuous improvement requirements are met and that disengagement is ultimately reached in those areas.

> 3.  *Communication guidelines require Defendants to report actions they have taken to implement individual audit or CPR recommendations every 30, 60, and 90 days.*

Defendants are trying to give the Community Monitor reports (via computer disk) following the 30-60-90 day schedule as Judge Smith directed.  TT Vol. I, 121:11-25.  The Community Monitor complains that she has not consistently received those reports and the reports have not been complete.  *Id*. at 123:1-6.  Nonetheless, the Community Monitor noted that she is "getting close to having a complete disk."  *Id*. at 123:4-6.  Additionally, the Community Monitor and Defendants have agreed that the Community Monitor will direct any questions regarding the reports to the appropriate region.  *Id*. at 155:22-24.

Although Defendants are attempting to comply with the requirement of reporting actions taken on individual audits or CPR recommendations every 30, 60, and 90 days, reports are being submitted incomplete or inconsistently.  The Court acknowledges that Defendants are dealing with an immense amount of information and that this reporting requirement may need refinement. Even so, these reports are important in making sure that individual recommendations are addressed and do not fall through the cracks of the system.

4.      *Compliance with the 706 Expert's Findings and   Recommendations.*

The 706 Expert made several recommendations in her August 2008 report, her first

report.  Although Defendants objected to some of those recommendations on October 22, 2008,

*see* RESPONSE TO 706 REPORT TO THE COURT: JANUARY 2008-JUNE 2008 (Doc. No.

1637) at 6 and 10-11, Defendants, nonetheless, implemented the 706 Expert's request to respond

to aspiration deaths by establishing the Aspiration Clinical Team (ACT) in August 2008.  The

ACT  assessed 281 class members identified as having a high risk of aspiration in approximately

18 months.  TT Vol. II, 338:20-339:7, 342:22-343:3; TT Vol. IV, 737:7-11, 747:23-748:2; Dr.

Antoinette Benton Deposition, 32:20-33:15, 36:23-37:20.  Unfortunately, Defendants have not

always followed the ACT recommendations.  TT Vol. I, 68:3-6.

Defendants also claim that they implemented the recommendation of the 706 Expert to

organize three workgroups in 2008: the Money Management Workgroup, the Community

Medical Issues Workgroup, and the Significant Events Workgroup.  These workgroups evolved

or began as the result of the June 2008 quarterly meeting in which the 706 Expert acted as

facilitator, not necessarily as a direct result of a recommendation by the 706 Expert.  Def. Ex.

Vol. II, 0-02 (00347-000348); Def. Ex. Vol. X, X-10 (0003999-004003); Janet Simons

Deposition, 37:20-38:11; TT Vol. II, 345:7-347:16.

Even so, the record indicates that Defendants have accepted a recommendation by the

706 Expert to improve Incident Management Bureau (IMB) quarterly and monthly meetings as

well as her recommendation to provide training to IMB investigators through Labor Relations

Alternatives, Inc.  Def. Ex. Vol. II, R-02 (000368); Alice Maes Deposition, 127:24-128:4,[14]

---

[14]Plaintiffs objected to this portion of Alice Maes' deposition as irrelevant and
cumulative.  Alice Maes, the chief of the Incident Management Bureau (IMB), stated in her
deposition that the Department of Health (DOH) offered training through Labor Relations

138:24-139:6.

Defendants also note that they responded to the 706 Expert's comment in her April 2010 report that there was "[n]o access to real time incident data," Pl. Ex. 59 (001677), by initiating in October 2010 an electronic, web-based system called Electronic Comprehensive Heath Care Assessment Tool (ECHAT) to help eliminate health care coordination issues by updating and incorporating data collected in real time. All *Jackson* class members should have been enrolled in the ECHAT system by the end of 2011. TT Vol. IV, 758:23-759:1, 762:2-21; Dr. Ralph Hansen Deposition, 182:7-183:8; Def. Ex. Vol. X, P-10 (003916-003924); Pl. Ex. 68 (002087-002088). ECHAT will, among other things, incorporate the Significant Events reporting system and track events that do not rise to the level of an incident report. TT Vol. IV, 763:2-10.

In addition, although the 706 Expert found in her April 2010 report that there were issues related to Defendants' follow-up on findings made by the Mortality Review Committee (MRC), Pl. Ex. 59 (001671), Defendants had revised MRC policies and procedures on March 1, 2010. The revisions were based on the essential national recommendations found in the United States Government Accountability Office's recommendations for Home and Community Based Waiver (HCBW)[15] mortality review committees. Def. Ex. Vol. VI, L-06; Dr. Karen Armitage

---

Alternatives, Inc. because the 706 Expert recommended Labor Relations Alternatives, Inc., a company which focuses "more on the population of Developmental Disabilities Waiver." Alice Maes Deposition, 128:3-4. The Developmental Disability (DD) waiver population consists of persons who are medically and financially qualified to receive state services which provide an "alternative to institutional care." New Mexico DOH, Developmental Disabilities Supports Division (DDSD) Website, pgs. 5-6 *at* http//www.nmhealth.org/ddsd (updated March 24, 2010). This information is relevant to the issue of whether Defendants have complied with the 706 Expert's recommendations and does not appear to be cumulative. Consequently, Plaintiffs' objections to Alice Maes' deposition at 127:24-128:4 are overruled.

[15]HCBW "is designed to provide services and supports that will allow eligible individuals with developmental disabilities to participate as active members of their communities." New Mexico DOH, DDSD Website *at* http://nmhealth.org/ddsd/developmentaldisabilities/

Deposition, 131:12-133:14.[16]  The 706 Expert had actually provided these national

recommendations to Defendants.  Pl. Ex. 68 (002090).

Next, Defendants admit that they responded to the 706 Expert's February 2011 report

with requests for clarifications and with objections based on duplicative efforts.  Nonetheless,

Defendants agreed to implement at least one recommendation and agreed to review Dr. Zwick's

recommendations.  Pl. Ex. 68 (002089).  Interestingly, Dr. Zwick found the MRC reviews to be

"excellent," although he found other problems with the MRC process, including inadequate

minutes. TT Vol. III, 464:3-8.

Finally, Defendants are generally concerned that the 706 Expert is biased in favor of

Plaintiffs.  Defendants note that the 706 Expert met with Plaintiffs' counsel to prepare for her

testimony at the June 2011 evidentiary hearing.  TT Vol. II, 328:4-329:3.  The 706 Expert,

however, did not bill Defendants for her testimony preparation.  *Id.* at 329:4-6.

Defendants have implemented some, but not all, of the 706 Expert's recommendations.

Nowhere in the ORDER APPOINTING RULE 706 EXPERT (Doc. No. 1610) does the Court

explicitly require Defendants to implement the 706 Expert's recommendations.  The 706 Expert

---

programddwaiverpg1.htm (last visited Sept. 20, 2012). The DD waiver program is one of
several waiver programs available under the HCBW.  *Id.*

[16]Plaintiffs objected to this portion of Dr. Karen Armitage's deposition because they
believe it is irrelevant, speculative, cumulative, and narrative.  Dr. Armitage was the interim
chair of the MRC from March 2009 until October 2010 and continued to sit on the MRC until
December 2010.  Dr. Karen Armitage Deposition, 8:3-5, 8:21-25, 9:1-4.  She testified at her
deposition that the revised MRC policies and procedures were based on the United States
Government Accountability Office's recommendations.  Her knowledge of the revised MRC
policies and procedures is relevant to the issue of whether Defendants have complied with the
706 Expert's recommendations regarding the MRC.  Dr. Armitage's deposition testimony is also
not speculative because of her knowledge as the interim MRC chair prior to the March 2010
revision of MRC policies and procedures.  In addition, there is no indication that this part of Dr.
Armitage's deposition is cumulative or "narrative."  The Court, therefore, overrules Plaintiffs'
objections to this portion of Dr. Armitage's deposition testimony.

is "to substantially assist the Court" in determining if Defendants have complied with the JSD, POA, and APPENDIX A.  ORDER APPOINTING RULE 706 EXPERT (Doc. No. 1610) at 1. Consequently, Defendants' failure to comply with the 706 Expert's recommendations does not constitute *per se* noncompliance with the JSD, POA, and APPENDIX A.  Whether and to what extent Defendants have deferred to the 706 Expert's expertise is, however, a relevant factor in determining if Defendants have substantially complied with the JSD, POA, and APPENDIX A. The Court will, therefore, take into consideration the 706 Expert's findings, recommendations, and testimony from the June 2011 evidentiary hearing, as well as Defendants' actions in response to her findings and recommendations, in addressing the substantial compliance issues presented in the Renewed Noncompliance Motion.  Furthermore, the fact that Plaintiffs' counsel prepared the 706 Expert for testifying at the June 2011 evidentiary hearing does not necessarily make her unfairly biased against Defendants.  In view of the content of her reports, the 706 Expert's testimony obviously would have favored Plaintiffs more than Defendants.

>    5.    *Compliance with the Community Monitor's Findings and Recommendations.*

While Defendants have not always complied with the Community Monitor's recommendations for various reasons, Defendants have actually complied with some of her recommendations or, at least, have taken steps to comply with the recommendations.  For example, in 2005, Defendants established the Clinical Services Bureau (CSB) at the recommendation of the Community Monitor to oversee clinical services like physical therapy, occupational therapy, speech pathology, the seating clinic, assistive technology, and all aspiration initiatives.  The CSB also provides clinical support to nurses in the regional offices and to all nurses in provider agencies.  TT Vol. IV, 743:25-744:10, Def. Ex. Vol. VII, O-07

(002428-002429); Pl. Ex. 6 (000282).  The CSB, however, could be strengthened with more staff and resources.  TT Vol. I, 98:1-14.

In 2009, Defendants compiled a Status Report on CPR Health, Wellness, and Assistive Technology Recommendations from 2004-2008.  Def. Ex. X, N-10.  Defendants noted in the Status Report the various actions they had taken to address most of the Community Monitor's recommendations and explained their disagreement with a few of the recommendations.  The Community Monitor's chief objection to Defendants' Status Report was that Defendants did not provide a means for measuring the effectiveness of their actions, even when some of those actions had been identified as effective according to CPR data.  Def. Ex. X, Z-10 (004016).

Defendants responded to the 2009 CPR recommendations by describing things they had done to address most of the recommendations and by explaining why they disagreed with one of the recommendations.  Def. Ex. Vol. III, J-04.  An example of an action taken with respect to the 2009 CPR recommendations includes Defendants' recent attempts to provide the Community Monitor with reports following the 30-60-90 day reporting requirement.  Another example of an effort by Defendants was the formation in 2009 of the Jackson Continuous Improvement and Care Coordination Team (CICC) which provides, among other things, "consistent qualified and experienced reviewers" to address repeat recommendations from the 2004 CPR and subsequent CPRs.  Def. Ex. Vol. III, E-04 (000871); TT Vol. IV, 666:17-667:11.  Defendants also took actions regarding the 2009 CPR findings on immediate and special needs, including the preliminary conclusion of Comprehensive Aspiration Risk Management Plans (CARMPs) by Spring 2010.  Def. Ex. Vol. III, F-04 and G-04; TT Vol. IV, 737:12-23, 752:16-753:3.

Defendants additionally complain that the current Community Monitor, Lyn Rucker, has not complied with JSD ¶ 30 which requires that CPRs be in substantially the same form as they were in 1994-1996.  For instance, Defendants have long disputed the way Ms. Rucker has changed the scoring method under the CPR.  TT Vol. I, 51:25-52:8; TT Vol. IV, 867:22-869:2; Pl. Ex. 7 (000289-000290); Pl. Ex. 8 (000298); Def. Ex. Vol. I, L-02 (000329-000339).  Under the CPR, a score of 2 reflects compliance with a recommendation, a score of 1 means partial compliance, and a score of 0 means no compliance.  Ms. Rucker now gives a score of 1 or 0 when historically (presumably when Linda Glenn was Community Monitor) a score of 2 would have been given with a recommendation for further action.  Pl. Ex. 7 (000289-000290).  For example, scores of 1 or 0 are now given when guardians refuse medical treatments or services even though the IDTs are pursuing treatment options, whereas in the past, a score of 2 would have been given in that situation with a recommendation for follow-up.  Pl. Ex. 7 (000290).  The Community Monitor also does not give partial credit scores in continuous improvement areas. The Community Monitor agreed that if all of the partial credit scores, that had been awarded before Ms. Rucker changed the scoring, were included, the total would probably be over 80% compliance in all areas.  TT Vol. I, 163:24-164:21.[17]   Moreover, in 2004, Ms. Rucker "linked" CPR assessment questions to Individual Service Plan (ISP) components of the CPR.  Pl. Ex. 7 (000289-00290).  According to Defendants, even if the ISP itself meets the needs of the class member, the CPR assessment questions unfairly influence the score for all ISP components.  *Id*.

Also, the scope of the CPRs under Ms. Rucker has expanded.  Unlike Ms. Glenn, Ms. Rucker includes findings in her CPRs on whether sample class members have unmet immediate

---

[17]The Court notes that there is an element of subjective or "professional" judgment in assigning scores.  Pl. Ex. 8 (000297-000298).

or special needs.  As a consequence, issues with the definitions of immediate and special needs have arisen.  Under Ms. Glenn, the CPR was a one week on-site review; it is now a one week paper review plus a one week on-site process involving 24-34 DOH employees, five of whom are solely dedicated to the CPR.  TT Vol. IV, 796:19-797:22; Def. Ex. Vol. I, K-02 (000328).  In 2000, Ms. Glenn audited 90 class members while the 2009 CPR conducted by Ms. Rucker audited 108 class members.  Pl. Ex. 4 (000237); Def. Ex. Vol. XII, I-12 (004553).  Defendants objected to the 2007 CPR which they claim Ms. Rucker expanded (1) by including substitution of the word "must" or "will" for "should;" (2) by requiring the Internal Review Committee (IRC) to report to the Community Monitor as well as to Plaintiffs, the 706 Expert, and intervenors; (3) by making Defendants use the consultant recommended by the Community Monitor for class members with vision/hearing limitations; and (4) by having Defendants convene a workgroup with Virginia Commonwealth University and others.  Def. Ex. Vol. I, K-02 (000325-000326).  In all fairness to Ms. Rucker, it should be noted that she responded to the objections by acknowledging the expansion of the 2007 CPR and by making many of the adjustments requested by Defendants.  Def. Vol. I, L-02 (000329-000332).

Defendants also contend that Ms. Rucker, like the 706 Expert, is not neutral and that the CPR process and methodology which Ms. Rucker employs, unlike the CPR process employed by Ms. Glenn, works unfairly against Defendants' ability to comply with the JSD, POA, and APPENDIX A.  Interestingly, the 2000 CPR conducted by Ms. Glenn was intended to be the final compliance review, and the approach and depth of the review was modified with the approval of the parties to guide Defendants with steps to ensure continuing compliance.  Pl. Ex. 4 (000237-000238).  The subsequent CPRs conducted by Ms. Rucker, on the other hand, do not reflect that a final compliance review is anywhere in sight.

26

Finally, Defendants note that it is important to acknowledge that the Community Monitor agrees that Defendants get too many CPR recommendations to manage.  TT Vol. III, 600:1-4. The Columbus Organization consultant, Janet Simons, stated that Defendants are simply overwhelmed by the individual recommendations in the CPRs.[18]  Janet Simons Deposition, 180:4-17.

As with the 706 Expert's recommendations, Defendants have complied with some, but not all, of the Community Monitor's recommendations.  Also, Defendants have at various times acted on a Community Monitor's recommendation, but the Community Monitor found Defendants' actions insufficient. Considering the numerous recommendations, the Court acknowledges it would be unrealistic to expect Defendants to be able to implement all of the Community Monitor's recommendations. This raises the question to what extent are Defendants required to fully implement the Community Monitor's recommendations.  Unfortunately, the JSD does not directly address this question.  It is clear from the JSD that "data" generated from the CPR, not the Community Monitor's recommendations, are "conclusive evidence for determining the extent of future compliance and continued improvement for" individual service planning and supports, behavior supports, and supported employment.  JSD ¶ 33.  Although the JSD provides a process for Defendants to challenge a systemic recommendation by the Community Monitor, JSD ¶ 43, the JSD does not address whether, in the absence of a formal challenge to the Community Monitor's recommendations, Defendants are required to follow

_____

[18]The Court notes that Defendants did not address Plaintiffs' assertion that Defendants have also failed to comply with the Community Monitor's recommendations regarding supported employment. On the other hand, Defendants challenged the Community Monitor's CPR findings on repeat recommendations and on Defendants' failure to provide routine medical assessments.  These challenges are more appropriately addressed under the health care section of the FINDINGS OF FACT AND CONCLUSIONS OF LAW.

those recommendations.[19]  This general silence on whether to require Defendants to implement

recommendations is significant because the parties otherwise agreed in the JSD to require

Defendants to implement " the systemic recommendations of the 1997 and 1998 community

audits, unless a specific recommendation is determined to be unreasonable in the mediation

process or by the Court," and to implement certain recommendations from the 1996 CPR

attached as Appendix 14 to the JSD.  JSD ¶ 31.  The parties, therefore, made a conscious

decision to mandate that Defendants implement specific recommendations from certain CPRs,

but the parties did not make that same decision with respect to all CPR recommendations.

Accordingly, the Court cannot find that any failure by Defendants to comply with the

Community Monitor's recommendations, in the absence of a formal challenge to those

recommendations, constitutes, in itself, noncompliance with the JSD, POA, or APPENDIX A.

Nevertheless, because the Community Monitor has extensive knowledge and experience with

this case, the Court will give due consideration to her recommendations as well as to her

testimony at the June 2011 evidentiary hearing in deciding whether Defendants have

substantially complied with the JSD, POA, and APPENDIX A provisions at issue in the

Renewed Noncompliance Motion.

 Moreover, the Court agrees with Defendants that the scoring component of the CPR has

changed in some respects, special and immediate needs findings have been added to the CPR,

and the CPR review itself has grown.  These changes reflect a different perspective by Ms.

Rucker on how to approach a CPR, a perhaps more challenging approach, than Ms. Glenn had on

the task of conducting a CPR.  Even so, no evidence suggests that Ms. Glenn's scoring in the

---

 [19]Plaintiffs do not allege that Defendants have not substantially complied with JSD ¶ 43.
*See* Renewed Noncompliance Motion at 14 n. 16 (listing "Court ordered obligations with respect
to the Community Monitor with which the defendants are in noncompliance....").

continued improvement areas differed from Ms. Rucker's.  Scoring of non-continued

improvement areas is not conclusive evidence of compliance under the JSD.  Additionally, the

use of immediate and special needs findings and the expansion of the CPR have not substantially

changed the form of the CPR; instead, those changes have merely refined the form of the CPR.

If the form of the CPR has substantially changed as Defendants claim, it is curious that

Defendants have not in previous years raised this issue with the Court.  Finally, the Community

Monitor is not unfairly biased; she is performing her duties to the best of her abilities and in

conformance with her professional expertise.

       B.      *Findings of Fact.*

    1.  The essential purposes of the JSD, POA, and APPENDIX A are to provide class

members with adequate health care, a reasonably safe environment, and supported employment

opportunities.

    2.  Defendants have not shown by a preponderance of the evidence that they have

complied fully with JSD ¶ 33 which requires Defendants to develop regional corrective action

plans approved by the Community Monitor.

    3.  Defendants have not shown by a preponderance of the evidence that their failure to

comply fully with JSD ¶ 33 does not defeat the essential purpose of the JSD, i.e., to provide class

members with adequate health care and a safe environment.

    4. Defendants have not shown by a preponderance of the evidence that they have

complied fully with the communication guidelines established by Judge Smith setting a 30-60-90

day reporting schedule regarding the implementation of individual audit or CPR

recommendations.

5.   Defendants have not shown by a preponderance of the evidence that their failure to comply fully with the communication guidelines established by Judge Smith setting a 30-60-90 day reporting schedule does not adversely affect the essential purpose of the reporting requirement, i.e., to ensure that individual recommendations are implemented in a timely fashion so that class members receive adequate health care and have a reasonably safe environment.

6. The 706 Expert is not unfairly biased against Defendants.

7. The Community Monitor is not unfairly biased against Defendants.

*C.      Conclusions of Law.*

1.  Defendants have not substantially complied with JSD ¶ 33.

2.  Defendants have not substantially complied with the current 30-60-90 day reporting requirement imposed by Judge Smith.

3.   Noncompliance with the 706 Expert's recommendations is not a basis for finding noncompliance with the JSD, POA, or APPENDIX A.

4.  The 706 Expert's recommendations, findings, and testimony from the June 2011 evidentiary hearing are factors in determining substantial compliance with the JSD, POA, or APPENDIX A.

5.  Noncompliance with the Community Monitor's recommendations alone is not a basis for finding noncompliance with the JSD, POA, or APPENDIX A.

6.  The Community Monitor's recommendations, findings, and testimony from the June 2011 evidentiary hearing are factors in determining substantial compliance with the JSD, POA, or APPENDIX A.

7.  The data generated by the Community Monitor's CPRs are conclusive evidence for determining future compliance and continued improvement in the areas of individual service

planning and supports, behavior supports, and supported employment.

III.     *Whether Defendants have Substantially Complied with Their Obligations under the JSD, POA, and APPENDIX A to Provide Adequate Health Care to Class Members.*

    A.     *Defendants' Obligations under the JSD, POA, and APPENDIX A to Provide Adequate Health Care to Class Members.*

Plaintiffs assert that Defendants have not substantially complied with requirements in the areas of medical services and quality enhancement to the detriment of the quality of class member health care.  The goal of the POA with respect to medical services is to enhance the Continuum of Care Project (Continuum) which serves the medical needs of class members.  "The emphasis is to improve the knowledge of medical practitioners, statewide, who serve individuals with developmental disabilities.  This will be done by increasing the consultation and technical assistance capabilities through improved staffing, technology, and the availability of training and consultation support funds."  POA at 4-5.  The POA states that

> Continuum's Mission is to improve access to comprehensive medical services for people with developmental disabilities and chronic conditions in New Mexico.  Continuum's approach is to support enhancement of local resources and develop these where not available, rather than supply medical services directly by health professionals on Continuum's staff.  Such support most frequently takes the form of consultation, training and information dissemination.  In addition, the results of many of its activities will be long-term in nature; for example, training being done with medical students should improve access once they graduate and go into practice several years from now.

POA at 122.

The purpose of quality enhancement under the POA is to develop "a structure which will sustain quality enhancement efforts at all levels of the service system.  The approach is to develop and implement an organizational structure which is practical and which includes mechanisms to guide quality improvement now and in the future."  POA at 4.

Plaintiffs specifically contend that Defendants have not substantially complied with the

following JSD, POA, and APPENDIX A provisions related to health care:

1.    Medical Services

    a.    POA Appendix 12, <u>Desired Outcome A</u>, Activity # 5: The Developmental Disabilities (DD) "Division will implement the relevant recommendations of Ellen Ashton from her audits performed at Los Lunas" (this activity is now known as Appendix 15 of the POA). POA at 127.

    b.    POA Appendix 14, 1998 Audit Recommendation # 25.

2.    Quality Enhancement

    a.    POA Appendix 1, <u>Desired Outcome A</u>, Activity # 2: "To continue to provide on-site reviews to providers in response to identified issues." POA at 8.

    b.    APPENDIX A

    (1)    QE 1: "Develop implementation plan for Division of Health Improvement's (DHI) assumption of responsibility for corrective action follow-up, including resource requirements." APPENDIX A at 2.

    (2)    QE 2: "Address each recommendation in the internal monitor's October 2003 report." *Id.*

    (3)    QE 5: Prioritize and address areas of concern listed in Dr. Willcox's report.

    (4)    QE 6: Department of Health (DOH) "will establish systematic  capacity/competence to address medical and behavioral needs of persons  served." *Id.*

    (5)    QE 7: "DOH will establish an adequate process for follow-up after hospitalization  to ensure that appropriate medical care is provided." *Id.*

    (6)    QE 8: "Modify Internal Review Committee's (IRC) procedures to improve its ability to identify deficiencies at provider agencies that require corrective action, for promptly establishing adequate corrective action plans and

for ensuring that corrective actions are completed in a timely manner." *Id.*

    1.    *Medical Services.*

        a.    *POA Appendix 12,* <u>*Desired Outcome A*</u>*, Activity # 5: Ashton Recommendations*.

POA Appendix 12 (Medical Services) was disengaged on August 24, 2010.  AMENDED ORDER FOR PARTIAL DISENGAGEMENT OF PLAN OF ACTION APPENDIX 3 DESIRED OUTCOME L AND PLAN OF ACTION APPENDIX 12 AMENDED OUTCOME A OF THE JOINT STIPULATION ON DISENGAGEMENT (Doc. No. 1755).  Moreover, Activity # 5, the Ashton Recommendations, no longer exists because it has since been designated as POA Appendix 15.  Appendix 15 has not yet been disengaged.  *See* Def. Ex. i(13) (004669).  The Court assumes that Plaintiffs are arguing that Defendants have not substantially complied with the Ashton Recommendations which now appear as Appendix 15.

On November 2, 2011, Defendants stated in DEFENDANTS' POST-TRIAL BRIEF IN RESPONSE TO PLAINTIFFS' MOTION FOR FURTHER REMEDIAL RELIEF TO REMEDY NON-COMPLIANCE AND IN SUPPORT OF TERMINATION OF THE JACKSON CONSENT DECREE (Doc. No. 1886) at 4 that they have submitted a JSD ¶ 44 notification to Plaintiffs to disengage the Ashton Recommendations.  Defendants also stated that they "are prepared to proffer the evidence of Defendants' compliance if to do so would assist the Court in making a determination." *Id.*  Defendants then filed on December 15, 2011 DEFENDANTS' OPPOSED MOTION FOR PARTIAL DISENGAGEMENT AND MEMORANDUM IN SUPPORT REGARDING PLAN OF ACTION APPENDIX 15, ASHTON RECOMMENDATIONS (Doc. No. 1898) (Motion for Partial Disengagement).  In response, Plaintiffs filed PLAINTIFFS' OPPOSED MOTION FOR ADMINISTRATIVE DISMISSAL

OF, OR IN THE ALTERNATIVE FOR STAY OF BRIEFING ON, OR IN THE
ALTERNATIVE FOR AN EXTENSION OF TIME TO RESPOND TO DEFENDANTS'
OPPOSED MOTION FOR PARTIAL DISENGAGEMENT AND MEMORANDUM IN
SUPPORT REGARDING PLAN OF ACTION APPENDIX 15, ASHTON
RECOMMENDATIONS (Doc. No. 1905) (Motion to Delay Response).  The Court granted the
Motion to Delay Response, dismissed without prejudice the Motion for Partial Disengagement,
and granted Defendants leave to refile the Motion for Partial Disengagement after the Court
rules on Plaintiffs' Renewed Nomcompliance Motion which raises the issue of Defendants'
substantial compliance with the Ashton Recommendations.  MEMORANDUM OPINION AND
ORDER (Doc. No. 1911), filed Feb. 16, 2012.  Consequently, the issue of whether Defendants
have substantially complied with the Ashton Recommendations is now before the Court.

The Ashton Recommendations are:

1. Develop a "formal tracking mechanism for [medical] consultations."  Def. Ex.
Vol. X, I-10 (003757).

2. Develop an "[i]nternal forum for team to dispute doctor or recommendations."
*Id.*

3. Address chronic medical needs in an Individual Program Plan (IPP).

4. Examine role of registered nurses.

5. "Review current infection control standards," including staff training on infection
control.  *Id.*

6. Improve infection control standards, including formalized training for staff.

7. Formalize "training of direct care staff and other members of the treatment team
in client diagnosis, medications, side effects, and signs and symptoms of illness."

34

Def. Ex. Vol. X, I-10 (003758).

8.        Formalize "training of all staff in strict adherence to OSHA regulations...." *Id.*

9.        Incorporate policy outlining the procedure to utilize medications when not

approved by the Physician's Desk Reference (PDR) for the intended use.

10.      Formalize staff training in the area of community placement.

11.      Formalize "training in the IDT process for both medical and nursing

departments."        *Id.*

12.      "Update all medical and nursing policy and procedures manuals." *Id.*

*See* Def. Ex. Vol. X, I-10 (003757-003758) for Ashton Recommendations.  Ms. Ashton first

made these recommendations in 1994 for the Los Lunas Center for Persons with Developmental

Disabilities.

The development of the ECHAT program would probably meet recommendation # 1

which requires a formal tracking mechanism for consultations.  Otherwise, the IDT considers

consultation recommendations; and if accepted, a consultation recommendation is placed in the

ISP and into an action plan.  Progress notes, appointment documentation, and nurse's quarterly

health summaries provided evidence of implementation of the consultation recommendation.  An

IDT's disagreement with a consultation recommendation is documented on a decision

consultation form and filed with the original recommendation.  TT Vol. IV, 775:8:21.

The 1995 audit or CPR by Linda Glenn indicated a "positive compliance" with

recommendation # 2's requirement that Defendants provide an internal forum to dispute a doctor

or recommendations.  Def. Ex. Vol. X, I-10 (003765).

Also, in the 1995 audit, a "positive compliance" was given to recommendation # 3 which

recommends that chronic medical needs be addressed in an IPP.  *Id.*  Defendants, however,

acknowledge that "every single year since 2004, a majority of the individuals, in fact, more than 60 percent of the individuals in each year's audit is found to have had their team determine that they needed an assessment, and at the time of the audit, the assessment had not been conducted[.]" TT Vol. IV, 776:10-15. Without appropriate medical assessments, Defendants cannot address class members' chronic medical needs. Moreover, although Continuum provides telephonic consultations and has begun utilizing telemedicine programs, it is often difficult for persons with severe developmental disabilities to receive specialized care in rural towns like Farmington, Clovis, Las Cruces, and Alamogordo, and, therefore, to have their chronic medical needs addressed. Dr. Javier Aceves Deposition, 89:19-91:2; Dr. Antoinette Benton Deposition, 113:25-114:16, 115:13-18, 116:4-10; Dr. Alya Reeve Deposition, 97:16-98:24; TT Vol. V, 893:9-12, 902:16-24; Def. Ex. Vol. V, C-05 (001877- 001878); Def. Vol. XI, K-11 (004108-004111).

With respect to recommendation # 4's requirement that Defendants examine the role of registered nurses, Dr. Carol Merovka, a former Chief Medical Officer for the Division of Health Improvement (DHI) and chair of the MRC until February 2009, testified at her deposition about a lack of clarity with respect to the role of nurses. Dr. Carol Merovka Deposition, 104:1-17. *See also* Paulette Archibeck Deposition, 116:2-6.

The need for staff and nurse training as required in recommendations #s 5, 6, 7, and 8 is also still an issue. For example, Dr. Merovka felt that as of February 2009 direct care staff had not received adequate training with respect to health care needs. Dr. Carol Merovka Deposition, 182:21-25. In addition, the Community Monitor's finding in 2009 that recommended medications were not found in the class member's home (although documentation indicated the medication had been given) demonstrates a failure to train staff on medications. Pl. Ex. 14

(000378); TT Vol. I, 68:1-2.  Lack of staff training is also reflected in the Community Monitor's 2009 findings which include, for example, that (1) aspiration prevention plans were not in place; (2) correct positioning was not being done; (3) ACT recommendations were not being followed; (4) staff were not following mealtime plans; (5) adaptive equipment for safe meal plans were not present; (6) staff were not taking class members to doctor's appointments as scheduled; and (7) staff were not following orders and guidelines.  Pl. Ex. 14 (000378-000379); TT Vol. I, 68:3-12. In April 2010, the 706 Expert agreed with the Community Monitor that specialized meal programs were not being maintained.  Pl. Ex. 59 (001679).  Dr. Antoinette Benton, a Continuum physician, also agreed that nursing health care plans sometimes are inconsistent with mealtime plans.  Dr. Antoinette Benton Deposition, 48:4-10.  Then, in November 2010, the Community Monitor updated information on class members with immediate and special needs findings and determined that those findings concerned, among other things, issues regarding aspiration, meal time plans, positioning, and gastroesophageal reflux disease (GERD).  Pl. Ex. 26 (000583). These aspiration-related problems arose from deficiencies in treatment planning, lack of staff knowledge, outstanding or disregarded assessments, and failure of staff to conduct aspiration reviews.  Pl. Ex. 25 (000564-000565).

Lack of nursing training was also reflected in the 2009 findings by the Community Monitor involving missing nursing assessments, and nursing and crisis plans which were not reviewed or revised to show significant changes in health status.  Pl. Ex. 14 (000379).  The Community Monitor noted that these failures happened repeatedly.  TT Vol. I, 68:23-25. Defendants identified these nursing deficiencies from 2009 to 2011 at certain providers: failure (1) to ensure agency nurse monitoring, (2) to provide adequate oversight of medication administration, (3) to conduct nursing assessments and preventive screenings in a timely manner,

37

(4) to develop care plans in accordance with prudent nursing care practices, and (5) to conduct proper training and supervision of direct caregivers.  Pl. Ex.  331 (004770-004771).  Generally, the 706 Expert has concluded that the quality of service has decreased.  TT Vol. II, 303:7-8.  The 706 Expert noted that Defendants' own data shows that providers fail to correct deficient practices as required by the Quality Management Bureau (QMB).   TT Vol. II, 377:10-19.

With respect to recommendation # 11, the evidence shows ongoing problems regarding IDT training.  For instance, IDTs are unsure about their responsibility to intervene when an inappropriate medical practice is taken or recommended.  Pl. Ex. 5 (000249); TT Vol. I, 34:24-35:2-9.  Furthermore, the Community Monitor in her 2009 CPR found that the IDTs failed to adequately coordinate health care intervention and consultation.  Pl. Ex. 14 (000378); TT Vol. I, 67:20-24.  She also found that IDTs were not meeting to identify, manage, and attempt to lower aspiration risks.  Pl. Ex. 14 (000379).  Plaintiffs did not present evidence indicating that recommendations #s 9, 10, and 12 are still outstanding.

In summary, it appears that Defendants have complied with Ashton Recommendation # 1 (development of a formal tracking mechanism for medical consultations) and with recommendation # 2 (development of internal forum to dispute a doctor or recommendations).  Issues remain, however, regarding recommendations #s 3, 4, 5, 6, 7, 8, and 11.  Addressing chronic medical needs in class members' plans still falls short as evidenced by the Community Monitor's finding that a majority of class members do not have recommended assessments performed and by the fact that class members in more remote parts of the state have a difficult time receiving specialized care.  In addition, the lack of clarity with respect to the role of registered nurses and lack of staff and nurse training continue to be problems as reflected in the Community Monitor's findings and by comments from Dr. Merovka and Dr. Benton.  Even

Defendants identified nursing deficiencies from 2009 to 2011.  IDT training has also fallen short, according to the Community Monitor.  Finally, Plaintiffs apparently concede that Defendants have substantially complied with recommendation # 9 (incorporate policy outlining the procedure to utilize medications when not approved by the PDR for the intended use), recommendation # 10 (formalize staff training in community placement), and recommendation # 12 (update medical and nursing policy and procedures manuals) by their silence on those recommendations.

     *b.*   *POA Appendix 14, 1998 Community Audit Recommendation # 25.*

  POA Appendix 14, 1998 Community Audit Recommendation # 25 states:

1.  The [Developmental Disabilities] Division should follow-up on its recently distributed policy manual on medical coordination with specific training by Continuum of Care for each case management agency.  Specific persons served found in the audit to require such actions should be selected by Continuum of Care as examples for hands-on technical assistance and training to each case management agency.  Continuum of Care should be assigned to assist the Regional Offices with any technical assistance needed in following up on both individual recommendations from the audit and systemic problems in medical coordination or identification of resources within that region.

2.  As the resident population at Los Lunas declines and staff resources are made available, medical assessment and therapy capacity from Los Lunas should be assigned out to the Regions to fill in where there is not now existing specialities [sic] or natural supports for persons served.

POA at 135.

  Recommendation # 25 further requires that the Developmental Disabilities (DD) system insure that persons receive:

    a.  TD screening for persons on psychoactive medications;
    b.  Blood level monitoring for specific medications;
    c.  Participation of primary care physicians, psychiatrists, neurologists and other appropriate health care professionals in team meetings, especially when health issues are critical in the life of the person served;

39

      d.      Training for all staff relative to side effects of specific drugs;

      e.      Identification of health care professionals with the skills and commitment to provide medical services to persons with developmental disabilities; and

      f.      Crisis intervention plans as an integral part of the ISP.

*Id.*

Defendants note in their Response to Renewed Noncompliance Motion at 22 that they began the disengagement process for Recommendation # 25 on August 24, 2010.  Moreover, Defendants oppose the 1998 Audit Recommendations because they are mostly obsolete.  *Id.* Even so, Defendants state they can show that they complied with those recommendations.  For instance, the recommendation # 25 issue of medical care coordination has been problematic, but the new ECHAT program may resolve that issue.  *See* Pl. Ex. 59 (001679); Dr. Alya Reeve Deposition, 134:10-139:17 (the current percentage of people in the DD system who get adequate and appropriate health care coordination is 40-45%).  However, Dr. Javier Aceves, the primary investigator for Continuum stated that except for Continuum physicians, primary care physicians do not attend IDT meetings on a regular basis, a recommendation # 25 issue.  Dr. Javier Aceves Deposition, 84:5-25.  As noted above, staff training problems have arisen regarding medication administration.  These problems indicate that staff have not received adequate training on medication side effects, another recommendation # 25 issue.  Dr. Carol Merovka Deposition, 182:21-25.  In addition, identifying health care professionals with certain specialized skills specific to class members is often difficult in rural areas of the state, and a nursing shortage could affect some class members.  Dr. Alya Reeve Deposition, 24:19-25:15, 28:9-16; Dr. Antoinette Benton Deposition, 118:20-119:5.

Defendants' implementation of the ECHAT program may constitute compliance with the requirement in recommendation # 25 which directs Defendants to address medical coordination

problems.  On the other hand, Defendants have not met other portions of recommendation # 25

which, for example, require primary care physicians to attend IDT meetings.  Additionally,

since there have been problems with medication administration, it seems unlikely that

Defendants have provided adequate staff training on medication side effects.  Moreover, the

undisputed difficulty in finding specialized health care providers in rural parts of the state and

the acknowledged nursing shortage strongly suggest that Defendants have not met

recommendation # 25's requirement that they identify health care professionals who specialize in

caring for persons with developmental disabilities.

> 2.    *Quality Enhancement.*

> > a.    *POA Appendix 1, Desired Outcome A, Activity # 2: "To continue to provide on-site reviews to providers in response to identified issues."  POA at 8.*

With respect to POA Appendix 1, Desired Outcome A, Activity # 2, the 706 Expert

explained that on-site reviews do not always occur if the provider has a protracted history of

substandard performance and that a significant lapse of time between on-site reviews usually

results.  Pl. Ex. 60 (001714).  It appears from the January-March 2010 Jackson Quarterly Report

(excluding the Southeast Region) that Defendants did not conduct any on-site reviews from July

2010 to December 2010.  Pl. Ex. 326 (004682-004683).  Although Defendants provide on-site

reviews in response to identified issues, those on-site reviews do not appear to always be timely

or consistent.  Without timely or consistent on-site reviews, Defendants allow identified issues to

remain unaddressed, putting the health of class members at risk.

> > b.    *APPENDIX A.*

> > > (1)    *QE 1: "Develop implementation plan for [DHI's] assumption of responsibility for corrective action follow-up, including resource requirements."  APPENDIX A at 2.*

41

The 706 Expert found in her April 2010 Report that with respect to quality enhancement (QE) "Defendants have established resources and protocols to measure quality of services but these processes do not ensure quality."  Pl. Ex. 59 (001679).[20]  The 706 Expert concluded that her findings in her April 2010 and February 2011 reports were consistent with the Court's 1990 findings that Defendants lack control over the community providers and that there is "'no mechanism for holding service providers accountable for delivering quality services with measurable outcomes that can be tracked through a management information system.'"  Pl. Ex. 59 (001679) (quoting *Jackson*, 757 F.Supp. at 1295); Pl. Ex. 60 (001720) (quoting *Jackson*, 757 F.Supp. at 1295); TT Vol. II, 276:3-8, 280:21-23.  Moreover, the 706 Expert noted in her February 2011 report that although Defendants intended to initiate activities to improve the quality of class members' health and safety, no measurable outcomes supported the conclusion that the new activities actually improved the quality of health and safety.  Pl. Ex. 60 (001721). In addition, the 706 Expert concluded in the 2011 report that "Defendant's [sic] have not fully developed and implemented effective systems to protect class members from avoidable threats to their health and safety."  *Id*. at (001722).  The 706 Expert testified at the June 2011 evidentiary hearing that Defendants "lack a sense of urgency" regarding health concerns and preventable harm, and that Defendants' strategies to avoid preventable harm are ineffective.  TT Vol. II, 286:15-19.

For example, the 706 Expert, in examining Defendants' data, found that at one provider, Mosaic, 128 class members were victims of neglect 24 times.  The 706 Expert concluded that

---

[20]The 706 Expert further found in her February 2011 report that Defendants have not complied with QE 2, QE 3, QE 4, QE 5, and QE 8.  Pl. Ex. 60 (001724-001726).  Plaintiffs argue, however, that Defendants have not substantially complied with QE 1, QE 2, QE 5, QE 6, QE 7, and QE 8.  The Court will focus on the QE provisions with which Plaintiffs assert Defendants have not substantially complied.

Mosaic had "a pattern of inadequate care, profound neglect, and a failure to identify and respond to medical emergencies, potentially resulting in death."[21]  Pl. Ex. 72 (002115); TT Vol. II, 288:24-289:3.  Another provider, Dungarvin, had nine class members as clients who died within two years.  There were three aspiration related deaths, and at least one preventable death which resulted from a nurse improperly inserting a gastrostomy tube (G-tube). TT Vol. II, 296:2-10.  The nurse who inserted the G-tube that led to the death was referred to the Board of Nursing by the MRC.  TT Vol. II, 335:25-336:8.  There were other problems with G-tube management at Dungarvin that did not result in death.  Paulette Archibeck Deposition, 95:14-96:13.  Numerous other examples of neglect at Dungarvin arose from medication error, plans not being followed, and serious injury.  TT Vol. II, 296:11-16.  Although Plaintiffs described certain class members as having received less than satisfactory health care, Defendants presented other evidence showing instances when the same class members received good health care.[22]

_____

[21]Contrary to the 706 Expert's testimony, one of the class members who died at Mosaic, RK, received a necessary breathing or nebulizer treatment, but that treatment was simply ineffective.  TT Vol. II, 289:21-290:8; TT Vol. III, 455:5-9.

[22]HR had severe cerebral palsy which put him at significant risk for aspiration as well as for other health issues.  Consequently, he received an ACT evaluation, received technical assistance from the CSB, was part of the Aspiration Demo Project, received a CARMP, and was recently seen by a Continuum consulting physician.  Dr. Sheela Stuart also visited and counseled him on augmentative communication devices.  TT Vol. IV, 739:17-743:18.  MC had a "trach" and required rehabilitation at Kindred for a couple of months so he could breathe on his own.  When he was discharged from rehabilitation, his provider did not believe it could meet MC's complex needs, so MC was transferred to another provider.  Defendants provided technical assistance to the new provider through the CSB and Dr. Stuart.  MC also participated in the Aspiration Demo Project and had a CARPM developed for him.  *Id.* at 731:21-735:24.  JM, a deceased class member, was recently reviewed in a CPR and was noted in the CPR as suffering from sacral skin breakdown as well as being medically fragile.  Pl. Ex. 193 (003085).  JM was seen weekly at a wound clinic.  *Id.*  Interestingly, the 72-hour mortality investigation of JM does not mention any recommendation by the Community Monitor regarding the skin breakdown.  Pl. Ex. 192.  The 72-hour mortality investigation documented that the DDSD Regional Office Nurse stated that there were no other individuals at risk in the provider home and no issues with JM's care.  *Id.* (003082).

Cathy Stevenson, Deputy Director of DDSD, is the co-chairperson of the Developmental Disabilities Steering Committee on Quality Improvement (DDSQI).  She spends up to ten hours a month chairing the DDSQI and the time she devotes to implementing planning efforts or to follow-up from the DDSQI varies.  TT Vol. IV, 702:4-703:17.  Curiously, at the time of her deposition, Ms. Stevenson did not know whether a majority of providers failed their QMB compliance surveys in the past year.  TT Vol. IV, 707:16-708:13.  January 21, 2010 was the last time the QMB submitted a report to the DDSQI regarding provider surveys.  Pl. Ex. 296 (004216-004224).  The DDSQI sent that report back to QMB for additional work.  The DDSQI has not yet received that formal QMB report although it does receive information from QMB.  TT Vol. IV, 709:22-712:1.  Nonetheless, in the third year of New Mexico's current DD Waiver, 27% of provider surveys did not show compliance with DD Waiver requirements.  Pl. Ex. 305 (004334).

Starting in 2005, DHI investigators took over managing and monitoring provider corrective actions resulting from DHI investigations of incidents.  Carl Martinez Deposition, 12:3-14.  A report in October 2008 issued by Janet Simons, a Columbus Organization consultant for Defendants, found that only 13% of incident investigation files she reviewed contained a copy of the provider's corrective or preventive action documents. Janet Simons Deposition, 44:1-10, 45:24-46:13.

DHI also maintains an electronic database of information on direct service staff who, according to an IMB investigation, was found "to have engaged in a substantiated registry-referred incident of abuse, neglect and/or exploitation of a person receiving care or services from a provider."  Def. Ex. Vol. II, Z-02 (000426).  The protocol for conducting investigations, filing reports, and conducting follow-up is outlined in Incident Management System Policies and

Procedures (revised 5-29-06).  Pl. Ex. 194 (003110-003123).  Representatives from DHI, IMB, QMB, DDS, the Aging and Long Term Services Department, and Adult Protective Services have monthly and quarterly regional meetings to review patterns and trends in findings from the various entities, to develop corrective actions, and to determine whether or not a corrective action has resulted in "the desired effect."  TT Vol. II, 264:20-265:7; Pl. Ex. 194 (003135).  IMB investigators are expected to attend these regional meetings as well.  Pl. Ex. 194 (003135).

The evidence indicates that Defendants can and do identify provider-related problems that affect the health of class members.  Defendants have several means of addressing these problems.  For instance, providers can perform corrective actions and future harm can be averted through the electronic database identifying abusive direct service staff.  Moreover, Defendants have a protocol for conducting investigations, filing reports, and following up on problems at provider facilities.

Although Defendants have taken steps to address provider accountability, they have not always been effective as demonstrated by the multiple serious problems which occurred over a significant period at providers like Mosaic and Dungarvin.  The 706 Expert suggests that Defendants need to develop measurable outcomes from which they can determine the actual effectiveness of their actions in keeping providers accountable.  Despite Defendants' good intentions, the actual effectiveness of Defendants' actions regarding follow-up on corrective actions is uncertain.

>  (2)  *QE 2: "Address each recommendation in the internal monitor's October 2003 report."  APPENDIX A at 2.*

Plaintiffs argue that Defendants have not substantially complied with QE 2 which contains 23 subparts.  Plaintiffs, however, have not identified the problematic subparts.  In

general, QE 2 addresses provider performance and accountability, and ways to ensure that

provider services are not substandard and harmful to their clients.  The 706 Expert concluded in

the February 2011 report that many (but not all) of the QE 2 subparts had not been met.  Pl. Ex.

60 (001724-001725).   Defendants contend that they have complied with all of the subparts.  The

Court will focus on those QE 2 subparts which the 706 Expert found had not been met and will

discuss the subparts in a collective manner by considering the Community Monitor's findings

and recommendations, the 706 Expert's findings and recommendations, the QMB, the IMB, and

the MRC and DDSQI.  The QE 2 subparts at issue are:

QE 2.1-IM:   "[E]stablish responsibility for the identification of patterns of incidents specific to a provider or individual."  TABLE OF ALL *JACKSON* COURT ORDERED OBLIGATIONS (Doc. No. 1884-1) at 9, filed Nov. 2, 2011.

QE 2.2-IM:   "[E]stablish responsibility for incorporating information on providers with serious patterns of incidents into other information on provider performance to assess level of substandard performance and determine appropriate administrative action/sanction."  *Id.*

QE 2.3-IM:   "Require that risk assessments and preventive action plans be developed for individuals who experience multiple incidents and that IDTs review incidents in relation to the assessments and plans."  *Id*. at 10.

QE 2.4-IM:   "Establish requirements including time frames for completion of corrective action on incidents where follow-up is requested."  *Id.*

QE 2.5-IM:   "Formalize DHI's [Incident Management Bureau (IMB)] role with Long Term Services Division (LTSD)'s ROB in jointly determining acceptance of corrective action to incidents where follow-up is requested."[23]  *Id.*

QE 2.6:   "Require providers to develop and implement approved Corrective Action Plans (CAP) with specified timeframes."  *Id.*

---

[23]LTSD is now known as the DDSD.  The Court is unable to discern what "ROB" is.

46

QE 2.8:     "Establish levels of provider compliance with review requirements and tie into the frequency of provider review and/or length of provider contract." *Id.*

QE 2.9:     "Resolve the functions of the Mortality Review Committee and the process for performing death investigations and mortality review." *Id.*

QE 2.10:    "Reinstitute a tracking system for mortality reviews and the recommendations for follow up." *Id.*

QE 2.11:    "Establish responsibility for assuring that provider and/or systemic corrective action has occurred." *Id.*

QE 2.12:    "The definitions of substandard performance need greater specificity so that there is no confusion concerning which level of substandard performance applies to a provider.  More examples may assist in reducing confusion." *Id.*

QE 2.13:    "Fix responsibility within LTSD or DHI unit to determine whether there is substandard performance and, if so, at what level.  Require that unit to initiate action within DOH to establish the administrative action or sanction." *Id.*

QE 2.14:    "Develop and implement 'triggers' for substandard performance that places consumers at imminent risk to their health and safety.  These triggers would prompt immediate action to eliminate the risk."[24] *Id.*

QE 2.15:    "Change the culture within LTSD and DHI from disbelief to belief that there are serious consequences to provider substandard performance." *Id.*

QE 2.18:    "Establish responsibility for the collection of all performance information with one unit that is charged with its analysis." *Id.*

---

[24]QE 2.14 appears to be the same as QE 2.22.

QE 2.19:    "Utilize the information to modify LTS/Quality Management program."[25] *Id.*

QE 2.20:    "Expand the regional monthly meetings on trends analysis and incidents to include QMB and provider review performance." *Id.* at 11.

QE 2.21:    "Develop and implement an integrated database for provider performance." *Id.*

QE. 2.23:    "Establish authority for determining administrative actions/sanctions for substandard performance with the Director of DHI or with the Program Deputy Secretary." *Id.*

> (a)    *The Community Monitor's Findings and Recommendations.*

Unquestionably, Defendants have an organizational commitment to deliver quality medical care to the class members that is at least at the same level as the care provided to the non-developmentally disabled in New Mexico. Def. Ex. Vol. V, C-05 (001880). Nonetheless, in 2004, the Community Monitor, out of concern for the health and safety of class members, created and assigned the categories of "immediate" and "special" needs so that the more vulnerable class members could receive prompt attention from the providers and Defendants. Pl. Ex. 8 (000292). The 2004 CPR reported that 44% of the sample class members needed immediate or special attention. Pl. Ex. 6 (000272). The Community Monitor, therefore, recommended a health and safety screening of all class members to begin in 30 days. *Id.* As of 2011, the Community Monitor considers this recommendation unmet. Def. Ex. Vol. III, H-04

---

[25]Defendants did not submit evidence showing they met QE 2.19 and QE 2.23. Little or no evidence on those subjects was introduced at the June 2011 evidentiary hearing. If the Court finds it necessary to consider QE 2.19 and QE 2.23 in deciding the compliance issue, Defendants request an opportunity to proffer evidence that they have met their obligations under QE 2.19 and QE 2.23. Because the Court will examine compliance with the QE 2 subparts collectively, it is unnecessary at this time for Defendants to provide specific evidence regarding compliance with QE 2.19 and QE 2.23.

(000887).  Issues have arisen, and continue to persist, as to the definition of "immediate"and

"special" needs.  Defendants feel that having to address findings of immediate and special needs

has "raised the bar" on their commitment to responding to the Community Monitor's

recommendations.  TT Vol. I, 108:7-110:24, 111:2-113:24, 114:1-115:6; Pl. Ex. 7 (000288-

000289); Def. Ex. Vol. III, T-04 (001005).

      The Community Monitor in her 2009 CPR found a dramatic increase in the number of

class members with immediate and/or special needs.  Pl. Ex. 14 (000377, 000385-000386).  The

Community Monitor also identified in the 2009 CPR the "[n]eed to assess, coordinate, plan for,

and effectively address class members' health and safety needs."  *Id*. (000378). She emphasized

the importance of aggregating statewide data by percentages in order to demonstrate the nature

and scope of these problems.  *Id*.  The Community Monitor reviewed 108 class members for the

2009 CPR and found that 74% of those class members were not having their health supports and

needs adequately addressed; 37% of the IDTs lacked evidence that they had discussed the

individual's health needs; and 68% of the class members reviewed had IDT participants who

could not describe the class members' health needs.  *Id.* (000378, 000390, 000397); TT Vol. I,

67:4-11.

      More specifically, the Community Monitor concluded: (1) class members were found to

be at high and increasing risk due to chronic, multiple, and complicated medical conditions, but

their IDTs failed to adequately coordinate health care needs; (2) class members were not

receiving recommended hydration, medication, or G-tube feedings; (3) recommended

medications were not found in class members' residences although documentation noted that the

medications had been given; (4) class members at risk of aspiration lacked necessary aspiration

prevention plans; (5) ACT recommendations were not being followed; (6) class members

experienced multiple episodes of aspiration and aspiration symptoms, emergency care, and hospitalizations; (7) IDTs were not identifying, managing, and attempting to lower these aspiration risks; (8) class members were not being positioned correctly; (9) staff members were not following meal plans and adaptive equipment for safe meals were not present; (10) staff members were not administering medications consistent with doctors' orders, were not taking class members to doctors' appointments as scheduled, and were not following other medical orders and guidelines; and (11) lack of health care coordination resulted in missed nursing assessments, missed medical appointments, lack of hospital and emergency room documentation, and health care plans that failed to show significant changes in health status.  Pl. Ex. 14 (000378-000379).

The Community Monitor testified that these kinds of problems were "found again and again."  TT Vol. I, 68:23-25.  For instance, from 2000 to 2009, there were 114 repeat recommendations for 83 class members regarding health diagnosis, assessment, intervention, treatment, and follow-up issues.  Pl. Ex. 25 (000565).  The Community Monitor, therefore, renewed her recommendation that all class members receive ongoing health and safety assessments, that all class members receive individualized plans which include interventions and strategies to minimize risks, and that Defendants adopt a process to evaluate, review, and report the efficacy of those plans on a quarterly basis as well as to offer class members external consultations when necessary.  Pl. Ex. 14 (000379).  The Community Monitor's June 2010 Quarterly Report documented the number of class members between 2004 and 2009 whose immediate and special needs findings related to swallowing, mealtime, and diet issues.  Pl. Ex. 25 (000564-000565).

50

Defendants and the Columbus Organization consultant, Janet Simons, studied the increase in immediate and special needs findings in the 2009 CPR, and concluded the reasoning for determining immediate or special needs was unclear.  Def. Ex. Vol. III, F-04 (000873-000878).  In 2009, the Community Monitor had changed the definition of "immediate need" to add the word "effectively" which meant that the definition is applied on a case by case basis.  TT Vol. I, 135:21-136:21.  In 2010, needs the Community Monitor identified as "immediate" were referred to the IMB, which found no evidence of neglect under its definition of "neglect."  Def. Ex. Vol. I, F-02 (000304); Def. Ex. Vol. I, G-02 (000305).

Ms. Simons, the head of the CICC, questioned the Community Monitor's definition of a "repeat" recommendation. Janet Simons Deposition, 183:20-184:15.  Many of the repeat recommendations were only partially related to the original recommendation, and repeat recommendations sometimes occurred in non-consecutive years.  *Id*.  Moreover, it appears that when a guardian or parent refused a recommendation, the Community Monitor recorded that decision as a repeat recommendation.  Def. Ex. Vol. III, U-04 (001008-001009).

In 2008, Defendants asked the Community Monitor to raise individual health and safety concerns in Regional Office Request for Regional Intervention (RORI) forms which are submitted to a regional committee charged with reviewing provider compliance issues.  Use of the RORI, however, did not result in follow-up actions by Defendants and responses, when received, were untimely.  Furthermore, initial information the Community Monitor received on three class members for whom she submitted RORI forms was not adequate to determine the status of those class members.  Pl. Ex. 14 (0000378); Pl. Ex. 25 (000561-000562); TT Vol. I, 132:7-134:10.

In 2009, the Community Monitor believed that Defendants had not taken full action on many recommendations from the 2004 to 2008 CPRs regarding health, wellness, and adaptive technology.  Defendants, on the other hand, insist that they have adequately addressed most of those recommendations and rightly dispute a handful of the Community Monitor's recommendations.  For instance, in 2009, Defendants implemented the Health Assessment Tool (HAT) which an agency nurse conducts prior to the annual ISP meeting, or after a hospital discharge, or when there is a change in condition. TT Vol. I, 108:17-22.  Defendants also implemented the Medication Administration Assessment Tool (MAAT) which is conducted at least annually to ensure accurate medication delivery.  TT Vol. I, 108:22-25.  In 2004, Defendants promulgated policies and procedures for, and began training on, aspiration risk management.[26]   TT Vol. IV, 750:9-12; TT Vol. V, 925:7-17. New aspiration risk policies and procedures were issued in August 2010.  TT Vol. IV, 750:12-22.  In 2008, Defendants instituted the ACT adopting the 706 Expert's recommendation.  In about 18 months, the ACT assessed 281 persons identified as having a high risk of aspiration.  TT Vol. II, 338:20-339:7, 342:22-343:3; TT Vol. IV, 737:7-11, 747:23-748:2.  In 2008, Defendants also revised the DDSD Aspiration Management Work Plan which relates to systemic aspiration issues.  Def. Ex. Vol. II, N-02 (000344-000346).  Defendants continue to measure the effectiveness of the ACT by tracking whether persons on the SARL have a current CARMP in place.  TT Vol. IV, 781:1-13.

---

[26]Even earlier, during 1999, Defendants established the Supports and Assessment for Feeding and Eating Clinic (SAFE) to support teams in their treatment of aspiration.  The SAFE program was developed in collaboration with the Center for Development and Disability through the University of New Mexico Health Sciences Center and Continuum.  The SAFE clinic has a registered dietician, a physician, a physical therapist, and a speech pathologist on staff.  TT Vol. IV, 748:3-25.  Additionally, Continuum helped Defendants devise a screening tool to identify persons who had not yet been assessed for aspiration risk.  This program is called the Statewide Aspiration Risk List (SARL).  TT Vol. IV, 749:8-23.

Also, in 2008, the Community Monitor questioned the ACT assessments but noted that, overall, Defendants' aspiration materials were "very helpful." Def. Ex. Vol. III, R-04 (000963, 000965-000966). Continuum physicians had developed the ACT assessment tool and Dr. Aceves had tested the tool. TT Vol. II, 340:15-24; TT Vol. V, 922:24-924:29. To determine whether the ACT and other aspiration initiatives were effective, Defendants in 2009 engaged the DOH Division of Epidemiology to survey and analyze the rates of hospitalization and deaths due to aspiration pneumonia in the HCBW population. TT Vol. II, 341:16-342:6; TT Vol. V, 1096:12-1097:17; Def. Ex. Vol. II, D-03 (000573-000574). This is an ongoing project. TT Vol. V, 1097:22-23; Def. Ex. Vol. II, D-03 (000573-000574).

Defendants also initiated the Aspiration Demo Project in 2009 at the recommendation of the Community Monitor. The Aspiration Demo Project identified 15 persons at high risk for aspiration and gave them extensive consultation. Although the Aspiration Demo Project concluded in the spring of 2010, the Aspiration Demo Project continued to evaluate the CARMPs for those 15 persons a year later in order to determine how well staff completed the next CARMPs. TT Vol. IV, 737:12-19, 752:16-753:3. The Aspiration Demo Project led to the more widespread use of CARMPs. TT Vol. IV, 737:13-21.

Finally, ECHAT was intended to replace HAT by the end of 2011 to help alleviate health care coordination issues. The ECHAT program should address many of the health care coordination issues raised by the Community Monitor. Def. Ex. Vol. III, G-04 (000880). This system should guide nurses as to when a health care plan is required. TT Vol. IV, 759:18-21. ECHAT also has an aspiration screening tool, a medication administration tool, and a health tracker to monitor medical appointments, lab results, weight, emergency room visits, allergies, hospitalizations, and seizure frequency. TT Vol. IV, 759:22-762:6. Significant events are also

reported in the ECHAT program.  All class members were to be enrolled in the ECHAT program by the end of 2011.

The Community Monitor's main concern with Defendants' various programs is the lack of measurable indicators to demonstrate the effectiveness of the programs.  TT Vol. I, 74:20-75:17.  The Community Monitor observed in her testimony at the June 2011 evidentiary hearing that forms, policies, and even "great procedures" are ineffective if they do not protect people. For example, although the HATs appear to be a good idea, they still do not "trip the kind of preventative identification of health care issues that put people in jeopardy...."  TT Vol. I, 113:4-24.  This conclusion is borne out by the Community Monitor's CPRs which have included 700 evaluations since 2004.  TT Vol. I, 113:14-15.  Moreover, the Community Monitor recommended in 2004 that the health and safety screening of class members be done within 30 days.  The HAT was instituted five years later and is an annual tool, although it should also be used "upon any hospital discharge or change in condition."  TT Vol. I, 108:17-22. Implementation of the ECHAT tool had also been delayed; it should have been installed in 2007. TT Vol. I, 114:1-115:6.  At the individual level, the Community Monitor would like to see health status outcomes established for each class member and identification of each class member's risk factors in order to measure Defendants' efforts to provide minimally adequate health care for each class member.  TT Vol. I, 96:3-8.

Although Defendants dispute the definitions of immediate and special needs as well as the use of the term "repeat" recommendations, Defendants feel that addressing those needs and repeat recommendations are additional hurdles not included in the previous CPRs conducted by Ms. Glenn.  The Court does not doubt that, in general, the concepts of immediate and special needs categories and repeat recommendations would be helpful in gauging how well providers

54

are performing.  However, those concepts could be better defined by the parties.  In addition, the parties should re-evaluate the way the Community Monitor uses RORIs so as to ensure the most effective approach for addressing individual health and safety issues.

Defendants have responded to many of the Community Monitor's recommendations by engaging in well-intentioned activities like implementing the HAT program, the MAAT program, ECHAT, and various aspiration programs including the ACT, the Aspiration Demo Project, and CARMPs.  The effectiveness of these programs remains at issue, however.

(b)    *The 706 Expert's Findings and Recommendations.*

The 706 Expert observed in her February 2011 report that although DDSD reported in 2009-2010 that it would initiate activities to improve class members' health and safety, no measurable outcomes are available to document whether those activities had the intended effect. Pl. Ex. 60 (001721).  The 706 Expert concluded that Defendants "have not fully developed and implemented effective systems" to prevent avoidable threats to the health and safety of class members.  *Id.* (001722).  In other words, according to the 706 Expert, the level of the quality of provider services has decreased.  TT Vol. II, 303:7-8.

The 706 Expert testified at the June 2011 evidentiary hearing that the mechanism for holding providers accountable must be changed because it is inadequate, as demonstrated by the "adverse outcomes and the protracted histories of some of these providers."  TT Vol. II, 307:4-12.  As noted above, the 706 Expert went so far as to state in her 2010 and 2011 reports that her findings are consistent with *Jackson*, 757 F.Supp. at 1295, wherein the Court found in 1990 that "Defendants lack control over existing community providers," and that there is "no mechanism for holding service providers accountable for delivering quality services with measurable outcomes that can be tracked through a management information system."  Pl. Ex. 59 (001679);

55

Pl. Ex. 60 (001720).

The troubling findings by both the Community Monitor and the 706 Expert demonstrate that these programs are not necessarily achieving the desired outcomes.  A lack of efficacy negatively affects the quality of the providers' performance.  As both the Community Monitor and the 706 Expert note, Defendants need to develop measurable indicators of the effectiveness of Defendants' programs and to improve the delivery of the programs' services.

*(c)     The QMB.*

DHI oversees the QMB, which is responsible for conducting routine surveys or reviews of providers in the DD system.  TT Vol. II, 261:9-11.  "QMB coordinates with other divisions of the DOH and state agencies to assure compliance with program, contractual and quality standards."  Def. Vol. II, Z-02 (000426).  The QMB has three components: "(1) Program Monitoring and Evaluation, which involves on-site reviews and other quality improvement activities related to DOH funded or operated programs; (2) the Community System Quality Review (SQR), a client centered review of [DD] Waiver individuals in the community; and (3) Continuous Quality Improvement activities conducted in partnership with other state agencies and provider groups."  *Id.*

The QMB is required to survey providers when they initially become providers; then, to conduct routine surveys every three years or sooner depending on the status of the provider with DOH; and to conduct focused reviews when there are specific issues or concerns.  TT Vol. IV, 727:18-728:8; Def. Ex. Vol. II, Z-02 (000427).  If deficiencies are identified in a survey, a corrective action plan is required, and the QMB must conduct a verification survey.  TT Vol. II, 261:14-18; Pl. Ex. 32 (000760-000764); David Rodriguez Deposition, 67:10-23.  The purpose of the survey is to ensure that providers are meeting "all applicable state and federal requirements

56

and to evaluate compliance with DOH/ DDSD Service Standards."  Def. Ex. Vol. II, Z-02 (000427).  QMB reviews or surveys can lead to the implementation of corrective actions to eliminate further risk to class members.

Between 2009 and the spring of 2011, the QMB generated a series of reports and letters regarding three large community residential providers (Los Lunas, Mosaic, and Dungarvin) and their failures to comply with federal and state standards concerning health, safety, and welfare of DD Waiver individuals.  Pl. Ex. 41-56; TT Vol. II, 203:22-205:15.  The QMB identified numerous nursing care deficiencies at those three providers.  Pl. Ex. 331 (004770-004771).  Consequently, the QMB directed them (1) to develop and implement policies and procedures for effective incident management systems as well as quality improvement processes, (2) to increase accountability in medication administration and storage, (3) to ensure implementation of individual crisis and health care plans, (4) to collaborate and communicate with external health care providers, and (5) to develop systems to ensure the health, safety, and welfare of individuals.  *Id.*  In addition, the QMB required the providers to ensure that all personnel are qualified, trained, and competent to deliver services effectively, and to arrange for the appropriate quantity and quality of nursing performance and oversight.  *Id.*  The Community Monitor explained at the June 2011 evidentiary hearing that "we need clear expectations regarding the involvement of nurses in an oversight and consultative and training role, and that that should be developed, implemented and enforced."  TT Vol. I, 61:11-15.

Over the course of 2010, the QMB re-visited Los Lunas, Mosaic, and Dungarvin, warned them about ongoing deficiencies, and required them to submit corrective action plans.  In response to the warnings, Defendants only received "repeated submissions of non-responsive plans without evidence of necessary corrective measures."  Pl. Ex. 331 (004771).  These

57

providers were subsequently referred to the IRC for failure "to sustain corrective action and to develop quality assurance and quality management systems...."  TT Vol. II, 204:25-205:6; Pl. Ex. 331 (004771).

In October 2010, the IRC recommended sanctions against Mosaic for the death of one of its clients.  The sanctions committee, made up of the DHI division director and the DDSD division director, did not act on that recommendation because "it fell between the cracks."  TT Vol. IV, 855:21-857:8.  As of the spring of 2011, all three providers continued to have significant problems with their provision of  "health supports and services."  TT Vol. II, 205:9-15.

Another provider, Tresco, also had repeated incident reports concerning delays in providing medical treatment.  TT Vol. II, 296:21-25.  In 2009 at Tresco, 11 class members were victims of health-related neglect 13 times, one class member was abused, and two class members died.  *Id*. at 297: 9-11.  In the first quarter of 2011, six class members were victims of medical-related neglect seven times.  *Id*. at 297:15-17.

In examining state fiscal years (FY) 2007-2009, Defendants found that "on average 15-20% of providers [were] referred to the IRC for actions."  Pl. Ex. 70 (002100).  Generally, the same 10-15% of providers were referred repeatedly to the IRC.  *Id*.  Defendants determined that the absence of the implementation of timely corrective actions or follow-up on corrective actions continued to be the largest issue with all providers in FY 2009; this was consistent with QMB findings intimating that providers have failed to implement adequate quality assurance and improvement systems.  *Id*.  Other QMB data showed that 75% of providers surveyed later in FY 2010 "had new and/or repeat deficiencies...."  Pl. Ex. 74 (002131).

Defendants established the QMB to timely review or survey providers in order to ensure compliance with DDSD Service Standards as well as state and federal requirements, and to ensure correction of those deficiencies in a timely manner.  The QMB does indeed discover deficiencies at providers' facilities and requires those providers to submit corrective action plans.  Providers who submit non-responsive corrective action plans are referred to the IRC for sanctions and the IRC can, in turn, refer the matter of sanctions to the IRC sanctions committee. Although this process appears adequate to assure provider accountability, in certain situations, the time frame for reaching accountability amounts to years.  In one case, the IRC sanctions committee simply did not act on a recommendation for sanctions when a death occurred. Despite the QMB's established oversight process, a significant percentage of providers have new and/or repeat deficiencies and fail to furnish adequate care as required by the QMB.

*(d)*      *The IMB*.

The IMB "'triages' reports received for investigation, assigns an investigator, completes the investigation within 45 days" and reports findings and recommendations to the IMB manager.  Def. Ex. Vol. II, Z-02 (000425).  The IMB manager then reviews the findings and recommendations "to determine if a *preponderance of the evidence* supports" abuse, neglect, or exploitation.  *Id*.  "Findings are shared with the responsible provider and DDSD."  *Id*.  The IMB subsequently determines whether a follow-up onsite review is necessary to decide if "appropriate and timely actions have been taken to protect the individual receiving services from a community-based provider."  *Id*.  If a provider fails to take appropriate and timely action, the IMB can refer that provider to the IRC to determine what actions should be taken.  *Id*.

The IMB maintains a database to track incidents.  *Id.* The IMB uses the database to analyze and trend incidents with respect to "individual consumers, specific providers, and for the

59

system as a whole." *Id.* The IMB generates quarterly and annual reports for the DD Waiver and general fund providers. *Id.*

Additionally, the IMB meets with various entities, including QMB, on a monthly and quarterly basis, by region, to discuss, among other things, individuals with patterns of multiple incidents (more than three incidents in a quarter). *Id.*; Pl. Ex. 194 (003135); Janet Simons Deposition, 133:11-19; Alice Maes Deposition, 137:16-21, 140:8-20. The groups at these meetings examine patterns and trends, develop corrective actions, and determine whether or not a corrective action "has had the desired effect." TT Vol. II, 264:20-265:7. IMB investigators are expected to attend these regional meetings as well. Pl. Ex. 194 (003135).

The IMB also requires the IDT to meet when there is a confirmation of abuse, neglect, or exploitation. Alice Maes Deposition, 145:5-10. Moreover, the IMB requires the IDT to meet when there are three confirmed incidents in a quarter. Def. Ex. Vol. II, Z-02 (000425). The IDT then conducts a risk assessment and writes a prevention plan. *Id.* Compliance is tracked by IMB. *Id.*

Alice Maes, the IMB Chief since April 2008, sees data that tracks the kinds of events that most frequently trigger incident reports on a monthly and quarterly basis. Alice Maes Deposition, 12:10-11, 68:20-25. The IMB last created an annual report on the trends of events that trigger incident reports in 2008. *Id.* at 71:19-72:3. Ms. Maes has not issued any written reports comparing trend data from year to year. *Id.* at 72:8-11.

Most of the time, IMB field investigators refer cases for "follow-up" because a provider's corrective action plan has not been timely submitted. *Id.* at 112:6-16. The IMB tracks how many cases go to follow-up and how many of those cases are referred to the IRC for having untimely corrective action plans or substantively unacceptable corrective action plans.

60

*Id*. at 113:1-5.  The IMB does not separate the untimely corrective action plans from the substantively unacceptable corrective action plans in its tracking; however, if necessary, that information can be separated for examination.  *Id*.  When a class member dies, the IMB participates in a teleconference held by Defendants' contract Specialty Surveyor, Nurse Barbara Burr Sharp, to review the circumstances of the class member's death.  *Id*. at  114:12-115:12.

Most of the time, IMB field investigators obtain copies of provider corrective action plans and place them in the case file.  *Id*. at 218:2-25.  The IMB, however, has apparently not done a review to assess the percentage of corrective action plans actually obtained and placed in case files.  *Id*. at 219:2:24.  Moreover, the IMB, as of April 2011, had eight vacant investigator positions and a vacant manager position.  *Id*. at 34:6-36:16.

Similar to the QMB, Defendants established the IMB to investigate provider abuse, neglect, or exploitation, and to ultimately protect individuals from abusive situations by placing copies of provider corrective action plans in case files and referring cases for follow-up or sanctions.  Aside from its investigations and follow-up activities, the IMB fulfills its duties through various means including (1) maintaining a database to track incidents and compliance, (2) producing quarterly and annual reports, (3) attending monthly and quarterly meetings with various entities to discuss corrective actions and patterns of incidents, involving IDTs, and (4) participating in telephonic meetings with the Specialty Surveyor in the case of a death.  Despite all this activity, the IMB does not always compile the information it gathers into meaningful reports by which provider performance could be better evaluated.  Notably, the IMB is short-staffed.

*(e)*      *The MRC and the DDSQI.*

As mentioned previously, MRC policies and procedures were revised March 1, 2010 and were based on the essential national recommendations found in the United States Government

Accountability Office's recommendations for HCBW mortality review committees. Interestingly, Dr. Willcox observed in 2003 that the Mortality Review Policy and Procedures "with a few minor changes, appear[] to be more than adequate to serve the Department's needs." Def. Ex. Vol. VI, V-05 (002061).  Even so, Defendants' own expert, Dr. Ric Zaharias, recommended in his expert report on DDSD's mortality review process that Defendants should follow the timelines laid out in their policy, involve "stakeholders in the actual mortality review process," and more consistently present case closure documentation for each MRC reviewed death.  Def. Ex. Vol. V, B-05 (001867).

Dr. Zwick, the 706 Expert's consultant on mortality reviews, found that Defendants' mortality reviews were "excellent," had good recommendations, and were consistent.  TT Vol. III, 464:3-7.   Dr. Zwick's complaint with the mortality reviews was that he could not determine from the documents he examined the extent to which the MRC's recommendations were being implemented.  *Id.* at 464:7-22.  The 706 Expert, in her February 2011 report, noted that "[a]lthough process has improved in some areas, timeliness of getting cases to the MRC [for] review and use of information generated by investigators and reviewers is not used for systemic enhancements."  Pl. Ex. 60 (001721).  In addition, the 706 Expert acknowledged that Defendants reported that during 2009-2010 they initiated various activities to improve the quality of class member health and safety, but the 706 Expert also stated that "there is an absence of measurable outcomes to support the activities have had the intended impact."  *Id*.  Dr. Aveces recommended that Defendants work with Continuum to evaluate outcomes.  TT Vol. V, 936:21-937:7.

Dr. Ralph Hansen, the DDSD Medical Director hired in the fall of 2010, receives three mortality reports: one from DHI, one from Continuum which began performing mortality reviews in 2009, and one from Ms. Sharp, the DOH contract Specialty Surveyor who began

work in 2009.  Dr. Ralph Hansen Deposition, 167:7-10; Def. Ex. Vol. VI, F-05; TT Vol. V,

915:17-22.  The DHI report sets forth an informational background on the deceased while the

Continuum report "does a good job at identifying and prioritizing important issues, important

faults or criticisms of the care and recommendations based–recommendations for education or

improvement of a systems problem."  Dr. Ralph Hansen Deposition, 167:15-168:14.  Ms.

Sharp's mortality reports are "very effective and usually quite complete...."  *Id*. at 166:7-10.  In

addition, Ms. Sharp reviews the DHI mortality reports and participates in telephone conferences

with DHI and others to go over the reports and to discuss recommendations to improve client

care.  Barbara Burr Sharp Deposition at 70:13-71:20, 75:13-23.  DHI is responsive to Ms.

Sharp's input in a timely way.  *Id*. at 71:21-72:1.

    While Continuum physicians give advice to providers and IDTs regarding medical care

of class members, Continuum physicians also conduct mortality reviews of class members.  To

avoid a conflict of interest by giving advice for a class member and then performing a mortality

review of that class member, Continuum excludes the physician who gave the advice from the

mortality review and assigns a different person, preferably from another region of the state, to

perform it.  TT Vol. V, 914:11-17; Pl. Ex. 182.  Furthermore, Dr. Aceves, a Continuum

principal, contracts with the Columbus Organization to perform mortality reviews of persons

with intellectual and developmental disabilities nationwide.  TT Vol. V, 911:7-24.

    Nevertheless, Dr. Hansen conceded in his deposition that the mortality review process

could be improved (1) by his participation in the background review before the mortality review

process is completed, (2) by focusing the mortality review to more clearly identify systemic

problems, (3) by clearly documenting corrective action plans, (4) by identifying markers to track

outcomes, and (5) by removing barriers between DHI and DDSD.  Dr. Ralph Hansen

Deposition, 5:13-17, 91:3-93:1. Dr. Hansen further agreed that monitoring systemic issues to determine if actions result in problem resolution would be good, but difficult to do. *Id*. at 158:22-159:3, 163:6-164:1. Dr. Hansen also noted that the DDSQI does not interact with the MRC, even though the DDSQI has been in operation for over a decade and includes representatives from DHI, the DD Division, DDSD, and Medicaid, and the purpose of DDSQI is to ensure "continuous improvement of services and supports" for the developmentally disabled as well as to take timely action when systemic problems arise. *Id*. at 151:6-18; TT Vol. IV, 666:3-16. Moreover, no one in DHI or DOH has provided Dr. Hansen with a copy of the quality improvement plan on mortality review issues developed by Dr. Merovka. Dr. Ralph Hansen Deposition at 157:17-158:6. Finally, DHI currently is not reporting on the status of implementation of recommendations at each MRC meeting. *Id*. at 164:17-24.

Generally, the substance of the MRC reviews is very good and the process has improved. As in other endeavors by Defendants, the issue of whether the MRC reviews are effective, i.e., whether recommendations in the MRC reviews are implemented by Defendants in a timely manner, remains a problem. In other words, the mortality review process can be further improved to identify and correct systemic issues. Monitoring implementation of MRC recommendations and developing measurable outcomes to determine the effectiveness of Defendants' actions is necessary to have the MRC process improve the DD system. Moreover, the DDSQI should, theoretically, aid Defendants in making necessary systemic changes. The Court, however, is unsure whether the DDSQI is actually used or is just another layer of bureaucracy that may hinder rather than advance progress.

(f)    *General Observations Regarding QE 2.*

In sum, Defendants have generally done a great job of putting together processes and policies with the goals of overseeing and ensuring adequate provider performance. As explained

above, implementing those processes and policies in a timely and effective manner to force providers to deliver adequate health care to class members remains a barrier to substantially complying with QE 2.  The Court believes that Defendants need to take their actions a step beyond what they are already doing.  For instance, Defendants should (1) cooperate with the Community Monitor to define special and immediate needs and repeat recommendations in a more meaningful way; (2) discuss with the Community Monitor the effective use of RORI forms; (3) develop measurable outcomes to determine the effectiveness of their various programs and procedures; (4) evaluate information they have already gathered in more meaningful and useful ways; and (5) look at ways to implement the lessons of the MRC process to make it an effective tool for positive change to the entire DD system.

> (3)     *QE 5: Priortize and address areas of concern listed in Dr. Willcox's Report.*

Dr. Willcox's quality enhancement areas of concern (a total of 60 areas) address issues regarding health care coordination and communication, nurse training and performance, aspiration risk management, and the purview of physicians' practices.  *See* Pl. Ex. 179. Defendants have over the years prioritized those QE areas of concern and developed action plans to address them.  However, it appears from a March 25, 2009 DOH status report that many of the 60 areas of concern regarding quality enhancement have not been fully addressed.  Def. Ex. Vol. X, K-10; Attachment 1 (Doc. No. 1884-1) at 11-13, filed Nov. 2, 2011.  The latest action plan in the record, dated May 4, 2010, contains proposed activities to complete the remaining areas of concern.  Pl. Ex. 179.  Dr. Zwick agreed that many of the Willcox recommendations pertaining to quality enhancement needed to be addressed.  Pl. Ex. 60 (001803-001805).

(4)     *QE 6: "DOH will establish systematic*
*capacity/competence to address medical and behavioral*
*needs of persons served."  APPENDIX A at 2.*

In addressing QE 6, the Court will focus on three areas relevant to the obligation

described in QE 6: (1) quality of nursing and direct care staff, (2) recruitment of specialized

health care professionals, and (3) repeat recommendations by the Community Monitor related to

aspiration-caused deaths.

(a)     *Quality of Nursing and Direct Care Staff.*

Dr. Aceves said he

believes that NM persons with developmental and intellectual disabilities have access to
a health system of care that addresses their ongoing health needs. As any health system
has its [sic] challenges and limitations. There is ongoing need for continuous training of
future and present health professionals in this field to continue to enhance their skills and
knowledge and strategically impact their professional and humanistic attitudes towards
this population. However, there are well established system wide processes, programs
and regulations to ensured [sic] a higher level of quality of care for current and future
generations of persons with intellectual and developmental disabilities.

Def. Ex. Vol. V, C-05 (001880).  Dr. Antoinette Benton, a former Continuum physician for nine

years, agreed with Dr. Aceves and stated in her deposition that she "see[s] good care out there."

Dr. Antoinette Benton Deposition, 10:2-4, 86:3-16.  In fact, Continuum concluded that deceased

class members reviewed by the MRC received proper medical care within the system available

to them.  Dr. Alya Reeve Deposition, 60:8-22.  That system of medical care necessarily includes

differences in quality of medical care in different New Mexico communities, a difference in

quality of medical care which all New Mexicans experience.  TT Vol. V, 936:11-19.

Nevertheless, DD clients still get care "superior" to the care an average person in New Mexico

receives.  Dr. Antoinette Benton Deposition, 124:14-125:1.  Furthermore, it is important to

recognize that class members are aging, so their mortality rates will naturally go up.  Dr. Ralph

66

Hansen Deposition, 147:22-148:1.

Despite these assertions that class members receive at least adequate health care when one takes into account the state of health care generally in New Mexico, Dr. Merovka stated that more than half the time the mortality reviews she saw prior to February 2009 revealed deficient medical records, problems with data collection practices, lack of adequate tracking of class members' health care needs and services, and inadequate staff training regarding individuals' health care needs. Dr. Carol Merovka Deposition, 181:1-24; 182: 21-25. She also noted that the insufficient amount of nursing care was a chronic problem for class members. *Id*. at 121:5-12, 126:19-23. Dr. Merovka generally felt, as of 2009, that New Mexico did not have a system for consistently training primary care physicians on medical issues affecting developmentally disabled persons. *Id*. at 79:13-18.

Dr. Alya Reeve, a psychiatrist and co-investigator at Continuum, testified in her March 2011 deposition that based on her work for hundreds of people in the developmental disabilities systems, only 40-45% of the current population get adequate and appropriate health care coordination. Dr. Alya Reeve Deposition, 139:12-17. Paulette Archibeck, a DHI nurse who was involved in mortality reviews for DOH from 2002 until April 2011, testified in her April 2011 deposition that in some areas nursing caseloads are so large that certain providers are unable to adequately serve class members, whereas other providers do not utilize nurses when they should. Paulette Archibeck Deposition, 15:1-6, 24:18-20, 115:23-116:6.

Some of these nursing care issues may arise from the fact that all state community programs struggle with training, skills, and expectations of direct care staff and nurses. Janet Simons Deposition, 124:3-10. Moreover, it is undisputed that there is a nursing shortage in New Mexico which could affect the level of nursing provided to class members, depending on the

provider and location.  TT Vol. II, 199:1-201:8; Dr. Antoinette Benton Deposition, 119:1-5;

Paulette Archibeck Deposition, 237:2-3. Defendants' nursing policies and standards, however,

remain excellent and consistent with the standard of care in the United States.  TT Vol. II,

179:21-180:11, 229:13-16.

To address the staffing concerns, the CSB established DD Waiver standards related to

nursing and therapist expectations.  TT Vol. IV, 744:13-15.  The DD Waiver standards

"unbundle" nursing, and this, along with a new intensive medical home, are intended to improve

nursing services to all members of the DD Waiver system.  Janet Simons Deposition, 217:1-14.

The CSB also provides nurses at the regional offices, consults with providers, and conducts

therapies training for the providers.  TT Vol. IV, 744:1-10.  In addition, the CSB has

collaborated with Continuum to create a curriculum for nurses who care for developmentally

disabled persons.  TT Vol. IV, 745:19-747:1.  Despite this good work by the CSB, the

Community Monitor has pointed out the need to strengthen the CSB with additional staff and

resources.  TT Vol. I, 98:6-14.

To further improve nursing services, Defendants have also published a grid composed of

nursing tasks and responsibilities, the level of nursing required for the performance of each task,

a description of each nursing task, and a citation to the requirement in the DDSD standards.  Def.

Ex. Vol. X, Q-10 (003925-003930).  Additionally, the Columbus Organization improved nursing

services to the Los Lunas Community Program (Los Lunas) in 2007 by streamlining lines of

communication and nursing responsibilities.  Janet Simons Deposition, 97:7-98:4.  The

Columbus Organization does not believe that there is a lack of monitoring of care in individual

homes or that staff training is inadequate.  *Id.* at 124:21-125:3.

68

Although Continuum's July 2009 to August 2010 mortality reviews found many examples of "good and appropriate use of nursing judgment in a timely fashion," Continuum was, nonetheless, concerned with communication, record keeping, infection control, policy implications, referrals, and emergencies.  Def. Ex. Vol. VII, F-07 (002349-002350).  Even so, members of the MRC found it surprising that class members, who are typically medically fragile, have lived as long as they have considering all of their medical issues. Paulette Archibeck Deposition, 108:20-109:8.

This positive assessment is undermined by Dr. Zwick who, in preparing for the 706 Expert's February 2011 report, reviewed a sample of 17 deceased class members for FY 2009 and FY 2010, 65% of the deceased class members for those years.  Pl. Ex. 60 (001700.  Dr. Zwick found that six deceased class members had "probably or potentially preventable" deaths; three had received "poor or less than adequate care;" nine had "serious problems" with their care; and five were victims of confirmed neglect.  *Id.* (001700, 001702).  The 706 Expert noted in her February 2011 report that, according to DOH mortality reviewers and Dr. Zwick, use of emergency services and/or hospitalizations has resulted from the lack of staff training, "lack of nursing oversight and delays in seeking medical care...."  *Id.* (001692).  The 706 Expert further concluded in the February 2011 report that the DOH would have a "considerable positive impact" if it focused on the training, skills, and expectations of direct care staff and nurses.  *Id.* (001719).  Notably, Dr. Hansen agreed with the 706 Expert's conclusion that there is no monitoring system to determine if Defendants' actions have resulted in problem resolution or other actions.  Dr. Ralph Hansen Deposition, 142:20-143:16.

In fact, Dr. Zwick and the 706 Expert's conclusions are supported by Defendants' own findings.  Between 2009 and 2011, Defendants found the following nursing deficiencies at

Mosaic, Dungarvin, and Los Lunas: failure to ensure provider nurse monitoring, failure to provide adequate oversight of medication administration, failure to conduct nursing assessments and preventative screenings in a timely manner, failure to develop plans of care in accordance with "prudent" nursing care, and the failure to conduct proper training and supervision of direct care staff.  Pl. Ex. 331 (004770-004771).

The Court does not doubt that adequate health care can exist under the DD system when that system is operating as Defendants intended and that class members can potentially receive overall better health care under the DD system than is available to the average New Mexican. As already discussed, Defendants provide commendable programs, processes, and regulations to address the health care needs of class members.  Problems arise, however, in the implementation of those services so that class members actually receive the optimal benefit from the DD health care system.  For example, the record indicates that despite excellent nursing policies and standards as well as various initiatives to provide improved nursing skills and even reports of good nursing, nurses are many times simply overextended or not efficiently utilized and, therefore, cannot always provide adequate nursing care.  The Court acknowledges that the provision of nursing care is not entirely Defendants' fault because there is a widespread nursing shortage.  The record also suggests that the training and skills of direct care staff often fall short, a problem experienced in all state community programs.  Evidence in the record documents the harm suffered by class members due to poor nursing or direct staff care.  Nonetheless, even with these problems, some medical professionals with Continuum are surprised at how long many class members have lived considering their medically fragile state.

70

          *(b)*    *Recruitment of Specialized Health Care*
                        *Professionals.*

As of November 2009, the Community Monitor still considered her 2004 recommendation to recruit and retain health care professionals in areas of the state where health care gaps exist to be unmet by Defendants.  TT Vol. I, 115:23-116:9.  Defendants promptly responded to the Community Monitor's concern by providing a comprehensive list of therapists they had retained in 2010.  TT Vol. I, 116:4-7; Def. Ex. Vol. X, N-10 (003898).  The Specialty Services Reports used to determine therapist shortages did not indicate any further shortages at that time. Def. Ex. Vol. X, N-10 (003898).  Nonetheless, the Community Monitor replied that Defendants had not met the recommendation to recruit and train therapists.  Def. Ex. Vol. X, Z-10 (004024-004025).  Even Dr. Aceves admitted that it is sometimes difficult for persons with severe developmental disabilities to receive appropriate emergency room treatment in Farmington, Albuquerque, Clovis, and Las Cruces.  Dr. Javier Aceves Deposition, 89:19-91:2.  Additionally, Dr. Benton testified in February 2011 at a deposition that there were no physicians in Farmington, Clovis and Alamogordo with special expertise in treating people with complex developmental disabilities.  Dr. Antoinette Benton Deposition, 113:25-114:16, 115:13-18, 116:4-10.  Dr. Reeve also testified in a deposition in March 2011 that it is challenging to obtain certain specialized services in Clovis and Farmington.  Dr. Alya Reeve Deposition, 24:19-25:15, 28:9-16.

Defendants cannot address medical and/or behavioral needs in a systematic and competent manner if there are no health care professionals who specialize in caring for and treating severely developmentally disabled persons.  It is undisputed that receiving specialized care in the more rural parts of the state is difficult because of a lack of those kinds of health care

professionals.  Although Defendants retained several health care professionals in 2010 to fill in the rural health care gaps, some of those gaps still existed in 2011.

> (c)     *Repeat Recommendations Related to Aspiration Caused Deaths*.

Repeat findings by the Community Monitor include inadequate aspiration prevention plans, inadequate health care coordination, inadequate communication in areas concerning the "involvement of nurses in an oversight and consultative and training role" as well as inadequate nurse training.  TT Vol. I, 60:1-62:6.  In addition, QMB data for FY 2010 demonstrated that 75 % of providers had "new and/or repeat deficiencies...."  Pl. Ex. 74 (02131).  Defendants responded by creating the CICC to focus on repeat recommendations.  As discussed previously, Defendants have concerns with the definition of repeat recommendations.  No matter how repeat recommendations are defined, aspiration pneumonia deaths[27] in the adult New Mexico developmentally disabled population appear to have trended upwards: in 2000 there was a crude death rate of 0.6 per 1,000 persons while in 2009 there was a crude death rate of 2.4 per 1,000 persons.[28]  Def. Ex. g(13) (004667); TT Vol. V, 1098:4-20, 1102:18-21.  There is, however, no clear cause for the increase in the crude death rate.  TT Vol. V, 1103:3-10.  Causes could include

---

[27]The Court uses the broader definition of aspiration pneumonia death which occurs when a death certificate has either aspiration pneumonia as the underlying cause of death or any mention of both aspiration and pneumonia.  Def. Ex. g(13) (004667).

[28]As of the Fall of 2011, crude death rates for 2010 were still preliminary and the crude death rates for 2011 were incomplete.  Def. Ex. g(13) (004667).  Defendants have also compiled preliminary information with respect to aspiration pneumonia hospital discharges beginning in 2009.  Def. Ex. h(13) (004668).

an aging population, "better case surveillance," or inferior quality of care.[29]  *Id.*

Aspiration risk is, nevertheless, acknowledged as a predominant potential cause of death for class members.  TT Vol. II, 337:2-8.  The 706 Expert acknowledges that individuals with a high risk of aspiration can die from aspiration pneumonia and/or aspiration even if they are watched 24 hours a day.  *Id.* at 337:22-338:3.  Minimizing aspiration is simply "an ongoing unsolvable problem."  Dr. Ralph Hansen Deposition, 183:23-184:19.  In some cases, aspiration symptoms can be reduced but not prevented completely.  Dr. Antoinette Benton Deposition, 107:10-25.

The POA, the only *Jackson* court order concerning aspiration, requires Defendants to oversee 22 class members who were seen by the seating support clinic at the LLH & TS before it closed.  TT Vol. IV, 747:14-23.  Defendants now track over 200 class members who have since been identified to be at risk of aspiration.  TT Vol. IV, 747:23-25.  Furthermore, Defendants have developed a Health Passport system and a master medical diagnosis list to improve health care coordination; these projects are already underway.  Janet Simons Deposition, 52:9-54:16, 216:7-23.  Even so, as of April 2011, DOH had made no effort to determine if class members have a current and accurate medical problems list.  *Id.* at 54:22-55:1.

Additionally, Defendants have not systematically tracked if class members have reached the targets set forth in the CARMPs nor do Defendants have a database which indicates whether

---

[29]The Secretary of DOH assigned Dr. C. Mack Sewell of the DOH Epidemiologist's Office to conduct a study comparing New Mexico's annual rate of aspiration deaths in the New Mexico DD system with that of other states.  Def. Ex. Vol. V, D-05 (001909).  Only two states would participate.  Dr. Sewell admitted that selecting these two states to compare to New Mexico lacked any scientific methodology and that he did not know the particulars of the populations used as a basis for the aspiration rates of the other states.  TT Vol. V, 1113:4-1114:22; Def. Ex. Vol.V, D-05 (001909).  Consequently, the Court will not consider Dr. Sewell's comparison findings.

the CARMPs are being implemented.  TT Vol. IV, 781:1-782:6.  Defendants also do not expect direct care staff to necessarily recognize the term "CARMP."  TT Vol. IV, 782:7-19.  No one has, in fact, studied the efficacy of efforts by Continuum to reduce preventable aspiration.  TT Vol. V, 963:12-24.

Repeat recommendations, whether defined broadly or narrowly, especially with respect to aspiration related deaths, can demonstrate a lack of systematic capacity/competence by Defendants to address the medical needs of class members.  Defendants have made tremendous efforts to address preventable aspiration symptoms by instituting various programs, but as with Defendants' other programs, Defendants have not developed systems to determine if those programs are being implemented and whether those programs actually help reduce the incidence of preventable aspiration.

*(d)      General Observations Regarding QE 6.*

Defendants have made great strides in establishing systematic capacity/competence to address the medical and behavioral needs of class members.  Many services and programs are available to class members, but there is still a problem in actually providing those services and programs to benefit class members.  For instance, Defendants have established resources and training for nurses but sufficient nursing services are nonetheless lacking, whether Defendants or a nursing shortage are to blame for that deficiency.  Direct care staff, perhaps the most vital persons in a class member's day-to-day life, are often unprepared for their duties.  Another example of the gap between existing programs and class members actually benefitting from those programs is the difficulty in delivering or providing appropriate specialized services in rural parts of the state.

74

One of the concerns Plaintiffs rightly have is the aspiration caused death rate of class members and how that reflects on Defendants' systematic capacity/competence to address medical needs of class members.  Although the Court notes that aspiration pneumonia-related deaths are trending upwards with the DD population as a whole, the cause for that trend has not been established.  Moreover, the facts that class members are aging and that aspiration-related deaths are not always preventable in that population are certainly factors over which Defendants have no control.  Even so, Defendants are obligated to develop a systematic capacity/competence to reduce aspiration symptoms when possible.  Defendant have, to their credit, established several programs to specifically address aspiration.  Defendants, however, have not gone so far as to initiate systems to determine if those programs are being implemented and whether those programs actually help reduce the incidence of preventable aspiration caused deaths.

> (5)   *QE 7: "DOH will establish an adequate process for follow-up after hospitalization to ensure that appropriate medical care is provided."  APPENDIX A at 2.*

In 2008, the 706 Expert acknowledged that Defendants provide post-hospitalization follow-up by regional nurses but suggested that this might need more study.  Pl. Ex. 58 (001633-001634).  Defendants subsequently organized a Hospitalization Issues Workgroup in the summer of 2008.  The workgroup required that regional managers "designate a lead staff that will triage each situation to assure appropriate DDSD support and or [sic] intervention ... throughout the post hospitalization period."  Def. Ex. Vol. II, O-02 (000347).  The Community Monitor's 2009 CPR noted, however, that lack of health care coordination resulted, among other things, in a lack of hospital documentation.  Pl. Ex. 14 (000379).  Nursing and direct care staff issues referred to above may also generally reflect an inadequate process for post-hospitalization follow-ups.  Dr.

75

Hansen noted concerns with "correct medication regimens" or "correct active health problem lists" not being shared between provider staff and physicians; providers not following physician's orders; and problems with "responsiveness or timely evaluation of patients...."  Dr. Ralph Hansen Deposition, 153:17-24, 154:13-155:3.  These general concerns could relate to post-hospitalization follow-up as well as to regular medical care.  Moreover, Dr. Benton had concerns with whether follow-up visits are being made, but she admitted that these concerns exist within the entire medical care system in New Mexico.  Dr. Antoinette Benton Deposition, 44:18-45:7.

Defendants addressed QE 7 by establishing a process for post-hospitalization follow-up.  Whether that process is successful, however, is unclear.  Although issues, generally, with health care coordination, which necessarily include coordinating post-hospitalization treatments and concerns, have been a problem, the ECHAT program may eliminate some of those particular coordination issues.  Nonetheless, issues with nursing and direct care staff certainly affect whether a post-hospitalization follow-up is adequately conducted.  Admittedly, lack of follow-up care is a concern not only for the DD population, but also for all New Mexicans.  QE 7, however, does not set a standard of care based on the standard of care for New Mexicans as a whole.

> (6)    *QE 8: "Modify [IRC]procedures to improve its ability to identify deficiencies at provider agencies that require corrective action, to promptly establish adequate corrective action plans, and to ensure that corrective actions are completed in a timely manner."  APPENDIX A at 2.*

The IRC is chaired by the QMB chief and composed of various bureau chiefs and representatives.  TT Vol. II, 262:8-21.  Providers are referred to the IRC for performance issues.

76

*Id*. at 262:23-263:5.  Remedies the IRC can impose include corrective actions (or directed improvement plans), fines, and other sanctions.  *Id*. at 263:8-21.  As noted above, the IRC refers sanctionable actions to its sanctions committee which is composed of the directors of DHI and DDSD.  *Id*. at 263:17-21.  When the MRC makes a referral to the IRC, the IRC is required to "communicate its actions and completion of sanctions or corrective actions to the Chairperson of the MRC;" and the IRC will "communicate its findings to the appropriate DDSD agency."  Def. Ex. Vol. VI, L-06 (002208).  The IRC can also make recommendations on systemic issues to the DDSQI.

Additionally, the IRC is required to review consumer specific trend data on at least a quarterly basis.  Pl. Ex. 194 (003123).  The trend data comes "from incidents and follow-up issues not corrected by the provider."  *Id.*  In 2009, the IRC made revisions to its "database to improve tracking and reporting of IRC actions," and modified process and resource allocations to decrease the time to issue IRC actions.  Pl. Ex. 325 (004670).  DOH also has a policy regarding the implementation of corrective action plans or directed corrective action plans but those policies apparently have not been revised since the Court approved QE 8.  TT Vol. IV, 716:4-22; Pl. Ex. 32 (000761-000762).

The 706 Expert testified at the June 2011 evidentiary hearing that from FY 2007 to FY 2009 the same 10-15% of providers were referred to the IRC.  TT Vol. II, 305:12-14. She also found that the "biggest issue" is the untimely implementation of corrective actions or follow-up on corrective actions. *Id*. at 305:14-16.  For example, Los Lunas, Dungarvin and Mosaic remained on the IRC log for multiple years due to serious health and safety violations.  TT Vol. V, 1044:8-1045:15.  The 706 Expert found in general that "Defendant's [sic] have not fully developed and implemented effective systems," including presumably the IRC process, "to

77

protect class members from avoidable threats to their health and safety." Pl. Ex. 60 (001722).

There is no evidence in the record to indicate that IRC policies and procedures have been significantly improved with respect to issues concerning corrective action plans. The Court acknowledges that in 2009 Defendants made improvements to the IRC database for tracking and reporting purposes and that Defendants modified processes and resource allocations to help speed up IRC actions. It is unclear from the record, however, if these changes have actually resulted in compliance with QE 8, particularly when Dungarvin, Mosaic, and Los Lunas continued to have deficiencies until as recently as 2011. Of course, if Defendants feel that there is other evidence, not in the record now before the Court, which supports disengagement of QE 8, Defendants are free to utilize the disengagement procedure to disengage QE 8.

3.    *Summary of Issues Affecting Defendants' Ability to Comply with Health Care Obligations.*

The CPRs conducted under Lyn Rucker, the current Community Monitor, are quite rigorous and are designed to give the class members maximum health care protection. Defendants have, in good faith, tried to comply with most of Ms. Rucker's recommendations which even Ms. Rucker admits is a daunting task. The Court senses, however, that there is a fundamental underlying difference in philosophy between Defendants and Ms. Rucker. All the parties can agree that Defendants have over the years initiated numerous health care programs and procedures designed to improve the health care of class members. Because class members can only benefit from those programs in a community setting, the provision of health care is, unfortunately, subject to lower community standards which may not always live up to the more exacting standards advocated by the Community Monitor and the 706 Expert. For example, the choice to live in rural New Mexico necessarily limits the availability of some specialized health

78

care, and simply living in a generally poor state like New Mexico means that prompt medical appointments are not always available and that nursing care will be affected by a shortage of nurses.   On the other hand, the Community Monitor and the 706 Expert make the excellent point that Defendants have fallen short in the actual consistent implementation of their programs and processes so that class members can fully reap the benefits of the DD health care system. Plaintiffs further correctly argue that Defendants are bound to comply with their obligations in the JSD, POA, and APPENDIX A as those obligations are written.

Defendants, the Court believes, would recognize that there is generally room for improving the provision of health care to class members.  Of course, Defendants reasonably argue that there must be an end point to the improvements which they must achieve especially considering budgetary issues like the cost of programs as well as the cost of this continued litigation.  An obstacle facing Defendants in trying to substantially comply with the multiple health care provisions of the JSD, POA, and APPENDIX A is the question of what exactly is expected of Defendants in order to comply with the provisions.  For instance, it is unclear what actions by Defendants will qualify as "addressing" Elin Howe's recommendations and the areas of concern listed by Dr. Willcox.  Another obstacle for Defendants, assuming that Defendants develop methodologies to evaluate the effectiveness of programs and procedures, is what constitutes "effective" for purposes of disengaging a provision.

Despite these vagaries and Defendants' good faith attempts at compliance, Defendants must still meet their responsibilities as described in the JSD, POA, and APPENDIX A.  In sum, Defendants' lack of (1) evaluative methodologies to ensure effective implementation of programs and processes, (2) an effective and timely process for ensuring provider accountability, (3) sufficient nurses trained in their appropriate roles, and (4) properly trained direct care staff all

make it next to impossible for Defendants to provide to class members the adequate consistent health care contemplated in the JSD, POA, and APPENDIX A.

    B.     *Findings of Fact.*

        1.     *POA Appendix 15, Ashton Recommendations.*

8.  Defendants have shown by a preponderance of the evidence that they have complied with POA Appendix 15, Ashton Recommendation # 1.

9.  Defendants have shown by a preponderance of the evidence that they have complied with POA Appendix 15, Ashton Recommendation # 2.

10.  Defendants have shown by a preponderance of the evidence that they have complied with POA Appendix 15, Ashton Recommendation # 9.

11.  Defendants have shown by a preponderance of the evidence that they have complied with POA Appendix 15, Ashton Recommendation # 10.

12.  Defendants have shown by a preponderance of the evidence that they have complied with POA Appendix 15, Ashton Recommendation # 12.

13.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 15, Ashton Recommendation # 3.

14.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 15, Ashton Recommendation # 4.

15.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 15, Ashton Recommendation # 5.

16.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 15, Ashton Recommendation # 6.

17.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 15, Ashton Recommendation # 7.

18.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 15, Ashton Recommendation # 8.

19.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 15, Ashton Recommendation # 11.

20.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 15, Ashton Recommendation # 3 does not defeat the essential purpose of the POA, i.e., to provide adequate health care to class members.

21.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 15, Ashton Recommendation # 4 does not defeat the essential purpose of the POA, i.e., to provide adequate health care to class members.

22.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 15, Ashton Recommendation # 5 does not defeat the essential purpose of the POA, i.e., to provide adequate health care to class members.

23.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 15, Ashton Recommendation # 6 does not defeat the essential purpose of the POA, i.e., to provide adequate health care to class members.

24.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 15, Ashton Recommendation # 7 does not defeat the essential purpose of the POA, i.e., to provide adequate health care to class members.

25.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 15, Ashton Recommendation # 8 does not defeat the essential

81

purpose of the POA, i.e., to provide adequate health care to class members.

26.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 15, Ashton Recommendation # 11 does not defeat the essential purpose of the POA, i.e., to provide adequate health care to class members.

*2.*     *POA Appendix 14, 1998 Audit Recommendation # 25.*

27.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 14, 1998 Audit Recommendation # 25.

28.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 14, 1998 Audit Recommendation # 25 does not defeat the essential purpose of the POA, i.e., to provide adequate health care to class members.

*3.*     *POA Appendix 1, Desired Outcome A, Activity # 2.*

29.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 1, Desired Outcome A, Activity # 2.

30.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 1, Desired Outcome A, Activity # 2 will not defeat the essential purpose of the POA, i.e., to provide adequate health care to class members.

*4.*     *APPENDIX A, QE 1.*

31.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, QE 1.

32.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX, QE 1 will not defeat the essential purpose of APPENDIX A, i.e., to provide adequate health care to class members.

82

5.      *APPENDIX A, QE 2.*

33.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, QE 2.

34.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX QE 2 will not defeat the essential purpose of APPENDIX A, i.e., to provide adequate health care to class members.

6.      *APPENDIX A, QE 5.*

35.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, QE 5.

36.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX QE 5 will not defeat the essential purpose of APPENDIX A, i.e., to provide adequate health care to class members.

7.      *APPENDIX A, QE 6.*

37.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, QE 6.

38.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX QE 6 will not defeat the essential purpose of APPENDIX A, i.e., to provide adequate health care to class members.

8.      *APPENDIX A, QE 7.*

39.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, QE 7.

40.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX QE 7 will not defeat the essential purpose of APPENDIX A, i.e.,

to provide adequate health care to class members.

>    *9.      APPENDIX A, QE 8.*

41.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, QE 8.

42.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX QE 8 will not defeat the essential purpose of APPENDIX A, i.e., to provide adequate health care to class members.

>    *C.      Conclusions of Law.*

>    *1.      POA Appendix 15, Ashton Recommendations.*

8.  POA Appendix 15, Ashton Recommendation # 1 is subject to disengagement.

9.  POA Appendix 15, Ashton Recommendation # 2 is subject to disengagement.

10.  POA Appendix 15, Ashton Recommendation # 9 is subject to disengagement.

11.  POA Appendix 15, Ashton Recommendation # 10 is subject to disengagement.

12.  POA Appendix 15, Ashton Recommendation # 12 is subject to disengagement.

13.  Since Defendants have not substantially complied with POA Appendix 15, Ashton Recommendation # 3, it is not subject to disengagement at this time.

14.  Since Defendants have not substantially complied with POA Appendix 15, Ashton Recommendation # 4, it is not subject to disengagement at this time.

15.  Since Defendants have not substantially complied with POA Appendix 15, Ashton Recommendation # 5, it is not subject to disengagement at this time.

16.  Since Defendants have not substantially complied with POA Appendix 15, Ashton Recommendation # 6, it is not subject to disengagement at this time.

17.  Defendants have not substantially complied with POA Appendix 15, Ashton Recommendation # 7.

18.  Since Defendants have not substantially complied with POA Appendix 15, Ashton Recommendation # 8, it is not subject to disengagement at this time.

19.  Since Defendants have not substantially complied with POA Appendix 15, Ashton Recommendation # 11, it is not subject to disengagement at this time.

2.      *POA Appendix 14, 1998 Audit Recommendation # 25.*

20.  Since Defendants have not substantially complied with POA Appendix 14, 1998 Audit Recommendation # 25, it is not subject to disengagement at this time.

3.      *POA Appendix 1, Desired Outcome A, Activity # 2.*

21.  Since Defendants have not substantially complied with POA Appendix 1, Desired Outcome A, Activity # 2, it is not subject to disengagement at this time.

4.      *APPENDIX A, QE 1.*

22.  Since Defendants have not substantially complied with APPENDIX A, QE 1, it is not subject to disengagement at this time.

5.      *APPENDIX A, QE 2.*

23.  Since Defendants have not substantially complied with APPENDIX A, QE 2, it is not subject to disengagement at this time.

6.      *APPENDIX A, QE 5.*

24.  Since Defendants have not substantially complied with APPENDIX A, QE 5, it is not subject to disengagement at this time.

7.      *APPENDIX A, QE 6*

25.  Since Defendants have not substantially complied with APPENDIX A, QE 6, it is not subject to disengagement at this time.

        8.     *APPENDIX A, QE 7.*

26.  Since Defendants have not substantially complied with APPENDIX A, QE 7, it is not subject to disengagement at this time.

        9.     *APPENDIX A, QE 8.*

27.  Since Defendants have not substantially complied with APPENDIX A, QE 8, it is not subject to disengagement at this time.

IV.   *Whether Defendants have Substantially Complied with Their Obligations under the JSD, POA, and APPENDIX A to Provide a Reasonably Safe Environment to Class Members.*

       A.    *Defendants' Obligations under the JSD, POA, and APPENDIX A to Provide a Reasonably Safe Environment to Class Members.*

The POA states that "individuals have the right to live in a safe environment free from abuse, neglect and exploitation."  POA at 11.  Goals under the POA to ensure a safe environment include prevention of serious incidents.  Prevention "requires each agency serving individuals to develop and implement their own internal Incident Management System which review[s] complaints, including incidents, [and] takes responsibility and action to prevent incidents and injury."  *Id.*  Next, the POA states that "it is critical that the individuals present when a serious incident occurs, including but not limited to abuse, neglect and exploitation, promptly and appropriately respond.  Responding appropriately includes, but is not limited to, taking actions to ensure the safety of the individual, providing first aid, calling for assistance, making notifications and documenting the incident."  *Id.*  Moreover, "agency staff who are expected to respond to incidents must have a working understanding of what is a serious incident and what constitutes abuse, neglect and exploitation."  *Id.*  "[I]ndividuals with the most direct knowledge of a complaint/incident must have a clear understanding of who to notify, how to make the notifications, and when the notification is to be made."  *Id.*  The POA provides that complaints

86

will be investigated and that Incident Regional Management Investigators will share data trends in the DD Division Monthly and Quarterly Quality Management Meetings held in each region. On-site reviews will also be conducted "when DHI has reason to believe that serious incidents, death, abuse, neglect or exploitation are the result of possible systemic issues within an organization."  *Id*. at 12.  Finally, "the Monthly and Quarterly Regional Quality Management Meetings may identify the need for an on-site review."  *Id*.

Plaintiffs specifically argue that Defendants have not substantially complied with the following safety-related provisions of the JSD, POA, and APPENDIX A:

1.    Quality Enhancement

    a.    JSD ¶14, POA Appendix 1, <u>Desired Outcome A</u>: "To establish resources and protocols to ensure quality of services."  POA at 8.

    b.    APPENDIX A, QE 2: "Address each recommendation in the internal monitor's October 2003 report."  APPENDIX A at 2.

2.    Incident Management

    a.    JSD and POA Provisions

        (1)    JSD ¶ 15, POA Appendix 2, <u>Desired Outcome F</u>: "Follow-up System for Incident Management."  POA at 19.

        (2)    JSD ¶ 15, POA Appendix 2, <u>Desired Outcome F</u>, Activity #3: "The DD Division Director and/or designated staff will implement follow-up with the Community Provider, as needed, based on the findings of the investigation."  POA at 19.

        (3)    JSD ¶ 15, POA Appendix 2, <u>Desired Outcome F</u>, Activity # 4: "The DD Division will maintain a current log of investigative follow-up implemented by provider."  *Id*.

        (4)    JSD ¶ 15, POA Appendix 2, <u>Desired Outcome G</u>: "Conduct timely and professional investigations of incidents of abuse, neglect or exploitation or of serious incidents."  POA at 20.

(5)     JSD ¶ 15, POA Appendix 2, <u>Desired Outcome G</u>, Activity # 1: "When conducting full investigations, DHI will utilize investigators trained in professionally accepted investigatory methods and techniques to conduct investigations of abuse, neglect, exploitation (where Children, Youth & Families has confirmed they will not be conducting an investigation) or serious incidents. Each reported serious incident will be reviewed to verify that the appropriate notifications were made." POA at 20.

(6)     JSD ¶ 16, POA Appendix 3, <u>Desired Outcome B</u>: "Incidents of suspected abuse, neglect and exploitation will be reported and investigated according to the established protocol." POA at 26.

b.     APPENDIX A

(1)     IM 2: "DHI will have adequate resources to follow-up, verify, and close incidents requiring follow-up." APPENDIX A at 2.

(2)     IM 4: "DHI's intake/triage process will appropriately assign incidents for investigation, especially emergency room visits." *Id*.

(3)     IM 5: "Improve the process for evaluating incident reporting during provider reviews." *Id*.

(4)     IM 6: "Establish and implement effective sanctions for under reporting." *Id.*

(5)     IM 7: "Sufficient numbers of investigators will be assigned to perform investigations and all investigators will demonstrate ability to perform professionally adequate investigations." *Id.*

(6)     IM 8: "Implement all recommendations regarding Mortality Review made by Dr. Willcox in his December 2003 report." *Id.*

(7)     IM 9: "Ensure that Dr. Willcox makes written recommendations regarding both individual and systemic corrective actions when he writes each death review report, and establish a reliable mechanism to ensure that those recommendations are promptly implemented." *Id.*

(8)     IM 10: "Establish an adequate process for improving the reporting of incidents to the [IMB]." *Id.*

(9)     IM 11: "Establish adequate protocols for assessing whether a provider is reporting all reportable incidents and for properly sanctioning providers that fail to report." *Id.*

(10)    IM 12: "Ensure that after appropriate intake of emergency room visit incidents medical technical assistance is provided." *Id.* at 3.

(11)    IM 13: "Improve the quality of investigations of abuse, neglect, and exploitation." *Id.*

(12)    IM 14: "Implement changes to the system for performing intake/triage of incident reports, to ensure that investigations are conducted of all incidents of suspected abuse, neglect, and exploitation." *Id.*

1.     *Quality Enhancement.*

a.      *JSD ¶14, POA Appendix 1,* <u>*Desired Outcome A*</u>*: "To establish resources and protocols to ensure quality of services." POA at 8.*

POA Appendix 1, Desired Outcome A contains eight activities designed to ensure enhancement of the quality of services.  Plaintiffs observe that the quality enhancement obligations fall into two categories: (1) the obligation of the Community Monitor to conduct annual CPRs, and (2) Defendants' obligation to conduct periodic on-site reviews of providers to maintain quality services.  Plaintiffs argue that Defendants have, in fact, not met their obligation to conduct periodic on-site reviews and that the failure to meet that obligation has resulted in inadequate services which have harmed class members.  The Court has already determined that Defendants have not substantially complied with POA Appendix 1, Desired Outcome A, Activity # 2 which requires Defendants "[t]o continue to provide on-site reviews to providers in response to identified issues."  POA at 8.  Moreover, although QMB has a process in place for conducting provider surveys or reviews which will identify provider deficiencies and corrects them, Defendants still have problems with new and/or repeat deficiencies as well as with getting providers to correct deficiencies timely.  These problems and the failure to comply with Activity # 2 adversely affect Defendants' ability to afford class members a reasonably safe environment.

89

> b.  APPENDIX A, QE 2: "Address each recommendation in the
>     internal monitor's October 2003 report."  APPENDIX A at 2.

Plaintiffs contend that Defendants' failure to implement Ms. Howe's October 2003 recommendations to improve provider performance has also resulted in harm to class members. In fact, the Court has determined that Defendants have failed to substantially comply with QE 2 to the detriment of class members' health care.  For the same reasons, Defendants' failure to substantially comply with QE 2 is, likewise, detrimental to the safety of class members.  Since the Court has already ruled on QE 2, it would be redundant to do so again.  Hence, the Court will not rule on QE 2 in the context of the safety of class members.

> 2.  *Incident Management.*

> a.  *JSD and POA Provisions.*

> (1)  *JSD ¶ 15, POA Appendix 2, <u>Desired Outcome F</u>: "Follow-
>      up System for Incident Management."  POA at 19.*

POA Appendix 2, Desired Outcome F sets forth four activities.  Plaintiffs generally argue that Defendants have not substantially complied with Desired Outcome F and Plaintiffs specifically argue that Defendants have not substantially complied with Activities # 3 and # 4 of Desired Outcome F.  The Court instructed counsel in its August 19, 2011 letter at 3 that Plaintiffs' counsel must "specify which POA outcomes and accompanying activities and which Appendix A actions they believe Defendants have failed to comply with."  Since Plaintiffs have only identified with specificity Activities #s 3 and 4 as the activities at issue under Desired Outcome F, the Court will not consider whether Defendants have, in general, substantially complied with Desired Outcome F. Instead, the Court will focus only on Activities # 3 and 4 and whether Defendants have substantially complied with those particular Activities.

> (2)    *JSD ¶ 15, POA Appendix 2, <u>Desired Outcome F</u>, Activity #*
> *3: "The DD Division Director and/or designated staff will*
> *implement follow-up with the Community Provider, as*
> *needed, based on the findings of the investigation."  POA*
> *at 19.*

Ms. Maes, the chief of the IMB, testified at her deposition that the IMB generates follow-up reports which are distributed during the regional monthly and quarterly incident meetings. Alice Maes Deposition, 61:9-19.  Follow-up actions are developed at both the monthly and quarterly meetings, while trends are examined at the quarterly meetings. *Id.* at 142:18-143:6, 147:4-148:17.[30]   Ms. Maes further testified that the IMB requires that providers confirm that they implemented corrective action plans by submitting certain documents according to a timeline to the IMB for review.  *Id.* at 150:11-21.[31]

Ms. Maes noted that it is the provider's responsibility to develop a corrective action plan, not her staff's.  *Id.* at 109:19-110:1.  Ms. Maes explained that after IMB personnel make a finding of abuse, neglect, or exploitation, the case can be forwarded to a higher DOH official for follow-up.  Most cases are forwarded for follow-up because the provider did not submit a timely corrective action plan.  *Id.* at 112:6-16.  Ms. Maes has not determined how many of the cases identified for follow-up have substantive flaws with the corrective action plan or how many of those cases had simply untimely corrective action plans.  *Id.* at 112:23-113:5.  When a class member dies, the IMB participates in a teleconference with the Specialty Surveyor to discuss the

---

[30]Plaintiffs object to 147:4-148:17 of Ms. Maes' deposition testimony as cumulative.  The Court determines, however, that this portion of the deposition testimony is relevant and not prejudicial to Plaintiffs.  Plaintiffs' objection is, therefore, overruled.

[31]Plaintiffs, likewise, object to this part of Ms. Maes' deposition testimony as cumulative. The Court overrules that objection because that part of the deposition testimony is both helpful to the Court and not prejudicial to Plaintiffs.

death and whether the provider's preventive or corrective action plan is acceptable.  *Id.* at 114:18-115:12.

Despite the importance of the provider's corrective action plan, a report issued by Janet Simons in October 2008 found that only 13% of the incident investigation files she reviewed contained a copy of the provider's corrective or preventive action documents.  Janet Simons Deposition at 44:1-10, 45:24-46:13.  After February 2009, IMB investigators were required to have that documentation in their files as well as copies of the provider's investigation and documentation of the actions the provider took to correct the problems.  *Id.* at 47:11-48:18.

The 706 Expert found in her April 2010 report, among other things related to class member safety, that "[t]he follow up system for incident management is inadequate."  Pl. Ex. 59 (001679).  In her February 2011 report, the 706 Expert made numerous findings relating to how class members continue to be at risk from unreasonable harm.  Pl. Ex. 60 (001720-001722).  For example, the 706 Expert specifically found that MRC reviews do not include individual and systemic corrective actions so that "[t]here is no reliable mechanism [to ensure that MRC] recommendations are promptly implemented. MRC does not review recommendations and then track until resolution."  *Id.* (001720).

Even Defendants found that the absence of the implementation of timely corrective actions and follow-up on corrective actions continued to be the largest issues with all providers in FY 2007-2009.  Pl. Ex. 70 (002100).  In one instance of neglect leading to a death at Dungarvin, Defendants took almost six months to send Dungarvin an IRC referral and sanction letter for failure to resolve outstanding corrective actions.  Pl. Ex. 53.

The IMB and DOH clearly have a process in place to follow-up with providers who have submitted corrective action plans based on IMB investigations.  However, according to both the

706 Expert and Defendants, timely implementation of corrective actions or follow-up on corrective actions remains problematic. Furthermore, while the MRC could develop corrective action plans and implement its recommendations, it has not done so. There simply appears to be a disconnect between Defendants' good intentions, as expressed in its processes and meetings, and the actual results achieved. This disconnect, unfortunately, adversely affects the safety of class members, which is what Activity # 3 is intended to protect.

> (3)  JSD ¶ 15, POA Appendix 2, <u>Desired Outcome F</u>, Activity # 4: "The DD Division will maintain a current log of investigative follow-up implemented by provider." POA at 19.

Defendants assert that little, if any evidence, was introduced at the June 2011 evidentiary hearing regarding Activity # 4. Consequently, Defendants have not addressed Activity # 4 in their proposed findings of fact. If the Court decides nonetheless to consider Activity # 4, Defendants request an opportunity to show that they have complied with that activity.

Contrary to Defendants' representation that their proposed findings of fact do not address Activity # 4, Defendants' proposed findings of fact #s 473 and 474 specifically concern an MRC tracking log and other of Defendants' proposed findings of fact relate to the IMB and IRC. Since these proposed findings of facts address Defendants' argument that they have complied with Activity # 4, the Court will consider whether Defendants have substantially complied with Activity # 4 without further argument or evidence from Defendants.

The MRC maintains a tracking log designed to document the MRC process through closure when it has been confirmed that MRC recommendations have been implemented. TT Vol. III, 465:16-25; Def. Ex. Vol. VII, N-08 (002718-002719); Def. Ex. Vol. VII, M-08 (002717-002718); Def. Ex. Vol. VI, J-06 (002190-002192); Def. Ex. Vol. XI, C-11 (004038-

004044); Dr. Karen Armitage Deposition, 43:7-12; Dr. Ralph Hansen Deposition, 119:21-121:3. However, as the 706 Expert found, MRC recommendations are not tracked to resolution.  Dr. Hansen agreed that there is no computerized database to track MRC concerns.  Dr. Ralph Hansen Deposition, 133:25-134:12.

The IMB, on the other hand, generates follow-up reports (not a log) which are distributed at the regional monthly and quarterly meetings and follow-up actions are developed at those meetings, but there is no indication that there is an IMB "current log" which shows what providers have done to follow-up on incident investigations.  The IMB, however, is required to track whether case managers convene IDTs to conduct risk assessment and to develop prevention plans when the IMB identifies that an individual has had three or more incidents in a quarter.  Def. Ex. Vol. II, Z-02 (000425).  Moreover, it is undisputed that the IRC keeps a log of deficient providers.  Nevertheless, the fact that agencies like Dungarvin, Mosaic, and Los Lunas have remained on the IRC log for years undermines confidence in the quality of the system maintained by the IRC.[32]

Defendants have attempted to maintain at least a couple of "logs" to follow-up on provider's corrective actions.  Those logs have either not been sufficiently maintained or are not designed to prevent harm to class members.  Although the IMB tracks whether an IDT meeting has been held when an individual has been subjected to more than three incidents in a quarter, there is no indication that the IMB tracks the outcome of those meetings.  The fact that an IDT meeting is held under those circumstances is imperative, but tracking the outcome of that meeting is even more important to ensure that the individual is not again the subject of an incident report.

_____

[32]The Court is aware that, on an annual average, 80 to 85% of the providers have not been referred to the IRC for actions. TT Vol. II, 305:9-12.

> (4) *JSD ¶ 15, POA Appendix 2, <u>Desired Outcome G</u>: "Conduct timely and professional investigations of incidents of abuse, neglect or exploitation or of serious incidents." POA at 20.*

As it did with POA Appendix 2, Desired Outcome F, the Court will not consider Plaintiffs' general argument that Defendants have not substantially complied with POA Appendix 2, Desired Outcome G because Plaintiffs have more specifically alleged that Defendants have not substantially complied with POA Appendix 2, Desired Outcome G, Activity # 1. The Court will, therefore, address only POA Appendix 2, Desired Outcome G, Activity # 1.

> (5) *JSD ¶ 15, POA Appendix 2, <u>Desired Outcome G</u>, Activity # 1: "When conducting full investigations, DHI will utilize investigators trained in professionally accepted investigatory methods and techniques to conduct investigations of abuse, neglect, exploitation (where Children, Youth & Families has confirmed they will not be conducting an investigation) or of serious incidents. Each reported serious incident will be reviewed to verify that the appropriate notifications were made."[33] POA at 20.*

The IMB has in place Incident Management System Policies and Procedures which describe in some detail the investigation process. Pl. Ex. 194 (003110-003119). The Incident Management System Policies and Procedures provide for notifications to appropriate entities during the intake/triage phase of an incident investigation. *Id.* (003106-003107). In addition,

---

[33]Despite citing to several portions of the record in support their contention that they have met Activity # 1, Defendants assert that they did not think that Activity # 1 would be the subject of the June 2011 evidentiary hearing and request an opportunity to more fully address Activity # 1. Because Defendants did cite to the record to support their position, the Court is not inclined to allow further development of the record concerning Activity # 1. If, based on the current record, the Court determines that Defendants have not substantially complied with Activity # 1, Defendants are at liberty to use the disengagement process under the JSD to assert that Activity # 1 should be disengaged.

IMB investigators participate in the National Certified Investigator/Inspector Training program as well as in the Labor Relations Alternatives, Inc. training.  Pl. Ex. 187; Pl. Ex. 188.  In fact, the 706 Expert had recommended that Defendants use Labor Relations Alternatives, Inc. for training investigators.  Alice Maes Deposition, 127:24-128:4.  Although IMB investigators are not trained medical professionals, they make assessments regarding whether an emergency room visit resulted from prior poor medical care.  *Id*. at 214:23-215:15.  To make that assessment, the IMB investigators have access to a nurse for consultations should they decide they need assistance.  *Id.* at 215:16-19.  It seems, however, that few IMB investigators consult with a nurse.  *Id*. at 216:9-217:5.

Oddly, Ms. Maes, the IMB chief, did not have training or experience in conducting incident investigations when she began her position; however, she later received training.  *Id.* at 25:23-26:2, 125:4-12.  Ms. Maes, at her deposition, stated that she "truly believe[s]" that her staff follows the principle of incident investigation which requires that witnesses be questioned separately.  *Id*. at 177:5-178:21.  Ms. Maes was unsure how often IMB investigators conduct telephone interviews.  Also, she did not know the extent that travel for IMB investigators had been reduced due to travel fund reductions.  *Id*. at 184:2-22, 194:3-17.

The 706 Expert found in her April 2010 report that "[s]erious incidents, especially injuries and use of emergency services lack thorough investigation."  Pl. Ex. 59 (001678).  The 706 Expert further found that "[i]ncidents of suspected abuse, neglect and exploitation are not reported and investigated according to the established protocol and the protocols are not consistent with accepted professional standards."  *Id*. (001679).  Moreover, the 706 Expert found that "Emergency Services are not investigated and/or analyzed for the purpose of determining if the class member's health care needs have been adequately addressed prior to the need for urgent

care." *Id.* Even so, the 706 Expert testified at the June 2011 evidentiary hearing that Defendants have conducted investigations of various types to substantiate claims of abuse, neglect, and exploitation and this is the standard of practice. TT Vol. II, 336:9-17.

Defendants clearly have policies and procedures regarding (1) investigations and notifications, (2) training of IMB investigators, and (3) access to a nurse for consultations. Although the 706 Expert conceded that Defendants conduct investigations as they should, she questioned the quality of the investigations in her reports. The Court is also unsure of the quality of investigations. For instance, considering that medical neglect can be a significant issue with class members, the Court wonders if IMB investigators should be medically trained. Moreover, it is questionable whether investigators consult with a nurse as often as they should and whether face-to-face interviews and on-site investigations happen as frequently as they should. Without assurance that the policies and procedures and the training produce adequate investigations, POA Appendix 1, Desired Outcome G, Activity # 1 becomes meaningless.

> (6) *JSD ¶ 16, POA Appendix 3, <u>Desired Outcome B</u>:*
> *"Incidents of suspected abuse, neglect and exploitation will be reported and investigated according to the established protocol." POA at 26.*

Although Plaintiffs complain generally that Defendants have not substantially complied with POA Appendix 3, Desired Outcome B, Plaintiffs do not specifically address each of the ten Desired Outcome B activities in either their Renewed Noncompliance Motion or their proposed findings of fact and conclusions of law. Without more specificity as well as references to the record, the Court cannot analyze whether Defendants have substantially complied with Desired Outcome B.

b.     APPENDIX A.

(1)     IM 2: "DHI will have adequate resources to follow-up,
verify, and close incidents requiring follow-up."[34]
APPENDIX A at 2.

As noted above, Ms. Maes was unaware of the frequency that IMB investigators conduct

telephonic interviews as opposed to face-to-face interviews.  Ms. Maes, nonetheless, testified at

her deposition that when IMB investigators need to travel outside their region to investigate

incidents, they use the telephone "more than they ordinarily do when they conduct investigations

in their own region."  Alice Maes Deposition, 193:3-14.  Interestingly, Ms. Maes did not know if

IMB staff have chosen not to drive from one community to another due to a reduction in travel

funds nor did she know how much the travel fund had been reduced.  *Id*. at 194:3-17.

Ms. Maes admitted that there is about a 40% vacancy rate in the IMB incident

investigation staff, but she claimed that the vacancy rate has not affected class members.  *Id*. at

187:16-22.  The vacancy rate is presumably the reason why the average caseload for each IMB

investigator has risen from 17 to between 25 and 30.  *Id*. at 201:4-15.[35]  Nevertheless, Ms. Maes

again stated that the increased caseload has not affected class members.  *Id*. at 201:16-22. A case

---

[34]Although Defendants cite to the deposition testimony of Alice Maes to support their
contention that they have met IM 2, they also contend that they did not think that IM 2 would be
the subject of the June 2011 evidentiary hearing and request an opportunity to more fully address
IM 2.  Since Defendants were able to find evidence in the record to support their position on IM
2, the Court is not inclined, at this time, to allow further development of the record with respect
to IM 2.  If the Court determines that Defendants have not substantially complied with IM 2
based on the current record, Defendants can always move for the disengagement of IM 2 under
the JSD and present, at that time, evidence to support a disengagement.

[35]Plaintiffs object to this portion of Ms. Maes' deposition testimony as speculative, but
they also cite to it in their proposed findings of fact (finding of fact # 505(o) at pg. 122).  Since
Plaintiffs are willing to cite to this information in support of their proposed findings of fact, the
Court is unwilling to sustain Plaintiffs' objection.

could also be made that IMB investigators could better conduct investigations of medical neglect if they had some sort of medical training.

It appears from Ms. Maes' deposition testimony that lack of resources has restricted the ability of investigators to conduct face-to-face interviews and to visit facilities where investigators have an opportunity to observe the care given to class members as well as the condition of the facility. Moreover, the Court finds it incredible that an almost 40% vacancy rate for IMB investigation staff and an increased caseload for IMB investigators would not affect class members adversely. Finally, the Court is aware that it is probably less expensive to hire investigators who do not have a medical background, but the resultant lack of medical knowledge could adversely affect the quality of the investigations of medical neglect, especially when investigators do not appear to consult very often with a nurse. Without sufficient resources to conduct adequate incident investigations as well as follow-up and verification that corrective actions have been taken by providers, the chances of harm to class members inevitably increases.

> (2) *IM 4: "DHI's intake/triage process will appropriately assign incidents for investigation, especially emergency room visits." APPENDIX A at 2.*

The Incident Management System Policies and Procedures provide a detailed description of the intake/triage process. Pl. Ex. 194 (003102-003107). Essentially, "IMB reviews/screens 'triages' reports received for investigation, assigns an investigator, completes the investigation within 45 days and refers findings and recommendations to the IMB manager for review to determine if a *preponderance of evidence* supports confirmation of the abuse, neglect, exploitation reports." Def. Ex. Vol. II, Z-02 (000425). Ms. Simons recommended that serious

99

incidents other than abuse, neglect, and exploitation should be reported along with the other

incidents in a single system.  Janet Simons Deposition, 120:15-121:11.

Defendants have in place an intake/triage process that assigns incidents for investigation.

This process is directed towards incidents of abuse, neglect, and exploitation.  However, as Ms.

Simons observed, other serious incidents should likewise be reported, triaged, and investigated

by the IMB.  The Court agrees that incidents subject to the intake/triage process should not be

restricted to abuse, neglect, and exploitation.  Any serious incident that harms a class member

should be triaged and investigated to prevent future harm to class members.

> (3)   *IM 5: "Improve the process for evaluating incident*
> *reporting during provider reviews."  APPENDIX A at 2.*

As described above, representatives from the IMB, QMB, DDSD, Aging and Long Term

Services Department, and Adult Protective Services meet monthly and quarterly to review

patterns and trends of incidents, to develop corrective actions, and to determine if corrective

actions have had a desired effect.  IMB investigators are also expected to be present at these

meetings.

In 2008, the average rate of either late provider incident reporting or provider failure to

report incidents of abuse, neglect or exploitation was 38%.  Alice Maes Deposition, 81:23-82:1.

Then, in June 2009, Ms. Maes sent dozens of letters to providers in which she informed

providers whether the percentage of incident reports in their programs that confirmed abuse,

neglect or exploitation was higher than the state average.  *Id*. at 73:11-74:8.  However, Ms. Maes

did not know if anyone from DOH took any action regarding any of the providers to which she

sent those letters.  *Id*. at 77:21-78:1.  Moreover, at the time of her deposition in April 2011, Ms.

Maes had not yet analyzed whether the number of late provider incident reports was higher or

lower in 2010 when compared with 2009.  *Id*. at 76:13-77:4.  Additionally, Ms. Maes had not yet compared the number of failures to report incidents or of late reportings from state fiscal year 2008 to state fiscal year 2009.  *Id*. at 210:15-19.

Some evaluation of incident reporting apparently occurs at the monthly and quarterly meetings attended by the IMB and others when they develop corrective action plans for providers and later analyze the impact of those plans.  Providers should be interested in receiving information regarding how the percentage of confirmed incident reports in their programs compares to the state average.  However, that information, without more, is at best an incomplete evaluation of a provider's incident reporting.  Furthermore, there are no yearly statistical comparisons, specific to a provider, that show whether there has been an improvement or a decline in incident reporting by that provider.  In sum, the process for evaluating incident reporting by providers could be substantially improved.

> (4)     *IM 6: "Establish and implement effective sanctions for under reporting."  APPENDIX A at 2.*

Providers who are found to be deficient in reporting abuse, neglect, and exploitation and have not corrected those deficiencies can be referred to the IRC for appropriate actions, including sanctions.  Nonetheless, the average rate of late reporting or failure to report abuse, neglect, or exploitation by providers was 38% in 2008.  Alice Maes Deposition, 81:23-82:1. The 706 Expert observed in her April 2010 report that "[o]ne of the 5 most often cited deficiencies in the New Mexico [developmental disabilities] program is the failure to immediately report and investigate allegations of abuse and neglect."  Pl. Ex. 59 (001678).  The 706 Expert further found that "[i]ncidents of suspected abuse, neglect and exploitation are not reported and investigated according to the established protocol and the protocols are not consistent with accepted professional standards."  *Id*. (001679).

Although sanctions are available for under-reporting incidents, providers who under-report are not being effectively sanctioned.  If effective sanctions had been imposed on under-reporting providers, the failure to report abuse, neglect, or exploitation would not have been so high in 2008 and the 706 Expert would not have noted in 2010 that failure to report was one of the five most often cited provider deficiencies.  Implementation of effective sanctions for under-reporting is a matter that Defendants need to improve to ensure the adequate safety of class members.

> (5)   *IM 7: "Sufficient numbers of investigators will be assigned to perform investigations and all investigators will demonstrate ability to perform professionally adequate investigations."  APPENDIX A at 2.*

As already discussed, there is an almost 40% vacancy rate in the IMB investigation staff and a concomitant increase in caseloads.  Surprisingly, Ms. Maes claimed that investigations of class members had not been affected by the vacancy rate and increase in caseloads.

Although the Incident Management System Policies and Procedures contain the protocol for conducting investigations and IMB investigators go through two training programs, including one recommended by the 706 Expert, the former DHI director, David Rodriguez, recognized that IMB investigators lack the medical experience needed to determine the extent of medical neglect.  David Rodriguez Deposition, 48:20-23.  In cases of medical neglect, IMB investigators also do not have sufficient training and experience to determine if a provider's corrective action is acceptable.  *Id.* at 50:19-25.  As mentioned previously, the IMB investigators could contact a nurse for medical consultations, but the investigators apparently do not do so very often.

Moreover, as noted above, Ms. Maes was unsure of the frequency of the investigators' use of telephone interviews and how reductions in travel funds have affected investigations. The

706 Expert also found in her February 2011 report that "[i]nvestigation of emergency services use are not professionally adequate." Pl. Ex. 60 (001702). Despite these problems with conducting adequate investigations, Ms. Archibeck testified at her deposition that several IMB investigators perform their jobs well. Paulette Archibeck Deposition, 58:4-60:13. On the other hand, Ms. Archibeck found that IMB investigators do not use "[a]ll sources of information about a class member death" in making their opinions. *Id*. (001714). Additionally, according to Ms. Simons, a more thorough investigative system would identify serious incidents other than abuse, neglect, and exploitation.

In addition to having IMB investigators conduct incident investigations, DHI hired a contract nurse called a Specialty Surveyor to conduct death investigations separate from the MRC review process. David Rodriguez Deposition, 136:20-137:10. Apparently, the Specialty Surveyor does not complete her reports in time for them to be incorporated into the incident investigations. *Id*. at 137:14-19.

First, the Court questions whether there are enough investigators considering the vacancy rate and increased caseloads. Second, the Court does not doubt that the investigators perform their work to the best of their abilities, but issues still remain as to the adequacy of the investigations. For example, although there are investigation protocols and the investigators receive training, the fact that the IMB investigators are not medically trained seems to limit their ability to perform adequate medical neglect investigations, especially when the investigators seldom take advantage of nurse consultations. Additionally, the Court questions the adequacy of the investigations when face-to-face interviews and travel to facilities appear limited. The scope of incident investigations should also be broadened to capture other serious incidents which affect the safety of class members. Third, the Court applauds Defendants' use of a Specialty Surveyor; but for her expertise to be effective, her reports must be completed more timely.

> (6)   *IM 8: "Implement all recommendations regarding Mortality Review made by Dr. Willcox in his December 2003 report."  APPENDIX A at 2.*

The mortality review recommendations by Dr. Willcox which Plaintiffs contend are at issue are listed in Plaintiffs' Table of All *Jackson* Court Ordered Obligations (Doc. No. 1884-1) at 13-14.  The first recommendation listed by Plaintiffs is Dr. Willcox's recommendation for Defendants to establish criteria that trigger when to conduct a death review.  Def. Ex. Vol. VI, V-05 (002061).  The remaining recommendations are numbered in Dr. Willcox's report and read as follows:

> 1. If meeting monthly is felt to be too often, then meeting every two months or quarterly should suffice. The number of cases to be reviewed would determine the required frequency of meeting.
>
> 2. It would be helpful for the policy to expand the detail and be more specific about the DOH Mortality Review Committee's role in identifying system issues and problem resolution. This is the penultimate role of this committee and the only mechanism for effecting system change with the goal of improving the provision of care, reducing morbidity, and ensuring that, even though the outcome may be death, care is provided in a timely, competent, caring environment. It is important that all recommendations for improvement that arise from local/regional and external reviews be compiled and discussed at the state level. The format for meeting minutes should be identified and include information on the identification of system issues and areas for problem resolution.
>
> 3. The policy should specify those details of individual case information that should be collected.  Attachment A includes suggestions for this data collection. This type of data collection can be used to assist in tracking trends among the reviewed cases and possible indicators of risk.
>
> 4. A procedure for monitoring systemic issues should be devised to determine whether actions taken have resulted in problem resolution or other actions are indicated. Attachment B gives a list of systemic issues that have been discovered during external mortality reviews completed for the NMDOH since August 2002 and may be helpful in formulating categories of system issues. A system for tracking these issues and the actions taken is needed.

     5. A procedure by which recommendations for system improvement/change are referred to the appropriate division within the NM DOH for further action should be developed. Recommendations requiring programmatic actions should be assigned to the appropriate program division, e.g. Long Term Services, Behavioral Services. Monitoring of the completion of these actions should be assigned to the Division of Health Improvement. The Division of Health Improvement would further be responsible for reporting on the status of implementation of the recommendations at each Mortality Review Committee meeting.

*Id*.

     The 706 Expert found in her February 2011 report that Defendants have not met Dr. Willcox's recommendations #s 2, 3, 4, and 5.  Pl. Ex. 60 (001720-001721). Consequently, the Court will focus on those four recommendations.

     With respect to the quality of the MRC minutes, the Court notes that Plaintiffs' counsel produced an example of an MRC summary (or minutes) at Dr. Hansen's deposition which was abbreviated and did not even list the meeting's participants.  Dr. Hansen Deposition, 35:2-36:3. Dr. Zwick also criticized the quality of the MRC minutes.  TT Vol. III, 464:7-18.

     Dr. Merovka noted in her deposition testimony that during her tenure with DOH, which ended in February 2009, she believed that more than half the time data collection practices were problematic and case managers were not adequately tracking class members' health care needs and services.  Dr. Carol Merovka Deposition, 181:7-24.  Although the 706 Expert developed an electronic database containing medical topics, like how many times a class member went to the hospital before dying, DOH did not use that database because it was unwieldy, difficult, and inefficient to use.  TT Vol. IV, 787:12-24.   DOH does have its own electronic database, but it admits that this database is not as comprehensive as the 706 Expert's database.  *Id*. at 787:25-788:8.  In October 2007, Defendants maintained a catalog containing the kind of information that Dr. Zwick recommended DOH should keep, including the identification of issues that

contributed to class members' deaths.  DOH, however, no longer keeps that kind of catalog and Jennifer Thorne-Lehman, Deputy Director of DDSD, did not know why that catalog was discontinued.  *Id.* at 789:15-791:24.  Nonetheless, similar information from the previous catalog is presented to the DDSQI steering committee.  *Id.* at 790:20-791:5.

Dr. Hansen also believed that corrective measures identified by the MRC should be tracked to determine if those measures have been efficacious.  Dr. Ralph Hansen Deposition, 199:14-25, 201:2-14. Dr. Hansen further agreed that it is a good idea to have a system for monitoring systemic issues to determine whether actions have resulted in problem resolution, but establishing that kind of system may be harder to do than it sounds.  *Id.* at 163:6-164:1.  Dr. Hansen was unaware if there is a formal tracking system to identify recommendations by consultants and to determine whether those recommendations have been implemented.  *Id.* at 158:22-159:3.  Moreover, Dr. Hansen noted that there is no computerized database to track concerns of the MRC over the prior months.  *Id.* at 133:25-134:12.  To his knowledge, DOH has not provided "a real breakdown statistical analysis of mortality rates over time."  *Id.* at 44:1-11. Also, DOH is not currently "reporting on the status of implementation of systemic recommendations at each" MRC meeting.  *Id.* at 164:17-24.  Dr. Hansen testified at his deposition that he was unaware of any direct involvement of the DDSQI with the MRC to address systemic issues concerning mortality.  *Id.* at 151:6-18.

Dr. Hansen recommended improving the mortality review process in several ways.  First, he wants to get involved in the mortality review process early on when there is a complicated and challenging review.  Dr. Ralph Hansen Deposition, 91:1-92:4.  Second, Dr. Hansen would like to have the focus of the mortality review process "be fleshed out and documented more clearly about identification of system problems."  *Id.* at 92:5-12.  This would include clearly

106

documenting corrective action plans.  *Id.* at 92:13-19.  Third, Dr. Hansen would like to improve

the identification and tracking of sentinal markers to measure system performance.  *Id.* at 92:20-

93:1.  Finally, Dr. Hansen recommended removing some of the barriers between DHI and

DDSD.  *Id.* at 93:2-94:14.  Even Dr. Ric Zaharias, Defendants' expert, made recommendations

on how to improve the mortality review process: follow timelines, involve stakeholders, and

include case closure documentation more consistently.  Def. Ex. Vol. V, B-05 (001867).

Ms. Maes further indicated that the IMB does not track data about what kinds of events

most frequently trigger incident reports, although she sees tracked data at monthly and quarterly

meetings.  Alice Maes Deposition, 68:20-25.  The IMB last produced an annual trend report in

2008, and the IMB no longer presents an Investigation Data Report Run at DDSQI meetings.  *Id.*

at 69:17-22, 71:19-72:3; Pl. Ex. 184 (003035).  Ms. Maes did not know if Continuum issued an

annual report on its death investigations.  Alice Maes Deposition, 104:3-6.

The evidence clearly shows that MRC minutes need improvement in order to achieve

meaningful systemic change.  Although Defendants engage in data collection and tracking of

various sorts of information, these activities can also be improved to meet Dr. Willcox's

recommendations more fully.  Furthermore, as Dr. Hansen discussed at his deposition, and even

as Dr. Zaharias recommended, the MRC and its mortality review process can be better focused

and improved to ensure improvement in system performance.  Overall, Defendants still have

some work to do to meet IM 8.

> (7)   *IM 9: "Ensure that Dr. Willcox makes written*
> *recommendations regarding both individual and systemic*
> *corrective actions when he writes each death review*
> *report, and establish a reliable mechanism to ensure that*
> *those recommendations are promptly implemented."*
> *APPENDIX A at 2.*

Dr. Willcox no longer performs external mortality reviews.  Defendants decided to have Continuum perform external mortality reviews because Dr. Willcox's reviews were lengthy, overly detailed, dealt with issues outside the control of DOH, and were not useful to Defendants. TT Vol. V, 918:2-919:10; Paulette Archibeck Deposition, 192:13-194:8.  Interestingly, Dr. Willcox testified at his deposition that no one in New Mexico complained about his mortality reviews.  Dr. James Willcox Deposition, 28:18-29:21, 31:10-13, 98:20-25.  Defendants claim that they asked Continuum to perform the external mortality reviews because Defendants wanted the external mortality reviews to be focused and to be performed by New Mexicans who know the systems of care and could provide clear and concise technical recommendations.  Dr. Karen Armitage Deposition, 46:10-47:3.  In conducting an external mortality review, Continuum determines the cause of death and whether the death was preventable by reviewing all available documents compiled six months before death or even as far back as to the time of institutionalization.  Continuum determines if any problem was individual or systemic.  TT Vol. V, 916:7-917:11.  Nevertheless, the 706 Expert in her February 2011 report found that "[i]ndividual and systemic corrective action[s are] not included in external review.  There is no reliable mechanism [to ensure] recommendations are promptly implemented.  MRC does not review recommendations and then track until resolution."  Pl. Ex. 60 (001720).

Although Dr. Antoinette Benton, a physician with Continuum, performed a mortality review of a class member by using a Continuum template, no one had told her that there is a court order requiring the mortality reviews for class members to include systemic and individual recommendations.  Dr. Antoinette Benton Deposition, 55:13-56:3, 57:10-15.  Furthermore, when Dr. Benton performed that mortality review, she did not have the benefit of the Specialty Surveyor's report or the DOH Mortality Review Investigator's 72-hour report.  *Id*. at 56:15-57:1.

If Dr. Benton had known about other similar deaths at that particular provider, she might have taken other action regarding her concerns or made recommendations regarding patient care at that provider.  *Id.* at 64:20-65:9.

Considering Dr. Benton's experience with a mortality review, the Court is left with the impression that it is unclear if, and to what extent, Continuum external mortality reviews have written recommendations regarding both individual and systemic corrective actions.  No evidence suggests that if Continuum physicians make recommendations for corrective actions that those recommendations are tracked and promptly implemented.

> (8)    *IM 10: "Establish an adequate process for improving the reporting of incidents to the [IMB]."  APPENDIX A at 2.*

Undoubtedly, investigating allegations of abuse, neglect, and exploitation of individuals is a top priority for Defendants.  Pl. Ex. 194 (003131).  Moreover, Defendants have in place a fairly comprehensive Incident Management System Policies and Procedures, Pl. Ex. 194, as well as an Incident Management System Guide for Community Based Service Provider Agencies, Pl. Ex. 189., which explain the reporting process.  Additionally, the Significant Events workgroup has undertaken to require providers to report to DOH significant events that implicate class member health and safety.  Ms. Simons, the chair of the Significant Events workgroup found a 70% compliance rate for reporting significant events within 48 hours, up from less than 50%. Janet Simons Deposition, 69:20-70:2.  These compliance rates are interesting since DOH has not mandated the reporting of significant events although DOH expects compliance by providers. *Id.* at 190:1-12.

The 706 Expert, however, found in her April 2010 report that "[t]here is under-reporting of serious incidents involving class members."  Pl. Ex. 59 (001678).  She further found that

"[d]elays in reporting and investigating allegations of abuse, neglect, and exploitation" perpetuate class members' exposure to harm and threats to their health and safety. *Id.*; TT Vol. II, 275:10-15.

In June 2009, Ms. Maes sent out letters to providers informing them whether the percentage of incident reports in their programs that were confirmed as abuse, neglect or exploitation was higher than the state average. Alice Maes Deposition, 73:11-74:8. Ms. Maes testified at her deposition that she did not know if DOH took any action regarding any of the providers to which she sent the June 2009 letters. *Id.* at 77:21-78:1. Moreover, at the time of her April 2011 deposition, Ms. Maes had not yet done an analysis about whether the number of late incident reports was higher or lower in 2010 compared to 2009. *Id.* at 76:13-77:4. The average rate of either submitting late incident reports or failing to submit incident reports of abuse, neglect, or exploitation was 38% in 2008. *Id.* at 81:23-82:1. Ms. Maes also admitted that she has not done any kind of reporting comparing fiscal year 2008 and fiscal year 2009 with respect to late incident reports or failure to report incidents. *Id.* at 210:15-19. Ms. Maes, however, testified that she has compared, from year to year, the averages for confirmed abuse, neglect, and exploitation; for late reporting of incidents; and for failure to report incidents. *Id.* at 70:7-21.

As always, Defendants are diligent in developing polices and procedures which, in this instance, describe the incident reporting process and have even provided a guide for providers. Defendants further encourage, although unfortunately do not require, that providers report significant events. Ms. Maes' June 2009 letters to providers indicating how providers confirmed abuse, neglect, or exploitation incidents compare to the state average were also a good start toward improving incident reporting but were not followed up. Better and more timely statistical reporting by the IMB would further aid in improving incident reporting. Defendants' actions,

although admirable, still fall short of providing an adequate process for improving the reporting of incidents.

> (9)     *IM 11: "Establish adequate protocols for assessing whether a provider is reporting all reportable incidents and for properly sanctioning providers that fail to report." APPENDIX A at 2.*

Ms. Maes testified that she has compared, from year to year, the averages for confirmed incidents of abuse neglect, and exploitation; late reporting of incidents; and failure to report incidents.  Alice Maes Deposition, 70:7-21. On the other hand, Ms. Maes admitted that she had not, at the time of her April 2011 deposition, compared late incident reports or failure to submit incident reports for fiscal years 2008 and 2009.  *Id*. at 210:15-19.  Nor had she analyzed whether the number of late incident reports was higher or lower in 2010 compared to 2009.  *Id.* at 76:13-77:4.  As indicated earlier, the average rate of either submitting late incident reports or failing to submit incident reports of abuse, neglect, or exploitation was 38% in 2008.  *Id*. at 81:23-82:1.  Although Ms. Maes sent out letters in June 2009 to providers stating whether the percentage of incident reports in their programs that were confirmed as abuse, neglect or exploitation was higher than the state average, Ms. Maes testified at her deposition that the she did not know if DOH took any action regarding any of the providers to which she sent the June 2009 letters.  *Id.* at 73:11-74:8, 77:21-78:1.

As Defendants point out, providers are subject to sanctions from the IRC if they do not correct identified problems, including problems with reporting incidents.  However, the 706 Expert noted in her August 2008 report that "Defendants' pattern of failure to comply with the corrective action process is a significant reason for the defendants' protracted lack of compliance."  Pl. Ex. 58 (001642).  The 706 Expert recommended in 2010 that generally "DOH

needs to develop and implement strategies to monitor and provide technical assistance to reduce unreasonable threats to class members' health and safety.  The effectiveness of the remedial strategies will be determined by periodic evaluation of measurable outcomes."  Pl. Ex. 59 (001679-001680).  Ms. Simons testified at her deposition that DDSD is struggling with how to study the outcome of its activities although DOH administrators have more recently and more frequently discussed the need to establish performance outcome measures.  Janet Simons Deposition, 118:24-119:8.; 200:4-13.

The Court acknowledges that Defendants are trying to assess whether providers are reporting all reportable incidents as reflected in the IMB's statistical reports.  Those reports, however, could be more timely and subject to follow-up, including measurable outcomes. Although sanctions are available for failing to report incidents, imposition of those sanctions and determination of the effectiveness of the sanctions are still issues that Defendants need to address in order to provide class members with a reasonably safe environment.

> (10)    *IM 12: "Ensure that after appropriate intake of emergency room visit incidents medical technical assistance is provided."  APPENDIX A at 3.*

IM 12 appears to require that once there has been a emergency room visit, Defendants must provide the class member with medical technical assistance, presumably to prevent or lessen the chances of another emergency room visit.  However, neither Plaintiffs' nor Defendants' proposed findings of fact concerning IM 12 are particularly relevant to a plain reading of IM 12.  Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 195, ¶ 25; Defendants' Proposed Findings of Fact and Conclusions of Law at 183, ¶ 856.  Without relevant citations to the record, the Court is not in a position to determine whether or not Defendants have substantially complied with IM 12.

> (11)   IM 13: *"Improve the quality of investigations of abuse, neglect, and exploitation."* *APPENDIX A at 3.*

Defendants have in place Incident Management System Policies and Procedures which outline the investigative process. Pl. Ex. 194 (003110-003123). Although Ms. Maes, the chief of the IMB, had no training or experience in conducting incident investigations when she was hired as chief, newly hired IMB investigators are trained and mentored for at least 30 days prior to conducting investigations on their own. Alice Maes Deposition, 122:3-123:9.[36] In addition to their regular training, they receive training through Labor Relations Alternatives, Inc., a company recommended by the 706 Expert.

IMB investigators, as mentioned before, are not medically trained and so do not have the expertise to determine the extent of medical neglect. Accordingly, IMB investigators do not have the training and experience to determine if a provider's corrective action is sufficient in a medical neglect case. David Rodriguez Deposition, 50:19-25. The IMB investigators, however, have access to a nurse for medical consultations, but they apparently do not frequently take advantage of the nurse's services. Nonetheless, Ms. Archibeck testified at her deposition that several of the IMB investigators do their jobs well. Paulette Archibeck Deposition, 58:4-60:13. In the case of death due to abuse, neglect, or exploitation, IMB investigators obtain a corrective action plan from the provider regarding the abuse, neglect, or exploitation, and refer the death itself to the IRC. David Rodriguez Deposition, 138:12-21.

---

[36]Plaintiffs object to this portion of Ms. Maes deposition testimony as irrelevant and cumulative. Training of IMB investigators, however, is relevant to the quality of investigations and the Court does not find the cumulative objection to be persuasive. Consequently, Plaintiffs' objections to this part of Ms. Maes' deposition testimony are overruled.

However, questions arose at Ms Maes' deposition regarding the frequency of telephone interviews by IMB investigators and the effect of reduction of travel fund reductions on the number of face-to-face interviews.  Additionally, Ms. Maes claimed that IMB investigations have not suffered despite an increase in the investigators' caseloads due to vacancies.  In October 2008, Ms. Simons found that IMB investigation files lacked important documentation, but after February 2009, IMB investigators were required to have in their files a copy of a provider's investigation of the incident, the provider's corrective action plan, and documentation that the provider took actions to correct the issues surrounding the incident.  Janet Simons Deposition, 47:11-48:18.  Ms. Simons further recommended that the IMB investigate other types of serious incidents besides abuse, neglect, and exploitation.

Over the years, DHI has improved its database system and has hired a Specialty Surveyor, who is a nurse, to perform death investigations.  David Rodriguez Deposition, 46:4-47:17. The Specialty Surveyor's reports, however, were not completed in time to be incorporated into the IMB incident investigations.  David Rodriguez Deposition, 137:14-19.

As described above, instances of neglect, many of which were health-related, were found numerous times at Mosaic, Dungarvin, Los Lunas, and Tresco.  The 706 Expert rightly testified that the mechanisms to hold providers accountable "is not adequate as we can see from the adverse outcomes and the protracted histories of some of these providers.  There is this tolerance of substandard performance that's not acceptable."  TT Vol. II, 307:4-9.  The 706 Expert also found in her February 2011 report that "IMB investigations are not conducted on all serious incidents" including deaths.  Pl. Ex. 60 (001702).

There is no doubt that the IMB investigators are working hard and doing the best they can under the circumstances.  Moreover, Defendants have investigation policies and procedures,

114

conduct various investigator trainings, provide a nurse consultant to the investigators, have improved IMB databases, and have hired a Specialty Surveyor. Nonetheless, as discussed previously, there are still shortcomings regarding the quality of the investigations like underutilization of the nurse consultant; less use of face-to-face interviews; fewer actual visits to facilities; higher caseloads for the investigators; issues with documentation in investigation files; investigations that omit serious incidents (other than abuse, neglect, or exploitation); untimely Specialty Surveyor reports; and even a lack of investigation on all serious incidents. These shortcomings have undoubtedly increased the risk of harm to class members and have resulted in several instances of health-related neglect found at providers like Mosaic, Dungarvin, Los Lunas, and Tresco.

> (12)   *IM 14: "Implement changes to the system for performing intake/triage of incident reports, to ensure that investigations are conducted of all incidents of suspected abuse, neglect, and exploitation."  APPENDIX A at 3.*

As noted before, Defendants' Incident Management System Policies and Procedures sets forth the intake/triage process for incident reports. Pl. Ex. 194 (003102-003107). This document was revised on May 29, 2006, about a year after APPENDIX A was filed with the Court. It is notable that Defendants have been able to identify various incidents of neglect at providers like Dungarvin, Mosaic, Tresco, and Los Lunas. Nonetheless, the 706 Expert found in her February 2011 report that the IMB does not investigate all serious incidents including some deaths. Pl. Ex. 60 (001702). Although Defendants have established an intake/triage process for investigations, the implementation of that process is not always effective if some serious incidents go uninvestigated.

3.      *Summary of Issues Affecting Defendants' Ability to Comply with Safety Obligations.*

Defendants are to be commended for developing policies and procedures to address incident investigations as well as a providers' guide for reporting incidents.  Defendants are also to be commended for providing IMB investigators with two trainings, for holding monthly and quarterly regional meetings to discuss incident reports, for providing a nurse consultant for investigators, and for hiring a Speciality Surveyor to conduct death investigations.  These activities have surely increased the chances that class members live in safe environments. Nevertheless, Defendants have failed on several accounts to take actions which would ensure that class members are reasonably safe and not subject to unreasonable harm.

Issues that have arisen include the need to timely follow-up on corrective action plans and the need for mortality reviews to focus on and develop corrective action plans or recommendations, on both individual and systemic levels, which will be tracked to resolution. Other issues include the need for more useful statistical incident reporting by the IMB, plus follow-up on that reporting for providers which are performing poorly.  It is imperative for the safety of class members that late or under-reporting of incidents is recognized in a timely way and effectively sanctioned.  In addition, the quality of IMB investigations cannot help but be affected by the apparent lack of resources to hire more investigators, to enable more face-to-face interviews, and to allow for more travel to facilities.  Finally, because medical neglect of class members is a significant concern, the Court doubts whether IMB investigators should have discretion whether to consult with a nurse, and the Court believes class members might be better served if the investigators either were medically trained or were required to consult with a nurse on every case of neglect, abuse, or exploitation based on inadequate medical care.  The Court is

116

confident that Defendants can address these outstanding issues within a reasonable time and in so doing substantially comply with Defendants' remaining obligations under the JSD, POA, and APPENDIX A to provide class members with a reasonably safe environment in which they can thrive.

       *B.*     *Findings of Fact.*

43. Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 1, Desired Outcome A.

44. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 1, Desired Outcome A will not defeat an essential purpose of the POA, i.e., to provide class members with a reasonably safe environment.

45. Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 2, Desired Outcome F, Activity # 3.

46. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 2, Desired Outcome F, Activity # 3 will not defeat an essential purpose of the POA, i.e., to provide class members with a reasonably safe environment.

47. Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 2, Desired Outcome F, Activity # 4.

48. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 2, Desired Outcome F, Activity # 4 will not defeat an essential purpose of the POA, i.e., to provide class members with a reasonably safe environment.

49. Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 2, Desired Outcome G, Activity # 1.

50.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 2, Desired Outcome G, Activity # 1 will not defeat an essential purpose of the POA, i.e., to provide class members with a reasonably safe environment.

51.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 2.

52.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 2 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

53.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 4.

54.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 4 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

55.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 5.

56.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 5 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

57.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 6.

58.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 6 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

118

59. Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 7.

60. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 7 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

61. Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 8.

62. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 8 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

63. Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 9.

64. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 9 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

65. Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 10.

66. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 10 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

67. Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 11.

68.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 11 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

69.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 13.

70.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 13 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

71.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, IM 14.

72.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, IM 14 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with a reasonably safe environment.

C.       *Conclusions of Law.*

28.  Since Defendants have not substantially complied with POA Appendix 1, Desired Outcome A, it is not subject to disengagement at this time.

29.  Since Defendants have not substantially complied with POA Appendix 2, Desired Outcome F, Activity # 3, it is not subject to disengagement at this time.

30.  Since Defendants have not substantially complied with POA Appendix 2, Desired Outcome F, Activity # 4, it is not subject to disengagement at this time.

31.  Since Defendants have not substantially complied with POA Appendix 2, Desired Outcome G, Activity # 1, it is not subject to disengagement at this time.

32.  Since Defendants have not substantially complied with APPENDIX A, IM 2, it is not subject to disengagement at this time.

33.  Since Defendants have not substantially complied with APPENDIX A, IM 4, it is not subject to disengagement at this time.

34.  Since Defendants have not substantially complied with APPENDIX A, IM 5, it is not subject to disengagement at this time.

35.  Since Defendants have not substantially complied with APPENDIX A, IM 6, it is not subject to disengagement at this time.

36.  Since Defendants have not substantially complied with APPENDIX A, IM 7, it is not subject to disengagement at this time.

37.  Since Defendants have not substantially complied with APPENDIX A, IM 8, it is not subject to disengagement at this time.

38.  Since Defendants have not substantially complied with APPENDIX A, IM 9, it is not subject to disengagement at this time.

39.  Since Defendants have not substantially complied with APPENDIX A, IM 10, it is not subject to disengagement at this time.

40.  Since Defendants have not substantially complied with APPENDIX A, IM 11, it is not subject to disengagement at this time.

41.  Since Defendants have not substantially complied with APPENDIX A, IM 13, it is not subject to disengagement at this time.

42.  Since Defendants have not substantially complied with APPENDIX A, IM 14, it is not subject to disengagement at this time.

V.     *Whether Defendants have Substantially Complied with Their Obligations under the JSD,*
       *POA, and APPENDIX A to Provide Supported Employment to Class Members.*

    A.     *Defendants' Obligations under the JSD, POA, and APPENDIX A to Provide*
       *Supported Employment to Class Members.*

The goal of supported employment, as described in the POA, is "to give access to
employment to all individuals with developmental disabilities who wish to work, and for whom
employment will substantially improve their quality of life."  POA at 103.  The POA "builds on
the systems's successes to date in developing employment opportunities for individuals with
developmental disabilities, and gives concentrated attention to providing relevant employment
opportunities, training, and supports to individuals who were previously institutionalized, in
order to access and sustain meaningful jobs, and to continue their career development."  *Id*.  The
POA defines supported employment in accordance with the United States Department of
Education regulations as follows:

> [Supported employment is] paid employment, with Ongoing supports, in integrated
> settings for the maximum number of hours possible based on the unique strengths,
> resources, interests, concerns, abilities and capabilities of individuals with the most
> severe disabilities.  Integrated settings are work places where most of the employees are
> not handicapped and where an individual interacts on a regular basis, in the performance
> of their job duties, with employees who are not handicapped....

*Id*.  Defendants agreed that a goal of supported employment should be to work "at criteria."
Working at criteria means working ten hours a week at half of minimum wage in an integrated
work setting.  TT Vol. III, 520:5-9.

Plaintiffs assert that Defendants have not substantially complied with the following
supported employment provisions of the JSD, POA, and APPENDIX A:

    1.     JSD and POA Provisions

        a.     JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome B:</u> Activity # 2:
       "Recruit/orient and train existing provider and division staff who will be

involved in the completion of vocational profiles and Career Development Plan (CDP) for individuals served in each region."  POA at 105.

b.      JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome B:</u> Activity # 3: "Orient and train provider staff on competency-based [CDP]."  *Id.*

c.      JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome B:</u> Activity # 5: "Implement profiles and CDPs statewide for the identified 119 individuals based on a prioritization scale:

a.  Persons who want to work and have an identified transition plan for supported employment but are not now working,

b.  Persons receiving services that are inconsistent with the transition plan and ISP objectives that were recommended for supported employment assessments,

c.  Persons receiving services consistent with the transitional plan whose employment/work services require enhancements as a safeguard for continued growth and opportunity, [and]

d.  Persons employed consistent with the transition plan and who may need new employment opportunities due to changes, layoffs, problems with performance or newfound career interests."                  *Id.* at 106.

d.      JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome B:</u> Activity # 6: "[CDPs] with action steps for employment will be in ISPs as evidence of career component individuals in each of the groups identified in [Activity] #5 above as: Group 'a,' Group 'b,' Group 'c,' [and] Group 'd.'" POA at 107.

e.      JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome C:</u>  Activity # 1: "Case Managers, IDTs, individuals and guardians will be informed of the need to consider, at the time of the annual ISP meeting, whether an individual would benifit [sic] from a supported employment profile and/or a CDP."  POA at 108.

f.      JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome C:</u> Activity # 2: "Increase employment opportunities for individuals who were previously institutionalized [as follows:]

a.  Facilitate employment/access jobs for previously institutionalized individuals who want to work,

123

b.  Access employment for persons receiving services that are inconsistent with the transition plan and ISP objectives who were formerly institutionalized,

c.  Sustain/improve job matches for persons who were formerly institutionalized and are currently working in jobs that are poor job matches or offer limited number of hours to work,

d.  Sustain/improve employment for persons previously institutionalized who are working, [and]

e.  Continue to increase the number of persons who gain access to employment based on CDP development." *Id.*

g.      JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome C</u>: Activity # 5: "Continue to improve the quality of supported employment [as follows:]

a.  Provide technical assistance to individuals, programs, regional office staff on the development of vocational profiles and individual CDPs,

b.  Provide technical assistance to individuals, programs, regional office staff on individual supports to persons with significant disabilities,

c.  Provide technical assistance in addressing disincentives to employment,

d.  Provide technical assistance on the use of natural supports, [and]

e.  Provide technical assistance on accessing alternative funding      for supported employment...."  POA at 110.

2.      APPENDIX A

a.      SE 1: "LTSD [(Developmental Disabilities Supports Division, formerly known as Long Term Services Division)] will retain new full time equivalent personnel to develop an employment institute (center) and to initiate, support and provide technical assistance for job development and innovative employment practices including customized employment and micro-enterprises at the local level in conjunction with the Supported Employment consultants."  APPENDIX A at 4.

b.      SE 2: "Ensure that the consultants are used for job development at least to the same extent they were used in past years." *Id.*

124

c.  SE 3: "Use the employment consultants at least to the same extent that the previous administration did to provide quality supported employment services to more class members." *Id*. at 5.

d.  SE 4: Implement POA Appendix 10, Desired Outcome B, the 119 Work Plan.

e.  SE 5: "Develop a plan with time lines to provide quality supported employment at the minimum criteria to all priority class members who are determined to be appropriate for work." *Id.*

f.  SE 7: "Analyze all policies and practices that are inconsistent with 'employment first' principles and make necessary changes." *Id.*

g.  SE 9: "LTSD will set and enforce standards that define expectations for all day services, including work." *Id.*

h.  SE 10: "Develop consequences for case management agencies whose case managers do not carry out DOH policies regarding employment in line with employment first principles and as identified in individual comprehensive personal profiles." *Id.*

i.  SE 11: "Develop criteria outlining competencies for staff involved in supported employment." *Id.*

j.  SE 12: "LTSD will recruit employment providers in areas of the state where there are few/no quality outcomes and innovative approaches." *Id.*

k.  SE 13: "Performance-based contracts will be developed, implemented, and enforced." *Id.*

l.  SE 16: "Develop guidelines, consistent with [DOH's] employment first principles, for case managers regarding the need for adequate comprehensive personal profiles and implementation of [CDPs]." *Id.*

3.  JSD ¶¶ 32 and 33: Continuous Improvement of Supported Employment Services.

1.  *JSD and POA Provisions.*

Plaintiffs raise noncompliance issues with both Desired Outcomes B and C of POA

Appendix 10.  Desired Outcome B applies to the 119 class members who are known as the 119

Priority Group.  When the 119 Priority Group were still residents at either LLH & TS or FSH

125

&TS, they had ISPs which indicated that they had work goals.  Desired Outcome B of POA

Appendix 10 requires that the 119 Priority Group have "a [vocational] profile and CDP, if

indicated, addressed in their annual ISP."  POA at 105.  Desired Outcome C of POA Appendix

10 provides that "[t]he New Mexico Developmental Disabilities Division will have improved

and expanded capacity for quality supported employment.  For individuals previously

institutionalized (other than those 119 identified in "B") whose ISP indicates employment, there

will be a [vocational] profile and CDP, if indicated, addressed in their annual ISP."  *Id*. at 108.

Defendants note in their response to the Renewed Noncompliance Motion that on May

12, 2011, they initiated the disengagement process for both Desired Outcomes B and C.

Plaintiffs, however, oppose the disengagement and have raised issues of noncompliance with the

supported employment obligations at the June 2011 evidentiary hearing as well as in their

Renewed Noncompliance Motion.  Consequently, the issue of whether Defendants have

substantially complied with Desired Outcomes B and C and their supporting activities is now

before the Court.  *See* JSD ¶ 45 ("If the motion [to disengage] is contested, the parties will

request that the Court hold a hearing and enter its findings and conclusions.").  Since the Court

has instructed Plaintiffs to identify with specificity the supporting activities Plaintiffs claim

Defendants have not substantially complied with, the Court will not focus on the broader

obligations set forth in Desired Outcomes B and C, but will instead concentrate on the specific

activities supporting Desired Outcomes B and C identified by Plaintiffs as activities with which

Defendants have not substantially complied.

> a.  *JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome B</u>: Activity #*
> *2: "Recruit/orient and train existing provider and division staff*
> *who will be involved in the completion of vocational profiles and*
> *Career Development Plan (CDP) for individuals served in each*
> *region."  POA at 105.*

126

It is significant that the number of supported employment providers has increased from 15 to 20 in 1994 to approximately 45 in 2011.  TT Vol. III, 546:25-547:19.  Defendants also contract with outside entities to provide vocational assessments, direct the New Mexico Employment Institute (NMEI) to conduct vocational assessments, and provide training statewide to build capacity to perform vocational assessments.  TT Vol. IV, 687:18-25.   In fact, Defendants developed vocational assessment profile (VAP) training with the assistance of their long-time supported employment consultant, Ruby Moore.  *Id.* at 642:22-25. The *Jackson* quarterly report for October to December 2010 indicates that Activity # 2 is ongoing and that "follow-up mentoring to VAP training continued this quarter" for the southwest and southeast regions.  Pl. Ex. 95 (002376).  Training was also scheduled for the northeast region the following quarter.  *Id*.  The amount of training being offered to supported employment providers has increased over time as well.  Robert Mazzola Deposition, 51:13-16.  In addition, Defendants have created training for case managers to insure that they understand their role in providing supported employment opportunities and that they perform their roles appropriately.  TT Vol. IV, 643:1-2.

Notwithstanding the progress Defendants have made in recruiting supported employment providers, increasing the number of VAP facilitators, and in providing training, according to Cathy Stevenson, the Deputy Director of DDSD, the state could still use more VAP facilitators. *Id.* at 717:2-12.  For example, the QMB found that VAPs were provided properly only 27 % of the time in FY 2009 due, in part, to lack of qualified state staff who are approved to complete VAPs.  Pl. Ex. 134 (002612).  Clearly, Defendants need to recruit and train even more staff who can prepare adequate VAPs for the 119 Priority Group so that members of the group, who want to work, can attain supported employment at criteria.  The Court will discuss the CDP training

127

component of Activity # 2 in conjunction with Desired Outcome B, Activity # 3 which also

requires CDP training.

> b.    *JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome B:</u> Activity #*
> *3: "Orient and train provider staff on competency-based [CDP]."*
> *POA at 105.*

According to the *Jackson* quarterly report for October to December 2010, Activity # 3 is,

likewise, ongoing.  The quarterly report notes that with respect to Activity # 3, NMEI provided

technical assistance concerning career development to several providers; Ms. Moore provided

consultation on job development strategies; and Ruthie Beckwith, Ms. Moore's associate,

provided consultation on small business development strategies. Pl. Ex. 95 (002376).  As stated

above, supported employment providers have, over the years, received generally more training.

In the early 1990s and more recently, Defendants have specifically conducted statewide CDP

training as well.  TT Vol. IV, 642:15-20.  Even so, the CPRs show that CDPs lack requisite

information or that the CDPs are not implemented.  TT Vol. III, 561:13-24.  As Ms. Moore

observed in her testimony during the June 2011 evidentiary hearing, there are class members

who are not working who could be working at good jobs and class members who are working

who could do more and get paid more than they do.  *Id.* at 522:2-5; 523:16-18.  Ms. Moore

further testified that Defendants have continued to contract with providers who have a "chronic

inability to get people jobs and provide good quality supported employment services...."  *Id*. at

535:2-9.  Once more, despite technical assistance, consultations, and trainings, CDPs either often

are not being produced or have been implemented properly.  These problems with CDPs show

that the current orientation and training of supported employment provider staff is simply

inadequate.  Without adequate orientation and training, not all members of the 119 Priority

Group who desire to engage in supported employment will be able to do so, thereby defeating

128

the overarching JSD and POA goals to provide supported employment at criteria to 119 Priority

Group members who want to work.

> c.    JSD ¶¶ 24, 37, POA Appendix 10, _Desired Outcome B:_ Activity #
> 5: "Implement profiles and CDPs statewide for the identified 119
> individuals based on a prioritization scale:
>
> a.  Persons who want to work and have an identified transition
> plan for supported employment but are not now working,
>
> b.  Persons receiving services that are inconsistent with the
> transition plan and ISP objectives that were recommended for
> supported employment assessments,
>
> c.  Persons receiving services consistent with the transitional plan
> whose employment/work services require enhancements as a
> safeguard for continued growth and opportunity, [and]
>
> d.  Persons employed consistent with the transition plan and who
> may need new employment opportunities due to changes, layoffs,
> problems with performance or newfound career interests."  POA
> at 106.

Vocational assessment updates were completed for the 119 Priority Group in FY 2010.

Pl. Ex. 95 (002377).  Nonetheless, five of the 119 Priority Group have never worked at criteria

while other 119 Priority Group members who previously had work goals no longer have them,

and others have outdated CDPs or CDPs that have not been implemented. TT Vol. III, 515:21-

516:1.  While Defendants have made progress in updating VAPs for the 119 Priority Group, they

have had difficulty in updating CDPs for the 119 Priority Group as well as implementing the

CDPs for some members of the 119 Priority Group.  Improvement of the CDP process is

necessary in order for Defendants to meet the JSD and POA goal of providing supported work

opportunities, especially at criteria, to those 119 Priority Group members who desire to work.

> d.    JSD ¶¶ 24, 37, POA Appendix 10, _Desired Outcome B:_ Activity #
> 6: "[CDPs] with action steps for employment will be in ISPs as
> evidence of career component individuals in each of the groups

> identified in [Activity] #5 above as: Group 'a,' Group 'b,' Group 'c,' [and] Group 'd.'" POA at 107.

The *Jackson* quarterly report for October to December 2010 states that Activity # 6 is both completed and ongoing.  Pl. Ex. 95 (002378).  The quarterly report notes that "[t]he vocational profile policy and procedure[s] available on the DDSD web site specify the role of the IDT."  *Id*.  The quarterly report also documents that a total of 38 of the 119 Priority Group members were employed that quarter with 20 of them working at criteria.  *Id*.  The quarterly report explained that four of the 119 Priority Group members who had been employed were no longer employed:  one class member retired and the other three class members had jobs that ended for various reasons including transitioning to a new provider, not wanting the job and having a guardian opposed to employment, and working conditions that were too loud for the class member.  *Id*.

Ms. Moore testified more generally at the June 2011 evidentiary hearing that many class members' CDPs are outdated and those that are current are not being implemented.  She also observed that CDPs are not being incorporated into ISPs; consequently, class members' work goals are ignored.  TT Vol. III, 574:2-18.

Although Defendants have developed policies and procedures for IDTs in specifying their role with respect to VAPs and a handful of 119 Priority Group members are employed at criteria, problems remain regarding outdated CDPs, CDPs not being incorporated into ISPs, and unimplemented CDPs.  Without updated CDPs incorporated into the ISPs, there is no chance that 119 Priority Group members who want to work at criteria can have their work goals realized.  Defendants must, therefore, put more effort into complying with Activity # 6 in order to meet the supported employment goals of the JSD and POA.

> e.      *JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome C</u>: Activity #*
> *1: "Case Managers, IDTs, individuals and guardians will be*
> *informed of the need to consider, at the time of the annual ISP*
> *meeting, whether an individual would benifit [sic] from a*
> *supported employment profile and/or a CDP."  POA at 108.*

As mentioned before, policies and procedures are available to the IDTs regarding their role in producing VAPs.  Pl. Ex. 95 (002379).  In addition, every year at the ISP meeting, there is supposed to be "a conversation with the individual and the people who care about them, like their guardian, their team members, their friends, [and] their family" about "how work could improve this person's life...."  TT Vol. IV, 649:13-22.  Supported employment is the preferred service for DD adults and should be the first piece of the ISP process.  *Id*. at 649:10-13.  In fact, the supported employment discussion at the annual ISP meeting must be documented and employment is a default choice.  TT Vol. III, 554:11-20; Judy Stevens Deposition, 68:2-24; Pl. Ex. 32 (000790-000791).  This preference for employment is commonly referred to as the Employment First principle.  Class members who enroll in supported employment as a service in their ISP have work goals and expect to get a job, unless there is a medical situation that prevents employment.  Dan Jackson Deposition, 53:25-55:3.

Although all written guidance by Defendants–their contracts, policies, and the definition of supported employment–describe employment as a default choice, "[i]n practice, that's not necessarily what's happening."  TT Vol. III, 554:18-21.  Ms. Moore stated at the June 2011 evidentiary hearing that the fact that so few class members are actually working indicates that Desired Outcome C obligations, including presumably Activity # 1, are not being met by Defendants.  TT Vol. III, 519:9-19.  Ms. Moore did acknowledge, however, that the decrease in the number of class members working from 2002 to 2010 could be the result of illness, retirement, and deaths.  *Id*. at 545:22-546:23; Def. Ex. Vol. VI, K-05 (001993-001994).  She,

nonetheless, noted that CDPs are not being incorporated into ISPs which means that those CDPs are not being implemented.  TT Vol. III, 574:2-18.

Again, Defendants have in place policies and procedures to ensure that the appropriate persons in a class member's life are informed of the importance of supported employment at the annual ISP meeting.  Putting those policies and procedures into practice is where the problem seems to lie.  Without consistent implementation of those policies and procedures, Defendants will necessarily fall short of affording reasonable opportunities for class members, who so desire, to engage in supported employment at criteria.

> f.  *JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome C</u>: Activity # 2: "Increase employment opportunities for individuals who were previously institutionalized [as follows:]*
>
> *a.  Facilitate employment/access jobs for previously institutionalized individuals who want to work,*
>
> *b.  Access employment for persons receiving services that are inconsistent with the transition plan and ISP objectives who were formerly institutionalized,*
>
> *c.  Sustain/improve job matches for persons who were formerly institutionalized and are currently working in jobs that are poor job matches or offer limited number of hours to work,*
>
> *d.  Sustain/improve employment for persons previously institutionalized who are working, [and]*
>
> *e.  Continue to increase the number of persons who gain access to employment based on CDP development."  POA at 108.*

Defendants have taken a number of steps designed to increase employment opportunities for class members.  For example, Defendants have developed more than one policy promoting employment and disseminated it; Defendants have more than doubled the number of supported employment providers since 1994; and Defendants created NMEI in 2007 to assist the state,

132

providers, and individuals in having better employment outcomes.  TT Vol. II, 406:22-407:2; TT

Vol. IV, 640:7-15.  Moreover, in 2009, Defendants obtained a federal Medicaid grant in excess

of a million dollars to increase the funding for NMEI. TT Vol. III, 621:22-622:11.  Ms. Moore

also works closely with NMEI and state staff to ensure that they have the skills and capacity for

job development. In addition, she also works with providers and she employs agents who work

on her behalf, including Rick Toscano and Ruthie Beckwith.  TT Vol. IV, 646:8-20.  Defendants

are further increasing training to build the capacity to perform vocational assessments, and

Defendants have trained case managers regarding their role in providing supported employment.

TT Vol. IV, 687:18-25.  Additionally, Defendants have a total of six supported employment

specialists who collect data on class members, attend IDT meetings, advocate on behalf of class

members, work with providers, and work with NMEI.  *Id.* at 638:23-639:10; 639:20-640:1.

Defendants have also reached out to national experts to improve supported employment services.

TT Vol. III, 565:3-19; Judith Stevens Deposition, 77:15-78:6, 99:4-100:19, 103:17-105:19.

Defendants, moreover, produce a data elements report that contains current information on the

status of VAPs and CDPs.  TT Vol. IV, 714:10-715:8.  Defendants have also redirected

resources from segregated to integrated services and supports, as recommended by Ms. Moore.

TT Vol. II, 407:24-408:2.  Defendants have implemented an updated system for measuring the

performance of supported employment providers which includes progressive technical

assistance.  TT Vol. IV, 699:15-20.  Furthermore, the performance contracts for supported

employment providers lists "deliverables" for each class member for each quarter, and supported

employment staff monitor the "deliverables" every quarter.  *Id.* at 647:19-648:5; Dan Jackson

Deposition, 19:9-21.  Defendants, in addition, have developed standards and requirements for

supported employment providers.  TT Vol. IV, 643:3-6.  In 2011, New Mexico ranked ninth in

the country in supported employment as measured by the United Cerebral Palsy Association's publication, "The Case for Inclusion." *Id.* at 655:12-656:7;  Def. Ex. Vol. I, E-02 (000292).

Despite Defendants' good faith effort to comply with Activity # 2, Ms. Moore reports that there are still class members working in supported employment positions that do not meet criteria and that "many" other class members who are capable of working at criteria are not working at all.  TT Vol. III, 521:8-20.  As mentioned previously, more VAP facilitators are needed and the VAPs could be updated more quickly.  TT Vol. IV, 688:1-5.  Although Defendants followed Ms. Moore's recommendation to move resources from segregated programs to integrated programs, Ms. Moore believes that the resources are "not at the level [they] need[] to be."  TT Vol. II, 407:24-408:2.  Ms. Moore noted at the June 2011 evidentiary hearing that five members of the 119 Priority Group have never worked at criteria; that other members of the 119 Priority Group who previously had work goals no longer have them; and that other members have outdated CDPs or CDPs that have not been implemented.  *Id.* at 515:21-516:1.

Ms. Moore believes that the historic data illustrates that Defendants have "lost the momentum" to implement the supported employment reforms mandated by the JSD and that Defendants are not engaging in "adequate" efforts to increase supported employment opportunities for class members.  *Id*. at 523:4-11.  For instance, Ms. Moore testified at the June 2011 evidentiary hearing that the CPRs indicate that CDPs lack requisite information, CDPs are not being implemented, and that providers do not have adequate staffing.  *Id*. at 561:13-24.  Ms. Moore further testified that Defendants have not effectively addressed issues like low wages, segregation, the quality of alternatives to work, i.e., day programs, and relegation of class members who can work to day programs.  TT Vol. II, 407:2-1l; Pl. Ex. 93 (002354).  Finally,

while acknowledging the existence of supported employment policies and procedures, Ms. Moore testified that there is a problem with Defendants' ability to effectively implement those policies.  TT Vol. II, 406:22-407:4; TT Vol. III, 626:22-627:5.

The Community Monitor, likewise, has concluded in each of her CPRs from 2005 through 2009 that Defendants have not provided class members with appropriate supported employment services.  Pl. Ex. 10 (000323-000325); Def. Ex. Vol. XI, F-12 (004394-004397); Def. Ex. Vol. XI, G-12 (004456-004457); Def. Ex. XI, H-12 (004505-004506, 004524-004525); Def. Ex. Vol. XII, I-12 (004569-004570, 004580, 004597-004598).  For example, the 2009 CPR reflects that a third of the sampled class members who were determined to need a VAP did not receive one and that two-thirds of the sample did not have CDPs.  Def. Ex. Vol. XII, I-12 (004569-004570).  Furthermore, class members who received a VAP dropped from 100% in 2000 to 70% in 2009 while employment assessments that conformed to DOH regulations fell from 89% in 2000 to 39% in 2009.  *Id*. (004597).   The Community Monitor also concluded in the 2009 CPR that half of the class members who should have been engaged in supported employment were not working at all in 2009 due to Defendants' planning and implementation failures, and that only 30% of the jobs provided in 2009 met criteria.  *Id*. (004580). The Community Monitor stated in the 2009 CPR that the 2009 data reflected "systemic failure and more important, life-wasting for class members who are not receiving needed supports." *Id*. (004597).  The Community Monitor testified at the June 2011 evidentiary hearing that the providers which are paid six hours a day, five days a week to provide meaningful and purposeful activities are not doing their jobs.  TT Vol. III, 603:23-604:3.  The Community Monitor further testified that there are still class members who are on the available-to-work lists who do not have work outcomes, and that there is no evidence that the Employment First policy is being

135

implemented at all levels, how it is being implemented, or how it is being evaluated and measured.  TT Vol. III, 601:25-602:6.

    More recent statistics show that as of April 15, 2011, only 36 class members were working at least ten hours a week.  TT Vol. III, 534:4-10; TT Vol. IV, 687:1-6.  As of May 2010, 57 members of the 119 Priority Group were available to work but only 43 had any type of employment.  Pl. Ex. 130 (002595-002597).  Furthermore, 20 of the 119 Priority Group members had work at criteria by December 2010 while 18 worked below criteria.  Pl. Ex. 95 (002378).  In FY 2010, 75 class members were enrolled in supported employment services.  Pl. Ex. 100 (002444); TT Vol. III, 517:14-20.  This number has remained fairly steady from 2001 to 2010.  *Id.*  However, fewer class members were actually working in 2010 than in 2001.  TT Vol. III, 517:22-24.  DDSD Deputy Director, Cathy Stevenson, is aware of class members who have a work goal, but do not have a job, and of class members whose desire to work is not shown in their ISPs.  TT Vol IV, 683:13-22, 685:9-12.

    The Court commends Defendants for obtaining more supported employment providers, developing policies and procedures to encourage supported employment, providing statewide staff including the NMEI to help develop supported employment, obtaining grant money to implement supported employment, providing training, working with experts on supported employment including Ms. Moore, collecting data, moving away from segregated employment environments, improving provider performance contracts, and establishing provider standards.  These efforts are reflected in New Mexico's relatively high national ranking on providing supported employment.  Unfortunately for Defendants, the parties did not establish national rankings as an indicator of compliance with Activity # 2.  The record demonstrates, on the other hand, that several problems persist in increasing adequate supported employment opportunities

for class members.  These problems include the need (1) to provide timely VAPs, (2) to employ

more VAP facilitators, (3) to direct more resources to integrated employment settings, (4) to

update CDPs, (5) to effectively implement CDPs, (6) to ensure better supported employment

provider staffing, (7) to implement policies and procedures, and (8) to offer more work at

criteria.  The Court understands, of course, that employment numbers for class members will

naturally decrease as the class ages and class members retire, die, or develop more health issues.

Additionally, the Court realizes that some guardians may not want a class member to work,

especially in an integrated setting where a class member might face challenges which the

guardian believes the class member should not experience.  Nevertheless, Defendants are still

responsible under the JSD and POA for increasing employment opportunities, especially at

criteria.

> g.   *JSD ¶¶ 24, 37, POA Appendix 10, <u>Desired Outcome C</u>: Activity #
> 5: "Continue to improve the quality of supported employment [as
> follows:]*
>
> *a.  Provide technical assistance to individuals, programs, regional
> office staff on the development of vocational profiles and
> individual CDPs,*
>
> *b.  Provide technical assistance to individuals, programs, regional
> office staff on individual supports to persons with significant
> disabilities,*
>
> *c.  Provide technical assistance in addressing disincentives to
> employment,*
>
> *d.  Provide technical assistance on the use of natural supports,
> [and]*
>
> *e.  Provide technical assistance on accessing alternative funding
> for supported employment...."  POA at 110.*

Defendants have established the NMEI to provide technical assistance to the state, providers, and individuals.  Defendants have also contracted with Ms. Moore and her associates to afford technical assistance to NMEI, state staff, and providers.  In addition, Defendants have brought in national experts to work on improving supported employment services.  State supported employment coordinators offer technical assistance as well.  *See, e.g.,* Pl. Ex. 95 (002385).  All of these actions are meant to improve the quality of supported employment.

However, the fact that many working class members are not working at criteria while other class members who are capable of working at criteria are not working at all demonstrates that Defendants are not providing the various kinds of technical assistance required by Activity # 5.  In fact, both Ms. Moore and the Community Monitor perceive an "overt resistance" from state leaders and providers to more fully implement the Employment First policy and give class members access to meaningful employment.  Pl. Ex. 83 (002240-002241); TT Vol. III, 599:6-19.

Obviously, Defendants are attempting to give technical assistance to the various stakeholders by various means.  Nevertheless, because of the deficiencies noted above, it appears that the technical assistance that Defendants now offer is not effective enough to ensure that class members are receiving the quality supported employment services to which they are entitled under the JSD and POA.  Defendants must, therefore, do more to address the requirements listed under Activity # 5.

> 2.      *APPENDIX A.*

Defendants note that they have initiated the disengagement process with respect to APPENDIX A, Supported Employment, but that Plaintiffs oppose the disengagement.  The parties, however, presented evidence at the June 2011 hearing on the supported employment provisions of APPENDIX A which are currently contested in the Renewed Noncompliance

Motion.  The Court will, therefore, address those provisions at this time.  *See* JSD ¶ 45 ("If the motion [to disengage] is contested, the parties will request that the Court hold a hearing and enter its findings and conclusions.").

> a.   *SE 1: "LTSD [(now known as the DDSD)] will retain new full time equivalent personnel to develop an employment institute (center) and to initiate, support and provide technical assistance for job development and innovative employment practices including customized employment and micro-enterprises at the local level in conjunction with the Supported Employment consultants." APPENDIX A at 4.*

To address SE 1, Defendants established the NMEI in 2007 to provide technical assistance to the State, providers, and individuals.  NMEI's phased-in implementation goals from 2006 called for the recruitment of a director, four to five employment support staff, an administrative staff, a consultant, and technical support staff.  Pl. Ex. 125 (002569).  NMEI, however, has never had a director and at most has only had three staff.  Robert Mazzola Deposition, 64:5-16, 66:9-67:4.

In 2010, NMEI had a calendar year budget of over $300,000 and employed two full-time employees who are directly involved in assisting class members.  TT Vol. IV, 640:22-641:10.  The 2010 budget for NMEI apparently was funded by a federal Medicaid grant in excess of a million dollars that Defendants obtained in 2009 to be used over the next three years. TT Vol. III, 621:22-622:21; Judith Stevens Deposition, 100:9-11.  NMEI normally has a $150,000 state general fund contract which serves as its base budget.  Judith Stevens Deposition, 128:17-129:4, 155:2-4.  Ms. Moore had recommended that NMEI be funded at $200,000 to $250,000 a year. TT Vol. III, 622:15-16.  Apparently, NMEI cannot fund the director's position through the state general fund contract.  Robert Mazzola Deposition, 64:18-21.  Even with Medicaid funding, the Community Monitor believes that the NMEI is still underfunded and criticizes the effectiveness

139

of the NMEI because it lacks a director.  TT Vol. III, 622:10-12.  Ms. Moore concurs that

without sufficient funds to recruit and hire a director, NMEI cannot be as effective as it was

intended to be.  TT Vol. III, 525:13-23.  Even Judith Stevens, head of DOH's Community

Inclusion Team which focuses on meaningful day and supported employment services, agreed

that NMEI would benefit from having a director.  Judith Stevens Deposition, 15:17-20, 155:14-

16.

        Although Defendants, in fact, created an employment institute as required by SE 1 and

have recently been successful in increasing its funding, NMEI is not being used to its fullest

potential.  Without full staffing and a director, NMEI will be hard-pressed to adequately perform

the functions described in SE 1 so that class members who want to work can access supported

employment opportunities at criteria.

> **b.** *SE 2: "Ensure that the consultants are used for job development at least to the same extent they were used in past years."  APPENDIX A at 4.*

        Defendants continue to contract with Ms. Moore, their supported employment consultant,

and her associates to address supported employment issues.  TT Vol. IV, 644:6-10.  Defendants

continue to use the same funding for Ms. Moore's contract.  *Id.* at 646:8-9.  However, it is

notable that Ms. Moore and her associates worked 852 hours in 2004, 940 hours in 2005, and

1,064 hours in 2006 before a reduction to only 394 hours in 2009 and 262 hours for the first half

of 2010.  Pl. Ex. 105 (002473-002474).  Currently, Ms. Moore interacts with Dan Jackson, the

State Lead for supported employment, from two or three times a month to as often as six to eight

times a month with emails exchanged at a rate of at least two or three times a month.  Dan

Jackson Deposition, 35:4-16.

The reduction of hours worked per year by Ms. Moore and her associates demonstrates that Defendants are not using Ms. Moore and her associates "to the same extent they were used in past years."  APPENDIX A, SE 2.  The frequency of Ms. Moore's contacts with Mr. Jackson supports this observation as well.  To meet SE 2 in a meaningful way, Defendants need to more fully take advantage of the expertise offered by Ms. Moore and her associates.

> c.     *SE 3: "Use the employment consultants at least to the same extent that the previous administration did to provide quality supported employment services to more class members."  APPENDIX A at 5.*

Referring to the discussion of SE 2, the Court notes that the record shows that Ms. Moore and her associates are not working under their contract to the extent they had in the past.  Consequently, it would be a stretch to conclude that Defendants are using "the employment consultants at least to the same extent that the previous administration did to provide quality supported employment services to more class members."  APPENDIX A, SE 3.

> d.     *SE 4: Implement POA Appendix 10, Desired Outcome B, the 119 Work Plan.*

The Court has already discussed, *supra*, the activities under POA Appendix 10, Desired Outcome B with which Plaintiffs allege Defendants have not substantially complied.  Having found that those activities pose concerns which Defendants must still address, the Court finds similarly with respect to SE 4.

> e.     *SE 5: "Develop a plan with time lines to provide quality supported employment at the minimum criteria to all priority class members who are determined to be appropriate for work."  APPENDIX A at 5.*

By December 2010, just 20 of the 119 Priority Group members were working at criteria.  Pl. Ex. 95 (002378).  At least five of the 119 Priority Group members have never worked at criteria; other 119 Priority Group members had work goals, but now they no longer have them;

141

and other 119 Priority Group members have outdated CDPs or CDPs that have not been implemented.  Considering these statistics and the fact that Defendants did not direct the Court to any evidence in the record which shows the existence of "*a plan with time lines* to provide quality supported employment at the minimum criteria to all priority class members who are determined to be appropriate for work," (emphasis added), the Court is left with no choice but to find that Defendants must still develop a plan as required by SE 5.

> f.    SE 7: "*Analyze all policies and practices that are inconsistent with 'employment first' principles and make necessary changes.*" *APPENDIX A at 5.*

It is undisputed that Defendants have developed policies promoting Employment First principles.  TT Vol. II, 406:22-407:2; Judith Stevens Deposition, 18:9-22.  Defendants have established the NMEI, engaged more supported employment providers and VAP facilitators, created a supported employment database, provided training, contracted with supported employment experts, implemented performance-based contracts with supported employment providers, and developed the ISP process to implement the Employment First policies. However, in 2008, Ms. Moore reported that "[o]verall, there is a failure, and in some cases overt resistance, on the part of state leadership and many providers to make good on promises to the *Jackson* Class Members, to more fully implement the *Employment First* Policy, and to continue to open doors for people with developmental disabilities in New Mexico to access meaningful employment."  Pl. Ex. 83 (002240-002241).  *See also* TT Vol. II, 407:2-4; TT Vol. III, 554:18-21.  This report was based on interviews and contacts with DDSD employment coordinators, meaningful day" staff, the Community Monitor, *Jackson* parties, Division of Vocational Rehabilitation personnel, NMEI consultants, community reviewers, advocates, family members, and people with disabilities.  Pl. Ex. 83 (002227).  Ms. Moore observed in her June 2011

142

testimony that functional impairments are listed in the ISPs as reasons "for why not to move forward with supporting the person to access employment." TT Vol. III, 514:21-515:4. The Community Monitor, likewise, testified at the June 2011 hearing that there is no evidence whether the Employment First principle is being implemented at all levels, or how it is being evaluated and measured. TT Vol. III, 602:1-6.

In FY 2009, the QMB found that 27% of the time VAPs were not properly provided. Pl. Ex. 134 (002612). As mentioned previously, there are not as many approved VAP facilitators as Ms. Stevenson would like, VAPs should be more current, and some class members who want a VAP who have not received one. TT Vol. IV, 687:18-688:5, 713:6-8, 716:23-717:5. Moreover, it is possible that a day services provider (who does not also provide supported employment services and who is on the IDT) might reject or refuse a recommendation for supported employment services because the day services provider has a vested interest in not losing that class member to a supported employment provider. Judith Stevens Deposition, 76:10-77:14. In addition, in 2009, two-thirds of the class members did not have CDPs and half of those who should have been working were not working. Def. Ex. Vol. XII, I-12 (004570, 004580). With regards to the 119 Priority Group, as stated previously, five of the group members have never worked at criteria while some who had work goals no longer have those goals, and others had outdated CDPs or CDPs that were not implemented at all.

Additionally, Ms. Moore stated at the June 2011 evidentiary hearing that, despite more supported employment provider training, supported employment providers are not necessarily experienced in providing supported employment services. TT Vol. III, 533:21-534:10; 535:2-9. Unlike other states, New Mexico has performance-based contracts for supported employment providers that do not include qualitative criteria for employment like job placement deadlines, a

minimum of hours worked per week, and at least a minimum wage.  Pl. Ex. 112 (002519-002520); Robert Mazzola Deposition, 114:23-115:9.  Including qualitative criteria in the contracts would help to force supported employment providers to implement the Employment First principle as well as to provide quality supported employment at criteria.

Enforcement of the performance-based contracts seems problematic as well.  For instance, even if a supported employment provider fails to meet its obligations, it still gets paid unless the provider "violated a Medicaid fraud type of thing...."  Judith Stevens Deposition, 81:19-82:5.  When a supported employment provider fails to fulfill its obligations under its contract, Defendants "counsel" it.  When a supported employment provider meets less than 50% of its contract obligations, Defendants send it a letter informing it of deficient performances.  Dan Jackson Deposition, 63:8-11; TT Vol. IV, 698:23-699:3. Defendants use progressive technical assistance in addressing issues arising from the performance of supported employment providers.  TT Vol. IV, 699:15-20; Judith Stevens Deposition, 78:8-17.  Although referral to the IRC is a possibility for failure to meet the performance-based contracts, DDSD Deputy Director Cathy Stevenson testified at the June 2011 evidentiary hearing that the most severe sanction for performance failings has been "interaction" with state officials and orders to write corrective actions plans.  TT Vol. IV, 700:6-17.  *See also* TT Vol. IV, 648:19-22; Judith Stevens Deposition, 79:22-80:23.

Defendants have in place sufficient Employment First policies which they believe to be an essential component of successful supported employment.  Defendants have tried to implement the Employment First policy through various means such as (1) establishing the NMEI, (2) enlarging the number of supported employment providers and VAP facilitators in the state, (3) collecting information via a database, (4) training, (5) contracting with experts and

144

consultants, (6) integrating Employment First ideals in the ISP process, and (7) using performance-based contracts.  The issue, however, is that other problems (e.g., untimely VAPs, possible conflicts of interest, inexperienced supported employment providers, CDPs that need updating and implementing, and performance-based contracts that could be better written and enforced) prevent Defendants from effectively implementing the Employment First principle as SE 7 intends.

> g.   *SE 9: "LTSD will set and enforce standards that define expectations for all day services, including work."  APPENDIX A at 5.*

Defendants have, in fact, developed standards and requirements for providers of supported employment services that convey Defendants' expectations.  TT Vol. IV, 643:3-6; Pl. Ex. 32 (000803-000833).   The Court assumes that the use and enforcement of performance-based contracts are designed to ensure that the supported employment providers meet those standards and requirements.  Specifically, the performance-based contracts are intended to set performance outcomes for supported employment providers as well as to establish growth targets for individuals.  Judith Stevens Deposition, 72:16-73:15.  Laudable as these intentions may be, the performance-based contracts lack some basic qualitative criteria such as job placement deadlines, minimum work week hours, and minimum wage amounts.  Defendants can impose serious sanctions on supported employment providers who do not fulfill their contracts.  However, to date the harshest sanctions imposed on noncompliant supported employment providers have been referring the failures to the IRC, counseling, sending letters, and requiring corrective action plans.  It seems obvious that the standards and requirements are not being enforced because there continues to be a lack of supported employment opportunities at criteria.  TT Vol. II, 406:19-407:4.  Stricter performance-based contracts and meaningful enforcement of

those contracts would result in greater compliance with supported employment provider

standards and requirements.  Without effective enforcement of supported employment provider

standards and requirement, class members who desire to work may not receive supported

employment at criteria, a clear violation of the goals of the JSD, POA, and APPENDIX A.

> h.       *SE 10: "Develop consequences for case management agencies whose case managers do not carry out DOH policies regarding employment in line with employment first principles and as identified in individual comprehensive personal profiles." APPENDIX A at 5.*

Ms. Moore testified at the June 2011 evidentiary hearing that Defendants' contracts with

case management agencies include specific penalty steps for failing to demonstrate progress in

obtaining jobs for class members, but Defendants have never enforced those penalty steps.  Ms.

Moore also observed that Defendants have not taken any action against case management

agencies that publically state that "supported employment is a waste of time and a waste of

money...."  TT Vol. III, 526:16-23.  Defendants obviously need to penalize case management

agencies that employ case managers who do not help class members pursue employment goals

as required by the JSD, POA, and APPENDIX A, and who do not promote the Employment First

principle.

> i.       *SE 11: "Develop criteria outlining competencies for staff involved in supported employment."  APPENDIX A at 5.*

NMEI provides technical assistance to staff; Defendants train VAP facilitators, case

managers, and supported employment providers; supported employment providers have

standards which they should meet; Ms. Moore and her associates work with staff on supported

employment; and other supported employment experts also work with Defendants.

Consequently, training, standards, and resources are available to staff so that they can develop

146

competencies necessary to provide supported employment opportunities at criteria to class

members. However, whether staff actually take advantage of the training, standards, and

resources is questionable. For instance, according to Ms. Moore, supported employment

providers still lack "the skills to do the job that they are getting paid to do." TT Vol. III, 533:21-

534:10. Additionally, Ms. Moore and her associates are consulted less often than they used to

be. Also, lack of better written and better enforced performance-based contracts for supported

employment providers naturally leads to a more lackadaisical effort to ensure competent staff.

Ms. Moore concluded at the June 2011 evidentiary hearing that Defendants have continued to

contract with supported employment providers with a "chronic inability to get people jobs and

provide good quality supported employment services...." TT Vol. III, 535:2-9. Furthermore, the

Court is simply unsure whether there are specific "criteria" applicable to staff competencies

related to supported employment. Finally, even if there are criteria outlining staff competencies,

they do not appear to be applied successfully as demonstrated by the continuing problems class

members encounter in obtaining supported employment at criteria. Without that success,

Defendants cannot meet the supported employment goals of the JSD, POA, and APPENDIX A.

> j.    *SE 12: "LTSD will recruit employment providers in areas of the state where there are few/no quality outcomes and innovative approaches." APPENDIX A at 5.*

Defendants have increased the number of supported employment providers, statewide,

from between 15 and 20 in 1994 to about 45 in 2011. In fact, Ms. Moore does not complain

about the number of supported employment providers; she complains about the quality of the

supported employment services. TT Vol. III, 547:23-24. Ms. Moore testified at the June 2011

evidentiary hearing that if the supported employment providers "are actually providing

supported employment," then the increase in supported employment providers would actually be

beneficial to class members.  The Court believes that Defendants would agree that recruitment of

supported employment providers who actually offer supported employment services would

fulfill Defendants' obligation not only under SE 12, but would more generally fulfill

Defendants' supported employment obligations under the JSD, POA, and APPENDIX A.

However, since there are issues regarding the extent to which supported employment services

are being rendered, Defendants must remain diligent and proactive in recruiting sufficient

supported employment providers who will actually provide supported employment at criteria to

those class members who desire to work.

> k.    SE 13: *"Performance-based contracts will be developed,*
> *implemented,  and enforced."  APPENDIX A at 5.*

Defendants have developed and implemented performance-based contracts, but, as noted

above, there are concerns about what should be performed under the contracts in order to ensure

that the class members have adequate supported employment opportunities at criteria.  Also,

there are problems with enforcement of those contracts and a need for imposing more serious

consequences for the breach of those contracts to ensure accountability and full compliance.

Without requiring more qualitative actions on the part of the providers to achieve the goal of

supported employment at criteria along with more accountability through tougher mechanisms to

enforce the contracts, the Court cannot, in good conscience, uphold Defendants' superficial

compliance with SE 13 to the detriment of class members whose employment goals are not

reached due to ineffectual contracting.

> l.    SE 16: *"Develop guidelines, consistent with [DOH's] employment*
> *first principles, for case managers regarding the need for adequate*
> *comprehensive personal profiles and implementation of [CDPs]."*
> *APPENDIX A at 5.*

Supported employment policies have been disseminated to various persons including

case managers.  TT Vol. II, 406:22-407:2.  Presumably, case managers are required to attend the

annual ISP meetings when employment is discussed and are required to refer individuals for

VAPs.  TT Vol. IV 687:18-688:5.  Case managers can receive technical assistance from NMEI

or Ms. Moore and her associates.  In the early 1990s and more recently, Defendants have

conducted statewide training regarding CDPs.  *Id*. at 642:15-20.  Defendants also have

specifically trained case managers to understand their role in supported employment so they can

perform that role appropriately.  TT Vol. IV, 643:1-2; Dan Jackson Deposition, 52:4-16.

Nonetheless, Ms. Moore testified at the June 2011 evidentiary hearing that although case

managers are being trained, structural obstacles within the ISP process are causing class

members to lose their work goals.  TT Vol. III, 574:2-18.  Structural obstacles include outdated

CDPs, unimplemented CDPs, and CDPs not being integrated into ISPs.  *Id*.

   Even if case managers have policies at their disposal, interact with IDT members during

IDT meetings, are required to refer class members for VAPs, and have several resources

available to them including training, it is unclear whether there are specific "guidelines" for case

managers regarding VAPs and CDPs.  If there are guidelines on VAPs and CDPs, it appears case

managers may be violating those guidelines by being involved, to some degree, in the structural

obstacles outlined by Ms. Moore. Guidelines that are not followed are ineffective and fail to

fulfill their purpose which, in the case of SE 16, is to develop VAPs and implement CDPs so that

class members can attain their employment goals.

   3.   *JSD ¶¶ 32 and 33: Continuous Improvement of Supported Employment*
        *Services.*

   JSD ¶ 32 describes what constitutes continuous improvement while JSD ¶ 33 requires

that Defendants must develop regional corrective action plans approved by the Community

Monitor if continuous improvement is not occurring.  Although Plaintiffs admit that Defendants

issued the required corrective action plan regarding the 2009 CPR, Plaintiffs assert that

Defendants have not demonstrated continuous improvement in the area of supported

employment and that Defendants have failed to develop regional corrective action plans on

supported employment, approved by the Community Monitor, for the years 2004 to 2008.  *See*

JSD ¶¶ 32 and 33; Renewed Noncompliance Motion at 34.  Defendants do not specifically

address or deny these assertions in their response to the Renewed Noncompliance Motion.  The

Court, therefore, concludes that Defendants concede that they have not substantially complied

with either JSD ¶ 32 or ¶ 33 as they relate to supported employment.  *See* D.N.M. LR-Cv 7.1 (b)

(failure to respond to a motion "constitutes consent to grant the motion."); D.N.M. LR-Cv 7.3 (a)

("A ... response ... must cite authority in support of the legal positions advanced.").

Furthermore, the Court has already found that Defendants have generally not substantially

complied with JSD ¶ 33.

> 4.   *Summary of Issues Affecting Defendants' Ability to Comply with*
> *Supported Employment Obligations.*

As with the areas of class member health and safety, Defendants have made great strides

toward meeting their supported employment obligations.  Defendants contracted with more

supported employment providers, provided more training for those providers and case managers,

increased the number of VAP facilitators, updated VAPs, established Employment First policies,

created a supported employment database, employed supported employment consultants like Ms.

Moore and others, increased funding for NMEI, and redirected segregated employment funds to

integrated employment programs.  Unfortunately, these efforts fall short of providing class

members with the kind of supported employment opportunities contemplated in the JSD, POA,

and APPENDIX A.  Although the Court is well aware that a poor economy currently adversely

affects the job market, the Court believes that more class members, especially 119 Priority Group members, who express a desire to work, should be working at criteria.  Several concerns with the "system" support this conclusion.  For example, some supported employment providers appear to lack experience in supported employment and are inadequately staffed.  In addition, there are other problems: (1) NMEI is understaffed and without a director; (2) the state needs even more VAP facilitators; (3) VAPs should be prepared more timely and properly; (4) CDPs lack information, are not implemented, are not incorporated into ISPs, and need updating; (5) more segregated employment funds should be redirected to integrated employment programs; (6) Ms. Moore and her associates should be used as they had been in the past; and (7) performance-based contracts should be better drafted to require accountability and should be enforced vigorously.  Until Defendants address these concerns, which were raised by their own supported employment consultant, Ms. Moore, as well as by the Community Monitor, class members will not obtain the full benefit of the supported employment goals and obligations outlined in the JSD, POA, and APPENDIX A.

     *B.*      *Findings of Fact.*

73.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 10, Desired Outcome B, Activity # 2.

74.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 10, Desired Outcome B, Activity # 2 will not defeat an essential purpose of the POA, i.e., to provide the 119 Priority Group of class members with the opportunity to engage in supported employment at criteria.

75.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 10, Desired Outcome B, Activity # 3.

76.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 10, Desired Outcome B, Activity # 3 will not defeat an essential purpose of the POA, i.e., to provide the 119 Priority Group of class members with the opportunity to engage in supported employment at criteria.

77.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 10, Desired Outcome B, Activity # 5.

78.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 10, Desired Outcome B, Activity # 5 will not defeat an essential purpose of the POA, i.e., to provide the 119 Priority Group of class members with the opportunity to engage in supported employment at criteria.

79.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 10, Desired Outcome B, Activity # 6.

80.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 10, Desired Outcome B, Activity # 6 will not defeat an essential purpose of the POA, i.e., to provide the 119 Priority Group of class members with the opportunity to engage in supported employment at criteria.

81.  Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 10, Desired Outcome C, Activity # 1.

82.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 10, Desired Outcome C, Activity # 1 will not defeat an essential purpose of the POA, i.e., to provide all class members with the opportunity to engage in supported employment at criteria.

83. Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 10, Desired Outcome C, Activity # 2.

84. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 10, Desired Outcome C, Activity # 2 will not defeat an essential purpose of the POA, i.e., to provide all class members with the opportunity to engage in supported employment at criteria.

85. Defendants have not shown by a preponderance of the evidence that they have complied fully with POA Appendix 10, Desired Outcome C, Activity # 5.

86. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with POA Appendix 10, Desired Outcome C, Activity # 5 will not defeat an essential purpose of the POA, i.e., to provide all class members with the opportunity to engage in supported employment at criteria.

87. Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 1.

88. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 1 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

89. Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 2.

90. Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 2 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at

153

criteria.

91.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 3.

92.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 3 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

93.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 4.

94.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 4 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

95.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 5.

96.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 5 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

97.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 7.

98.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 7 will not defeat an essential purpose of APPENDIX A,

i.e., to provide class members with the opportunity to engage in supported employment at criteria.

99.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 9.

100.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 9 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

101.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 10.

102.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 10 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

103.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 11.

104.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 11 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

105.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 12.

106.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 12 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

107.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 13.

108.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 13 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

109.  Defendants have not shown by a preponderance of the evidence that they have complied fully with APPENDIX A, SE 16.

110.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with APPENDIX A, SE 16 will not defeat an essential purpose of APPENDIX A, i.e., to provide class members with the opportunity to engage in supported employment at criteria.

111.  Defendants have not shown by a preponderance of the evidence that they have complied fully with JSD ¶ 32 as it applies to the area of supported employment.

112.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with JSD ¶ 32 will not defeat an essential purpose of the JSD, i.e., to ensure continuous improvement in the provision of supported employment opportunities to class members at criteria.

156

113.  Defendants have not shown by a preponderance of the evidence that they have complied fully with JSD ¶ 33 as it relates to the area of supported employment.

114.  Defendants have not shown by a preponderance of the evidence that their failure to comply fully with JSD ¶ 33 will not defeat an essential purpose of the JSD, i.e., to ensure continuous improvement in the provision of supported employment opportunities to class members at criteria.

*C.*     *Conclusions of Law*.

43.  Since Defendants have not substantially complied with POA Appendix 10, Desired Outcome B, Activity # 2, it is not subject to disengagement at this time.

44.  Since Defendants have not substantially complied with POA Appendix 10, Desired Outcome B, Activity # 3, it is not subject to disengagement at this time.

45.  Since Defendants have not substantially complied with POA Appendix 10, Desired Outcome B, Activity # 5, it is not subject to disengagement at this time.

46.  Since Defendants have not substantially complied with POA Appendix 10, Desired Outcome B, Activity # 6, it is not subject to disengagement at this time.

47.  Since Defendants have not substantially complied with POA Appendix 10, Desired Outcome C, Activity # 1, it is not subject to disengagement at this time.

48.  Since Defendants have not substantially complied with POA Appendix 10, Desired Outcome C, Activity # 2, it is not subject to disengagement at this time.

49.  Since Defendants have not substantially complied with POA Appendix 10, Desired Outcome C, Activity # 5, it is not subject to disengagement at this time.

50.  Since Defendants have not substantially complied with APPENDIX A, SE 1, it is not subject to disengagement at this time.

51.  Since Defendants have not substantially complied with APPENDIX A, SE 2, it is not subject to disengagement at this time.

52.  Since Defendants have not substantially complied with APPENDIX A, SE 3, it is not subject to disengagement at this time.

53.  Since Defendants have not substantially complied with APPENDIX A, SE 4, it is not subject to disengagement at this time.

54.  Since Defendants have not substantially complied with APPENDIX A, SE 5, it is not subject to disengagement at this time.

55.  Since Defendants have not substantially complied with APPENDIX A, SE 7, it is not subject to disengagement at this time.

56.  Since Defendants have not substantially complied with APPENDIX A, SE 9, it is not subject to disengagement at this time.

57.  Since Defendants have not substantially complied with APPENDIX A, SE 10, it is not subject to disengagement at this time.

58.  Since Defendants have not substantially complied with APPENDIX A, SE 11, it is not subject to disengagement at this time.

59.  Since Defendants have not substantially complied with APPENDIX A, SE 12, it is not subject to disengagement at this time.

60.  Since Defendants have not substantially complied with APPENDIX A, SE 13, it is not subject to disengagement at this time.

61.  Since Defendants have not substantially complied with APPENDIX A, SE 16, it is not subject to disengagement at this time.

62.  Since Defendants have not substantially complied with JSD ¶ 32, it is not subject to disengagement at this time.

63.  Since Defendants have not substantially complied with JSD ¶ 33, it is not subject to disengagement at this time.

VI.   *Whether Defendants have Violated § 504 of the Rehabilitation Act and Title II of the ADA by Discriminating Against Severely Disabled Class Members with Respect to the Provision of Health Care Services and Supported Employment Services.*

A.    *Discussion of Rehabilitation Act and ADA Claims.*

Plaintiffs argue that Defendants have violated the provisions of § 504 of the Rehabilitation Act and Title II of the ADA (collectively, the Acts) prohibiting discrimination based on disability.  Plaintiffs specifically assert that this alleged discrimination has occurred in the areas of health care services and supported employment services.  First, Plaintiffs contend that Defendants have violated these Acts by (1) denying "access to hospitals, nursing care, medical specialists and other healthcare services due to the severity of their disabilities," (2) contracting with providers who "do not reasonably accommodate the severe disabilities of class members with respect to the health care services" they provide, and (3) furnishing nursing services and health care coordination which are "not as effective as the services provided to other people whose disabilities are not severe."  Renewed Noncompliance Motion at 22.  Second, Plaintiffs contend that Defendants have violated the Acts by (1) "depriving [severely disabled class members] of supported employment services equivalent to the employment services provided to similarly-situated persons who do not have severe disabilities," and (2) "largely consign[ing]" severely disabled class members "to segregated, congregate day services,

while their less disabled peers are commonly able to obtain supported employment."[37]  *Id.* at 29.

>    1.   *Standards for Discrimination Based on Disability Under the*
>         *Rehabilitation Act and the ADA.*

Because the anti-discrimination provisions of § 504 of the Rehabilitation Act and Title II

of the ADA are analogous, the analyses of the Rehabilitation Act and the ADA claims will be

addressed together.  *Cohon ex rel. Bass v. New Mexico Dept. of Health*, 646 F.3d 717, 725-76

(10th Cir. 2011).  *See also Rhodes v. Langston University*, 2011 WL 4867552 *6 (10th Cir.) (slip

copy).  Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), states that "[n]o otherwise

qualified individual with a disability in the United States, as defined in section 705(20) of this

title, shall, solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance...."   To maintain a § 504 claim, a plaintiff must prove by a

preponderance of the evidence "(1) that he is a 'handicapped individual' under the Act, (2) that

he is 'otherwise qualified' for the [benefit] sought, (3) that he was [discriminated against] solely

by reason of his handicap, and (4) that the program or activity in question receives federal

financial assistance."  *Cohon*, 646 F.3d at 725 (quoting *Johnson by Johnson v. Thompson*, 971

F.2d 1487, 1492 (10th Cir. 1992) (quotation marks and citations omitted)).  *See also, e.g., Sista*

*v. CDC Ixis North America, Inc*., 445 F.3d 161, 169 (2nd Cir. 2006) (plaintiff has burden of

proving by a preponderance of the evidence discrimination based on disability).

---

[37]Plaintiffs have rephrased and arguably modified their Rehabilitation Act and ADA
claims in Plaintiffs' Memorandum on Rehabilitation Act and ADA.  In the interest of fair play,
the Court will address the claims only as they are set forth in the Renewed Noncompliance
Motion and will rely on the characterizations of those claims in Plaintiffs' Memorandum on
Rehabilitation Act and ADA only to the extent they clarify Plaintiffs' initial claims.

Title II of the ADA, 42 U.S.C. § 12132, similar to § 504 of the Rehabilitation Act, provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   To maintain a Title II claim, a plaintiff must show by a preponderance of the evidence that "'(1) [s]he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability.'"   *Cohon*, 646 F.3d at 725 (quoting *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007)).  *See also Sista,* 445 F.3d at 169.

It is well-established that the Rehabilitation Act and ADA require "that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  A grantee, however, may be required to make reasonable accommodations so that the individual can actually access a benefit or program in a meaningful way. *Robertson*, 500 F.3d at 1195.  A grantee effectively denies meaningful access when it places an "obstacle" which blocks access to an existing government program. *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1267-68 (D.C. Cir. 2008). On the other hand, where plaintiffs seek to fundamentally alter an existing program to provide new substantive benefits, they have not been denied meaningful access. *Id.*  In other words, states do not have an affirmative obligation to furnish services. *Jackson*, 757 F.Supp. at 1297. Additionally, the Rehabilitation Act and ADA do not guarantee "equal results" for disabled individuals. *Cohon*, 646 F.3d at 729.  In fact, in *Choate*, 459 U.S. at 303, the United States Supreme Court "held that 'adequate health care' was too 'amorphous' a concept to define the

161

government service or benefit to which disabled persons may assert a statutory right of access and accommodation."  Quoted in *Wright v. Giuliani*, 230 F.3d 543, 548 (2nd Cir. 2000).

Defendants agree with Plaintiffs that discrimination based on the severity of a person's disability violates the Rehabilitation Act and the ADA.  Response to Renewed Noncompliance Motion at 44.  *See Jackson*, 757 F.Supp. at 1299 ("The severity of plaintiffs' handicaps is itself a handicap which, under § 504, cannot be the sole reason for denying plaintiffs access to community programs.").  Nonetheless, Defendants cite to language from *Traynor v. Turnage*, 485 U.S. 535, 548 (1988) in which the United States Supreme Court stated that "the central purpose of § 504 ... is to assure that handicapped individuals receive 'evenhanded treatment' in relation to nonhandicapped individuals."   The United States Supreme Court went on to declare that "[t]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." *Id.* at 549.  One could reasonably read *Traynor* to disallow Rehabilitation Act and ADA claims, like those raised by Plaintiffs, alleging that severely disabled persons have been denied meaningful access to benefits which less severely disabled persons receive.

The Court, however, distinguished *Traynor* from this case in 1990 because the severely disabled Plaintiff class members could not be faulted for their conditions, whereas the veterans in *Traynor* suffered from alcoholism (a disability) resulting from willful misconduct.  *Jackson*, 757 F.Supp. at 1299 n.36.  Moreover, the United States Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 n.10 (1999) later rejected "as a matter of precedent and logic" the idea that discrimination due to disability cannot encompass disparate treatment among the disabled.

Interestingly, in *Cohon*, filed more than ten years after *Olmstead*, the Tenth Circuit Court of Appeals continued to cite *Traynor* for the proposition that states can discriminate between categories of individuals with disabilities and even questioned this Court's distinction between *Traynor* and this case. *Cohon*, 646 F.3d at 727-78, 728 n.2. The Tenth Circuit simply ignored *Olmstead's* expanded view of discrimination in its discussion of Cohon's argument that she was treated differently than less severely disabled persons. Although the District Court is normally required to follow Tenth Circuit precedent, the Court read *Olmstead*, a United States Supreme Court case, to control the situation in this case and to trump *Cohon*. *Olmstead* provides a more than adequate ground for concluding that Plaintiffs can sue under the Rehabilitation Act and the ADA for discrimination claims based on severely disabled persons being treated differently than less severely disabled persons.[38]

Unlawful differential treatment claims can be brought under two legal theories: disparate treatment or disparate impact. A claim of disparate treatment involves proving intentional discrimination through either direct proof of intent or circumstantial evidence of intent. *Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, ___ F.3d ___, 2012 WL 2561883 *1 (10th Cir.) (describing intentional discrimination in the context of the Rehabilitation Act and the ADA). "Direct evidence of [intentional] discrimination is evidence which, if believed, proves that the decision in the case at hand was discriminatory–and does so without depending on any further inference or presumption." *Id.* Circumstantial evidence of [intentional]

---

[38]Regulations promulgated under the Rehabilitation Act and the ADA also prohibit discrimination based on the severity of a disability. *See, e.g., Messier v. Southbury Training School*, 916 F.Supp. 133, 140-41 (D. Conn. 1996).

discrimination is shown through the use of the *McDonnell Douglas* burden shifting scheme.[39]  *Id*.

A claim of disparate impact, on the other hand, does not require proof of an intent to

discriminate, but, instead, mandates a showing that a policy caused a disparate effect.  *Id*. at *4.

In addition to discrimination predicated on the denial of meaningful access to benefits,

discrimination against disabled persons can also occur when there is unnecessary segregation of

those persons.  Regulations promulgated under the Acts, like 28 C.F.R. § 35.130(d) and 28

C.F.R. § 41.51(d), require that public entities or recipients of federal assistance administer their

services, programs, and activities "in the most integrated setting appropriate to the needs of

qualified" disabled persons.  To maintain a claim of unnecessary segregation, a disabled person

must show that the program at issue "would result in ... unjustified isolation or premature

institutionalization."  *Cohon*, 646 F.3d at 729.  In the context of denial of supported employment

services, unnecessary segregation occurs when disabled persons who are eligible for supported

employment services are denied those services "with the result of unnecessarily segregating

them in sheltered workshops" or elsewhere.  *See Lane v. Kitzhaber*, 841 F.Supp. 2d 1199, 1208

(D. Or. 2012).

2.    *Health Care Services.*

Plaintiffs argue that Defendants have denied class members access to health care services

due to their severe disabilities and that Defendants have failed to make providers accommodate

---

[39]The *McDonnell Douglas* burden shifting scheme consists of three steps.  First, "a plaintiff must carry the initial burden of establishing a prima facie case of discrimination. Once a prima facie case of discrimination is made out, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for its action. If the defendant does so, the plaintiff must be given the opportunity to show by a preponderance of the evidence that the reason offered by the defendant is mere pretext."  *Ramsey v. City and County of Denver*, 907 F.2d 1004, 1007 (10th Cir. 1990), *cert. denied*, 506 U.S. 907 (1992) (citations omitted).

class members with severe disabilities so that they have meaningful access to the same health

care and nursing services that Defendants provide to those with less severe disabilities.  Plaintiffs

also argue that the health care and nursing services Defendants offer to severely disabled class

members are not as effective as those provided to people with less severe disabilities.  The Court

construes this last argument as a disparate treatment claim.  *See* Plaintiffs' Memorandum on

Rehabilitation Act and ADA at 13 (Plaintiffs broadly invoke the theory of disparate treatment).

Before addressing these health care claims as they relate to severely disabled class members, in

general, the Court will first address these claims as they relate to severely disabled class

members living in rural New Mexico.[40]

a.       *Health Care Services in Rural New Mexico.*

Plaintiffs complain that severely disabled class members who live in rural areas of New

Mexico like Clovis, Alamogordo, and Farmington are denied meaningful access to health care

services.  Defendants acknowledge that it is difficult to offer specialized care in rural areas.

Similarly, class members and their guardians who choose to live in those areas must realize this

limitation.  Dr. Aceves admitted at the June 2011 evidentiary hearing that the quality of medical

---

[40]Plaintiffs do not specifically assert in the Renewed Noncompliance Motion or in
Plaintiffs' Memorandum on Rehabilitation Act and ADA that Defendants have violated the
Rehabilitation Act and ADA with respect to the provision of health care services in rural New
Mexico.  Plaintiffs' proposed findings of fact and conclusions of law on the alleged
Rehabilitation Act and ADA violations, however, cite to facts in the record concerning the health
care services rural class members receive.  *See* Plaintiffs' proposed conclusion of law # 56 and
its references to the proposed findings of fact.  Consequently, the Court construes those citations
to the record as forming the basis for a contention that Defendants violated the Rehabilitation
Act and ADA by not providing severely disabled class members who live in rural New Mexico
with meaningful access to health care services, by not accommodating those severely disabled
class members so they can have meaningful access to health care services, and by offering health
care services to rural class members which are not as effective as health care services provided
to less severely disabled persons living in rural New Mexico. The Court will treat the last
contention as a disparate treatment claim.

care received by all New Mexicans varies among the different communities throughout the state. TT Vol. V, 936:11-19.  Timeliness of care and follow-up care are problems for all New Mexicans, not just DD Waiver participants.[41]  Dr. Antoinette Benton Deposition, 44:18-45:22; Dr. Alya Reeve Deposition, 60:18-61:5.

Nevertheless, Defendants, through Continuum, frequently operate specialty clinics in rural parts of the state, offer consultations and trainings to health care providers around the state, and are developing as well as implementing a long-distance telemedicine program to the benefit of rural class members.  Whether Continuum's work so far actually produces "equal results" is different from the question of whether Defendants have afforded meaningful access.  The Court construes Continuum's work in the rural areas of New Mexico as a reasonable accommodation allowing rural class members with severe disabilities to access health care services in a meaningful manner.  In other words, Plaintiffs have not shown by a preponderance of the evidence that Defendants have placed "obstacles" that prevent severely disabled class members in rural New Mexico from obtaining meaningful access to health care services.

Next, the Court addresses whether Plaintiffs have proven that disparate treatment of severely disabled class members exists in the provision of rural health care services, i.e., whether rural severely disabled class members receive health care services which are not as effective as the health care services which less severely disabled persons receive.[42]  First, Plaintiffs failed to produce any direct proof of discriminatory intent by Defendants in their provision of health care

---

[41]Compared to the average New Mexican, class members actually get "superior" health care.  Dr. Antoinette Benton Deposition, 124:20-22.

[42]Although Plaintiffs generally couch their Rehabilitation Act and ADA claims as disparate treatment claims in Plaintiffs' Memorandum on Rehabilitation Act and ADA at 13, they do not engage in any disparate treatment analyses.

services in rural New Mexico.  On the contrary, Defendants, through Continuum, have made a

determined effort to make health care services available to severely disabled class members who

live in rural areas.  Second, Plaintiffs did not present a *McDonnell Douglas* analysis which

would demonstrate intentional discrimination through circumstantial evidence.  Even so, the

Court is doubtful that Plaintiffs could have met their initial burden under *McDonnell Douglas* of

showing a *prima facie* case of discrimination.  *See Cinnamon Hills*, 2012 WL 2561883 at *2.  To

demonstrate a *prima facie* case of discrimination, Plaintiffs would have to produce evidence that

similarly situated individuals, i.e., persons with less severe disabilities living in rural New

Mexico, receive better or more effective health care services than rural severely disabled class

members receive.  *See id.* Unfortunately for Plaintiffs, the Court was unable to find any evidence

in the record which shows that less severely disabled persons in rural New Mexico fare any

better with respect to health care services than severely disabled persons who, likewise, live in

rural New Mexico.

> b.    *Health Care Services in New Mexico Generally.*

Plaintiffs also contend that Defendants have violated the Rehabilitation Act and ADA by

providing all severely disabled class members who reside anywhere in New Mexico with

generally inferior health care due to their severe disabilities.  While the Court has found that

Defendants have in many instances not substantially complied with their obligations under the

JSD, POA, and APPENDIX A to perform certain activities designed to provide adequate health

care to class members, the issue of substantial compliance with those orders is not the same as

the issue of meaningful access to health care services and programs through reasonable

accommodation, or the issue of disparate treatment between severely disabled class members

and less severely disabled persons.  Overall, the evidence shows that Defendants have initiated

various health care programs to improve the health of severely disabled class members, but there are problems with the quality of health care those class members ultimately receive. There is, however, no indication that severely disabled class members are being denied access to health care services based on their disabilities, i.e., that Defendants are placing "obstacles" to prevent severely disabled class members from accessing health care services. Rather, the evidence shows that the quality of health care services severely disabled class members receive could be improved. As mentioned above, a request for something as amorphous as "adequate health care," or a demand for equal results from health care services does not reference the applicable standard, which is whether there has been a denial of meaningful access to health care services.

Plaintiffs further argue that access to health care services is not meaningful because the providers do not reasonably accommodate class members with severe disabilities. The Court assumes that a reasonable accommodation would include, for instance, providers hiring a sufficient number of highly trained nursing and direct care staff who specialize in caring for severely disabled persons.[43]  The Court notes that the intent of Defendants' policies and procedures, provider staff training, oversight and monitoring of providers, and follow-up of providers, although imperfectly implemented, is to make providers capable of adequately caring for severely disabled class members. In other words, these processes and activities are in place to reasonably accommodate the severe disabilities that certain class members have. Although many providers, through these processes and activities, accommodate severely disabled class members so that they have meaningful access to health care services, other providers have failed

---

[43]The Court assumes that Plaintiffs are not asking Defendants to fundamentally alter preexisting provider services by adding even more specially trained staff. If Plaintiffs are making that request, then they would be seeking a remedy beyond the scope of the Rehabilitation Act and ADA.

to make those accommodations. Hence, reasonable accommodation is still a problem for at least some class members.

Even so, reasonable accommodation is not always required under the Rehabilitation Act and ADA. Plaintiffs seem to be arguing that providers are required under the Rehabilitation Act and ADA to reasonably accommodate severely disabled class members, e.g., hire staff specializing in severe disabilities, so that severely disabled class members receive at least "adequate" health care services that others with less severe disabilities presumably receive. As previously mentioned, the Rehabilitation Act and ADA do not require reasonable accommodations for the provision of "adequate health care" because that is "too 'amorphous' a concept to define the government service or benefit to which disabled persons may assert a statutory right of access and accommodation." *Choate*, 459 U.S. at 303.

Finally, the Court addresses whether Defendants have subjected severely disabled class members to disparate treatment by offering persons with less severe disabilities access to better or more effective health care. Plaintiffs have not presented direct proof that shows, by a preponderance of the evidence, that Defendants intend to discriminate against severely disabled class members in Defendants' provision of health care services, generally. Instead, the record contains evidence of various activities Defendants have pursued over the years to improve the health care of severely disabled class members.

As for a circumstantial evidence case, the Court is hard-pressed to determine that Plaintiffs could meet their initial burden, under *McDonnell Douglas*, of showing a *prima facie* case of discrimination in which similarly situated persons, i.e., less severely disabled persons, receive more effective health care services than more severely disabled class members. In addition to general evidence that severely disabled class members receive less than adequate

169

health care, Plaintiffs point to information from the 706 Expert.  Ms. Gant, the 706 Expert, found

in her April 2010 report that "Jackson class members are victims of abuse, neglect, and

exploitation at a rate greater than other New Mexicans with developmental disabilities receiving

Medicaid funded Home and Community Based Waiver services [] (HCBW);" and that "Jackson

class members use Emergency Services more often than their peers in the New Mexico HCBW

program."  Pl. Ex. 59 (001678).   These findings do not indicate whether the HCBW peers are

less severely disabled than the class members who are severely disabled.  In fact, Dr. Benton

testified at her deposition that "[i]n [her] experience, the bulk of the nursing care goes to the

Jackson class members, sometimes at the expense of the non-Jackson class members."  Dr.

Antoinette Benton Deposition, 118:17-19. Even Plaintiffs' counsel responded to Dr. Benton by

admitting that: "You and I agree that Jackson class members get superior attention and other

kinds of benefits."  *Id.* at 118:20-22.  Dr. Aceves also testified at the June 2011 evidentiary

hearing that class members receive "some added benefits" that non-class members in the DD

Waiver program do not receive.  TT Vol. V, 969:13-16.  Plaintiffs have failed to show that the

quality of health care services severely disabled class members receive is inferior to the quality

of health care services less severely disabled persons receive.

### 3. *Supported Employment Services.*

Plaintiffs assert that Defendants have violated the Rehabilitation Act and ADA with

respect to supported employment services in two ways: (1) Plaintiffs allege in their Renewed

Noncompliance Motion at 29 that class members do not receive supported employment services

equivalent to the supported employment services which less severely disabled persons receive;

and (2) Plaintiffs allege that "[c]lass members are largely consigned to segregated, congregate

day services" while less severely disabled persons engage in supported employment.  The Court

170

construes both of these claims as disparate treatment claims.  *See* Plaintiffs' Memorandum on

Rehabilitation Act and ADA at 23 (alleging disparate treatment, generally).

a.     *Equivalent Supported Employment Services.*

First, the Court examines evidence which might be relevant to whether there is direct

proof of discriminatory intent by Defendants to deny severely disabled class members supported

employment services equivalent to those services received by less disabled persons.  It is notable

that Defendants' own supported employment consultant, Ms. Moore, wrote in her 2008 report

that "in some cases" there was "overt resistance" by state leaders "to make good on promises to

the *Jackson* Class Members, to more fully implement the *Employment First* Policy, and to

continue to open doors for people with developmental disabilities in New Mexico to access

meaningful employment."  Pl. Ex. 83 (002240-002241).  The Community Monitor explained at

the June 2011 evidentiary hearing that although Defendants have supported employment policies

and procedures, "resistance" to change is still an issue.  TT Vol. III, 599:6-19.  Moreover, Ms.

Moore noted that Defendants did not take any action against a case management agency which

"publicly [stated that] supported employment is a waste of time and a waste of money...."  TT

Vol. III, 526:20-23.  In 2006, the Community Monitor found that persons with less challenging

disabilities were more likely to have employment than those with more severe or significant

disabilities, who either were not employed or waited a long time for employment.  The

Community Monitor testified at the June 2011 evidentiary hearing that to a "large extent" this is

still happening.  TT Vol. III, 596:22-597:12.  Ms. Moore also testified at the June 2011

evidentiary hearing that Defendants have failed to ensure that class members with significant

disabilities have access to employment equal to the access their less disabled peers have.  TT

Vol. III, 535:10-22.

171

These assessments and observations by Ms. Moore and the Community Monitor, although insightful, are not direct proof of discriminatory intent. Plaintiffs would have the Court infer from those assessments and observations that resistance to change is motivated solely by discriminatory intent.  However, there may, in fact, be other reasons for a perceived resistance to change like lack of resources.   In addition, Defendants' failure to take action against one case management agency for its anti-supported employment stance is not direct proof of Defendants' discriminatory intent regarding severely disabled class members, because that agency's statement seemed to be directed at supported employment for all disabled persons, regardless of the severity of their disabilities.  Furthermore, the Community Monitor and Ms. Moore's observations that less severely disabled persons are more likely to be employed than severely disabled persons, while conceivably true, would require an inference that this disparity was caused by discriminatory intent by Defendants as opposed to other factors like lack of suitable jobs for severely disabled persons, a lackluster economy, or a shortage of resources available to Defendants to develop supported employment opportunities for more severely disabled persons. Finally, there is considerable evidence contradicting a finding of direct proof that Defendants intend to discriminate against severely disabled class members by not providing them with supported employment services equivalent to those received by persons with less severe disabilities.   This evidence includes: (1)  Defendants pursuing and obtaining a grant for NMEI worth over a million dollars; (2) Defendants increasing the number of supported employment providers; (3) Defendants continuing to contract with Ms. Moore (albeit she is consulted less often); (4) Ms. Moore's statement in 2008 that "[t]here are examples of good work being done relative to advancing employment opportunities for _Jackson_ Class Members and other individuals with developmental disabilities in New Mexico," Pl. Ex. 83 (002240); and (5) Ms.

Moore's testimony at the June 2011 evidentiary hearing that New Mexico has "talented people" and "effective organizations" related to supported employment, TT Vol. III, 577:9-12.

With respect to a possible *McDonnell Douglas* disparate treatment claim based on circumstantial evidence, Plaintiffs must first demonstrate a *prima facie* case of discrimination by showing that Defendants provided similarly situated persons, i.e., less severely disabled persons who want to work, with supported employment opportunities while denying severely disabled class members who also want to work with those same opportunities. Both the Community Monitor and Ms. Moore have said that exactly that kind of differential treatment exists in the provision of supported employment services to severely disabled class members. The statements by the Community Monitor and Ms. Moore may be enough to support Plaintiffs' *prima facie* case of discrimination. However, since Plaintiffs did not analyze their disparate treatment claim under *McDonnell Douglas*, Defendants did not address any of the steps of the *McDonnell Douglas* burden shifting scheme. The Court believes that it would be premature and unfair for the Court to attempt to analyze any further this hypothetical disparate treatment claim under *McDonnell Douglas* without giving Defendants an opportunity to respond. If Plaintiffs wish to pursue this particular disparate treatment claim, the Court will permit Plaintiffs to file a motion with full briefing of the *McDonnell Douglas* burden shifting scheme and citations to the record.

### b.    *Segregation*.

As with the other disparate treatment claims, the Court first examines whether the record contains direct proof that Defendants intended to discriminate against severely disabled class members by consigning them to segregated, congregate day services instead of affording them supported employment opportunities like those available to less severely disabled persons. Ms. Moore testified at the June 2011 evidentiary hearing that there are still issues of segregation and

173

low wages.  TT Vol. II, 407:4-8.  For instance, she found that class members with significant impairments were excluded from "decent employment opportunities" and, instead, were "primarily in segregated services."  Pl. Ex. 93 (002346-002347); TT Vol. II, 404:11-18.  Ms. Moore further testified that class members are still in congregate settings due to the perception that those class members need somewhere to go during the day.  TT Vol. II, 407:12-20. Defendants and Ms. Moore agree that production worker programs are not "real jobs," provide low wages, and are considered segregated.[44]  Judith Stevens Deposition, 95:9-18; TT Vol. III, 551:13-16. As of the first quarter of FY 2010, 13 class members were production workers.[45]  Pl. Ex. 119 (002548-002549).  The Community Monitor noted that nothing in the needs of the class members requires that they be placed in segregated, congregate settings.  TT Vol. III, 595:5-18. Surprisingly, at the June 2011 evidentiary hearing, Ms. Moore expressed her view that "congregate segregated services are growing at least as rapidly as the employment services are growing in New Mexico."  TT Vol. II, 408:2-4.  Moreover, although Defendants are redirecting resources from segregated to integrated services, in Ms. Moore's opinion, it is not "at the level it needs to be."  TT Vol. II, 407:24-408:2.

Clearly, the above evidence shows that some severely disabled class members are in segregated, congregate settings rather than engaged in supported employment.  That evidence,

---

[44] Even Defendants' expert, Norm Davis, found Adelante's production work program "substandard."  TT Vol. V, 1021:5-7.  Mr. Davis also visited some day programs and observed that the larger ones had too many people and too many big rooms while another one resembled a sheltered workshop. *Id.* at 1019:19-1020:4, 1065:5-8.  He further observed that the staff in these large programs "were basically trying to maintain control and order, which [he] found alarming." *Id.* at 1019:22-23.

[45] Of those 13 workers, eight workers made between $.32 and $.89 an hour, three made between $1.02 and $1.65 an hour, one made $3.70 an hour, and one made $7.50 an hour but worked only one hour a week.  Pl. Ex. 119 (002548-002549).

however, does not provide direct proof that Defendants intend to discriminate against severely disabled class members by denying them supported employment when those class members desire to work and then "consigning" them to segregated, congregate settings, whether those settings provide production work or some other day services.  First, as discussed above, there are factors other than an intent to discriminate against severely disabled class members that could be responsible for severely disabled class members not engaging in appropriate supported employment.  Those factors include the lack of suitable supported employment positions for severely disabled persons, a poor economy, and a lack of resources.  Second, there is no direct proof that Defendants intend to somehow "consign" severely disabled class members to segregated, congregate settings against their wills.  Class members, through their IDTs, have the freedom to choose a day services provider, including supported employment providers or even a segregated, congregate setting if the class member or guardian believes that a more sheltered environment would be less threatening and intimidating for the class member.  TT Vol. IV, 724:16-20; Judith Stevens Deposition, 146:22-147:6; Pl. Ex. 32 (000790-000791).  Even if choices of day providers might be limited, Defendants do not place class members in day programs without their consent or the consent of their guardians.  Judith Stevens Deposition, 90:5-19; TT Vol. III, 620:23-621:10.  Defendants cannot actually control the choices of class members or their guardians.  TT Vol. IV, 650:6-9.  In addition, DD Waiver standards require that providers document that disabled persons spend 50% of their time in the community and that any deviation from this 50% requirement must be justified to Defendants.  *Id.* at 650:19-22.  The purpose of the Defendants' DD Waiver standards is to make sure class members spend a substantial amount of time in the community, a purpose which runs counter to an argument that Defendants intend to unlawfully "consign" severely disabled class members to segregated,

congregate settings without their consent or the consent of their guardians.  Furthermore, 70% of class members work in community-integrated employment at some level.  *Id*. at 679:17-20, 684:13-19, 685:1-8.  This relatively high level of community integrated-employment suggests that Defendants do not intend to unlawfully "consign" severely disabled class members to segregated, congregate settings against their wills.

Although the evidence does not contain direct proof of an intent to discriminate, Plaintiffs can still show disparate treatment through circumstantial evidence under the *McDonnell Douglas* burden shifting scheme.  To do so, Plaintiffs must first make out a *prima facie* case of discrimination by proving by a preponderance of the evidence that similarly situated persons, i.e., less severely disabled persons who want to work, receive supported employment while severely disabled class members who want to work are deprived of similar opportunities and, instead, are "consigned" to segregated, congregate settings.  Although there is evidence that less severely disabled persons engage in supported employment more often than those with severe disabilities, the evidence does not show that those severely disabled persons who do not engage in supported employment are necessarily placed in segregated, congregate settings without having made the choice to go there.  *Messier*, 562 F.Supp.2d at 323 ("There is no 'federal requirement that community-based treatment be imposed on patients who do not desire it.'") (quoting *Olmstead*, 527 U.S. at 602 (citing 28 C.F.R. § 35.130(e)(1))).  At this point, the Court is uncomfortable concluding that Plaintiffs have carried their burden of making a *prima facie* case of discrimination under *McDonnell Douglas*.

4.    *Summary of Rehabilitation Act and ADA Issues*.

Since the Court entered the JSD, POA, and APPENDIX A, Defendants have been creating and enhancing various health care services for the benefit of severely disabled class

members.  Although those health care services have not always been implemented effectively or adequately, Defendants cannot be faulted with blocking access to those services.  Plaintiffs' attempt to imply through their disparate treatment claims that Defendants intend to discriminate against severely disabled class members with respect to the provision of health care services appears to be disingenuous.  There is simply no direct proof of discriminatory intent or proof that severely disabled class members are treated differently than less severely disabled persons in receiving health care services.  In fact, it appears that severely disabled class members receive better health care services than developmentally disabled non-class members do.

With regard to supported employment, the evidence shows that over the years Defendants made progress in providing supported employment opportunities to class members, but then Defendants seemingly lost traction in this area.  While there is no direct proof that Defendants have intended to discriminate against severely disabled class members seeking supported employment equivalent to that enjoyed by less severely disabled persons, the Court is concerned that the Community Monitor and Ms. Moore both believe that severely disabled class members are less likely than others to receive supported employment.  Since Plaintiffs failed to analyze that particular disparate treatment claim under *McDonnell Douglas*, the Court cannot at this time address that claim.

The Court, however, is more confident in finding that there is no discriminatory intent with respect to Plaintiffs' claim that Defendants "consign" severely disabled class members to segregated, congregate settings while other less disabled persons obtain supported employment. It is clear that factors other than discriminatory intent can affect the availability of supported employment for severely disabled class members. Those factors include the number of suitable jobs, the economy, and resources available to Defendants for developing supported employment

opportunities.  Moreover, the Court is troubled by Plaintiffs' assertion that Defendants are

"consigning" severely disabled class members to segregated, congregate settings.  Defendants

cannot forcibly "place" those class members in segregated, congregate settings; the class

member or guardian chooses the type of day services in which the class member will participate.

The Court is also unclear about exactly how many severely disabled class members are actually

in segregated, congregate settings.  Since the DD Waiver standards typically require that 50% of

a person's time be spent in the community and since 70% of class members actually work in

community-integrated settings, it appears unlikely that a large number of persons are in

segregated, congregate settings.

   B.  *Findings of Fact*.

     1.  *Health Care Services.*

  115.  Specialized health care services are not readily available to New Mexicans,

including severely disabled class members, who live in rural areas of New Mexico,.

  116.  Continuum, however, provides additional health care services to rural class

members with severe disabilities.

  117.  Defendants reasonably accommodate severely disabled class members who live in

rural New Mexico so that they have meaningful access to health care services.

  118.  Defendants do not place obstacles to block severely disabled class members from

meaningful access to health care services.

  119.   Defendants do not intend to discriminate against severely disabled class members

by providing them with health care services that are not as effective as the health care services

provided to persons with less severe disabilities.[46]

120.  Since Defendants do not intend to discriminate against severely disabled class members by providing them with health care services that are not as effective as the health care services provided to persons with less severe disabilities, Defendants have not engaged in disparate treatment of those severely disabled class members.

121.  Because Defendants have not engaged in disparate treatment of severely disabled class members by providing them with health care services that are not as effective as the health care services provided to persons with less severe disabilities, Defendants have not discriminated against those severely disabled class members.[47]

2.    *Supported Employment Services.*

122.  There is no direct proof that Defendants intend to discriminate against severely disabled class members by depriving those class members of supported employment services equivalent to the supported employment services provided to persons with less severe disabilities.

123.  Since there is no direct proof that Defendants intend to discriminate against severely disabled class members by depriving those class members of supported employment services equivalent to the supported employment services provided to persons with less severe disabilities, Defendants have not engaged in disparate treatment of those class members under a

---

[46]*See, e.g., Lynch v. Freeman*, 817 F.2d 380, 382 (6th Cir. 1987) ("A trial court's finding on the issue of intent to discriminate is a pure question of fact....").

[47]A finding of whether a grantee discriminated against a person on the basis of disability is a factual question.  *See, e.g., Tuttle v. Henry J. Kaiser Co.*, 921 F.2d 183, 186 (8th Cir. 1990) (in Title VII context, issue of discrimination based on race is the "'ultimate factual issue.'" (citations omitted)).

disparate treatment analysis based on direct proof of intent to discriminate.

124.  Because Defendants have not engaged in disparate treatment by depriving severely disabled class members of supported employment services equivalent to the supported employment services provided to persons with less severe disabilities, Defendants have not discriminated against those severely disabled class members under a disparate treatment analysis based on direct proof of intent to discriminate.

125.  Defendants do not intend to discriminate against severely disabled class members by "consigning" them to segregated, congregate settings while less severely disabled persons engage in supported employment.

126. Since there is no intent to discriminate against severely disabled class members by "consigning" them to segregated, congregate settings while less severely disabled persons engage in supported employment, Defendants have not engaged in disparate treatment of those severely disabled class members.

127.  Because Defendants have not engaged in disparate treatment of severely disabled class members by "consigning" those class members to segregated, congregate settings while less severely disabled persons engage in supported employment, Defendants have not discriminated against those class members.

C.     *Conclusions of Law.*

    1.     *Health Care Services.*

64.  Since Defendants have not discriminated against class members based on the severity of their disabilities by denying those class members meaningful access to health care services or by providing those class members with health care services inferior to services received by less disabled persons, Defendants have not violated § 504 of the Rehabilitation Act,

29 U.S.C. § 794(a).

65. Since Defendants have not discriminated against class members based on the severity of their disabilities by denying those class members meaningful access to health care services or by providing those class members with health care services inferior to services received by less disabled persons, Defendants have not violated Title II of the ADA, 42 U.S.C. § 12132.

2.   *Supported Employment Services*.

66.  There is no direct proof of Defendants' intent to discriminate against class members based on the severity of their disabilities by not providing those class members with supported employment services equivalent to services received by less disabled persons; consequently, Defendants have not violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), under a disparate treatment analysis based on direct proof of intent to discriminate.

67.  There is no direct proof of Defendants' intent to discriminate against class members based on the severity of their disabilities by not providing those class members with supported employment services equivalent to services received by less disabled persons; consequently, Defendants have not violated Title II of the ADA, 42 U.S.C. § 12132, under a disparate treatment analysis based on direct proof of intent to discriminate.

68.  Since Defendants have not discriminated against class members based on their severe disabilities by "consigning" those class members to segregated, congregate settings while less disabled persons engage in supported employment, Defendants have not violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

69.  Since Defendants have not discriminated against class members based on their severe disabilities by "consigning" those class members to segregated, congregate settings while less disabled persons engage in supported employment, Defendants have not violated Title II of the ADA, 42 U.S.C. § 12132.

181

70.  Plaintiffs should be given an opportunity to file a motion seeking relief under *McDonnell Douglas* on Plaintiffs' disparate treatment claim that Defendants provided similarly situated persons, i.e., less severely disabled persons who want to work, with supported employment opportunities while denying more severely disabled class members who also want to work with those same supported employment opportunities.

VII.   *Remedies for Substantial Noncompliance with the JSD, POA, and APPENDIX A in the Areas of Health Care, Safety, and Supported Employment.*

The Plaintiffs request the following remedies:

1.  appointment of a *Jackson* Compliance Administrator to ensure that Defendants fully comply with the JSD, POA, and APPENDIX A;

2.  full implementation of the Community Monitor's 2009-2010 health, safety, and supported employment recommendations;

3.  implementation of the 706 Expert's 2010 and 2011 health and safety recommendations;

4.  prompt identification of deficiencies in nursing and medical care coordination at provider agencies that need corrective action;

5.  completion, within 18 months, of all of Defendants' outstanding obligations under the JSD, POA, and APPENDIX A relating to health, safety, and supported employment, including the implementation of Ellen Ashton's medical and nursing care recommendations, the implementation of Elin Howe's recommendations in her October 2003 report, and the resolution of the medical "areas of concern" identified in the December 2003 report by Dr. James Willcox; and

6.  an award of Plaintiffs reasonable attorneys' fees and costs for litigating the noncompliance issues.

A.       *Appointment of a Jackson Compliance Administrator.*

Plaintiffs suggest that the Court appoint Lyn Rucker, the current Community Monitor, as

the *Jackson* Compliance Administrator.  Plaintiffs recommend that, if the Court appoints a

*Jackson* Compliance Administrator, the Court vacate the positions of  706 Expert, Internal

Monitor, employment consultant (except that the employment consultant would continue to

participate in the annual CPR), and assistive technology consultant.  PROPOSED ORDER

APPOINTING JACKSON COMPLIANCE ADMINISTRATOR (Doc. No. 1882-1) at 1-2.

Defendants oppose the appointment of a *Jackson* Compliance Administrator and would rather

have the Honorable Chief United States Magistrate Judge Karen B. Molzen appointed as a

special master to streamline the disengagement process and to determine when Defendants have

disengaged from their obligations under the JSD, POA, and APPENDIX A.

Plaintiffs' PROPOSED ORDER APPOINTING JACKSON COMPLIANCE

ADMINISTRATOR describes the kind of authority, responsibilities and duties the *Jackson*

Compliance Administrator should have and the activities in which Plaintiffs believe the *Jackson*

Compliance Administrator should engage.  Primarily, the *Jackson* Compliance Administrator

would "have the authority necessary to facilitate and achieve compliance with all of the Court's

outstanding orders and plans in this case."   *Id*. at 1.  To meet the goal of compliance, the

*Jackson* Compliance Administrator would have the authority to

a.       "[a]ccess, at reasonable times, the Defendants' offices, all agencies or entities
serving or proposed to serve class members, including unrestricted access to all
records, files, reports, memoranda, correspondence, plans, notices, budgets,
compliance reviews and other documents relevant to the Jackson Compliance
Administrator's duties,"[48] *id*. at 5;

_____

[48]"The auditors and/or consultants for the Jackson Compliance Administrator shall have the
same access to staff, records, person[s], ... facilities, or sites of services that the Jackson
Compliance Administrator has and that the Jackson Compliance Administrator determines is
necessary to fulfill the auditor expert or consultant role."  *Id*. at 8.

b.   "[c]onduct, at reasonable times and places, confidential interviews with persons who she believes have information that will assist her in performing her duties, including the Defendants' employees, agents and staff; staff of their provider agencies and contractors; counsel for the parties; class members; and parents, guardians, and advocates of class members.  The Defendants will use their best efforts to encourage the full cooperation of such persons," *id.* at 5-6;

c.   "[a]ttend any formal meetings and other proceedings not protected by attorney work product or attorney client privilege that are conducted by the Defendants regarding subject matters relevant to her duties," *id.* at 6;

d.   "[r]equest written reports from any of the Defendants' employees, agents, staff or attorneys with respect to compliance with the orders of the Court," *id.*;

e.   "[c]onfer and conduct working sessions informally and on an ex parte basis with the parties on matters affecting compliance," *id.*;

f.   "[r]eview and comment on documents, plans, policies and procedures prepared by the Defendants to implement the orders of the Court, prior to their execution or formal submission by the Defendants," *id.*;

g.   "[m]ake informal suggestions to the parties in whatever form the Jackson Compliance Administrator deems appropriate in order to facilitate compliance with the orders of the Court," *id.*; and

h.   "[c]onduct discussions with this Court without prior notice to or consultation with the parties."  *Id.*

The *Jackson* Compliance Administrator would also be "solely responsible and accountable to the Court, and function[] as an agent of the Court.  The Jackson Compliance Administrator [would] serve for as long as necessary to achieve compliance with all of the Court's outstanding orders and plans in this case."  *Id.* at 1.  To further aid in achieving the goal of compliance, the *Jackson* Compliance Administrator would be able to

a.   "[o]versee the development of the community service system for persons with developmental disabilities in New Mexico, including the timely implementation of all remedial plans, procedures, and activities related to the Court's orders in this case," *id.* at 2;

b.    "[o]versee the activities of the Defendants in order to ensure that the service system provides services and supports to class members that comply with all

requirements of federal law, are consistent with professional standards and are at least equivalent to the quality of services provided to people who do not have severe disabilities," *id*.;

c.    "[a]ssist the Defendants to ensure that their contractors, providers, and agents who are responsible for services to class members comply with all requirements of federal law, professional standards, and Court-ordered obligations," *id*.;

d.    "[c]oordinate the activities of the Defendant state agencies that are responsible for implementation of the Court's orders," *id*.;

e.    "[i]dentify improvements in data collection, management information, performance standards, provider review, and quality improvement systems that are necessary to ensure the health, safety, and welfare of class members," *id*.;

f.    "[m]onitor compliance with all orders of the Court," *id*. at 3;

g.    "[f]acilitate efforts of the parties to achieve compliance with the orders at the earliest feasible time," *id*.;

h.    "[e]valuate the status of compliance with any court order, remedial plan or other obligation," *id*.;

i.    "[e]valuate the performance of any contractor, provider, or agency funded by the Defendants to provide services to class members," *id*.;

j.    "[e]valuate the adequacy of current remedies, remedial strategies, and remedial plans," *id*.;

k.    "[r]eport periodically, and at least semi-annually, to the Court regarding the Defendants' compliance with the orders of the Court, and to recommend to the Court such modifications and alterations in the remedial orders or plans as appear necessary and proper," *id*.;

l.    "[c]ommunicate regularly with the parties," *id*.;

m.    "[a]dvise the Defendants and their agencies and officials regarding implementation activities," *id*.;

n.    "[a]ssist the Defendants and their agencies to develop and implement plans to achieve compliance, overcome obstacles to compliance, and ensure that class members receive mandated protections, procedures and services," *id*.;

o.    "[e]stablish outcome measures for determining the efficacy of such plans," *id*.;

p.    "[e]stablish systems for periodically evaluating the extent to which outcome measures are being met," *id*.;

185

q.    "[a]ssist the Defendants and their agencies to develop needed modifications to such plans," *id*. at 4;

r.    "[a]ssist the Defendants and their agencies to establish internal processes that can carry out [various activities] after the Jackson Compliance Administrator position is eliminated," *id*.;

s.    select a person to conduct the annual CPR in substantially the same form as it had been conducted in the past, *id*.;

t.    "[m]ake recommendations to the parties and the Court regarding actions that could be taken to more rapidly achieve compliance, including the need for any further orders of the Court," *id*.; and

u.    "[m]ake specific assessments of compliance or noncompliance with the provisions of the Court's orders or remedial plans...." *Id*.

If the *Jackson* Compliance Administrator determines that there is noncompliance with any order, plan, or obligation, and if the *Jackson* Compliance Administrator "determines that any current remedial strategies, or remedial plans are not reasonably calculated to result in compliance in a timely manner, the Jackson Compliance Administrator [would] develop a recommended remedial strategy or plan, using such input from consultants, experts, the parties and others as the Jackson Compliance Administrator deems appropriate, in order to ensure timely compliance with such orders, plans, or obligations...." *Id*. at 4-5. "In developing a recommended remedial plan, the Jackson Compliance Administrator [would], to the extent possible:

(a) develop specific and measurable standards of compliance for those areas in which there is or may be dispute regarding compliance;
(b) encourage and allow the Defendants in the first instance to propose remedies and standards of compliance, should the Defendants desire to do so; and
(c) include 'disengagement criteria,' namely, criteria the satisfaction of which will enable the Court to end its active oversight of a remedial plan or other obligation...."

*Id*. at 5. The *Jackson* Compliance Administrator would "[s]upervise implementation by the Defendants of the orders of the Court and of any supplemental remedial plans or orders." *Id*.

186

Moreover, the *Jackson* Compliance Administrator would make written recommendations to resolve disputes following a procedure in which the Court has the final word on whether to implement the recommendations.  *Id*. at 6-7.

Finally, "[a]ll authority to require remedial activities remains with the Court.  All actions of the Jackson Compliance Administrator, experts and consultants [would] be under the direct control and supervision of this Court.  The exclusive power to direct compliance activities, to sanction parties for noncompliance, and to enter further remedial orders [would] remain[] with this Court, although the Jackson Compliance Administrator may make such recommendations as she deems necessary to facilitate compliance or remedy noncompliance."  *Id*.  "At such point as the Court determines that the Jackson Compliance Administrator duties are completed," the Court would be able to terminate that position.  *Id*. at 8.

It is well-established that when a federal court "invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution[, the court] has the continuing duty and responsibility to assess the efficacy and consequences of its order."  *Brown v. Plata*, ___ U.S. ___, 131 S.Ct. 1910, 1945 (2011).  In other words, a federal court is "not reduced to issuing injunctions against [public officials] and hoping for compliance.  Once issued, an injunction may be enforced."  *Hutto v. Finney*, 437 U.S. 678, 690 (1978).  To ensure enforcement of an injunction or consent decree, the Court, in "the most compelling circumstances," is justified in substituting its "authority for that of elected and appointed officials...."  *Morgan v. McDonough*, 540 F.2d 527, 535 (1st Cir. 1976).  As a district court in Ohio explained:

> Following a finding of liability, it is common in institutional reform litigation for courts to appoint parajudicial officers to assist in conducting and overseeing actual implementation of the remedies.  These officials have been given various names:

> masters, special masters, examiners, experts, monitors, referees, commissioners, administrators, observers, committees, panels, etc.  Because these officials inevitably and necessarily displace certain functions and responsibilities that otherwise would rest with those who control the institution, they have been classified as a group as "neoreceivers."

*Reed v. Rhodes*, 500 F.Supp. 363, 397 (D.C. Ohio 1980), *decision clarified in* 642 F.2d 186 (6th Cir. 1981) (citations omitted).  *See also Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982), *amended in part, vacated in part on other grounds by* 688 F.2d 266 (5th Cir. 1982), *cert. denied*, 460 U.S. 1042 (1983) (court-appointed agents "to supervise the implementation of its decrees" have been called "a confusing plethora of titles: 'receiver,' 'Master,' 'Special Master,' 'master hearing officer,' 'monitor,' 'human rights committee,' 'Ombudsman,'" and others.  The function is clear, whatever the title.") (citations and internal quotation marks omitted).  Such parajudicial officers are particularly necessary when the Court lacks expertise in the field and lacks time to devote to oversight of a remedial action.  *Reed*, 500 F.Supp. at 397 n. 22 (quoting *Perez v. Boston Housing Authority*, 379 Mass. 703, 400 N.E.2d 1231, 1250 n. 29 (1980)).  Hence, courts have not hesitated to appoint compliance administrators to oversee and supervise compliance with consent decrees.  *See, e.g., Local 28 of Sheet Metal Workers' Intern. Ass'n v.* E.E.O.C., 478 U.S. 421, 481-82 (1986); *Reed v. Rhodes*, 635 F.2d 556, 558-59 (6th Cir. 1980); *Petties v. District of Columbia*, 268 F.Supp.2d 38, 39-40 (D.D.C. 2003); *Gary W. v. State of La.*, 1990 WL 17536 *1 (E.D. La.); *Glover v. Johnson*, 721 F. Supp. 808, 849-50 (E.D. Mich. 1989), *affirmed in part and reversed in part on other grounds by* 934 F.2d 703 (6th Cir. 1991); *United States v. City of Detroit*, 476 F.Supp. 512, 520 (D.C. Mich. 1979).

Although states have argued that the appointment of a compliance administrator with broad powers unjustifiably interferes with a state's right to self-governance, courts have rejected that argument so long as the compliance administrator's powers "are confined to implementation

188

of the district court's remedial orders," last no longer than necessary, and are the least intrusive effective remedy. *See Reed*, 635 F.2d at 558; *Morgan*, 540 F.2d at 533; *Glover*, 721 F. Supp. at 850. *See also Local 28 of Sheet Metal Workers' Intern. Ass'n*, 478 U.S. at 481-82; *City of Detroit*, 476 F.Supp. at 520 ("Whenever a federal court is involved in the affairs of local government and a remedy is sought which may interfere with traditional notions of separation of powers, great care must be taken to reach a balance that does not summarily deny to such local government the full exercise of its authority over its affairs."). Even when state officials made progress in complying with some areas of a consent decree, at least one court held that if the "factual findings show the urgent need for a new, more fundamental approach to change," it is appropriate for the court to appoint a receiver. *LaShawn A. v. Kelly*, 887 F.Supp. 297, 315 (D.D.C. 1995). To decide whether to appoint a compliance administrator, the Court should utilize a "reasonableness under the circumstances" test. *Morgan*, 540 F.2d at 533. *See also Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W.Va. 1990) (citing to *Morgan* and applying "reasonableness under the circumstances" test in deciding whether to appoint a receiver while recognizing that the appointment of a receiver "is an intrusive remedy which should only be resorted to in extreme cases."); *Reed*, 500 F.Supp. at 397 (citing to *Morgan*) ("Though we approved the appointment of an Administrator of Desegregation with broad authority to implement specified remedial orders of the district court, we did not purport to remove or displace the Cleveland Board of Education.").

Defendants concede that "[t]he power of a federal court to appoint an agent to supervise the implementation of its decrees has long been established." DEFENDANTS' MEMORANDUM REGARDING THE COURT'S AUTHORITY TO APPOINT A JACKSON COMPLIANCE ADMINISTRATOR (Doc. No. 1885) at 6. Defendants, however, contend that

189

Ms. Rucker should not be appointed the *Jackson* Compliance Administrator because her purported bias in favor of Plaintiffs violates 28 U.S.C. § 455.  Section 455(a) and (b) describe circumstances under which a "justice, judge, or magistrate judge of the United States" must disqualify him or herself from a case.  Those circumstances include when "impartiality might reasonably be questioned," when the justice or judge "has a personal bias or prejudice concerning a party, or personal knowledge of the disputed evidentiary facts concerning the proceeding," when the justice or judge has "an interest that could be substantially affected by the outcome of the proceeding," and when the justice or judge is "likely to be a material witness in the proceeding."  28 U.S.C. § 455(a), (b)(1), (b)(5)(iii), and (b)(5)(iv).  Defendants argue that § 455 would apply to a *Jackson* Compliance Administrator like Ms. Rucker by virtue of Fed. R. Civ. P. 53.  Rule 53 governs the appointment of special masters and states that

> [a] master must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification.

Rule 53(a)(2).

Both § 455 and Rule 53 do not on their faces apply to "compliance administrators," but, instead, apply to justices and judges.  Moreover, "[R]ule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy."  *Ruiz*, 679 F.2d at 1161.  The issue then is whether the *Jackson* Compliance Administrator is the functional equivalent of a "special master" under Rule 53 so that § 455 applies.  A special master may, unless a statute states otherwise, be appointed to "perform duties consented to by the parties;" under certain circumstances, to "hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury;"

and to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  Rule 53(a)(1).  Rule 53(c) outlines the special master's authority which, "[u]nless the appointing order directs otherwise," includes the ability to "regulate all proceedings," to "exercise the appointing court's power to compel, take, and record evidence" if conducting an evidentiary hearing, to impose noncontempt sanctions as provided in Fed. R. Civ. P. 37 or 45, and to recommend contempt sanctions.  Moreover, a special master issues reports that must be filed and served on the parties, unless otherwise ordered, and which are either adopted, modified, or rejected by the court.  Rule 53(e) and (f).  In other words, a special master exercises quasi-judicial powers.  *Benjamin v. Fraser*, 343 F.3d 35, 45 (2nd Cir. 2003), *abrogated in part on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70-72 (2nd Cir. 2009).  *See also La Buy v. Howes Leather Company*, 352 U.S. 249, 256 (1957) (a court utilizes a special master to perform "'specific judicial duties'" (quoting *Ex parte Peterson*, 253 U.S. 300, 312 (1920)).

In contrast to a special master whose "'role is broad[]: to report to the court and, if required, make findings of facts and conclusions of law,'" a court monitor or compliance administrator's primary role is limited to ensuring or monitoring compliance with a court's orders. *United States v. Tennessee*, 2010 WL 1212076 *12-*13 (W.D. Tenn.) (unpublished decision) (quoting *Cobell v. Norton*, 392 F.3d 461, 476 (D.C. Cir. 2004) (internal quotations and brackets omitted)).  *See also Plata v. Schwarzenegger*, 603 F.3d 1088, 1094, 1096 (9th Cir. 2010) (a receiver, like a court monitor, is not a special master); *Handberry v. Thompson*, 446 F.3d 335, 352 (2nd Cir. 2006) (compliance monitor not a special master); *Benjamin*, 343 F.3d at 44-45 (commission's monitoring function did not make it a special master).  In determining if a court-appointed agent is a special master, the court must be guided by the agent's function. *Benjamin*, 343 F.3d at 47.

Here, the proposed *Jackson* Compliance Administrator would not have the authority to conduct trials, decide pre- or post-trial matters, "regulate all proceedings," "compel, take, and record evidence," impose noncontempt sanctions, or recommend contempt sanctions.  Although the proposed *Jackson* Compliance Administrator would have authority to conduct implementation activities, to conduct compliance assessment activities, to access persons and documents, to attend some formal meetings and proceedings, to request written reports, to report to the Court periodically on compliance, and to make recommendations to the Court on compliance disputes, that authority is not quasi-judicial in nature.  Rather, the *Jackson* Compliance Administrator's function is better characterized as being a compliance or monitoring function.  Consequently, the proposed *Jackson* Compliance Administrator would not be a "special master" under Rule 53 subject to § 455's disqualification provision and Ms. Rucker's purported unfair bias would not necessarily disqualify her from being appointed the *Jackson* Compliance Administrator.  In fact, the role of a court monitor or administrator, by its very nature, involves protection of the rights of the class members which "may appear to be adversarial to the State...."  *See Tennesee*, 2010 WL 1212076 at *13.  The overlap of a court monitor or administrator's duties with the interests of the class members does not comprise impermissible bias as long as the court monitor or administrator is fulfilling his or her duties.  *Id.*

The Court believes that Ms. Rucker has served admirably and diligently as the Community Monitor.  On the other hand, the Court understands Defendants' concerns and fears about Ms. Rucker's impartiality.  Defendants' somewhat hostile attitude toward Ms. Rucker likely would impede Ms. Rucker from effectively fulfilling her duties as the *Jackson* Compliance Administrator.  Ms. Rucker's appointment as the *Jackson* Compliance Administrator would, therefore, simply be problematic and ultimately unworkable.

192

Defendants, in the alternative, suggest that the Court appoint Judge Molzen as a special master.  Although the Court does not doubt that Judge Molzen would do her utmost as special master to move this case towards termination, Judge Molzen is not an expert in providing services to severely disabled persons and she does not have the enormous amount of time necessary to ensure substantial compliance.  The circumstances in this case, including the need for expertise in the area of severely disabled persons, the need to devote substantial time to this case, the slow pace of compliance, and the increased medical and safety concerns associated with aging class members, all reasonably justify the extreme measure of appointing a *Jackson* Compliance Administrator to implement the JSD, POA, and APPENDIX A.  Because appointing Ms. Rucker as the *Jackson* Compliance Administrator is untenable, the Court will give the parties 30 days from the filing date of these FINDINGS OF FACT AND CONCLUSIONS OF LAW to mutually decide who should be appointed *Jackson* Compliance Administrator and to submit a stipulated order appointing the *Jackson* Compliance Administrator.  If the parties cannot agree on who to appoint as the *Jackson* Compliance Administrator and/or on an order appointing the *Jackson* Compliance Administrator, the parties must inform the Court in writing and the Court will schedule a hearing.

B.      *Other Remedies*.

 In addition to the appointment of a *Jackson* Compliance Administrator, Plaintiffs ask for several other remedies.  Those remedies include that Defendants fully implement the Community Monitor's 2009-2010 health, safety, and supported employment recommendations; that Defendants fully implement the 706 Expert's 2010 and 2011 health and safety recommendations; that Defendants identify promptly deficiencies in nursing and medical care coordination at provider agencies which need corrective action; and that Defendants complete,

193

within 18 months, all of the outstanding outcomes and activities in the JSD and POA and the outstanding actions in APPENDIX A which relate to health, safety, and supported employment, including the implementation of Ellen Ashton's medical and nursing care recommendations, the implementation of Elin Howe's recommendations in her October 2003 report, and the resolution of the medical "areas of concern" identified in the December 2003 report by Dr. James Willcox. Plaintiffs also seek an award of reasonable attorneys' fees and costs for litigating the noncompliance issues.

Although the current Community Monitor and 706 Expert have made recommendations in the best interests of the class members, Defendants are only legally bound to substantially comply with the obligations set forth in the JSD, POA, and APPENDIX A or in any other Court order. As noted before, JSD ¶ 43 provides a process by which Defendants can challenge a systemic recommendation by the Community Monitor. The fact that there is a process suggests that if Defendants make no formal challenge to the Community Monitor's recommendations, then Defendants will be expected to follow the recommendations. The JSD, however, does not clearly state that Defendants are generally required to follow the recommendations when Defendants fail to make a formal challenge. The absence of explicit language in the JSD that would require implementation of recommendations is notable because the parties have otherwise agreed in the JSD that Defendants must implement certain specific CPR recommendations.[49] Plaintiffs also do not argue in the Renewed Noncompliance Motion that Defendants have not

---

[49]The JSD specifically addresses only the 1996, 1997 and 1998 CPR recommendations: "[t]he Department will implement the systemic recommendations of the 1997 and 1998 community audits, unless a specific recommendation is determined to be unreasonable in the mediation process or by the Court," and Defendants will implement certain recommendations from the 1996 CPR attached as Appendix 14 of the POA.  JSD ¶ 31.

complied with JSD ¶ 43.  Additionally, the ORDER APPOINTING RULE 706 EXPERT does

not require Defendants to follow recommendations by the 706 Expert.  Finally, Plaintiffs'

request that Defendants promptly identify deficiencies in nursing and medical care coordination

at provider agencies which need corrective action is already covered by the various JSD, POA,

and APPENDIX A provisions which the Court has reviewed.  It would be superfluous to order

Defendants to engage in activities that are already addressed in the JSD, POA, and APPENDIX

A.

On the other hand, a deadline to substantially comply with outstanding obligations under

the JSD, POA, and APPENDIX A should help in terminating this lawsuit in an expedient

manner, especially if there is a *Jackson* Compliance Administrator to ensure that Defendants are

diligently making progress towards that end.  The fact that Plaintiffs think that 18 months is a

realistic deadline underscores the Court's belief that Defendants are close to substantially

complying with their outstanding obligations.  The Court further believes that if the parties are

required to file with the Court a joint report every six months on Defendants' compliance

progress, the Court will be able to keep abreast of any emerging problems or issues and the

Court will, therefore, be able to intervene quickly to resolve those problems or issues.

Finally, Plaintiffs' request for an award of reasonable attorneys' fees and costs for

litigating this matter is premature.  As with any request for an award of attorneys' fees and costs,

Plaintiffs must follow the motion practice procedure under D.N.M. LR-Civ. 7 so that Plaintiffs'

request for attorneys' fees is thoroughly briefed by the parties and the Court can properly rule on

the motion with the benefit of relevant supporting documentation.

C.    *Final Comments on Plaintiffs' Requests for Remedies.*

The Court believes that a *Jackson* Compliance Administrator will be invaluable in

moving this case towards termination.  Although Ms. Rucker would not be disqualified under

195

§ 455 if the Court were to appoint her as the *Jackson* Compliance Administrator, Defendants' perception that Ms. Rucker is unfairly biased would impede her ability to adequately perform her duties as the *Jackson* Compliance Administrator.  The Court will, therefore, not appoint Ms. Rucker as the *Jackson* Compliance Administrator, despite her vast institutional knowledge of this case and her expertise.  In addition, Judge Molzen is not in a position to function as a special master.  In fact, a *Jackson* Compliance Administrator not previously involved with the case, agreed to by the parties, with expertise in providing health care, safety, and supported employment to severely disabled persons, would be in the best position to objectively determine what Defendants need to accomplish to substantially comply with Defendants' remaining obligations under the JSD, POA, and APPENDIX A.   To accelerate the rate of substantial compliance with Defendant's outstanding obligations, a deadline of 18 months following the appointment of a *Jackson* Compliance Administrator should be ordered and six month joint progress reports should be required.   Finally, the Court cannot, at this time, rule on Plaintiffs' request for an award of reasonable attorneys' fees and costs without that request being presented in the proper manner.

> D.      *Findings of Fact.*

128. Defendants contractually agreed to substantially comply with the remaining JSD, POA, and APPENDIX A obligations in the areas of health care, safety, and supported employment.

129.  A *Jackson* Compliance Administrator would not engage in quasi-judicial activities.

130.  Defendants perceive that Ms. Rucker is unfairly biased against them.

131.  Ms. Rucker would be unable to effectively or adequately fulfill the duties associated with being the *Jackson* Compliance Administrator because of Defendants' strong belief that she is unfairly biased against them.

196

132.  Judge Molzen has neither the time nor the expertise to ensure substantial compliance with the JSD, POA, and APPENDIX A in the capacity of a special master.

133.  Considering the many years which have elapsed since the Court entered the JSD, POA, and APPENDIX A, and the increasing medical and safety needs of aging class members, it is urgent that Defendants substantially comply with their outstanding obligations regarding health care, safety, and supported employment in an expedient manner.

134.  A *Jackson* Compliance Administrator should have substantial time to devote to this case.

135.  A *Jackson* Compliance Administrator should have expertise in providing health care, safety, and supported employment services to severely disabled persons.

136.  A *Jackson* Compliance Administrator's authority should be confined to the implementation of the JSD, POA, and APPENDIX A.

137.  A *Jackson* Compliance Administrator's authority should last no longer than necessary to accomplish termination of the case.

138.  Appointment of a Jackson Compliance Administrator would be the least intrusive means to ensure compliance with the JSD, POA, and APPENDIX A.

139.  Defendants should be able to substantially comply with their outstanding health care, safety, and supported employment obligations within 18 months.

140.  Plaintiffs have not presented their request for an award of reasonable attorneys' fees and costs in a proper manner.

E.     *Conclusions of Law*.

71.  Since the *Jackson* Compliance Administrator would not engage in quasi-judicial activities, the *Jackson* Compliance Administrator would not be considered a special master under Rule 53.

72. Since the *Jackson* Compliance Administrator would not be a special master under Rule 53, 28 U.S.C. § 455's disqualification provision does not apply to the *Jackson* Compliance Administrator.

73. Even if Ms. Rucker is considered biased, she could be appointed the *Jackson* Compliance Administrator because § 455's disqualification provision would not apply to her.

74. Since Defendants perceive that Ms. Rucker is unfairly biased and that perception likely would interfere with Ms. Rucker's ability to perform the duties of the *Jackson* Compliance Administrator, the Court should not appoint Ms. Rucker as the *Jackson* Compliance Administrator.

75. Since Judge Molzen has neither the time nor the expertise needed to be a special master in this case, she should not be appointed a special master.

76. It is reasonable under the circumstances to appoint a *Jackson* Compliance Administrator.

77. It is premature to rule on Plaintiffs' request for an award of reasonable attorneys' fees and costs.

## *CONCLUSION*

The Court applauds Defendants for the innovations and progress they have made in providing class members with various health care, safety, and supported employment services. Defendants are correct to observe that the class members' quality of life has vastly improved since the filing of this lawsuit in 1987. Notwithstanding these positive changes for class members, Defendants still have not substantially complied with all of their health care, safety, and supported employment obligations under the JSD, POA, and APPENDIX A. The Court believes, however, that Defendants are close to substantially complying with those obligations.

198

In reviewing Plaintiffs' Renewed Noncompliance Motion, the Court has observed several reasons why Defendants have not been able to substantially comply with those obligations despite the ample time Defendants have had to do so.  First, it appears that priorities change with changes in the administration of DOH.  This seems to be an inherent problem when politics dictate who is in charge of state departments and upper level management.  Second, available funding for services fluctuates depending on reasons like the strength of the economy as well as shifting priorities in state government.  Sufficient and dependable funding is also an inherent problem when state government is responsible for paying for services.  Third, the health care, safety, and supported employment obligations themselves, as agreed to by the parties, are often redundant and sometimes do not provide quantifiable criteria that Defendants can easily grasp and attain. The Court does not doubt the parties' good intentions in agreeing to these obligations, but many of the obligations are described in language that is more aspirational in nature than operational. The Court suggests that the parties reconsider the descriptions of the more broadly stated obligations and restate them in language that makes the obligations achievable. Otherwise, Defendants must substantially comply with those outstanding obligations, as broadly and loosely written, because this is the contractual language to which Defendants originally agreed.

Although there are certainly issues regarding substantial compliance with the JSD, POA, and APPENDIX A in the areas of health care, safety, and supported employment, the Court is unable to conclude that Defendants have violated the Rehabilitation Act and ADA. To start with, the Court could not conclude that Defendants have discriminated against severely disabled class members with respect to the provision of health care services.  In fact, the Court commends Defendants for accommodating those severely disabled class members who live in rural New

199

Mexico by providing them meaningful access to health care services through Continuum and for developing more and better health care services directed to severely disabled persons.  There is, however, a question as to whether Defendants violated the Rehabilitation Act and ADA by intentionally denying severely disabled class members supported employment services equivalent to those received by less severely disabled persons.  Unfortunately, that question of disparate treatment cannot be analyzed at this time, but must be further briefed.  On the other hand, the Court was unable to find a violation of the Rehabilitation Act and ADA when severely disabled class members choose to participate in segregated, congregate day services while less severely disabled persons more often chose to engage in supported employment.

Having concluded that Defendants have not substantially complied with many outstanding health care, safety, and supported employment obligations under the JSD, POA, and APPENDIX A and having found that aging class members have more medical and safety issues because this case has been pending for a long time, the Court determines that it is reasonable under the circumstances to appoint a *Jackson* Compliance Administrator who has both the appropriate expertise and availability to prod Defendants into final substantial compliance.  That *Jackson* Compliance Administrator would not be a special master, but simply an administrator chosen by the consent of the parties and with agreed upon authority.  Of course, if the parties cannot agree upon a *Jackson* Compliance Administrator or the authority of a *Jackson* Compliance Administrator, the Court will meet with the parties to work out a resolution.  The Court expects that with the help of a *Jackson* Compliance Administrator Defendants should be able to substantially comply with the remaining health care, safety, and supported employment obligations under the JSD, POA, and APPENDIX A within 18 months of the appointment of the *Jackson* Compliance Administrator.  The parties must keep the Court advised of the progress of

Defendants' compliance by filing joint reports every six months, with the first report due six months from the appointment date of the *Jackson* Compliance Administrator. Finally, the Court will consider Plaintiffs' request for reasonable attorneys' fees and costs once they are presented in an appropriate motion.

IT IS ORDERED that:

1. Plaintiffs' Renewed Noncompliance Motion is granted in part as described *supra*;

2. PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE THE 2010 AND 2011 REPORTS OF DAVIS DESCHAIES LLC (Doc. No. 1841) is granted in part in that the Court considered only those portions of the reports which contained admissible evidence;

3. PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY AND REPORT OF RIC ZAHARIA, PH.D. (Doc. No. 1842) is granted in part in that the Court considered only those portions of the testimony and report which contained admissible evidence;

4. DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' REMEDY EXPERT LEWIS H. SPENCE REGARDING REMEDY (Doc. No. 1843) is granted in part in that the Court considered only those portions of the testimony which contained admissible evidence;

5. Plaintiffs may, by November 15, 2012, file a motion seeking relief under *McDonnell Douglas* on Plaintiffs' disparate treatment claim that Defendants provided similarly situated persons, i.e., less severely disabled persons who want to work, with supported employment opportunities while denying more severely disabled class members who also want to work with those same supported employment opportunities;

6. The parties have until November 15, 2012 to mutually decide who should be appointed *Jackson* Compliance Administrator and to submit a stipulated order appointing the *Jackson* Compliance Administrator;

7.  If the parties cannot agree on who to appoint as *Jackson* Compliance Administrator and/or on an order appointing the *Jackson* Compliance Administrator, the parties must inform the Court of the nonagreement in writing so that the Court can schedule a hearing;

8.  Within 18 months from the time a *Jackson* Compliance Administrator is appointed, Defendants must substantially comply with their outstanding health care, safety, and supported employment obligations under the JSD, POA, and APPENDIX A;

9.  The parties must file a joint progress report every six months after a *Jackson* Compliance Administrator is appointed; and

10.  Plaintiffs may, by November 15, 2012, file a motion for an award of reasonable attorneys' fees and costs incurred in litigating the noncompliance issues.


_____
SENIOR UNITED STATES DISTRICT JUDGE

202