IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WALTER STEVEN JACKSON, et al.,

        Plaintiffs,

vs.                                                    No. CIV 87-839 JAP/KBM

LOS LUNAS CENTER, et al.,

        Defendants,

and

THE ARC OF NEW MEXICO,

        Intervenor,

and

MARY TERRAZAS, et al.,

        Intervenors, pro se.

## MEMORANDUM OPINION AND ORDER

### Introduction

This civil rights class action, filed on July 8, 1987, *see* CLASS ACTION COMPLAINT (Doc. No. 1), challenged various aspects of the institutionalization of developmentally disabled persons at Fort Stanton Hospital and Training School and Los Lunas Hospital and Training School, two New Mexico state-supported institutions that closed in the late 1990s. Twenty-seven years later, this lawsuit continues to creep along as the parties attempt to agree on what remains to be done and how Defendants can successfully fulfill all of their outstanding obligations. Notwithstanding the imposition through the years of many deadlines for completion of all

1

outstanding obligations, the latest deadline having been July 2014, *see* Doc. No. 1942 at 2, the case is like the Energizer battery bunny. Based on its torpid pace, it is difficult to estimate when the case will reach completion.[1] In addition, it is unclear what the Court can do, in a practical sense, to expedite resolution. The Court invites counsel to offer any helpful or creative suggestions that might narrow and prioritize the remaining issues and advance finalization.

The narrow scope of this MEMORANDUM OPINION AND ORDER (Order) is to resolve all disagreements between Plaintiffs and Defendants, specific to the proposed "Goals" and "Objectives" in the Jackson Compliance Administrator's (JCA) REMEDIAL PLAN OVERCOMING OBSTACLES TO SUBSTANTIAL COMPLIANCE ("Remedial Plan" at 11-38) (Doc. No. 1969), dated February 3, 2014, and filed February 4, 2014. The JCA's Remedial Plan was issued in accordance with the ORDER APPOINTING JACKSON COMPLIANCE ADMINISTRATOR (Appointment Order) (Doc. No. 1942), after the parties failed to agree on remedial plans. *See also* ORDER (Doc. No. 1966). The Remedial Plan is the JCA's attempt to summarize and detail what obstacles remain in Defendants' path to substantial compliance with *certain* outstanding obligations[2] to the Plaintiff Jackson Class Members who prevailed in this class action lawsuit.

---

[1]In its October 12, 2012 Order, the Court found that Defendants had made significant progress such that the Court believed Defendants were "close to substantially complying with their outstanding obligations." (Doc. 1930 at 195). Both parties provide different explanations for the lack of progress since then, but it is obvious that Defendants have not demonstrated substantial compliance with the remaining outstanding obligations in the almost two years that have passed since the Court made that remark. *See* Defendants' Response to Plaintiffs' Memorandum (Doc. 1975 at 12) ("Now, more than a year later [since the JCA's appointment], the Defendants are farther from disengagement than at the outset . . . .").

[2]Table I, attached to this Order, contains a complete list of the revised Goals and Objectives, taken from the JCA's Remedial Plan. In this Order, the Court works from the Goals and Objectives as numbered by the JCA in the Remedial Plan, by the parties in briefing, and by Chief Magistrate Judge Karen B. Molzen and the parties in the JSR Chart (Doc. No. 1986-1). Table I, however, contains a re-numbered list of the Goals and Objectives based on the parties' agreement to re-arrange certain Goals and Objectives, their agreement to eliminate certain Goals and Objectives, and the Court's resolution of the disputes. Because the Court will allow Plaintiffs to provide additional support for specified Objectives, *see infra,* Table I may be modified depending on the Court's review of Plaintiffs' supplemented positions.

The JCA's Remedial Plan is divided into four domains or plans:  Safety, Health, Supported Employment, and Quality Assurance.[3] *See* Joint Status Report (JSR) Chart (Doc. 1986-1). Each plan is further broken down into differing numbers of Goals, Objectives, Statements of Need, Evaluative Components, and Main Action [steps].[4] The four original plans are comprised of approximately 125 Goals and Objectives. The original Safety Plan, for example, includes five Goals, and within those five Goals, about eleven Objectives. The eleven Objectives are followed by numerous evaluative, disengagement criteria and at times, multiple pages of single-spaced main action steps. Even after reaching agreement on about 80 of the Goals and Objectives, the parties still disagree as to approximately 45 Goals and Objectives in the four Plans. The Court, therefore, must resolve each of the 45 disputes.

## Background

The Court does not recount the protracted procedural history of this case or its docket entries that number almost 2000. After a prolonged trial, the Court issued a decision in 1990, finding that Defendants violated both §504 of the Rehabilitation Act and the substantive due process clause of the Fourteenth Amendment of the United States Constitution with respect to the Jackson Class Members. *See Jackson by Jackson v. Fort Stanton Hosp. and Training School*, 757 F. Supp. 1243 (D.N.M. 1990), *rev'd in part*, 964 F.2d 980 (10th Cir. 1990).[5] From 1990 forward, *i.e.,* for over 20 years, the parties have taken various steps in an attempt to work out the

---

[3]The Court will eliminate a separate Quality Assurance Plan. *See* discussion *infra*.
[4]The JCA's Remedial Plan uses "evaluative components" and "main actions" to indicate the steps that Defendants ultimately must take in order to show compliance, and then, disengagement. Remedial Plan at 8-9. The Court will refer to these components or actions as "evaluative, disengagement criteria" in this Order.
[5]For additional background information, *see Jackson*, 757 F. Supp. at 1249-1253; FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER (10/12/12 Order) (Doc. No. 1930), and the JCA's Remedial Plan.

compliance issues and achieve disengagement of Defendants' outstanding obligations to the Jackson Class Members.

In addition, the Court notes the following key developments. In 2011, Plaintiffs filed a RENEWED MOTION FOR FURTHER REMEDIAL RELIEF TO REMEDY NON COMPLIANCE (Plaintiffs' Noncompliance Motion) (Doc. No. 1988), alleging that Defendants had not complied with certain plans the parties had formulated for correction of deficiencies. These included the Joint Stipulation on Disengagement (JSD), the Plan of Action (POA), and the 2005 Appendix A.[6] Plaintiffs also asserted that Defendants' failure to provide adequate health care to severely disabled class members and to afford them supported employment opportunities violated §504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act (ADA) by discriminating against persons with severe disabilities. 10/12/12 Order at 1 (Doc. 1930).

After a lengthy evidentiary hearing, the Court granted in part Plaintiffs' Noncompliance Motion. In its 206-page Order, the Court determined substantial noncompliance by Defendants with several aspects of the JSD, POA, and Appendix A related to health, safety, and supported employment issues. However, the Court did not find any new or additional violations of the Rehabilitation Act or of the ADA. The Court required Defendants to substantially comply with the health care, safety, and supported employment obligations under specific provisions of the JSD, POA, and Appendix A. 10/12/12 Order at 200.

On January 11, 2013, the Court appointed Sue Gant, Ph.D., as the JCA to assist the parties with their endeavor of satisfying the numerous outstanding obligations that remained. Appointment Order. All parties stipulated to the appointment of Dr. Gant as the JCA. *See* 10/12/12 Order at 201; Doc. No. 1987 at 1. Dr. Gant had significant knowledge of the case, having previously served as the Rule 706 Expert from December 2007 until January 2013. As the

---

[6]Table III contains a list of acronyms used in this Order and Table I.

Rule 706 Expert, Dr. Gant's role was to assist the Court in the determination of compliance with its earlier Orders, including the JSD, POA, audit recommendations, stipulations, and Appendix A. ORDER APPOINTING RULE 706 EXPERT (Doc. No. 1610).

The JCA was assigned various responsibilities and given the authority necessary to assist Defendants in achieving substantial compliance with Defendants' obligations, consistent with provisions in the JSD, the POA, and Appendix A. The Appointment Order provides that the JCA's responsibilities and authorities are confined to Defendants' outstanding obligations under the JSD, the POA, and Appendix A. Appointment Order at 1. The JCA is "solely responsible and accountable to the Court, and will function as an agent of the Court." *Id.* at 1-2. In addition, the JCA has the authority to make formal written recommendations in order to achieve substantial compliance with outstanding obligations and court orders. *Id.* at 6-7. Each party is bound by the JCA's formal written recommendations, unless the party files timely objections and requests a hearing. *Id.* at 7. However, "[t]he exclusive power to direct compliance activities, to sanction parties for noncompliance, and to enter further remedial orders remains with the Court." *Id.*

In February 2014, in accordance with the Court's directive, the JCA issued the Remedial Plan that consists of over 200 pages. The JCA's Remedial Plan provides an introduction,

background information, graphs and charts, aspirational "I" statements, acknowledgements, definitions of pertinent terminology, and a list of resources.[7]

As contemplated by the Appointment Order, Defendants filed timely objections to the JCA's Remedial Plan. Defendants objected to almost the entire 200-page Plan. *See* DEFENDANTS' OBJECTIONS TO THE JACKSON COMPLIANCE ADMINISTRATOR'S REMEDIAL PLAN TO OVERCOME OBSTACLES TO SUBSTANTIAL COMPLIANCE (Doc. No. 1971). In contrast, Plaintiffs agreed with most, if not all, of the Remedial Plan. *See* PLAINTIFFS' MEMORANDUM IN SUPPORT OF THE JACKSON COMPLIANCE ADMINISTRATOR'S RECOMMENDATION AND REMEDIAL PLANS (Doc. No. 1970). Thus, the parties were at loggerheads. *See also* DEFENDANTS' RESPONSE TO PLAINTIFFS' MEMORANDUM IN SUPPORT OF THE JACKSON COMPLIANCE ADMINISTRATOR'S RECOMMENDATION AND REMEDIAL PLANS (Doc. No. 1975), to which Defendants attached their proposed October 2013 remedial plans (Doc. No. 1975-1).

Rather than require complete briefing, the Court directed the parties to consult in an attempt to resolve as many disputes as possible and subsequently, to meet with Chief United States Magistrate Judge Molzen for mediation of all remaining disputes. In order to focus their efforts in resolving the objections to the Remedial Plan, the Court instructed the parties to review

---

[7]Most of the JCA's Remedial Plan and its many subsections may prove unworkable in a practical sense. Undoubtedly, the JCA's Remedial Plan supplies helpful guidance. Moreover, the Remedial Plan was a massive undertaking that the JCA promptly completed. Yet, it is untenable, for example, to require Defendants to satisfy 28 separate evaluative, disengagement components for just one of 24 Objectives in the Safety Plan alone. *See, e.g.,* Remedial Plan, Safety Objective S1.2.1, at 134-135, 119-174. Further, in addition to 28 evaluative, disengagement components, there are approximately 100 "main action" steps to be completed for this single Objective. Admittedly, this example contains more extensive steps than others, but the Court calls attention to it, not to criticize the JCA's work, but to emphasize the need for all involved, including parties, counsel, the JCA, and consultants, to find workable, practical solutions that will allow Defendants to satisfy their obligations to the Jackson Class Members and to bring this litigation to an end. This may require the parties, the JCA, counsel, consultants, and the Court to use a fresh approach where possible.

only the JCA's statement of Goals and Objectives for the four original domains in the Remedial Plan. *See* Remedial Plan, Section II (separately setting out the Goals and Objectives for Safety, Health, Supported Employment, and Quality Assurance).

The Court envisioned that, once the parties reached agreement on the Goals and Objectives of the plan, the parties would attempt to work out the evaluative, disengagement criteria for every Goal and Objective. However, Defendants advised that they could not agree to any Objective that did not have "measurable evaluative criteria." Thus, Defendants stated that any consensus they might reach with Plaintiffs on the Goals and Objectives in the Remedial Plan would be "conditioned upon agreement on each and every evaluative component." (May 1, 2014 Letter to Court from defense counsel). It is noteworthy that Defendants already had objected to almost all of the JCA's proposed evaluative, disengagement criteria and "main action [steps]."

The parties met and succeeded in "conditionally" agreeing on the language of numerous Goals and Objectives. They also agreed to make certain changes to the language of Goals and Objectives, and they eliminated or re-numbered some Goals and Objectives. After mediation with Judge Molzen on June 5, 2014, however, Plaintiffs, Defendants, and Intervenor Arc of New Mexico agreed unanimously that no further mediation would be helpful. Defendants then clarified that their agreements to Goals and Objectives were conditioned on the subsequent determination of the evaluative, disengagement criteria for each Goal or Objective. *See* JSR Chart (Doc. 1986-1); *see* discussion *infra* as to deadlines for presenting evaluative, disengagement criteria.

The JSR required the parties[8] to submit to the Court "concise simultaneous position statements for each of the JCA Recommendations [as to Goals and Objectives] for which no conditional agreement has been reached." JSR at 2. The Court could then accept or reject any continuing objection proffered by the Defendants, and the Court could choose to modify the JCA's recommended Goals and Objectives based on a continuing objection. *Id.*

In resolving the parties' present disputes, the Court reviewed numerous pleadings, briefs, orders, and exhibits, including PLAINTIFFS' POSITION STATEMENT REGARDING THE JCA'S RECOMMENDATIONS (Plaintiffs' Memorandum) (Doc. No. 1987) and Defendants' MEMORANDUM SUPPORTING DEFENDANTS' OBJECTIONS TO THE JCA PROPOSED REMEDIAL PLAN (Defendants' Memorandum) (Doc. No. 1989), the Remedial Plan, DEFENDANTS' NOTICE OF ERRATA (Doc. No. 1973), and other pertinent documents. The Court has determined that it will sustain some of Defendants' objections and overrule others. In some instances, the Court will revise the language of the JCA's proposed Goals and Objectives for which there is objection. For example, the Court replaces references to "individuals" in the disputed Goals and Objectives with "Jackson Class Members." The Court makes little to no changes in the language of Goals and Objectives in Table I that the parties did not dispute.

The Court clarifies that the final Goals and Objectives, as set forth in Table I, are the requirements that Defendants must satisfy in order to prove compliance with the existing obligations that were the subject of Plaintiffs' Noncompliance Motion, the Court's 10/12/12 Order, and the revised JCA's Remedial Plan. There were and still are a number of other outstanding court-ordered obligations that the Noncompliance Motion, the Court's 10/12/12

---

[8]Intervenor Arc of New Mexico did not submit a written statement regarding the Remedial Plan, but Intervenor Arc of New Mexico's counsel participated in the mediation efforts before Chief Magistrate Judge Molzen.

Order, and consequently, the JCA's Remedial Plan did not address.[9] Stated differently, orders and obligations not related to the revised Remedial Plan's Health, Safety, and Supported Employment provisions must still be disengaged through the appropriate procedures. For example, obligations outside the scope of the Remedial Plan include those concerning training and technical assistance, case management, and assistive technology, as well as other identified areas of deficiencies. Thus, the Court rejects Defendants' argument that the amended Goals and Objectives in the Remedial Plan addressed "*all* outstanding obligations" such that once the Remedial Plan Goals and Objectives were disengaged, the case could then be terminated. *See* JSR at 4-6, 9-14. Defendants must demonstrate substantial compliance with the revised Remedial Plan Goals and Objectives, as further defined by the evaluative, disengagement criteria, and also with outstanding obligations from other orders and plans that were not the subject of Plaintiffs' Noncompliance Motion. *See* Table I and Table II.

### Legal Authority for Rulings on Disputes

The Court's specific authority for deciding the parties' objections to the JCA's Goals and Objectives derives from the Appointment Order, which states, "All actions of the [JCA] . . . will be under direct control and supervision of this Court. The exclusive power to direct compliance

---

[9]All parties agreed at a September 4, 2014 meeting with Chief Magistrate Judge Molzen that PLAINTIFFS' [27-page corrected] MATRIX OF REMAINING OBLIGATIONS: AUGUST 12, 2014 (Matrix), emailed to the Court on August 14, 2014, and attached to this Order as Table II, is an accurate list of all obligations that remain for disengagement. The parties, however, clarified that certain substantive protections in the JSD are not subject to the disengagement process and will remain in effect until Court oversight is concluded, *e.g.,* JSD ¶ 8 (prohibiting placement of Jackson Class Members into nursing homes without prior notice to Plaintiffs' counsel), JSD ¶ 9 (prohibiting housing Jackson Class Members at the training school campus), JSD ¶ 28 (requiring maintenance of certain regulations), JSD ¶ 29 (retaining the community monitor), etc. Otherwise, the Matrix provides an agreed upon comprehensive list of outstanding obligations that must be disengaged. The Matrix highlights in gray those obligations regarding Health, Safety, and Supported Employment that were raised by Plaintiffs' Noncompliance Motion and that were the subject of the JCA's Remedial Plan and this Order. It is not clear if or how those highlighted obligations correspond to the Court's revised Goals and Objectives listed in Table I, and the parties may wish to provide clarification.  It is clear that Tables I and II contain all the remaining obligations that Defendants must satisfy for full disengagement.

activities, to sanction parties for noncompliance, and to enter further remedial orders remains with this Court." Appointment Order at 7. In addition, the Court has inherent authority to manage its docket "so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31(1962). *See also Milliken v. Bradley*, 433 U.S. 267, 279-80 (1977) (discussing the Court's broad equitable authority and remedial powers in a school desegregation case); Defendants' Response at 14 (Doc. No. 1975) ("Courts have inherent authority to enforce their judgments after the entry of a final order or consent decree.") (*citing Thompson v. United States Dep't of Housing & Urban Dev.*, 404 F.3d 821, 833 (4th Cir. 2005)).

**Resolution of Disputes**

In organizing its rulings, the Court addresses each Goal and Objective from the JCA's Remedial Plan's original four sections: Safety, Health, Supported Employment (SE), and Quality Assurance, for which the parties noted disagreement.[10] *See* JSR Chart. The Court presents each of the JCA's Goals and Objectives that are disputed, summarizes the parties' positions, decides the disputes, and identifies the final language to be used in the disputed Goal and Objective. Because the Court is eliminating a separate Quality Assurance Plan, its discussion of the JCA's original proposed Quality Goal and Quality Objectives is found under Safety Goal 5, *infra*. At the end of this Order, the Court addresses issues related to the evaluative, disengagement criteria and deadlines for compliance and disengagement.

## I.     QUALITY ASSURANCE PLAN

As stated, the Court will eliminate the JCA's proposed Quality Assurance Plan as a separate plan, but will insert some of the JCA's original Quality Assurance Plan language under the Safety Plan. In reaching this decision, the Court reviewed the parties' positions.

---

[10]This Order does not address any Goals and Objectives to which the parties agreed.  However, those Goals and Objectives are provided in Table I and are re-numbered as needed.

Defendants state that over the past year, "the JCA at times considered the creation of a separate quality plan, and the Defendants complied, submitting the Defendants' Quality Plan in October 2013." Defendants' Memorandum at 30. Defendants contend that in December 2013, the JCA "announced that the Defendants' [Quality] plan would not be discussed" and no discussions were held about a quality plan in December. Thus, Defendants were "surprised by the creation of the totally new JCA Quality Assurance Plan. . . ." and object to the JCA's Quality Assurance Plan in its entirety.

Defendants "strongly object" to what they characterize as the JCA's "unilateral attempt to modify existing contractual obligations by creating an entirely new section of obligations titled 'Quality Assurance.'" According to Defendants, the outstanding requirements in the POA that define Defendants' quality-related obligations are described under POA Quality Enhancement, Activities 1-8. In addition, there are eight activities in Appendix A that establish Defendants' obligations related to Quality Enhancement. Defendants further explain that they have not rejected the obligations in the POA and Appendix A related to Quality. Defendants have agreed to incorporate their October 2013 Quality Goals into Safety Goal 5 "as defined by Plaintiffs." *See* discussion *infra* regarding the JCA's originally proposed Quality Goal 1, and revised Safety Goals 4 and 5.

It is true that Defendants, at one time, included a separate Quality Assurance Plan in their proposed October 2013 Remedial Plan. Doc. 1975 at 2; Doc. 1975-1 at 63-76. However, the Court never envisioned a separate or fourth Quality Assurance Plan and will not add one. Thus, the Court concludes that the Remedial Plan should include only three plans:  Safety, Health, and Supported Employment. Certain aspects of the original Quality Goal 1 and its Objectives will be included in the Safety Plan.

II.    **SAFETY PLAN**

A.    **Disputed Safety Objective S1.1.3**[11]

*The JCA's Proposal:*  Those providing services to Jackson Class Members will receive competency based training to report ANE [Abuse, Neglect, and Exploitation].

*Defendants* propose the following language for Safety Objective S1.1.3: "The individuals listed in POA CIMS B [Plan of Action Community Incident Management System Bureau Paragraph B][12] will receive the training described in the Eva Kutas Recommendations #7 and 8[13] and pass a formal test of the student's knowledge and understanding of IMB [Incident Management Bureau] provider policy requirements." Defendants argue that references to Eva Kutas' recommendations #7 and #8 and to POA CIMS B should be included in the Objective to provide clear direction to Defendants.

*Plaintiffs* essentially agree with Defendants but assert that language requiring demonstration of competency should also be included in the Objective. Despite their agreement with Defendants' proposal, Plaintiffs assert that the JCA's language is "easier to understand and put to use" than the language proposed by Defendants. Plaintiffs propose the following language for Safety Objective S1.1.3: "The individuals listed in CIMS 8 [sic] will receive the training described in Eva Kutas' Recommendations #7 & 8, and pass a test that demonstrates their

---

[11]The Court works from the original Goal and Objective numbering found in the JCA's Remedial Plan and the JSR Chart unless otherwise noted. The first number in Safety Objective S1.1 (S1), indicates that the Objective falls under Safety Goal 1. Safety Objective S2.1 is the first Objective that falls under Safety Goal 2.

[12]The POA is the September 26, 1997 Plan of Action that was revised in subsequent years. The reference to CIMS B (¶ B is "Desired Outcome: Staff Trained on the Incident Management System") is found on page 15 of the POA as revised on 5/31/2000. This section of the POA is also recited in Defendants' Memorandum at 6-7.

[13]Eva Kutas is an incident management expert on abuse, neglect and exploitation who Dr. Gant hired as a consultant. Ms. Kutas submitted a Report in January 2013 to the Rule 706 Expert (formerly, Dr. Gant) that suggests how to improve incident management within the Department of Health Division of Health Improvement, Incident Management Bureau. Ms. Kutas' Recommendations Nos. 7 and 8 are recited verbatim in Defendants' Memorandum at 6, and are included in her January 2013 Report at 67. It appears that the Report has not been filed of record.

knowledge and understanding of IMB provider policy requirements." Plaintiffs' Memorandum at 14. Plaintiffs' proposed language does not specifically mention competency.

*The Court* agrees with the parties that more specificity than that proposed by the JCA will provide clearer instruction for Defendants and expedite disengagement. Moreover, Plaintiffs, in effect, agree to Defendants' proposal. Thus, the Court sustains Defendants' objections and adopts the language proposed by Defendants. If Defendants want Safety Objective S1.1.3 to contain specific language from Eva Kutas' Recommendations #7 and #8 and POA CIMS B, Defendants may include that language, as appropriate, in the evaluative, disengagement criteria.

### *Court's Final Safety Objective S1.1.3:*

The individuals listed in POA CIMS B will receive the training described in the Eva Kutas Recommendations #7 and #8 and will pass a formal test of the individuals' knowledge and understanding of IMB provider policy requirements.

### B.     **Disputed Safety Objective S1.6.1**

*The JCA's Proposal:*  Stakeholders make informed recommendations for improving the ANE system.

*Defendants* object, arguing that no such language is needed because there is no outstanding obligation related to proposed Safety Objective S1.6.1. Defendants further assert that the Department of Health (DOH) has already established a system, described in detail, for receiving, discussing, and incorporating stakeholder input. Defendants' Memorandum at 7-9. Defendants contend that the creation of a new system as recommended by the JCA would cause confusion and lead to duplication and disagreement. Defendants state that, should the JCA seek to establish an external review board over state processes, such a practice cannot be adopted

because the Secretary of Health is obligated to manage all DOH operations and to administer and enforce pertinent New Mexico laws.

*Plaintiffs* suggest language similar to that of the JCA: "Stakeholders are provided information and the opportunity to make recommendations for improving the ANE system." Plaintiffs' Memorandum at 14.

*The Court* sustains Defendants' objections and will eliminate Safety Objective S1.6.1. Plaintiffs do not identify any outstanding contractual obligation that supports either their proposal or the JCA's proposal. In addition, Plaintiffs do not demonstrate that the system already developed by Defendants, "The Advisory Council on Quality Support for Individuals with Developmental Disabilities and their Families," is deficient in the area of stakeholder feedback on the ANE system.

**Court's Final Safety Objective S1.6.1:**

Omit.

C.     **Disputed Safety Objective S3.1**

*The JCA's Proposal:*  Identify measurable indicators used to determine quality.

*Defendants* assert that there is no outstanding obligation related to Safety Objective S3.1 and object to Plaintiffs' demand to move Safety Objective S3.1 to a "new 'Quality' Section." Defendants also indicate that they do not specifically object to the "terms of Safety Objective S3.1, but to Plaintiffs' attempt to expand the litigation by creating" a separate Quality Assurance Plan "that is not part of the JSD, the POA, Appendix A or any outstanding obligation." Defendants' Memorandum at 10-11. Notwithstanding Defendants' objections, Defendants would agree to the following language for Safety Objective S3.1, provided the

14

Objective remains part of the Safety Plan: "Establish and use indicators for DD [Developmentally Disabled] Services in New Mexico."[14]

     *Plaintiffs* will agree to Defendants' proposed language for Safety Objective S3.1 but ask that S3.1 include a specific reference to quality. Plaintiffs propose the following language for Safety Objective S3.1: "Establish and use indicators to measure quality of DD Services in New Mexico."

     *The Court* sustains in part and overrules in part Defendants' objections to the JCA's proposed Safety Objective S3.1. The Court will employ Plaintiffs' proposed Safety Objective S3.1. Defendants agreed to essentially the same language for Safety Objective S3.1, albeit without the phrase "to measure quality." Defendants' position--that quality assurances by The Centers for Medicare and Medicaid (CMS) are already in place--does not compel exclusion of Plaintiffs' proposed language. Defendants may indicate how quality is measured in the evaluative, disengagement criteria, as appropriate.

     *Court's Final Safety Objective S3.1:*

     Establish and use indicators to measure quality of DD Services in New Mexico.

     D.    **Disputed Safety Objective S4.1**

     *The JCA's Proposal:* Measurable indicators are consistent with standards that prescribe expectations for quality provider performance.

     *Defendants* argue there is no outstanding obligation, but they will agree to the following language for Safety Objective S4.1: "Establish supports in the field to promote knowledge and use of performance indicators at the provider level."

---

[14]Defendants' contention that Safety Objective S3.1 should be part of Safety Goal 5 is confusing in view of the JSR Chart and the parties' memoranda. The Court will address Safety Goal 5 below. Safety Objective S3.1 will remain under Safety Goal 3. *See* Table I.

*Plaintiffs* support the JCA's Safety Objective S4.1 and challenge Defendants' proposed language on grounds that the terms "supports" and "to promote" are not measurable. Plaintiffs also object to Defendants' failure to reference "standards" that will guide the establishment of evaluative, disengagement criteria.

*The Court* sustains in part and overrules in part Defendants' objections to the JCA's proposed Safety Objective S4.1. The Court finds Defendants' proposed language, particularly the use of "supports," to be vague and unenforceable. The Court will modify Safety Objective S4.1 to make it more understandable and measurable. The Court essentially adopts language from Defendants' proposed Safety Objective S4.1 set forth in their October 2013 Plan. (Doc. 1975-1 at 47). If Defendants continue to object to Safety Objective S4.1, they can incorporate some of the specific actions, s*ee* Defendants' Memorandum at 11-14, in the evaluative, disengagement criteria, as appropriate.

> *Court's Final Safety Objective S4.1:*

Examine current Quality Assurance and Quality Improvement processes and activities intended to safeguard Jackson Class Members and to improve the quality of provider performance in relation to Jackson Class Members. Take steps to increase transparency, accountability, and effective remediation. Establish measurable indicators that are consistent with the pertinent standards that address the quality of provider performance.

> E.   **Disputed JCA's Proposed Safety Goal 5**

*The JCA's Proposal:* DOH holds itself (and its contractors) accountable.

*Defendants* argue that this is not a goal to which the parties agreed, and that in any event, Safety Goal 4, as rewritten and agreed by the parties, subsumes or satisfies the JCA's proposed Safety Goal 5.

To address the parties' positions regarding Safety Goal 5, the Court must first summarize the parties' positions concerning Safety Goal 4. The JCA's proposed Safety Goal 4 was "Quality is Maintained through Evaluating Regulatory Compliance." The parties agreed to new language for Safety Goal 4:  "Prompt and effective action is taken with respect to provider agencies where serious incidents, deaths, patterns of incidents or of significant events, or serious programmatic deficiencies have been identified, in order to protect class members, to reduce the risk of future harm, and to ensure that quality services and supports are provided." JSR Chart at 4. *See also* Table I.

**Plaintiffs** seek to retain the JCA's proposed Safety Goal 5 because they believe accountability is a problem and that implementation of specific steps is needed to protect class members. "Including accountability in the Defendants' remedial plan will help ensure that the necessary steps to protect class members are implemented." Plaintiffs' Memorandum at 15. Plaintiffs further contend that Defendants proposed no meaningful alternative to the JCA's Safety Goal 5 that includes accountability.

**The Court** sustains Defendants' objections in that that the JCA's proposed Safety Goal No. 5 will be removed. Safety Goal No. 4, as re-written by the parties implicitly includes the concept of accountability. However, Defendants should specify requirements for accountability in the evaluative, disengagement criteria under Safety Goal No. 4, as needed.

**Court's Final Safety Goal No. 5:**

The JCA's proposed Safety Goal 5 is omitted. The original single Safety Objective (S5.1) under proposed Safety Goal 5 was already re-numbered by the parties as Safety Objective S4.2.

However, while the Court eliminates the JCA's proposed Safety Goal 5, the Court will substitute a new Safety Goal 5 that is taken from language in the JCA's original proposed Quality Assurance Plan. *See* below.

F.      **JCA's Disputed Quality Goal 1, replaced by New Safety Goal 5**

***The JCA's Proposal:***  Implement an effective quality assurance (QA) system. This was the JCA's proposed <u>Quality</u> Goal 1. As noted above, the Court is eliminating the JCA's proposed Quality Assurance Plan. However, the parties reached some agreements about the JCA's proposed Quality Goal and related Objectives. Those agreements, as well as the Court's resolution of disputes, are reflected under new Safety Goal 5 and its Safety Objectives.

***Defendants*** propose the following language for this Goal:  "Measurable indicators of quality are established, and an integrated data collection system is developed that collects, analyzes, employs information from multiple sources to determine if these quality indicators are met, the safety of individuals is protected, and quality services are provided for individuals."

***Plaintiffs*** contend that the JCA's proposed Goal "sets forth a rudimentary requirement that the United States Supreme Court has essentially held is required in order for a defendant to conclude a systems reform class action." Plaintiffs' Memorandum at 3. Plaintiffs assert that "Defendants' October 2013 [Quality] Plan is a more elaborate explication of the same principle." *Id.* Plaintiffs' position appears to be that the Court should adopt the JCA's more "rudimentary" Goal over Defendants' "more elaborate explication" of the Goal. Plaintiffs refer to a Supreme Court decision but provide no citation. Plaintiffs also argue that Defendants' past failures to fulfill similar obligations concerning quality enhancement are indicators that Defendants' proposed Quality (now Safety) Goal and Objectives should not be utilized. *See* Plaintiffs' Memorandum at 3-4.

*The Court* finds that Defendants' proposed Goal is more amenable to measurement and evaluation than the JCA's broader-stated Goal. Therefore, the Court will use Defendants' proposed language, with minor modifications, as a new Safety Goal 5. As noted earlier, the Court substitutes "Jackson Class Members" for all references to "individuals."

### *Court's Final, New Safety Goal 5:*

Establish measurable indicators of quality and develop an integrated data collection system that collects, analyzes, and employs information from multiple sources to ensure that these quality indicators are met, the safety of Jackson Class Members is protected, and quality services are provided for Jackson Class Members.

G.   **Disputed Quality Objective Q1.1 will be omitted rather than used as a New Safety Objective**

*The JCA's Proposal:*  DOH (and its agents) implements an effective Quality Assurance (QA) Plan.

*Defendants* argue that there is no related existing obligation and that this Objective would not disengage any outstanding obligation. They also object on the ground that the term "agent" is overly broad, open to interpretation, and unenforceable. Defendants assert that they are well along in their Quality Assurance/Quality Improvement programs. They provide descriptions of those programs and efforts. Defendants' Memorandum at 32. Thus, Defendants ask that the Court eliminate this Objective.

*Plaintiffs* argue that Defendants' October 2013 Plan contains more stringent requirements than the JCA's proposal. Plaintiffs support the JCA's proposed Objective Q1.1, which they believe is an achievable Objective. Plaintiffs' Memorandum at 4.

*The Court* finds that New Safety Goal 5, at least by implication, subsumes this proposed Objective. In other words, the requirements of New Safety Goal 5 to establish "measurable

indicators of quality" and "an integrated data collection system" apply to the DOH. Therefore, the Court will eliminate this Objective.

       ***Court's Final Safety Objective Original Q1.1:***

Omit.

      H.    **Disputed Quality Objective Q1.2 will be omitted rather than used as a New Safety Objective**

       ***The JCA's Proposal:*** There are sufficient numbers of quality improvement personnel.

       ***Defendants*** object on grounds that the proposed Objective is vague, aspirational, not measurable, and unenforceable. They argue that this Objective does not take into account the Office of Systems Improvement and all of the activities Defendants have initiated in the past year. Moreover, according to Defendants, the number of personnel is variable and dependent on many factors.

       ***Plaintiffs*** assert that the Court's "voluminous findings that Defendants have failed to comply with their obligations in the areas of Safety, Health and Supported Employment" support a Court determination that an "effective quality assurance system is established and maintained." Plaintiffs' Memorandum at 4.  In addition, Plaintiffs contend that Defendants entered into a "similar stipulation" in 2005 that "DHI will have adequate resources to follow-up, verify, and close incidents requiring follow-up." *Id.*

       ***The Court*** sustains Defendants' objections on the grounds that the JCA's proposed Objective is vague and not susceptible to measurement. It is unknown what "sufficient numbers" of personnel would be. Therefore, the Court will eliminate this Objective.

       ***Court's Final Safety Objective Original Q1.2:***

Omit.

I.     **Disputed Quality Objective Q1.3 will be omitted rather than used as a New Safety Objective**

*The JCA's Proposal:*  Region implements an effective Quality Assurance (QA) plan.

*Defendants* state that they have disengaged obligations related to regional offices as of May 29, 2008, and refer to Doc. No. 1624. Defendants' Memorandum at 33. Document No. 1624 is an Order for Partial Disengagement for Plan of Action Appendix 13-Regional Offices.

*Plaintiffs* contend that Defendants have exhibited an "ongoing failure to comply with their stipulated obligation to annually issue corrective action plans," and that this Objective will rectify the deficiency. Plaintiffs' Memorandum at 5.

*The Court* is not persuaded by Defendants' position. The Court reviewed the Plan of Action-Appendix 13 – "Plan of Action for Regional Offices" that addresses regional office staffing and collaboration, but finds it unclear whether the disengagement of the POA-Appendix 13 eliminates the need for this type of Objective. Nonetheless, the Court will remove this Objective. New Safety Goal 5, at least by implication, subsumes this proposed Objective. In other words, the requirements in New Safety Goal 5 to establish "measurable indicators of quality" and "an integrated data collection system" apply to the Regional Offices, and that is sufficient.

*Court's Final Safety Objective Original Q1.3:*

Omit.

J.     **Disputed Quality Objective Q1.4 will be replaced by New, Revised Safety Objective S5.1** (*See* Table I for re-numbering)[15]

*The JCA's Proposal:*  Provider implements an effective Quality Assurance (QA) Plan.

---

[15]The final Goals and Objectives, in Table I, had to be re-numbered. Here, for example, original proposed Quality Objective Q1.4 is placed under Safety Goal 5. Thus, it will be re-numbered as Safety Objective S5.1 to reflect that it is the first Objective under S5 (Safety Goal 5). The Court eliminated the first three proposed Objectives (Q1.1, Q1.2, and Q1.3).

*Defendants* propose the following:  "Providers will use the identified performance indicators as part of their agency quality assurance system to improve quality."

Defendants also object to the JCA's proposed Objective on the ground that it is duplicative of Objective Q1.1. However, the Court eliminated original Objective Q1.1 and did not include it as a Safety Objective.

*Plaintiffs* assert that the "Department of Health DD Waiver Standards already require each provider agency to establish and implement a Quality Assurance Plan." Plaintiff's Memorandum at 5. According to Plaintiffs, the "JCA has determined that compliance with this state-issued DD Waiver Standard is necessary to achieve compliance with the Court's orders and to establish a durable remedy." *Id.*

*The Court* will use the language proposed by Defendants, provided that the evaluative, disengagement criteria supply any necessary clarifying information as to "identified performance indicators."

### Court's Final Safety Objective S5.1:

Providers will use the identified performance indicators as part of their agency quality assurance system to improve quality.

### K.    Disputed Quality Objective Q1.5 will be omitted rather than used as a New Safety Objective

*The JCA's Proposal:*  Collaborate with stakeholders to improve services.

*Defendants* argue that original Quality Objective Q1.5 is not related to any outstanding obligation, is aspirational, and thus is not measurable. They further assert that the meaning of terms like "stakeholders" and "improve services" has caused consistent disagreement in the past.

*Plaintiffs* contend that the "JCA approach to quality appropriately includes input and partnerships with those most affected by the Defendants' service system–class members,

families, guardians, and other stakeholders." Thus, it is Plaintiffs position that the JCA's proposed Quality Objective provides an "effective and tested strategy for ensuring quality services." Plaintiffs' Memorandum at 5.

*The Court* sustains Defendants' objections that the proposed Objective is not measurable and is aspirational. Moreover, Plaintiffs did not identify an outstanding obligation that corresponds to this proposed Objective. In addition, the Court finds that "to improve services" is vague. If the language "from multiple sources" in New Safety Goal 5 can be made more specific by including a reference to collaboration with stakeholders, families, community partners, and guardians, Defendants may provide clarification through the evaluative, disengagement criteria. Therefore, the Court eliminates this Objective.

*Court's Final Safety Objective Original Q1.5:*

Omit.

L.       **Disputed Quality Objective Q1.6 will be replaced by New, Revised Safety Objective S5.2**

*The JCA's Proposal:* Significant events (other than ANE) are responded to effectively.

*Defendants* argue that there is no related outstanding obligation, and further that the proposed Objective does not take into account the current "Significant Events Reporting" and the requirement that providers report significant events to the "TherapGER system."

*Plaintiffs* define significant events "such as falls, emergency room visits and medication errors that place Jackson Class Members at risk, other than ANE." Plaintiffs insist that Defendants develop a method for reviewing and responding to such events. Plaintiffs concede that one of Defendants' proposed Objectives in Defendants' October 2013 Quality Assurance Plan related to reporting significant events through GER and was very similar to the JCA's proposal. Plaintiffs' Memorandum at 6.

*The Court* will utilize a combination of Defendants' proposed Objective from their October 2013 Plan that states:  "Use significant events reported through GER including emergency services use and law enforcement incidents to support management of the DD system," and specific inclusive language proposed by Plaintiffs. The Court finds that Defendants' proposed Objective is more susceptible to measurement than the JCA's broader proposed Objective.

### Court's Final Safety Objective S5.2:

Use significant events reported through GER-- including use of emergency services, falls, medication errors, and law enforcement incidents -- to support DD system management, that includes responses to significant events.

M. **Disputed Quality Objective Q1.7 will be omitted rather than used as a New Safety Objective**

*The JCA's Proposal:*  When an individual's needs are not met due to an interruption in services, threatening health, safety and functional regression, DOH promptly responds to protect the person and restore service.

*Defendants* argue that this Objective is not related to any outstanding obligation. Thus, according to Defendants, this Objective is unnecessary, aspirational, and unenforceable.

*Plaintiffs* argue generally that because the Court has found Defendants' noncompliance with "scores of stipulated orders requiring Defendants to protect the health and safety" of Jackson Class Members, this Objective is necessary. However, Plaintiffs provide no citations to stipulated orders or outstanding obligations related to the proposed Objective.

*The Court* finds that there are other Goals and Objectives that address the same type of concerns proposed in this Objective, *i.e.,* instances when there is an "interruption in services" to the Jackson Class Member that threatens the Jackson Class Member's health and safety. For

24

example, Safety Goal 4, as revised and agreed to by the parties, requires that provider agencies take prompt and effective action where there are "serious incidents, deaths, patterns of incidents or of significant events, or serious programmatic deficiencies" in order to protect Jackson Class Members and to "ensure that quality services and supports are provided." In addition, Health Objective H1.2, as revised by Court decision (*see infra*), requires that a nurse routinely monitor Jackson Class Members' individual health needs by oversight, communication with Direct Support Professionals, and correction that results in the achievement of health goals and timely responses to changes in health status. Because other Goals and Objectives address this matter, the Court sustains Defendants' objections and eliminates this Objective.

*Court's Final Safety Objective Original Q1.7:*

Omit.

N.   **Disputed Quality Objective Q1.8 will be omitted rather than used as a New Safety Objective**

*The JCA's Proposal:*   Implement an effective Complaint and Dispute Resolution system as a safeguard in protecting people from harm and improving quality.

*Defendants* argue that this obligation has been disengaged and also has been codified in the New Mexico Administrative Code. In addition, Defendants refer to the POA, Appendix 5, Individual Service Plan Outcome E, "Continuation of the Dispute Resolution Process, Activities 1-5". "Disengaged." Defendants assert that no remediation is required.

*Plaintiffs* state that Defendants' "initial Community Plan that preceded the JSD required the creation of a complaint and dispute resolution system" and that the JCA has "properly determined that this system is neither effective nor adequately monitored to ensure the health and safety of class members." Plaintiffs' Memorandum at 7.

*The Court* sustains Defendants' objections based on Defendants' representation that any related obligation has been disengaged and Plaintiffs' failure to show otherwise.  Therefore, the Court will eliminate this Objective, but will allow Plaintiffs an opportunity to produce information that this obligation has not been disengaged.

*Court's Final Safety Objective (Original Q1.8):*

Omit. (subject to Plaintiffs providing additional information)

O.     **Disputed Quality Objective Q1.9 will be used as proposed by the JCA but re-numbered as Safety Objective S5.3**

*The JCA's Proposal:*  Implement a responsive and effective case management system as evidenced by the provision of needed supports and services.

*Defendants* failed to address this Objective, s*ee* Defendants' Memorandum at 35-36, although the JSR Chart indicates that this Objective (originally Quality Objective Q1.9) is in dispute.

*Plaintiffs* assert that the 1997 JSD and the 2005 stipulation adopting Appendix A support this Objective.

*The Court* will utilize the JCA's proposed Objective. If Defendants believe that more explanation is necessary to define "provision of needed supports and services," that can be done through the evaluative, disengagement criteria.

*Court's Final Safety Objective S5.3:*

Implement a responsive and effective case management system as evidenced by the provision of needed supports and services.

P.     **Disputed Quality Objective Q1.10 will be omitted rather than used as a New Safety Objective**

*The JCA's Proposal:*  Evaluation of case management results in improved practice.

*Defendants* object on grounds that the Objective is not measurable and is the type of obligation in Appendix A that has resulted in "fruitless argument between the parties as to the completion of the obligation." Defendants' Memorandum at 36.

*Plaintiffs* explain that the JCA's proposed Objective requires that corrective actions be taken to improve the agency's practice, "in the event that Defendants' evaluation of a case management agency identifies a problem[.]" "Improving practice is the purpose of DOH evaluations of service providers. . . ." Plaintiff's Memorandum at 7.

*The Court* finds that the Objective is not measurable and is too vague. While Plaintiffs attempt to identify what the Objective means, the Court is still unclear as to what the Objective seeks to accomplish. Moreover, other than general mention of the Court's 10/12/12 Order, Plaintiffs do not identify a related outstanding obligation. Therefore, the Court eliminates this Objective.

### Court's Final Safety Objective Original Q1.10:

Omit.

### Q.   Disputed Quality Objective Q1.11 will be replaced by New, Revised Safety Objective S5.4

*The JCA's Proposal:*  Implement an effective integrated data management system to improve practice.

*Defendants* propose:  "Develop an integrated DD Strategic Information Management System."

*Plaintiffs* support the JCA's Objective. They also argue that Defendants' Plan, including Defendants' proposed Objectives, contains more demanding requirements than the JCA Plan.

*The Court* will use Defendants' proposed Objective, blended with a couple of the JCA's appropriate clarifying words, because it is specific and susceptible to measurement.

***Court's Final Safety Objective S5.4:***

Develop and implement an effective, integrated DD Strategic Information Management System.

R.    **Disputed Quality Objective Q1.12 will be omitted rather than used as a New Safety Objective**

***The JCA's Proposal:***  DOH implements a plan of competency based training.

***Defendants*** strongly object to this Objective and argue that DOH has a comprehensive and effective competency based training program. They further assert that the JCA has not attended any of these related courses and has no personal knowledge of the content of the program. According to Defendants, this Objective ignores the existing outstanding obligations in training, the training obligations that have been disengaged, and the current competency based training system already administered by the DOH. Defendants' Memorandum at 37-39.

***Plaintiffs*** merely state that the JCA has determined Defendants will need to provide a competency based training in order for Defendants "to establish an enduring remedy." Plaintiffs' Memorandum at 8. Plaintiffs do not cite any outstanding obligations in support of their position.

***The Court*** sustains Defendants' objections and will eliminate this Objective.

***Court's Final Safety Objective Original Q1.12:***

Omit.

III.    <u>**HEALTH PLAN**</u>

A.    **Disputed Health Objective H1.2**

***The JCA's Proposal:***  Individual health needs are routinely monitored by a nurse as evidenced by oversight, communication with DSP (Direct Support Professionals) and correction which results in the achievement of health goals and timely response to changes in health status. (Ashton #3)

28

*Defendants* propose: "Individual health needs are routinely monitored by a nurse based on acuity as evidenced by documentation of assessments, health status reviews and communication with DSP and health care providers."

Defendants object to some of the JCA's proposed language in that the JCA cited Ashton #3 that reads "Address chronic medical needs in an Individual Program Plan." Defendants' Memorandum at 40. Defendants argue that Health Objective H1.2 is not tailored to meet Ashton #3, and further, that certain terms and phrases are unclear, *e.g.,* "routinely monitored," "oversight," "the achievement of health goals," and "timely." However, Defendants apparently understand the phrase "routinely monitored," as they included it in their proposed Health Objective H1.2.

*Plaintiffs* do not propose a specific revision. They contend that "nursing correction" is an essential element of Health Objective H1.2 that should be included in the Objective. Plaintiffs further state that the critical element in dispute is the JCA's requirement that nurses take corrective actions after oversight and monitoring of health care delivery.

Plaintiffs assert that "binding language requiring correction by nurses" is found in the 2011 Community Practice Review (CPR) that states: "Issues of medication administration and management continue to be an issue . . . . This continues to highlight issues surrounding nursing oversight, mid-level management oversight and staff training." The CPR also provides that, "Agency nurses need to have their health care coordination and oversight responsibilities within their organizations clearly defined, monitored and enforced." Plaintiffs' Memorandum at 8-9. In addition, Plaintiffs cite the 10/12/12 Order, wherein the Court made findings of fact correlating to lack of nursing oversight with hospitalizations of class members. Specifically, Plaintiffs refer to the Court's finding that "The 706 Expert (then Dr. Gant) noted in her February 2011 report

29

that, according to DOH mortality reviewers and Dr. Zwick, use of emergency services and/or hospitalizations has resulted from lack of staff training, 'lack of nursing oversight and delays in seeking medical care . . . .' [PL. Ex. 60] (001692)." 10/12/12 Order at 69. Plaintiffs refer to additional findings between 2009 and 2011, that there were nursing deficiencies at specific locations, including failure to ensure provider nurse monitoring, failure to provide adequate oversight of medication administration, failure to conduct nursing assessments, and other failures. *Id.* at 70.

   ***The Court*** overrules Defendants' objections to Health Objective H1.2, with the exception that the reference to Ashton #3 will be removed. The connection between "Ashton #3" and Health Objective H1.2 is unclear. The Court finds that Defendants' use of the term "acuity" is vague and susceptible to misinterpretation. Based on provisions of the 2011 CPR and findings in the 10/12/12 Order, as cited by Plaintiffs, the Court concludes that the JCA's proposed Health Objective H1.2 is appropriate and supported. However, the Court makes modifications to Final Health Objective H1.2. If Defendants believe that some terms or phrases are unclear in Final Health Objective H1.2, Defendants may provide clarification through the evaluative, disengagement criteria, as necessary.

   ***Court's Final Health Objective H1.2:***

   Nurses routinely monitor Jackson Class Members' individual health needs through (1) oversight, (2) communication with DSP (Direct Support Professionals), and (3) corrective actions in order to implement the Jackson Class Members' health plans, to ensure that the Jackson Class Members' health needs are being met, and to timely respond to changes in Jackson Class Members' health status.

B.      **Disputed Health Objective H1.3**

*The JCA's Proposal:*  Accurate health records are used by teams. (Ashton #3)

*Defendants* object and argue that this Objective is not justified and that no remediation is required. Defendants assert that the term "accurate" is not defined and also that the phrase "health records" is overly broad, undefined, and cannot be measured. Yet, in the same breath, Defendants note they have no objection to the use of accurate health records because they believe it is already an expectation, thus undermining their objections.

Defendants again argue that Ashton #3, which reads "Address chronic medical needs in an Individual Program Plan," does not correspond to the JCA's Health Objective H1.3. The Court agrees.

*Plaintiffs* support the JCA's Health Objective H1.3. They argue that accurate health records are integral to successful health care coordination and are chronically an area with significant deficiencies. Moreover, according to Plaintiffs, the use of accurate health records is required by Defendants' policies and standards. Plaintiffs also refer to CPR findings in 2011 where health care information in 57% of Jackson Class Members' files was wrong, inconsistent, or missing. In 2013, 48% of Jackson Class Members' files had wrong, inconsistent, and/or missing health-related information. Plaintiffs further cite the Court's 10/12/12 Order and findings that medical information for Jackson Class Members was deficient.

*The Court* overrules Defendants' objection to Health Objective H1.3, with the exception that the reference to Ashton #3 will be removed and the term Jackson Class Members will be added for clarity. Plaintiffs have supported the JCA's proposed Health Objective H1.3 with source documentation and court findings, as well as statistical data. If any of the terms in Health

Objective H1.3 require further clarification, Defendants can propose appropriate evaluative,

disengagement criteria, as necessary.

*Court's Final Health Objective H1.3:*

Teams use accurate health records for Jackson Class Members.

C.    **Disputed Health Objective H1.4**

*The JCA's Proposal:*  Health status which reflects daily medical considerations is

addressed in the ISP [Individual Service Plans]. (Ashton #4)

*Defendants* propose the following language:  "Identified health needs including daily

medical considerations are addressed in individualized healthcare plans, MERPs [Medical

Emergency Response Plans], CARMPs [Comprehensive Aspiration Risk Management Plans]

and written direct support instructions as appropriate to the individual. Healthcare plans are

reviewed and modified in response to changes in health status."

Defendants object by noting that Ashton #4 actually states, "Examine role of registered

nurses," which has little, if any, relation to the JCA's Health Objective H1.4. In addition,

Defendants state that the ISP is updated annually not daily, although daily medical

considerations are recorded and updated as needed in the Health Care Plans. Defendants'

Memorandum at 41-42.

*Plaintiffs* agree to Defendants' proposed language if there is a requirement that

modifications to healthcare plans are timely. Plaintiffs cite the 2011 CPR findings that incorrect

and outdated healthcare records continue to be problematic for class members, and that timely

review and updating of these records is necessary to address the issue. Plaintiffs' Memorandum

at 10. Plaintiffs again supply statistical support for their position. *Id.* Plaintiffs propose inserting

the word "promptly" before the clause "modified in response to changes in health status," and the Court finds this to be appropriate.

*The Court* adopts Defendants' proposal and includes the term "promptly" as suggested by Plaintiffs. If Defendants feel that "promptly" requires clarification, Defendants can do so through the evaluative, disengagement criteria.

### Court's Final Health Objective H1.4:

Identified health needs for Jackson Class Members, including daily medical considerations, are addressed in individualized healthcare plans, MERPs, CARMPs, and written direct support instructions as appropriate to the Jackson Class Members. Healthcare plans are reviewed and promptly modified in response to changes in health status.

### D.   Disputed Health Objective H1.6

*The JCA's Proposal:*  Individuals receive prescribed medications as evidenced by right person receiving the right medication by the right dose, right route and at the right time.

*Defendants* object and argue this Objective is unnecessary and that no remediation is required in this area. Defendants further contend that "NM Home and Community Based Waiver" has an excellent record of medication delivery. There is no data to suggest an outstanding obligation or a need in the current system. In any event, according to Defendants, the right reason for the drug is the doctor's decision; the right drug dose is the pharmacist's job. "Such suggestions are completely outside the appropriate scope of practice in the DDSD standards." Defendants' Memorandum at 42.

*Plaintiffs* assert that medication errors continue to impact class members and lead to serious health problems for certain Jackson Class Members. Thus, they support proposed Health Objective H1.6. Plaintiffs cite statistics from the 2011 CPR as evidence that issues of medication

administration and management continue. For example, they refer to statistical data demonstrating that 27% of Jackson Class Members had findings that ranged from the prescribed medications not being given or not being available, the wrong dose being given, and the wrong medication being given. Plaintiffs' Memorandum at 10-11. The 2013 statistics confirm that problems with medication errors continue. In 2014, there have been several individuals for whom medication administration errors occurred, "some with catastrophic consequence." *Id.* at 11. Plaintiffs also cite findings in the 10/12/12 Order, wherein the Court noted evidence of serious problems with medication administration.

**The Court** generally overrules Defendants' objections and finds support in the CPRs and the Court's 10/12/12 Order for Health Objective H1.6. The Court has revised Health Objective H1.6 in an attempt to clarify the intent of the Objective.

### Court's Final Health Objective H1.6:

Each Jackson Class Member will receive the Jackson Class Member's medications (1) in the doses prescribed, (2) in the manner and frequency prescribed, and (3) at the times prescribed.

E.   **Disputed Health Objective H2.1**

**The JCA's Proposal:**  Individuals receive age appropriate preventative/early detection screening/immunizations for health risk factors. (QE5.4, QE5.5)[16]

**Defendants** propose the following language:  "Individuals receive age appropriate preventative/early detection screening/immunizations for health risk factors given informed decision making and consent."

---

[16]The JCA's references to QE5.4 and QE5.5 are to Appendix A, Willcox Recommendations for Quality Enhancement (QE). QE 5.4 states "Timeliness of care issues: inconsistent documentation of follow-up nursing/physician assessments."  QE 5.5 states: "Timeliness of care issues: scheduling of procedures and follow-up office visits."

Defendants argue that the JCA's language does not reflect the individual's or the guardian's right to decline, while Defendants' proposal contemplates the right to decline.

***Plaintiffs*** first argue that Defendants did not object to Health Objective H2.1 in Defendants' Objections, filed February 26, 2014. Thus, according to Plaintiffs, Defendants' May 2014 revision should not be allowed. In addition, Plaintiffs assert that in December 2013, Defendants agreed to the JCA's Objective H2.1 "verbatim." Aside from the procedural arguments, Plaintiffs state the additional language lacks clarity and injects "ill defined exceptions" to the JCA's requirement that class members receive preventive/early detection screening and/or immunizations.

***The Court*** agrees with Plaintiffs and overrules Defendants' objections to Health Objective H2.1. The Court will, however, omit the references to QE 5.4 and QE 5.5, which do not appear directly pertinent to Health Objective H2.1. In addition, the Court will use "Jackson Class Members" in place of "Individuals."

### ***Court's Final Health Objective H2.1:***

Jackson Class Members receive age appropriate preventive/early detection screening/immunizations for health risk factors.

F.      **Disputed Health Objective H3.1**

***The JCA's Proposal:***  Individuals receive increased intensity of services during acute episode/illness.

***Defendants*** do not object to Health Objective H3.1 as worded but propose the following language that they believe will clarify the objective:  "Individuals receive increased intensity of services from the appropriate resource during acute episode/illness."

*Plaintiffs* assert that the Court should not allow the proposed clarification because Defendants did not object to this Objective in their February 26, 2014 Objections. Further, Plaintiffs argue that the phrase "from the appropriate resource" lacks clarity and is susceptible to misinterpretation.

*The Court* overrules Defendants' objections because it finds that Defendants' proposed language is unclear and might be subject to misinterpretation. The Court makes minor modifications to the JCA's proposed Health Objective H2.1.

*Court's Final Health Objective H3.1:*

Jackson Class Members receive increased intensity of services during acute episodes or illnesses.

G.      **Disputed Health Objective H3.2**

*The JCA's Proposal:*  Direct Service Personnel/supervisors are able to identify subtle signs of change/acute symptoms.

*Defendants* propose the following language that they believe clarifies the JCA's proposed Health Objective H3.2:  "Direct Service Personnel/supervisors are able to recognize subtle signs of change/acute symptoms that are known and unique to the individual as reflected in their Healthcare plan." Otherwise, Defendants do not object to Health Objective H3.2.

*Plaintiffs* argue that the Court should not allow the supposed clarifying revision because Defendants did not object to this Objective in their February 26, 2014 Objections. Further, Defendants' attempt to clarify the Objective is actually confusing and appears to inappropriately exclude any requirement that staff respond to acute symptoms unless those problems or symptoms are already described in the Jackson Class Member's health care plans.

*The Court* overrules Defendants' objections and adopts the JCA's proposed Health Objective H3.2. The Court finds that Defendants' proposed revision lacks clarity and is subject to misinterpretation.

*Court's Final Health Objective H3.2:*

Direct Service Personnel/supervisors are able to identify subtle signs of change/acute symptoms.

H.   **Disputed Health Objective H3.3**

*The JCA's Proposal:*  When informed of signs of change in health status (including chronic and acute pain) agency nurses take immediate action.

*Defendants* propose the following language:  "When informed of signs of change in health status (including chronic and acute pain) agency nurses take prompt action."

Defendants further state that this is a current expectation of nursing practice and that the JCA's objective is not narrowly tailored to address an outstanding obligation. Moreover, Defendants assert that "immediate action" is not defined.

*Plaintiffs* believe the use of the term "immediate" is appropriate in order to prevent unnecessary suffering and reduce chances of an avoidable death. Plaintiffs support their position with findings of a chronic failure by nurses to be adequately responsive in the past.

*The Court* overrules Defendants' objections and sees little difference between the use of "prompt" or "immediate." If Defendants believe that "immediate" is unclear, they may propose evaluative, disengagement criteria for clarification.

*Court's Final Health Objective H3.3:*

When informed of signs of change in health status (including chronic and acute pain) agency nurses take immediate action.

I.     **Disputed NEW Health Objective H3.5**

*The JCA's Proposal:*  None. This is a new objective proposed by Defendants.

*Defendants* propose the following language as new Health Objective H3.5:  "When an individual is receiving healthcare in an out-of-home setting, the IDT [Interdisciplinary Team] plans for a smooth transition home prior to discharge." Defendants' Memorandum at 45.

*Plaintiffs* explain that new Health Objective H3.5 has two objectives and that the parties agreed on the first objective that states:  "When an individual is receiving healthcare in an out-of-home setting, critical health and functional information will be provided and the individual's existing adaptive equipment that can be used in that setting will be offered." Plaintiffs' Memorandum at 13. However, the parties disagree about how promptly discharge planning should occur when a class member is hospitalized or placed in a nursing facility. *Id.* Plaintiffs propose that the second part of new Health Objective 3.5 should state:  "When an individual is receiving healthcare in an out-of-home setting, the IDT plans for a smooth transition home as soon as medically feasible." *Id.*

Defendants object to Plaintiffs' proposed language as overly broad, vague, and not narrowly tailored to existing obligations. Defendants further contend that they have an established post hospitalization protocol that was created to meet the obligations of Appendix A. According to Defendants, there has been no discussion as to shortcomings of Defendants' Post Hospital Protocol or their failure to satisfy QE7, that states, "DOH will establish an adequate process for follow up after hospitalization to ensure that appropriate medical care is provided." Defendants' Memorandum at 45. Moreover, Defendants assert that discharge planning is the responsibility of the hospital or other acute care facility caring for the Jackson Class Member.

Thus, Defendants believe that they lack the authority to dictate discharge planning to other facilities.

*The Court* observes that the first part of proposed new Health Objective H3.5 was already agreed to and is located at Health Objective H3.4. There is no need to repeat that language in H3.5. The Court overrules Defendants' objections to the second part of the new proposed Objective. The language proposed by Plaintiffs is specific and clear. In addition, the Court notes that QE7, relied upon by Defendants, does not directly address the second part of new Health Objective 3.5. The Court further observes that the Interdisciplinary Team can encourage the hospital or facility to move forward with discharge planning as soon as it is medically feasible without interfering with or usurping the role of the hospital or facility. The Court makes minor revisions to Plaintiffs' proposed language for purposes of clarity.

*Court's Final New Health Objective H3.5:*

When a Jackson Class Member is receiving healthcare in an out-of-home setting, the IDT will plan for a smooth transition back to the Jackson Class Member's home as soon as medically feasible.

J.     **Disputed Health Objective H4.1**

*The JCA's Proposal:*  Services to Jackson Class Members are provided by competent personnel as evidenced by nurses, direct support staff, front line supervisors, ancillary providers, and case managers who have received and passed competency based training related to prevention and early identification. (Ashton #6, 7, 8)

*Defendants* object and argue that Health Objective H4.1 is not justified because DDSD has a competency based training system for direct service agency staff. Defendants set out a

lengthy description of the training system. Defendants' Memorandum at 46-50. Thus, Defendants assert that no remediation is required with respect to the Objective.

*Plaintiffs* support the JCA's proposed Health Objective H4.1. They contend that providers must take and pass competency based training in order to effectively provide services to Jackson Class Members.

*The Court* overrules Defendants' objections because it appears that the primary disagreement with Health Objective H4.1 concerns training of providers' personnel rather than DDSD agency personnel. Defendants' description of the system in place for direct service agency staff does not address provider personnel training. The Court makes minor revisions for purposes of clarity. If Defendants believe that the wording "prevention and early identification" in Objective H4.1 is unclear, Defendants may address that in the evaluative, disengagement criteria.

### *Court's Final Health Objective H4.1:*

Competent personnel (nurses, direct support staff, front line supervisors, ancillary providers, and case managers), who have received and passed competency based training related to prevention and early identification, provide services to Jackson Class Members. (Ashton #6, 7, 8)

## IV.   SUPPORTED EMPLOYMENT (SE) REMEDIAL PLAN

### A.   Disputed Supported Employment Objective SE1.1

*The JCA's Proposal:*  The number of individuals working in integrated jobs will increase by 40% annually.

*Defendant*s "strongly object" and urge that there is no outstanding obligation related to this proposed Objective which they characterize as "highly arbitrary." Defendants further

contend that there is no data to support the JCA's proposed annual increase and no rational basis for imposing this target. According to Defendants, the JCA's proposed target figure appears to require Defendants to have 139 class members working at minimum wage in 2016, regardless of health, interests, guardians' position, etc.

Defendants propose that they use their "October 4, 201[3] Plan" to meet existing outstanding obligations in SE POA B, POA C and Appendix A. Defendants' proposed Objective SE1.1 from their October 4, 2013 SE Plan (Doc. No. 1975-1 at 51) reads: "Based upon the information obtained in the individual employment pilot, provide technical assistance and support for teams to use discovery process and explore new possibilities in supported employment."

*Plaintiffs* complain of Defendants' persistent failure to comply with Court Orders regarding SE to which Defendants purportedly stipulated in 1997 and 2005. Thus, Plaintiffs assert that a "fresh approach" is necessary to remedy Defendants' intractable failure to enable Jackson Class Members to get jobs. According to Plaintiffs, major changes are needed to provide SE to Jackson Class Members who wish to work, and time is of the essence since the Jackson Class Members are aging. Plaintiffs cite the Court's 10/12/12 Order regarding evidence that there are Jackson Class Members who are not working who could be working and some who could do more work. Plaintiffs also cite a number of requirements from the POA. Plaintiffs argue that in "June 2011," [sic] the Court received evidence showing that numerous Jackson Class Members are still waiting to have proper Career Development Plans and Vocational Assessment Profiles incorporated into their ISPs. Plaintiffs' Memorandum at 16.

Plaintiffs further state that Defendants objected to every provision of the JCA Plan that required any action by Defendant Division of Vocational Rehabilitation (DVR). In Plaintiffs'

view, DVR apparently is claiming that it has satisfied all of its obligations under Appendix A.

Plaintiffs refer to the July 17, 2014 Jackson Quarterly Report indicating that only ten Jackson

Class Members who were prioritized for employment when they left the training schools are

currently working "at criteria (at least 10 hours per week, with pay of no less than half of

minimum wage)."[17] Plaintiffs' Memorandum at 17. According to Plaintiffs, the proposed 40%

increase would merely require that four additional class members be working at criteria within a

year. In addition, only ten jobs would be added over a full two-year period.

**The Court** sustains Defendants' objections in part but is reluctant to use the language

proposed by Defendants in their October 2013 plan without modification. For example, the term

"pilot" in Defendants' proposed language is not defined nor is it found in the Court's 10/12/12

Order. In addition, the phrases "discovery process" and "explore new possibilities" are vague.

However, the JCA's proposal of a 40% increase does not appear to have a statistical basis. Had

the JCA or Plaintiffs provided specific data indicating how many Jackson Class Members are

able to work, want to work, and have skills for employment that is available in their regions, the

Court might have found the use of targeted numbers more appropriate.

The Court modifies the language proposed by the JCA and Defendants by referring to its

10/12/12 Order at 136-137. In formulating the evaluative, disengagement criteria for revised

---

[17]Plaintiffs define "at criteria" as Jackson Class Members who work "at least 10 hours per week, with pay of no less than half of minimum wage," and then refer to "at criteria" as Jackson Class Members who would be working "at those minimal criteria . . . ." Plaintiffs' Memorandum at 17. Based on these references, Plaintiffs apparently define "at criteria" and "minimal criteria" in the same manner. Defendants assert that the parties agreed on the following definition of "Minimum Job Criteria:" "the Jackson Class Member will work ten hours or more per week or the number of hours worked are consistent with each [Jackson Class Member's] ISP; at least half of the federal minimum wage or better; reasonable expectation that the position will continue past 90 days; and an integrated setting where 80% of the individuals employed by the business are co-workers without disabilities." Defendants' Memorandum at 15. In this Order, the Court will use the term "at criteria", and will assign it the parties' definition of "Minimum Job Criteria" based on Defendants' representation that the parties agreed to this more specific definition.

Objective SE1.1, Defendants should take into account any available data regarding the number of Jackson Class Members who want to work and who are able to work, the positions of the Jackson Class Members' guardians, and the number of jobs available for Jackson Class Members in the various localities throughout the State of New Mexico.

> ### Court's Final Supported Employment Objective SE1.1:

Achieve an annual increase of Jackson Class Members working "at criteria," in accordance with information gathered regarding the Jackson Class Members' abilities and desires to be employed, and the guardians' positions on employment of the Jackson Class Members. Defendants must provide technical, supported employment assistance to the Jackson Class Members and support for teams to assist all qualified and willing Jackson Class Members to obtain "at criteria" employment.

### B.    Disputed Supported Employment Objective SE1.2

*The JCA's Proposal:*  Increase number of individuals earning minimum wage or better by following the planned schedule.

The "planned schedule" appears to refer to the section under "Evaluative Components" in the JCA's Remedial Plan for SE. That section indicates that in the first year, 24 Jackson Class Members (in addition to the 31 Jackson Class Members presently working at minimum wage or better) should be working at or above minimum wage. The section shows in the second year an increase of 22 Jackson Class Members and in the third year an increase of 31 Jackson Class Members, for a total of 139 Jackson Class Members working at minimum wage or better within three years. JCA Remedial Plan, Section III, SE Plan at 178.

*Defendants* assert that there is no outstanding obligation related to this Objective. They note that the currently agreed upon criteria for integrated work is set out in their objections to SE

1.1 (above). Therefore, they object to any attempt to "unilaterally modify the agreed upon definition for Minimum Job Criteria reached by the parties and used for current employment evaluation." *See* footnote *supra*. In addition, Defendants object to the phrase "planned schedule" as vague and confusing.

Defendants again propose that the Court use their October 4, 2013 Plan to meet existing outstanding obligations in SE POA B, POA C, and Appendix A. However, Defendants' October 4, 2013 Plan does not appear to propose a Supported Employment Objective SE1.2 or an Objective that corresponds with Supported Employment Objective SE1.2. *See* Doc. No. 1975-1 at 51-54.

*Plaintiffs* urge that this Objective is a necessary remedial measure to cure longstanding noncompliance. Individuals should not be allowed to earn less than minimum wage which promotes bad practices and low expectations.

*The Court* partially sustains Defendants' objections. There is no data supporting the requirement that a certain number of Jackson Class Members must obtain employment that pays minimum wage or better within a specific time frame. The JCA's target figures set up a scenario that is almost guaranteed not to succeed. However, the Court believes it is important to make a determined effort to increase the number of Jackson Class Members earning minimum wage or better for longer hours. The Court refers, in part, to language in its 10/12/12 Order.

### Court's Final Supported Employment Objective SE1.2:

Defendants will increase the number of qualified providers statewide in order to increase the number of Jackson Class Members earning minimum wage or better, and to increase the average number of hours per week worked by Jackson Class Members. Defendants will develop a plan with time lines to provide quality supported employment at criteria to all priority class

members who are determined to be appropriate for work. (*See* 10/12/12 Order at 141 (citing Appendix A, SE5)).

### C.   **Disputed Supported Employment Objective SE1.3**

*The JCA's Proposal:*  Individuals will increase number of hours worked weekly as evidenced by the average hours worked for individuals being 15 hours/week within 3 years.

In reviewing the JCA's Supported Employment Objective SE1.3 and the related evaluative, disengagement components, the Court understands that the JCA expects Jackson Class Members to be working at least 15 hours per week by the end of the third year of implementation of the Remedial Plan and an average of 20 hours per week within five years. Remedial Plan, Section III, SE Plan at 179.

*Defendants* state that there is no outstanding obligation related to this Objective. They further contend that a requirement that the aging class members increase the number of working hours to an average of 15 hours/week, whether they want to or not, is arbitrary and not based on the Jackson Class Members' interests, health status, or the guardians' positions. According to Defendants, the trajectory envisioned by the JCA's Plan would require each Jackson Class Member to work an average of 20 hours per week by the end of a five-year period.

Defendants again propose that the Court use their October 4, 2013 Plan to meet existing outstanding obligations in SE in POA B, POA C, and Appendix A. However, there is no corresponding Objective SE1.3 in Defendants' October 4, 2013 Plan. *See* Doc. No. 1975-1 at 53-54.

*Plaintiffs* argue that these requirements are more modest than those to which Defendants agreed in 2005, without citing a specific agreement for the Court to review. Plaintiffs' Memorandum at 18.

*The Court* sustains Defendants' objections. Plaintiffs did not identify the 2005 Agreement that was more demanding than the JCA proposed SE1.3. The Court finds that the JCA's targeted figures do not have a statistical basis. Because the Court's Final SE Objective SE1.2 included part of this Objective, at this time the Court will eliminate SE Objective SE 1.3. However, if Plaintiffs direct the Court to a specific 2005 agreement by Defendants, with more stringent requirements than those proposed by the JCA in SE1.3, the Court will reconsider.

### Court's Final Supported Employment Objective SE1.3:

Omit. (subject to Plaintiffs providing additional information)

D.    **(Disputed) Supported Employment Objective SE1.4**

*The JCA's Proposal:*  Capable, competent personnel develop career development plans which help individuals obtain jobs.

*Defendants* stated no position as to SE1.4. *See* Defendants' Memorandum at 17. However, according to the JSR Chart (Doc. No. 1986-1 at 5), the parties agreed to new language for Objective SE1.4:  "Personnel who develop or implement career development plans will receive and pass competency based training based on DDW standards on career development planning." JSR Chart at 5.

Plaintiffs' Memorandum creates confusion about whether Plaintiffs have withdrawn agreement to the new language, or whether there simply is a misunderstanding. *Plaintiffs* argue that in 2012, the Court found there were insufficient numbers of competent personnel working on career development planning and that Defendants needed to recruit and train even more staff who could prepare adequate vocational assistance plans for the "119 Priority Group" so that members of that group, who wanted to work, could attain supported employment at criteria. Plaintiffs' Memorandum at 18 (citing 10/12/12 Order at 132).

Based on the parties' apparent agreement, the Court adopts their new language for Supported Employment Objective SE1.4.

### Court's Final Supported Employment Objective SE1.4:

Personnel who develop or implement career development plans will receive and pass competency based training based on DDW standards on career development planning.

E. **Disputed Supported Employment Objective SE1.5**

*The JCA's Proposal:*  Substitute group supported employment for jobs (both individualized and integrated) that pay at least minimum wage.

In order to better understand the JCA's proposed SE1.5, the Court reviewed the proposed evaluative criteria. *See* Remedial Plan, Section III, SE Plan at 180. Those criteria provide that there should be an annual percentage increase in the number of Jackson Class Members who have "individualized employment," are paid at least minimum wage, and have "integrated jobs." *Id.*

*Defendants* explain that consent decrees have attributes of contracts, but that this disputed Objective is insufficiently defined to meet the contractual needs of this litigation. Defendants contend that proposed SE1.5 is not related to any outstanding obligation in the JSD, POA, or Appendix A, and further that it is not based on actual needs, interests, and abilities of the class.

Defendants again suggest that the Court use Defendants' October 4, 2013 Plan to meet their outstanding Supported Employment obligations in POA B, POA C and Appendix A. The Court has reviewed that plan but finds no Objective that corresponds to proposed Objective SE1.5. *See* Doc. 1975-1 at 53-54.

*Plaintiffs* made no statements regarding the JCA's proposed SE Objective SE1.5.

*The Court* concludes that Plaintiffs have abandoned their disagreement with Defendants' proposal. However, the Court will eliminate the JCA's proposed SE Objective SE1.5 as it appears to duplicate, in large part, Objectives SE1.1 and SE1.2. Defendants may elect to provide evaluative, disengagement criteria under SE1.1 or SE1.2 to incorporate part of Objective SE1.5, if appropriate.

> *Court's Final Supported Employment Objective SE1.5:*

Omit.

F.    **Disputed Supported Employment Objective SE1.7**

*The JCA's Proposal:*  Individual records (including ISPs) contain accurate employment plans.

*Defendants* argue that this objective is overly broad and too vague to be enforceable because the term "individual records" is imprecise and ambiguous. They again ask that the Court use their October 2013 Plan. The Court reviewed Defendants' October 4, 2013 Plan but did not see an Objective that corresponds with Objective SE1.7.

*Plaintiffs* claim that this Objective builds on court-ordered obligations, including POA Outcome B Activity #6 that requires career development plans. Plaintiffs also cite the Court's 2012 findings of major problems with career development or employment plans being implemented (*citing* Doc. No. 1930 at 130).

*The Court* overrules Defendants' objections to Objective SE1.7, but will modify the JCA's proposed Objective. In addition, Defendants may wish to provide further specificity through the evaluative, disengagement criteria.

**Court's Final Supported Employment Objective SE1.7:**

Individual records (including ISPs) of Jackson Class Members will contain accurate

employment plans that include information about the Jackson Class Members' desires to work,

the Jackson Class Members' skills for existing jobs, and whether the guardians want the Jackson

Class Members to work.

G.     **Disputed Supported Employment Objective SE1.13**

*The JCA's Proposal:*  DDSD and DVR will function as equal partners.

*Defendants* "strongly object to this blatant overreaching and apparent disregard of the

contractual agreements entered into by DVR and Plaintiffs in 2005 (Doc. No. 1473)." DVR has

eight obligations. *See* Defendants' Memorandum at 18-19. Defendants assert that DVR and

DDSD are not on the same footing in this litigation. DVR is funded through a federal grant with

regulations distinct from regulations governing the CMS Home and Community Based Waiver.

According to Defendants, DDSD and DVR assist each other but are not "equal partners" in this

litigation.

Defendants wish to eliminate SE 1.13, arguing that DVR has filed a Paragraph 44 letter

and that Defendants will pursue disengagement under the JSD regarding DVR's eight

outstanding Appendix A obligations.

*Plaintiffs* claim that DDSD and DVR share responsibility for creating and implementing

a system to provide SE to Jackson Class Members. Plaintiffs also list or summarize the eight

obligations in Appendix A. *See* Plaintiffs' Memorandum at 19-20. Plaintiffs seek active

participation by DVR in remedying the noncompliance that Plaintiffs assert was found in 2012.

*The Court* sustains Defendants' objection to SE1.13 and eliminates it as an Objective.

Clearly, DVR has a role to play, must fulfill its outstanding obligations, and has agreed to fulfill

its obligations. There is no identified contractual obligation that the two departments must be "equal partners." The proposed objective does not assist the parties in achieving disengagement.

### Final Supported Employment Objective SE1.13:

Omit.

### H.    Disputed Supported Employment Objective SE2.3

*The JCA's Proposal:*  DDSD and DVR will jointly implement the Employment First Policy that explicitly sets forth the role and importance as well as expectations, for employment in individuals' lives.

*Defendants* believe proposed SE2.3 is overreaching. Defendants reiterate that DVR has eight outstanding obligations. According to Defendants, "Employment First" is a not a policy; Defendants state it is a principle that guides their operations. Defendants describe at length the actions they are taking in accordance with this principle. Defendants' Memorandum at 20-22.

Defendants seek to eliminate Supported Employment Objective SE2.3, claiming that they have filed a Paragraph 44 letter and will pursue disengagement under the JSD. Thus, according to Defendants, no remediation is required for DOH/DDSD.

*Plaintiffs* refer the Court to their position set out in response to statements regarding SE 1.13. *See* Plaintiffs' Memorandum at 20. Plaintiffs also observe that DVR bears significant responsibility for promoting and supporting employment in the Jackson Class Members' lives. Plaintiffs believe that SE2.3 is consistent with that role.

*The Court* will adopt the JCA's proposed SE Objective SE2.3 with certain linguistic changes.

***Court's Final Supported Employment Objective SE2.3:***

Defendants will implement the Employment First Policy that explicitly sets forth the role and importance of employment, as well as expectations for employment, in a Jackson Class Member's life.

I.     **Disputed Supported Employment Objective SE2.10**

***The JCA's Proposal:***  Develop a data system to ensure implementation of Supported Employment Objectives.

***Defendants*** state they have already disengaged the POA SE Outcome D requirement to create an information management and evaluation process to ensure continuous feedback on the effectiveness of the employment plan implementation. They believe this Objective requires them to enter into a legal contract to develop a data system to track the Objectives in the JCA's Remedial Plan. Defendants contend that there is no related outstanding obligation and no reason to enter into a legal agreement to track progress of the SE Objectives. Thus, according to Defendants, no remediation is required and this Objective can be removed.

***Plaintiffs*** support the JCA's Supported Employment Objective SE2.10. Plaintiffs do not directly dispute Defendants' assertion that Defendants' obligation to develop an effective data system has been disengaged. However, Plaintiffs refer to the 1997 POA SE Outcome D that requires "an information management and evaluation process will be established to ensure continuous feedback …" Plaintiffs' Memorandum at 20-21. Plaintiffs state that the JCA determined the existing system established by Defendants is not providing "continuous feedback" on the effectiveness of the employment plan implementation. Thus, Plaintiffs believe SE2.10 is necessary to remedy Defendants' noncompliance.

***The Court*** disagrees with Defendants that Objective SE2.10 requires the parties to enter into a contractual relationship to develop a data system. Nothing in SE2.10 refers to a contract, nor does the JCA's proposed SE2.10 state that a data system must track all Objectives "on any eventual remedial plan that is developed." *See* Defendants' Memorandum at 22. However, if Defendants have disengaged this aspect of POA SE Outcome D, no further remediation is necessary.

While Plaintiffs contend that "the JCA has determined that the existing data system is not providing 'continuous feedback' on the effectiveness of the employment plan implementation," Plaintiffs do not refer to any documentation to support their assertion. *See* Plaintiffs' Memorandum at 20. The JCA's Remedial Plan's "Statement of Need" for Objective SE2.10 merely states that data management is an "effective tool to determine if planned employment outcomes . . . are accomplished." Remedial Plan, Section II, at 34.

The Court sustains Defendants' objections primarily based on Defendants' representations that they have disengaged the pertinent outstanding obligation relating to Supported Employment Objective SE2.10. If Plaintiffs can point to documentation showing the relevant obligation has not been disengaged, the Court will reconsider.

***Court's Final Supported Employment Objective SE2.10:***

Omit. (subject to Plaintiffs providing additional information)

J.      **Disputed Supported Employment Objective SE3.1**

***The JCA's Proposal:***  Employment providers demonstrate capacity to complete person-centered vocational assessments.

***Defendants*** object to "Plaintiffs' attempt to include DVR in this [O]bjective," arguing there is no related outstanding obligation in the JSD, POA, or Appendix A. Defendants again

note that DVR has eight discrete obligations as set out in Appendix A and Defendants will not agree to expand those obligations.

Notwithstanding the objections, Defendants agree to the following proposed language: "Employment providers are informed where to refer Jackson Class Members for a complete, person-centered vocational assessment and employment providers understand the requisite elements of a person-centered vocational assessment as defined by DDSD."

***Plaintiffs*** will agree to Defendants' proposed language but wish to add DVR to Objective SE3.1. *See* JSR Chart at 7. In support of their position, Plaintiffs refer to the Court's statement in the 10/12/12 Order that Defendants needed to recruit and train additional staff who can prepare adequate VAPs for the 119 Priority Groups so that members of the group who want to work can attain SE criteria. Plaintiffs contend that Defendants' proposal would not remedy the deficiency found by the Court concerning an inadequate number of existing vocational assessors.

It is not certain whether Plaintiffs prefer the JCA's proposed SE3.1 or Defendants' proposed SE3.1. It also is unclear how the addition of DVR in Objective SE3.1 will resolve issues raised by Plaintiffs. Moreover, it is unknown what progress, if any, Defendants have made since the Court issued its 10/12/12 Order.

***The Court*** will use Defendants' proposed language, with modifications, because Plaintiffs generally agree to Defendants' proposed SE3.1. In addition, Plaintiffs did not provide statistical evidence of an inadequate number of existing vocational assessors. Further, Defendants' proposed SE3.1 is more specific than the JCA's proposed SE3.1.

*Court's Final Supported Employment Objective SE3.1:*

Defendants will inform employment providers where to refer Jackson Class Members for a complete, person-centered vocational assessment, and employment providers will understand the requisite elements of a person-centered vocational assessment as defined by Defendants.

### K.   Disputed Supported Employment Objective SE3.5

*The JCA's Proposal:*  The provider will ensure all needed work related supports are available for individuals.

*Defendants* state that there is no related obligation in the JSD, POA, or Appendix A. They object to SE3.5 on grounds that the Objective is vague, aspirational, and displays a lack of knowledge of the DDW employment system. They further assert that employers, not providers, are responsible for assuring that work related supports are available. Based on Defendants' position that there is no evidence to support the need for this Objective and because it is unenforceable, Defendants contend that no remediation is required and that SE3.5 should be removed.

*Plaintiffs* state that in 2005, DOH agreed that "LTSD will recruit employment providers in areas of the state where there are few/no quality outcomes and innovative approaches. Appendix A, SE 12." Plaintiffs' Memorandum at 21. In addition, Plaintiffs refer to the Court's 10/12/12 Order, where the Court commended Defendants on their progress but also identified numerous persistent problems related to increasing adequate SE employment opportunities for Jackson Class Members. 10/12/12 Order at 136-37. These problems included the need to provide timely VAPS, to employ more VAP facilitators, to direct more resources to integrated employment settings, and others. *Id.* at 137. Plaintiffs support the JCA's proposed SE3.5 and

argue that it is a reasonable method for addressing noncompliance by improving the capabilities of provider agencies or adding agencies in underserved areas.

*The Court* sustains Defendants' objections. The JCA's proposed Objective SE3.5 is very general. "Work related supports" could include, e.g., physical objects, transportation, personal assistants, or other things. In addition, the Objective does not clearly accomplish any or all of what Plaintiffs seek, nor do Plaintiffs demonstrate how LTSD (now DDSD), *see* 10/12/12 Order at 46 n. 23, relates to SE Objective SE3.5. It is not clear that SE3.5 derives from contractual obligations in Appendix A, SE 12 or the Court's Order at 136-37. If, however, Plaintiffs can identify an outstanding obligation related to Objective SE3.5, the Court will reconsider.

### Final Supported Employment Objective SE3.5:

Omit. (subject to Plaintiffs providing additional information)

### L.        Disputed Supported Employment Objective SE3.8

*The JCA's Proposal:*  Coordinate with relevant state agencies to improve employment outcomes for individuals.

*Defendants* state that DVR and DOH have had a Memorandum of Understanding (MOU) since 2005 that was revised in 2013 with input from the Court-appointed Employment Expert, Ruby Moore. Thus, Defendants assert there is no need to include this Objective and no remediation is required. They ask that Objective SE3.8 be removed.

*Plaintiffs* contend that HSD remains a Defendant in this litigation and further assert that HSD's regulations govern the DD Waiver. According to Plaintiffs, Objective SE3.8 requires DOH to coordinate with HSD and DVR, as well as state agencies that could, but do not, employ people with developmental disabilities. Plaintiffs believe that Objective SE3.8 is a reasonable method for addressing noncompliance identified by the Court in 2012.

*The Court* does not understand how Defendants' reference to the 2005 MOU or Plaintiffs' mention of HSD and the DD Waiver, state agencies' employment of individuals with developmental disabilities, and the Court's 2012 decision are directly linked to the JCA's proposed Supported Employment Objective SE3.8. The Court will remove Objective SE3.8 based on Plaintiffs' failure to connect the proposed Objective to an outstanding contractual obligation. If, however, Plaintiffs can identify an outstanding obligation related to Objective SE3.8, the Court will reconsider.

> *Court's Final Supported Employment Objective SE3.8:*

Omit.  (subject to Plaintiffs providing additional information)

M.   **Disputed Supported Employment Objective SE3.9**

*The JCA's Proposal:*  State Agency partners implement intergovernmental agreements that support employment of individuals.

*Defendants* again cite the 2005 MOU, revised with input from Ruby Moore in 2013 that DVR and DOH have had. They contend that this Objective can be eliminated and that no remediation is required.

*Plaintiffs* argue that DOH must coordinate with HSD and DVR, along with other state agencies that could, but do not, employ people with developmental disabilities.

*The Court* concludes that SE3.9 is vague and too general, even after reviewing the JCA's proposed evaluative, disengagement criteria for this Objective. *See* Remedial Plan, Section III, SE at 197. The parties' positions do little to assist the Court in resolving this dispute. The language is so vague as to make it unenforceable and the Court, therefore, will eliminate SE Objective SE3.9.

*Court's Final Supported Employment Objective SE3.9:*

Omit.

N.      **Disputed Supported Employment Objective SE3.15**

*The JCA's Proposal:*  DDSD/DVR will provide funding for training to employment and case management providers on evidence based practices in Supported Employment.

*Defendants* propose:  "DDSD provides training to employment providers and case managers on evidence based practices in Supported Employment."

Defendants removed DVR from the Objective based on their contention that there is no outstanding obligation in the JSD, POA, or Appendix A that requires DVR to provide funding to train DDSD's contracted employment providers, nor is DVR required to do so under their governing statute or regulations. Defendants again emphasize that DVR has eight discrete obligations in Appendix A, which Defendants will not expand.

*Plaintiffs* argue that DVR bears major responsibility for promoting and supporting SE in class members' lives. They contend that SE 3.15 is consistent with that role.

*The Court* will use Defendants' proposed language, which is close to the JCA's language, with a minor modification. It is up to Defendants who can best provide the type of training at issue. The Court reiterates that DVR must satisfy any and all outstanding obligations. Here, however, Plaintiffs do not identify specific outstanding obligations that support inclusion of DVR in Objective SE3.15.

*Court's Final Supported Employment Objective SE3.15:*

Defendants will provide training to employment providers and case managers on evidence based practices in Supported Employment.

O.      **Disputed Supported Employment Objective SE3.17**

*The JCA's Proposal:*  DDSD/DVR will fund the Employment Institute to maintain an ongoing learning collaborative.

*Defendants* propose:  "DDSD will partner with Partners for Employment (formerly known as Employment Institute) to maintain an ongoing learning collaborative."

Defendants object to the JCA's attempt to expand the obligations of DVR and argue that no source material supports a new obligation. DVR will not agree to fund a DOH contractor through a binding legal document because DVR has eight discrete obligations in Appendix A and Defendants will not expand those obligations.

*Plaintiffs* refer to the 2005 Appendix A SE1 and argue that Defendants DOH and DVR agreed that "LTSD will retain a new FT equivalent personnel to develop an employment institute (center) and to initiate, support and provide technical assistance for job development and innovative employment practices including customized employment and micro-enterprises at the local level." They note that "chronic underfunding of the Employment Institute is a major cause of Defendants' noncompliance…."

While Plaintiffs quote from Appendix A SE 1, nothing in Appendix A SE 1 refers specifically to DVR. Although DVR1-8 in Appendix A refers to obligations of the Division of Vocational Rehabilitation, Plaintiffs do not rely on DVR 1-8 in support of their position. Thus, Plaintiffs did not identify an outstanding obligation on the part of DVR in relation to Objective SE3.17.

*The Court* will use Defendants' proposed language with modifications.

***Court's Final Supported Employment Objective SE3.17:***

The appropriate Defendant will work with Partners for Employment (formerly known as Employment Institute) to maintain an ongoing learning collaborative.

P.      **Disputed Supported Employment Objective SE3.18**

***The JCA's Proposal:***  DDSD/DVR will fund the Employment Institute to provide an evidence based supported employment version of Project Echo.

***Defendants*** present a lengthy 3-page objection stating that this Objective is not related to any outstanding obligation in the JSD, POA, or Appendix A. According to Defendants, Project Echo was developed at the UNM Health Sciences Center to enhance the safety and effectiveness of the treatment of chronic, common, and complex diseases in rural and medically underserved areas. It is "a medical tele-health model." Defendants argue that they already have a UNM-based center of excellence called Partners for Employment (PFE) (formerly known as the Employment Institute). Defendants provide a long description of how PFE was created and its scope of work. Defendants' Memorandum at 26-28.

***Plaintiffs*** state that Project Echo is a job program for young people sponsored by the Employment Institute. They refer to the JCA's determination that Defendants' "failure to use the Employment Institute to initiate similar job opportunities for class members is one cause of the Defendants' noncompliance." Plaintiffs' Memorandum at 22-23.

***The Court*** will sustain Defendants' objections on the ground that Plaintiffs did not identify any outstanding obligation that corresponds with proposed Objective SE3.18. Therefore, the Court will remove Objective SE3.18. If, however, Plaintiffs can identify an outstanding obligation related to Objective SE3.18, the Court will reconsider. If Plaintiffs supplement their position regarding Objective SE3.18, they should supply an agreed-upon definition of "Project

Echo." Any references to the "Employment Institute" in the supplementation should be to "Partners for Employment" if that is the current name of the program.

*Court's Final Supported Employment Objective SE3.18:*

Omit. (subject to Plaintiffs providing additional information)

Q.   **Disputed Supported Employment Objective SE3.19**

*The JCA's Proposal:*  DDSD/DVR will fund the Employment Institute to develop an evidence-based Supported Employment Incubator Project to support the use of evidence-based supported employment interventions.

*Defendants* state there is no related outstanding obligation to support this Objective. They also object on grounds that SE3.19 is vague, aspirational, and open to interpretation. Defendants further assert that they already have a program in place and argue that no remediation is required.

*Plaintiffs* argue that one cause of Defendants' noncompliance was the JCA's determination that Defendants failed to use the Employment Institute (now known as Partners for Employment) to initiate evidence based incubator projects to provide job opportunities for Jackson Class Members. Plaintiffs believe "Objective SE3.19 is a reasonable method for addressing the noncompliance identified by the Court in 2012."

*The Court* sustains Defendants' objections because Plaintiffs did not identify any specific outstanding obligation that corresponds to SE3.19. Therefore, the Court will remove Objective SE3.19. If, however, Plaintiffs can identify an outstanding obligation related to SE3.19, the Court will reconsider.

*Court's Final Supported Employment Objective SE3.19:*

Omit. (subject to Plaintiffs providing additional information)

R.      **Disputed Supported Employment Objective SE4.3**

*The JCA's Proposal:*  DDSD/DVR in partnership with UNM/CDD will sponsor

statewide Social Role Valorization training.

*Defendants* contend there is no related outstanding obligation for DDSD to provide this

training. Although DDSD has provided this training in the past, there is no outstanding

obligation in the JSD, POA, or Appendix that requires DVR to provide this training.

*Plaintiffs* argue that the JCA determined that Defendants' failure to train providers and

others regarding the valued social roles that Jackson Class Members can fulfill is one cause of

Defendants' noncompliance. Plaintiffs believe that Objective SE4.3 is a reasonable method for

addressing noncompliance "identified by the Court in 2012."

*The Court* sustains Defendants' objections because Plaintiffs did not identify any specific

outstanding obligation that corresponds to SE4.3. Therefore, the Court will remove Objective

SE4.3. If, however, Plaintiffs can provide direct support of a corresponding outstanding

obligation related to SE4.3, the Court will reconsider.

*Court's Final Supported Employment Objective SE4.3:*

Omit. (subject to Plaintiffs providing additional information)

**Development of Evaluative, Disengagement Criteria**

A.      **Introduction**

The JSR sets out a process for the development of evaluative, disengagement criteria,

JSR at 2, and the Court adopts that process. The Court clarifies that the evaluative,

disengagement criteria are the measurements that determine whether Objectives are satisfied, and

therefore, are subject to disengagement.[18] Defendants should immediately begin to develop the evaluative, disengagement criteria for each Objective listed in Table I.

B.    **Supplementation of Plaintiffs' Positions**

Table I is subject to revision, based on permitted supplementation by Plaintiffs of their positions on these proposed Objectives:  Supported Employment Objectives SE1.3, SE2.10, SE3.5, SE3.8, SE3.18, SE3.19, and SE4.3 and Original Quality Objective Q1.8 (that was omitted but could be included in the Safety Plan).[19] Plaintiffs may file supplementation of their positions on these eight Objectives by September 24, 2014.

C.    **Court Rulings on Plaintiffs' Supplementation**

The Court will promptly rule on supplementation submitted by Plaintiffs as to the specified Objectives.

D.    **Defendants' Submission of the Evaluative, Disengagement Criteria**

Defendants' proposed evaluative, disengagement criteria should contain language that is understandable,[20] precise, and measurable. The evaluative, disengagement criteria must lead to disengagement of each Objective that, in turn, corresponds to an outstanding obligation to which the parties have agreed. Defendants should propose no more than a few evaluative, disengagement criteria for each Objective.

Defendants must file their proposed evaluative, disengagement criteria for each Objective in Table I by November 21, 2014.  The parties should then follow the process set forth in the JSR at 2-3 as to the remaining steps for approval of the evaluative, disengagement criteria.

---

[18]As noted, the JCA broke down her proposed Objectives into Statements of Need, Evaluative Components, and Action Steps. Because the Statements of Need, Evaluative Components, and Action Steps are frequently aspirational and not easily measurable, those components of the JCA's Remedial Plan will not be used.

[19]Before providing permitted supplementation, the parties should confer in an attempt to reach agreement on these eight omitted Objectives.

[20]The use of acronyms, unless easily understood, is discouraged.

E.      **The JCA's Recommendations**

As noted in the JSR, the JCA will decide which proposed evaluative, disengagement criteria to recommend. The JCA may add proposed evaluative, disengagement criteria to or delete evaluative, disengagement criteria from the list filed by Defendants, but the total number of evaluative, disengagement criteria for each Objective in Table I should remain few in number. Any new evaluative, disengagement criterion the JCA adds for an Objective in Table I must be directly linked to an outstanding obligation listed in Table I or Table II.

The JCA will promptly make and electronically file recommendations regarding the evaluative, disengagement criteria for each Objective. After the JCA files recommendations, the parties will have 15 days to file Objections to the JCA's recommendations. *See* JSR at 2.

F.      **Court's Rulings on the JCA's Recommended Evaluative, Disengagement Criteria**

As noted in the JSR, no additional mediation will occur. The Court will promptly issue a final Order resolving the parties' Objections to the JCA's recommendations.

**Deadlines for Disengagement of Remaining Obligations**

Chief Magistrate Judge Molzen and the parties will prepare a schedule indicating the estimated completion date for each outstanding obligation shown on Table I and Table II.

The parties will maintain a calendar, for the benefit of the Court and the parties, showing the date of disengagement of each obligation and any revised estimated completion date for each remaining obligation in regard to which the original estimated completion date is changed. The calendar will be updated quarterly and filed electronically. The calendar will reflect the date for disengagement of the last obligation.

**Sanctions**

Failure to meet the estimated date for disengagement of an obligation may result in sanctions.

**Conclusion**

The JCA's Remedial Plan (Doc. No. 1969) is adopted with respect to the revised Goals and Objectives that are attached to this Order in Table I. All agreed upon outstanding obligations are listed in Table II.

The revised Goals and Objectives in Table I do not replace or modify existing obligations that were not the subject of Plaintiffs' Noncompliance Motion, the Court's 10/12/12 Order, or the JCA's Remedial Plan. In other words, Defendants must demonstrate substantial compliance with all other outstanding obligations, apart from those addressed by Plaintiffs' Noncompliance Motion, the 10/12/12 Order, and the JCA's Remedial Plan. *See* Table II. The Court will end its active oversight of this case only after full disengagement of all outstanding obligations.

IT IS ORDERED that:

(1) DEFENDANTS' OBJECTIONS TO THE JACKSON COMPLIANCE ADMINISTRATOR'S REMEDIAL PLAN TO OVERCOME OBSTACLES TO SUBSTANTIAL COMPLIANCE (Doc. No. 1971) and Defendants' modified objections in the MEMORANDUM SUPPORTING DEFENDANTS' OBJECTIONS TO THE JCA PROPOSED REMEDIAL PLAN (Doc. No. 1989) are SUSTAINED in part and OVERRULED in part as described herein;

(2) Table I, attached to this ORDER, contains revised Goals and Objectives for which EVALUATIVE, DISENGAGEMENT CRITERIA must be developed by Defendants;

(3) Table II, attached to this ORDER, contains all other outstanding obligations for disengagement as agreed to by the parties;

(4) The procedure in the JOINT STATUS REPORT (Doc. No. 1986 at 2-3) for developing and electronically filing the EVALUATIVE, DISENGAGEMENT CRITERIA (Doc. No. 1986 at 2-3) for all Objectives listed in Table I is ADOPTED;

(5) Plaintiffs must file permitted supplementation by September 24, 2014;

(6) DEFENDANTS must file proposed EVALUATIVE, DISENGAGEMENT CRITERIA for the final Objectives listed in Table I by November 21, 2014; and

(7) The parties, with the assistance of Chief Magistrate Judge Molzen, must prepare a schedule indicating the estimated completion date for each outstanding obligation shown on Table I and Table II.

_____
SENIOR UNITED STATES DISTRICT JUDGE