IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**WALTER STEVEN JACKSON, et al.,**

        **Plaintiffs,**

vs.                                                 **No. CIV 87-839 JAP/KBM**

**LOS LUNAS CENTER, et al.,**

        **Defendants,**

**and**

**THE ARC OF NEW MEXICO,**

        **Intervenor,**

**and**

**MARY TERRAZAS, et al.,**

        **Intervenors, pro se.**

### MEMORANDUM OPINION AND ORDER

On September 26, 2014, Defendants filed DEFENDANTS' OPPOSED MOTION FOR PARTIAL DISENGAGEMENT SEEKING DISENGAGEMENT OF APPENDIX A-DVR[1] (Doc. No. 2003) (DVR Motion). The DVR Motion asks the Court to find that Defendants have "substantially complied" with the vocational rehabilitation requirements set out in Appendix A of the 2005 Plan of Action (POA). (Doc. 1064, attachment). The Court will deny Defendants' DVR Motion for the reasons stated below.

Although Plaintiffs oppose the DVR Motion, the Court determines that a ruling is appropriate without the need for a response by Plaintiffs because Defendants have not provided

---

[1] DVR refers to the State of New Mexico's Division of Vocational Rehabilitation.

sufficient support to demonstrate substantial compliance with the DVR obligations. While Plaintiffs indicated at a February 11, 2015 status conference that they intend to complete a Rule 30(b)(6) deposition and conduct other discovery before filing a response to the DVR Motion in either March or April 2015, there is no need to review opposition to a motion that lacks adequate support in the first place. This decision reduces the need for additional costly briefing and discovery particularly as it concerns a motion that has been pending for more than four months. In addition, the decision describes the type of evidence that will support a motion for disengagement.[2] The Court does not intend to discourage the parties from attempting to reach agreement on disengagement of the DVR obligations. If Plaintiffs agree that Defendants have substantially complied with any or all of the DVR requirements, Defendants may file another Motion for Partial Disengagement.

**Background**

For a more detailed explanation of this 27-year-old case, the Court refers to the "Background" section of the MEMORANDUM OPINION AND ORDER (Doc. No. 1996), entered September 11, 2014. For purposes of deciding Defendants' DVR Motion, the Court provides the following background.

The parties agree that Defendants have numerous outstanding obligations to satisfy before the Court can terminate its oversight of this class action lawsuit. A number of Orders and

---

[2] If, after reviewing this decision, Defendants determine that their December, 2014 Motion for Partial Disengagement-1998 Audit Recommendations (Doc. No. 2013) does not contain adequate support, Defendants may withdraw the 1998 Audit Motion and re-file it with sufficient evidentiary support. The Court has not reviewed the 1998 Audit Motion but advises that the support for this DVR Motion is deficient. A properly supported 1998 Audit Motion could avoid the need for briefing a legal issue that the parties discussed at the February 11, 2015 status conference and might reduce the need for Rule 30(b)(6) discovery as well as an evidentiary hearing.

documents set out Defendants' outstanding obligations, including Appendix A,[3] which lists required actions that Defendants must complete in the areas of health, safety, and supported employment of the Jackson Class Members (JCMs).

Defendants' DVR Motion addresses only one section in Appendix A, specifically the DVR obligations. There are eight DVR required actions in the 2005 POA. Defendants assert that they have satisfied all of these requirements, as evidenced primarily by 162 pages of documentary support to the DVR Motion.

### Disengagement Procedure

The Joint Stipulation on Disengagement (JSD)[4] provides a process for Defendants to disengage from their obligations. JSD, ¶¶ 44–49. Defendants may file a motion for partial or full disengagement with respect to compliance with a Plan of Action (POA) appendix or desired outcome, or a provision of the JSD. Doc. No. 1064 ¶ 44 (Paragraph 44 Disengagement Process); Doc. No. 1930 at 10 (describing process). "A motion alleging [substantial] compliance with any provision of the Stipulation, or any appendices or outcomes of the Plan, must demonstrate that the Department has implemented that provision, outcome or activity." JSD, ¶ 45.

---

[3] Appendix A is attached to the May 20, 2005 JOINT STIPULATION ON AGREED ACTIONS TO COMPLY WITH JOINT STIPULATION ON DISENGAGEMENT AND PLAN OF ACTION AND TO RESOLVE PENDING MOTIONS TO SHOW CAUSE AND TO RE-ENGAGE (Doc. No. 1473) (May 20, 2005 Joint Stipulation), which the Court adopted on May 20, 2005 (Doc. No. 1474). *See also* ORDER APPROVING STIPULATION ON DISENGAGEMENT (Doc. No. 1064) (approving the May 20, 2005 Joint Stipulation on Disengagement (JSD))

[4] The JSD's purpose was to "define[] the further actions and requirements which the defendants must complete and the services, supports, and benefits which must be provided to classmembers in order for the defendants to comply with their obligations to classmembers under the Court's orders in this case." FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER at 11 (Doc. No. 1930); *see also* JSD at ¶ 5 (Doc. No. 1064). The JSD required the parties to develop a PLAN OF ACTION (POA) that addressed thirteen components or desired outcomes, referred to as Appendices 1-13. Additional Appendices 14 and 15 were added later. Doc. No. 1930 at 12. In May 2005, the parties filed a Joint Stipulation that was intended to obligate Defendants to take certain actions outside the POA as identified in Appendix A to the Joint Stipulation. Doc. No. 1473. Appendix A did not affect Defendants' other obligations under the JSD and the POA. Doc. No. 1930 at 14.

## Legal Standard

"'Substantial Compliance' is oft defined by what it is not." *Alab. Disabilities Advocacy, Program v. Walley*, 390 F. Supp. 2d 1030, 1044 (M.D. Ala. 2005) There is no perfect measurement for determining substantial compliance. *See id.* (substantial compliance is not exact compliance or perfection). This is particularly true where Defendants must satisfy numerous obligations, some of which are subjective in nature. Put simply, Defendants need only demonstrate *substantial*, not full compliance with the evaluative components.

The Court set out the pertinent legal standard for substantial compliance in its FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER (Doc. No. 1930 at 20–21).

> The touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree–i.e. its essential requirements. In determining if Defendants have substantially complied with a consent decree, the Court should first consider the essential purposes of the consent decree and then consider the specific steps set forth in the consent decree by which those purposes may be satisfied.

(quotation marks and citations omitted). Thus, in analyzing substantial compliance, the Court examines the essential purposes of the pertinent consent decree and the specific steps Defendants have taken to satisfy these purposes. Deficiencies in a party's progress in fulfilling those obligations do not always spell out failure. Rather, the decision-maker assesses whether a deviation is unintentional or sufficiently minor so as not to "substantially" defeat the object which the parties intended to accomplish. In contrast, substantial performance of specific criteria is not attained "where the part unperformed touches the fundamental purpose of the contract and defeats the object of the parties entering into the contract." *Jeff D. v. Otter,* 643 F.3d 278, 288 (9th Cir. 2011) (citation omitted).

## Analysis

I.   **Purpose of Consent Decree**

One of the essential purposes of the consent decree is to provide JCMs with supported employment (SE) services and opportunities. Doc. 1930 at 5, 33.[5] The POA states that the goal of SE is "to give access to employment to all [JCMs] with developmental disabilities who wish to work, and for whom employment will substantially improve their quality of life." Doc. 1930 at 126 (quoting POA at 103).[6] The Court borrows this language from materials specifically concerning Appendix A "Supported Employment" obligations. But, whether found under Supported Employment" obligations or DVR requirements, both SE and DVR obligations seek to further the essential purpose of providing SE opportunities and services to JCMs.

II.  **Specific Criteria**

Appendix A lists eight DVR obligations or requirements. Defendants must demonstrate that they have taken specific steps that satisfy the essential purpose of the DVR requirements, including the eight Appendix A requirements. In assessing whether Defendants have substantially complied with the Appendix A DVR requirements, the Court considers Defendants' efforts and commitment to completing specific steps, their progress in completing those steps, and the effect of any unperformed steps, i.e., whether a failure to complete specific steps frustrates the overall purpose of the consent decree.

---

[5] The references to the Court's October 12, 2012 FINDINGS OF FACT AND CONCLUSIONS OF LAW (Doc. No. 1930) are to the page numbers listed at the top of the document.
[6] Defendants state that the goal of the DVR requirement was to "accomplish the implementation of Supported Employment under the Rehabilitation Act of 1973…." DVR Motion at 2. The language in the "Supported Employment" portion of the POA more accurately captures the goal of addressing employment needs of the JCMs. POA at p. 101 ("NM Employment Plan for Individuals Who Were Previously Institutionalized").

A.     DVR 1

DVR 1 states: "Annually, DVR will target outcomes, in conjunction with LTSD,[7] for specific Jackson class members who have work goals but who are not working and collaborate with LTSD to obtain employment for them." Defendants contend that DVR 1 "simply requires that DVR target outcomes for Jackson Class Members." DVR Motion at 4. The Court finds that the express language of DVR 1 requires more than a demonstration of targeted outcomes alone. To show substantial compliance with DVR 1, Defendants must, on an annual basis, (1) identify JCMs with work goals who are not working, (2) target a number of JCMs who Defendants will attempt to place in jobs, and (3) take steps to assist the targeted JCMs in obtaining employment.

In support of showing substantial compliance with DVR 1, Defendants attach a copy of the 2013 Intergovernmental Services Agreement (IGA) between the New Mexico DVR (NMDVR) and the New Mexico Department of Health, Developmental Disabilities Support Division (DDSD). DVR Motion, Ex. C. Defendants state that the DVR and DDSD entered into the IGA with the express and stated purpose of accomplishing the joint implementation of Supported Employment under the Rehabilitation Act of 1973. According to Defendants, the IGA "details the methods of providing [SE to JCMs] and the ability to verify those services were actually provided." DVR Motion at 3. Defendants emphasize subparagraph 2 of the IGA ("Targeted Outcomes"), Ex. A at 12, which states: "The NMDDSD and the NMDVR shall identify and agree on targeted outcomes for each state fiscal year. The Targeted Outcomes will include the number of referrals[8] and job start-ups[9] for Jackson Class Members. Outcomes for

---

[7] LTSD is short for Long Term Services Division. That Division is now known as Developmental Disabilities Support Division (DDSD).DVR Motion at 4 n.2.

[8] A "referral" is described in training materials as "An individual or individuals who is/are identified as a person or persons who may benefit from DVR services in terms of employment." DVR Motion, Ex. U at 5.

each state fiscal year will be jointly established prior to the beginning of each new state fiscal year." DVR Motion at 4.

Defendants assert that DVR and DDSD have complied with the IGA requirement since at least 2006, although they only attach documentation concerning the years 2006, 2010, and 2013. *Id.* For example, Defendants rely on an August 11, 2006 letter from the Assistant Secretary for Vocational Rehabilitation to the Department of Health Secretary, stating that the "target number of referrals to the [DVR] for vocational rehabilitation services in FY 2007 is twenty [JCMs]." *Id.*, Ex. D. Defendants attach a similar letter, dated December 13, 2010, stating that in 2010, there were sixteen referrals and ten job start-ups for JCMs. *Id.*, Ex. F. For 2011, there was a goal of sixteen referrals and ten job start-ups. *Id.* A third letter, dated November 15, 2013, set a target of 77 referrals and 35 job start-ups in 2014. *Id.*, Ex. H.

While the IGA is a recitation of requirements and aspirations, its mere existence does not demonstrate actual satisfaction of DVR 1. The three letters from 2006, 2010, and 2013 do not show whether, on an annual basis, Defendants identified JCMs who wished to work, determined a target number of JCMs for possible employment, and assisted the targeted JCMs in obtaining employment.

Defendants' support falls short of demonstrating substantial compliance with the overall goal of giving JCMs, who wish to work, access to employment. In addition, Defendants have not shown that they have taken the required steps to satisfy the DVR 1 obligations. For example, Defendants have provided no figures regarding how many of the remaining 292 JCMs[10] seek work but have no employment.

---

[9] According to the definitions in the IGA, a "start-up" signifies "[a]n individual who is eligible for NMDVR supported employment services and placed in a job (starts working)." IGA, Ex. C at 5.
[10] The Court understands that of the original 552 JCMs in 1988, only 292 are still living as of February 2015.

The Court does not require Defendants to supply annual statistics from 2006 through the present. But, in order to demonstrate substantial compliance, Defendants must show their progress in satisfying all three elements of DVR 1 on an ongoing basis from at least 2010 through the current year. The Court does not require hundreds of pages of exhibits to demonstrate substantial compliance of this DVR requirement and others; an affidavit or other evidence may be sufficient.

      B.      DVR 2

DVR 2 states: "DVR will take referrals for certain Jackson class members and take the lead in getting an employment profile done to establish a blue print for job development. DVR will assist in obtaining employment in conjunction with [DDSD]." To demonstrate substantial compliance with DVR 2, Defendants must show that they have taken these specific steps: 1) DVR obtains referrals for "certain" JCMs; 2) DVR ensures that employment profiles for job development are created for the referred JCMs; and 3) DVR and DDSD assist the referred JCMs in obtaining employment.

Defendants refer to the 2006 letter as evidence that DVR "has historically and continues to take referrals" to JCMs. DVR Motion at 5, Ex .D. Defendants also rely on training materials from 2006 and a description of the SE Referral Process to DVR that was updated in September 2014. *Id.* Exhs. U and V. The letters and materials from 2006 do not show that Defendants "continue to take referrals" for JCMs. In other words, the 2006 information is stale and fails to demonstrate current sustained substantial compliance with DVR 2. The document that was updated in September, 2014 does not indicate if or to whom it was distributed. *Id.* Ex. V. There was a significant gap between 2006 and 2014; thus, the Court cannot make a determination from

the attached documents whether Defendants continue to take referrals sufficient to satisfy the DVR 2 requirements.

With respect to the obligation that DVR create employment profiles for JCMs, Defendants summarily assert that DVR has created employment profiles for JCMs in compliance with the IGA requirement that Defendants complete Vocational Assessment Profiles (VAPs) for "priority Jackson class members." *Id.* at 6. Defendants further state that 100% of JCMs have received a VAP and that the JCMs' Individualized Services Plans "are updated with new [VAPs] as needed or they become available." *Id.* Defendants must present evidence, rather than unsupported argument, showing completion of current VAPs for the JCMs. However, if the parties can agree that the JCMs have the required employment profiles, this will be sufficient to show satisfaction of part of the DVR 2 obligations.

In addition to summary assertions of compliance, Defendants state that they have supplied evidence of DVR's compliance with DVR 2 requirements in the form of "multiple letters" demonstrating that "DVR not only created employment profiles but assisted in obtaining Supported Employment for [JCMs]." *Id.* Defendants refer to a "form letter" dated March 2006 as the type of letter that was sent apparently to employers or potential employers informing them that a JCM was targeted for employment and might currently be unemployed or seeking employment. *Id.*, Ex. I. Defendants assert that in March 2006, they sent at least 57 of the form letters, and in July 2006, they sent at least 30 follow-up letters. *Id.* at 6 n.3. The form letter asks the employer or potential employer to notify the DVR of upcoming ISPs[11] or team meetings for the identified JCM. The letter further states that DVR will attend and participate in the meeting(s) to afford an opportunity to initiate discussion toward employment. *Id.*, Ex. I.

---

[11] ISP usually indicates an Individual Service Plan. *See* Doc. 1996-3. The form letter may have intended to refer to "IDTs (Interdisciplinary Team) and/or team meetings." It is unclear.

The form letter is some evidence that DVR has attempted to assist JCMs in obtaining employment but it does not show actual help to JCMs. In other words, Defendants present no evidence that the form letters resulted in employment of JCMs. Moreover, there is no evidence that these form letters were sent out in any year after 2006.

Defendants give examples of several redacted letters sent to DVR from family members or guardians declining the need for vocational assistance to a JCM. *Id.*, Ex. J. These letters are also outdated. For example, Defendants offer form letters for 2007 and 2009, but no documents or other evidence for the last five years.

In order to demonstrate substantial compliance of DVR 2, Defendants should provide recent and current evidence that DVR is taking referrals for JCMs who seek employment, that these JCMs have current VAPs, and that the identified JCMs receive assistance from DVR in seeking employment, including the results of those efforts. This should not be an overwhelming task in view of the reduced number of living JCMs, some of whom have apparently declined vocational rehabilitation services.

C.      DVR 3 and DVR 7

DVR 3 states: "DVR and [DDSD] will use creative approaches to getting jobs for Jackson class members with significant disabilities and seek methods of providing incentives through innovation contracts." DVR 7 states: "DVR will co-sponsor training for key stakeholders on quality employment outcomes, innovative approaches, best practices, [and] employer negotiations." Defendants contend that they have satisfied the interrelated requirements of DVR 3 and DVR 7 that both "address the need for innovative thinking and approaches in the development and implementation of Supported Employment." DVR Motion at 7.

In support, Defendants refer to training and public seminars that DVR participated in or conducted in August 2006. *Id.* at 8, Exhs. L, M. Defendants also attach a copy of materials in a presentation dated June, 2001, entitled "Making the Road by Taking It/Team & Individual Exercises for Self-Employment Training." *Id.* Ex. K. Defendants state that a training session in the area of "Supported Employment and People with Disabilities," dated 2010, was given at some point but Defendants do not indicate who attended or who sponsored the training. On the basis of these materials alone, Defendants assert that they have substantially complied with the DVR 3 and DVR 7 obligations.

Defendants present no persuasive evidence that they have utilized methods of providing incentives through innovation contracts in attempting to obtain employment opportunities for JCMs. The classroom exercises contained in the Exhibit K training materials do not show that DVR used these materials in helping JCMs find jobs. In fact, it is unclear how most of these materials were used to assist JCMs.

Defendants have not demonstrated that they currently or recently have used "creative approaches" in assisting JCMs with employment opportunities or that Defendants have provided incentives through innovation contracts in this area. In addition, there is no indication that DVR has cosponsored training for key stakeholders on an ongoing basis in the areas specified by DVR 7. Again, the Court is not seeking hundreds of pages of training materials. *See* DVR Motion at 8 n.5. Defendants may be able to show compliance with DVR 3 and DVR 7 by supplying an affidavit detailing the required actions Defendants have taken.

D.     DVR 4

DVR 4 states: "DVR will participate in selected team meetings of the '119' individuals whose teams are not supportive of work and assist individuals to consider other providers if necessary. DVR will ideally be provided 8–10 weeks notice, but in no event less than 4 weeks notice, of these meetings."

Defendants rely on a provision of the IGA stating that "NMDVR shall [p]articipate in selected IDT [Interdisciplinary Team] meetings identified for [JCMs], to provide assistance in the discovery, comprehensive assessment and job development and placement process." DVR Motion at 9. Defendants further assert that "DVR has participated in IDT meetings and has worked to emphasize the Employment First Policy." *Id.* Defendants rely on the 2006 letters to service providers requesting that DVR be included in the next "ISPs or team meetings" to discuss employment opportunities for relevant JCMs. *Id.*, Ex. I.

It is not clear how any of these materials or assertions specifically address the DVR 4 requirements. Defendants do not state whether DVR participated in the IDT meetings for the "119" JCMs whose teams are not supportive of work or if this is still a relevant obligation. In other words, are there still 119 JCMs whose teams do not support work for those individuals? Have Defendants taken actions to assist those JCMs to consider other providers? How does the Employment First Policy, referred to by Defendants without explanation, assist these 119 JCMs?

Again, it should not be a difficult task to show substantial compliance with DVR 4 if the requirement applies to only 119 or fewer JCMs.

E.   DVR 5

DVR 5 states: "DVR will take the lead in developing and implementing quality vocational profiles for Jackson class members who do not have an updated one." DVR 5 requires that DVR create and use "quality" VAPs for JCMs who do not have updated VAPs.

There appears to be some overlap between the requirements in DVR 2 and DVR 5 as they pertain to vocational assessments or employment profiles. DVR 2 requires Defendants to get "employment profile[s] done to establish a blueprint for job development." In response to DVR 2 obligations about "employment profiles," Defendants state that 100% of JCMs have updated VAPs. DVR Motion at 6. Yet, in response to the DVR 5 requirements that Defendants implement and update VAPs, Defendants do not state that all JCMs have current or updated VAPs. It is not clear why Defendants treat these obligations differently.

In response to DVR 5, Defendants state that DVR contracted with specific vendors to provide VAPs for all JCMs and Defendants refer to a 2006 proposal and fee schedule for all the VAPs. *Id.* at 10, Ex. T. Defendants also assert that DVR required DVR counselors "to attend the vocational assessment profiles for class members on their caseloads." *Id.* at 10. The meaning of this sentence is unclear. In support of this assertion, Defendants refer to Exhibit O, which they describe as "internal emails from Debbie L. Hambel to DVR Supported Employment Liaisons, May 17, 2007." But Exhibit O is not emails; Exhibit O is a two-page list of trainings and consultations that Ms. Hambel gave or attended, mainly in 2006. *Id.* Ex. O. Exhibit P is copy of an email from Ms. Hambel, dated May 17, 2007, requiring all counselors "and or SE liaisons" serving JCMs "to attend the vocational profile for these individuals when this is scheduled." *Id.* Ex. P. In addition to these materials, Defendants note that DVR provided funding in the amount of $20,000 to DDSD to conduct forty VAPs for JCMs in 2007. DVR Motion at 10, Ex. E. In

2013, the IGA funded an additional $20,000 to obtain 37-40 VAPs for "priority Jackson class members." *Id.* Ex. C at p. 13.

These assertions and documents do not convince the Court that Defendants have substantially complied with the obligations in DVR 5 or that DVR has implemented the required VAPs for JCMs who do not have updated VAPs. Defendants rely on outdated materials or documents that do not necessarily provide clear support for their position. Again, this task should not be onerous in view of the reduced number of living JCMs. If appropriate, Defendants may present affidavit evidence to show that all JCMs have current or updated VAPs as of a certain recent date.

  F.  DVR 6

DVR 6 states: "DVR will ensure that all liaisons understand their role as facilitators of employment for individuals with significant disabilities."

Defendants contend that have complied with DVR 6 requirements by giving training to SE liaisons as well as to DDSD Regional Coordinators. Defendants refer to specific training sessions provided in 2006 and 2007. DVR Motion at 10. Defendants acknowledge that they have lost some of the training materials since the training occurred "over seven years ago." *Id.* at 10–11. Defendants also rely on IGA language requiring that "all liaisons understand their role as facilitators of employment for individuals with the most significant disabilities." *Id.* at 11, Ex. C, at p. 11. Defendants summarily assert that DVR has fulfilled the DVR 6 obligations "by periodically conducting training to remind liaisons of their roles as facilitators in relation to Supported Employment as evidenced by the attached documents." *Id.* at 11. According to Defendants, the attached documents show "past compliance with the requirements," and the "IGA provides evidence of DVR's continued commitment to the underlying goals." *Id.*

While the IGA may be some evidence of the DVR's continued commitment to satisfying goals, the document alone does not indicate what actions DVR has taken or when DVR has taken actions that relate to DVR 6 obligations. The 2006 and 2007 materials and the requirements set out in the 2013 IGA do not demonstrate substantial compliance with DVR 6. It may be, however, that nothing more than a short affidavit is required to show that DVR has satisfied DVR 6 obligations in terms of the specified liaisons' recent or current training.

G.     DVR 8

DVR 8 states: "DVR will do case reviews at the local level and collaborate with [DDSD] to solve individual and systemic issues." Defendants refer to "twenty-two Class member case reviews" conducted in 2006. DVR Motion at 11, Ex. R. Exhibit R contains an undated recitation of DVR 8 and a typed note that these actions were completed when the SE Coordinator conducted 22 case reviews in 2006 and developed a case review schedule for 2007. Defendants also assert that DVR continues to use "this rotation schedule for case reviews as indicated in the attached affidavit." DVR Motion at 11. The Court was unable to locate any affidavits attached to the DVR Motion. Defendants refer to Exhibit S, which contains a "sample of the forms used to conduct case reviews." This form consists of a number of unchecked boxes and is dated April 16, 2014. *Id.* Ex. S. It is unclear if the form was actually used to conduct case reviews.

Although Defendants assert that they have regularly conducted case reviews, the attached documentation does not support the assertion. Most of the materials refer to actions taken in 2006 and actions to be taken in 2007. However, there is no evidence to confirm that Defendants have identified "individual and systemic issues" and have regularly conducted case reviews in order to resolve those issues. Form documents and summary assertions are insufficient.

15

**Conclusion**

The Court concludes that Defendants' DVR Motion does not make an adequate showing that Defendants substantially complied with the overall purpose of the consent decree with respect to providing SE services and opportunities to the JCMs. Defendants' failure to show continued and sustained progress in completing the eight required DVR steps rules out disengagement at this time. It may be that Defendants have substantially complied with some or all of the DVR requirements, but Defendants did not produce evidence of substantial compliance. The Court encourages Defendants to file only substantiated motions for partial disengagement.

IT IS ORDERED that DEFENDANTS' OPPOSED MOTION FOR PARTIAL DISENGAGEMENT SEEKING DISENGAGEMENT OF APPENDIX A-DVR (Doc. No. 2003) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE