IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WALTER STEVEN JACKSON, et al.,

                Plaintiffs,

vs.                                         No. CIV 87-839 JAP/KBM

LOS LUNAS CENTER, et al.,

                Defendants,

and

THE ARC OF NEW MEXICO,

                Intervenor,

and

MARY TERRAZAS, et al.,

                Intervenors, pro se.

MEMORANDUM OPINION AND ORDER

On December 10, 2014, Defendants filed a MOTION AND MEMORANDUM IN

SUPPORT OF OPPOSED MOTION FOR DISENGAGEMENT OF THE 1998 AUDIT

RECOMMENDATIONS NUMBERS 6, 8, 12, 15, 16 (a, e, and f), 19 and 24 (Doc. No. 2003)

(1998 Audit Motion). The 1998 Audit Motion asks the Court to find that Defendants have

"substantially complied" with some, but not all, of the 1998 Audit Recommendations set out in

Table I[1] to this Order.

---

[1]In March 4, 2015 correspondence to the Court, both parties submitted partial lists of the 1998 Audit
Recommendations. The Court used the two lists to compile a complete list of the 1998 Audit
Recommendations Nos. 1-25. Table I. The Court copied the text of the 1998 Audit Recommendations
from the parties' submissions except for some minor grammatical corrections; the Court did not attempt
to decipher acronyms that may not be used now. If the parties disagree with any language in Table I, they
may submit to the Court agreed upon corrections of the 1998 Audit Recommendations in Table I.

Plaintiffs oppose the 1998 Audit Motion but have not yet filed a response in opposition. *See* 1998 Audit Motion at 3. At a February 11, 1015 status conference, counsel for Plaintiffs stated they would need to conduct Rule 30(b)(6) discovery before they could respond to the 1998 Audit Motion. Counsel further observed that there was a preliminary legal dispute that had to be resolved – whether Defendants could seek disengagement of fewer than all of the 1998 Audit Recommendations. (Transcript (Tr.) of Feb. 11, 2015 conference) (Doc. 2031 at 6–8). Plaintiffs' counsel explained that in the past the parties had agreed that some of the 1998 Audit Recommendations had been "completed" but that an Order of Disengagement could not be sought until all of the 1998 Audit Recommendations were completed. Counsel for Defendants argued that Defendants had completed and substantially complied with all of the 1998 Audit Recommendations and that their 1998 Audit Motion seeks disengagement of the "1998 in its entirety." Tr. at 9. However, the 1998 Audit Motion specifically requests disengagement of only some of the enumerated 25 Audit Recommendations: Nos. 6, 8, 12, 15, 16, 19 and 24.

At the February 11, 2015 status conference, the Court and counsel discussed whether to set an evidentiary hearing on the 1998 Audit Motion or to proceed with simultaneous briefing of the legal issue. Counsel agreed to submit briefs on whether Defendants could seek disengagement of fewer than all of the 1998 Audit Recommendations. In order to expedite this matter and reduce the need for briefing, the Court asked counsel to submit letters answering several questions concerning the history and procedure for disengagement of the 1998 Audit Recommendations.

On March 4, 2015, the parties simultaneously submitted letters on the questions posed by the Court. After considering arguments by counsel at the February 11, 2015 hearing, Defendants' 1998 Audit Motion and exhibits, and the parties' March 4, 2015 letters and exhibits, the Court

elects to deny the 1998 Audit Motion without prejudice. Defendants may, at an appropriate time, file a motion seeking disengagement of the 1998 Audit Recommendations in their entirety.[2]

**Background**

I.     Introduction: General History of Proceeding:

This 28-year-old class action lawsuit is difficult to summarize. Plaintiffs, a group of formerly institutionalized developmentally disabled persons, were certified as a class and were ultimately successful on their claims. *See* December 28, 1990 Memorandum Opinion and Order (finding constitutional and statutory violations in Defendants' operation of Fort Stanton Hospital and Training School and Los Lunas Center for Persons with Developmental Disabilities and in Defendants' community service system for persons with developmental disabilities). In the remedial stage of this lawsuit, Defendants are obligated to take certain actions to correct identified deficiencies in healthcare, safety conditions, and other areas. The Court will continue to oversee this proceeding until Defendants have demonstrated sustained substantial compliance with all of the outstanding obligations. For a more detailed explanation of this lawsuit, *see* the "Background" section of the September 1, 2014  MEMORANDUM OPINION AND ORDER (Doc. No. 1996) and the "Background" section of the October 12, 2012 FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER (Doc. No. 1930).

On December 19, 1997, in response to compliance issues, the Court entered an ORDER APPROVING STIPULATION ON DISENGAGEMENT (Doc. No. 1064), which approved what is known as the JOINT STIPULATION ON DISENGAGEMENT or the JSD. The JSD's purpose was to "define[] the further actions and requirements which the defendants must

---

[2] Many of the 1998 Audit Recommendations listed in Table I appear to be outdated, if not obsolete. The Court encourages the parties to discuss what actions Defendants must take now to satisfy the 1998 Audit Recommendations. Counsel should work creatively and cooperatively to settle on the 1998 Audit Recommendations that must still be implemented for purposes of providing required assistance to Jackson Class Members.

complete and the services, supports, and benefits which must be provided to classmembers in order for the defendants to comply with their obligations to classmembers under the Court's orders in this case." Doc. No. 1930 at 11; see also JSD ¶ 5. The JSD required the parties to develop a PLAN OF ACTION (POA) that addressed thirteen components or desired outcomes, referred to as Appendices 1-13. Additional Appendices 14 and 15 were added later. Doc. No. 1930 at 12. Appendices 14 and 15 may contain the audit recommendations at issue in the 1998 Audit Motion although it appears that the 1998 Audit Recommendations were never filed with the Court. Plaintiffs' 3/4/15 Letter to Court at 3, 4; Doc. 1930 at 12.

II.     JSD Disengagement Process

The JSD sets out a "Disengagement Process" to be used when a party seeks disengagement or termination of the Court's oversight of certain obligations. JSD ¶¶ 40–49. Paragraph 45 of the JSD states:

> The defendants may file a motion at any time requesting the Court to find that they have complied with any particular provision of this Stipulation, or an appendix or desired outcome…. Proof that all of the activities set forth in an appendix or outcome of the [POA] have been implemented shall constitute a rebuttable presumption that the desired outcomes have been implemented.

The JSD disengagement process requires that Defendants write Plaintiffs a "Paragraph 44 Letter" to give written notice of Defendants' intention to file a "Paragraph 45 Motion for Disengagement." JSD ¶¶ 44, 45. The Paragraph 44 Letter tests the water to determine Plaintiffs' position on Defendants' anticipated Paragraph 45 Motion. *See, e.g.,* 1998 Audit Motion, Exhibits D and E (¶ 44 Letter and Response).

III.     Procedural History of the 1998 Audit Recommendations

Most of the 25 Audit Recommendations arose from a 1998 Community Audit, "as amended," after which the Community Monitor made "systemic audit recommendations" regarding deficiencies identified in the audit. 1998 Audit Motion at 2. Some of the 1998 Audit Recommendations refer to deficiencies found in the 1996 and 1997 audits. In May, 2001, the remaining outstanding 1996 and 1997 Audit Recommendations were added to the 1998 Audit Recommendations to allow the Court to disengage its active supervision of most of the 1996 and 1997 Audit Recommendations. *Id.*; Plaintiffs' 3/4/13 Letter at 2; STIPULATION REGARDING THE 1996 AND 1997 COMMUNITY AUDIT RECOMMENDATIONS (Doc. No. 1947); March 30, 2001 ORDERS (Doc. Nos. 1245, 1246). Plaintiffs explain that in transferring specific "1996 and 1997 Audit obligations into the 1998 Audit Recommendations, the plaintiffs thereby allowed the 1996 and 1997 Audit Recommendations to be disengaged *en masse*, notwithstanding the defendants' failure to complete certain of the 1996 and 1997 Audit Recommendations." Plaintiffs' 3/4/15 Letter at 2. Defendants state that the remaining 1996 and 1997 audit obligations became 1998 Audit Recommendation No. 25. Defendants' 3/4/15 Letter at 2. For ease in tracking the 1998 Audit Recommendations, they are attached as Table I to this Order.

The Court has not previously ordered disengagement of any of the 1998 Audit Recommendations. However, since early 2000, Plaintiffs have agreed that specific 1998 Audit Recommendations have been "completed." Plaintiffs' agreement of "completion" was intended "to provide the defendants with an informal acknowledgement that a specific sub-part … or a discrete element of the Court Monitor's 1996, 1997 and 1998 Audit Recommendations have been accomplished." Plaintiffs' 3/4/15 Letter at 1. According to Plaintiffs, the designation "completed" was meant to assist the parties in tracking Defendants' progress in satisfying the

5

Court's Orders and to encourage Defendants that they were making progress. *Id.* Defendants state that any stipulated agreements of "completion" between the parties "reflected the understanding of the parties that the purpose of the recommendation had been met but that [the] Court would nonetheless retain supervision" over completed audit recommendations. Defendants' 3/4/15 Letter at 1.

On February 19, 2003, the parties entered a FIRST STIPULATION ON 1998 AUDIT RECOMMENDATIONS (2003 First Stipulation) (Doc. No. 1387), agreeing that 1998 Audit Recommendations Nos. 1, 2, 3, 4, 5, 7, 9, 11, 20, 21, and 23 were completed. The language of the 2003 First Stipulation suggests that Defendants would move to disengage "all of the 1998 [A]udit [R]ecommendations," rather than move to disengage fewer than all of the 1998 Audit Recommendations. *Id.* at 1 In other words, while the parties agreed in the 2003 First Stipulation that certain 1998 Audit Recommendations were completed, they did not agree that the Court could disengage any completed 1998 Audit Recommendations.

It is not clear what steps Defendants took between 2003 and 2010 to complete the 1998 Audit Recommendations. On February 18, 2010, the parties reached a Stipulated Agreement on Disengagement Process for 1998 Audit Recommendations and Appendix A Areas (2010 Stipulated Agreement) (Doc. No. 1688). The 2010 Stipulated Agreement stated that the 1998 Audit Recommendations were to be resolved in accordance with the JSD Paragraphs 44 and 45 Disengagement Process. The 2010 Stipulated Agreement specifies that Defendants may seek to disengage the 1998 Audit Recommendations "when all recommendations for that year have been completed."

On March 4, 2010, Community Monitor Lyn Rucker sent the parties a letter and a chart identifying 1998 Audit Recommendations (1) that the parties agreed had been "completed" and

(2) those in which the parties agreed the "intent was met." The chart also showed the 1998 Audit Recommendations for which there was no agreement of completion. Defendants' 3/4/15 Letter at 1–2, Ex. A; 1998 Audit Motion, Ex. C (Chart). As noted previously, none of 1998 Audit Recommendations have been disengaged.

On August 24, 2010, Defendants sent Plaintiffs a Paragraph 44 Letter regarding an anticipated Paragraph 45 Motion to partially disengage 1998 Audit Recommendations Nos. 6, 8, 10, 12, 13, 15, 17, 18, 19, 24, and 25. 1998 Audit Motion at 3, Ex. D. Defendants characterized the intended motion as seeking disengagement "of the remaining 1998 Audit Recommendations." 1998 Audit Motion, Ex. D. In response, Plaintiffs wrote that they agreed 1998 Audit Recommendations Nos. 10, 13, 17, and 22 were completed. Plaintiffs disagreed that Defendants had completed 1998 Audit Recommendations Nos. 6, 8, 12, 15, 16, 18, 19, 24, and 25. *Id.*, Ex. E. In their response, Plaintiffs stated that "until all of the 1998 Audit Recommendations are completed, disengagement of this category is premature." *Id.*

Between August, 2010 and November, 2014, Defendants did not file a Paragraph 45 Motion to disengage the 1998 Audit Recommendations. *See* 1998 Audit Motion at 3. In December, 2014, in response to correspondence from Defendants, Plaintiffs stated that they agreed the 1998 Audit Recommendations Nos. 16(b-d), 17, and 18 were completed. *Id.*, Ex. F. On December 10, 2014, Defendants filed the present 1998 Audit Motion.

## Discussion

Rather than resolve the merits of the 1998 Audit Motion, the Court will decide if Defendants can seek incremental disengagement of the 1998 Audit Recommendations or if Defendants must file a motion to disengage the 1998 Audit Recommendations in their entirety. The language of the JSD is somewhat ambiguous in that Paragraph 45 of the JSD expressly

7

allows a party to seek partial disengagement with respect to a "provision, appendix, or desired outcome." JSD ¶ 45. Paragraph 45 also states that "[p]roof that all of the activities set forth in an appendix or outcome of the Plan have been implemented shall constitute a rebuttable presumption that the desired outcomes have been implemented." This JSD language does not prohibit a party from seeking partial or incremental disengagement of an appendix.

However, the express language of the 2003 First Stipulation and the 2010 Stipulated Agreement put to rest any confusion about whether Defendants must seek disengagement of the 1998 Audit Recommendations in their entirety. The 2003 First Stipulation specifically contemplates Defendants moving "to disengage **<u>all</u>** of the 1998 audit recommendations." 2003 First Stipulation at 1 (emphasis added). The 2010 Stipulated Agreement advises that "defendants may seek to disengage the 1998 audit recommendations **<u>when all recommendations for that year have been completed</u>**." 2010 Stipulated Agreement at 2 (emphasis added). Thus, the Court concludes that it is not permissible to seek disengagement of fewer than all the 1998 Audit Recommendations. Defendants must file a single Paragraph 45 Motion requesting disengagement of all of the 1998 Audit Recommendations.

In addition to language in court filings, the parties' past correspondence and actions evince the parties' understanding that a piecemeal approach to disengagement of the 1998 Audit Recommendations is not permissible. For example, there is no showing that Defendants disagreed with Plaintiffs' September 22, 2010 letter stating that disengagement of the 1998 Audit Recommendations was premature "until all of the 1998 Audit Recommendations are completed." In fact, Defendants did not seek disengagement of the 1998 Audit Recommendations until more than four years after Plaintiffs' letter. In addition, if Defendants believed the 2003 First Stipulation meant that the "completed" 1998 Audit Recommendations were ripe for

disengagement in 2003, they have failed to explain their 11-year delay in filing a Paragraph 45 Motion to partially disengage the "completed" audit recommendations.

Moreover, Defendants' March 4, 2015 letter to the Court states Defendants are willing to withdraw the 1998 Audit Motion and to re-file a motion seeking disengagement of all of the 1998 Audit Recommendations. Defendants suggest that it might have been less confusing "if Defendants had sought to disengage all of the outstanding obligations in one motion" based on their belief that all of the 1998 Audit Recommendations had been completed and should be disengaged. Defendants' 3/4/15 letter at 2. Thus, Defendants' recent letter supports the Court's decision that Defendants may not seek incremental disengagement of the 1998 Audit Recommendations.

Defendants state that they can file a new motion seeking disengagement of all of the 1998 Audit Recommendations by including "the 2003 stipulation, the 2010 stipulation and the 2014 stipulation … to clarify that Defendants believe all of the 1998 Recommendations (1-24) have been met and should be disengaged." *Id.* at 3. In accordance with the JSD Disengagement Process, Defendants should first send Plaintiffs a properly supported Paragraph 44 Letter before filing a new Paragraph 45 Motion. It may not be sufficient to simply include "the 2003 stipulation, the 2010 stipulation and the 2014 stipulation" to show that completed 1998 Audit Recommendations are subject to disengagement. For one reason, the Court does not know what was agreed to in the parties' 2014 stipulation. In addition, a new 1998 Audit Motion should indicate, if possible, Plaintiffs' express agreement that all completed 1998 Audit Recommendations may be disengaged.

Defendants say they are in the process of gathering additional information about Audit Recommendation No. 25 to present to Plaintiffs or to support a separate motion. Defendants may

be treating Audit Recommendation No. 25 differently from Nos. 1-24 because No. 25 contains 1996 or 1997 Audit Recommendations. However, the Court understands that the 1998 Audit Recommendations now include No. 25. A new Paragraph 45 Motion must include support to disengage all of the 1998 Audit Recommendations, Nos. 1-25.

The Court will not grant a request for disengagement unless there is adequate evidence that all 1998 Audit Recommendations have been satisfied. If the Court determines there is insufficient evidence to justify disengagement of any one audit recommendation, the Court will deny the Paragraph 45 Motion notwithstanding evidence that Defendants have satisfied the other 24 audit recommendations.

Although the Court has not conducted an in-depth review of the 1998 Audit Motion and attachments, the Court is concerned with how to evaluate 350 pages of exhibits supposedly demonstrating that Defendants took required audit actions, most of which had to be performed in 1999 or 2000. The Court refers to Audit Recommendation No. 6 as an example:

> On or before September 30, 1999, a formal rate study on Case Management must be undertaken by the DOH/LTSD. Findings of the study must be implemented in the fiscal year 2001 Case Management Provider contracts/Provider Agreements. A formal mechanism must be established by the LTSD to solicit (and insure) input into the rate setting methodology by the leadership of Case Management Agencies that have exhibited over time their capacity and expertise in meeting Jackson internal quality control and supervision. Caseload ratios should be determined by compliance with the DOH/LTSD regulations and with the goal of recruiting and retaining qualified staff.

1998 Audit Recommendation No. 6. Table I (attached).

Defendants submitted 87 pages of exhibits to support disengagement of Audit Recommendation No. 6:

> (1) excerpts from the "New Mexico Rate Validation Study" conducted by Myers and Stauffer LC, December 2000, including a list of Objectives, a table of the proposed rates for case management (divided by physical therapy, nursing, assisted living, personal care, etc.), study methodology, study participation

statistics, cast basis, components of service cost, administrative expense, capital expense, arrays, travel, recommendations (Ex. G) (14 pages);

(2) 2013–2014 description of Myers and Stauffer's services (Ex. H) (1 page);

(3) Schedule 10 of the Myers and Stauffer study prepared 9/2/99 (Ex. I) (1 page);

(4) LTSD "Calculation of Weighted Median Rate" prepared by Myers and Stauffer (Ex. J) (1 page);

(5) 11/99/99 Memo from Linda Glenn to Elin Howe regarding completion of Ms. Glenn's review of Myers and Stauffer contract and work scope (Ex. K) (1 page);

(6) chart of DD Waiver: Units and Rates, effective 9/1/98; DD Waiver: Universal Rate Table, effective 7/1/2000; discussion of Myers and Stauffer completed study and 3% adjustment to rates in 2001 (Ex. L) (3 pages);

(7) Bulletin announcing 2008 name change for the Center for Health Program Development and Management and describing services (Ex. M) (2 pages);

(8) New Mexico Home and Community Based Services Waiver Provider Rate Study, 10/14/05, prepared by Center for Health Program Development and Management for New Mexico HSD, discussing background, research questions, methodology, comparison of provider rates across waivers within New Mexico, and comparison of provider rates across waivers within each state (Ex. N) (24 pages);

(9) January 24, 2012 Memorandum to Cathy Stevenson from Burns & Associates (health policy consultants) who were assisting DDSD in the development of consumer service packages and a comprehensive review of provider reimbursement rates for the State's Developmental Disabilities waiver (Ex. O) (11 pages); and

(10) New Mexico DDSD Rate Setting Project Final Rate Models prepared by Burns & Associates, 8/24/12 including multiple pages of spreadsheets containing comparisons of current, proposed, and final rates (Ex. P) (31 pages).

1998 Audit Motion at 3–9, Exhibits G–P.

Defendants present numerous arguments why they have satisfied the requirements of 1998 Audit Recommendation No. 6. For example, they state that they retained Myers and Stauffer, an accounting firm, to conduct a rate study in 1999. The goal of the rate validation

11

study was to provide Defendants "with cost based financial information and a comprehensive rate analysis to evaluate the established rate structure and review policy and procedural issues." 1998 Audit Motion at 4. The 1999 Rate Study methodology "included using the initial rates in use for the waiver programs (based on 1995 Waiver program) which largely relied on wage proxies, estimates of staffing levels and estimates of costs that would be incurred as the waiver program was implemented in New Mexico." *Id.* (citing various pages of the exhibits). Defendants explain that the "central component of the 1999 Rate Study was the development of a cost survey instrument that would collect and recognize all of the costs that providers, including case management agencies, were required to incur in order to deliver quality services under the waiver." *Id.* at 5. Defendants also discuss workshops that were conducted throughout the state to provide service providers with instruction on how to complete the "Cost Survey instrument." *Id.* Defendants state that in addition to the general information collected regarding all providers, "Schedule 10 of the Myers Stauffer study identifies information that was only collected from Case Management service providers." *Id.* at 6. In 1999, Community Monitor Linda Glenn issued a memorandum approving the Myers and Stauffer 1999 Rate Study methodology. *Id.* Finally, Defendants argue that the Myers and Stauffer Rate Validation study of 1999 "meets the terms of Recommendation [N]umber 6 of the 1998 Audit Recommendations" for a number of reasons. *Id.* at 7.

The 1998 Audit Recommendation No. 6 appears to require completion of discrete steps: (1) conduct a formal rate study on case management by September 30, 1999; (2) implement the formal rate study's findings in fiscal year 2001; (3) establish a formal mechanism to solicit input into the rate methodology by the leadership of case management agencies; (4) provide adequate rates to cover certain costs; and (5) create appropriate caseload ratios as described. The answer to

whether Defendants have satisfied these five steps may be lurking in the seven pages of argument in the 1998 Audit Motion and the 87 pages of attached exhibits. However, the extensive argument and voluminous documentation obfuscate a clear answer and the Court is uncertain whether it can decipher the attached accounting reports and spreadsheets to reach an informed decision on disengagement. Defendants should consider using a table format indicating the steps to be completed for each 1998 Audit Recommendation, the actions Defendants have taken to satisfy those steps, and dates of completion, supported by appropriate documentation or affidavits, if possible. Defendants should omit unnecessary materials and must highlight critical portions of exhibits that Defendants wish to bring to the Court's attention.

The parties should also inform the Court whether Defendants must demonstrate sustained substantial compliance with certain 1998 Audit Recommendations that required Defendants to take specific actions during 1999 and 2000. The Court believes it should be a relatively straightforward task for the parties to determine if Defendants have taken the required steps to satisfy the time-sensitive 1998 Audit Recommendations.

The Court may defer to the judgment of the Jackson Compliance Administrator (JCA) or her expert consultants for recommendations. *See* ORDER APPOINTING JACKSON COMPLIANCE ADMINISTRATOR (JCA Appointment Order) (Doc. No. 1942 at II(B)(1) and II(E)(1)) (describing JCA's authority and responsibilities). The JCA or a consultant with expertise may be better qualified than the Court to evaluate the evidence Defendants rely on to demonstrate entitlement to disengagement of the 1998 Audit Recommendations. *See Youngberg v. Romero*, 457 U.S. 307, 322–23 (1982) (emphasizing that courts must show deference to the judgment exercised by a qualified professional on matters on which the experts are better informed).

13

**Conclusion**

The Court will deny without prejudice Defendants' 1998 Audit Motion. At an appropriate time, Defendants may file a new motion seeking disengagement of the 1998 Audit Recommendations, Nos. 1-25.

IT IS THEREFORE ORDERED that Defendants' MOTION AND MEMORANDUM IN SUPPORT OF OPPOSED MOTION FOR DISENGAGEMENT OF THE 1998 AUDIT RECOMMENDATIONS NUMBERS 6, 8, 12, 15, 16 (a,e and f), 19 and 24 (Doc. No. 2003) is DENIED, without prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE

14