# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WALTER STEVEN JACKSON, et al.,

Plaintiffs,

vs.                                                     No. CIV 87-839 JAP/KBM

LOS LUNAS CENTER, et al.,

Defendants,

and

THE ARC OF NEW MEXICO,

Intervenor,

and

MARY TERRAZAS, et al.,

Intervenors, pro se.

## MEMORANDUM OPINION AND ORDER

On August 25, 2015, Defendants filed a VERIFIED RULE 60(b)(5) MOTION AND

SUPPORTING MEMORANDUM TO TERMINATE ALL REMAINING ORDERS IN

JACKSON et al. v. FSH&TS et al. (Motion) (Doc. No. 2053), arguing that circumstances have

changed to the extent that this Court should vacate all existing orders and end its oversight of this

proceeding. PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

ALL REMAINING COURT ORDERS AND DISMISS THE CASE (Response at 2) (Doc. No.

2063) asserts that Defendants' Motion is yet a "sixth attempt to avoid compliance with the

Court's orders," which should be denied. DEFENDANTS' REPLY IN SUPPORT OF

VERIFIED RULE 60(b)(5) MOTION AND SUPPORTING MEMORANDUM TO

1

TERMINATE ALL REMAINING ORDERS IN JACKSON et al. v. FSH&TS et al. (Reply at 2) (Doc. No. 2071) contends that termination of this 29-year-old proceeding is appropriate and that Plaintiffs "erroneously cling to an interpretation of case authority which, when taken to its logical conclusion, results in interminable litigation."

**Background**

I.     General History

This civil rights class action, filed on July 8, 1987, *see* CLASS ACTION COMPLAINT (Doc. No. 1), challenged various aspects of the institutionalization of developmentally disabled persons at Fort Stanton Hospital and Training School and Los Lunas Hospital and Training School, two New Mexico state-supported institutions that closed in the late 1990s. After a prolonged trial, the Court issued a decision on December 28, 1990 (1990 Order), ruling that Defendants violated both § 504 of the Rehabilitation Act and the substantive due process clause of the Fourteenth Amendment of the United States Constitution with respect to the Jackson Class Members (JCMs). *See Jackson by Jackson v. Fort Stanton Hosp. and Training School*, 757 F. Supp. 1243 (D.N.M. 1990), *rev'd in part*, 964 F.2d 980 (10th Cir. 1992). From 1990 forward, *i.e.,* for over 25 years, the parties have attempted to work out the compliance issues and achieve disengagement of Defendants' outstanding obligations to the JCMs. To date, however, the Court has been unable to terminate oversight of this proceeding.[1]

The Court understands that in 1989, there were 552 JCMs and that, at present, there are about 288 class members still living. *See* Motion at 32.

---

[1]For additional background information, *see Jackson*, 757 F. Supp. at 1249-1253; FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER (October 2012 Order) (Doc. No. 1930); and the parties' briefing of the present Motion.

II.     Pertinent Orders, Decrees, Stipulations, and Motions

    A.  *1990 Order*

The Court's 1990 Order identified constitutional and statutory violations in Defendants' operations of state-supported institutions for the developmentally disabled.  Based on the evidence before it, the Court identified 18 areas of deficiencies that the parties were to address. *Jackson*, 757 F. Supp. at 1315–16. The Court required the parties "to formulate by agreement a plan to correct the deficiencies," with the hope that the Court could avoid "getting too deeply involved in detail." *Id.* at 1315. As part of the plan, the parties were to create a "detailed timetable establishing deadlines by which specific components of the correction plan for each deficiency" could be achieved. *Id.* at 1316. Indeed, the Court set a deadline for corrections that would "lead to complete correction of all deficiencies by not later than September 10, 1991." *Id.* (emphasis added). This deadline was not met.

The Court also required the parties to provide a "[m]eans of assuring continued compliance with appropriate standards after correction of the deficiencies."[2] *Id.* While the Court trusted the parties to work in good faith in resolving differences, the Court indicated in 1990, that if any party was recalcitrant "in any manner" in promptly complying with the Court's Order, a special master or monitor could be appointed. *Id.* at 1317. To date, the Court has not appointed a special master or monitor. *But see* Doc. No. 1942 (Order Appointing Jackson Compliance Administrator). For six years after entry of its 1990 Order, the Court entered various remedial orders and continued to oversee enforcement of those orders. *See* Joint Stipulation on Disengagement ¶ 1 (Doc. No. 1064).

---

[2] The Court rejects any suggestion that its recent rulings have added a new concept of "sustainability" to Defendants' obligations. *See* Motion at 2, 6. Clearly, the Court contemplated and required sustained performance by Defendants as early as the 1990 Order. Moreover, Defendants have agreed that they must show evidence of sustainability, which they characterized as "vital to disengagement." Doc. No. 1975 at 20.

B.  *1997 Joint Stipulation on Disengagement* (JSD)

On October 6, 1997, Plaintiffs and Defendants presented the JSD to the Court, with a Plan of Action, and filed a joint motion requesting the Court's approval of the JSD. 1997 Order on JSD (Doc. No. 1064). The JSD defines "the further actions and requirements" that Defendants had to complete, along with the services, supports, and benefits that Defendants had to provide to JCMs "in order for the defendants to comply with their obligations to JCMs under the Court's orders …." JSD ¶ 5.

The JSD did not call for the immediate dismissal of the lawsuit, but, instead contemplated "judicial oversight that could extend well into the next millennium." 1997 Order on JSD at 3. The JSD documented the parties' intention to fulfill most of the activities described in the Plan of Action by December 31, 1998, but also indicated that certain requirements could not be met until December 31, 2000. *Id.* These deadlines came and went.

The JSD sets forth criteria and a process for disengagement of Defendants' obligations. *See, e.g.,* JSD ¶¶ 40–48. The JSD also includes a specific area to be disengaged, identified as "Continuous Improvement of Community Services." *Id.* ¶ 30–37. The Continuous Improvement obligations address "a quality improvement approach" that requires Defendants to achieve a certain score on an annual audit known as the Community Practice Review (CPR).[3] The parties included other obligations, at that time, in the Plan of Action. *See discussion infra*.

In 2011, Defendants stated that 70.6% of the JSD had been formally disengaged. Doc. No. 1830 at 4. It is unclear if this percentage referred only to Continuous Improvement requirements in the JSD or to the JSD generally. The Court understands that there are a total of

---

[3] Recently, Defendants asked the Court to disengage several Continuous Improvement requirements, but the Court denied the part of Defendants' Motion that Plaintiffs opposed. MEMORANDUM OPINION AND ORDER (Doc. No. 2102). Defendants never explain why they were unable to timely satisfy all of these 19-year-old obligations at a time when the obligations actually made sense.

70 separate Continuous Improvement "items" in the JSD to be disengaged and that, as of August 2015, 56 of the 70 items had been disengaged. Motion at 23.[4] *See also* Reply at 23 (80% of the JSD is complete).

    C.  *1997 Plan of Action*[5]

Defendant Department of Health developed the September 26, 1997 Plan of Action "to enhance the Community Service System…." JSD ¶ 12. The Plan of Action contains "a narrative" with "desired outcomes, and specific activities for thirteen components of the Community Service System." *Id.* The thirteen components are contained in the Plan of Action's thirteen attached appendices. *Id.* ¶¶ 14–27. Over time, the parties added two appendices to the Plan of Action (including the 1996 Audit Recommendations and the Ashton Recommendations) for a total of 15 appendices. *See* October 2012 Order at 12[6] (Doc. No. 1930) (noting that the Ashton Recommendations would become Appendix 15). The 1997 Plan of Action was revised on April 29, 1999 and on May 31, 2000.[7]

At a fairness hearing on November 21, 1997, the Court observed that it did not expect to dismiss this lawsuit until <u>the end of 2000</u>. November 21, 1997 hearing transcript at 8. (Doc. No. 1063). This target was not met.

Defendants state that a little over 80% of the Plan of Action requirements have been formally disengaged. Motion at 8, 24, Reply at 23. *See, e.g.,* Corrected Matrix of Remedial Plans

---

[4] Defendants contend that it is "virtually impossible" to achieve compliance with the remaining 20% of the Community Improvement obligations because they are "no longer programmatically sound and are no longer the desire of the class members." Motion at 23.

[5] Plaintiffs represent that the State, through its own consultants, drafted the entire Plan of Action. Response at 17.

[6] References to page numbers in the October 2012 Order are to the numbers at the top right hand corner of the pages rather than to the numbers on the bottom of the pages.

[7] It does not appear that the approximately 139-page Plan of Action (minus the Ashton Recommendations) was docketed, although the Court has a copy of the twice-revised Plan of Action in its files. And, it is not clear if the Ashton Recommendations were docketed.

and Outstanding Court Orders, at 8–17 (Doc. No. 1996–2) (discussing remaining Plan of Action obligations); and Stipulation and Order of Disengagement (Doc. No. 2052) (clarifying that the Court could disengage certain obligations in the Plan of Action and Appendix A, as well as specific "Ashton Recommendations").

### D.  *1998 Audit Recommendations*[8]

The parties agreed to implement certain recommendations that arose from the Community Monitor's audits in 1996, 1997, and 1998. *See* Motion at 8. The JSD provides that from 1997 to 2000, the Department was to conduct community audits similar to audits performed in 1994 to 1996. JSD ¶ 30. The Community Monitor was to utilize specialists in specific areas to perform the audits and make recommendations. Unless specific audit recommendations were found to be unreasonable, Defendants were to implement the audit recommendations as part of their obligations. *Id.*

Based on the parties' recent agreement to disengage the 1998 Audit Recommendations (Doc. No. 2076),[9] the Court will not recount the procedural history of these recommendations. *But see* Motion at 8, Response at 17–18, and March 19, 2015 Order at 5–7 (Doc. No. 2032).

### E.  *2005 Appendix A*

On May 20, 2005, the parties submitted a JOINT STIPULATION ON AGREED ACTIONS TO COMPLY WITH [JSD] AND PLAN OF ACTION AND TO RESOLVE PENDING MOTIONS TO SHOW CAUSE AND TO RE-ENGAGE. (Doc. No. 1473). On May 20, 2005, the Court entered an Order approving the parties' Stipulation. Doc. No. 1474.

---

[8] The Court did not locate a docketed copy of the 1998 Audit Recommendations. However, in deciding Defendants' Motion for Disengagement of the 1998 Audit Recommendations, the Court pieced together the 1998 Audit Recommendations, which it attached as Table I to its Order. Doc. No. 2032-1.

[9] Plaintiffs did not agree that Defendants had shown substantial compliance with all of the 1998 Audit Recommendations, but, rather, that the more recent Evaluative, Disengagement Criteria (Doc. No. 1946), *see* discussion *infra*, adequately addressed the 1998 Audit Recommendations. Doc. No. 2076 at 1–2.

Attached to the 2005 Stipulation is "Appendix A Agreed Actions to Address Contempt Motions" (Appendix A). Doc. No. 1473 at 6–12. The Stipulation states that it "is intended to obligate Defendants to take certain actions outside the Plan of Action as more specifically outlined in Appendix A …." Stipulation ¶ 2. "[T]he actions identified in Appendix A are intended to facilitate compliance with the JSD, to promote completion of certain 1998 Audit Recommendations, to further address Case Management even though Plan of Action Desired Outcomes related to Case Management have been previously disengaged by an order of the Court and to address certain aspects of Vocational Rehabilitation." *Id*. The Stipulation clarifies that it did not change or modify the terms of the JSD, which remain in effect. *Id.* ¶ 3. In addition, the Stipulation refers to Defendants' agreement to implement all of the actions identified in Appendix A, while noting that some of the Appendix A actions had supplanted or modified activities listed in the Plan of Action. *Id.* ¶ 5.

Appendix A contains a list of over 100 agreed actions for Defendants to complete. Some of the Appendix A actions are identified as "complete," but most obligations indicate the actions were to be completed within a year from May 20, 2005, or by May 2006. Appendix A at 6–12. A few of the Appendix A actions were to be completed in 2006 or 2007. *Id.* at 11–12. It does not appear that these deadlines were met. Defendants state that one third of the activities in Appendix A have been disengaged. Motion at 9.[10] *See* Doc. Nos. 1996–2 and 2052 (for list of remaining Appendix A obligations).

---

[10] Defendants blame "vague terminology" and "lack of formal disengagement process" for their failure to disengage all of the Appendix A requirements. Motion at 9. But, Defendants and Plaintiffs were responsible for drafting the Stipulation and the Appendix A actions. The parties could have clarified vague language and could have included a disengagement process to the extent it differed from the JSD provisions for disengagement. The Stipulation states, in part, that the parties agreed that the Stipulation was "fair and reasonable under the circumstances." Stipulation ¶ 14.

F.  *2008 Order[11] Appointing Rule 706 Expert*

On September 6, 2007, Plaintiffs brought a Motion for Further Remedial Relief to Address Defendants' Noncompliance. Doc. No. 1590. Rather than seek additional deadlines for compliance, Plaintiffs asked the Court to appoint Lyn Rucker as the Rule 706 Expert. Previously, Ms. Rucker had been jointly selected as the Community Monitor. *Id.* at 2. After receiving the parties' proposals for the Rule 706 Expert, the Court appointed Dr. Sue Gant, Ph.D, as the Rule 706 Expert. 2008 Order (Doc. No. 1610). Dr. Gant served as the Rule 706 Expert from 2008 through 2012.

G.  *2010 to 2013 Motions and Orders*

1.  2010–2011

On July 15, 2010, Plaintiffs filed another Motion for Further Remedial Relief to Address Defendants' Noncompliance. Doc. No. 1731. The Court denied the Motion, having decided that an evidentiary hearing would be required. 2011 Order (Doc. No. 1798).The Court explained that Plaintiffs' Motion would need to be re-filed after further factual development.

On April 26, 2011, the day before the pretrial conference for the evidentiary hearing, Defendants filed a RULE 60(b)(5) MOTION AND SUPPORTING MEMORANDUM TO TERMINATE ALL REMAINING ORDERS (Doc. No. 1830) (Defendants' First Rule 60(b)(5) Motion). The Court suspended briefing on Defendant's First Rule 60(b)(5) Motion until the

---

[11] Contrary to Plaintiffs' identification of a "2008 Stipulation to Appoint a Rule 706 Expert," Response at 18, the appointment of the Rule 706 Expert was by Court Order. The parties agreed that a Rule 706 Expert would assist the Court in the determination of compliance but they disagreed as to who should fill that role and provided the Court with recommendations.

completion of the evidentiary hearing and held the Motion in abeyance.[12] The evidentiary

hearing lasted from June 13 through June 17, 2011. Doc. Nos. 1863–1867 (Hearing Transcripts).

On November 2, 2011, Plaintiffs filed a MEMORANDUM CONCERNING THE

COURT'S AUTHORITY TO APPOINT A *JACKSON* COMPLIANCE ADMINISTRATOR

(JCA). Doc. No. 1882. Plaintiffs sought the appointment of a Compliance Administrator rather

than the appointment of a Special Master under Fed. R. Civ. P. 53. Defendants opposed the

appointment of a JCA and opposed Plaintiffs' proposal that Ms. Rucker be employed as the JCA,

believing that Ms. Rucker would not be impartial based on her extensive involvement in the

case. DEFENDANTS' MEMORANDUM CONCERNING THE COURT'S AUTHORITY TO

APPOINT A JACKSON COMPLIANCE ADMINISTRATOR. Doc. No. 1885. Defendants also

voiced concerns about the costs of employing a JCA and asked, instead, that the Court expand

the role of the Magistrate Judge assigned to oversee pretrial and discovery matters. *Id.*

On November 14, 2011, Plaintiffs filed a Renewed Motion for Further Remedial Relief to

Remedy Noncompliance, alleging that Defendants had not complied with certain plans the

parties had formulated for correction of deficiencies. Doc. No. 1888. Plaintiffs also asserted that

Defendants' failure to provide adequate health care to severely disabled class members and to

afford them supported employment opportunities violated §504 of the Rehabilitation Act of 1973

and the Americans with Disabilities Act (ADA) by discriminating against persons with severe

disabilities. *Id.*

---

[12] Defendants informed the Court at a status conference that they might re-file a Rule 60(b)(5) Motion if
warranted. Oct. 25, 2011 Minutes (Doc. No. 1881). The Court subsequently "terminated" the First Rule
60(b)(5) Motion which was not fully briefed, although Plaintiffs had filed opposition. Defendants did not
re-file the Rule 60(b)(5) Motion and, instead, waited until August 25, 2015, to file the present Rule
60(b)(5) Motion.

### 2.  2012

On October 12, 2012, the Court issued Findings of Fact and Conclusions of Law, granting in part Plaintiffs' Renewed Motion. October 2012 Order. In its 206-page Order, the Court determined substantial <u>non</u>compliance by Defendants with numerous provisions of the JSD, the 1997 Plan of Action, and Appendix A related to health, safety, and supported employment issues. But, the Court did not find that Defendants had violated the Rehabilitation Act or the ADA.[13] *Id.* at 180–86, 203.

Plaintiffs emphasize the Court's 2012 findings of "ninety-nine" instances of noncompliance in the areas of health, safety, and supported employment. Response at 13 n.13, 31 n.31. In contrast, Defendants highlight the Court's praise of Defendants' "innovations and progress" and Defendants' improvement of JCMs' quality of life. Motion at 2, 5 (*citing* October 2012 Order at 202). The Court stated its belief in October 2012 that Defendants were "close to substantially complying with [their] obligations[,] despite their noncompliance in a number of

---

[13] Plaintiffs argue that Defendants' Motion "entirely ignores the Court's additional findings of statutory violations pursuant to § 504 of the Rehabilitation Act …." Response at 13. But, the Court's review of its October 2012 Order did not uncover any explicit findings of additional statutory violations. Plaintiffs' position may be that because the Court found statutory violations in 1990, these statutory violations continue as long as Defendants do not meet all of their obligations. *See* Response at 13–14. Plaintiffs have not specified what statutory violations exist at this time. Moreover, in 2012, the Court concluded that the evidence did not demonstrate that Defendants had violated the Rehabilitation Act or the ADA. October 2012 Order at 203.

areas. *Id.* at 202–03.[14] However, even in 2012, the Court observed that many of the agreed

obligations were described in language that was "more aspirational in nature than operational"

and urged the parties to restate obligations to make them achievable. *Id.* at 203.

The October 2012 Order granted Plaintiffs' 2011 request to appoint a JCA, who could

"prod Defendants into final substantial compliance," although the Court asked the parties to

jointly choose the appropriate JCA. *Id.* On January 11, 2013, the Court appointed Dr. Gant, as

the JCA,[15] who was to act as an agent of the Court and who was given the authority necessary to

facilitate and assist Defendants to achieve substantial compliance with Defendants' remaining

obligations. Order Appointing JCA (Doc. No. 1942). The Order stated that the JCA would serve

as long as necessary to achieve substantial compliance but that it was expected that Defendants

would substantially comply with the JSD, the Plan of Action, and Appendix A by July 11, 2014.

*Id.* at 2. This deadline came and went.[16]

---

[14] Defendants repeatedly call attention to the Court's praise of Defendants' progress in 2012. *See, e.g.,* Motion at 2, 5, 16 and Reply at 12. Defendants explain elsewhere, Doc. No. 1975 at 12, that they did not appeal or contest the October 2012 Order based on the Court's encouraging statements that led Defendants to believe that substantial compliance was near and that cooperation with the plan to appoint a JCA was the solution. It is difficult to pinpoint who, if anyone, might be at fault for Defendants' failure to achieve substantial compliance. Perhaps there has been a systemic failure, for which all of those involved, including the Court, are to blame. By 2014, Defendants themselves observed that "more than a year later [since the JCA's appointment], the Defendants are farther from disengagement than at the outset . . . ." *Id.* Plaintiffs similarly state that Defendants have failed to comply with most of the orders, which have not been satisfied and that "in most cases, have barely begun to be implemented." Response at 2. Despite its optimism in 2012, the Court, too, wonders when Defendants will substantially comply with the remaining obligations which, as of May 2016, may number well over 300 discrete steps. *See discussion infra.* After all, the Court believed Defendants could satisfy their obligations by 1991, 1998, 2000, 2006, 2007, and 2014, deadlines that were not met. The Court wonders if this litigation has become an end in itself that benefits those engaged in protracted litigation more than the remaining class members.

[15] The parties' agreement to the appointment of Dr. Gant is documented in correspondence to the Court.

[16] Defendants state that "the Court targeted a completion date of July 11, 2014." Motion at 10. While true, defense counsel urged the Court to set final deadlines in this case. *See, e.g.,* 11/19/13 Hearing transcript at 2–3 (Doc. No. 1961).

H.  *2015 Revised Table IV*[17]

After entry of the October 2012 Order, the parties were to develop a consolidated plan in the areas of Health, Safety, and Supported Employment to address the identified violations. The ensuing efforts by the parties, counsel, the JCA, and the Court to arrive at a final consolidated plan took well over two years; the procedure used was complex.[18] *See, e.g.,* Motion at 10–12, Response at 20–21 n.20, and Document Nos. 1961, 1966, 1969–1, 1970, 1971, 1986, 1996, 2008, 2016, 2035, 2041–1, 2046, and 2073.

On June 12, 2015, the parties filed a final list of Objectives for the Health, Safety, and Supported Employment Plans, Evaluative, Disengagement Criteria for each Objective, and projected completion dates for all of the Criteria. Revised Table IV (Doc. No. 2046). Defendants argue that Revised Table IV was not really their plan at all and that the Court overstepped its authority, by "draft[ing or creating] the contractual terms binding Defendants on April 3, 2015." Motion at 21. Defendants contend that the Court's actions were both outside its authority and outside its expertise since many of the "contractual terms" concerned Defendants' programmatic obligations. *Id.* According to Defendants, the Court contradicted its earlier statement that the New Mexico Department of Health would have the ultimate responsibility for preparing the plans and that the details of the plans would be based on the Department's knowledge and expertise. *Id.*

The Court disagrees. The Court had hoped the parties, with the help of the JCA, would collaborate and reach a workable plan to promptly address the violations that the Court found in October 2012. The Court intended to streamline, as much as possible, the process for Defendants to attain substantial compliance of all outstanding obligations. Regrettably, this did not occur.

---

[17] Revised Table IV contains the final "Evaluative, Disengagement Criteria."
[18] Rather than describe this process in detail, the Court refers to the parties' summaries as well as to key orders and documents by docket numbers.

Thus, the Court had little choice but to join the fray in late 2013 and in 2014, and to assist the parties in articulating the goals, objectives, and actions to address the 2012 violations.

Contrary to Defendants' position, the Court did not "draft" or "create" the ensuing Objectives and Evaluative, Disengagement Criteria. *See* Motion at 21. Because the parties were unable to agree on a consolidated remedial plan, the Court directed the JCA to issue a plan. The JCA issued a Remedial Plan that was over 200 pages. The Court then had to resolve the parties' numerous disagreements with the JCA's proposals. *See* Doc. No. 1996. Ultimately, the Court required Defendants to develop the Evaluative, Disengagement Criteria for each Objective. Doc. No. 1996 at 64; Doc. No. 2008. Then, in accordance with a process which the parties developed, with the assistance of Chief Magistrate Judge Karen B. Molzen, Doc. No. 1986, Plaintiffs were permitted to file comments to Defendants' Evaluative, Disengagement Criteria, and the JCA was required to issue Formal Recommendations as to the Criteria. Next, Defendants filed 116 pages of objections to the JCA's Formal Recommendations, which the Court resolved in a decision entered April 3, 2015. Doc. No. 2035. In order to make the Evaluative, Disengagement Criteria more precise and more understandable, the Court revised some of the language proposed by the parties and by the JCA.[19] *Id.* Even so, the parties were allowed to amend some of the Evaluative, Disengagement Criteria. *See* Doc. Nos. 2039, 2044. Moreover, the Court, and particularly Chief Magistrate Judge Molzen, took great care to ensure that the parties were extensively involved in the development of the Goals, Objectives, and Evaluative, Disengagement Criteria. The parties, not the Court, have determined the specific actions necessary to address the 2012 violations.

Defendants also argue that the resulting Evaluative, Disengagement Criteria "do not have a clear disengagement process." Motion at 21. After filing the final Evaluative, Disengagement

---

[19] Some of the proposed language was so mired in domain- specific "speak" that the Court found it unintelligible and not susceptible to objective measurement.

Criteria (Revised Table IV), the parties submitted a Stipulated Agreement on Disengagement Process for Revised Table IV. Doc. No. 2073. Thus, there is a disengagement process in place, specific to the final Evaluative, Disengagement Criteria.[20]

In addition, Defendants assert that the Evaluative, Disengagement Criteria are "a bevy" of new obligations that "dramatically expand" the original contractual obligations, forcing the State to "essentially start[] from scratch with no end in sight[]." Motion at 2, 5, 21. During the process of arriving at final Evaluative, Disengagement Criteria, Defendants argued that all outstanding obligations (with the exception of a specific 1998 Audit Recommendation), were to be addressed through the Evaluative, Disengagement Criteria. Defendants believe that the Court's October 2012 Order and the JCA Appointment Order supported their position that all outstanding obligations were to be disengaged by the Remedial Plan. *Id.* at 11.

In the Joint Status Report (JSR), Chief Magistrate Judge Molzen noted Plaintiffs' position that Defendants had previously contended, for over a year, that any remedial plan should <u>not</u> replace or modify any existing orders, including the JSD, the Plan of Action, and Appendix A. Instead, the remedial plan was to "define the standards for compliance with these orders." JSR at 5 (Doc. No. 1986). But, at least as of July 2014, Defendants contended that virtually all outstanding obligations should be addressed through the anticipated remedial plan. *Id.* at 9. In

---

[20] The process contemplates that Defendants will submit a request for disengagement of specific Evaluative, Disengagement criteria to the JCA, who must make a written "determination" regarding whether the Evaluative, Disengagement Criteria are met. If the JCA does not agree that the criteria are met, Defendants may withdraw their request for a determination, or they may pursue a motion for disengagement with the Court. Doc. No. 2073. As of May 2016, the JCA has issued approximately three determinations on Defendants' requests. One determination was favorable to Defendants (S1.1.1), Doc. Nos. 2080, 2095, and the other two indicate that the JCA was not satisfied that Defendants had met the criteria (S1.1.4a and SE3.6). The Court wonders if this process will streamline disengagement, particularly where there appear to be about 197 more Evaluative, Disengagement Criteria for which the JCA must issue preliminary determinations. *See* Jackson Quarterly Report, 4/15/16 (Doc. No. 2101) (listing all Evaluative, Disengagement Criteria). Although the Quarterly Report indicates some tasks were completed on specific dates, there are not corresponding Stipulations or Orders of Disengagement as to the various "completed" Evaluative, Disengagement Criteria. Thus, the Court assumes that almost all of the Evaluative, Disengagement Criteria must still be satisfied.

contrast, Plaintiffs argued that "all [pre-existing] court orders that [were] not related to the JCA Plans regarding Health, Safety, or Supported Employment" would remain in effect, including, those parts of the JSD, the Plan of Action, and Appendix A that had not yet been disengaged. *Id.* Thus, as of July 2014, the parties did not agree what effect, if any, the Evaluative, Disengagement Criteria would have on the orders and obligations that predated the Court's October 2012 Order. *See id.* at 5–6.

The Court resolved this dispute by finding that the Evaluative, Disengagement Criteria "d[id] not replace or modify existing obligations that were not the subject of Plaintiffs' Noncompliance Motion" and the Court's October 2012 Order. Doc. No. 1996 at 64. This meant that Defendants still had to demonstrate substantial compliance with the earlier outstanding obligations, in addition to the Evaluative, Disengagement Criteria. *Id.*

The Court, however, is sympathetic to Defendants' argument that the Evaluative, Disengagement Criteria added almost two hundred requirements atop some of Defendants' previous, outstanding obligations in the JSD, the Plan of Action, and Appendix A. Yet, Defendants were required to resolve numerous violations found to exist in late 2012, which involved developing a new plan or approach as of that date. It might have been more straightforward had the remedial plan and the resulting Evaluative, Disengagement Criteria simply replaced all earlier obligations. Moreover, utilizing the Evaluative, Disengagement

Criteria to supplant earlier orders might have eliminated the problem of trying to determine whether Defendants have complied with obsolete obligations.[21]

   III.   Summary of Defendants' Outstanding Obligations

Defendants' present obligations can be divided into two groups: 1) the JSD, the Plan of Action, and Appendix A (1997–2005) obligations; and 2) Revised Table IV (2012–2015) obligations. "Plaintiffs' Corrected Matrix of Remaining Obligations: August 12, 2014" (Corrected Matrix) sets out a 27–page list of all of the 1997–2005 obligations. Doc. No. 1996–2. *See also* Doc. No. 2041–1 at 32–51. The parties' Revised Table IV contains all of the 2012–2015 obligations. Doc. No. 2041 at 1–31; Doc. No. 2046.

The Corrected Matrix indicates by gray highlighting all of the 1997–2005 obligations that are addressed by 2012–2015 obligations and that were raised by Plaintiffs' Renewed Noncompliance Motion. *See* Doc. No. 1996 at 9 n.9. The parties agreed to formally disengage the 1997–2005 obligations marked with gray highlighting because the Revised Table IV obligations supplanted or rendered moot the gray highlighted obligations. August 2015 Stipulation and Order of Disengagement (Doc. No. 2052). For example, the 2015 Stipulation and

---

[21] The Court does not know why the parties could not agree on final Evaluative, Disengagement Criteria that would address all outstanding obligations along with the 2012 violations. Agreement on a single set of obligations could have simplified an already tangled procedure that continues to require Defendants to satisfy numerous sets of obligations set forth in multiple, overlapping orders, some of which must be disengaged through different processes. *Compare, e.g., Evans v. Fenty*, 701 F.Supp.2d 126, 129 (D.C.Ct. 2010) (after a series of consent orders and remedial plans, the parties "jointly agreed" on a single plan of compliance). The parties' inability to agree makes it difficult to understand the obligations still to be satisfied. Moreover, the parties' disagreement on almost innumerable issues does not appear to advance the interest of a dwindling class of developmentally disabled individuals or the citizens of New Mexico.

Order of Disengagement terminated the Court's oversight of specific obligations in the Plan of Action, Appendix A, and the Ashton Recommendations.[22] *Id.*

Therefore, to sum it up,[23] Defendants still must show substantial compliance with approximately 307 obligations, made up of the following: 1) 96 obligations in the Plan of Action and Appendix A;[24] 2) 14 (of 70) obligations in the JSD; 3) an unspecified number of Ashton Recommendations; and 4) 197 obligations in the Revised Table IV.[25] *See* Comprehensive List of Outstanding Obligations and Timetable (Doc. Nos. 2041, 2046), August 2015 Stipulation and Order of Disengagement (Doc. No. 2052), and April 15, 2016 Jackson Quarterly Report (Doc. No. 2101).

IV.     Consent Decrees and Substantial Compliance

The Court has previously noted that the pertinent orders in this case, including the JSD, Plan of Action, and Appendix A are, in essence, consent decrees that are treated like contracts. October 2012 Order at 20. Revised Table IV is also treated as a consent decree. Defendants must demonstrate substantial compliance with the obligations in all of these orders.

---

[22] It is somewhat misleading to say the Court's oversight of these obligations is terminated since it does not appear that Plaintiffs necessarily agree that Defendants have substantially complied with these obligations. Instead, it may be more accurate to say that the Court continues oversight of some or all of these obligations as set forth under a different set of corresponding or related obligations in Revised Table IV.

[23] After carefully compiling this lengthy list of pertinent orders, the Court still is not certain that it has a correct tally of obligations or a list of obligations that pertains to real needs of the remaining JCMs. The parties and the Court sometimes try to quantify this case to bring it into focus, e.g., 29-year old case, 200-plus page opinion, 200-plus page Remedial Plan, 116 Objections, 99 alleged violations, and 288 remaining JCMs. But, the true focus of this case should be to define the required services and benefits that will actually address the needs of the remaining JCMs in the most cost-effective manner.

[24] These 96 obligations include 10 obligations identified as 1997 Plan of Action "Outcome B CIMS ACT 1-10," which may be eliminated from the total if specific final Evaluative, Disengagement Criteria supplanted these obligations. *See* Doc. No. 2041–1 at 32. However, the Court did not find a Stipulation to this effect. The Court will conduct a status conference in the near future at which counsel may wish to correct the Court's tally of obligations, as needed.

[25] There may be additional obligations the Court has failed to mention, e.g., "the JSD in its entirety, except the continuous improvement sections," the "Mortality Review Order," and the "IFC/MR Stipulation." Corrected Matrix (Doc. No. 1996–2) at 27. The Court has not located descriptions of these obligations.

The doctrine of "substantial compliance" derives from contract law. Substantial compliance "assist[s] the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract." *Id.* (citations omitted). A determination of substantial compliance involves an analysis of whether Defendants have "frustrated the purpose" or the essential requirements of the consent decree. *Id.* In its October 2012 decision, the Court found that the "essential purposes of the JSD, [Plan of Action], and Appendix A are to provide class members with adequate health care, a reasonably safe environment, and supported employment opportunities." *Id.* at 33.

Despite failing to demonstrate substantial compliance with all of the above-described orders and requirements, Defendants argue that significant changes of factual conditions and "sensitive federalism issues" justify Rule 60(b) relief in the form of "relief from all orders filed in the case." Motion at 16–17.

V.      Rule 60(b)(5) Relief

A.  *Legal Standard*

Rule 60 provides, in part, that a court may relieve a party from a judgment, order or proceeding if "applying [a judgment or order] prospectively is no longer equitable[.] Fed. R. Civ. P. 60(b)(5). A Rule 60(b) motion "must be made within a reasonable time …." Fed. R. Civ. P. 60(c)(1).

In *Rufo v. Inmates of Suffolk Cnty. Jail (Rufo),* 502 U.S. 367 (1992) and in *Horne v. Flores,* 557 U.S. 433 (2009), the United States Supreme Court examined whether the lower courts had applied the correct standards in deciding Rule 60(b)(5) motions. In both cases, the Supreme Court remanded so that the district courts could apply the correct standards in evaluating the Rule 60(b) motions. Both cases are instructive.

18

1.   *Rufo v. Inmates of Suffolk Cnty. Jail (Rufo)*

In *Rufo,* the Supreme Court made clear that Rule 60(b)(5) relief was available to modify

consent decrees "in response to changed circumstances." *Rufo*, 502 U.S. at 380. *See also Horne*

*v. Flores*, 557 U.S. 433, 439 (2009) (Rule 60(b)(5) provides the vehicle for arguing that

continued enforcement of a judgment was inequitable due to changed circumstances)."Because

such decrees often remain in place for extended periods of time, the likelihood of significant

changes occurring during the life of the decree is increased." *Id.* at 380 (citation omitted).

Modifications of consent decrees are sometimes warranted where the changes in circumstances

are beyond the defendants' control and "were not contemplated by the court or the parties when

the decree was entered." *Id.* at 380–81. However, the Supreme Court declined to adopt a test

requiring the movant to show that modification of a decree was only warranted where a change

of facts was unforeseen and unforeseeable. "Litigants are not required to anticipate every

exigency that could conceivably arise during the life of a consent decree." *Id.* at 385.

The Supreme Court also instructed that a flexible approach to modifying consent decrees

"is often essential to achieving the goals of reform litigation." *Id.* at 381 (citation omitted). *See,*

*e.g., New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir.),

*cert. denied*, 464 U.S. 915. 967 (1983) ("the power of a court of equity to modify a decree of

injunctive relief is long-established, broad, and flexible"). In addition, "the public interest is a

particularly significant reason for applying a flexible modification standard in institutional

reform litigation because such decrees 'reach beyond the parties involved directly in the suit and

impact on the public's right to the sound and efficient operation of its institutions." *Rufo*, 502

U.S. at 381 (citation omitted). "[A] court should surely keep the public interest in mind in ruling

on a request to modify based on a change in conditions making it substantially more onerous to abide by the decree." *Id.* at 392.

"[T]he party seeking modification of a decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* at 384. The Court examines whether significantly changed factual conditions exist that make compliance with a decree "substantially more onerous" or "unworkable because of unforeseen obstacles" *Id.* (citation omitted). In addition, sufficiently changed conditions exist if enforcement of a decree without modification would be detrimental to the public interest. *Id.*

If Defendants meet their burden, the Court should consider if the proposed modification "is suitably tailored to the changed circumstance." *Id.* at 383, 391. A modification of a consent decree should not violate the "basic purpose of the decree," *id.* at 387, and "must not create or perpetuate a constitutional violation," *id.* at 391. Nor should modification of a decree "strive to rewrite a consent decree so that it conforms to the constitutional floor." *Id.* The focus should be on "whether the proposed modification is tailored to resolve the problems created by the change in circumstances." *Id.*

The *Rufo* Supreme Court advised that, "[w]ithin these constraints," the Court should "keep the public interest in mind" where changed circumstances make it "substantially more onerous [for the State] to abide by the decree." For example, the State's financial constraints "are a legitimate concern of government defendants in institutional reform litigation and are relevant in "tailoring a consent decree modification." *Id.* at 392–93.

2. *Horne v. Flores (Horne)*

In *Horne*, the Supreme Court again examined the application of Rule 60(b)(5) in "institutional reform litigation" but this time in the context of a request to modify a litigated

judgment rather than a consent decree. *Horne*, 557 U.S. at 441. Nonetheless, the Supreme Court, in *Horne*, discussed consent decree cases extensively.

In *Horne,* the Supreme Court observed that "institutional reform injunctions often raise sensitive federalism concerns," which are heightened when "a federal-court decree has the effect of dictating state or local budget priorities." *Id.* at 448. The Court reasoned that states have limited funds and that when a federal court orders money to be appropriated in one program, "the effect is often to take funds away from other important programs." *Id.* (citation omitted). The Court further noted that "[w]here 'state and local officials . . . inherit overbroad or outdated consent decrees that limit their ability [to] respond to the priorities and concerns of their constituents,' they are constrained in their ability to fulfill their duties as democratically elected officials." *Id.* at 449 (citations omitted).

The Supreme Court recognized the need for courts to take a "flexible approach" in addressing Rule 60(b)(5) motions in the context of consent decrees. *Id.* at 450. "A flexible approach allows courts to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Id.* (citation omitted). "[T]he longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic process." *Id.* at 453.

A critical question in the Rule 60(b)(5) inquiry is "whether the objective of [the consent decree, order or judgment] has been achieved." *Id.* at 450. Under those circumstances, "[i]f a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.*

B.  *Defendants' Positions*

Defendants attempt to show changed circumstances through arguments that: 1) their obligations have increased in number and complexity to the point of being unattainable; 2) some obligations have become outdated and obsolete; 3) the constitutional violations have been remedied; and 4) the costs of litigation have increased. Based on these changed circumstances, Defendants contend that the interests of federalism require the Court to vacate all existing orders and to terminate this litigation.

1.  Increased number and complexity of obligations

Defendants argue that they will never be able to catch up to the "labyrinth of obligations" that are "ever-changing and ever-increasing" and that this proceeding has "evolved into a litigation industry, with Hydra-like divisions of requirements that, when satisfied, [are] replaced or enhanced by others." Motion at 2, 3. Defendants claim, in part, that the JCA and Revised Table IV complicated and improperly expanded Defendants' obligations. *See id.,* at 30–32. Similarly, according to Defendants, Plaintiffs have not promoted resolution of this proceeding as instructed by the Court, but have, instead, prolonged it by setting the stage "for future hearings, meetings, briefing, and related litigation activities." *Id.* at 28. Thus, increased contractual obligations, many of which are not subject to objective measurement, comprise "changed circumstances" that Defendants believe justify Rule 60(b)(5) relief. *See id.* at 28–29.

2.  Outdated obligations

Defendants assert that some of their obligations are now outdated, *e.g.*, 1) the JSD provisions about community practice improvements at the Los Lunas Hospital & Training School, which are no longer relevant as that institution closed in 1997, *id.* at 21–22; 2) the JSD formula for disengagement of the Continuous Improvement outcomes, which is "convoluted,"

"confusing," and "unworkable," *id.* at 22; 3) the JSD Continuous Improvement obligations that "are no longer programmatically sound and are no longer the desire" of the JCMs," and that are not relevant to the present-day needs of JCMs, *id.* at 23–24; 4) the 1997 Plan of Action obligations that have been "morphed into new requirements" under Revised Table IV and that are "long detached from remedying the original constitutional issues," *id.* at 24; and 5) Appendix A obligations that consist of vague and aspirational language, making disengagement impossible, *id.* at 26–27.

### 3.   Remedied constitutional violations

Defendants represent that they long ago remedied the past constitutional violations of federal law. "[T]he state has complied with the consent decree and cured the constitutional violations, and [has] progressed far beyond the constitutional violation threshold." *Id.* at 5. Based on the argument that the constitutional violations have been remedied, Defendants ask the Court to make a determination that the contractual obligations "are at a point where further federal oversight and monitoring is no longer necessary …." *Id.* Defendants assert that the Court's continued oversight exceeds its jurisdiction to remedy the underlying constitutional violations. *Id.* at 6. Thus, while Defendants concede that they have not substantially complied with all of the specific obligations in the JSD, the Plan of Action, Appendix A, and Revised Table IV, *see id.* 8–9, they assert that their correction of constitutional violations justifies Rule 60(b)(5) relief. *See id.* at 32, 44–52.

In relation to their position that they have remedied all constitutional violations, Defendants argue they have corrected all 18 areas of deficiencies that the Court identified in its 1990 Order. In support, Defendants discuss in some detail each of these 18 areas along with actions they have taken that purportedly show they have resolved the deficiencies. *Id.* at 33–44.

For example, to show they have addressed the first two areas of deficiencies (Individual Program Plans and Medical Records), Defendants refer to exhibits attached to their opposed First Rule 60(b)(5) Motion filed in 2011, that the Court never decided. *Id.* at 33, 41 (citing Doc. Nos. 1830–3 and 1830–9). In some instances, Defendants cite to orders that disengaged specific obligations. *See id.* at 37. Defendants also rely on argument alone as proof that they have adequately addressed the original 18 areas of deficiencies. *See id.* at 33–44.

In addition, Defendants assert that this litigation has lost its initial focus of correcting the 18 areas of deficiencies, and, instead, has been derailed to require "continued quality improvement," which, by definition, is a never ending process. *Id.* at 44. Defendants argue that disengagement will never be achieved "if the basis for disengagement is completion of the State's natural process of quality improvements." *Id.*

### 4.   Increased costs of litigation

Defendants state that the State has expended more than 50 million dollars related to this litigation in the last eight years. *Id.* at 30. In fiscal year 2015, the overall litigation costs exceeded $5.6 million," including $838,852.00 for the JCA alone.[26] The Community Monitor was paid $1,044,835.00, *id.* at 29, although this fee is presumably part of the $5.6 million calculation. The State also must compensate Plaintiffs' attorneys, and additional experts and consultants, which again are fees that probably make up part of the $5.6 million.

Defendants assert that the average yearly cost to provide services to the JCMs has risen from $67,290.00 to $135,535.00 (per JCM) in 2009, while New Mexico's $32,992.00 per capita income was the ninth lowest among the United States. *Id.* at 47. To continually allocate limited

---

[26] The State has continued to incur litigation costs of over $5 million each year from 2009 forward. Motion at 47–48. Thus, it is not clear that the litigation costs have significantly increased from 2009 to fiscal year 2015. But, Defendants state that for fiscal year 2016, they have estimated a supplemental budget request in the amount of $2,554,589.00 to address new *Jackson* obligations and that they will need to request a supplemental amount of over $3 million for fiscal year 2017. *Id.* at 48.

resources to the JCMs removes the State's ability to fund other important programs. "[F]or every million dollars in state funds expended on Jackson related court oversight, approximately fifty additional people can be provided with Home and Community Based Services (DD Waiver)." *Id.* at 48.[27]

### 5.   Federalism interests

Based on these purported changed circumstances, Defendants contend that important notions of federalism support the requested Rule 60(b)(5) relief. Defendants represent that federalism concerns are heightened where, as here, "a federal-court decree has the effect of dictating state or local budget priorities." *Id.* at 18. *See also* Reply at 2. Defendants take the position that the consent decrees at issue "improperly deprive state officials of their designated legislative and executive powers," s*ee id.* at 19, and that various state administrations have been shackled by overbroad or outdated consent decrees that limit their abilities to respond appropriately to constituent concerns, s*ee id.* at 45. According to Defendants, continued federal court monitoring improperly impinges on New Mexico's sovereignty where ongoing violations of federal law no longer exist. *Id.* at 44.

Defendants blame the "JCA and experts" for "interfere[ing] with basic government operations beyond what is necessary to remedy the initial constitutional violations[,]" *id.* at 17 n.1, the Plaintiffs for perpetually increasing Defendants' obligations, *id.* at 27, and the Court for its "ever-expanding expectations that have made disengagement "impossible," *id.* at 17. In sum, Defendants assert that the Court should terminate its oversight and vacate all existing orders because the "objects" of the consent decrees have been attained. *Id.* at 45. Thus, Defendants argue that responsibility for the State's obligations should be promptly returned to the State and its officials. *Id.* at 19.

---

[27] Defendants provide no supporting data for this assertion.

C.  *Plaintiffs' Positions*

Plaintiffs contend that this is Defendants' sixth attempt to vacate all of the Court's orders without a showing of substantial compliance with their obligations. They also argue that Defendants should not be permitted to raise these arguments in the "guise of a Rule 60(b) motion" without having appealed the Court's previous rulings. Response at 1, 2. *See also* Response at 24–27 and 32–34 (setting out summaries of Defendants' previous motions and arguments that Defendants' Motion is an impermissible collateral attack on orders, etc.). The Court does not find these arguments persuasive and, therefore, does not address them.[28]

Plaintiffs' most persuasive arguments for denying the requested Rule 60(b)(5) relief are that Defendants have <u>not</u>: 1) shown sufficient changed circumstances; 2) demonstrated satisfaction of the basic purposes of the consent decrees; 3) demonstrated substantial compliance of their obligations; and 4) presented evidence that a durable remedy is in place. *See* Response at 6–8, 11–13, 31, 38–39.

VI.    <u>Analysis</u>

A.  *Changed Circumstances*

In analyzing Defendants' Rule 60(b)(5) request to modify the pertinent orders, the Court first examines whether Defendants have met their burden of showing that significant changes of circumstances warrant revision of the pertinent orders. *Rufo*, 502 U.S. at 384. Here, Defendants do not actually ask for a partial revision or modification of the orders, but, rather, for a wholesale vacatur of all orders and decrees and for the termination of this proceeding.

---

[28] The Court might have considered an argument that Defendants' Motion is untimely under language of Rule 60(c)(1). *See, e.g., Evans,* 701 F. Supp. 2d at 157 (noting that the defendant's Rule 60(b)(5) request for relief based on a change of law came "decades too late, long after the entry of countless remedial orders, many of which defendant agreed to and all of which were relied upon these many years by the Court, the Special Masters, the plaintiffs and the Department of Justice."). However, Plaintiffs did not urge the Court to deny the Motion based on Rule 60(c)(1)'s requirements that a motion be filed "within a reasonable time."

It is tempting to find that changed circumstances exist, e.g., in the forms of a web of increased and overlapping obligations, greater litigation costs and decreased state budgetary allocations, a reduction of the class size by almost 50%, and the competing needs of New Mexico's non-class member citizens for already limited disability services. [29]

The Court understands Defendants' position that their task has become incomprehensible, if not insurmountable. And, while Defendants' obligations are onerous, the question for purposes of deciding this motion is <u>when</u> did the changed circumstances occur? Some of the complained about developments have been happening for years. For example, did Defendants' obligations increase significantly in 1997, 2005, 2012, or later? Defendants never identify the dates of these changed circumstances or explain why they did not pursue the requested Rule 60(b)(5) relief earlier.

Significantly, Defendants have not satisfied their burden of showing that "the objects of the decree have been attained." *See Horne*, 557 U.S. at 452 (citation omitted). Defendants repeatedly argue that the "goal of the Jackson litigation is to restore Class Members as victims of constitutional discriminatory conduct to the position they would have occupied absent that conduct." Reply at 2, 3, 4, 8, 17, 19, 20. In support, Defendants cite *Milliken v. Bradley*, 418 U.S. 717 (1974).

The Court does not disagree that "the remedy [to address a constitutional violation in a disparate treatment case] is necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken*, 418 U.S. at 746. But, this Court clearly informed the parties in 2012, that the "essential purposes" of the JSD, Plan of Action and Appendix A "are to provide class members with adequate health care, a reasonably safe environment, and supported employment

---

[29] Defendants did not make all of these arguments.

opportunities." October 2012 Order at 33. Thus, these are the more specific "essential purposes" that the Court examines in deciding if the objects of the pertinent orders have been satisfied. Without question, the obligations in the JSD, Plan of Action, Appendix A, and Revised Table IV encompass health, safety, and supported employment services. Based on Defendants' concessions that they have not substantially complied with all of these obligations, the Court concludes that Defendants have not fulfilled the essential purposes of the pertinent decrees.

In addition, Defendants claim that they long ago remedied all constitutional and federal law violations identified in 1990, and that, therefore, court monitoring is no longer warranted. Reply at 1, 3. For example, Defendants state that they resolved "the original eighteen violations" that the Court found in 1990. According to Defendants, the remaining outstanding obligations do not flow from the original violations and are not limited to restoring the JCMs to the positions they would have occupied before the Court's 1990 Order.

The argument is somewhat misleading. The Court did not find 18 single, isolated violations in 1990. Instead, the Court concluded that there were deficiencies in 18 different areas, including broad categories like medical records, discharge plans, behavior management, programming, staffing, and training. October 2012 Order at 9. The Court then required the parties to develop detailed plans of action to address these deficiencies. *Id.* at 9–15. Contrary to Defendants' position, the obligations in the JSD, Plan of Action, and Appendix A all flowed from the Court's original findings of violations in 1990. *See, e.g.,* JSD ¶ 5 (stating that JSD's purpose was to define actions and requirements which Defendants had to complete and the services, etc. that had to be provided to JCMs "to comply with [Defendants' obligations to classmembers under the Court's orders in this case").

The same is true of Revised Table IV, which was developed in response to the 2012 findings of approximately 100 violations. The Court correlated its specific findings of violations in 2012 with enumerated requirements in the JSD, Plan of Action, and Appendix A. *See, e.g.,* October 2012 Order at 161 (Court's conclusions of law regarding compliance with Plan of Action Appendix 10). Stated differently, the October 2012 violations evolved from compliance issues concerning obligations that first appeared in the JSD, Plan of Action, and Appendix A that Defendants had not yet satisfied.

Defendants' position that they have remedied the "underlying federal constitutional and federal violations," is related to their argument that "the Court has not found any ongoing violations of federal law[.]" Reply at 5. Defendants state that the Court "importantly found [in its October 2012 Order at 203] that there were no continuing violation[s] of federal law …." Again, Defendants' argument is misleading. In October 2012, the Court made no findings as to "continuing violations of federal law." Plaintiffs' Renewed Noncompliance Motion (Doc. No. 1888) asserted that Defendants had failed to comply with specific health, safety, and supported employment obligations and that Defendants' failure to supply certain services violated § 504 of the Rehabilitation Act of 1973 (Rehabilitation Act) and the Americans with Disabilities Act (ADA) by discriminating against persons with severe disabilities. The Court found that while there were substantial compliance issues with the obligations in the JSD, Plan of Action and Appendix A, there was not sufficient evidence of discrimination under either the Rehabilitation Act or the ADA. October 2012 Order at 203–204.

Even if the Court's October 2012 findings are construed as findings of no "continuing" statutory violations under the Rehabilitation Act, the Court was not asked and made no findings as to whether Defendants continued to violate the JCMs' constitutional rights. Thus, it simply

cannot be said that the Court has determined there are no continuing violations of statutory *and constitutional* law. While Defendants complain that Plaintiffs have not identified in the record where the Court found violations of law in 2012, it is Defendants' burden to show that changed circumstances warrant relief under Rule 60(b)(5). And, Defendants have failed to supply citations to the record where the Court concluded that Defendants are no longer violating the JCMs' statutory and constitutional rights.[30]

Moreover, to the extent Defendants are attempting to rely on an argument that compliance with federal law or satisfaction of a constitutional minimum is enough to justify the requested modification, *see* Reply at 7, the Court is unpersuaded. Parties may agree to a series of measures designed to remedy constitutional violations even if those measures involve more extensive relief than the Constitution itself requires. *See, e.g., Wyatt, By & Through Rawlins v. King,* 803 F. Supp. 377, 388 (M.D. Ala. 1992) (collecting cases involving parties' agreement to provisions in a consent decree that exceeded the requirements of federal law). *See also Evans*, 701 F. Supp. 2d at 165 (district court did not accept the defendant's "exceedingly broad interpretation of *Horne"* whereby a defendant's agreement to take measures that exceeded a constitutional floor would necessarily be unenforceable); *Frew v. Hawkins*, 401 F. Supp. 2d 619, 635 (E.D. Tex. 2005), *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006) (finding that the pertinent consent decree did not merely require compliance with federal law, but rather, the decree spoke to broader terms negotiated by the parties). Here, the parties entered into a number of consent decrees to cure the original violations found by the Court, as well as agreements to take certain measures that flowed from those violations.

---

[30] Presumably, the Court could only reach these types of conclusions of law based on a presentation of evidence. Unlike the defendants in *Burt v. County of Contra Costa*, 2014 WL 253010, Case No. 73-cv-00906-JCS (N.D. Ca. Jan. 22, 2014), who presented affidavits, charts, exhibits, and other evidence in support of their argument that they had satisfied the purpose of the consent decree, Defendants did not produce evidence to support their Rule 60(b)(5) Motion and instead, primarily rely on argument.

The Court acknowledges that Defendants do not admit there are "continuing violations of law" and do not admit that any of the "series of orders entered" is evidence of a violation of law. Reply at 11–12. But, Defendants concede that they have not demonstrated substantial compliance with over 300 obligations, *see* Motion 8–9, assuming the Court has accurately estimated the remaining number of outstanding obligations. Because all of these outstanding obligations grew out of the Court's 1990 Order and/or the related 2012 findings of violations, Defendants have not convinced the Court that they have satisfied the essential purposes of the JSD, Plan of Action, Appendix A, and Revised Table IV. Similarly, the Court is not in the position to assess, and, therefore, cannot conclude that Defendants are no longer violating constitutional or federal law. Thus, the Court will continue its oversight of this litigation.

Defendants also rely heavily on principles of federalism as support for Rule 60(b)(5) relief. They go so far as to argue that federalism principles "define the legally appropriate objectives against which to measure substantial compliance." Reply at 3. Defendants may mean that principles of federalism should supplant the substantial compliance test. *See id.* at 10.

While the Supreme Court in *Horne* emphasized the appropriateness of "heightened" federalism concerns in cases where a federal consent decree has the effect of dictating state budget allocations, *Horne*, 557 U.S. at 448, the Supreme Court, first and foremost, asked if, during the intervening years of attempted compliance, the State "was fulfilling its obligations" to comply with the pertinent statutory requirements. *Id.* at 439. In other words, federalism concerns alone did not prompt the Supreme Court to overturn an earlier denial of the Rule 60(b)(5) motion and to remand for further proceedings. Rather, the Supreme Court first looked at whether the defendant was fulfilling its obligations in view of specific changes, *e.g.*, the State's adoption of specific regulations, Congress' enactment of a related law, reforms in the community, and

increased overall funding. *Id.* at 459–69. The critical inquiry was whether the defendant had achieved the objectives of the pertinent order.

Here, the Court recognizes the importance of federalism principles and was mindful, as indicated in 2012, that the "officials of the State must be presumed to have a high degree of competence" in discharging the State's responsibilities. October 2012 Order at 20 (citation omitted). Defendants' obligations appear to have multiplied over the years to the point of becoming onerous. Clearly, increasing fees and costs associated with this litigation are detrimental to the State's interest. In addition, more than 25 years of orders and stipulations have restricted the State's ability to make basic decisions concerning its budget. And, sadly, it is doubtful that the outlay of over 5 million dollars of attorney's fees and costs every year is directly assisting the JCMs.

The Court would jump at a legitimate opportunity to conclude its oversight of this case, *e.g.,* if Defendants had provided supported reasons to vacate all of the existing orders and decrees. But, this, Defendants have not done. Unlike *Horne*, Defendants have not shown that they have fulfilled their outstanding obligations, "by other means." *Horne*, at 439 (concluding that these "other means" included the passage of specific legislation, modification of existing regulations, and/or development of new policy insights).

The Court applies a flexible standard in analyzing Defendants' Motion and certainly does not seek to deprive State officials of their powers and responsibilities. But, the Court will not apply principles of federalism in a vacuum where Defendants have not presented sufficient changed circumstances in the first place to warrant the requested relief.

B.  *Suitably Tailored Modification*

Under the second *Rufo* prong, the Court examines whether "the proposed modification is tailored to resolve the problems created by the change in circumstances." *Rufo,* at 391. *Rufo* instructs that the Court should do no more than equity requires. *Id.*

The Court need not reach the second prong of the *Rufo* test having concluded that Defendants have not met their burden of establishing significant changes of circumstances that warrant the requested Rule 60(b)(5) relief. Moreover, neither party pays much attention to the second prong of the *Rufo* test. *See* Motion at 18 (setting forth the standard without any discussion of why vacatur of all orders is a "suitably tailored" modification); Response at 30 (noting that Defendants could have sought modification of specific provisions but did not). However, the Court will address this prong since Defendants have not come close to showing that vacatur of all of the orders and decrees is suitably tailored to the proposed changed circumstances.

Defendants never state why their request for vacatur of all orders and dismissal of this litigation is a suitably tailored modification. However, in support of their request, Defendants cite *Burt v. County of Contra Costa*, 2014 WL 253010, Case No. 73-cv-00906-JCS (N.D. Ca. 2014), and *Calderon v. Wambua*, 2012 WL 1075840, No. 74 Civ. 4868 (LAP) (S.D.N.Y. 2012). Motion at 48–52. *Calderon* is distinguishable because the district court was asked to vacate only specific paragraphs of a decree rather than the entire consent decree. *See also Rufo*, 502 U.S. at 389 n.12 (Supreme Court did not have before it the question of whether the entire decree should be vacated).

Only in *Burt* did the defendants ask the Court to vacate the entire decree. 2014 WL 253010, at *1. *Burt* is distinguishable in a number of significant ways. First, the parties entered into the pertinent consent decree "without any finding or adjudication on the merits of the case

33

….." *Id.* at *2. Second, in support of the defendants' argument that they had fulfilled the purpose of the consent decree, they offered significant evidentiary support, as well as identification of new legislation aimed at accomplishing the goals of the litigation. *Id.* at *5–8. Third, while the Court noted the defendants' failure to meet "precisely" the "numerical tests" and/or to attain the 80% goal, the defendants offered evidence that they were "approximately 70% of the way." *Id.* at *1. Fourth, the Court noted it had broader discretion than the traditional "substantial compliance" test under Rule 60(b)(5) due to language in the consent decree allowing the parties to seek to vacate the decree after just five years "on the ground that 'further supervision by the Court is not necessary.'" *Id.* at *11. The Court found persuasive the defendants' evidentiary proof as well as the legislative expansion of legal remedies and the passage of a pertinent municipal ordinance. *Id.* at *13–15.

In contrast to *Burt,* Defendants have not demonstrated that they are close to reaching their targets in all areas. They admit, for example, that only one third of the Appendix A requirements have been disengaged. Motion at 9. Nor is the Court persuaded by Defendants' argument alone that they have satisfied the goals of this litigation.

Defendants' position advocating a blanket dismissal of this litigation may be premised on an argument that the Court need not engage in continued oversight over this matter where no ongoing constitutional or statutory violations exist. However, the Court has already explained that it did not previously conclude Defendants were no longer engaging in a constitutional violation and that it could not reach that legal conclusion based on Defendants' argument alone.

If Defendants had demonstrated sufficient changed circumstances to warrant Rule 60(b)(5) relief, the Court would have been amenable to reviewing suitably tailored modifications of pertinent orders. For example, the Court would have considered a request to disengage

specific requirements if Defendants had demonstrated that specific: 1) required actions are obsolete or duplicative of other requirements; 2) regulations or programs by the State make enforcement of some requirements no longer necessary; 3) obligations are no longer realistically achievable; 4) obligations in some regions of New Mexico have already generally been fulfilled; and/or 5) agreements by the parties that waive certain obligations. In other words, the Court is willing to consider proposals to revise Defendants' obligations if the proposed modifications of orders are sufficiently tailored to the changed circumstances. But, at this point, the Court does not find that wholesale vacatur of all of the orders and dismissal of this litigation is suitably tailored or warranted. *See, e.g., Frew v. Hawkins,* 401 F. Supp. 2d at 683 (noting the "radical nature of a court's dissolving a consent decree in its entirety") (citation omitted).

C. *Durable Remedy*

In addition to satisfying both prongs of the *Rufo* test, Defendants must show that a "durable remedy" is in place. *Horne*, 557 U.S. at 450.

> This may be accomplished by showing that the objectives of the order or decree have been "attained," *Frew*, 540 U.S. at 442, 124 S.Ct. 899, and that it is unlikely that the prohibited conditions or actions will recur, *Dowell*, 498 U.S. at 247–48, 111 S.Ct. 630 (requiring defendants to show that "it was unlikely that the school board would return to its former ways"). *See Horne*, 129 S.Ct. at 2618 (Breyer, J., dissenting) (where the requested relief "amounts to having a 'decree set aside entirely,' " the movant must show "that it is unlikely, in the absence of the decree, that the unlawful acts it prohibited will again occur") (*quoting Frew*, 540 U.S. at 442, 124 S.Ct. 899).

*LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 111 (D.D.C. 2010), *aff'd sub nom.*

*LaShawn A. ex rel. Moore v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011).

Defendants' support for a durable remedy rests, in part, on arguments that Defendants have "cured" the original 18 violations and that Defendants are no longer violating Plaintiffs'

constitutional rights, Reply at 16–18, arguments the Court has already rejected. Defendants also rely on a previous statement by the Court that "class members' quality of life has vastly improved since the filing of this lawsuit in 1987." *Id.* at 17. But, that statement alone does not address questions about mechanisms for sustained or future compliance. Moreover, Defendants' assertion that they have in place "new policies, new partnerships, new emphasis on training and quality assurance, new enforcement mechanisms, sustained funding and new approaches to serving the developmentally disabled population" and that "these changes have been institutionalized" is conclusory. With so many obligations still to be attained, the Court cannot make the leap requested by Defendants. Thus, the Court concludes that Defendants have not demonstrated that a durable remedy is in place sufficient to justify vacatur of all of the Court's orders.

IT IS THEREFORE ORDERED that Defendants' VERIFIED RULE 60(b)(5) MOTION AND SUPPORTING MEMORANDUM TO TERMINATE ALL REMAINING ORDERS IN JACKSON et al. v. FSH&TS et al. (Doc. No. 2053) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE