IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WALTER STEPHEN JACKSON, et al.,

        Plaintiffs,

vs.                                                               CIV No. 87-0839 JP/KBM

LOS LUNAS CENTER FOR PERSONS with
DEVELOPMENTAL DISABILITIES, et al.,

        Defendants,
and

ARC of NEW MEXICO,

        Intervenors,
and

MARY TERRAZAS, et al.,

        Intervenors pro se.

## MEMORANDUM OPINION AND ORDER
## ON DISCOVERY DISPUTE ON RULE 60(b) MOTION

In 1990, the Honorable James A. Parker expressly found that "Defendants' failure to accommodate the severely handicapped in existing community programs while serving less severely handicapped peers is unreasonable and discriminatory." *Jackson by Jackson v. Fort Stanton Hosp. & Training Sch.*, 757 F. Supp. 1243, 1299 (D.N.M. 1990), rev'd in part, 964 F.2d 980 (10th Cir. 1992). This finding came in his conclusions of law section regarding statutory discrimination claims brought pursuant to Section 504 of the Rehabilitation Act. *Id.* at 296-99. Judge Parker further found that "where reasonable accommodations in community programs can be made, defendants' failure to integrate severely handicapped residents into community programs which presently serve less severely handicapped residents violates § 504." *Id.* at 1299.

He additionally concluded that Defendants were violating class members' substantive due process rights. *Id.* at 1306-07, 1312.

At his direction, the parties worked in good faith and finally agreed to the entry of a consent decree to correct the deficiencies he had identified. That decree, with numerous additions and modifications to it, has been in existence for almost three decades with continuing oversight by the federal district.

In June 2016, Judge Parker rejected Defendants' contention that changed circumstances made continuing federal court involvement inequitable such that all remedial orders should be vacated and federal court oversight discontinued. *Jackson v. Los Lunas Ctr.,* 2016 WL 9777237 (D.N.M. June 14, 2016). He disagreed with Defendants' assertion that he had found no ongoing violations of federal law in his 206-page October 12, 2012 decision, *Doc. 1930*, following a trial on Plaintiffs' Renewed Motion for Further Remedial Relief to Remedy Noncompliance. Rather, he stated that the court "is not in a position to assess, and, therefore, cannot conclude that Defendants are no longer violating constitutional or federal law." *Jackson v. Los Lunas Ctr. for Persons with Developmental Disabilities ("Jackson III")*, 2012 WL 13076262, at *76 (D.N.M. Oct. 12, 2012). Instead, Judge Parker noted "so many obligations" of the consent decrees were not yet fulfilled and "conclude[d] that Defendants have not demonstrated that a durable remedy is in place sufficient to justify vacatur of all the Court's orders." *Id.* at *18.

On appeal of that decision denying Rule 60(b) relief, the Tenth Circuit determined that

> the district court's analysis on this point was too narrow, focusing almost entirely on whether defendants had fulfilled the numerous, detailed obligations provided in the consent decrees. But because Defendants move on the ground that continued enforcement of the consent decrees is no longer equitable, the district court should have "ascertain[ed] whether ongoing enforcement of the [decrees] was supported by an ongoing violation of federal law," *see Horne*, 557 U.S. at 454 – here, whether Defendants are violating class members' rights under the

2

substantive due process component of the Fourteenth Amendment and under the Rehabilitation Act.

*Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1206 (10th Cir. 2018). The Tenth Circuit therefore remanded the case back to Judge Parker with instructions that "the court should consider the broader question of whether the State is meeting the requirements of the Fourteenth Amendment and the Rehabilitation Act by means other than those stated in the consent decrees." *Id.* at 1206. In doing so, the court is to "make up-to-date findings" and if no violations of federal or constitutional law are found, "assess the durability of that compliance." *Id.* at 1207.

It is against the above backdrop that this Court now addresses the discovery dispute at hand in preparation for the trial on the remanded issues that Judge Parker will hold next Spring. Specifically, Plaintiffs seek production of certain information and data about non-*Jackson* class members to which Defendants have objected.

Plaintiffs contend that they require information about non-class members to demonstrate a continuing violation of Section 504 under the theory that the State's policies and practices discriminate against the more severely disabled while accommodating the needs of the less severely disabled. In other words, they put forth a "disparate impact" argument for relevance of the requested data. Defendants counter that a showing of "disparate impact" is not the applicable standard for a Section 504 claim; rather, Defendants argue that "meaningful access" to services forms the proper inquiry for such a claim by class members. Thus, Defendants maintain, information regarding services provided to non-class members is simply irrelevant.

Defendants posit that the "Supreme Court has specifically held that disparate impact, by itself, does not state a prima facie case under § 504." Walz Letter of July 20, 2018 (Attachment A) (citing *Alexander v. Choate*, 469 U.S. 287 (1985)). In his 2012 decision, Judge Parker acknowledged that the *Alexander* case stood for the proposition "that an otherwise

3

qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." *Jackson III,* 2012 WL 13076262, at *76 (D.N.M. Oct. 12, 2012). He further recognized that "the Rehabilitation Act and ADA do not guarantee 'equal results' for disabled individuals." *Id*. (citing *Cohon ex rel. Bass v. New Mexico Dept. of Health,* 646 F.3d 717, 729 (10th Cir. 2100). Nevertheless, Judge Parker found that the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 n.10 (1999), "provides a more than adequate ground for concluding that Plaintiffs can sue under the Rehabilitation Act and the ADA for discrimination claims based on severely disabled persons being treated differently than less severely disabled persons." *Jackson III,* at *77.

Moreover, Judge Parker indicated that "[u]nlawful differential treatment claims can be brought under two legal theories: disparate treatment or disparate impact" and that a disparate impact claim "does not require proof of an intent to discriminate, but, instead, mandates a showing that a policy caused a disparate effect." *Id.* Although Judge Parker went on to find that Plaintiffs failed to demonstrate an intent to discriminate on Plaintiffs' Section 503 disparate *treatment* claims, he did not address any potential Section 503 disparate *impact* claims, which do not implicate an intent to discriminate.[1] This Court notes that disparate impact claims, usually seen in the context of employment discrimination, require statistical analysis of accumulated data and expert testimony as to the significance of the statistical information.

---

[1] As Plaintiffs acknowledged in a motion *(Doc. 1936)* asking Judge Parker to vacate his 2012 findings on the Section 504 claims, it was their own briefing that misled Judge Parker into thinking that they were raising disparate treatment, rather than disparate impact, claims pursuant to the statute. Although Judge Parker denied the motion and declined to amend his findings of no direct evidence of disparate treatment, he did not address any claims as to alleged disparate impact resulting from the State's policies and practices. *See Doc. 1946.* Instead, he offered to Plaintiffs an opportunity to file a motion as to their supported employment claims showing an inference of discriminatory intent by indirect evidence using the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 3. Plaintiffs did not do so.

Given all these observations, this Court finds that some of the information requested by Plaintiffs as to non-class members is intended to lead to admissible evidence showing that the State's system currently violates Section 504 by providing lesser disabled individual with more meaningful access to services than those more severely disabled. But the Court must question whether non-class member data can be truly said to represent a group lesser disabled than the *Jackson* class members. Such an inference seems supportable because the *Jackson* class members were institutionalized based upon the severity of their developmental disabilities. Presumably, only a portion of the non-class members would be at the same end of that spectrum such that the non-class group *on average* could be considered lesser disabled. Again, the Court questions how the numerous variables will influence the data and the validity of conclusions drawn, but that is the job of the experts at trial – not the undersigned referred magistrate judge.

As to each of the categories of information sought as to non-class members, the Court will balance the relevance asserted by Plaintiffs (as to alleged disparate impacts in the delivery of services and/or the showing of a durable remedy after court oversight is terminated) against the asserted burdens of production cited by Defendants.

*1. DHI Incident Management Database on Abuse, Neglect, and Exploitation ("ANE")*

According to Plaintiffs, this "IMB database provides information on the number of reports of abuse, neglect and exploitation for all individuals in New Mexico's DD System and the amount of time Defendants take to complete their investigations and to take needed corrective action." Cubra Letter of July 13, 2018 at 4 (Attachment B). With the above caveat as to the validity of assuming non-class members truly represent a lesser disabled population, the Court finds that the information is discoverable for analysis of disparate impact and the durability of the system as a whole to address ANE issues. The Court is unpersuaded by

Defendants' argument that it would be unduly burdensome to produce the database as it exists. Any confidentiality issues can be addressed by the entry of a protective order, and would not require the State to expend its resources redacting information.

*2. DHI Quality Management Database on Provider Quality Review*

Again, the Court finds that this information may be relevant in analyzing alleged disparity in the provision of services among individuals with varying levels of severity of disability. In addition to the proposed analysis of the data for comparing class-members to non-class members, the information may also be relevant on the durable remedy inquiry. For instance, a remedy in place for the *Jackson* class members that is unavailable for non-class members may inform as to the system-wide durability of the remedies provided by Defendants. The Court will order production of the database pursuant to a confidentiality order.

*3. Databases relating to Employment Support*

Plaintiffs reference a DVR Database, DDSD databases on day and employment service, and other databases regarding Strike Force, SELN or wage and hour reports, and characterize the information as essential in demonstrating disparity in service depending on the severity level of disability. Unlike the previous databases for which discovery is ordered, the Court has no firm understanding of what databases truly exist in this area and is less able to articulate their relevance or ascertain the burden in finding and producing the requested data. Therefore, the Court, if needed, will meet with counsel, who will bring their staff members with the technical expertise to better inform the discovery decision-making process to assure proportionality.

*4. DDSD Database on Aspiration*

Plaintiffs say they need this information "to ascertain the status of aspiration risk management for class members from 2013 to present." Clearly, this goes to the substantive due

process issues related to healthcare and meaningful access to services. The relevance of non-class member information, however, is not as obvious. It is certainly not obvious to the Court that the factors affecting the level of risk for aspiration pneumonia can easily correlate to generalized categories of "severe" or "less severe" developmental disability. Thus, the Court orders disclosure of this information as to *Jackson* class members only.

*5. DDSD Database on General Events Reporting ("GER")*

The GER database in Therap tracks injuries and incidents, and DDSD mandates that Providers enter that information. With the same caveat expressed above, the Court finds the information including both class members and non-class members potentially relevant and discoverable. Moreover, it appears that Defendants can produce this database pursuant to an agreed upon protective confidentiality order without undue burden.

*6. DOH Databases on Supports Intensity Scale ("SIS")*

Despite their position that this information is irrelevant, Defendants indicate that they will comply with my previous oral order to produce the SIS group data. As I explained when we conferred, I believe this information will be of assistance to both sides in helping Judge Parker to assess the validity of any comparison data derived from production of the non-class member information.

*7. DDSD Database on Therap*

The maintenance of consistent, complete and up-to-date medical records of *Jackson* class members has been a concern for the Court for decades in assuring their health and safety. Plaintiffs want any Therap audit reports as to non-class members' medical records regarding the accuracy, timeliness and completeness of those records for comparison purposes. Specifically, Plaintiffs want such reports to see if there is a difference among severity levels of disability in

triggering DOH intervention based on such an audit report and the efficacy of the DOH response. If such a Therap audit exists, Defendants are to produce it pursuant to a protective confidentiality order.

*8. Medicaid and DDSD Databases on Durable Medical Equipment*

Plaintiffs relate that in the past, the *Jackson* Coordinating Committee received periodic reports from DOH's Clinical Services Bureau regarding "gasps (sic) in therapy services" and from Specialty Services regarding delays in providing equipment and services. If such spreadsheets or reports have been prepared regarding non-class members, Defendants will provide that information to Plaintiffs for their assessment of any differences relating to severity level of disability.

Counsel are to meet and confer to address any unforeseen issues raised by the above rulings and to discuss the most efficient way to produce the information found to be discoverable. The parties will also submit to my chambers a proposed protective confidentiality order governing the production of both the class and non-class member information. Further, I will ask for an update on compliance with this Order at the August 14, 2018 Quarterly Meeting.

**IT IS SO ORDERED.**

_____
**HON. KAREN B. MOLZEN**
**UNITED STATES MAGISTRATE JUDGE**