**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


WALTER STEVEN JACKSON, et al.,

　　　　　　　　Plaintiffs,

vs.　　　　　　　　　　　　　　　No. CIV 87-839 JAP/KBM

LOS LUNAS CENTER, et al.,

　　　　　　　　Defendants,

and

THE ARC OF NEW MEXICO,

　　　　　　　　Intervenors,

and

MARY TERRAZAS, et al.,

　　　　　　　　Intervenors, pro se.


**MEMORANDUM OPINION AND ORDER**
**APPROVING SETTLEMENT AGREEMENT**

　　　Plaintiffs Walter Stephen Jackson et al. (Plaintiffs), Intervenor Arc of New Mexico (Arc) and pro se Intervenors Mary Terrazas, et al. (jointly, Intervenors), and Defendants Los Lunas Center, et. al. (Defendants), seek final approval of a joint settlement agreement[1] that provides a resolution to a dispute over Defendants' treatment of class members.

---

[1] *See* JOINT MOTION TO FINALLY APPROVE SETTLEMENT AGREEMENT (Joint Motion for Final Approval) (Doc. No. 2299), SETTLEMENT AGREEMENT (Doc. No. 2299-1) (Settlement Agreement) and JOINT MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF THE PARTIES' SETTLEMENT AGREEMENT (Doc. No. 2300) (Joint Memorandum).

On April 17, 2019, the parties jointly filed a motion asking the Court to give preliminary approval to the Settlement Agreement.[2] On April 18, 2019, the Court held a hearing on the motion. During the hearing, counsel clarified provisions of the Preliminary SA. On April 19, 2020, the Court approved the Preliminary SA as clarified and directed the parties to issue Notice to all Plaintiff Class Members and Intervenors.[3]

On June 4, 2019, the parties filed their Joint Motion for Final Approval, Joint Memorandum, and final Settlement Agreement, which as directed by the Court's Preliminary Approval Order, clarified the language of the Preliminary SA.[4]

On June 12, 2019, the Court held a hearing on final approval of the Settlement Agreement. Present for the Plaintiffs were Steven Schwarz, Peter Cubra, Cathy Costanza, Tim Gardner, Philip Davis, Ann McCartney, and Debra Poulin. Present for Defendants were Jerry A. Walz, Kathyleen Kunkel, Billy Jimenez, Jason Cornwell, and Matthew Garcia. Present for the Intervenors were Maureen Sanders and Jacqueline Mader.[5] At the hearing the following five guardians and/or family members of Jackson class members addressed the Court with expressions of concern: Julie Bisbee, Hector Romero, Audrey Quintanta, Therese Quintana Doolittle, and Sophia Nolte. Prior to the hearing, pro se Intervenor Ava Peets filed written comments expressing concern,[6] and at the hearing, she addressed the Court.

---

[2] *See* JOINT MOTION TO PRELIMINARILY APPROVE SETTLEMENT AGREEMENT (Doc. No. 2289) (Motion) and SETTLEMENT AGREEMENT (Doc. No. 2289-1) (Preliminary SA).
[3] *See* ORDER PRELIMINARILY APPROVING SETTLEMENT AGREEMENT (Doc. No. 2292) (Preliminary Approval Order).
[4] *See* JOINT MOTION TO FINALLY APPROVE SETTLEMENT AGREEMENT (Doc. No. 2299) (Joint Motion for Final Approval); SETTLEMENT AGREEMENT (Doc. No. 2299-1) (Settlement Agreement); JOINT MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF THE PARTIES' SETTLEMENT AGREEMENT (Doc. No. 2300) (Joint Memorandum).
[5] Several individuals who have a long history with this case were present in the gallery including: Dr. Sue Gant, former Jackson Compliance Administrator and her staff Eva Kutas and Jodi Simmons; Lyn Rucker, Community Coordinator; and former Director of the Arc of New Mexico, Veronica Chavez Newman.
[6] *See* COMMENTS (Doc. No. 2297).

After considering the long history of the case, the Settlement Agreement, the arguments of counsel, and the comments of pro se Intervenor, guardians and/or family representatives of members of the class, the Court will grant final approval of the Settlement Agreement. Additionally, the Court will vacate the Scheduling Order.[7] Moreover, the Court will vacate all other orders in this case except *Jackson by Jackson v. Fort Stanton Hosp. and Training School*, 757 F. Supp. 1243 (D. N.M. 1990) *rev'd in part,* 964 F.2d 980 (10th Cir. 1992) (*Jackson I*) (Doc. No. 679),[8] the Memorandum Opinion and Order (Doc. No. 831) (granting Plaintiffs' motion to amend the Complaint by interlineation to include a claim under the American with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (ADA)), and the Memorandum Opinion and Order (Doc. No. 890) (reconfiguring the class).

## I.    <u>STANDARD OF REVIEW</u>

A trial court has the discretionary authority to approve a settlement of a class action. *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984). Federal Rule of Civil Procedure 23(e) provides the following procedure:

> (e) Settlement, Voluntary Dismissal, or Compromise. The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> > (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
> > (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> > (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
> > …
> > (5) Any class member may object to the proposal if it requires court approval

---

[7] See ORDER GRANTING JOINT MOTION TO EXTEND DEADLINES (Doc. No. 2287).
[8] The Intervenors appealed *Jackson I*, arguing "that the court erred by enjoining defendants from considering the present availability of community facilities when deciding whether to recommend a resident for community placement." *See Jackson by Jackson v. Fort Stanton Hosp. and Training School,* 964 F.2d 980, 987 (10th Cir. 1992). The Tenth Circuit agreed with the Intervenors and reversed the Court solely on that issue.

under this subdivision (e); the objection may be withdrawn only with the court's approval.

The notice requirements of Rule 23 are designed to satisfy due process by providing class members notice of settlement and a right to be heard. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974). "[N]otice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* at 174 (internal quotation marks omitted) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) and like cases).

Under Rule 23(e)(2) a court may approve a settlement agreement as fair, reasonable and adequate if the settlement agreement meets four criteria: (1) the settlement was fairly and honestly negotiated; (2) serious legal and factual questions place the litigation's outcome in doubt; (3) the immediate recovery is more valuable than the mere possibility of a more favorable outcome after further litigation; and (4) the parties believe the settlement is fair and reasonable. *Tennille v. Western Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015). "[T]he district court must independently analyze the evidence *before* it in making its determination[.]" *Gottlieb v. Wiles*, 11 F.3d 1004, 1015 (10th Cir. 1993) (emphasis in original) *abrogated on other grounds by Devlin v. Scardelletti*, 536 U.S. 1 (2002).

## II.  **BACKGROUND**

This civil rights class action began 32 years ago on July 8, 1987 when 21 individual developmentally disabled citizens of New Mexico on behalf of themselves and other similarly situated individuals (JCMs)[9] filed a complaint to "redress the unconstitutional and illegal conditions" at Fort Stanton Hospital and Training School (Fort Stanton) and Los Lunas Hospital

---

[9] JCMs is an abbreviation of "Jackson Class Members."

and Training School (Los Lunas) (jointly, institutions) that operated, in part, with federal funds.[10] Defendants were the institutions and individuals operating the institutions. On June 27, 1988, the Court granted parents and guardians of some of the residents of the institutions leave to intervene,[11] which they did on July 6, 1988.[12]

On October 16, 1989, the merits trial commenced. On December 28, 1990, the Court ruled that Defendants had violated the JCMs' rights under § 504 of the Rehabilitation Act and the substantive due process clause of the Fourteenth Amendment of the United States Constitution. *See Jackson by Jackson v. Fort Stanton Hosp. and Training School*, 757 F. Supp. 1243 (D. N.M. 1990) *rev'd in part,* 964 F.2d 980 (10th Cir. 1992) (*Jackson I*). Since 1990, the parties have attempted to resolve compliance issues and achieve disengagement of Defendants' obligations to the JCMs.

## A.      Jackson I

In *Jackson I*, the Court made detailed findings of fact. The Court found 18 areas where Defendants' operation of state supported institutions for the developmentally disabled were deficient under federal law and the Constitution.[13] The Court ordered the parties to create a

---

10 *See* COMPLAINT (Doc. No. 1). The Court certified the class on May 23, 1989. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 395). On February 24, 1995, the Court granted the Plaintiffs' motion to reconfigure the class. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 890). The Jackson class consists of all persons who were residents at Fort Stanton and Los Lunas on July 8, 1987, the date of filing the Complaint, all persons who became residents of those institutions while the litigation was pending; and all those who were transferred from those institutions to skilled nursing facilities, intermediate care facilities, homes for the aged and similar facilities and whose service were funded in whole or in part by Defendants. *Id.*

11 *See* ORDER (Doc. No. 163). There were over 125 Intervenors. The Intervenors sought to require the Defendants to bring the institutions into compliance with federal law and the United States Constitution but opposed any effort to close the institutions and transition the residents to community-based facilities.

12 *See* COMPLAINT IN INTERVENTION (Doc. No. 171).

13 The areas were: "(1) Individual program plans, (2) Medical records, (3) Discharge plans, (4) Data collection, (5) Qualified mental retardation professional services, (6) Behavior management, (7) Use of physical restraints, (8) Prevention of abuse of residents, (9) Reduction of accidents and injuries to residents, (10) Reports of abuse, accidents and injuries, (11) Staff supervision, (12) Preservice training of staff, (13) In-service training of staff, (14) Sufficiency of professional staff, (15) Adaptive equipment, (16) Functional and chronologically age appropriate programming, (17) Coordination between residential areas and training program areas, and (18) Inadequate space in training program area. *Jackson I*, 757 F. Supp. at 1315-16.

written plan of correction at each institution for each of the 18 identified deficiencies. The parties were to submit the plan to the Court no later than April 1, 1991. *Jackson I*, 757 F. Supp. at 1315. The plan was to include the following: a detailed written policy to be followed by each institution; identification of an individual who would be responsible for implementing the policy; a strategy for achieving the goals of the corrective plans; a timetable with guidelines for achieving the specific components of each plan; and a means of assuring continued compliance with the adopted standards. *Id.* at 1316. The Court asked that the plan of correction establish a timetable for correcting all deficiencies by September 10, 1991. *Id.*

On September 27, 1991, Defendants completed a Systemic Plan, which was amended on November 19, 1993. On January 4, 1993, Defendants promulgated new polices and procedures for institutions which were reported to the Court on February 17, 1993.[14] On November 9, 1993, Plaintiffs moved to amend the Complaint by adding a claim under the American with Disabilities Act, 42 U.S.C. § 12101 *et seq.*,[15] which the Court granted on January 27, 1994.[16]

In April 1994, the parties filed a joint motion under Rule 60(b)(5) to modify *Jackson I* as it applied to Fort Stanton because by 1995, Fort Stanton would no longer serve JCMs.[17] The Court granted the motion on June 27, 1994, relieving Defendants from making further improvements to Fort Stanton.[18] In March 1995, Fort Stanton closed, and all residents were transferred to community-based services.

---

[14] *See* JOINT STATUS REPORT FOR 1992 (Doc. No. 769).
[15] *See* PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT BY INTERLINEATION (Doc. No. 803).
[16] *See* MEMORANDUM OPINION AND ORDER (Doc. No. 831) (Order Granting Leave to Amend).
[17] *See* DEFENDANTS' AND PLAINTIFFS' JOINT MOTION FOR MODIFICATION OF DECEMBER 28, 1990 ORDER (Doc. No. 841) and DEFENDANTS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR MODIFICATION OF DECEMBER 28, 1990 ORDER (Doc. No. 842).
[18] *See* ORDER CONCERNING FORT STANTON (Doc. No. 893).

In July 1997, after all residents in Los Lunas transitioned to community-based services, Los Lunas also closed.

## B.    Consent Decrees

After *Jackson I*, the Court entered various remedial orders and actively oversaw their enforcement. During the pendency of this case, there have been four consent decrees.[19] In 1997, the Court entered the first two consent decrees, a Joint Stipulation on Disengagement (JSD) and its attached Plan of Action.[20] In subsequent years, the Court entered two additional consent decrees: in 2005, Appendix A,[21] and the 2015 Revised Table IV.[22] All four documents attempt to resolve the areas of noncompliance identified in *Jackson I*. Each consent decree imposes additional obligations on Defendants.

### i.    JSD

In October 1997, the parties presented the Court with a joint motion requesting the Court approve their proposed JSD with a Plan of Action. The JSD states the criteria and process for disengagement from most of the identified obligations. *Id.* at 20-25. Because both institutions had closed, the JSD focused on preventing future harm to Plaintiffs' rights in community settings. *See* JSD (Doc. 1047-1) at 14. Toward that end, the JSD groups a specific area of obligations, identified as "Continued Improvement of Community Services," for a different disengagement procedure. To disengage from those obligations, Defendants were required to conduct an annual community audit and achieve a certain score for four years. *Id.* at 14-17.

---

[19] The Court has found that these orders are consent decrees and the parties agree. *See Jackson II*, 2016 WL 9777237 at *9.
[20] *See* ORDER APPROVING STIPULATION ON DISENGAGEMENT (Doc. No. 1064)
[21] *See* ORDER ADOPTING JOINT STIPULATION (Doc. No. 1474) (Appendix A)
[22] *See* ORDER AMENDING TABLE IV (FINAL EVALUATIVE COMPONENTS) (Doc. No. 2044); STIPULATION AND ORDER OF DISENGAGEMENT (Doc. 2052) (adopting Revised Table IV).

After a fairness hearing regarding the JSD on November 20, 1997, the Court entered an Order approving the JSD.[23]

The JSD set a December 31, 1998 deadline for disengagement of most of its obligations but indicated that certain requirements would not be met until December 31, 2000. *Id.* at 20. These deadlines were not met.

### ii. Plan of Action

In addition to the JSD, the parties prepared a Plan of Action,[24] which was meant to provide a structure to enhance the community services system. *See* JSD (Doc. 1047-1) at 28.[25] Initially, the 1997 Plan of Action comprised thirteen components in thirteen appendices. Each appendix listed specific activities with their desired outcomes.[26] Over time, two additional appendices were added.[27]

### iii. Appendix A

On May 20, 2005 the parties submitted Appendix A, which sought to resolve pending motions and to detail actions that would bring the Defendants into compliance with the JSD.[28] Appendix A contains a list of over 100 additional agreed actions which were meant to "facilitate compliance with the JSD, to promote completion of certain 1998 Audit Recommendations, to further address Case Management even though Plan of Action Desired Outcomes related to Case

---

[23] *See* ORDER APPROVING STIPULATION ON DISENGAGEMENT (Doc. No. 1064).

[24] It does not appear that the 139-page Plan of Action was docketed although the Court has a copy of the twice revised plan in its files.

[25] When citing to the JSD, the Court will use the numbers the Clerk has stamped in the upper right-hand corner.

[26] The Appendices included: (1) quality enhancement, (2) community incident management system, (3) training, (4) management information systems, (5) individual service planning, (6) case management, (7) behavioral services, (8) crisis response, (9) sexuality, (10) supported employment, (11) assistive technology, (12) medical services, (13) regional offices. Plan of Action (1047-1) at 29.

[27] The two additional appendices included the 1996 Audit Recommendations and the Ashton Recommendations. On April 29, 1999 and on May 31, 2000, the Plan of Action was revised. *See Jackson II*, 2016 WL 9777237 at *3.

[28] *See* JOINT STIPULATION ON AGREED ACTIONS TO COMPLY WITH [JSD] AND PLAN OF ACTION AND TO RESOLVE PENDING MOTIONS TO SHOW CAUSE AND TO RE-ENGAGE (Doc. No. 1473).

Management have been previously disengaged by an order of the Court and to address certain aspects of Vocational Rehabilitation." Appendix A (Doc. 1473) at 1-2. Each action had a deadline, with the last one scheduled to be completed by the end of fiscal year 2007. Notably, the additional obligations in Appendix A did not change or end Defendants' obligations under the JSD and the Plan of Action. On May 20, 2005, the Court entered an Order approving Appendix A.[29]

### iv. *2015 Revised Table IV*

Between 2007 and 2010, Plaintiffs filed motions asserting that Defendants were non-compliant with the JSD, with the Plan of Action, and with Appendix A by failing to provide the JCMs adequate health care, a reasonably safe environment, and supported employment services.[30] The Court responded to the Plaintiff's first motion by appointing a Rule 706 expert.[31] The Court denied the second motion, deciding that an evidentiary hearing was necessary to examine the issues raised by the Plaintiffs.[32] The evidentiary hearing occurred in June 2011.

After the evidentiary hearing, but before the Court issued a ruling, on November 2, 2011, Plaintiffs filed an opposed motion asking the Court to appoint a Jackson Compliance Administrator (JCA).[33] On November 14, 2011, Plaintiffs renewed their motion for remedial

---

[29] ORDER ADOPTING JOINT STIPULATION (Doc. No. 1474).
[30] *See* PLAINTIFFS' MOTION FOR FURTHER REMEDIAL RELIEF TO ADDRESS DEFENDANTS' NONCOMPLIANCE (Doc. No. 1590) and MOTION FOR FURTHER REMEDIAL RELIEF TO ADDRESS DEFENDANTS' NONCOMPLIANCE (Doc. No. 1731).
[31] On December 21, 2007, the Court appointed Dr. Sue Gant as a Rule 706 Expert. *See* ORDER APPOINTING RULE 706 EXPERT (Doc. No. 1610). As a Rule 706 Expert, Dr. Gant was "to substantially assist the Court in the determination of compliance with the orders of the Court, including the Joint Stipulation on Disengagement, the Plan of Action, the 1998 Audit Recommendations and the May 21 [sic], 2005 Stipulation and Appendix A." *Id.* at 1.
[32] *See* ORDER (Doc. No. 1798).
[33] *See* PLAINTIFFS' MEMORANDUM CONCERNING THE COURT'S AUTHORITY TO APPPOINT A JACKSON COMPLIANCE ADMINISTRATOR (Doc. No. 1882) and Defendants Response, DEFENDANTS' MEMORANDUM REGARDING THE COURT'S AUTHORITY TO APPOINT A JACKSON COMPLIANCE ADMINISTRATOR (Doc. No. 1885).

relief.[34] On October 12, 2012, the Court entered findings and conclusions and an order based on the evidentiary hearing.[35]

In the 2012 Order, the Court found that Defendants were not in substantial compliance "with many outstanding health care, safety, and supported employment obligations" of the JSD, the Plan of Action, and Appendix A. 2012 Order (Doc. 1930) at 200. The Court granted Plaintiffs' motion to appoint a JCA, whose role as an administrator would have the "appropriate expertise and availability to prod Defendants into substantial compliance." *Id*. On January 11, 2013, the Court vacated the Order Appointing the 706 Expert (Doc. 1610) and appointed Dr. Sue Gant as the JCA.[36]

To address violations identified in the 2012 Order, the JCA, Plaintiffs, and Defendants were to develop a consolidated plan in the areas of health, safety, and supported employment. On June 12, 2015, the parties submitted a final list of objectives in the 2015 Revised Table IV.[37] Like Appendix A, the 2015 Revised Table IV did not replace existing decree obligations.[38] In addition to the obligations defined in the 2015 Revised Table IV, Defendants had to demonstrate substantial compliance with still outstanding obligations in the JSD, the Plan of Action, and Appendix A.

## C.    Rule 60(b)(5) Motions

Rule 60(b)(5) states that a court may relieve a party from a judgment, order, or proceeding if "applying [a judgment or order] prospectively is no longer equitable[.]" Fed. R.

---

[34] *See* RENEWED MOTION FOR FURTHER REMEDIAL RELIEF TO REMEDY NONCOMPLIANCE (Doc. No. 1888).
[35] *See* FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER (Doc. No. 1930) (2012 Order).
[36] *See* ORDER APPOINTING JACKSON COMPLIANCE ADMINISTRATOR (Doc. No. 1942).
[37] *See* ORDER AMENDING TABLE IV (FINAL EVALUATIVE COMPONENTS) (Doc. No.2044); NOTICE OF SUBMISSION OF REVISED TABLE IV (Doc. No. 2046); STIPULATION AND ORDER OF DISENGAGEMENT (Doc. No. 2052) (adopting Revised Table IV)
[38] *See* COMPREHENSIVE LIST OF OUTSTANDING OBLIGATION AND TIMETABLE (Doc. No. 2041) (attaching a list of all outstanding obligations and timetable).

Civ. P. 60(b)(5). The Defendants have filed three motions[39] under Fed. R. Civ. P. 60(b)(5) seeking to end the Court's oversight of this class action.

On April 2, 1999, Defendants filed their first Rule 60(b)(5) motion, asking the Court to dismiss the case and vacate the JSD because they had an Eleventh Amendment defense to the case and it was no longer equitable that the judgement should have prospective application.[40] On September 7, 1999, the Court denied the motion.[41] The Court found that Defendants did not have an Eleventh Amendment immunity defense to this case because the JSD "does not invade a 'special sovereignty interest' of the State and does not provide for a form of improper legal relief." Order (Doc. No. 1132) at 14.

On April 26, 2011, the day before the pretrial conference scheduled to address the upcoming 2011 evidentiary hearing, Defendants filed their second Rule 60(b)(5) motion, asking the Court to vacate all existing orders and to end oversight of the case for the following reasons: 1) Defendants had made a reasonable effort to comply with the Court's orders; 2) Defendants had substantially complied with existing orders; and 3) changed factual circumstances made Defendant's continued compliance substantially onerous.[42] The Court suspended its ruling on the 2011 Rule 60(b)(5) Motion until after the conclusion of the 2011 evidentiary hearing so that the Defendants could cite evidence from the hearing in their briefing. *See* 2012 Order (Doc. 1930) at 12. Subsequently, the Court "terminated" the 2011 Rule 60(b)(5) Motion, which had not been fully briefed.

---

[39] In total there have been 4 Rule 60(b)(5) motions. As observed *infra* at p. 6, Defendants first Rule 60(b)(5) motion asked only to vacate the part of *Jackson I* that affected Fort Stanton.
[40] *See* DEFENDANTS' MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO Fed. R. Civ. P. 60(b)(5) and REQUEST FOR EXPEDITED ORAL ARGUMENT (Doc. No. 1101).
[41] *See* MEMORANDUM OPINION AND ORDER (Doc. No. 1132).
[42] *See* DEFENDANTS' RULE 60(b)(5) MOTION AND SUPPORTING MEMORANDUM TO TERMINATE ALL REMAINING ORDERS IN JACKSON et al. v. FSH&TS et al. (Doc. No. 1830) (2011 60(b)(5) Motion).

On August 25, 2015, Defendants filed a third motion under Rule 60(b)(5).[43] As grounds Defendants identified four changed factual circumstances: 1) Defendants' decree obligations had grown substantially and compliance had become increasingly difficult because of the numerosity of the obligations and because they were not subject to objective measurement; 2) many of Defendants' obligations had become outdated; 3) Defendants' had remedied all constitutional violations; and 4) increased litigation costs inhibited New Mexico's ability to fund other important programs. Plaintiffs opposed the motion, contending that the Rule 60(b)(5) Motion was Defendants' attempt to avoid compliance.[44] On June 14, 2016, the Court denied the Rule 60(b)(5) Motion, finding that Defendants had not met their burden. *See Jackson v. Los Lunas Center et. al.*, No. CIV 87-839, 2016 WL 9777237 (D.N.M. June 14, 2016) (*Jackson II*).

The Court held that Defendants had not shown that there had been a significant change in fact that would warrant vacatur of all orders and decrees and termination of the case. *Jackson II*, 2016 WL 9777237 at *14. The Court based its holding on the following: 1) Defendants never pinpointed a moment in the case when circumstances had changed; 2) Defendants did not show that they had provided the JCMs with the essential purposes of the obligations, specifically adequate health care, a reasonably safe environment, and supported employment opportunity; 3) Defendants had not established that they had remedied all federal statutory and constitutional violations because, as Defendants conceded, they had not complied with all consent decree obligations which flowed directly from the violations found by *Jackson I*; and finally, 4)

---

[43] *See* VERIFIED RULE 60(b)(5) MOTION AND SUPPORTING MEMORANDUM TO TERMINATE ALL REMAINING ORDERS IN JACKSON et al. v. FSH&TS et al. (Doc. No. 2053) and DEFENDANTS' REPLY IN SUPPORT OF VERIFIED RULE 60(b)(5) MOTION AND SUPPORTING MEMORANDUM TO TERMINATE ALL REMAINING ORDERS IN JACKSON et. at. V. FSH&TS et al. (Doc. No. 2071) (Rule 60(b)(5) Motion).
[44] *See* PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE ALL REMAINING COURT ORDERS AND DISMISS THE CASE (Doc. No. 2063).

federalism concerns did not mandate the Court's termination of its oversight because the State had not fulfilled its obligations under federal law. *Id.* at 15-19. Defendants appealed.

The Tenth Circuit reversed the Court, finding the Court had improperly focused on whether Defendants had substantially complied with the consent decrees, when it should have considered the broader question of whether "the State is meeting the requirements of the Fourteenth Amendment and the Rehabilitation Act by means other than those stated in the consent decrees." *Jackson v. Los Lunas Community Program et. al.*, 880 F.3d 1176, 1206 (10th Cir. 2018) (*Jackson III*). The Tenth Circuit found that two aspects of the Court's ruling required it to vacate the 2016 Order and to remand for further proceedings. *Id.* at 1204. First, the Tenth Circuit found that "the district court's determination that there are no chnged circumstances appears to be inconsistent with its factual findings." *Id.* Second, the Tenth Circuit observed that "federalism concerns are heightened here because the decrees and the court's continued oversight have 'the effect of dictating state . . . budget priorities.'" *Id.* at 1205 (quoting *Horne v. Flores*, 557 U.S. 433, 448 (2009)).

The Tenth Circuit gave the Court three issues to examine on remand: 1) Are the Defendants currently violating class members' rights under the Fourteenth Amendment and the Rehabilitation Act; 2) If Defendants are not violating the class members' rights under federal law, then is the Defendant's remedy durable; and 3) If Defendants have implemented a durable remedy, is vacatur of all pertinent orders and termination of this case appropriate. *Id.* at 1207.

On April 2, 2018, following the remand, Defendants supplemented the Rule 60(b)(5) motion.[45] The Court did not set a firm trial date, but indicated that trial would be set sometime in

---

[45] *See* DEFENDANTS' SUPPLEMENTATION TO DEFENDANTS' VERIFIED RULE 60(b)(5) MOTION AND SUPPORTING MEMORANDUM TO TERMINATE ALL REMAINING ORDERS IN JACKSON et al v. FSH&TS et al. [Doc. 2053] (Doc. No. 2188) (Supplement).

September or October of 2019.[46] From April 2018 through January 2019, the parties conducted

fact discovery related to the Rule 60(b)(5) Motion and Supplement. Ultimately, the parties

determined that "the most efficient and appropriate resolution of the Motion and this litigation is

to enter a Settlement Agreement to Resolve the Litigation." Settlement Agreement (Doc. 2299-1)

at ¶ 3.

The Settlement Agreement resolves all pending litigation disputes and is meant to

"establish a durable remedy" that will survive the dismissal of the case. *See* Joint Memorandum

(Doc. 2300) at 1-2. In their Joint Motion for Final Approval, the parties ask the Court to

determine that the Settlement Agreement is fair, adequate, and reasonable.

### D.      Settlement Agreement

The parties structured the Settlement Agreement to close the gap between Defendants'

policies and actions and thereby establish a durable remedy. The Settlement Agreement

contemplates a deadline of 18 months from the Court's final approval for completion of its

terms. The Settlement Agreement replaces all existing orders of the Court except *Jackson I*, the

Memorandum and Order approving the motion to amend the complaint (Doc. 831) and the

Memorandum and Order on class reconfiguration (Doc. 890). However, the Settlement

Agreement incorporates, as of the date of its entry, current New Mexico state policies,

procedures, practices, and waiver standards. The Settlement Agreement also introduces a new

agreement: the Qualified Provider Agreement Initiative (QPAI). The QPAI is a revised provider

agreement between the New Mexico Department of Health[47] Developmental Disability Supports

Division (DDSD) and community providers of developmental disability services.

---

[46] *See* ORDER ON AMENDED JOINT STIPULATION ON PRE-TRIAL SCHEDULE AND DISCOVERY (Doc. 2272); *see also* ORDER GRANTING JOINT MOTION TO EXTEND DEADLINES (DOC. 2287) (extending pretrial deadlines only).
[47] Hereinafter, "DOH."

The Settlement Agreement describes seven action provisions that Defendants will complete to fulfill their obligations to the JCMs. Six of the action provisions are substantive[48] and include: Incident Management, Mortality Review, Health, Provider Oversight, Supported Employment, and Individual Quality Review (IQR). The actions provisions obligate Defendants to do the following:

### i.    Incident Management

Defendants will eliminate the backlog of incident investigations, will conduct timely and adequate investigations, and will take necessary remedial actions as required by the current policies and procedures of the Division of Health Improvement of the New Mexico Department of Health (DHI).

### ii.    Mortality Review

By December 31, 2019, Defendants will eliminate the backlog of outstanding mortality reviews. Going forward they will conduct timely and adequate mortality reviews and take remedial actions as required by the current DOH/DHI policies.

### iii.    Health

There are three subdivisions under this action provision: medical, behavior, and case management. Each subdivision addresses the needs of the JCMs designated high-acuity or with high behavioral needs and provides a mechanism for evaluating individuals not currently designated high-acuity. Defendants are required to provide health related services as required by the current waiver standards. To help implement these services, new state-employed nurses will have the authority to review and monitor the health care status of JCMs under the state waiver standards and to direct corrective action if necessary. Defendants agree to continue to collect

---

[48] The first provision acknowledges that preliminary approval of the Settlement Agreement resulted in the cessation of the JCA's monitoring functions.

data on JCMs to help identify those with high behavioral needs. Data will be collected by state behavioral specialists through the review and analysis of behavioral support plans and by at least one unannounced monthly face to face visit. Defendants will also use state-employed case-management coordinators to review case management files for high-acuity/high behavioral JCMs.

### iv.    *Provider Oversight*

This subsection implements the QPAI and contemplates enforcement of its terms through DOH contract management policies and IRC policies.

### v.    *Supported Employment*

Defendants ensure they will assess each working age class member's abilities and interests as required by their policies, procedures, and waiver standards.

### vi.    *IQR*

By June 30, 2020, the current Community Monitor will have transferred the IQR process to DHI and will cease serving as Community Monitor. Defendants will hire at least five reviewers and one supervisor who will pass a core competency test to conduct the IQR thereafter. During the 2019-2020 transfer year, the Community Monitor or her designees and the state supervisor will jointly conduct the case judging process. Once Defendants have enough qualified staff, the Community Monitor will no longer use independent contractors. Disputes about whether state-employees are qualified will be resolved by the Court. Defendants will use an IQR process substantially like the one currently used by the Community Monitor through June 30, 2021. After transfer, Defendants will continue the process consistent with internal waiver standards and DHI's quality program management.

Defendants will comply with all Settlement Agreement actions until the case is dismissed.

The remaining sections of the Settlement Agreement address its implementation.

Defendant DOH will hire a consultant to assist in the implementation of the Settlement Agreement and will retain the consultant until the Court dismisses this case.

On the 15th of each month following the end of each quarter,[49] Defendants will provide data specific to each action provision to the Plaintiffs and Intervenor Arc to demonstrate Defendants are making reasonable progress. Two weeks after each production of the data, Defendants will meet with the Court.

When Defendants believe they have substantially implemented one of the action provisions, they will notify Plaintiffs and Intervenor Arc. Thirty days after submitting the notice, Defendants will file a motion seeking a finding of compliance and disengagement of the specified action provision mentioned in the notice. If the motion is contested, the parties will request a Court hearing. If the Court finds compliance, then the Court will terminate its oversight of that action provision. However, at any time, Defendants may file a motion requesting a court finding that they have complied with all action provisions, and that they have maintained compliance with all disengaged provisions of the Settlement Agreement.

The parties acknowledge that the Court maintains its inherent authority to interpret, clarify, modify or enforce this Settlement Agreement. The parties agree not to appeal a Court order that approves the Settlement Agreement.

---

[49] The required data for the first quarter will be provided on October 15, 2019, consistent with the terms of the Settlement Agreement. The next date for production of the contemplated data will be January 15, 2020.

## III.    DISCUSSION

### A.    Notice was Reasonable

Before a Court approves a settlement agreement, it must be assured that the parties have received adequate notice and a significant opportunity to be heard. *See Jones*, 741 F.2d at 325 ("The essence of procedural due process is that the parties be given notice and opportunity for a hearing."). Due process requires that the affected parties receive "'the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort.'" *Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res.*, 262 F.3d 1089, 1110 (10th Cir. 2001) (quoting *Eisen*, 417 U.S. at 174).

The parties included the proposed Notice of the Settlement Agreement in their Joint Motion for Preliminary Approval. The Notice sufficiently summarized the provisions of the Settlement Agreement and explained that class members could object to the Settlement Agreement by providing their objections in writing to the Court by May 24, 2019. The Notice further informed the JCMs and their guardians/family members that a hearing to determine whether to approve the proposed settlement would be held and gave the date and time for the hearing.

Attached to the parties' Joint Motion for Final Approval was the Declaration of Peter Cubra, Esq., counsel for the Plaintiff class, who stated that Notice was mailed by the DOH on April 23, 2019 to the last known address of members of the Plaintiff class and their guardians.[50] The Declaration discloses that after the Notices were mailed, the Plaintiffs' attorneys received the following responses:

---

[50] *See* DECLARATION OF PETER CUBRA, ESQ. REGARDING COMMENTS ON APRIL 17, 2019 SETTLEMENT AGREEMENT (Doc. No. 2299-2) (Declaration).

1) Ms. Annabelle Molina, a JCM-paid family living provider, called Plaintiff's counsel, Tim Gardner, and asked for clarification of the Notice and further stated that she wanted services to continue for the JCM living with her.

2) Ms. Ida Kasero, mother of a JCM, telephoned Plaintiffs' counsel Philip B. Davis and asked for additional information about the Settlement Agreement which he provided both orally, and with mailed copies of the (a) the Settlement Agreement; (b) Order Preliminarily Approving Settlement; (c) Notice to Plaintiff Class Members and Intervenors; and (d) Notice of Hearing. Mr. Davis advised Ms. Kasero to call if she had additional questions. As of the date of the hearing, she had not communicated further with Plaintiffs' counsel.

3) Ms. Julie Bisbee, a guardian of two JCMs, telephoned Ms. Carissa Tashiro, an attorney with Disability Rights New Mexico, and indicated that she would like to speak to the Court at the June 12, 2019 hearing. She expressed two main concerns: (a) the Settlement Agreement does not adequately address the needs of non-high-acuity JCMs; and (b) the Settlement Agreement does not contemplate the effectiveness of state-employed nurses.

4) Pro se Intervenor Ava Peets emailed a memo and a letter addressed to the Court to Plaintiffs' counsel Peter Cubra about her concerns. Her memo was docketed in the case as Comments (Doc. No. 2297). The Comments suggested improvements to the State's developmental disabilities system but did not explicitly object to approval of the Settlement Agreement. Ms. Peets also stated that she believed the JCA should continue her work and that it was "a bad idea" to discontinue the services of an outside community monitor.

Plaintiffs' counsel did not receive any other telephonic or written responses before the June 4, 2019 filing of the Declaration.

On June 12, 2019, the Court conducted a hearing on the Joint Motion for Final Approval.

At the hearing, Plaintiffs' Counsel stated that they had received the following two additional responses from JCMs' guardians/family members to the Settlement agreement:

1) Josh Hammons asked Plaintiffs' counsel to express at the fairness hearing his objection to the Settlement Agreement because he does not trust the State without the pressure of the lawsuit.

2) Paul Heck asked for clarification of the Settlement Agreement because of his concern that class members would no longer receive services once the case was dismissed. Plaintiff's counsel explained the Settlement Agreement to him.

At the hearing Ms. Peets and Ms. Bisbee spoke. Immediately before the hearing, four additional JCMs' guardians and/or family members asked to address the Court and did so. None of the six JCMs' guardians/family members who spoke objected to specific language or to the terms of the Settlement Agreement, but all expressed individual concerns about certain of the State's practices.

Defendants responded to the comments and assured the JCMs' guardians/family members that the terms of the Settlement Agreement addressed their concerns and that Defendants intended to comply. Counsel for the Plaintiffs and for the Defendants made it clear that Court approval of the Settlement Agreement does not mean the case is dismissed. The case will continue until the Court is satisfied that the Defendants have complied with all requirements of the Settlement Agreement and that a durable remedy exists.

Based on the Declaration, the telephonic response from the JCMs' guardians/family members and/or living provider, the presence and statements of the JCMs' guardians/family members, and Ms. Peet's written Comments and oral statements, the Court concludes that the

JCMs and their guardians/family members received adequate notice of the Settlement Agreement and had a significant opportunity to be heard on their concerns.

**B.      Settlement Agreement is Fair, Reasonable, and Adequate**

### 1.      *Settlement Agreement Was Fairly and Honestly Negotiated*

After the Tenth Circuit reversed the Court's denial of the Defendants' Rule 60(b)(5) Motion and directed the Court to conduct further proceedings, Defendants supplemented their Rule 60(b)(5) Motion, and the parties then estimated that approximately four weeks would be needed for an evidentiary hearing. In preparation for the evidentiary hearing, the parties conducted extensive factual discovery. At the end of the discovery period, and after reviewing the strength and weaknesses of their respective positions on the Rule 60(b)(5) Motion and Supplement, in January 2019 the parties began settlement negotiations.

Present at the face-to-face negotiations were representatives of the Defendants, the Plaintiff class, and Intervenor Arc. In their Joint Memorandum, and at the hearing, the parties described the process that resulted in the Settlement Agreement. The parties jointly assert that the Settlement Agreement was fairly and honestly reached through arms-length negotiation and helpful mediation by United States Magistrate Judge Karen B. Molzen. No JCM guardian/family member has argued or pointed to any evidence that the Settlement Agreement was the product of collusion.

The Court finds that the evidence establishes that the Settlement Agreement was fairly and honestly negotiated.

### 2.      *Serious Legal and Factual Questions Place Outcome of Litigation in Doubt*

First, the parties assert that serious legal and factual questions plague this case. The Plaintiffs' position is that factual questions remain about whether Defendants' practices indicate

ongoing federal statutory or constitutional violations of the JCMs' rights. In contrast, Defendants' stance is that while Defendants have not disengaged from all consent decree obligations, they have remedied all federal statutory and constitutional violations. Defendants' arguments find some support in *Jackson III*.

Although in *Jackson II* the Court found that Defendants have not substantially complied with all consent decree obligations, in *Jackson III*, the Tenth Circuit observed that "the obligations are merely a means of accomplishing that goal, not the end" and directed the Court to address the "broader question" of whether "the State is meeting the requirements of the Fourteenth Amendment and the Rehabilitation Act by means other than those stated in the consent decrees." *Jackson III*, 880 F.3d at 1206. The Tenth Circuit further advised that if there are no ongoing violations, and a durable remedy is in place, court oversight should end. *Id.* at 1207.

The Court believes that what constitutes a durable remedy raises yet another difficult, sticky legal issue. The Tenth Circuit stated when considering whether a remedy is durable, a district court should consider the totality of the circumstances. *Id.* at 1200. Factors indicating whether a remedy is durable include: "the party's commitment to compliance, the duration of the party's compliance with federal law, and whether or not the effects of the violation of federal law persist." *Id.* (citing *Freedman v. Pitts*, 503 U.S. 467, 491 (1992)). An examination of these factors likely would result in vigorous and lengthy litigation.

Second, the parties theorize that any ruling by the Court after an extensive evidentiary hearing on the Rule 60(b)(5) Motion and Supplement would result in yet another appeal which would have an unforeseeable impact on the JCMs. Significantly, the outcome of the appeal could

also lead to additional litigation. Moreover, the scope and nature of the prevailing party's relief cannot be predicted.

Since the inception of this case in 1987, there have been numerous evidentiary hearings, two appeals, four consent decrees, and four Rule 60(b)(5) motions. Rulings adverse to a party have resulted in additional litigation, which has not clarified the case, but instead has expanded it in complexity and scope. While the Tenth Circuit has delineated the appropriate inquiry for the Court's analysis of Defendants' Rule 60(b)(5) Motion and Supplement, the factual issues surrounding questions such as the nature and scope of a durable remedy would inevitably lead to yet more litigation. The Court finds that the evidence demonstrates both parties bear a significant risk of an adverse outcome.

### 3. The Value of an Immediate Recovery Outweighs the Possibility of Future Relief After Protracted Litigation

The ancillary costs of this case have been considerable. For 32 years this case has required the services of a federal court, the advocacy of numerous attorneys for the Plaintiffs, the Intervenors, and the Defendants and the services of a compliance monitor, a community monitor and their staff. Should this case continue, the cost of additional litigation would be substantial.

Significantly, the expense of this lawsuit also impacts the public interest. *See Jackson III*, 880 F.3d at 1205. In the last decade, Defendants have expended more than $50 million in costs related to this case, including $5 million on attorney's fees. *Id.* (observing that *Jackson II* found that Defendant's financial obligations are onerous). These expenditures have been detrimental to the State's interest and have raised federalism concerns by restricting the State's ability to make decisions about its budget. *See Id.* at 1204-05. Monies spent on the costs of the litigation might be better spent on State programs that ultimately benefit the JCMs and other state citizens. *Id.*

Many of the parties' disagreements have focused on the gap between the State's policies and procedures and its actual practices. Unfortunately, over time the numerosity of the consent decree obligations and the State's attendant work to disengage each obligation have evolved into a labyrinth of requirements that has obscured the real goal of achieving a durable remedy. *See Jackson III.* 880 F.3d at 1206. Now, the parties concur that a durable remedy is not only attainable, but structurally present in the State's current policies, procedures, and standards. The Settlement Agreement provides a clear path for the State to bring its practices into alignment with its policies. Most important, the parties agree that the State's compliance with its own polices, will establish the durable remedy discussed by the Tenth Circuit in *Jackson III.* Finally, the Settlement Agreement provides a resolution to this case by setting an 18-month deadline for the full implementation of the durable remedy, which will confer an immediate benefit on the remaining JCMs and end the ongoing uncertainty created by this litigation.

The Court finds that on balance the value of an immediate recovery to the Plaintiffs outweighs the possibility of future relief after protracted litigation.

### 4. The Parties Believe the Settlement Fair and Reasonable

In *Jackson III*, the Tenth Circuit directed this Court to determine whether Defendants have "fulfilled their federal-law obligations to class members by means other than those provided in the decrees" and to examine whether a durable remedy was in place. *Jackson III*, 880 F.3d at 1206. All parties indicate that they believe the Settlement Agreement accomplishes both purposes.

The Settlement Agreement has been negotiated by counsel for the JCMs, the Defendants, and the Intervenor Arc. The attorneys are experienced, and several have a significant background in disability law. For 32 years the parties have actively litigated this case and are familiar with its

issues. Extensive discovery has occurred both on Defendants' Rule 60(b)(5) Motion and Supplement and on a multitude of underlying issues. The parties have a clear understanding of the strengths and weaknesses of their positions in the case and agree that the Settlement Agreement is fair and reasonable.

At the June 12, 2019 hearing, pro se Intervenor Ava Peets, and JCMs' guardians/family members Julie Bisbee, Hector Romero, Audrey Quintana, Therese Quintana Doolittle and Sophia Nolte commented and expressed concerns that the State would no longer be motivated to fulfill their obligations to the JCMs should the Court vacate the consent decrees. Specifically, all six who spoke at the hearing expressed reservations about the State's ability to hire staff and compensate them adequately. Ms. Peets and Ms. Bisbee questioned the qualifications of current medical staff. Both Ms. Peets and Ms. Bisbee stated that in the past, class members had suffered adverse medical affects because of a medical provider's poor judgment. Mr. Romero, Audrey Quintana, and Therese Quintana Doolittle also expressed concern about the qualifications of state-employed medical providers and voiced dissatisfaction with certain state services, including the lack of effective communication between the state and the JCMs' guardians/family members. An additional JCMs' guardian/family member, Josh Hammons orally objected through Plaintiffs' counsel based on his distrust of the State without the pressure of the lawsuit. None of the six JCMs' guardians/family members who addressed the Court or the JCM's guardian/family member who expressed his reservations through Plaintiffs' counsel objected to the actual terms of the Settlement Agreement.

The Secretary for the DOH, Kathyleen Kunkel (Secretary) reassured each of the six JCMs' guardians/family members that their concerns were addressed in the Settlement Agreement and that the State will follow through on its stated commitment to implement the

Settlement Agreement. The Secretary further noted that there was an emergency fund for sitters, and she would address the lack of knowledge about that fund with relevant employees. All six JCMs' guardians/family members expressed satisfaction with the Secretary's statements.

The Court finds that the concerns of pro se Intervenor Ms. Peets and the JCMs' guardians/family members who commented at the hearing are appropriately addressed in the Settlement Agreement.

For 32 years the Court has overseen this case. The Court is very familiar with the issues. Mindful of the Tenth Circuit's direction to ensure that a durable remedy is in place, and the parties' confidence that the implementation of the Settlement Agreement will provide that durable remedy, the Court finds that the Settlement Agreement is fair, reasonable, and adequate. Therefore, the Court will approve the Settlement Agreement. The Court will vacate the Scheduling Order and all other orders in this case except for *Jackson I* (Doc. No. 679), Memorandum Opinion and Order (Doc. 831) (granting leave to amend), and Memorandum Opinion and Order (Doc. 890) (reconfiguring the class).

IT IS ORDERED that:

1.      The Court GRANTS the parties Joint Motion to Approve Settlement Agreement (Doc. 2299) and APPROVES the Settlement Agreement as revised (Doc. 2299-1);

2.      The Court VACATES the ORDER GRANTING JOINT MOTION TO EXTEND DEADLINES (Doc. 2287);

3.      The Court VACATES the following orders: ORDER APPROVING STIPULATION ON DISENGAGEMENT (Doc. 1064); ORDER ADOPTING JOINT STIPULATION (Doc. 1474); ORDER AMENDING TABLE IV (FINAL EVALUATIVE COMPONENTS) (Doc. No. 2044); STIPULATION AND ORDER OF

DISENGAGEMENT (Doc. 2052) (adopting Revised Table IV) and all other orders relating to and implementing the listed Orders with the exception of *Jackson by Jackson v. Fort Stanton Hosp. and Training School*, 757 F. Supp. 1243 (D. N.M. 1990) *rev'd in part,* 964 F.2d 980 (10th Cir. 1992) (Doc. No. 679); MEMORANDUM OPINION AND ORDER (Doc. No. 831) (granting Plaintiffs' motion to amend the Complaint by interlineation to include a claim under the American with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (ADA)); and MEMORANDUM OPINION AND ORDER (Doc. No. 890) (reconfiguring the class).

_____
SENIOR UNITED STATES DISTRICT JUDGE