**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

WALTER STEPHEN JACKSON, et al.,

     Plaintiff,

     vs.                                Civ. No. 87-0839 JAP/KBM

LOS LUNAS CENTER FOR PERSONS
WITH DEVELOPMENTAL DISABILITIES, et al.,

     Defendants.

and

THE ARC OF NEW MEXICO,

     Intervenors,

and

MARY TERRAZAS, et al,

     Intervenors. pro se

## MEMORANDUM OPINION AND ORDER

On October 3, 2019, Defendants filed two motions: DEFENDANTS' MOTION FOR

INJUNCTIVE RELIEF REGARDING ACTIONS OF COMMUNITY MONITOR (Doc. No.

2318) (Motion for IR); and DEFENDANTS' MOTION TO ENFORCE THE SETTLEMENT

AGREEMENT AS TO THE OPERATION OF THE INDIVIDUAL QUALITY REVIEW AND

DECLARE REVIEWER QUALIFIED (Doc. No. 2319) (Motion to Qualify). At a quarterly

meeting held on October 9, 2019, Plaintiffs argued that Defendants' Motion to Qualify was not

ripe. The Court asked for further briefing confined to that question. On October 21, 2019,

1

Plaintiffs responded to the Motion to Qualify,[1] and on October 25, 2019, Defendants replied.[2] Subsequently, on October 30, 2019, Plaintiffs responded to the Motion for IR.[3]

Both motions ask the Court to clarify the procedure outlined in ¶ 15 of the Settlement Agreement (SA) as it applies to state employees going through the qualification process to become a reviewer for the Individual Quality Review (IQR). After considering the briefs of the parties,[4] the language of the SA, and applicable law, the Court will grant, in part, Defendants' Motion to Qualify and will deny as moot Defendants' Motion for IR.

## FACTS AND PROCEDURAL BACKGROUND

The factual background of this 32-year-old case is well documented and known by all parties, and the Court will not repeat it here.

On April 17, 2019, the parties jointly filed a motion asking the Court to give preliminary approval to a settlement agreement,[5] which the Court granted on April 19, 2019.[6] On June 4, 2019, the parties filed a motion asking the Court to give final approval to the SA.[7] On June 21, 2019, the Court granted the parties' motion.[8]

The SA states that its purpose is "to memorialize a resolution that allows the Court to conclusively end this litigation and terminate all orders and decrees relating to this matter with a

---

[1] See PLAINTIFFS' INITIAL OPPOSITION TO DEFENDANTS' MOTION TO DECLARE AN IQR REVIEWER QUALIFIED (Doc. No. 2326) (Response).

[2] See DEFENDANTS' REPLY IN SUPPORT OF MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AS TO THE OPERATION OF THE INDIVIDUAL QUALITY REVIEW AND DECLARE A REVIEWER QUALIFIED (Doc. No. 2328) (Reply to Motion to Qualify).

[3] See PLAINTIFFS' AND THE ARC'S INITIAL OPPOSITION TO DEFENDANTS' MOTION FOR INJUNCTIVE RELIEF REGARDING ACTIONS OF COMMUNITY MONITOR (Doc. No. 2331) (Response to Motion for IR).

[4] Defendants have not yet replied to the Response to Motion for IR. However, because the Court does not address the merits of this motion, no reply is necessary.

[5] See JOINT MOTION TO PRELIMINARILY APPROVE SETTLEMENT AGREEMENT (Doc. No. 2289).

[6] See ORDER PRELIMINARILY APPROVING SETTLEMENT AGREEMENT (Doc. No. 2292).

[7] See JOINT MOTION TO FINALLY APPROVE SETTLEMENT AGREEMENT (Doc. No. 2299) and SETTLEMENT AGREEMENT (Doc. No. 2299-1).

[8] See MEMORANDUM OPINION AND ORDER APPROVING SETTLEMENT AGREEMENT (Doc. No. 2304) (MOO).

durable remedy in place." SA (Doc. No. 2299-1) at ¶ 1. The MOO terminated all outstanding orders and Consent decrees, excepting three: the Court's 1992 dispositive opinion, the order allowing the plaintiffs to amend the complaint and the order to reconfigure the class.[9]

## ANALYSIS

Defendants' two motions filed on October 3, 2019 arise from conflicting interpretations of ¶ 15 of the SA, which focuses on the IQR process. The IQR process is implemented by reviewers who evaluate the care of *Jackson* class members. Before becoming an IQR reviewer, an individual must become qualified through a three-step progression. At the completion of the three-steps, a reviewer will either be determined qualified or unqualified. In relevant part, ¶ 15 provides:

> The current Community Monitor, Lyn Rucker, will continue to transfer the IQR process to DHI and complete the transfer by June 30, 2020. During this transfer period, the Defendants will hire and employ a total of at least five reviewers and one supervisor, each of whom will pass a core competency test, will be mentored in at least one region, and will independently complete reviews in a second region. At that time, the Community Monitor and the state supervisor jointly will evaluate the state staff person and determine if the individual is qualified to conduct the IQR. In the event that the Community Monitor and the state supervisor disagree, the matter will be submitted to the Court which will make a final decision.

SA (Doc. No. 2299-1) at ¶ 15.

Both parties agree that historically the Community Monitor, Lyn Rucker (CM), has determined each part of the three steps. But Defendants argue that now, under the plain language of ¶ 15, only the Division of Health Improvement of New Mexico's Department of Health (DHI) may determine the requirements of each step. Accordingly, in the Motion to Qualify, Defendants ask the Court to decide that a specific state employee is a qualified IQR reviewer. Alternatively,

---

[9] *See Jackson by Jackson v. Fort Stanton Hosp. and Training School*, 757 F.Supp. 1243 (D.N.M. 1990) rev'd in part, 964 F.2d 980 (10th Cir. 1992) (Doc. No. 679; MEMORANDUM OPINION AND ORDER (Doc. No. 831)(granting Plaintiffs' motion to amend the Complaint by interlineation to include a claim under the American with Disabilities Act, 42 U.S.C. § 12101 et. seq.); and MEMORANDUM OPINION AND ORDER (Doc. No. 890) (reconfiguring the class).

Defendants ask the Court to conclude that the State has the authority to determine when a reviewer may move from one step to another. In the Motion for IR, Defendants ask the Court to conclude that ¶ 15 does not give the CM authority to enforce the three-step reviewer qualification process she has historically overseen. In opposition, Plaintiffs argue that neither issue is ripe for the Court's review, and that even if the issue was ripe, Defendants' motions should be denied as improper attempts to modify ¶ 15 of the SA.

A.     **Motion to Qualify**

1.     *Whether This Issue is Properly Before the Court*

As a preliminary matter, the Court must consider whether Defendants' motions are properly before the Court. Defendants argue that ¶ 15 of the SA contemplates the Court's resolution of this dispute when it states: "In the event that the Community Monitor and the state supervisor disagree, the matter will be submitted to the Court which will make a final decision" (disagreement sentence). *Id.* This language, Defendants argue, applies to any disagreement about the entire reviewer qualification process.

Not so, Plaintiffs say. They contend that the disagreement sentence applies only to disagreements arising from the CM and state supervisor's final joint evaluation of a potential reviewer at the conclusion of the three-steps. Because step three has not yet occurred and there has been no joint review, Plaintiffs argue that the Motion to Qualify is not properly before the Court.

The disagreement sentence does not specifically state whether it applies to each of the three steps or just to the final qualification decision. But the Court's authority to examine this issue does not originate from the disagreement sentence but from its inherent authority. As the SA states: "The Court retains the inherent authority to interpret, clarify, modify or enforce this Settlement Agreement." SA (Doc. No. 2299-1) at ¶ 20; *see also United States v. Hardage*, 982

F.2d 1491, 1496 (10th Cir. 1993) (observing "[a] trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it."). Although the Motion to Qualify is couched as a clash about whether a potential reviewer is qualified, at its core, this motion comes from a disagreement between the parties over the meaning of the language in ¶ 15. On that matter, there can be no dispute that the Court retains its authority to interpret, clarify, and enforce the terms of the SA.

Alternatively, Plaintiffs argue that as a prudential matter the issue is not ripe for the Court's review. "The purpose of the ripeness doctrine is to prevent the premature adjudication of abstract claims." *Tex. Brine Co., LLC and Occidental Chem. Corp.*, 879 F.3d 1224, 1229 (10th Cir. 2018). A court should consider two factors: "'(1) the fitness of the issue for judicial review,' and (2) 'the hardship to the parties from withholding review.'" *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019) (quoting *United States v. Bennett*, 823 F.3d 1316, 1326 (10th Cir 2016).

Plaintiffs contend that because the state employee has not completed the final step of the three-step qualification process, it is premature for the Court to decide whether the state employee is qualified as a reviewer. In opposition, Defendants argue that the matter is ripe because the central issue is not the qualification of the employee but control of the three-step reviewer qualification process. Moreover, Defendants assert, if the Court adopts the Plaintiffs' argument, the matter will never be ripe for Court review. Defendants posit this will create hardship for the Defendants because if the CM controls the content and the reviewers' progression through the three steps, no state employee will arrive at the third step unless and until the CM permits the state employee to do so.

The Court agrees with Defendants. The pivotal question before the Court is not whether a reviewer is qualified, but who controls the three-step reviewer qualification process. Both parties

look to the plain terms of the SA. An assertion that the language of a settlement agreement precludes a claim relates to the merits of an action, not to the ripeness of a claim. *See Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1276 (10th Cir. 2012). While Plaintiffs are correct that the state employee in question has not yet completed all three steps, the dispute between the parties centers on whether the language of ¶ 15 requires her to progress through those steps in a manner determined by the CM. Because the actual disagreement focuses on the language of the SA, the issue is properly before the Court.

### 2.    The Language of ¶ 15

"A settlement document is a contract and is construed using ordinary principles of contract interpretation." *Anthony v. United States*, 987 F.2d 670, 673 (10th Cir. 1993) (further citation omitted). As a contract, "'[i]ssues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law.'" *Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013) (quoting *Schoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) (alteration in original)). The parties created and entered into the SA in New Mexico, so New Mexico contract law applies.[10]

When examining a contract, a court must first determine if the contract is ambiguous. Generally, a contract is ambiguous when it is "'reasonably and fairly susceptible of different constructions.'" *LensCrafters, Inc. v. Keho*, 282 P.3d 754, 763 (N.M. 2012) (quoting *Allsup's*

---

[10] Plaintiffs argue that federal common law applies to contract interpretation of federal questions, citing *Chavez v. New Mexico*, 397 F.3d 826, 831 (10th Cir. 2005). In *Chavez*, the Tenth Circuit held that "'the enforcement and interpretation of Title VII cases are governed by federal common law because such settlements are 'inextricably linked' to the underlying law of Title VII.'" (quoting *Heuser v. Kephart*, 215 F.3d 1186, 1190 (10th Cir. 2000)). The Court went on to observe that although *Chavez* was a Title VII case, the parties had agreed that New Mexico contract law applied and the "'applicable principles of contract law are not different in federal and New Mexico law.'" *Id.* (quoting *Heuser*, 215 F.3d at 1191). Although this case does not arise under Title VII, Plaintiffs state that federal common law should apply because there are federal and constitutional law issues. Plaintiffs did not provide any authority for this argument, and because the Tenth Circuit concluded that principles of contract law in New Mexico and federal common law are substantially similar, the Court will apply New Mexico law.

*Convenience Stores, Inc. v. North River Ins. Co.*, 976 P.2d 1, 12 ( N.M. 1998)); *Lucero, Jr. v.*

*Northland Ins. Co*, 346 P.3d 1154, 1159–60 (N.M. 2015) (holding that a contract is ambiguous

when it may have two reasonable but conflicting meanings). A contract with clear terms is

conclusive. *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993) ("The

purpose, meaning and intent of the parties to a contract is to be deduced from the language

employed by them; and where such language is not ambiguous, it is conclusive" (citations

omitted)). "The question whether an agreement contains an ambiguity is a matter of law to be

decided by the trial court." *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993) (citation

omitted). A mere disagreement between the parties about the construction of the contract does

not make it ambiguous. *LensCrafters*, 828 P.3d at 763.

The SA "replaces all existing orders of the Court and will be the *sole source* of

Defendants' remaining obligations to class members during the Term of this Settlement

Agreement." SA (Doc. No. 2299-1) at ¶ 4. (emphasis added). As the sole source of Defendant's

obligations, the plain language of the SA controls. The plain language of ¶ 15 states that to

become qualified, a reviewer must go through three steps. The parties disagree about who

establishes and who implements those steps. Plaintiffs assert that the answer to those questions

can be found in the meaning of the terms IQR and CM. As the SA does not provide an explicit

definition for those terms, Plaintiffs argue that CM and IQR can only be understood in the

context provided by the history of this litigation. According to Plaintiffs, because the CM has

always implemented the IQR and overseen the reviewer qualification process those traditional

roles were contemplated by the language of ¶ 15. Defendants reject Plaintiffs' historical

argument on the basis that the SA vacated all previous relevant orders. Defendants assert that the

plain language of ¶ 15 and its stated purpose to transfer control from the CM to DHI indicates

that DHI has authority over both the content and the implementation of the three-step reviewer

qualification process. While the Court agrees with Plaintiffs that the plain language of the SA gives the IQR process historical context, the Court finds no similar support for Plaintiffs' argument about the role of the CM.

The language of ¶ 15 defines the IQR process in terms of how it is performed. It requires DHI "[to] conduct the IQR process, with technical assistance from [the CM], using a substantially similar sampling, protocol instrument, review, and data reporting methodology through June 30, 2021" (substantially similar sentence). *Id.* The use of the phrase "substantially similar" followed by a list of requirements indicates that the IQR is to conform to or to be substantially like the IQR that has been used over the years. The fact that it will be conducted with "technical assistance" from the CM reinforces this meaning. Notably, nothing in ¶ 15 suggests that qualifying reviewers is part of the IQR process, so we must look elsewhere for information about the CM's role.

The second and third sentences of ¶ 15 address how reviewers become qualified. In the second sentence, the parties stated: "Defendants will hire and employ" reviewers (hire and employ sentence). The latter part of the hire and employ sentence describes the three steps those individuals who Defendants hire and employ must complete to become reviewers. In the hire and employ sentence, the CM is neither a subject nor a named participant. The CM's contributions are contemplated only in the third sentence which states that, at the end of the qualification progression, the CM and the state supervisor "jointly will evaluate the state staff person and determine if the individual is qualified to conduct the IQR." *Id.* The plain language of the second sentence indicates that Defendants will control the three-step reviewer qualification process.

Plaintiffs rebut this conclusion by asserting that the three-step reviewer qualification process previously used by the CM is imported into the hire and employ sentence through the prepositional phrase, "[d]uring the transfer period" that begins the second sentence. *Id.*

According to Plaintiffs, the CM must be involved and is imported as the "doer" of the three-steps because the CM is required to do the transferring. This construction strains the meaning of that phrase. "During" is a preposition used before a noun to show when something happens. Thus, the prepositional phrase describes a time period for the transfer of the IQR process, which will occur between the signing of the SA and June 30, 2020, when the CM position ends. The language does not support the CM as a doer of the verbs "hire and employ."

Alternatively, Plaintiffs argue that the CM's three-step reviewer qualification process is imported into the second sentence because both parties to the SA understood that qualifying reviewers has been one of the CM's historical duties. Plaintiffs state, "[f]or years, these professionals were independent consultants to the Community Monitor, selected by the Community Monitor, paid through the Community Monitor, and ultimately responsible to the Community Monitor." Response (Doc. No. 2326) at p. 9.[11] But Plaintiffs' interpretation ignores that nowhere does ¶ 15 reference the CM's historical reviewer qualification process, while it does specifically reference the historical IQR and directs that the current IQR conform in a substantially similar manner. Paragraph 15's mandatory language indicating that the State must use an IQR process "substantially similar" to the CM's established one indicates that if the parties had wanted to similarly limit the three-step reviewer qualification process to the historical one established and used by the CM, they would have done so. They did not.

Finally, the Court observes that ¶ 15's delegation of responsibilities straddles the line between recognizing Plaintiffs' need for an immediate recovery and the State's autonomy. In the opinion remanding this Court's denial of Defendants Rule 60(b)(5) motion, the Tenth Circuit

_____

[11] The Court acknowledges that for many years, Lyn Rucker, the CM has performed her duties in a diligent outstanding manner. However, her past performance is not the issue. The Court is simply tasked with divining the meaning of the language chosen by the parties.

emphasized that ongoing court oversight raised federalism concerns. *See Jackson v. Los Lunas Community Program et. al.*, 880 F.3d 1176, 1204 (10th Cir. 2018) (observing "[o]nce the offending condition has been cured, the [Supreme Court] has instructed that responsibility over the state program must be returned promptly to the state and its officials."). The parties entered the SA because they concurred that "a durable remedy is not only attainable, but structurally present *in the State's current policies, procedures, and standards*." MOO (Doc. No. 2304) at 24 (emphasis added). Paragraph 15's delegation of the three-step reviewer qualification process to the State while calling on the CM's considerable experience in the final evaluation of each reviewer recognizes the role both Plaintiffs and Defendants have in the implementation of a durable remedy and eliminates concerns about continued court oversight.

In sum, the plain language of ¶ 15 gives control over the three-step reviewer qualification process to Defendants, and consequently only DHI has the authority to determine if a potential reviewer is ready to move to the next step. It is only at the end of that progression, during the joint evaluation of the state employee, that the CM plays a role. Because the Court has determined that, as a matter of law, the plain language of the SA controls the outcome of this dispute, Plaintiffs' argument that Defendants' interpretation modifies the terms of the SA has no merit; therefore, Plaintiffs' request for an evidentiary hearing is denied.

In the Motion to Qualify, Defendants also asked the Court to determine whether under the terms of ¶ 15 a specific reviewer is qualified. Defendants admit that the reviewer has not yet completed all three steps of the training nor has she been jointly evaluated by the CM and the state supervisor. Because the reviewer has not completed the third step of the reviewer qualification process or been jointly evaluated by the state supervisor and the CM, the Court finds that it is premature to consider this issue. After the reviewer has completed the three steps

as implemented by DHI and then has been evaluated, if the parties cannot agree on whether the reviewer is qualified, the parties may resubmit this issue.

**B.      Motion for IR**

Defendants' second motion asks the Court to enjoin the CM from implementing and enforcing her three-step reviewer qualification process on DHI employees. As the Court has found that under the plain language of the SA, Defendants control both the content of the three-step reviewer qualification process and its implementation, this motion is now moot.

IT IS ORDERED THAT:

1.      DEFENDANTS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AS TO THE OPERATION OF THE INDIVIDUAL QUALIFY REVIEW AND DECLARE REVIEWER QUALIFIED (Doc. No. 2319) is GRANTED IN PART and DENIED IN PART;

2.      DEFENDANTS' MOTION FOR INJUNCTIVE RELIEF REGARDING ACTIONS OF THE COMMUNITY MONITOR (Doc. No. 2318) is DENIED as moot.

_____
SENIOR UNITED STATES DISTRICT JUDGE