**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

WALTER STEPHEN JACKSON, et al.,

Plaintiff,

vs. Civ. No. 87-0839 JAP/KBM

LOS LUNAS CENTER FOR PERSONS
WITH DEVELOPMENTAL DISABILITIES, et al.,

Defendants.

and

THE ARC OF NEW MEXICO,

Intervenors,

and

MARY TERRAZAS, et al,

Intervenors. pro se

**MEMORANDUM OPINION AND ORDER**

On December 23, 2013, Defendants Los Lunas Center for Persons with Developmental Disabilities, et al. (Defendants) filed a MOTION TO DISENGAGE PARAGRAPH 7 OF THE SETTLEMENT AGREEMENT (Doc. 2342) (Motion). The Motion asserts that Defendants are in substantial compliance with actions delineated in paragraph 7 (¶ 7) of the parties' Settlement Agreement (Doc. No. 2299-1) (SA) and asks the Court to terminate its oversight of all activities listed in ¶ 7.

On January 28, 2020, Plaintiffs Walter Stephen Jackson et al. and Intervenors The Arc of New Mexico and Mary Terrazas et al. (jointly, Plaintiffs) filed a Response opposing disengagement of ¶ 7. *See* PLAINTIFFS' AND THE ARC OF NEW MEXICO'S OPPOSITION TO DEFENDANTS' MOTION TO DISENGAGE PARAGRAPH 7 (Doc. 2352) (Response). On February 18, 2020, Defendants filed their REPLY IN SUPPORT OF MOTION TO DISENGAGE PARAGRAPH 7 OF THE SETTLEMENT AGREEMENT (Doc. 2367) (Reply).

The Motion is fully briefed. The Court finds that Defendants have shown substantial compliance with ¶ 7 and will grant the Motion.

**THE SETTLEMENT AGREEMENT**

On June 21, 2019, the Court entered an order approving the parties' final SA. The SA "replaces all existing orders of the Court and will be the sole source of Defendants' remaining obligations to class members during the term of [the] Settlement Agreement." SA (2299-1) ¶ 4. Part III of the SA, entitled "Actions to Resolve the Litigation," lists the actions Defendants must take to terminate the litigation. Before termination, Defendants must show compliance with each action item.

Section V of the SA "Compliance and Disengagement" specifies that Defendants must implement all action items within 18 months of the date of the Court's final approval of the SA. *Id.* ¶ 17. Although the Court's written order of final approval was not entered until June 21, 2019, the Court gave final approval at the hearing on June 12, 2019. Eighteen months from June 12, 2019 establishes a termination date of December 12, 2020 (or midnight Friday, December 11, 2020).

The SA requires Defendants to provide specific quarterly data on the action items, with the first relevant quarter commencing on July 15, 2019. *Id.* ¶ 18. The procedure for disengaging from any action item is described in ¶ 19:

> When the Defendants believe they have substantially implemented an Action set forth in Section III of this Settlement Agreement, they will notify the Plaintiffs and Intervenor Arc. The notice will state the basis for the Defendants' belief that they have substantially implemented the Actions(s), including the facts then known supporting their claim of compliance. At any time after thirty days from this notice, the Defendants may file a motion for a finding of partial compliance and disengagement of the Action(s). If the motion is contested, the parties will request that the Court hold a hearing and enter its findings and conclusions.[1] If the Court determines that the Defendants have complied with the Action(s) of this Settlement Agreement, it will terminate its oversight of that Action(s). In such event, the Defendants will no longer be required to report on these Action(s) or compensate the Plaintiffs for attorney time spent monitoring such Action(s).

But disengagement from a specific action does not end the Defendants' obligations on that action. Until the SA is terminated, Defendants must continue sustained compliance with all actions. *Id.* ¶ 21.

The subject of this Motion, ¶ 7, addresses Incident Management and outlines the process for investigating Abuse Neglect and Exploitation (ANE) of *Jackson* class members. These cases are either substantiated, meaning that the investigation has uncovered evidence of ANE, or unsubstantiated, meaning that the investigation has not found evidence of ANE. *See Ex.* D (Doc. 2342-4) at 1 (Policy DIV.DHI.13.09(13.260.006). Paragraph 7 states:

> The Defendants will conduct timely and adequate investigations and take necessary remedial actions, as required by current DHI policies and procedures including Immediate Action and Safety Plan: Procedure and Guidelines; DIV.DHI.IMB.13.260.003—IMB Conducting Investigations of Abuse, Neglect, and Exploitation (ANE): DIV.DHI.IMB.13.260.005—IMB Investigation Quality Assurance Review, including its Operational Procedure Detail; and DIV.DHI.IMB 13.260.006—Corrective and Preventive Action Plans.

SA (Doc. 2299-1) ¶ 7. The New Mexico Department of Health (NMDH) Incident Management Bureau (IMB) conducts investigations of ANE. The three policies listed in ¶ 7 describe the procedures for an IMB investigation.

[1] The parties did not request a hearing on this contested motion.

Two of the policies involve the procedures for investigating the ANE: IMB Conducting Investigations of Abuse, Neglect & Exploitation and IMB Corrective and Preventive Action Plans. *See* Motion, Ex. B (Doc. 2342-2), Ex. D (Doc. 2342-4). The third policy, the Quality Assurance Review (QAR), examines whether the resulting investigation complied with the requirements of NMDH's policies and procedures. *See id.*, Ex. C (Doc. 2342-3). When IMB conducts a QAR, it uses a Quality Assurance tool (QA tool) developed by the Jackson Compliance Officer, Dr. Sue Gant (JCA) and her consultants, to assess the investigation. *Id.*, Ex. E (Doc. No. 2342-5) ¶ 4. The State began testing and using the QA tool in January 2016, and it was finalized in fall 2018. *Id.* ¶ 7. Each QA report gets two scores: a quality score and a process score. *Id.* ¶ 12. The scores are equally weighted for a total score. *Id.* ¶ 13. Under the State policy, a score of 90 percent is the compliance threshold. *Id.* ¶ 14.

Defendants assert that in the first quarter of fiscal year 2020, Defendants' IMB investigations, as analyzed by the QA tool, received an average score of 91 percent.

**LEGAL STANDARD**

The Motion asks the Court to find that Defendants have substantially complied with ¶ 7 of the SA. Substantial compliance is a contract doctrine meant "to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract." *Joseph A. by Wolfe v. New Mexico Dep't. of Human Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995) (citing John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 11-15 at 454 (3d ed. 1987)). "Thus, the touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree—i.e. its essential requirements." *Id.* at 1086. In the Court's 2015 MOO, this Court stated "[t]he substantial compliance inquiry asks whether Defendants took the required specific steps in furtherance of the essential purposes and intent of the consent decree."

*Jackson v. Los Lunas Center*, 2015 WL 13662981 *5 (D.N.M. 2015). When a settlement agreement identifies the steps that must be taken to meet its criteria, those criteria must be met to show substantial compliance. *See Wolfe*, 69 F.3d at 1086.

**ANALYSIS**

The SA states that its purpose is "to identify those services, safeguards, and protections from harm that will be provided to the plaintiff class and to ensure that a durable remedy is in place when this litigation ends and this case is dismissed." SA (Doc. 2299-1) ¶ 1. Toward that end, ¶ 7 identifies specific criteria that must be met to demonstrate a durable remedy and the standard for evaluating the performance of that criteria. Supporting documentation for Defendants' Motion demonstrates in fiscal year (FY) 2020, quarter one, as evaluated by the QA tool, IMB investigations received an average score of 91 percent.

Plaintiffs object to disengagement on three grounds: 1) Defendants have not demonstrated that they have been in substantial compliance with ¶ 7 for a sufficient period; 2) the QA tool is not an adequate measure of compliance; and 3) Defendants' IMB investigations were flawed.

*1. Length of Compliance Period*

Plaintiffs argue that Defendants' Motion must be denied because Defendants have not shown compliance long enough. They maintain that Defendants were not in compliance in the FY 2019, fourth quarter, and they question whether Defendants were in substantial compliance in FY 2020, first quarter. Plaintiffs also argue that Defendants showed bad faith by not including more data about FY 2019, fourth quarter cases. The language of the SA does not support Plaintiffs' arguments.

The SA prescribes all of Defendants' remaining obligations, replaces all existing orders, and governs only the period following its approval. *See* SA (Doc. 2299-1) ¶ 4. Thus, by its terms,

the SA applies only to Defendants' performance after approval. During the SA negotiations and at the SA preliminary approval hearing, the parties engaged in considerable discussion about when the first reporting period of the SA should begin.[2] The parties agreed that "[t]he specific actions taken to meet the terms of this Settlement Agreement will be provided on a quarterly basis on the 15th of the month following the end of each quarter . . . .The first production of this data will be due on the 15th day of the month following the end of the quarter." SA (Doc. 2299-1) ¶ 18. Ultimately, this language means that if the Court was to give final approval to the SA in June, which it did, the first reporting period would begin on July 1st and would conclude 90 days later on October 1st with the report due on October 15th. *See* TMH (Doc. 2298) at 39:20-21. Therefore, the SA limits all relevant data for evaluating Defendants' substantial compliance with ¶ 7 to data generated from July 1, 2019 to the present day.

Although the period between April 2019 through July 1, 2019 is not relevant to the Court's determination of substantial compliance under the language of the SA, Defendants may, of course, agree that additional data may be relevant. They did so here. While disengaging from ¶ 8, the parties agreed that the Court could consider all backlogged cases when considering disengagement from ¶ 7. Reply (Doc. 2367) at 11. However, Plaintiffs have presented no evidence that Defendants agreed that pre-SA data was more relevant or could supersede the data provided in the SA's first

---

[2] As explained at the preliminary hearing by Plaintiffs' counsel, Mr. Schwartz, and Kathyleen Kunkel, Cabinet Secretary of NMDH:

> Mr. Schwartz: The word 'approval' as we've discussed, although it probably could be clarified, means the final approval. So, if the court were, for instance, to approve the agreement on June 15th, then the quarter that begins on June 15th would be the first reporting quarter. So it would be three months from June 15th, approximately July, August, September 15th, and then the report would be due September 30th. So the time period of quarterly reporting runs from final approval.
>
> . . .
>
> Mrs. Kunkel: So that was the concept, just to start fresh on probably July 1, and then two weeks before we meet, we have a commitment to provide them [Plaintiffs] with documents which has been a problem for us to agree on dates, and it was more for us to agree on when reports would be provided and when we would meet.

*See* Transcript of Motion Hearing, April 18, 2019 (TMH) (Doc. 2298) at 34:10-18, 38:6-11.

reporting period. Nor is there evidence that the parties agreed that the Defendants' failure to include data about all backlogged cases would demonstrate bad faith.

Notably, the SA does not set a specific period for Defendants to show substantial compliance before requesting disengagement. When addressing compliance and disengagement, the SA states only that Defendants may give notice of substantial compliance and request disengagement "[w]hen the Defendants believe they have substantially implemented an Action set forth in Section III of this Settlement Agreement. . . ." With the notice Defendants must include "the basis for the Defendants' belief that they have substantially implemented the Actions(s), including the facts then known supporting their claim of compliance." SA (Doc. 2299-1) ¶ 19.

Moreover, in the hearing for preliminary approval of the SA, Plaintiffs acknowledged that there was not a "set period" for compliance. As Plaintiffs' counsel Mr. Schwartz stated:

> But we have also agreed that there is not a waiting period after compliance that the defendants come forward with their evidence, let's say, on January 1st, or whatever date it is – and we note that, the court notes, they can come forward with the evidence earlier than the 18 months because there is, as there currently is, a process for incremental disengagement.

TMH (Doc. 2298) at 32:4-10. For these reasons, Plaintiffs' argument that Defendants must show compliance for a period longer than one fiscal quarter fails. The SA states only that when Defendants give notice of substantial compliance, they must "believe" they have substantially complied and "provide evidence" in support. Defendants have done so.

*2. The QA Tool is the Parties' Agreed Method of Determining Substantial Compliance*

Defendants' assertion of substantial compliance as to ¶ 7 relies on their QA average score of 91 percent in FY 2020, first quarter. Plaintiffs object to this score, arguing that an average QA tool score is an inaccurate measure of IMB investigations. According to Plaintiffs, the QA tool is inadequate in two ways: first, the use of an average QA score masks deficiencies in IMB

investigations; and second, the QA tool is not comprehensive enough because it does not measure substantial compliance as to corrective actions plans. Defendants counter that Plaintiffs' arguments are an attempt to alter the substantial compliance standard in ¶ 7 by changing the criteria. The Court agrees.

Paragraph 7 requires compliance with the QAR. That policy incorporates the QA tool to "ensure the accuracy, thoroughness, quality and completeness of IMB investigations and identify and remedy any areas found deficient." Motion, Ex. C (Doc. 2342-3) I. Over a three-year period, the parties developed and refined the QA tool. Together, the parties set the threshold of substantial compliance at a 90 percent average score. Although the QA tool may not include everything the Plaintiffs now want, they cannot now change the criteria. An average score of 90 percent or above on IMB investigations demonstrates substantial compliance under the terms of ¶ 7.

*3. The Accuracy of the QA Scores*

Plaintiffs' final argument is that the QA scores are inaccurate because Defendants' documentation demonstrates a "pattern of noncompliance with several DHI policies and procedures." Response (Doc. 2352) at. 2. Plaintiffs support this argument with attached affidavits by Eva Kutas and Jaqueline Mader (jointly Affidavits). The Kutas Affidavit is accompanied by her summation and findings with respect to five substantiated cases and two unsubstantiated cases. These cases include both backlogged cases from FY 2019 and cases from FY 2020, quarter one. The Mader affidavit is accompanied with an IMB closure letter on one of the unsubstantiated cases.

Defendants object to the use of these experts to evaluate their compliance, largely because of Ms. Kutas' prior role in this case. Before the Court's preliminary approval of the SA, Ms. Kutas worked as a designee of the JCA. After the Court gave preliminary approval to the SA, Ms. Kutas' work as a JCA designee ended. SA (Doc. 2299-1) ¶ 6 (stating "the Jackson Compliance

Administrator will cease all monitoring or consultation activities and will no longer have any role in the oversight of Defendants' operations upon preliminary approval of the Settlement Agreement."). Defendants argue that the use of a former JCA designee violates the "spirit" of the SA because the SA is meant, in part, to avoid the costs of litigation. Reply (Doc. 2367) at 5. They ask the Court to reject the Affidavits. But Defendants have failed to establish that the Affidavits are not relevant.

While the SA terminated Ms. Kutas' role as a monitor, it did not bar Ms. Kutas from reviewing compliance issues. In fact, nothing in the SA prevents Plaintiffs from using an expert to substantiate their opposition to disengagement. Notably, Defendants do not argue that Ms. Kutas and Ms. Mader are unqualified to be experts or that their testimony is unreliable. *See* Fed. R. Evid. 702 and Fed. R. Evid. 703 (outlining the necessary qualifications of an expert and the relevant bases for expert opinions). Defendants' arguments concerning the substance of the Affidavits goes to the weight of the evidence, not their evidentiary value.

Relying exclusively on the Affidavits, Plaintiffs argue that there are three areas of noncompliance: 1) The QA scores are inaccurate because they were assessed by a DHI supervisor; 2) IMB did not implement the correct procedures in its investigations; and 3) Defendants did not substantiate that corrective action plans were implemented and successful.

Plaintiffs first contend that it is inappropriate to rely wholly on a NMDH supervisor's evaluation of a sample of the supervisor's own employees to demonstrate "compliance with four separate policies, and up to ten related procedures, comprising close to sixty pages of investigation requirements and provisions." Response (Doc. 2352 ) at 8. As proof, Plaintiffs indicate that the NMDH supervisor's conclusions that the investigations met the policy standards contradict the findings of Plaintiffs' expert, Ms. Kutas. This argument is yet another iteration of Plaintiffs'

rejection of the efficacy of the QA tool. The SA explicitly incorporates the QA tool, which provides both the standards and the personnel responsible for doing the evaluation. When Plaintiffs agreed to the SA, they agreed to those standards, and they are now bound by them.

Next, Plaintiffs allege that the investigations were inadequate. According to Plaintiffs, the IMB investigators did not take the actions Plaintiffs' assert were most appropriate. For this argument Plaintiff relies both on backlogged cases from FY 2019 and on the more current cases from FY 2020, first quarter. The backlogged cases are immaterial on this issue as Defendants did not produce them to support their claim of substantial compliance, and the cases predate the cases Defendants have produced.[3] The only relevant cases in this inquiry are the ones from FY 2020, first quarter.

In arguing the inadequacy of the investigations, Plaintiffs reject both the actions taken by the investigators and their conclusions. But Plaintiffs' arguments ignore the discretionary element of an IMB investigation. Each of the policies referenced in ¶ 7 direct that IMB investigators take some mandatory actions, but often leave the implementation of those actions to the discretion of the investigator. For example, when initiating an ANE investigation, the investigator is required to review an "Immediate Action and Safety Plan (IASP) provided by the Community-Based Service Provider (agency) and ensure the plan is adequate to protect the alleged victim and all other individuals potentially impacted by the incident/allegation, in accordance with the IASP policy." Motion, Ex. B (2342-2) III(B)(1). This provision makes an IASP mandatory, but the adequacy of the IASP is left, in part, to the discretion of the investigator.

Plaintiffs contend that "[a]ll five of the IASPs reviewed were non-compliant with one or more expectations for assuring safety of the individual and others affected when ANE was reported

[3] Defendants acknowledge that the backlogged cases received scores below 90 percent. There is no requirement in the SA that Defendants make backlogged cases substantially compliant. Even if there were, Defendants argue that they cannot correct errors in past investigations because of the timelines in the policies.

. . . .” But Plaintiffs’ arguments focus their analysis on the adequacy of the investigator’s actions. Plaintiffs do not argue that no action was taken to assure the class member’s safety; they just disagree with the actions that were. Nothing in the policy mandates that Defendants take specific actions to ensure an “adequate plan.” Moreover, there is no evidence that any deficiencies in the IASP were not accounted for in the investigation’s final QA score.

Plaintiffs also question the findings that two of the cases were unsubstantiated. Plaintiffs allege that the two cases involved severe injuries, and the documentation did not thoroughly establish that these cases were unsubstantiated. Again, Plaintiffs are substituting their judgment for the investigators’, and in doing so, are ignoring the QA scores, a tool they helped develop and implement.

Finally, Plaintiffs argue that Defendants have failed to furnish evidence that Defendants complied with the requirements of the Corrective Action Plan policy. This policy requires community-based providers to submit a corrective and preventative action plan (CPAP) for ANE substantiated cases. The policy provides guidance on “what constitutes a timely, effective and appropriate Corrective and Preventative Action Plan, and what to do when a Corrective and Preventative Action Plan submitted by a provider is inadequate.” In the two current cases reviewed with a CPAP, Plaintiffs object that certain corrective and preventative actions were not listed in the report and so had not been verified. Notably, Plaintiffs also found documentation that the corrective actions listed in the CPAP report had been completed.[4] As Defendants observe, the policy provides that under limited circumstances and with the approval of a supervisor,

---

[4] *See* Response, Affidavit of Eva Kutas (Doc. 2352-1). In her findings about the CPAP of case number 2K20-0102-A, Ms. Kutas states that the CPAP lists two corrective actions, that were not verified in the report. Then she notes that additional documentation indicated that both items were done.

investigators may close an investigation without verification of full implementation. *See* Motion, Ex. D (Doc. 2342-4) IIIB.

The Court finds that Defendants' scores on the QA tool demonstrate that they have substantially complied with the requirements of ¶ 7.

IT IS ORDERED THAT: Defendants' MOTION TO DISENGAGE PARAGRAPH 7 OF THE SETTLEMENT AGREEMENT (Doc. 2342) is GRANTED.

SENIOR UNITED STATES DISTRICT JUDGE

.