# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

WALTER STEPHEN JACKSON, et al.,

     Plaintiff,

     vs.                              Civ. No. 87-0839 JAP/KBM

LOS LUNAS CENTER FOR PERSONS
WITH DEVELOPMENTAL DISABILITIES, et al.,

     Defendants.

and

THE ARC OF NEW MEXICO,

     Intervenors,

and

MARY TERRAZAS, et al,

     Intervenors. pro se

## **MEMORANDUM OPINION AND ORDER**

On June 21, 2019, the Court approved a Settlement Agreement (SA) among Defendants

Los Lunas Center for Persons with Developmental Disabilities, et al. (Defendants) and Plaintiffs

Walter Stephen Jackson et al. and Intervenors The Arc of New Mexico and Mary Terrazas et al.

(jointly, Plaintiffs).[1] The SA[2] specifies that to terminate the litigation Defendants must demonstrate substantial compliance with delineated action items.[3] On February 28, 2020, Defendants filed a motion seeking to disengage ¶¶ 11(a), (b), and (c) (jointly ¶ 11).[4] Subsequently, Plaintiffs sought clarification of Defendants' evidence of substantial compliance as to ¶ 11. On April 20, 2020, Defendants supplemented their motion.[5]

On May 4, 2020, Plaintiffs filed a response objecting to disengagement of ¶ 11.[6] On May 26, 2020, Defendants replied.[7]

On June 23, 2020, the Court heard the Motion by Zoom.[8] At the hearing, Robert Hanson represented the Plaintiffs, Maureen Sanders represented the Intervenors,[9] and Taylor Rahn represented Defendants.[10] After considering the arguments of counsel and reviewing the briefs, the Court finds that Defendants have shown substantial compliance with ¶¶ 11(a), (b), and (c) and will grant the Motion.

---

[1] *See* MEMORANDUM OPINION AND ORDER APPROVING SETTLEMENT AGREEMENT, ECF No. 2304.
[2] The parties clarified the preliminary settlement agreement. The revised draft that incorporates those clarifications is Ex. 1 of the JOINT MOTION TO FINALLY APPROVE SETTLEMENT AGREEMENT ¶ 1, ECF No. 2299. The Court cites to that final version as the Settlement Agreement (SA).
[3] SA. ¶ 17, ECF No. 2299–1.
[4] MOTION TO DISENGAGE PARAGRAPHS 11A, 11B, AND 11C OF THE SETTLEMENT AGREEMENT, ECF No. 2374 (in citations, Motion, and in text, jointly with ECF No. 2426 as Motion).
[5] ADDENDUM TO MOTION TO DISENGAGE PARAGRAPH 11A, 11B, AND 11C OF THE SETTLEMENT AGREEMENT, ECF No. 2426 (in citations, Suppl., and in text, jointly with ECF No. 2374 as Motion)
[6] PLAINTIFFS' AND ARC OF NEW MEXICO'S RESPONSE TO DEFENDANTS' MOTION TO DISENGAGE PARAGRAPH 11 (Doc. 2374 and 2426) AND REQUEST FOR HEARING, ECF No. 2433 (Response).
[7] REPLY TO RESPONSE TO MOTION TO DISENAGE PARAGRAPHS 11A, 11B, AND 11C OF THE SETTLEMENT AGREEMENT, ECF No. 2440 (Reply).
[8] United States Magistrate Judge Karen Molzen was also present at the hearing.
[9] Several other attorneys of record appeared on behalf of Plaintiffs and Intervenors, including Ann McCartney, Nancy Simmons, Peter Cubra, Tim Gardner, Stephen Schwartz, Cathy Costanzo, and Jacquie Mader.
[10] Also present at the meeting on behalf of the New Mexico Department of Health (NMDOH) was James Grubel, Scott Doan, Daniel Lucero and Sally Karingada.

## I.      THE SETTLEMENT AGREEMENT

This 1987 case focuses on the State's systems and procedures for delivering care to the developmentally disabled.[11] Defendants seek disengagement from ¶¶ 11(a),[12] (b),[13] and (c),[14] which outline steps state employed nurses, behavioral specialists, and case management

---

[11] The history of this case is well-documented, and the Court will not repeat it here.

[12] Part III, Actions to Resolve Litigation, Section D., Health, ¶ 11(a) states:

> 11(a).  Medical—The Defendants will review all class members currently designated as high-acuity pursuant to DD Waiver Standards, Ch. 13, ¶ 13.2.13 (high-acuity individuals) to determine whether they should be receiving a higher level of living supports pursuant to DD Waiver Standards, Ch. 10, ¶ 10.1. If a class member should be receiving a higher level of living supports, based on the standards, the class member's budget will be revised to reflect the appropriate level of living support. None of these individuals will be moved to a lower category of living supports. The Defendants will add state-employed nurses in DDSD with the authority to review and monitor the health care status of *Jackson* class members and to direct corrective actions when necessary. Using current acuity levels as identified by e-CHAT and ARST, the Defendants will utilize state-employed nurses to monitor the nursing functions required for those individuals in DD Waiver Standards, Ch. 13, ¶ 13.2.13 by performing document reviews as necessary and performing a minimum of one unannounced, face to face monthly visit to each of those individuals. At this visit the State nurse will review those documents that are required to be present and up to date in the individual's home and will speak with direct care staff. The State nurse will also speak with the individual's nurse at that time or within five (5) business days of the visit. Failure by the provider to adhere to the standards will result in reporting and referral for contract management. If there is a situation in which an individual has suffered, or is likely to suffer serious harm, the state-employed nurse will take immediate action to protect the individual.

SA ¶ 11(a), ECF No. 2299–1.

[13] Part III, Actions to Resolve Litigation, Section D., Health, ¶ 11(b) states:

> 11(b).  Behavior—Defendants will continue to collect data on class members pursuant to the At Risk Criteria currently utilized to identify class members who demonstrate high behavioral needs. Those individuals identified as meeting criteria for the At Risk list will be reviewed to determine if they should be receiving a higher level of living supports pursuant to DD Waiver Standards, Ch. 10, ¶ 10.1. If the class member should be receiving a higher level of living supports, the individual's budget will be revised to receive this support. Defendants will utilize state behavioral specialists to review and analyze the behavioral support plans of those individuals identified on the At Risk list and perform at least one, unannounced, monthly face to face visit with the class members identified in the behavioral component of the At Risk list, review those documents required to be in the home, and document the state behavioral specialists' assessment of the effectiveness of the Positive Behavior Support Plan and any recommended adjustments. Failure of any provider (residential, day or therapist) to adhere to the applicable standards will result in reporting and referral for in contract management. If there is a situation in which an individual has suffered, or is likely to suffer serious harm, the state-employed behavioral specialist will take immediate action to protect the individual.

*Id.* ¶ 11(b)

[14] Part III, Actions to Resolve Litigation, Section D., Health, ¶ 11(c) states:

> 11(c).  Case management of high acuity and/or high behavioral individuals—Defendants will utilize state-employed case management coordinators to perform an unannounced quarterly visit to the case management agency for each high-acuity/high behavioral individual to review the site visit forms and any other medical, health or behavioral record relating to those high acuity/high behavioral services. The state employed case management coordinator will determine if the case manager is meeting the health/medical/behavioral requirements of the standards for those high acuity/high risk individuals as defined in the 2018 standards. The case management agency's failure to adhere to the standards in DD Waiver Standards, Ch. 8, ¶ 8.2 will result in reporting and referral for contract management.

*Id.* ¶ 11(c)

coordinators must take to evaluate providers who care for Jackson Class Members (JCMs) who are high-acuity, at risk, and/or both.

Paragraph 11 is one of twelve action items listed in Section III of the SA. Section V of the SA "Compliance and Disengagement" specifies that Defendants must implement all action items within 18 months of the date of the Court's final approval of the SA. SA ¶ 17, ECF No. 2299–1. Although the Court's written order of final approval was not entered until June 21, 2019, the Court gave final approval at the hearing on June 12, 2019. Eighteen months from June 12, 2019 establishes a termination date of December 12, 2020 (or midnight Friday, December 11, 2020).

The SA requires Defendants to provide specific quarterly data on the action items, with the first relevant quarter commencing on July 15, 2019. *Id.* ¶ 18. The procedure for disengaging from any action item is described in ¶ 19:

> When the Defendants believe they have substantially implemented an Action set forth in Section III of this Settlement Agreement, they will notify the Plaintiffs and Intervenor Arc. The notice will state the basis for the Defendants' belief that they have substantially implemented the Actions(s), including the facts then known supporting their claim of compliance. At any time after thirty days from this notice, the Defendants may file a motion for a finding of partial compliance and disengagement of the Action(s). If the motion is contested, the parties will request that the Court hold a hearing and enter its findings and conclusions. If the Court determines that the Defendants have complied with the Action(s) of this Settlement Agreement, it will terminate its oversight of that Action(s). In such event, the Defendants will no longer be required to report on these Action(s) or compensate the Plaintiffs for attorney time spent monitoring such Action(s).

Defendants have the burden of showing substantial compliance. But disengagement from a specific action does not end the Defendants' obligations on that action. Until the SA is terminated, Defendants must continue sustained compliance with all actions. *Id.* ¶ 21.

## II.      **LEGAL STANDARD**

The SA is a contract and "is construed using ordinary principles of contract interpretation." *Anthony v. United States*, 987 F.2d 670, 673 (10th Cir. 1993) (further citation omitted). As a contract, "'[i]ssues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law.'" *Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013) (quoting *Schoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) (alteration in original)). The parties created and entered the SA in New Mexico, so New Mexico contract law applies.

Courts examine contracts to "'ascertain the intentions of the contracting parties.'" *Mendoza v. Isleta Resort and Casino*, 460 P.3d 467, 473 (N.M. 2020) (quoting *Gallegos v. Pueblo of Tesuque*, 46 P.3d 668, 679 (N.M. 2002). A contract with clear terms is conclusive. *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993) ("The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive" (citations omitted)). Mere disagreement about the meaning of a contract's terms "'does not necessarily establish ambiguity.'" *LensCrafters, Inc. v. Kehoe*, 282 P.3d 758, 763 (N.M. 2012) (quoting *Vickers v. N. Am. Land Devs., Inc.*, 607 P.2d 603, 606 (N.M. 1980)). The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court." *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993) (citation omitted).

The Motion asks the Court to find that Defendants have substantially complied with ¶ 11(a), (b), and (c). Substantial compliance is a contract doctrine meant "to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract." *Joseph A. by Wolfe v. New Mexico Dep't. of Human Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995) (citing John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 11-15 at 454 (3d ed. 1987)). When a settlement agreement identifies the steps that must be taken to meet its criteria,

5

those criteria must be met to show substantial compliance. *See Joseph A. by Wolfe*, 69 F.3d at 1086.

Procedurally, motions to disengage the action items in the SA are like motions for summary judgment. A court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

"Once the moving party has met its burden, the burden shifts back to the nonmoving party to show that there is a genuine issue of material fact." *Jensen v. Kimble*, 1 F.3d 1073, 1077 (10th Cir. 1993) (citing *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)). Disputes are genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and they are material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (further citation and internal quotation marks omitted). "A plaintiff 'cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor.'" *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1130 (10th Cir. 2009) (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009) (further citation omitted)).

## III.    ANALYSIS

Defendants assert that they are in substantial compliance with ¶ 11. Plaintiffs disagree and object to disengagement on both procedural and substantive grounds. First, Plaintiffs argue that

Defendants' evidence is inadmissible hearsay that cannot support their claims. Second, Plaintiffs

argue that even if Defendants' evidence is admissible, it does not show substantial compliance.

### A. Defendants' Evidence is Admissible to Prove Substantial Compliance

When Defendants file a motion to disengage an action item, the SA requires them to include

"sufficient information to allow the Plaintiffs to make an informed judgement concerning

compliance and sustained compliance." SA ¶ 21, ECF No. 2299–1. To support their Motion,

Defendants provided the following evidence: affidavits,[15] samples of monitoring forms, records of

state employees' certifications of site visits, records of supervisor approval of monitoring forms,

and copies of the DD Waiver Standards referred to in ¶ 11. Plaintiffs focus on Defendants'

Affidavits, characterizing them as inadmissible hearsay because not all statements in the Affidavits

are based on personal knowledge. Under the summary judgment standard, Defendants counter,

evidence need not be in the form or shape necessary for trial, but the evidence should present

information that could be trial ready.

As a preliminary matter, the Court observes that the SA does not demand trial ready

evidence. Rather the SA requires "sufficient evidence," which is defined as the type and kind of

evidence that permits Plaintiffs to make an informed judgment about compliance. Significantly, a

motion to disengage is not the first time Plaintiffs see Defendants' evidence. Plaintiffs obtain

evidence throughout the process of disengagement. The SA obligates Defendants to provide

quarterly compliance data to Plaintiffs. SA ¶ 18, ECF No. 2299–1 ("The Defendants will provide

data specific to the actions described in the [SA] to demonstrate that they are making reasonable

---

[15] The affidavits include the AMENDED AFFIDAVIT OF SCOTT DOAN and AFFIDAVIT OF SALLY KARINGADA. Suppl. Ex. A., C., ECF No. 2426 (jointly Affidavits). Mr. Doan is the Deputy Director of the Developmental Disabilities Support Division (DDSD) and Ms. Karingada is employed by the New Mexico Department of Health (DOH) as the Jackson Compliance Officer (JCO).

progress in implementing the Actions . . . .'). The quarterly submissions are accompanied by a quarterly meeting where Plaintiffs may discuss the submitted data with Defendants and any "obstacles to implementing the Actions." *Id.* The SA contemplates an informal collegial process, not a formal adversarial one.

But even if the SA did set a formal evidentiary standard, Defendants have met it. Affidavits that rely, in part, on hearsay are not per se inadmissible at the summary judgment stage. *See Argo. v. Blue Cross & Blue Shield of Kansas, In*c., 452 F.3d 1193, 1199 (10th Cir. 2006). But any hearsay included in an affidavit must be representative of evidence that could be presented in an admissible form. *Id.* ("Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form."). Admissible evidence includes attestations by qualified witnesses.

Defendants offer the Affidavits as support for business records. The rules regarding the admission of business records are found in Federal Rule of Evidence (Rule) 803(6)(D). Business records are admissible when accompanied by testimony from the records custodian or "another qualified witness." While the Tenth Circuit has not definitively stated the meaning of "another qualified witness," in a recent unpublished case the Tenth Circuit concluded that an individual who can explain and has knowledge of how the pertinent business records are made and kept is a qualified witness. *See In re Kim*, 809 F. App'x. 527, 540 (10th Cir. 2020) (quoting in a citation to *Browner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010) that another qualified witness "'need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information.'"). Mr. Doan and Ms. Karingada are state employees who have either created the records, compiled the records, or

supervised the creation or compilation of the records. The Court concludes that both Mr. Doan and

Ms. Karingada are qualified witnesses and the Affidavits are admissible evidence.[16]

### B.  Defendants' Evidence Shows Substantial Compliance

#### 1.  Interpretation of the SA

Next, Plaintiffs argue that Defendants' evidence is functionally inadequate and does not

show substantial compliance. Much of this argument relies on an assertion that the Court should

interpret the SA's language under the rubric of the SA's unstated intent to safeguard the health and

welfare of the JCMs. Plaintiffs have asked the Court to consider when ruling on Defendants'

Motion the "overarching purpose of the lawsuit" and to contemplate all Defendants' "specified

policies, Medicaid Waiver Service Standards and regulations." Response 6–7, ECF No. 2433. To

support this argument, Plaintiffs quote from language in previous Court orders that found that

Defendants were obliged not only to meet specific steps in a consent decree but also to fulfill the

essential purposes of that decree. Now Plaintiffs urge the Court to find that the SA requires the

same obligation. Response 9, ECF No. 2433 (citing *Jackson v. Los Lunas Ctr.*, No. 87-0839, 2012

U.S. Dist. LEXIS 200138 at *30 (D.N.M. Oct. 12, 2012)). On this basis, Plaintiffs allege that ¶ 11

---

[16] Defendants and Plaintiffs have made additional requests that the Court mandate a more formal procedure than that contemplated by the SA.

Defendants ask that the Court enforce D.N.M.LR-Civ. 56.1(b) which deems any asserted facts by a movant accepted unless specifically controverted by the nonmovant. While the Court has found that the SA's standard for evaluating motions to disengage is like the standard for summary judgment, there is nothing in the SA that suggests that motions to disengage must comport with federal or local summary judgment rules.

Plaintiffs ask the Court to permit them to use traditional discovery methods in future motions because "Plaintiff's inability to conduct formal discovery under Rules of Civil Procedure, have prevented Plaintiffs from marshalling all of the evidence that they might otherwise have discovered to address and oppose the motions and the affidavits submitted in support thereof." Response 23, ECF No. 2433. Plaintiffs also argued that they were prejudiced in preparing for this Motion by their inability to formally depose Mr. Doan. *Id.* The SA creates the parameters for motions to disengage and the Court will not impose any substantive or procedural requirements not specified in the SA.

requires Defendants to show that they have "[n]arrow[ed] the gap between their standards and provider agency performance" by demonstrating that "the provider agencies serving class members are complying with Defendants' 'policies, procedures, practices, and waiver standards' to [a] greater degree [than] when the settlement was reached." *Id.* 2, 10 (internal quotations in original). Not only does the approach advocated by the Plaintiffs contradict the SA's language, but it changes the premises upon which the parties constructed the SA.

The SA's first sentence outlines its intent "to identify those services, safeguards, and protections from harm that will be provided to the plaintiff class and to ensure that a durable remedy is in place." SA ¶ 1, ECF No. 2299–1. The SA then explains that Defendants meet that purpose when they substantially comply with listed Action items[17] "that the Defendants must take in order to terminate the litigation." *Id.* ¶ 4. Those action items incorporate specific DD Waiver Standards, which are "current Service Standards for operating New Mexico's Developmentally Disability Home and Community-Based Waiver for adults, dated January 2019, and Mia Via Self-Directed Waiver Program Service Standards." *Id.* ¶ 5(3). The SA defines "current" as "state policies, procedures, practices, and waiver standards in effect as of the date of the entry of this Settlement Agreement." *Id.* ¶ 5(2). Notably, Medicaid Waiver Service Standards and regulations are not included.

In asking the Court to consider the overarching purpose of the lawsuit, the Plaintiffs urge the Court to go beyond the language of the SA to find unstated requirements as necessary components of substantial compliance. But to do as Plaintiffs ask would require the Court to ignore the unambiguous language of the SA reflecting the intent of the parties. The SA clearly states that

---

[17] The Action items are listed in ¶¶ 6–15. Paragraph 11 is subdivided into three action items.

it is "the sole source of Defendants' remaining obligations to class members" and "constitute[s] the entirety of the agreement between the parties." *Id.* ¶¶ 4, 27. While the Court recognizes that the goal of safeguarding the health and welfare of the JCMs motivated the parties to reach the agreement embodied in the SA, the parties ultimately concurred that Defendants would do so by completing certain stated steps. To require more of Defendants would change the parties' agreement.

By its language, the SA restricts Defendants' obligations to those contained within the whole document and specifically incorporated DD Waiver Standards. The Court will assess Defendants' substantial compliance as to ¶ 11 solely within those parameters.

### 2. Requirements for Substantial Compliance with ¶ 11

As a condition of disengagement, Defendants must show that they have and that they will continue to substantially comply with all requirements in ¶ 11. Although each subsection of ¶ 11 has a different focus, the subsections demand in whole, or in part,[18] that Defendants hire state-employees (employment requirement), evaluate list/living supports of high-acuity and at risk JCMs (list/living supports requirement), make monthly or quarterly visits to those JCMs (visit requirement), review site documents (documents review requirement), perform certain duties (duties requirement), and determine the necessity of corrective action (corrective action requirement). To demonstrate their compliance with each of these requirements, Defendants created monitoring forms tailored to each subsection of ¶ 11. Defendants argue that these forms, together with the Affidavits, business records, and copies of the waiver standards establish substantial compliance.

---

[18] Paragraph 11(c) has fewer requirements than ¶¶ 11(a) and (b).

Plaintiffs disagree that Defendants' evidence suffices. Their arguments rest, in part, on the reports of three experts Plaintiffs hired[19] to review Defendants' evidence. Plaintiffs argue that these experts' reports demonstrate that Plaintiffs have not substantially complied with four of the six requirements:[20] list/living supports, document review, duties, and corrective action.

### i.      List/ Living Supports Requirement

The list/living supports requirement, which appears only in subparagraphs 11(a) and (b) asks Defendants to review JCMs who are high-acuity and at risk under DD Waiver Standards, Ch. 10, ¶ 10.1. (LCA)[21] to determine whether those JCMs need higher living supports. If the JCM needs higher living supports, the State must increase the JCM's budget to provide those supports. The State must not move the JCM to a lower living supports category. Plaintiffs argue that Defendants have not shown substantial compliance with ¶ 11(a)'s list/living supports requirement.[22]

Defendants' evidence establishes that each month a state employee pulls a current report which is then compared to 2019 a master list. Suppl. Ex. A. ¶¶ 6, 11, ECF 2426-1. The report contains acuity scores which are generated by provider nurses using an Aspiration Risk Screening Tool (ARST) and an electronic Comprehensive Nursing Assessment Tool (e-CHAT). *Id.* ¶¶ 8–9; Ex. B. 13, (ECF 2426-2). If a score has changed, the master report is updated. *Id.* ¶ 12. Regional

---

[19] The experts are Barbara T. Pilarcik, RN for ¶ 11(a), Ted E. Hughes, M.A. for 11(b), and Nicole M. Arsentault, JD for 11(c).

[20] Plaintiffs do not argue that Defendants have not met the employment requirement or the visit requirement. The employment requirement mandates that the State employ qualified registered nurses, behavioral specialists, and case management coordinators. To meet the visit requirement, the monitors must perform either an unannounced monthly visit, ¶¶ 11(a) and (b), or an unannounced quarterly visit, ¶ 11(c).

[21] The LCA Waiver describes the living support arrangements for adults 18 years and older participating in DD Waiver Services.

[22] Although Plaintiffs express disbelief that there are not more than 11 JCMs on the at risk list, they have not explained the basis for that argument, and so the Court will not consider it further.

nurses, regional directors, and DOH employees review the list for accuracy and contact the provider agency if there are concerns. *Id.* ¶¶ 13-15. The JCM's Interdisciplinary Team (IDT) has the discretionary task of evaluating the individual's current living supports category. *Id.* ¶ 18. If the IDT does not agree about the level of support, the guardian or the JCM makes the final decision. *See* Suppl. Ex. D., ECF No. 2426–4. If a JCM's living supports are increased, the budget is increased. Suppl. Ex. A. ¶ 20, ECF No. 2426–1. Between July 2019 and January 2020, 23 JCMs received an increase in living supports. Motion Ex. C., ECF No. 2374–3.

Plaintiffs contend that Defendants have not met the ¶ 11(a) list/living supports requirement[23] because Defendants do not have a quality assurance process as to the ARST and e-CHAT scores, and thus, cannot guarantee the scores' accuracy. A quality assurance program, Plaintiffs argue, obligates Defendants to track "(i) whether needed changes in high-acuity scores are properly entered by provider agencies; (ii) how many changes have been made to high-acuity scores; and (iii) how many scores have changed due to DOH interventions." Response 13, ECF No. 2433. As further evidence of non-compliance, Plaintiffs point to at least five occasions when ¶ 11(a) state employed nurses reported that provider eCHAT assessments were untimely, incomplete, or inaccurate. Defendants respond that they do not bear the responsibility for calculating or verifying the accuracy of ARST and eCHAT scores.

Paragraph 11(a) states that "Defendants will review all class members currently designated as high-acuity pursuant to DD Waiver Standards, Ch. 13, ¶ 13.2.13 (high-acuity individuals) to determine whether they should be receiving a higher level of living supports pursuant to DD Waiver Standards, Ch. 10, ¶ 10.1." SA ¶ 11(a), ECF No. 2299–1. "Defendants," the subject of the

---

[23] Plaintiffs do not make a similar argument about ¶ 11(b).

sentence, must complete the action of reviewing high-acuity JCMs. Notably, Defendants' review is confined to the category of JCMs who have been "**currently designated**" as high-acuity. (emphasis added). Under the waiver standard mentioned in Ch. 13, ¶ 13.2.13, that designation results from a nurse provider's ARST and eCHAT assessment. Therefore, it is the nurse provider's assessments that create the "currently designated" category. While Defendants have assumed the additional task of looking at the scores and expressing concerns to provider agencies, ¶ 11(a) does not require that or any other form of quality assurance from Defendants.

Plaintiffs make a similar argument about the absence of a quality assurance program regarding decisions about JCM living supports. Again, Defendants counter that the DD Waiver Standards do not require a quality assurance program for the discretionary decisions of the JCM's IDT. Moreover, Defendants observe, the ultimate decision about living supports rests with either the JCM or the JCM's guardian. *See* Suppl. Ex. D., ECF No. 2426-4 (D.D. Waiver Services Ch. 10, 10.2 (stating "[a]ll people have the right to choose where they live."). The Court finds that the plain language of the DD Waiver Standards and ¶ 11(a) supports Defendants' argument.

Neither the language of ¶ 11 nor the words of the DD Waiver Standards requires a quality assurance program for the assessed acuity scores or living supports. Without a contractual mandate for a quality assurance program as to the list/living supports evaluation in ¶ 11, the absence of one cannot defeat substantial compliance. Defendants have demonstrated that they have substantially complied with ¶ 11's list/living supports requirement.

### ii.     *Review Documents Requirement*

Subparagraphs 11(a), (b), and (c) require the state employees to ***review*** site documents. *See* ¶ 11(a) (nurses "will review documents that are required to be present"); ¶ 11(b) (behavioral specialist must "review those documents required to be in the home"); ¶ 11(c) (case managers must

"review the site visit forms") (emphasis added). Defendants' evidence of substantial compliance with the review documents requirement consists of tables that include state employee names, dates of review, certification that the employee has reviewed site documents, and a supervisor's dated review and approval of those certifications. Plaintiffs contend that Defendants have not met the review document requirement because the state employees only note if the required site documents are present on site, but do not provide a qualitative assessment of those documents.

The parties' differing interpretations of the review document requirement rely on disparate definitions of the verb "to review." Neither the SA nor the DD Waiver Standards defines what it means "to review." Defendants assert that "to review" simply means to confirm that the documents are present on site. Plaintiffs argue that the term requires state-employees to do two things: 1) perform a qualitative assessment of site documents; and 2) record that assessment.

"The usual and customary meaning is given to language used in a contract." *Montoya v. Villa Linda Mall, Ltd.*, 793 P.2d 258, 260 (N.M. 1990) (citing *Sun Vineyards, Inc. v. Luna Cty. Wine Dev. Corp.*, 760 P.2d 1290, 1294 (N.M. 1988). The verb "review" has many definitions.[24] In one context, "review" may refer to nothing more than an examination; in another, "review" may require a critical evaluation. When a word has two or more meanings, a court must examine the usage and context of the word in the document. *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 976 P.2d 1, 12 (N.M. 1998) (holding that the "language of the entire agreement should be construed together").

---

[24] "Definition of review (entry 2 of 2) *transitive verb* 1 : to view or see again; 2 : to examine or study again; 3 :to look back on: take a retrospective view of 4 a :to go over or examine critically or deliberately b: to give a critical evaluation of; 5 : to hold a review of." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/review (pronunciation marks omitted) (last visited on July 22, 2020).

Review is used several times in all three of ¶ 11's subparagraphs. Subparagraphs (a) and (b) also use the verb "review" to describe Defendants' obligations with respect to the high-acuity and at risk lists. Nothing in (a) or (c) elucidates "review" in these contexts. But a sentence in ¶ 11(b) provides clarity:

> Defendants will utilize state behavioral specialists to ***review and analyze*** the behavioral support plans of those individuals identified on the At Risk list and perform at least, one unannounced, monthly face to face visit with the class members identified in the behavioral component of the At Risk list, ***review those documents required to be in the home***, and ***document the state behavioral specialists' assessment*** of the effectiveness of the Positive Behavior Support Plan and any recommended adjustments.

(emphasis added). The plain language here requires the state employee to "review and analyze . . . plans," review documents required to be in the home, and to "document" an "assessment of the . . . plan and any recommended adjustments." By coupling the verb "review" with the verb "analyze," the parties indicate that they did not intend to incorporate the action of analyzing into the task of reviewing. Similarly, the parties' use of the verb "document" to refer to the action of recording an assessment demonstrates that the verb "review" does not incorporate the action of documenting. Because the actions of analyzing and documenting are described separately from the function of reviewing, the Court concludes that a review of site documents does not require Defendants to record a written analysis of those documents. Rather, the SA's plain language requires state employees only to determine whether the documents are on site.

Defendants' evidence demonstrates that state employees certified that during their monthly or quarterly visits they reviewed whether providers had kept required documents on site. The evidence also shows that the state employees' supervisors examined and approved the state employees' certifications. Defendants have shown substantial compliance with this requirement.

16

### iii.      Purpose/Duties Requirement

Each subparagraph of ¶ 11 requires the reviewing state employee to assess a component of the JCMs' care. Toward this end, ¶ 11 directs Defendants to hire nurses, behavioral specialists, and case managers (employment requirement) and then, specifies their duties additional to those delineated in the list/living supports, review documents, and corrective action requirements. Because each subparagraph has somewhat different requirements, to which Plaintiffs' objections are tailored, the Court will address them separately.

¶ 11(a)

Paragraph 11(a) directs nurses "to review and monitor the health care status of Jackson class members" (monitoring requirement). Toward this end, 11(a) nurses "monitor the nursing functions for those individuals in DD Waiver Standards, Ch. 13, ¶ 13.2.13," (Nursing Waiver Standard) which mandates "prudent nursing practices and clinical issues," by performing document review, speaking with direct care staff, and speaking with the JCM's provider nurse at the time of the visit or within five (5) days of the visit. To demonstrate substantial compliance with ¶ 11(a), Defendants have submitted the following evidence: Affidavits affirming that Defendants' hired registered nurses with special certification relevant to those duties, a sample of the nurse monitoring form, completed site visit forms with the nurses' certification of completion, and tables demonstrating that DDSD supervisors reviewed and approved the completed forms. *See* Motion Ex. C., ECF No. 2374-3; Ex. D, ECF No. 2374-4; Ex E., ECF No. 2374-5, and Suppl. Ex. A., ECF No. 2426-1; Ex. B., ECF No. 2426-2; Ex. C., ECF No. 2426-3; Ex. E.,  ECF No. 2426-5.

Plaintiffs admit that ¶ 11(a) does not require site visit forms.[25] Rather, they object to the evidentiary adequacy of the forms. They argue 1) that the ¶ 11(a) nurse monitoring forms do not comply with established professional standards because they do not show the state employed nurse's qualitative assessment of the provider nurse, and 2) that nurses have not been given written guidance on how to complete the forms. Defendants stated that they created these forms to serve two purposes: 1) to demonstrate that the state employed nurses completed the ¶ 11(a) listed duties; and 2) to use as evidentiary support for contract management.[26]

As the parties agree that the site forms are not required by the plain language of the SA or the DD Waiver Standards, the dispute does not arise from the forms or how they are completed, but from a more fundamental disagreement about the state employed nurses' ¶ 11(a) duties. And when examined, it is apparent that each of Plaintiffs' objections stem from a central premise that the purpose of the ¶ 11(a) visit is to make and then document a qualitative assessment of the provider nurses' care. Plaintiffs argue that this directive is encased in the state employed nurses' duty to monitor provider nurses for prudent nursing practices. Defendants, on the other hand, point out that nothing in ¶ 11(a) indicates that the act of monitoring requires state employed nurses to complete a written qualitative assessment of the JCM provider nurses.

Only ¶ 11(a) uses the verb "to monitor." The state employed nurses are "to review and monitor the health care status of [JCMs]" and "to monitor the nursing functions required for those individuals." The Court has found that the word "review" as used in the SA merely means to determine whether something is present and does not incorporate a written analysis requirement. The SA does not define the verb "to monitor." So, again the Court must look to the plain meaning

---

[25] See Transcript of Hearing 15:3–6, ECF No. 2243 (Plaintiffs' counsel, Mr. Hanson acknowledging that "The Settlement Agreement does not mention forms").

[26] *Id.* at 7:6-10; 9:17-25, 10:1

of the term. Merriam-Webster explains that "monitor/monitored/monitoring" is a transitive verb that means: "to watch, to keep track of, or check usually for a special purpose"[27] Thus, the action signaled by "monitor" is that of watching or checking someone or something for a specific objective.

The Nursing Waiver Standard incorporated into ¶ 11(a) directs the state employed nurses to conduct monitoring visits based on "prudent nursing standards." Significantly, in her report, the Plaintiffs' expert did not actually use the term "prudent nursing standards" but instead referred to the benchmark as "prevailing nursing standards," and "standard nursing practices," terms not used in ¶ 11(a) or in the Nursing Waiver Standard. Response Ex. A. 2, (ECF No. 2433-1). The Court observes that the parties agreed that the States' current policies and procedures establish the baseline for measuring compliance. Thus, the only relevant standards for judging compliance are those stated in ¶ 11(a) and the Nursing Waiver Standard that tell the state employed nurses to monitor while guided by "prudent nursing standards." Because the state nurses must watch or check provider nurses and weigh their care against "prudent nursing standards," monitoring, as used in ¶ 11(a) and the Nursing Waiver Standard, does require a qualitative assessment.

But while the Court agrees that the SA imposes a qualitative assessment requirement, nothing in its language creates a writing requirement. As previously observed, only ¶ 11(b) demands a written assessment, and it does so by telling behavioral specialists to document both an assessment and recommendations. The writing requirement in ¶ 11(b) indicates that in the SA, the

---

[27] *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/monitor (last visited on July 22, 2020).

parties employed specific language when they intended to impose a writing obligation.[28] That language does not appear in ¶ 11(a).

Nor does the monitoring *objective* import a writing requirement. The Nursing Waiver Standard compels nurses to have "a face to face nursing visit **to monitor** the status of the individual and **discuss issues** with the DSP." (emphasis added). Here the verb "monitor" is coupled with the verb "discuss." The objective of the monitoring qualitative assessment in the Nursing Waiver Standard is "to discuss" issues.

Similarly, the ¶ 11(a) sentence that contains the monitoring requirement gives the nurses "the authority to review and monitor" and then, "when necessary", "to direct corrective action." In this way, ¶ 11(a) provides a second objective for monitoring—the need for corrective action. The Court concludes that the ¶ 11(a) monitoring requirement demands that the nurses make a qualitative assessment of the provider nurses' services based on prudent nursing practices, but the objective of that qualitative assessment is to discuss issues with the provider nurses and to determine whether to direct corrective action, but not to produce a written evaluation.

Defendants' evidence demonstrates that state-employed nurses completed 222 ¶ 11(a) monthly monitoring visits and certified that 95.6 percent of the time they spoke with provider nurses. Between July 2019 and January 2020, ¶ 11(a) visits generated 211 corrective actions.[29] The Court finds that Defendants have demonstrated substantial compliance with the ¶ 11(a) duties requirement.

---

[28] Other sections of the Nursing Waiver Standard not referenced in ¶ 11(a) also specifically impose a writing requirement. *See* DD Waiver Services, Ch. 13, 13.2.4(2) (stating that "nursing visits to monitor health status or to evaluate a change of clinical condition must be documented in a signed legible progress note that records both date and time.").

[29] This number includes 209 Requests for Regional Assistance (RORAs) and 2 occasions where state employed nurses removed JCMs from a provider's home.

¶ 11(b)

Paragraph 11(b) requires state employed behavioral specialists "to review and analyze the behavioral support plans of those individuals identified on the At Risk list" and "document the state behavioral specialists' assessment of the effectiveness of the Positive Behavior Support Plan and any recommended adjustments." Behavioral specialists use an electronic monitoring form to assess care and a review tool to evaluate the adequacy of the Positive Behavior Support Plan (PBSP). Suppl. Ex. A. ¶¶ 61–71, ECF No. 2426–1; *see also* Ex. K., ECF No. 2374-11 (Positive Behavior Supports Document Review). Subsequently, a clinical director reviews the behavioral specialists' work. *Id*., Ex. A. ¶ 73, ECF No. 2426–1. As evidence of substantial compliance with these requirements, Defendants supplied written guidelines for JCA At Risk Obligation, tables recording certification of ¶ 11(b) monthly visits, a sample of the electronic ¶ 11(b) monitoring form, guidelines for completing the ¶ 11(b) monitoring forms, and a sample of the behavioral tool. *See* Motion Ex. G.,  ECF No. 2374–7; Ex. H., ECF No. 2374–8; Ex. I., ECF No. 2374–9; Ex. J., ECF No. 2374–10; and Ex. K., ECF No. 2374–11; *see also* Suppl. Ex. A., ECF No. 2426–1.

Plaintiffs object to Defendants' forms and argue that paper monitoring forms are ineffective because they "have changed over time and do not consistently document either assessments or effectiveness, staff competence or implementation." Response 40, ECF No. 2433. Defendants reply that Plaintiffs' objections focus on a paper monitoring form that no longer exists but was replaced in January 2020 with an electronic form. More importantly, Defendants note that Plaintiffs' objections do not correlate with the findings made by their expert.

Initially, Plaintiffs' expert examined the paper form and found it ineffective. After examining the later-adopted electronic form, Plaintiffs' expert noted that the new form addressed most of his concerns. *See* Response Ex. 2. ¶¶ 21, 22, ECF No. 2433–2 ("Concerns related to the

identified failing of the paper-only versions of the BBS Monitoring forms . . . was, in part, addressed via the use of the most recent revision in the electronic version of the BBS Monitoring Form.") The expert also found that the electronic form met "the expectation for the documentation of the behavior specialists assessment of the effectiveness of the individual's PBSP, at least with regards to addressing the factors that resulted in the individual being placed on the At Risk list." *Id.* ¶ 23. Plaintiffs' expert expressed some concern that the forms did not seem "to assess both staff competence and consistency of implementation of the PBSP," although some narratives suggested that some assessment did occur. *Id.* ¶ 27. Defendants observe that these objections are addressed by the PBSP monitoring tool, which requires behavioral specialists to evaluate the effectiveness of the PBSP and skill factors. Defendants provided the tool, but the expert did not evaluate it.

Because Plaintiffs' objections center on a form that Defendants no longer use, and Plaintiffs' expert found Defendants' electronic form resolved most of his concerns, while his other concerns were resolved by a tool the expert did not consider, the Court finds that Defendants have met their burden and demonstrated substantial compliance with the duties requirement of ¶ 11(b).

¶ 11(c)

At a quarterly visit to each JCM who is included on both the high-acuity and at risk lists, the case manager coordinator evaluates whether the JCM's case manager is meeting the health/medical/behavioral requirements as defined in the 2018 DD Standards, Ch. 8, ¶ 8.2. *See* Motion Ex. M., ECF No. 2374–13 (Monitoring Form). Prior to the visit, the case manager coordinator reviews the site visit forms maintained in an electronic database and examines the current case manager's work under applicable DD Waiver Standards. *Id.*, Suppl. Ex. A. ¶ 86, ECF No. 2426–1. Case Manager Coordinators record their visits with an electronic form. Suppl. Ex. A. ¶ 85, ECF No. 2426–1. The visit forms are routed to the Statewide Case Management Coordinator

or his or designee for review. *Id.* ¶ 90. Since July 2019, 74 out of the 77 case manager coordinator visits have been approved.

Plaintiffs' expert found that the State has developed and implemented a process that satisfies most of the State's oversight responsibility. Response Ex. 3, ¶ 14, ECF No. 2433–3. In her report, she concluded that Defendants' visit form was adequate and that the case managers were completing the process delineated in ¶ 11(c) in accordance with the form. *Id.* The expert did express concern about the timeliness of the submission of the site visit forms; some forms were submitted long after the visit occurred. *Id.* But the expert also noted that neither ¶ 11(c) nor the DDS Waiver Standards imposed a deadline for submitting site visit forms. *Id.* ¶ 11 n.3.

While the Court agrees with Plaintiffs' expert that it would be helpful to have a deadline for form submission, the SA does not impose one. As Plaintiffs offered no other objections to the coordinator case managers' performance of their duties, the Court finds that Defendants' have substantially complied with the duties requirements in ¶ 11(c).

### iv.   *Corrective Action Requirement*

All three sections of ¶ 11 require the respective state employee to take corrective action by reporting and referring a provider for contract management if a state employee determines that the provider is not adhering to the applicable standards. Paragraphs 11(a) and (b) have an additional requirement: if the state employee determines that a JCM has "suffered, or is likely to suffer serious harm," the state-employee must take immediate action to protect the individual.

State employees can initiate preliminary steps for contract management through RORAs.[30] State employees use RORAs to inform DDSD of gaps in service for issues at the system level, for issues with a provider agency, or for issues with an individual. Suppl. Ex. F. 2, ECF No. 2376–6. ("The RORA form is intended to be a helpful mechanism for informing DDSD of gaps in service and/or needs for assistance."). State employees conducting ¶ 11(a) or (b) visits must complete a RORA if there is corrective action required but not completed prior to the state employees' departure from the site. *Id.* Ex. A. ¶ 38, ECF No. 2426–1. The electronic site visit forms require the state employee to report the submission of a RORA. *Id.* ¶ 39. Within five days of receipt of a RORA, the assigned regional office lead must contact the submitting individual. Steps taken to complete the request are documented and the requestor receives monthly updates. *Id.* ¶¶ 43–44.

Defendants have provided evidence that between July 2019 and January 2020, ¶ 11(a) visits generated 209 RORAs, ¶ 11(b) visits generated 11 RORAs, and ¶ 11(c) visits generated 28 RORAs. *See* Suppl. Ex A. ¶¶ 45, 78, 95, ECF No. 2426–1. One ¶ 11(c) visit resulted in a provider referral for contract management. *Id.* ¶ 97. Immediate action was taken after two 11(a) visits and after one 11(b) visit. *Id.* ¶¶ 50, 81.

Plaintiffs argue that the lack of referrals for contract management indicates that the state employees have not: 1) appropriately referred for contract management and taken effective corrective actions when non-compliance is found; and 2) taken immediate action when a class member has suffered or is likely to suffer serious harm. According to Plaintiffs, the existence of

---

[30] DD Waiver Services Contract Management Policy provides that "[p]rior to the imposition of any CMP or other sanctions [Defendants] may engage in activities that are less than sanctions in an effort to resolve the issue and/or concern. These activities may include but are not limited to technical assistance or administrative actions as defined in this policy and procedures. It is not a requirement that any activity, type of technical assistance, or administrative action be implemented prior to the imposition of a CMP. . . ." *See* Suppl. Ex. F. § V.A, ECF No. 2426-6. The policy further defines DDSD Site Visit Monitoring Forms and RORAs as evidence of documented technical assistance and administrative actions. *Id.* § V.D.2.b-c.

298 RORAs "documenting widespread and ongoing failures to abide by DD Waiver Standards" shows that the state employees are not engaging in in direct corrective action. Response 6, ECF No. 2433. This argument is premised on an assumption that the state-employees are charged not only with directing corrective action, but also with actively tracking RORAs from submission to completion. Defendants counter that ¶ 11 only gives state-employees the authority to refer for corrective action, whereas the responsibility for administering it lies in a different paragraph, ¶ 13.

The difference between state employees' and Defendants' contract management duties is illustrated in the verbs used to assign them. Paragraph 11 instructs state employees "to direct corrective actions when necessary" by "reporting and referral for contract management."[31] ¶¶ 11(a), (b). But ¶ 13 asks Defendants to do more: "**Defendants will implement** the Qualified Provider Agreement Initiative and **enforce** the terms of the revised provider agreement through DOH contract management." SA ¶ 13, ECF No. 2299–1 (emphasis added). "To implement" is "to give practical effect to and ensure of actual fulfillment by concrete measures."[32] And "enforce" means "to give force to" or "compel."[33] The SA's verbiage specifies that state employees only initiate or refer for corrective action: Defendants administer it.

Plaintiffs also argue that the number of ¶ 11(a) RORAs indicate that state employees should have made at least one ¶ 11(a) referral for contract management and taken more immediate actions to fulfill their obligation to remove JCMs threatened with serious harm. Response 15, ECF No. 2433. But Plaintiffs have failed to tie any specific RORA to these arguments. In the absence of

---

[31] Plaintiffs do not argue that Defendants must track a JCM's immediate removal from harm.

[32] *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/implement (last visited July 22, 2020).

[33] *Id.* https://www.merriam-webster.com/dictionary/enforce (last visited July 22, 2020).

support for their claim, Plaintiffs have not and cannot meet their burden to rebut Defendants' evidence with a genuine issue of material fact.

To show substantial compliance with ¶ 11, Defendants must only show that state employees understand their obligation to direct contract management and that state employees do so when appropriate. Defendants' evidence including 298 RORAs, three removals, and 1 referral for contract management shows that state employees have satisfied that requirement.

### 3.   **Plaintiffs' Additional Objections Are Not Based on ¶ 11 Requirements**

Plaintiff offer the following additional objections to disengagement: 1) Defendants have not created written guidelines for their 11(a) and 11(c) forms, 2) Defendants have not established a program to ensure inter-rater reliability; and 3) Defendants have not adequately trained their state employees. Plaintiffs have not associated these arguments with specific requirements in ¶ 11 or in the DD Waiver Standards.

Nothing in ¶ 11 supports Plaintiffs first two arguments. Because monitoring forms are not required by ¶ 11, Defendants are not obligated to create guidelines for them. While the Court agrees with Plaintiffs that the state-employees' use of the forms would improve with written guidelines, the SA does not require them.

Plaintiffs' second argument suggests that ¶ 11 requires Defendants to create a quality assurance program that "looks behind" the work of the state employed nurses, behavioral specialists, and case management coordinators to determine if they are correctly and consistently completing their obligations. In effect, such a program would require Defendants to monitor the monitors. Plaintiffs' admit that while the requirement is not within the plain language of the SA, the overarching purpose of the SA demands it. As previously stated, the Court will not "read" additional steps into the SA.

Next, Plaintiffs argue that Defendants have an obligation to adequately train their employees. According to Plaintiffs, evidence that the forms are not consistently filled out demonstrates that the state employees are not adequately trained. But the forms are not required, so inconsistent forms cannot be evidence of inadequate training. Defendants have provided evidence that that they hire qualified employees, train them, and provide ongoing training to those employees with monthly telephone calls. See Suppl. Ex. A. ¶¶ 22–26 (visiting nurse guidance), ¶¶ 68, 77 (behavioral specialist guidance), ¶¶ 88 (case manager coordinator guidance), ECF No. 2426–1. While the Court agrees that some form of written instruction for all components of ¶ 11 would benefit the state employees, nothing in ¶ 11 makes that a measurement for substantial compliance. Moreover, because Defendants have shown that state employees have complied with all ¶ 11 requirements, the Court finds that Defendants have shown that the state employees are adequately trained.

IT IS ORDERED:

Defendants' MOTION TO DISENGAGE PARAGRAPHS 11A, 11B, AND 11C OF THE SETTLEMENT AGREEMENT, ECF No. 2374, is GRANTED.

_____
SENIOR UNITED STATES DISTRICT JUDGE