# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WALTER STEPHEN JACKSON, et al.,

     Plaintiffs,

     vs.                            CIV No. 87-0839 JFR/KBM

LOS LUNAS CENTER FOR PERSONS
WITH DEVELOPMENTAL DISABILITIES, *et al.*,

     Defendants.

and

THE ARC OF NEW MEXICO,

     Intervenors,

and

MARY TERRAZAS, *et al*,

     Intervenors.

## <u>MEMORANDUM OPINION AND ORDER</u>

     This case arose out of conditions present in New Mexico's state-operated facilities for the developmentally disabled. In 1990, the Court found that those conditions violated the Jackson Class Members' (JCMs) constitutional and statutory rights.[1] Since then, Plaintiffs[2] and Defendants have worked to rectify and correct the systemic problems that resulted in the wrongs to the JCMs.[3]

---

[1] *See Jackson v. Fort Stanton Hosp. & Training Sch.*, 757 F. Supp. 1243 (D. N.M. 1990), *rev'd in part*, 964 F.2d 890 (10th Cir. 1992).

[2] JCMs are "the plaintiff class, as revised by the Court in its Order on Class Reconfiguration." *See* Doc. 2299-1 II.5(9). "'Parties' means the Plaintiffs, the Intervenor Arc of New Mexico, and the Defendants." *See* SA II ¶ 5(8). Plaintiffs refers to the JCMs and the Intervenors. All references to Plaintiffs include Intervenors.

[3] One of the state operated facilities, Fort Stanton, closed in 1995 and the other, Los Lunas, closed in July 1997. *See Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1184 (10th Cir. 2018).

On December 4, 2020, Defendants filed a Motion (Doc. 2489) to Disengage Paragraph 12 of the Settlement Agreement (SA).[4] Paragraph 12 describes the State's obligation to adhere to its Developmentally Disabled Waiver Service Standards (DD Waiver Standards) when providing health related services to the JCMs. On September 29, 2021, a hearing was conducted on the fully briefed Motion.[5] After considering the briefs, the arguments of counsel, and all exhibits, the Court will GRANT the Motion.

## I. FACTS AND PROCEDURAL HISTORY

### A.  The Settlement Agreement

In April 2019, the parties asked the Court for preliminary approval of the SA, which the Court granted.[6] After a hearing, the Court approved the SA on June 21, 2019.[7] The SA constitutes the parties' agreement that substantial compliance with the State's policies and standards will establish a durable remedy.[8] Toward that end, the SA includes a section entitled "Actions to Resolve the Litigation" (Actions) which describe Defendants' obligations to the JCMs. Doc. 2299- 1 III. The Actions are comprised of seven alphabetical sections[9] further divided into twelve

---

[4] The SA identifies Defendants as "the Departments of Health (DOH), the Human Services Department (HSD) and the Division of Vocational Rehabilitation (DVR) of the Public Education Department." *See* Doc. 2299-1 ¶ II.5(6).

[5] On January 22, 2021, Plaintiffs filed a response opposing disengagement (Doc. 2518) (Response), and on February 12, 2021, Defendants replied (Doc. 2532) (Reply). On July 28, 2021, Plaintiffs filed a Notice of Affidavit (Doc. 2563) (LR Affidavit). Defendants filed a Surreply on October 13, 2021. (Doc. 2584) (Surreply). In the text, the Court will refer to the briefing as, "Motion," "Response," "Reply," "LR Affidavit" and "Surreply." In citations, the Court will cite to the document numbers.

[6] *See* Joint Motion to Approve Settlement Agreement, Doc. 2289; Order, Doc. 2292.

[7] *See* Memorandum Opinion and Order, Doc. 2304.

[8] The SA contemplated a termination date of December 21, 2020. *Id.* ¶ 17. That date has passed. The pandemic and other events made that date unachievable. The Court finds that the failure to meet that date does not vitiate any portion of the SA.

[9] The seven alphabetical sections and paragraphs are as follows: A. *Removal of the Jackson Compliance Administrator*, Paragraph 6; B. *Incident Management*, Paragraph 7 and Paragraph 8; C. *Mortality Review*, Paragraph 9; D. *Health*, Paragraphs 11a, 11b, 11c, and Paragraph 12; E. *Provider Oversight*, Paragraph 13; F. *Supported Employment*, Paragraph 14; and G. *Individual Quality Review (IQR)*, Paragraph 15.

paragraphs. All but one of the paragraphs specifically incorporate the State's policies or standards.[10]

To terminate the litigation in this case, Defendants must demonstrate substantial compliance with each paragraph. Once Defendants believe that they have substantially complied with a paragraph, they must provide notice to the Plaintiffs. Doc. 2299-1 V ¶ 19. Thirty days after sending notice, Defendants may file a motion for disengagement. *Id.* If Plaintiffs contest that motion, then the parties may request that the Court "hold a hearing and enter its findings and conclusions." *Id.*

Disengagement from individual Actions does not end the Defendants' obligations. Until the SA is terminated, Defendants must continue sustained compliance with disengaged Actions. *Id.* ¶ 21. At any time during this process, Defendants may file a motion asking the Court to find that they have either complied or maintained compliance with all provisions of the SA. *Id.* "If the Court determines that the Defendants have complied with all provisions of this [SA], it will issue an order declaring that the Defendants are in compliance with this [SA], . . . vacate all remaining orders in this case, and dismiss this case with prejudice." *Id.*

Since the SA's final approval, Defendants have disengaged all paragraphs either by stipulation,[11] contested motion,[12] or by completion of all directives in the paragraph.[13] Presently, Paragraph 12 is the only Action not disengaged.

---

[10] Paragraph 6, which is the first paragraph in Actions, addresses the termination of the position of the Jackson Compliance Administrator and does not reference a policy or a standard. Doc. 2299-1 ¶ 6.

[11] The parties stipulated to disengagement of Paragraphs 8 (Doc. 2339), 10 (Doc. 2351), 13 (Doc. 2587), 14 (Doc. 2434) and 15 (Doc. 2525).

[12] Defendants' motions to disengage Paragraphs 7, 9, and 11 were contested.

[13]All actions in Paragraph 6 occurred upon the Court's final approval of the SA.

**B.  Findings of Fact**

      After considering the evidence, the briefings, and the arguments of counsel, the Court makes the following findings of fact:

1.    Paragraph 12 states "The Defendants will provide health related services as required by the DD Waiver Standards, and specifically Ch. 5, ¶ 5.1, 5.5; Ch. 13 ¶¶ 13.1—13.3; and Ch. 20 ¶¶ 20.2—20.6. Doc. 2299-1 ¶ 12.

2.    Most JCMs receive services under the New Mexico Developmental Disabilities Waiver (DD Waiver). *See* Doc. 2563-1 ¶ 9. Some JCMs receive services under the Mi Via Waiver. *See* Doc. 2299-1 II ¶5(3). The DD Waiver and the Mi Via Waiver are two home and community-based Medicaid waiver programs overseen by the Developmental Disabilities Supports Division (DDSD). *See* NMDOH, Developmental Disabilities Supports Division, https://www.nmhealth.org/about/ddsd .

3.    Defendants do not directly provide healthcare related services. They contract with third parties, or providers, to deliver these services. Doc. 2532-9, DD Waiver Standard ¶ 1.6.

4.    To guide providers in delivering services, the DOH created the DD Waiver Standards. *See* Doc. 2584-1 ¶ 36. The "DD Waiver Standards" are the "Services Standards for operating New Mexico's Developmental Disability Home and Community-Based Waiver for adults, dated January 2019,[14] and Mi Via Self-Directed Waiver Program Services Standards." Doc.

---

[14] The parties provided the Court with selections of the DD Waiver Standards from Chapters 5, 13 and 20. The full standards are available online. *See* Developmental Disabilities Waiver Service Standards (Effective Date January 1, 2019), https://www.nmhealth.org/about/ddsd/pgsv/ddw/publications?size=20&page=4 (DDSWD Manual). The Court will take judicial notice of the DDSWD Manual. *See* Fed. R. Evid. 201 (stating "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it …can be accurately and readily determined from sources whose accuracy cannot reasonable be questioned."). Whenever a standard is not included in the briefing, the Court will cite to the DDSWD Manual. On July 1, 2021, a new version of the standards became effective. DDW Draft DDW Service Standards Effective July 1, 2021  https://www.nmhealth.org/about/ddsd/pgsv/ddw/publications . The Court did not consider the new version in its analysis.

2299 - 1 II ¶ 5(3). These standards apply to all provider agencies and their staff and delineate how providers must render services. *See* Doc. 2532-9 ¶ 1.6.

5.  New Mexico's Department of Health's (DOH) Division of Health Improvement (DHI) "is the regulatory agency providing oversight for the DD Waiver." DDSWD Manual, ¶ 16.9.

6.  The DD Waiver Standards are divided into three sections: Section 1: Planning, Section II: DD Waiver Services, and Section III: Quality Assurance and Continuous Quality Improvement. *See* DDSWD Manual at 5-9. Divided among the sections are 22 chapters. Each chapter includes numerous standards.

**DD Waiver Chapters and Standards Named in Paragraph 12**

7.  Paragraph 12 names three chapters from the DD Waiver Standards: Chapter 5, Health, Chapter 13, Nursing Services, and Chapter 20, Provider Documentation and Client Records.

8.  Paragraph 12 names two standards from Chapter 5, Health: 5.1 and 5.5.

9.  Standard 5.1 addresses healthcare coordination. Doc. 2489-1 at 1.

10.  Standard 5.5 addresses aspiration risk management and includes sub standards for screening and treatment planning.

11.  Paragraph 12 specifically includes all Chapter 13 standards. Chapter 13 is divided into three parts: Overview, Part 1, and Part 2. *See* (Doc. 2489-3).

12.  Standard 13.1 provides an overview of the nurse's role as described in the Chapter 13 standards. *Id.* at 1.

13.  Part 1 of the Chapter 13 standards begins with Standard 13.2 and "addresses general nursing requirements that are applicable for all nursing supports provided through [sic] in

the DD Waiver." *Id.* at 1-15. There are fourteen standards in Part 1. *Id.* at 2-14. (13.2.1-13-2-14).

14.   Standard 13.3 initiates Part 2 and establishes parameters for specific Adult Nursing Services (ANS). *Id.* at 16-23. There are 5 standards in Part 2. (13.3-13.3.5)

15.   Chapter 20 is the final standard named in Paragraph 12. There are six standards in this chapter. *See* Doc. 2489-4 at 1. Paragraph 12 specifically includes 5 standards.

**DD Waiver Standards Included in Other SA Paragraphs**

18.   The SA textually incorporates DD Waiver Standards in Paragraph 12 and six additional paragraphs: 11a, 11b, 11c, 13, 14, and 15.

*Paragraph 11*

16.   Paragraph 11 of the SA is divided into three distinct paragraphs, 11a, 11b, and 11c. These paragraphs provide the guidelines for state employed nurses, state behavioral specialists, and case managers (CMs) to monitor and manage the medical and behavioral care of high-acuity and at-risk JCMs. The monitoring duties require monthly or quarterly visits. Paragraphs 11a, 11b, and 11c explain the requirements for these visits. Doc. 2299-1 ¶¶ 11a, 11b, 11c.

17.   Almost half of the JCMs, approximately 115-120, qualify for 11a monthly visits. Doc. 2491-3 ¶¶ 7-8.

18.   Paragraph 11a incorporates DD Waiver Standard 13.2.13. Doc. 2299-1 ¶11 a.

19.   During the 11a visits, among other things, the nurses are required to examine whether certain documents are current including the comprehensive electronic health assessment tool (e-Chat), ARST, Medication Administration Assessment Tool (MAAT), Individual Service Plan (ISP), Medication Administration Record (MAR), and Comprehensive

Aspiration Risk Management Plan (CARMP). *See* 2299-1 ¶ 11a; Doc. 2489-3 ¶ 13.2.13; Doc. 2532-6 at 1-5 (nurse monitoring form).

20. Paragraph 11a and 11b refer to DD Waiver Standard 10.1 from Chapter 10, Living Care Arrangements, which describes the five different types of living care arrangements under the DD Waiver. *See* 2299-1 ¶¶ 11a, 11b; DDSWD Manual ¶ 10.1.

21. On July 23, 2020, the Court found that Defendants had substantially complied with Paragraph 11, and ordered it disengaged. *See* Memorandum Opinion and Order, Doc. 2447.

22. Between January 2020 and October 2020, 11a visitors noted that e-Chat was current 99.22 percent of the time. The ARST was current 99.22 percent of the time. The MAAT was current 99.32 percent of the time. The ISP was current 97.26 percent of the time. The CARMP was current 90.32 percent of the time and available on-site 96.4 percent of the time. Doc. 2491-3 at 7-8.

23. Paragraph 11c of the SA discusses case management for high acuity and/or high behavioral individuals. It incorporates standard 8.2 of Chapter 8.0, Case Management. *See* 2299-1 ¶ 11c, *see also* DDSWD Manual ¶ 8.2.

24. Paragraph 11c visitors noted that the JCM's CM indicated health concerns 59 times during their twice monthly case management visits. *See* Doc. 2491 at 10.

25. When the CM noted health concerns, 93.22 percent of the time, the CM, or the interdisciplinary team (IDT) took appropriate action. *Id.*

26. Between February 2020 and October 2020, Paragraph 11c visits found that the Health and Safety section of the ISP provided a summary of significant medical, health, and behavioral concerns 98.49 percent of the time. *Id.* at 11.

27.     The 11c visits also found 92.19 percent compliance with follow up appointments and addressed needs. *Id.* at 12.

### Paragraph 13

28.     Paragraph 13 requires Defendants to implement the Qualified Provider Initiative, which is "the revised provider agreement between DDSD and community providers of developmental disability services, including the process for reviewing provider applications, and ensuring compliance with the terms of the revised provider agreement." Doc. 2299-1 ¶ 13, 5(10).

29.     Paragraph 13 includes several DIV.DDSD policies and includes three chapters from the DD Waiver Standards: Chapter 16: Qualified Provider Agencies, Chapter 18: Incident Management System, and Chapter 19: Provider Reporting Requirements. All three chapters are in Section III, Quality Assurance and Continuous Quality Improvement.

30.     Standard 16.9 delineates procedures for Quality Management Bureau (QMB) surveys. These surveys are conducted by DHI. *See* DDSWD Manual at 212-13. The QMB survey team conducts unannounced on-site, systems-based surveys and other quality improvement activities related to the health, welfare and safety of individuals receiving these supports." DDSWD Manual ¶ 16.9.

31.     Chapter 16 also explains the practice for contract management. Contract management authorizes the DDSD to ensure compliance with DD Waiver Standards. It is a continuous process that starts with the analysis and evaluation of the program and addresses areas not in compliance. *Id.* Contract Management ensures compliance through technical assistance, performance improvement plans, civil monetary sanctions, and referral to the Internal Review Committee. Doc. 2489 ¶ 45.

32.     In Chapter 18, standard 18.8 describes Case Management and DD Waiver Provider Agency responsibilities for risk management. *Id.* ¶ 18.8. The standard states that provider agencies "have a continuous responsibility to monitor for risk of harm especially during and after an investigation." *Id.* The subparts of the standard further describe a provider's responsibilities after a report of abuse and neglect (ANE). *Id.*

33.     By stipulation, on October 14, 2021 (Doc.2587), the parties disengaged Paragraph 13.

### *Paragraph 14*

34.     Paragraph 14 focuses on person-centered assessments and ensures that these assessments will address the interests and abilities of all working age JCMs. Paragraph 14 includes standards from 4 DD Waiver Chapters: Chapter 4: Person Centered Thinking, Chapter 6: Individual Service Plan, Chapter 8: Case Management, and Chapter 11: Community Inclusion. Doc. 2299-1 ¶ 14.

35.     Three standards from Chapter 4 are included in Paragraph 14: 4.2, Person-Centered Thinking, 4.3, Person-Centered Planning, and 4.5 Informed Choice. All three standards prioritize the dignity of the individual and focus on the importance of involving the individual in their own care as well as the opportunity to make informed choices. *Id.; see also* DDSWD Manual ¶¶ 4.2, 4.3, 4.5.

36.     From Chapter 6, Paragraph 14 includes standard 6.6.3.4, Documenting Employment First in the ISP. Doc. 2299-1. This standard elucidates the steps for determining whether the individual wants to obtain employment and if so, the process of developing a plan to do so. *See Id.* ¶ 6.6.3.4.

37.     Chapter 8 standard 8.2.1 explains the case manager's role "to facilitate self-advocacy and advocate on behalf of the person." *Id.* ¶ 8.2.1.

38.     Three standards from Chapter 11 are named in Paragraph 14: 11.1, General Scope and

        Intent of Services, 11.2 Employment First, and 11.4 Person Centered Assessments (PCA)

        and Career Development Plans. *See* 2299-1 ¶ 14; *see also* DDSWD Manual ¶¶ 11.1, 11.2,

        11.4.

39.     All three standards delineate the importance of providing access for individual to

        employment and the process for determining what activities and opportunities best meet

        the individual's needs. DDSWD Manual ¶¶ 11.1, 11.2, 11.4.

40.     By stipulation, on May 6, 2020 (Doc. 2434), Paragraph 14 was disengaged.

                            *Paragraph 15*

41.     The Internal Quality Review (IQR) is an audit that evaluates compliance with DD Waiver

        Standards. A succession of Jackson Community Monitors developed the IQR and

        continued to implement it until a transfer of the process began in 2019 and concluded in

        2020. See Doc. 2563-1 at 3; Doc. 2299-1 ¶ 15.

42.     Paragraph 15 explains the transfer of the IQR process from the Community Monitor to

        Defendants and in doing so, incorporates standard 16.10 from Chapter 16, which provides

        standards for Qualified Provider Agencies. *See* 2299-1 ¶ 15.

43.     The IQR survey continues as a quality component of the DD Waiver Standards and is now

        administered entirely by Defendants. All actions delineated in Paragraph 15 were

        completed on June 30, 2021.

**Paragraphs that Do Not Specifically Incorporate Standards**

44.     Defendants oversee a provider's compliance with DD Waiver Standards through quality

        control measures, including audits, investigations, and monitoring. SA Paragraphs 7 and 9

        describe two of the State's quality control measures.

### *Paragraph 7*

45. Paragraph 7 outlines the process for investigating alleged ANE of JCMs through incident management. Doc. 2299-1 ¶ 7.

46. The Incident Management Bureau (IMB) investigates allegations of abuse, which include "intentional deprivation by a caretaker or other person of services necessary to maintain the mental and physical health of a person" and neglect, which "means the failure of the caretaker to provide basic needs of a person such as clothing, food, shelter, supervision and care for the physical and mental health of the person. Neglect causes, or is likely to cause, physical or emotional harm to a person." Doc. 2342-2 (IMB Policy 13.260.006).

47. The IMB policies include requirements for immediate safety plans and corrective action. Doc. 2342-4 *(*IMB Policy 13.260.006).

48. Chapter 18 of the DD Waiver Standards also define certain Incident Management Standards. The standards in Chapter 18 describe the Incident Management System (IMS), a provider's duty to be trained to identify ANE, and how to respond if there are allegations of ANE. *See* DDSWD Manual ¶¶ 18.1-18.3. Providers also have a duty to cooperate with DHI investigation. *Id.* ¶ 18.4.

49. On April 5, 2020, the Court found that Defendants have substantially complied with Paragraph 7. *See* Memorandum Opinion and Order, Doc. 2415.

50. Since the disengagement of Paragraph 7, the IMB has continued to employ the same quality assurance review. Doc. 2489-5 ¶ 16.

51. The IMB audit in the second quarter of fiscal year 2020 noted several deficiencies that resulted in a non-passing score of 85.6 percent. *Id.* ¶ 24.

52.     In response, the IMB supervisors addressed the deficiencies with an investigation and documented the subsequent remediation. *Id.* ¶¶ 25-26.

53.     After retraining providers, IMB conducted another audit based on reports from December 2019 and January 2020. The results of the second audit showed significant improvement, scoring 91.45 percent. *Id.* at 8-11.

54.     Subsequent quarterly audits in the third and fourth quarters of fiscal year 20 and the first quarter of fiscal year 21 have received a passing score and shown continued improvement: Q3FY20, 93.5 percent; Q4FY20, 93.8 percent; Q1FY21, 93.74 percent. *Id.*

### *Paragraph 9*

55.     Paragraph 9 of the SA outlines the process for conducting mortality reviews of the deaths of JCMs and remediating any delivery of care issues found through the review.

56.     Part of the mortality review process includes determining whether necessary and reasonable medical, social, and psychological interventions were provided prior to death. Doc. 2554 at 3.

57.     The mortality review policy requires the Mortality Review Committee (MRC) to make certain recommendations following the review. *Id.* at 11.

58.     DD Waiver Standard 18.5 explains both how providers must report deaths and their duty to work with DDSD on any subsequent concerns. *See* DDSWD Manual ¶ 18.5.

59.     Defendants must complete a mortality review consistent with their own policy for the death of each JCM. *See* Doc. 2254 at 3.

60.     On June 8, 2021, the Court found that Defendants have substantially complied with Paragraph 9. *See* Memorandum Opinion and Order, Doc. 2554.

**Other Monitoring and Oversight Programs**

61.   Defendants established the Developmental Disabilities Systems Quality Improvement Committee (DDSQI) as a steering committee for quality improvement and quality assurance. Doc. 2491-2 ¶ 5.

62.   DDSQI implements and monitors the Quality Improvement Strategy (QIS). DDSWD Manual ¶ 1.5. Chapter 22 of the DD Waiver Standards outlines the QIS process, which requires providers to "evaluate their performance." *Id*. at 251. The provider must prepare an Annual Report based on the QI process and a QI plan. *Id.* ¶ 22.4.

63.   As explained in the DD Waiver Standards, the Regional Office Bureau has oversight responsibilities that include "case management agency and service provider compliance with standards, regulations, and provider agreements." DDSWD Manual at 280, ¶ 16.8 (contract management). The Regional Office also engages in certain monitoring duties "which may include ISP QA activities, site and home visits and responses to RORA." *Id.* ¶ 6.8(3).

64.   The Regional Office Bureau also oversees ongoing technical assistance, conflict resolution, contract management, and guidance to individual teams and programs. *See* 2491-2 ¶ 12; see also DDSWD Manual, ¶ 16.8.1 (describing technical assistance procedure).

65.   Individuals can submit a Regional Office Request for Assistance ("RORA") to address individual, provider, or systemic issues. *See Id.* at ¶ 19.6; *see also* Doc. 2491-2 ¶ 14.

### *The IQR*

66.   Although Paragraph 12 does not refer to the IQR, the parties agree that the IQR furnishes "the most comprehensive data" regarding compliance with the DD Waiver Standards. *See* Docs. 2489 ¶¶ 46; 2563-1 ¶ 8.

13

67.    Standard 16.10 explains that the IQR team, "conducts individualized surveys of JCMs. All services received by the individual JCM are reviewed to determine the quality of services and supports." DDSWD Manual ¶ 16.10.

68.    To conduct the IQR, the state is divided into five regions: metro, northeast, northwest, southeast, and southwest. *See* DDSWD Manual at 285.

69.    IQR surveyors conduct reviews of a sample of individuals using a "protocol. Doc.2489- 5 ¶ 5.

70.    The protocol is a set of questions the surveyors consider when evaluating the services provided to the JCMs. Doc. 2489-5 ¶ 6.

71.    Generally, IQR surveyors are not medical professionals. Doc. 2584-1 ¶ 69. IQR surveyors do not receive significant training on DD Waiver Standards. *Id.* ¶ 68.

72.    During the IQR survey, four types of evidence are gathered: (1) physical evidence collected through direct observation; (2) testimonial evidence obtained through interviews; (3) documentary evidence acquired through record review; (4) analytical evidence derived through comparative or deductive analysis. Doc. 2489-6 at 3.

73.    Each question has a set of ratings and is scored by the surveyor with help from scoring instructions and a guidance document. Doc. 2563-1 at 8.

74.    Surveyors grade IQR questions based on five factors: (1) the JCM's needs as identified by the team; (2) a review of documents in the individual's record; (3) interviews; (4) observations; and (5) documented evidence listed in the Protocol by the Surveyor, reviewed, and agreed/added to as necessary by the case judge. *Id.* at 12.

75.    Surveyors present findings using a plus "+" and minus "-" system to document the justification for their scores. *Id.* at 11.

76.     Case judges receive and review all material acquired by the surveyor, including results of interviews and observations. *See id.* at 10.

77.     The sample's last year of services is then analyzed during the IQR review which takes approximately three weeks. *See* Doc. 2489-6 at 2.

78.     In performing the review, the surveyor answers a series of questions with the following scoring system: 0=no compliance, *1*=needs improvement, few of the indicators are met, many are inconsistently met, *2*=many indicators met, but not all, *3*=full compliance, *4*=not applicable, *5*=could not determine. *See* Doc. 2489-6 at 4.

79.     At the conclusion of each review, a report is prepared summarizing the results. *See* Doc. 2489-5 ¶ 10.

80.     As described in the DD Waiver Standards, IQR "findings" are issues noted during the IQR that need the attention of the IDT "to address and bring resolution to ensure that the JCM has quality supports and service in place." DDSW Manual ¶ 16.10.1.

81.     The IQR may generate four types of findings. The first, "Standard Findings and Recommendations" arise from issues noted in the survey "that need the attention of the IDT and follow the standard 30, 60, 90-day timeframe. *Id.* ¶ 16.10.1.1.

82.     "Immediate Findings and Recommendations" come from issues during the IQR that "need immediate attention for individuals who have urgent health, safety, environmental and/or abuse/neglect/exploitation issues identified which the team is not successfully addressing in a timely fashion. These findings must be followed up on immediately." *Id.* ¶ 16.10.1.2.

83.     "Special Findings and Recommendations" come from IQR issues "that, if not effectively addressed, are likely to become an urgent health and safety concern" for the JCM. *Id.* at 16.10.1.3.

84.   "Repeat Findings and Recommendations" are IQR issues that are repetitions of findings "in a previous quality audit for the JCM." *Id.* at 16.10.1.4.

85.   At the conclusion of the IQR process, standard 16.10.2 requires the providers (1) review the findings, (2) meet as a team to resolve the findings, and (3) provide evidence to the DDSD to resolve the findings and recommendations. *Id.* ¶ 16.10.2.

86.   At the end of the fiscal year, June 30th, the DOH prepares two statewide reports: a PowerPoint report that contains quantitative data, and a report with a narrative analysis of the data. Doc. 2489-5 ¶ 11.

### *2019 IQR Report*

87.   The 2019 IQR Report encompasses data from a fiscal year. The fiscal year for the 2019 IQR Report began on July 1, 2019 and concluded on June 30, 2020. *See* ¶ 10, 11.

88.   Defendants released the 2019 Individual Quality Review Statewide Findings (2019 IQR Report)[15] on August 27, 2020. Eighty-seven JCMs were in the sample, which in 2019, was one-third of the 244 JCM population. Doc. 2489-7.

89.   Defendants prepared the 2019 IQR Report with input from the former Jackson Community Monitor, Lyn Rucker, who at the time acted as Defendants' technical advisor. Doc. 2489- 5 ¶ 12.

90.   The 2019 IQR Report found that 40 class members needed immediate attention. *Id.* at 3.

91.   Forty-seven people did not need immediate attention. *Id.*

92.   Forty-two individuals needed special attention. *Id.* Forty-five individuals did not need special attention. *Id.*

---

[15]The span of New Mexico's fiscal year means that the 2019 IQR Report includes a significant amount of 2020 data. *See., e.g.,* Doc. 2489-5.

## II. APPLICABLE LAW

"A settlement document is a contract and is construed using ordinary principles of contract interpretation." *Anthony v. United States*, 987 F.2d 670, 673 (10th Cir. 1993) (further citation omitted). "Issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law.'" *Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013) (quoting *Schoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) (alteration in original)). The parties created and entered the SA in New Mexico, so New Mexico contract law applies.

When examining a contract, a court first must determine if the contract is ambiguous. Generally, a contract is ambiguous when it is "'reasonably and fairly susceptible of different constructions.'" *LensCrafters, Inc. v. Keho*, 282 P.3d 754, 763 (N.M. 2012) (quoting *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 976 P.2d 1, 12 (N.M. 1998)); *Lucero, Jr. v. Northland Ins. Co*, 346 P.3d 1154, 1159–60 (N.M. 2015) (holding that a contract is ambiguous when it may have two reasonable but conflicting meanings). A contract with clear terms is conclusive. *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993) ("The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive" (citations omitted)). "The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court." *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993) (citation omitted). A mere disagreement between the parties about the construction of the contract does not make it ambiguous. *LensCrafters*, 828 P.3d at 763.

The Court must determine whether Defendants have substantially complied with Paragraph 12. Substantial compliance is a contract doctrine meant "'to assist the court in determining whether

conduct should, in reality, be considered the equivalence of compliance under the contract.'"

*Joseph A. by Wolf v. New Mexico Dep't of Human Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995)

(citing John D. Calamari & Joseph M. Perillo, the Law of Contracts § 11-15 at 454 (3d ed. 1987)).

Plaintiffs contend that in the context of the health of the developmentally disabled, the threshold

for substantial compliance should be flexible because of the important interests at stake. Plaintiffs

profess that "a score of 80% may be sufficient to show substantial compliance with an IQR

question concerning whether there is documentation that a non-essential event has occurred, but a

score of 96% may not be sufficient to show substantial compliance with a Standard that is crucial

to preventing aspiration because of the grave consequences (including possible death) when

safeguards to prevent aspiration are not in place." *Id.* Doc. 2518 at 22.

Defendants object to a flexible standard. The focus of the substantial compliance inquiry,

Defendants explain, is whether a party's performance of the terms of the agreement "frustrated the

purpose of the consent decree-i.e., its essential requirements." *Joseph A.* 69 F.3d at 1086.

Defendants state that they "have provided information and context to the Court to determine both

compliance with specific criteria addressed in the [SA] as well as whether Defendants are

frustrating the purposes of Paragraph 12." Doc. 2532 at 12.

*Joseph A.* is the seminal case on substantial compliance. At issue in *Joseph A.* was whether

the special master had appropriately applied the substantial compliance standard when evaluating

a consent decree. The Tenth Circuit held that when a consent decree "sets forth specific criteria

to be met, those criteria must be respected unless a deviation can be shown not to have a material

effect upon the overall performance ...." *Id.* at 1087. When making a substantial compliance

determination, the Tenth Circuit advised, a court should "begin with the essential purposes of the

consent decree . . . and it should then consider the specific steps set forth in the consent decree by

which those purposes may be satisfied." *Id.* at 1086. The Tenth Circuit explained that the *Joseph A.* special master erred, because he engaged in a substantial compliance analysis that did not focus on whether the defendants had strayed from the contract by performing in a manner that frustrated the purpose of the decree but proceeded under an approach that "subjectively weighs what was done against what was wanted." *Id.* (further citation omitted).

Here, the SA states that its "purpose and intent . . . is to identify those services, safeguards, and protections from harm that will be provided to the plaintiff class and to ensure that a durable remedy is in place when the litigation ends, and this case is dismissed." Doc. 2299-1 ¶ 1. In the Joint Motion to Approve the SA, the parties explained, "[t]he [SA] describes a series of Actions which the Defendants must complete in order to fulfill their obligations to plaintiff class members, terminating the Court's oversight of the litigation, and dismissing the case. The Actions and provisions set forth in the [SA] will directly benefit class members and are necessary to ensure a durable remedy has been implemented." Doc. 2299 ¶ 5. The SA further clarifies, "[e]xcept as to the court orders listed in Section II, ¶ 5(11)[16] below, this Settlement Agreement will be the ***sole source*** of Defendants' remaining obligations to the class members during the Term of this Settlement Agreement." Doc. 2299-1 ¶ 4 (emphasis added).

Thus, under the plain terms of the SA, a durable remedy is in place when Defendants have substantially complied with seven Action items. Defendants will show substantial compliance with Paragraph 12's terms when they "provide health related services *as required by the DD Waiver Standards.*" Doc. 2299-1 ¶ 12 (emphasis added). Therefore, as to Paragraph 12, the DD Waiver Standards provide the criteria for substantial compliance.

---

[16] The SA left three orders in place: (1) the Memorandum Opinion and Order of December 28, 1990, Doc. 679; the Memorandum Opinion and Order approving motion to amend complaint, Doc. 831; and (3) the Memorandum Opinion and Order on class reconfiguration, Doc. 890.

Plaintiffs ask the Court to impose a supplementary layer to the DD Waiver Standard substantial compliance scrutiny—one that examines "the interests at stake." Plaintiffs take the phrase "interests at stake" from the Tenth Circuit explanation that " 'substantiality' must depend on the circumstances of each case, including the nature of *interest at stake* and the degree to which noncompliance affects that interest." *Joseph A.*, 69 F.3d at 1085 (quoting *Fortin v. Commissioner of the Dep't of Mass. Pub. Welfare*, 692 F.2d 790, 795 (1st Cir. 1982) (emphasis added). As interpreted by Plaintiffs, an interest at stake standard demands that the Court make a discretionary judgment about the value of each standard, and based on that determination, determine the appropriate substantial compliance threshold. Plaintiffs misread *Joseph A.*

*Joseph A* explicitly rejected the type of standard proposed by Plaintiffs.[17] *Id.* at 1086. The Tenth Circuit did not use the term "interests at stake" to suggest that courts adopt a flexible substantial compliance standard, but rather to show that the definition of substantial compliance, like a contract term, must come from the facts and circumstances of the case. *Id.* at 1085 (observing "[t]he term 'substantial compliance' appears in the consent decree and thus we treat it like a contract term.") Here, in Paragraph 12, the SA establishes a benchmark for substantial compliance, the DD Waiver Standards. Interjecting an additional subjective shifting element into the substantial compliance inquiry would deviate from Paragraph 12's terms and thereby, materially modify the SA. When entering the SA, the parties did not adopt a "flexible standard." Neither will the Court.

---

[17]This is not the first time Plaintiffs have asked the Court to impose a higher standard than that required by the SA. *See, e.g.,* Doc. 2477 at 10 ("In asking the Court to consider the overarching purpose of the lawsuit, the Plaintiffs urge the Court to go beyond the language of the SA to find unstated requirements as necessary components of substantial compliance. But to do as Plaintiffs ask would require the Court to ignore the unambiguous language of the SA reflecting the intent of the parties.").

# III. ANALYSIS

## A. Parties' Arguments

Paragraph 12 focuses on Defendants' provision of healthcare services under the DD Waiver Standards. The parties debate (1) whether Defendants met the SA's notice requirements; (2) whether evidence of both disengaged paragraphs and the IQR can support substantial compliance; (3) whether the IQR is a standards-based survey and how it should be scored; and (4) whether Defendants have demonstrated substantial compliance with Paragraph 12.

## B. Notice

The SA states that "[w]hen the Defendants believe they have substantially implemented an Action . . .they will notify the Plaintiffs and Intervenor Arc. The notice will state the basis for the Defendants' belief that they have substantially implemented the Action(s), including the facts then known supporting their claim of compliance." Doc. 2299-1 ¶ 19. On November 2, 2020, Defendants sent notice to Plaintiffs of their substantial compliance with Paragraphs 12, 13, and 15. Doc. 2532-1.

Plaintiffs argue that Defendants' notice as to Paragraph 12 was defective, because it omitted a factual basis for Defendants' claim that evidence from disengaged paragraphs supported the Motion. Doc. 2518 at 6 n.5. Accordingly, Plaintiffs ask the Court to disregard "all factual assertions in the [M]otion regarding IMB, Paragraph 11A visits, RORAs (characterized as 'contract management') or Mortality Review activities." Doc. 2518 at 6.

Defendants' notice stated:

Defendants believe these systems actually support compliance with Paragraph 12 and demonstrate that there are multiple methods for identifying and correcting non-compliance with health-related standards. Notably, the Court has found IMB [Paragraph 7] and Paragraph 11A visits compliant with the terms of the Settlement Agreement: thus, the Court has already ruled these systems are functioning as intended.

Doc. 2532-1 at 4. Defendants maintain that this language gives Plaintiffs fair notice that previously disengaged paragraphs provide a factual basis for their assertion of substantial compliance with Paragraph 12. The Court agrees.

Defendants' Notice effectively informs Plaintiffs that Defendants will use the disengagement of paragraphs as evidence to support their Motion. The SA does not require more. The simple fact that a paragraph, with its attendant obligations, has been disengaged speaks for itself.

Even if Defendants' notice had been improper, Plaintiffs were not harmed. Plaintiffs have not argued that they did not have time to prepare their response to Defendants' Motion. Certainly, Defendants agreed to all Plaintiffs' requests for extensions. *See* Doc. 2532 at 2 (observing that Defendants granted Plaintiffs six weeks to respond to this Motion). Also, as the Court has stated many times and will reiterate here, the SA does not contemplate formal procedures, rather, it anticipates an informal process. *See* Doc. 2550 at 5-6 (detailing the Court's rulings that the SA does not provide for formal discovery, depositions, or hearings). The Court concludes that Defendants gave Plaintiffs proper notice.

## C.  Relevant Evidence of Substantial Compliance with Paragraph 12

### 1.  Evidence of disengaged paragraphs and Defendants' oversight activities

To support their Motion, Defendants submit evidence of disengaged paragraphs, quality control programs, and the 2019 IQR scores. Plaintiffs object to all evidence except the IQR scores, arguing (1) the IQR alone effectively measures the adequacy of the health-related services provided to the JCMs; and (2) evidence of or resulting from Defendants' monitoring and oversight

activities is not relevant.[18] *See* Doc. 2518 at 3, 28; Doc. 2563-1 at 9. Defendants disagree, contending that all health-related services are relevant. The text of Paragraph 12 and the SA support Defendants' assertions.

Paragraph 12 requires Defendants to "provide health related services as required by the DD Waiver Standards" and then lists specific standards in Chapter 5, 13, and 20. Notably, the text includes ***all*** DD Waiver Standards and "specifically" certain named standards in three chapters. Six SA Paragraphs include DD Waiver Standards. The Court finds that disengagement from those six paragraphs is relevant evidence as to this Motion.

Plaintiffs strenuously object to evidence from three of those paragraphs, 11a, 11b, or 11c, insofar as they incorporate Defendants' monitoring and oversight activities. According to Plaintiffs, "[d]ocumenting and reviewing instances of noncompliance does not fulfill Defendants' obligation under Paragraph 12 to 'provide . . . services.'" Doc. 2518 at 5 (alteration in brief). Focusing on the word "provide," Plaintiffs argue that Defendants must directly provide care and monitoring and oversight activities are not the active provision of care. [19]

---

[18] Plaintiffs make a third argument, which appears to be premised on New Mexico's nondelegation doctrine. Citing *Clear v Patterson*, 459 P.2d 358 (N.M. Ct. App. 1969), Plaintiffs allege that Defendants cannot evade the "consequences of noncompliance by delegating to third party providers their contractual obligation in Paragraph 12 to provide health related services to the plaintiff class." Doc. 2518 at 28-29. Plaintiffs contend that Defendants' monitoring programs are indirect oversight that "does not in any way relieve Defendants of their direct contractual obligation 'to provide health related services' to the plaintiff class." *Id.* at 29. This argument is unintelligible. Paragraph 12 includes all DD Waiver Standards. Those standards are constructed, in part, to guide the contracted providers who provide care. *See* DDSWD ¶ 1.6. Likewise, Plaintiffs have not cited to any evidence that Defendants have disclaimed or evade their contractual obligations. To the extent that Plaintiffs object to disengagement based on non-delegation principles, the Court will deny this argument.

[19] Until this Motion, Plaintiffs have emphasized the important role oversight and monitoring have in the DD Waiver System. In disengagement proceedings for Paragraphs 7, and 9, Plaintiffs argued that oversight was a crucial component of adequate healthcare. *See, e.g.*, Doc. 2352 at 3-4 (the Immediate Action and Safety Plan (IASP), with is part of IMB policies and procedures, "serves a critical function of assuring protection and safety"); and Doc. 2376 at 7 (observing that "compliance with the existing mortality review process [Paragraph 9] is critical to protect the health of surviving class members." ); *see also* Doc. 2460 at 33 (explaining that the purpose of the mortality review policy is "a way to promote the health and safety of the living.").

The quote used by Plaintiffs "provide . . . services" is incomplete. Tellingly, it omits the words "health related." The use of "health" and "related" to modify the word "services" means that Paragraph 12 covers the provision of all "health related services." Certainly, oversight and monitoring of third parties who provide healthcare is a health-related service.

In addition to Paragraphs 11a, 11b, and 11c, two other paragraphs in the SA, Paragraph 7 and Paragraph 9, involve monitoring activities. Neither refer to DD Waiver Standards, but both work under DOH/DHI policies. *See* 2299-1 ¶ 7 (requiring Defendants to conduct investigations under DOH/DHI policies and naming three); ¶ 9 (also listing three DOH/DHI policies and requiring Defendants to comply). Interestingly, the IQR is a third monitoring process on which Defendants rely for quality control. Paragraph 15 describes the IQR as "a component of DHI's quality program management." *See* 2299-1 ¶ 15 (emphasis added). As part of their quality control measures, all three programs require remediation.[20] Although the DD Waiver Standards do not include the policies for these quality control measures, the DD Waiver Standards do describe the providers' obligation to comply with investigations, which includes remediation.[21]

Plaintiffs suggest that remediation is irrelevant as it is "planned future action." *See* Doc. 2518 at 22 (arguing that "anticipate improvement" on found problems cannot show substantial compliance). This argument overlooks that remediation is more than the resolution of a problem. Remediation requires the isolation of concerns, a plan to resolve those concerns, and then taking

---

[20]Standard 8.2.7, which is incorporated into Paragraph 11c, requires case managers who are monitoring high acuity or high behavioral individuals to engage in a "formal ongoing monitoring process to evaluate the quality, effectiveness and appropriateness of services and supports provided to the person as specified in the ISP" and to report concerns. DDSWD Manual ¶ 8.2.7. The subsections of this standard further explains that if during the monitoring duties, the CM identifies concerns about the health and safety of the individual, the DD Waiver provider agency must "remediate or develop an acceptable plan of remediation." DDSWD Manual ¶ 8.2.7(9). If the concerns are not remedied, the CM is advised to use the RORA process. *Id.* ¶ 8.2.7(10).

[21]Significantly, the IQR also examines whether there are indicators of ANE. Any evidence of ANE scores against Defendants under the "nursing services" standards in Chapter 13. *See* Doc. 2489-1 at 22 (2019 IQR question "Is the person protected from abuse, neglect, and exploitation?"); *see also* Doc. 2563-1 at 36 (explaining scoring of IQR question #101).

actions to eliminate them. In sum, Defendants' monitoring duties are tied to ongoing actions, which effectively, are indirect care. As Paragraphs 7 and 9 compel Defendants to evaluate the performance of health providers and the quality of the services provided, the Court finds that Paragraphs 7 and 9 also contribute pertinent information about health related services.

Finally, adopting Plaintiffs' suggestion that the IQR is the only proper tool for measuring Defendants' compliance with Paragraph 12 would revive, in part, a past practice not ratified by the SA. Previously, under the terms of a now defunct consent decree, the predecessor to the IQR[22] was the sole measure for evaluating obligations within "Continued Improvement of Community Services." *See* Doc. 1047-1 (explaining the procedures for disengaging these obligations). To disengage those obligations, Defendants had to achieve a defined score on the Community Systems Review or Community Audit. *See* Doc. 1047-1 ¶ 32. But the parties did not carry this process into the SA. To accept Plaintiffs' argument that the IQR is the sole evaluative method for Paragraph 12 would revive this procedure and thereby, modify the SA. The Court will not do so.

The Court concludes that all evidence that relates to Defendants' provision of health-related services, which includes both direct care and indirect care through monitoring and oversight, is relevant.

## 2. The IQR

The parties also disagree about how well the IQR correlates with the DD Waiver Standards. Plaintiffs argue that (1) the IQR is a standards-based audit devised to evaluate DD Waiver Standards compliance, and (2) only certain scores on the IQR show substantial compliance. *See* Doc. 2563-1 at 5. Defendants disagree, contending that while the IQR is relevant evidence, it is

---

[22] The precursor to the IQR was the Community Systems Review or Community Audit. *See* Doc. 1064 at 17.  In 2003, this evaluation became known as the Community Practice Review. Doc. 2518 at 9; Doc. 2563-1 at 14 n.12; Doc. 2563-1 ¶5. In 2017, it was renamed the Individual Quality Review or IQR. *See* Doc. 2518 at 9, Doc. 2563-1 at 14 n.12. Doc. 2563-1 ¶ 5.

not dispositive because (1) the IQR was not intended to measure the DD Waiver Standards, and (2) often the IQR demands a level of performance not mandated by the Standards. Doc. 2584 at 2. When evaluating which IQR scores indicate substantial compliance, "Defendants ask the Court to consider findings of "Many" and "Needs Improvement" as well as the actual findings of affirmative non-compliance to make a determination of substantial compliance." Doc. 2532 at 12.

Plaintiffs' argument that the IQR is the only relevant evidence for Paragraph 12 hinges on the premise that the IQR is standards-based. They assert that the best evidence of the purpose of the IQR and of its scoring system comes from "the architect of the scoring system, Lyn Rucker." Doc. 2518 at 3. Toward that end they submit an affidavit from Ms. Rucker. Doc. 2563-1.

The Defendants do not dispute that as the Community Monitor for 17 years, Ms. Rucker has played an important role in developing the IQR. *See* Docs. 2563-1 ¶ 4, 2299-1 ¶ 15. Nevertheless, Defendants object to the testimony of Ms. Rucker, arguing that Ms. Rucker has "no specialized knowledge of DD Standards," and that "her testimony on the IQR is inconsistent with years of training and written guidance provided by DOH." *Id; see also* Doc. 2584-1 ¶¶ 24, 25 (Supplemental Affidavit of Shadee Brown, the Deputy Director for Community Programs for the NM DOH, stating that she has heard Ms. Rucker state an estimated 75 times that "the IQR is *not* a standards review"). The Court finds that Ms. Rucker's testimony is not dispositive of whether the questions reflect the standards, but that her testimony is relevant on the approach she took in developing the IQR system.

Ms. Rucker explained that "[t]he IQR questions, as written, do not expressly reference specific Standards but correlate to the Standards by addressing the ***content*** of the Standards' requirement" or as Ms. Rucker phrased another way, the "adequacy of the services and supports provided to [JCMs]." See Doc. 2563-1 at 4, 9.  Plaintiffs also admit that the IQR sometimes

"imposes a higher level of consideration than minimum compliance with the standards." Doc. 2518 at 16. According to Plaintiffs, because the IQR measures the "adequacy of services" and the DD Waiver Standards establish the foundation for what constitutes adequate services, the IQR is standards-based.

In this manner, Plaintiffs conflate the terms "standards-based" and "content-based." But Defendants argue that the terms do not mean the same thing. Standards-based, as used by Defendants, means a one-to-one correlation between an IQR question and a DD Waiver Standard. In contrast, content-based, as used by Plaintiffs, means an attempt to align the content or goal of a standard with a question that approximates the same.

Notably, the SA does not define the IQR as a standards-based audit or a content-based audit, it reveals only that the IQR is "consistent with DD Waiver Standards." Doc. 2299-1 ¶ 15. The term "consistent with" supports Ms. Rucker's assertion that the IQR is "content-based." But the phrase "consistent with" also implies that there is no direct link between individual questions and IQR questions. A comparison of the IQR questions with the DD Waiver Standards corroborates that point.[23]

The parties provided tables to the Court which indicate which standards they believe align with various IQR questions. Between them, they apply 54 of the IQR questions to the standards in Chapters 5, 13, and 20. Notably, both parties apply many questions to each standard, often not the same ones. The inverse is also true: one question is used to evaluate several standards.[24] As scored,

---

[23] For example, Plaintiffs align a documentation requirement standard, 13.2.4 with two very broad IQR questions that do not ask about documentation: #54 "Are nursing services provided as needed?"; #57c Were medical specialists appointments attended timely?" *See* Doc. 2489-7 at 11-12.

[24] Plaintiffs score three standards, 13.2.8.3 (Assistance with Medication Delivery by Staff), 13.3.2.3 (Medication Oversight), and 20.6 (Medication Administration Record) with one question, # 53 "Does the individual receive medication as prescribed?"

many IQR questions impose requirements that are often not in the standard[25] with which they are linked. Sometimes a question is scored on the quality of an answer rather than an assessment of the care required under the standard. *See, e.g.*, Doc. 2584-1 ¶¶ 42-47. Undefined terms in IQR questions like "as needed" and "adequate" bring an additional discretionary element to the scoring. Most importantly, when a surveyor scores an IQR question, the surveyor considers only five factors: (1) the Class Member's needs as identified by the team; (2) a review of documents in the individual's record; (3) interviews; (4) observations; and (5) documented evidence listed in the protocol by the surveyor, reviewed, and agreed/added to as necessary by the case judge. Doc. 2563-1 at 12. Conspicuously absent from these factors is any consideration of the DD Waiver Standards.

The Community Monitor designed the IQR with the goal of evaluating the adequacy of the services. Thus, it follows that the IQR is content based. But the question before the Court is not whether the IQR measures *adequate* services as defined by the IQR, the question is how well the IQR evaluates the "***health related services***" demanded by the DD Waiver Standards. Nowhere in the SA, Paragraph 12, or the DD Waiver Standards is "adequate" used as a benchmark for substantial compliance.  The Court finds that while the IQR is an important implement for examining the services provided to the JCMs, as a content-based audit, it is not a standards-based audit. The lack of a clear correlation between individual questions and particular standards means that the IQR results relay important but not sufficient evidence.

The parties also disagree about how to interpret IQR scoring. IQR questions are evaluated and scored on a four-tiered numerical scale with *0* meaning no factors met and *3* meaning full

---

[25] *See* Doc. 2584-1. Ms. Brown testified: "Mrs. Rucker's tips for consideration of adequacy in the IQR protocol go above and beyond the standards. [] For example, under IQR Question 57, Ms. Rucker provides a number of timelines for delivery of services. [] These are not contained in the DDW Standards."

compliance.[26] Relying on Ms. Rucker's testimony, Plaintiffs assert that only a *3* equates to substantial compliance because "[f]or 28 years, the CPR, IQR Surveyors and Case Judges have been trained that a score of 'Full Compliance' is the only score which confirms that supports and services evaluated during a Review meet the identified needs of the class member. All other scores indicate the degree to which the Class Members' needs have not been met." Doc. 2563-1 at 13.

As an initial matter, Plaintiffs' assertion gives surveyors and case judges an improper role. Substantively, this argument asserts that each time an IQR surveyor or case judge awards a *3,* a *2,* or a *1,* they have made a legal determination. That is not within their purview. Substantial compliance is a legal question for the Court. *See Joseph A.,* 69 F.3d at 1086 (explaining substantial compliance).

Also, not persuasive is Plaintiffs' historical argument. First, Defendants do not disagree a *3* means full compliance. Rather, Defendants assert that full compliance is a higher standard than substantial compliance. Support for this argument is found both in Plaintiffs' admission that the IQR does not directly correlate to the standards and that the IQR scoring often imposes a higher standard of compliance than that required by the standards.

Perhaps most importantly, the text of the IQR scoring matrix defines a score of *3* as "Full Compliance." The adjective "full" does not mean the same thing as the adjective "substantial." The latter generally indicates some quantum of full but a lesser amount. *Compare* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/full (defining full as "complete, especially in detail, number or duration")[27] *with* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/substantial (defining "substantial as "being largely

---

[26] The IQR includes two additional scores that do not gauge the substantive question: *4*=non applicable and *5*=could not determine.

[27] The Merriam-Webster Online Dictionary provides 11 definitions of "full." This is the second definition, and it most closely approximates how the word is used here.

but not wholly that which is specified").[28] Nothing in the SA or in the IQR scoring grid contradicts the plain meaning of "full" by equating it with "substantial."

The IQR definition of a *2* score gives further support to Defendants' argument that a *2* is the equivalent of substantial compliance. In the IQR scoring grid, a *2* means "many indicators met but not all." "Many," while less than "most," is still a significant amount. *See* Merriam-Webster Online Dictionary, https://www.merrriam-webster.com/dictionary/many (defining "many" as consisting of or amounts to a large but indefinite number" and "being one of a large but indefinite number"). "Full compliance" juxtaposed with "many but not all" contextually suggests that the higher score means "all."

Other evidence also indicates that a *2* shows substantial compliance. Defendants' evidence demonstrates that a *3* generally means a perfect score. In the 2019 IQR Report, only 5 of 180 questions that scored a *3* received any negative indicators. Doc. 2532-2 ¶¶ 15, 16, 17. These figures show that only 1.1 percent of all questions receiving a *3* did not receive a perfect score, whereas 98.9 percent did. The report also shows that, on occasion, a single negative finding may result in a score of less than 3, regardless of the number of positive findings. Doc. 2584-1 ¶ 18.

Plaintiffs' own evidence indicates that a *3* must mean something close to full compliance. *See* Doc. 2563-1 (examples of negative indicators resulting in a score of *2*, *1*, or *0*). Case studies demonstrate that a broadly worded IQR question can receive a score of *2* from as few as three negatively scored components.[29] To be sure, each negative component may signal more than one event, but when viewed in the context of an entire year, those negative components do not

---

[28]The Merriam-Webster Online Dictionary provides five definitions of substantial. The third and the fifth are the only definitions addressing quantity. The third, which provides two definitions, has different connotations for the word "substantial" than the way the word is used here: "a: possessed of means: WELL-TO-DO, b: considerable in quantity, significantly great//earned a substantial wage." *Id.*

[29] An IQR question is scored based on the number and weight of negative indicators. *See* Doc. 2563-1.

outweigh the myriad of services rendered by the provider.[30] Significant also, is the fact that a single problem with care may be included as a negative component on more than one question which can give that factor disproportionate weight.[31]

Defendants also argue that a *1* equates to substantial compliance. As defined, a *1* means "needs improvement/few factors met." According to Defendants, like scores of *2*, scores of *1* are the product of few mistakes. Defendants point out that "IQR scoring never required surveyors to consider whether any actual harm occurred" because the scoring focuses on indicators, "not whether needs were met." *See* Doc. 2584 at 5.

Although both Plaintiffs' and Defendants' evidence reveal that, at times, a small number of negative components can result in a score of *1,* the language of the scoring system does not support Defendants' argument that a *1* is equivalent to substantial compliance. The Court recognizes that because the DD Waiver Standards and the IQR standards do not always align, on occasion, a *1* may stem from negative indicators unrelated to the standard and so may not accurately reflect Defendants' compliance with that standard. But the parties have created and agreed to this scoring system. Meeting the requirements of only a "few factors" on an IQR question is not enough to show probable substantial compliance with the criteria of that question.

---

[30] Case study *C,* a 56-year-old JCM with 13 diagnoses including cerebral palsy, dysphagia, tachycardia, depression, and anxiety demonstrates how only a few negative components can result in a *2* score.

Question #60 asks: "Were recommendations from assessments used in planning?" *C*'s provider received a *2* based on four negative pieces of evidence. One negative component indicated that there was no evidence that the JCM's primary medical provider or team considered recommendations by the JCM's dietician that *C* take B-12, iron, and Vitamin C, and have a ferritin lab taken. The other negative component was for the residential staff's inability to find the resident's Positive Behavioral Support Plan on site. *See* Doc. 2563-1. Significantly, nothing in the case study indicates how many recommendations were made and followed within a given year nor is it clear the number or type of "plans" surveyors expected to find on-site.

[31] Plaintiffs' case study *A* concerns the care of a 70-year-old JCM and included five questions. Three of the five questions had a negative indicator because of problems with G-J tube. Those questions asked: #54 "Are nursing services provided as needed by the individual," #57e "Were Health Care Plans available, accurate and consistently implemented," and #101"Is the person protected from abuse, neglect and exploitation." The questions scored *1*, *2*, and *0*.

The language of the scoring grid, the testimony of Plaintiffs' and Defendants' experts, and the samples of negative indicators that resulted in a score of *2* show that scores of *2* and *3* on IQR questions presumptively establish substantial compliance with standards aligned with that question.

## D. Substantial Compliance

Plaintiffs argue that Defendants have not met their burden and demonstrated substantial compliance with Paragraph 12. They assert that (1) Defendants' oversight, quality assurance, and contract management activities "have found non-compliance, while also failing to provide any evidence that Defendants 'provide the health related services' required by Paragraph 12"; (2) the IQR scores "do not support a finding of substantial compliance under the principles espoused by the Tenth Circuit"; (3) Defendants "do not provide evidence of compliance with sixteen (16) of the Paragraph 12 standards," and (4) the 2020 IQR scores show a decreasing rate of compliance Doc. 2518 at 33, 35.

### 1. Defendants' Oversight, Quality Assurance, and Contract Management Activities

Defendants have disengaged all Paragraphs in the SA except Paragraph 12. Plaintiffs stipulated to disengagement of some Paragraphs and contested disengagement on only three: Paragraph 7, Paragraph 9, and Paragraph 11. During the proceedings on contested paragraphs, Defendants relied on evidence from 2019-2020. The evidence Defendants provided for Paragraph 12 also relies on data from this same period. The Court finds that because Defendants' proffered evidence in previous disengagement procedures parallels the evidence offered here, findings about health-related services that the Court made in those proceedings that relate to the provision of health-related services under DD Waiver Standards is equally conclusive here.

**Paragraph 7**

Paragraph 7 requires Defendants to conduct IMB investigations. These investigations research allegations of ANE. Paragraph 7 incorporates a DOH/DHI policy that adopts a Quality Assurance (QA) tool that performs an audit "'to ensure the accuracy, thoroughness, quality, and completeness of IMB investigations and remedy any areas found deficient.'" *See* Memorandum Opinion and Order, Doc. 2415 at 8 (further citation omitted). Defendants employ the QA tool quarterly. A score of 90 percent or more on a QA audit demonstrates substantial compliance with Defendants' IMB obligations. *Id.* On April 5, 2020, Paragraph 7 was disengaged.

Defendants have provided QA scores that followed disengagement. In the second quarter of fiscal year 2020, Defendants' QA scores dropped to a non-passing score of 85.6 percent. Defendants immediately addressed the deficiencies with an investigation. Subsequently, Defendants remediated the found problems and initiated another training. Since then, all QA audits have scored above 90 percent.

The Court finds that Defendants' evidence demonstrates ongoing substantial compliance with the requirements delineated in Paragraph 7. Accordingly, compliance with Paragraph 7 also shows substantial compliance with the DD Waiver Standards that require Defendants to oversee and monitor contracted providers' obligations to recognize, to document, to report, and to remediate ANE. *See* DDSWD Manual, Chapters 3, 6, 8, 17, and 18.

**Paragraph 9**

Paragraph 9 outlines the requirements for mortality reviews, which examine the circumstances surrounding the death of a JCM. Detailed DOH/DHI policies govern mortality

review. The policies mandate a timely, accurate review and require Defendants to take necessary remedial actions.

When disengaging Paragraph 9, Defendants submitted a 2019 annual written report, which recognized "statewide Developmental Disabilities system trends which need to be addressed to improve systems quality." *See* Doc. 2554 at 24. After Defendants filed their motion for disengagement of Paragraph 9, Defendants issued the 2020 annual written report, which summarizes mortality reviews for July 1, 2019 through June 30, 2020. Acknowledging that the report covers all those in the DD Waiver program, not just the JCMs, Plaintiffs argue that the 2020 report found "quality issues and findings . . . in 32% of reviews." Doc. 2518 at 29. As further evidence of noncompliance with DD Waiver Standards, they isolate a problem identified in both reports with "timely recognition of aspiration and risk of aspiration." *Id.* at 30. Plaintiffs conclude that the 2020 report is "probative of the healthcare services Defendants provide"[32] and demonstrates systemic issues concerning aspiration risk. *Id.* at 30-32.

By not differentiating between the types of issues within the report, Plaintiffs mischaracterize the 2020 findings. The 2020 report explains the difference between "significant care issues" and "other quality issues." Doc. 2532-4 at 1-2. Significant care issues "may or may not have been determined to be related to the cause of death, they are considered to offer opportunities for quality improvement." Doc. 2532-4 at 16. Significant care issues occurred in only

---

[32] Plaintiffs argue that the death of one JCM, SC, who died after the 2020 annual reporting period, was "potentially preventable" as reported by an external reviewer. *See* Doc. 2518 at 31. While an external reviewer's findings are considered in the final Mortality Review Summary Report, the findings are not dispositive. "The plain language of the [Mortality Review] Policy indicates that the purpose of the external reviewer's report is simply to aid the [Mortality Review Committee] in making its findings and recommendations." Doc. 2554 at 24. Here, the final Mortality Review Case Summary Report determined that the death of SC was not preventable and that it occurred despite appropriate care. *See* Doc. 2532-10.

2 cases--or 2.8 percent of the 72 deaths that occurred within the report period. In 23 cases or 32 percent, the mortality review committee found "other quality issues."

The 2020 report does observe that death due to aspiration continues to be a problem, but it also states that "not all aspirations can be prevented." Doc. 2518-5 at 3. In an improvement from 2019 which concluded that 10.3 percent of deaths in the reporting period had been preventable, the 2020 report found no preventable deaths. The 2020 report does reiterate some of the same recommendations as found in the 2019 IQR Report, but the Court has found that the reoccurrence of some problems does not automatically signal a failure to comply. While the goal is constant quality improvement, nothing in the DOH/DHI policies or in the DD Waiver Standards requires permanent solutions. Doc. 2554 at 27.

Accordingly, the Court finds that Defendants' substantial compliance with Paragraph 9 is evidence that is germane to the health-related services provided by Defendants.

**Paragraphs 11a, 11b, and 11c**

All three subparts of disengaged Paragraph 11 require nurses, behavioral specialists, and CM coordinators to make monthly or quarterly visits to high acuity or high behavioral JCMs. At the visit, nurses and behavioral specialists must "determine whether [the JCM] should be receiving a higher level of living supports pursuant to DD Waiver Standards. *See* Doc. 2299-1 ¶¶ 11a, 11b. Each paragraph charges the nurse, behavioral specialist, or CM coordinator to examine if certain standards are being met, and if not, to report the provider agency for contract management. *See* 2299-1 ¶ 11(a) (directing nurses "to review and monitor the health care status of Jackson class members and to direct corrective actions when necessary") 11b (advising behavioral specialists that "[f]ailure of any provider . . . to adhere to the applicable standards will result in reporting and referral for contract management" and obligating them "to take immediate action to protect the

individual" if an individual has suffered or is likely to suffer serious harm); ¶ 11c (explaining that the CM coordinator must determine if the CM is meeting the health/medical/behavioral requirements of the standards" and that failure to do so "will result in reporting and referral for contract management).

Defendants argue that disengagement of Paragraph 11 demonstrates substantial compliance with any corresponding requirements in Paragraph 12. According to Defendants, Paragraph 11 evidence is more pertinent than IQR data because "Paragraph 11 data is data on approximately 50% of all JCMs while the IQR sample is approximately 30% of JCMs. Further, Paragraph 11 reviews consist of those JCMs who are High-Acuity and/or At-Risk while the IQR sample does not specifically target those JCMS who are either High-Acuity and/or At-Risk." Doc. 2532 at 18.

Plaintiffs disagree. Plaintiffs argue that Paragraph 11's requirements are not probative of compliance with DD Waiver Standards including, 13.2.6 (e-Chat), 13.2.7 and 5.51 (ARST), 13.2.8 (MAATs), and 5.5 (CARMPs). Plaintiffs argue that "[a] meaningful review of compliance with the Paragraph 12 Standards governing these assessments and plans *requires evidence* of adequacy, completeness, accuracy and consistency of the assessments and plans for the class member being reviewed." Doc. 2518 at 32 (emphasis in original). Plaintiffs maintain that neither 11a nor 11b[33] demands that the monitor do more than determine whether certain documents are "current." *Id.* As for 11c, Plaintiffs maintain that 11c is irrelevant because it does not incorporate any standard from either Chapter 5, 13, or 20.

Plaintiffs' argument echoes objections made by them during the proceedings to disengage Paragraph 11. Then, Plaintiffs repeatedly argued that it was incumbent on nurses to do more than

---

[33] Plaintiffs do not articulate any other specific arguments about 11b.

certify that they had complied with the monitoring requirement. But the Court found that the DD Waiver Standard in 11a, 13.2.13, did not include a documentation requirement for face-to-face visits. *See* Doc. 2447 at 16 (the standard requires a nurse "to determine whether something is present and does not incorporate a written requirement.").

Defendants' current nursing monitoring form is almost five pages and contains documentation requirements. *See* Doc. 2532-6 at 1-5. The existing form requires nurses both to evaluate and record whether an individual's e-Chat, ARST, MAATs, CARMP, medical emergency response plans (MERPs), and MARs are current. While assessing these tools, nurses must consider DD Waiver Standards, including 13.3.1, 20.5.4, 13.3.2.1, 20.5.2 and 13.2.13. *Id.* The form directs nurse monitors to write a "narrative summary of [the] 11a visit." *Id.* at 5. Evidence from January 2020 through October 2020 shows that nurses have examined e-Chat, ARST, MAATs, ISPs and CARMPs and found that they were current at a minimum 90.32 percent of the time. Doc. 2491-3 at 7-8.

Contrary to Plaintiffs' argument, paragraph 11c requires CM coordinators to adhere to certain DD Waiver Standards. *See* Doc. 2532-7 at 3. Standard 8.2 describes the scope of the CM coordinator's responsibilities, which include a duty "to monitor the ISP implementation including service delivery, coordination of other supports, and health and safety assurance as described in the ISP; and [] to maintain a complete record for each person in services as specified in Chapter 20." DDSWD Manual ¶ 8.2. Paragraph 12 names five of the Chapter 20 standards. Evidence concerning a CM's adherence to this records requirement exhibits compliance with the Chapter 20 standards.

When conducting 11c visits, CM coordinators use monitoring forms. Doc. 2532-7 at 1-5. During the monitoring visit, CM coordinators must review site forms and the ISP. Most

importantly, they must actively look for documentation that demonstrates "adequate follow up action" for documented concerns. If appropriate action has not occurred, the CM coordinator "must take every avenue at his/her disposal to resolve the issue." Doc. 2532- 7 at 4.  Between February 2020 and October 2020, 11c visits found provider compliance with these requirements over 90 percent of the time.

Plaintiffs also argue that the specificity of the IQR questions regarding CM coordinators negates the importance of the 11c visits. The IQR does have specific IQR questions regarding CMs. *See* Doc. 2489-7 at 4-5 (listing 7 questions evaluating the CM's performance). The questions are relevant as to the CMs' performance, but they do not touch on the CM coordinator's analysis of the CM and the provider. *Compare* Doc. 2487-7 (question #29. *Does the case management record contain documentation that the case manager is monitoring and tracking the delivery of services as outlined in the ISP?*) *with* Doc. 2532-7 (CM monitoring form requiring the CM coordinator to review the most current ISP to "ensure the Health and Safety section provides a summary of the individual's significant health, medical and behavioral concerns."). And, like the 11a nurses, the CM coordinators must consult the DD Waiver Standards when performing their analysis. Meaningfully, IQR surveyors do not do the same.

While reviewing Defendants' motion to disengage all parts of Paragraph 11, the Court examined Defendants' substantial compliance within the framework of the DD Waiver Standards. As the 2019/2020 evidence[34] proffered by Defendants to support disengagement with Paragraphs 11a, 11b, and 11c dovetails with the 2019/2020 evidence proffered by Defendants to support this Motion, the Court concludes that disengagement with Paragraph 11a, 11b, and 11c, is relevant evidence of Defendants' substantial compliance with any similar requirements in Paragraph 12.

---

[34] With their motion to disengage Paragraphs 11a, 11b, and 11c, Defendants presented evidence that covered the period between July 2019 and January 2020.

### 2. The IQR

#### a) Methodology

The IQR results show the percentage of answers that received *3*, *2*, *1*, or *0*. Because both *2* and *3* demonstrate substantial compliance, the Court added the results of those two numbers to reach an overall score for each question. Then, the questions were grouped with the standards in two tables, one for Plaintiffs and one for Defendants. The scored questions were then averaged, so that there was an overall score for each standard.[35]

Defendants used 52 IQR questions with 42 standards from Chapters 5, 13, and 20.[36] Plaintiffs used 37 questions with 20 standards. Plaintiffs used 8 questions[37] that Defendants did not. Defendants used 23 questions that Plaintiffs did not.

In the past, when the parties used the Community Audit to disengage obligations, they agreed that to demonstrate compliance, Defendants did not "have to exceed 80 [percent] for any single item in any region." *See* Doc. 1047-1 VII. ¶ 32. After reviewing each individual question, the DD Waiver Standards, and the evidence provided demonstrating the negative indicators that

---

[35] The final score was rounded to the nearest tenth.

[36] Although Defendants referred to 52 questions, as a practical matter, they only used 46. Defendants did not present scores for five of the used questions: 18, 19, 20, 22, and 23. The sixth score, #118, was scored differently from the other scores and provided no useful information, so the Court did not include it in any scored standards.

[37] *See* #35. *Was the direct service staff able to describe his/her responsibilities in providing daily care/supports to the person?* (96.3%); #44. *Was the direct service staff able to describe his/her responsibilities in providing daily care/supports to the person?* (94%); #60. *Were the recommendations from assessments used in planning?* (85.5%); #81. *Does the ISP contain information regarding primary health (medical) care?* (94%); #81b *Is the Healthcare coordinator's name and contact information listed in the ISP?* (92.8%); #82. *Does the ISP reflect how the person will obtain prescribed medication?* (88%); #120 *If #118 OR #119 is scored "Yes", is the IDT adequately addressing the regression?* (64.9% yes, 35.1% no). Question #119 was also attributed to a single standard, but like IQR #118, neither the score nor the text of the question was relevant.

determined certain scores,[38] the Court finds that an average 80 percent score shows presumptive substantial compliance with the DD Waiver Standard with which the question is aligned. For scored standards that fell below the 80 percent threshold, the Court scrutinized the standard, the question, examples of scored questions and other evidence of substantial compliance.

Thirty-seven of the IQR questions used by both parties had scores above 80 percent.[39] Five of the questions used by Defendants had neither questions nor scores in the 2019 IQR Report provided to the Court.[40] Eight of the IQR questions used by both Defendants and Plaintiffs scored

---

[38] Both Plaintiffs and Defendants provided evidence of how certain relevant questions were scored including questions: #50a, #50b, #50c, #52, #51, #53, #54, #55, #56, #57e, #60, #80, #164. *See* Doc. 2518-2 at 5-8; Doc 2532-3 at 1-16; Doc. 2563-1 at 35-51

[39] These IQR questions all received scores above 80 percent: #24. "*Does the case manager 'know' the person*?" (99.0%); #25. "*Does the case manager understand his/her role/job?*" (82.0%); #26. "*Is the case manager available to the person?*" (100%); *#27. "*Was the case manager able to describe the person's health related needs?*" (90.4%); #28. "*Does the case manager have an appropriate expectation of growth for this person?*" (100%); *#29. "*Does the case management record contain documentation that the case manager is monitoring and tracking the delivery of services as outlined in the ISP?*" (81.9%); *#30. "*Does the case manager provide case management services at the level needed by this person?*" (86.8%); #31 "*Does the direct services staff 'know' the person*?" (98.8%); #32. "*Does the direct services staff have input into the person's ISP?*" (96.3%); *#34. "*Was the direct service staff able to describe this person's health-related needs?*" (80.2%); #37. "*Does the direct service staff have an appropriate expectation of growth for this person?*" (90.0%); #38. "*Does the person's day/work environment generally clean, free of safety hazards and conductive to the work/activity intended?*" (93.8%); #39. "*Does the residential direct services staff 'know' the person?*" (98.8%); #40. "*Does the direct service staff have input into the person's ISP?*" (88.0%); *#43. "*Was the residential direct service staff able to describe this person's health-related needs?*" (89.2%); *#48. "*Overall, were the team members interviewed able to describe the person's health-related needs?*" (88.0%); *#49. "*Is there evidence that the IDT discussed the person's health related issues?*" (81.9%); *#50. "*Was the e-Chat updated timely?*" (86.8%); #50a. "*Is the e-Chat updated timely with the ISP and after changes in condition?*" (80.8%); *#50b. "*Is the e-Chat complete?*" (89.2%); *#51. "*Are all of the individuals needed medical treatments, including routine, scheduled, and chronic needs timely received?*" (91.6%); *#56. "*Is the CARMP consistently implemented as intended?*" (90.4%); *#57 "*Are the person's health/supports/needs being adequately addressed?*" (94%); *#57a. "*Are assessments recommendations followed up on in a timely way?*" (90.4%); #57b. "*Were needed equipment/communications devices delivered timely?*" (91.9 %); *#57c. "*Were medical specialist appointments attended timely?*" (90.3%); #57d. "*Were changes in personal conditions, if any, responded to timely?*" (96.2 %); *#58. "*Did the team arranged for and obtain the needed, relevant assessments?*" (92.8 %); *#59. "*Are the assessments adequate for planning?*" (86.7%); *#59a. "*Were assessments provided timely?*" (81.9%); *#59b. "*Did assessments contain accurate information?*" (88%); *#59d. "*Did assessments contain recommendations?*" (89.2%); *#80. "*If needed, does the ISP contain a specific Medical Emergency Response Plan? (MERP)?*" (80.6%); #89. "*Overall, were the direct service staff able to describe their responsibilities in providing daily care/supports to the person?*" (97.6%); #103. "*Is the individual safe?*" (86.6%); #109. "*Does the person have food and drink available according to their specific nutritional needs and recommendations?*" (98.7%); #164. "*Is the total program of the level of intensity adequate to meet this person's needs*" (80.7%). Question #118 was also included by both parties, but the Court did not include it in the calculation. Scores marked with an asterisk were used by both parties.

[40] In the 2019 IQR Report provided to the Court, five of the questions used by Defendants, #18, #19, #20, #22, and #23, had neither questions nor scores.

below the presumptive 80 percent threshold.[41] The lowest scoring IQR question used by both parties had a 61.4 percent score for the question "Are nursing services provided as needed?" Defendants and Plaintiffs used this question more than once; Defendants, 30 times, and Plaintiffs, 3 times.

Of the IQR questions Defendants used, the highest score was 100 percent for two questions, #26 and #28, which asked about the CMs relationship to the individual. Defendants applied question #57 and its subparts #57a, #57b, #57c, #57d, and #57e to every scored standard.

The highest score in a question used by Plaintiffs, 96.3 percent, was for question #35, "Was the direct service staff able to describe his/her responsibilities in providing daily care/supports to the person?" Plaintiffs used this IQR question three times. Defendants did not use this question.

Plaintiffs used one question unused by Defendants that scored below 80 percent and Defendants used two.[42] Two questions had scores that the Court did not use because the scores deviated from the scoring pattern of all other scores.[43]

Cumulatively, as scored by Defendants, only one of the scored standards fell below the presumptive 80 percent threshold. In contrast, six of Plaintiffs' scored standards did.

All scored standards have been grouped with the chapters in which they are found.

---

[41] *See* #50c "*Is the e-Chat accurate?*" (77.1%); *#52. "*Has the individual received all age and gender appropriate health screenings and immunizations in accordance with National Best Practice and/or as recommended by his/her PCP or other healthcare professionals?*" (79.5%); *#53. "*Does the individual receive medication as prescribed?*" (63.9 %); *#54. "*Are nursing services provided as needed by the individual?*" (61.4 %); *#55. "*Is the CARMP consistent with recommendations in other health care documents?*" (70.2%); *#57e. "*Were health care plans available, accurate and consistently implemented?*" (70 %); *#59c. "*Did assessments contain information adequate to guide planning?*" (73.5 %); #113. "*Are the individual members of the IDT following up on their responsibilities?*" (77.1 %).

[42] Defendants used question #61 and #113. Question 61 asked, "*For medical, clinical or health related rec's, has a DCF been completed if the individuals and /or their guardian/health are decision maker have decided not to follow all or part of an order, rec, or suggestion?*" (64.1%). Question #113 asked, "*Are the individual members of the IDT following up on their responsibilities?*" (77.1%). *See* Doc. 2489-7 at 14. Plaintiffs used question # 120, but Defendants did not. It asked, "*If #118 or #119 is scored 'Yes', is the IDT adequately addressing the regression?* (64.9%). *Id.* at 25.

[43] See questions #118 "*Is there evidence or documentation of physical regression in the past year?*" (39.8% "yes", 60.2% "no"); #119 "*Is there evidence or documentation of behavioral or functional regression in the last year?*" (22.9% "yes" and 77.1% "no")

**b)  Chapter 5 Health**

Chapter 5, Health is in Section I, "Planning," of the DD Waiver Standards. The standards within Chapter 5 "involve the interaction, collaboration, and coordination of various IDT members to provide the appropriate level of healthcare supports." Doc. 2489-1 at 1. Paragraph 12 names two Chapter 5 standards: 5.1 and 5.5.

Defendants aligned five Chapter 5 standards with IQR questions. Plaintiffs scored only the two standards textually included in Paragraph 12. *See* Doc. 2518-3 (Plaintiffs' table) As scored by both Plaintiffs and Defendants, the IQR scores for all Chapter 5 standards were above the 80 percent presumptive threshold.

### *Standard 5.1 Healthcare Coordination*

Section 5.1 states that it describes standards to "monitor and manage health related needs, respond proactively to health changes and concerns, facilitate the appropriate delivery of healthcare services and support the larger process of Healthcare Coordination for the individual, in concert with multiple other entities in the healthcare system." Doc. 2489-1 at 1. Coordination includes communication among healthcare and behavioral providers, family, guardians, the IDT, and documentation of recommendations, healthcare needs, conditions, and risk factors. *Id.* The standard does not relay specific benchmarks.

Defendants associated 43 questions[44] with standard 5.1. The lowest scored IQR question, #54, scored 61.4 percent, the highest, #57d, was 96.4 percent.[45] A total of six questions scored beneath 80 percent. These questions addressed health screening, medication needs, nursing services, and the CARMP. None specifically addressed healthcare coordination. Defendants' questions averaged 86.1 percent.

Plaintiffs tied section 5.1 to 16 IQR questions.[46] The scores ranged from 79.2 percent to 96.3 percent. Only one question, #52, scored lower than eighty percent with an overall score of 79.2 percent. Many of Plaintiffs questions, which specifically addressed case management and the communication abilities of direct service staff, related to the subject matter of this standard. As scored by Plaintiffs, Standard 5.1 received an overall score of 87.9 percent.

### Standard 5.5: Aspiration Risk Management

Standard 5.5 emphases minimizing the "risk of aspiration and aspiration pneumonia." Doc. 2489-2 ¶ 5.1. The 5.5 standards describe the screening procedures for aspiration risk. *Id.* The standards also outline when and how often assessments should be completed, and the management tools and support for assessments. *See* Doc. 2489-2 at 1-14 (listing standard 5.5 and several subparts)

---

[44] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 4-14, 24, 35 (text and scores of questions #18, #19, #24, #25, #26, #27, #28, #29, #30, #31, #34, #37, #38, #39, #40, #43, #48, #49, #50, #50a, #50b, 50c, #51, #52, #53, #54, #55, #56, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #113, #118, and #164. *See* Doc. 2532-8 at 1. Two of the questions, #18, and #19 were not included in the final scoring as neither the question nor the scores were in the report. Question #118 was also omitted.

[45] Three IQR questions had subparts: 50 (50a, 50b, 50c), 57 (57a, 57b, 57c, 57d, 57e), and 59 (59a, 59b, 59c, 59d). Plaintiffs applied subparts specifically whereas Defendants referred only to the main question and did not acknowledge subparts. *Compare* Doc. 2532-8 (Defendants' table) *with* 2518-3 (Plaintiffs' table). When tabulating Defendants' scores, the Court included both the question and all subparts. Because Plaintiffs have separated the subparts from the primary question, when aggregating Plaintiffs' scores, the Court only tabulated the referenced question and did not include the subparts unless specifically used by Plaintiffs.

[46] *See* Doc. 2518-3 at 1-2 (Plaintiffs' table, scores, and text of questions #27, #29, #30, #34, #35, #43, #44, #48, #49, #50, #51, #52, #57, #57a, #57c, #60).

As compiled by Defendants, 15 questions applied to standards 5.5, 5.5.1, 5.5.2, and 5.5.3.[47] The questions address assessments, the CARMP, follow up by the individual's IDT, and an evaluation of the intensity of the overall program. The average score for questions used by Defendants was 86.9 percent.

Plaintiffs used only two questions to score standard 5.5: #55 and #56. Question #55 asks, "Is the CARMP consistent with recommendations in other health care documents" and scored 70.2 percent. *See* Doc. 2518-3 at 2. Question #56 asks, "Is the CARMP consistently implemented as intended" and scored 90.4 percent. *Id.* The resulting overall score was 80.3 percent.

Defendants submit that Paragraph 11a also offers relevant information about substantial compliance with 5.5 standards. Paragraph 11a requires nurses to monitor high-acuity JCMs monthly. At the visit, 11a nurses must monitor the nursing functions and ensure that required documents, including the ARST, are updated. Defendants have provided evidence that at the monthly visits between January 2020 and October 2020, the monitoring nurses assessed the required documents.

After reviewing the standards, the questions, the scores, and all other evidence, the Court finds that Defendants have substantially complied with all standards regarding health-related services in Chapter 5.

### c) Chapter 13: Nursing Services

Chapter 13 is in DD Waiver Standards Section II. This Chapter includes standards that describe the DD Waiver nurses' duty to coordinate, educate, communicate, and "assess, plan, monitor, and manage health related issues." Doc. 2489-3 ¶ 13.1. By requiring specific adherence to standards 13.1-13.3, Paragraph 12 incorporates all standards delineated in Chapter 13.

---

[47] *See* Doc. 2532-8 (Defendants' table); Doc 2489-7 at 11-14, 23 (text and scores of questions #55, #56, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #109).

Defendants scored 28 of the Chapter 13 standards. As aligned with IQR questions by Defendants, all Chapter 13 standards met the 80 percent threshold. Out of the 13 standards Plaintiffs scored, five fell below the 80 percent threshold.

The Court will begin by discussing the Chapter 13 standards that, as scored by Plaintiffs, did not meet the 80 percent threshold. The Court will then summarize the standards that did.

**Chapter 13 Standards scoring less than 80 percent**

### Standard 13.1 Overview of The Nurse's Role in the DD Waiver and Larger Health Care System

Arguably, standard 13.1, which is entitled an "overview," is not a standard. It appears at the beginning of chapter 13 and relays "general nursing requirements."[48] The preamble to Chapter 13 disclaims 13.1 as a standard when it indicates that Part 1, which begins in standard 13.2, initiates the Chapter 13 standards. Nonetheless, Defendants and Plaintiffs have treated 13.1 like a standard, so the Court will too.

---

[48] Paragraph 1 of standard 13.1 addresses billing requirements and is not included here. The remaining two paragraphs state:

> Nurses play a pivotal role in supporting persons and their guardians within the DD Waiver system and are a key link with the larger healthcare system in New Mexico. DD Waiver nurses identify and support the person's preferences regarding health decisions; support health awareness and self-management of medications and health conditions; assess, plan, monitor and manage health related issues; provide education; and share information among the ITD members including DSP in a variety of settings.

> Nurses also respond proactively to chronic and acute health changes and concerns, facilitating access to appropriate healthcare services. This involves communication and coordination both within and beyond the DD Waiver system and typically includes contact and collaboration with the person, guardian and IDT members, which include Primary Care Practitioners (physicians, nurse practitioners or physician assistants), specialty practitioners, Dentists and Medicaid Managed Care Organizations (MCO) Care Coordinators, Refer to Chapter 5.1 Healthcare Coordination for additional details.

*See* Doc. 2489-3 at 1.

Standard 13.1 does not delineate a set of requirements, rather it describes overall nursing functions in nonmandatory language. Defendants aligned 24 questions with this standard,[49] which resulted in an average of 86.5 percent. Plaintiffs connect this standard to four questions:

#54     Are nursing services provided as needed;
#118    Is there evidence or documentation of physical regression in the past year;
#119    Is there evidence or documentation of behavioral regression in the past year;
#120    If #118 or #119 is scored "Yes," is the IDT adequately addressing the regression.

Doc. 2518-3 at 3. Plaintiffs do not explain why these four questions are relevant. Only the first addresses nursing services, but the question is very broad and could encompass every standard within Chapter 13. The remaining three, which all refer to regression, do not directly refer to any language in standard 13.1.

Both parties apply question #54 to standard 13.1. In 2019, question #54 scored 61.4 percent, the lowest IQR score of all used questions. *See* Doc. 2489-7 at 11. As Defendants observe "[i]t is very difficult to put Question #54 into a percentage." The Court agrees. There is much that is problematic about this question. As scored, question #54 captures a wide variety of negative indicators, including indicators that are textually more aligned with other IQR questions.

Negative indicators are expected elements unmet by a provider that justify a question's score. *See* Doc. 2563-1 at 11. Question #54 received negative indicators for missing nursing monthly reports, missing bowel movement tracking reports, problems with G-J tubes, emergency hospital visits, a missing policy for monthly breast exams, missing semi-annual health care reports, incorrect e-Chats, medication errors in the report, etcetera. *See* Doc. 2518-2 at 5; Doc. 2532-3 at 7-11; Doc. 2563-1 at 35-38, 43-34, 48-49. To be sure, these indicators relate to nursing services, but none of the requirements they reference are textually within standard 13.1. Other standards

---

[49] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 10-14, 24, and 35 (scores and texts of questions #50, #50a, #50b, 50c, #51, #52, #53, #54, #55, #56, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #113, and #164).

have a stronger link with this question. *See, e.g.,* Doc. 2489-3 ¶ 13.2.3 (requiring documentation of nursing assessments, communications, and actions), ¶ 13.2.6 ("The nurse is required to complete all the e-CHAT assessment questions"), ¶ 13.2.8 (requiring documentation about medication delivery), ¶ 13.2.11 (document training and strategies regarding healthcare interventions and the Medical Emergency Response Plan).[50] Still other negative indicators, such as the requirement to track bowel movements, are not mentioned in any Chapter 13 standard.[51] Also among the negative indicators for question #54 are missing evidence for face-to-face nursing visits. These visits were also a crucial component of Paragraph 11a which was disengaged in May 2020.

Equally troubling about question #54 is how it is phrased. The adequacy of the nursing standards is determined by the qualifier "as needed." This introduces both ambiguity and a discretionary component into the question. For this reason, and because the scoring for question #54 includes negative indicators for things that are not in the standard, the Court finds that the overall percentage for IQR question #54 is not a true reflection of standard 13.1.

The Court now turns to the remaining three questions used by Plaintiffs: #118, #119, and #120. These questions are narrower than question #54, but no more determinative. All three questions ask about either behavioral or physical regression. Neither the word "regression" nor any of its synonyms appear in standard 13.1.[52] In the medical context "regression" means "progressive decline of a manifestation of a disease" or "reversion to an earlier mental or

---

[50] Defendants use Question #54 on two of these standards: 13.2.6, and 13.2.11. *See* Doc. 2532-8 (Defendants' table).
[51] Missing BM tracking reports appear as negative indicators on several of the examples given to the Court, but the Court could not find this requirement within chapter 13. It does appear in chapter 20, § 20.5.2.5 as part of the information that must be maintained in an electronic monitoring system called Therap. *See* Doc. 2489-4 (data that must be entered in Therap includes "Blood Glucose, Height/Weight, Infection, *Intake/Elimination*, Menses, Respiratory Treatment, Seizures, Skin/Wound, and Vital Signs") (emphasis added). Only Defendants link #54 to standard 20.5.2. *Compare* Doc. 2532-8. (Defendants' table) *with* Doc. 2518-4 at 1-6 (Plaintiffs' table).
[52] Standard 13.2.4 outlines documentation requirements, but nothing in that standard asks nurses to search for or document physical or behavioral regression. *See* Doc. 2489-3 at 3-4.

behavioral level." *See* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/regression. As defined, regression is not automatically the result of poor care. Here, questions # 118 and # 119 ask only if regression is present, they do not connect regression and poor care. Thus, regression is, at best, a neutral indicator.

The scoring of questions #118 and #119 also present a challenge. Unlike most other IQR questions, #118 and #119 require a simple "yes" or "no" answer.[53] Consequently, the 2019 recorded scores for these questions only indicate the percentage of people who have shown regression and the number of people who have not. Because neither answer signals anything about quality of care, the scores are meaningless. So, the Court did not include #118 or #119 here or with any other standard with which these questions were aligned.[54]

Unlike the scores for #118 and #119, question #120 asks for a qualitative assessment. In the 2019 IQR Report, question #120 received a 64.9 percent "yes" score and a 35.1 percent "no" score. Like question #54, this question is textually ambiguous. Nothing in the question or the scoring indicates what it means to "adequately address" regression. Without that information, it is difficult to quantify this score.

In contrast, Defendants applied a wider array of questions to standard 13.1. Many of Defendants' questions are as broadly worded as question #54. *See, e.g.,* Doc. 2489-7 at 12 (Question #57 asks "Are the person's health supports/needs being adequately addressed"). Other questions are as narrow as questions #118, #119 and #120. *See id.* at 14 (Question #59a asks, "Were assessments provided timely."). While, at times, the relationship of the questions to the

---

[53] Question #118 recorded "yes" on physical regression 39.8 percent of the time and on question #119, behavioral or functional regression, 22.9 percent of the time. *See* Doc. 2489-7 24-25.

[54] Defendants associated question # 118 with four other standards: 5.1, 13.2.2, 13.2.13, 13.3.2.1, and 20.5.2. *See* Doc. 2532-8 (Defendants' table). The Court also did not include the score of IQR question #118 in any standard to which the question was attached.

standards is also tenuous, the wide range of the questions mirror the "overview" character of the standard. The Court concludes that Defendants have met their burden and shown that they have substantially complied with standard 13.1.

### Standard 13.2.4 Documentation Requirements for All DD Waiver Nurses

This standard lists nine documentation requirements: (1) Nurses are required to document interactions with any individual who comes in contact with the patient; (2) nursing visits must be thoroughly documented; (3) follow up visits which occur because of medical consultant recommendations must be documented; (4) documentation can be handwritten typed or printed; (5) out of sequence documentation is permissible but must be appropriately labeled; (6) electronic signatures with appropriate credentials are permissible; (7) nurses must complete a semi-annual report and document it in the IDT; (8) nurses must collaborate with the CM on discharge planning, new orders and revised assessments and plans; (9) changes in providers must include a new transition plan and discharge summary report.

Defendants used more questions than Plaintiffs, applying sixteen.[55] The lowest score was 61.4 percent (#54) and the highest was 96.2 percent (#57d). Defendants' averaged score for this question was 82.9 percent.

Plaintiffs aligned standard 13.2.4 with two questions: #54 and #57c, which averaged 75.9 percent. *See* Doc. 2518-3 at 3-4.

As applied to standard 13.2.4, question #54 has a more obvious connection to this standard than it did to standard 13.1. The evidence demonstrates that question #54's negative indicators encompassed missing documentation, such as a failure to report weight, current status/healthcare

---

[55] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-14, 24 (text of questions #54, #55, #57, #57a, #57b, #57c, 57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #61 and #113).

issues, and missing information in the semi-annual nursing report. These issues fit squarely within the documentation requirements of 13.2.4. But, as previously observed, question #54 assesses many things: not all indicators are about documentation. This makes it difficult to calculate the score. Nothing in the scoring grid reveals how the different indicators are weighed. When a question has a negative indicator for missing documentation, as well as a misplaced G-J tube, it is not apparent if the score would remain the same if the part not relevant to documentation was eliminated.[56]

Plaintiffs also applied question #57c to this standard. This question asks, "Were medical specialist appointments attended timely?" Yet nothing in the standards requires or sets a benchmark for "timely" visits.

As calculated by Plaintiffs, the score for standard 13.2.4 is the result of the low score of question #54 which was 61.4 percent. While question #54 is scored on many indicators, some of which do not have documentation requirements, question #57c, which scored 90.4 percent, has minimal connection with standard 13.2.4. The Court finds that Plaintiffs' alignment of only two questions with standard 13.2.4, does not adequately address the standard's requirements.

Several questions included by Defendants but not by Plaintiffs are more relevant. Questions about assessments (#58, #59, #59b), health care plans (#57e), and recommendations (#59d)

---

[56] For a 56-year-old patient with 14 diagnoses, question #54 scored a *1* based on the following three pieces of negative evidence: 7 missing nursing documentations of monthly visits; untimely semi-annual nursing assessments, and a failure to follow up on "grossly abnormal lab results." See Doc. 2563 at 43-44. The monthly documentation requirements appear in standard 13.2.4., which states "Nursing visits conducted to monitor health status or to evaluate a change of clinical condition must be documented in a signed, legible progress note that records both date and time.". S*ee* Doc. 2489-3 at 3. The requirement for semi-annual nursing reports is in standard 13.2.4(7), which states "nurses will provide the IDT with semi-annual reports as described in 19.5 Semi-Annual Reporting. . .." *See id.* at 4; *but see* 13.2.4(5) (explaining that "[o]ut of sequence charting or late entry may be used to note information that was missed or not written in a timely manner."). Nothing in standard 13.2.4 discusses the procedures for not responding to abnormal lab results. The use of the word "grossly" to describe the lab results indicates that the surveyor found this piece of negative evidence significant. It is unclear whether the surveyor weighed one of these pieces of evidence more heavily than the others, and whether the score would have remained the same if the evidence concerning the lab results had not been used as a negative indicator for this question. *See* Doc. 2563-1 at 48-49.

address elements of the standard. As such, Defendants' score more accurately reflects the requirements of standard 13.2.4. The Court concludes that Defendants have shown substantial compliance with this standard.

### Standard 13.2.8.3 Assistance with Medication Delivery by Staff (AWMD)
### Standard 13.3.2.3 Medication Oversight

Medication delivery and oversight are the topics of the next two standards. Standard 13.2.8.3 allows trained staff to assist with medication delivery if criteria in MAAT is met, and the individual is trained. Doc. 2489-3 at 8. Among other things, the second standard, 13.3.2.3, requires nurses to oversee, monitor, and document the individual's response to medication as well as examine the MAR for accuracy. *Id.* at 19.

Plaintiffs tied both standards to a single question, #53, which asks, "Does the individual receive medication as prescribed?" In the 2019 IQR Report, this question scored 63.9 percent. Although Defendants also found #53 applicable to both 13.2.8.3 and 13.3.2.3, they applied more questions. To 13.2.8.3, Defendants used 8 questions,[57] averaging 86.2 percent. To standard 13.3.2.3, Defendants aligned 22 questions, with an 83.8 percent average. [58]

Both Defendants and Plaintiffs provided samples of how question #53 was judged. Generally, negative indicators for this question directly related to the substance of the question. Providers received negative scores for mistakes in the MAR and for missing documentation errors. Nonetheless, scores for this question highlight many of the problems with use of the IQR questions as the sole evaluative method for Paragraph 12. Plaintiffs' case study on Patient B demonstrates

---

[57] In addition to #53, Defendants used #57, #57a, #57b, #57c, #57d, #57e, and #58. *See* Doc. 2533-8 (Defendants' table); Doc. 2489-7 at 12-14 (text and scores of questions).

[58] To this standard, Defendants used questions #30, #32 #34 #43, #54, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #113, #164. *See* Doc. 2533-8 (Defendants' table); *See* Doc. 2489-8 at 5-6, 8, 12-14, 24, and 35 (text of questions). Three additional questions were tied to this score, #20, #21, and #23, but were not included in the overall scoring as the Court received neither the questions nor the scores.

how the score of the question does not always reflect the level of compliance with the standard. *See* Doc. 2563-1 at 42-43.

Patient B had 17 diagnoses listed in e-Chat. Eight negative indicators resulted in a score of *1. Id.* The negative indicators predominately documented occasions where Patient B missed medication, which occurred over 16 days and included 22 doses of different medications.[59] Although the evidence does not include how many medications Patient B took per day, if he took all five of these medications or "pills" only once a day, he took 1825 pills in fiscal year 2019. Of that number, he missed 23. That is an error rate of 1.3 percent.

Defendants' evidence is similar. Doc. 2532-3 at 4. Patient AS received a score of *1* on question 53 based on two negative components and three negative indicators, which involved confusing documentation in the MAR and "missing exceed amounts" on "as needed" medications. *Id.* As calculated by Defendants, Patient AS received 16,425 doses of medication, which in 2019, was given with 100 percent accuracy. *Id.*

Defendants give two more samples of question #53 scoring. In both cases, the question received a *1* because of more errors than shown with patient B or Patient AS. Still, in the scope of a year, the number of errors in these additional cases did not illustrate a failure to substantially comply. *Id.* One example, Patient GV, included only MAR discrepancies and no medication errors. *See id.* at 4-5. The other example, Patient AO, had the most medication errors and omissions of any of the four samples. *Id.* at 6. Patient AO received 9125 medication doses a year, with 244

---

[59]The eight negative indicators are documented as follows: (1) the general events reporting (GER) indicates that the patient missed his lithium dose for 11 days in October, his ER 45 mg dose was not signed for and the doctor's order said that the dose should be 450 mg; (2) the provider MAR requested but not received; (3) the GER shows that the patient missed his allergy pill on 7/31/2019 and there was an issue with refilling it; (4) the allergy pill was also not given in the morning on 7/27/19; (5) patient received his propanol in the morning but did not receive 7 other medications; (6) on 1/17/202 patient did not receive his Simvastatin; (7) on 11/13/19 medication passed in a napkin; (8) medication errors on 3/28/19 showing that patient is on 450 lithium without a recorded doctor's order. *See* Doc. 2563-1 at 42-43.

incorrect dosages. That equates to 2.7 percent error rate, or a 97.3 percent accuracy rate. *Id.* Slightly over 36 percent of the patients examined received a score of *1* on question #53.

The Court concludes that scores of *1* for question #53, while purportedly demarcating "few factors met," do not reflect the numerosity or accuracy of the services.   While medication errors are not optimal, the demonstrated mistakes are slight in the context of the total medications distributed in a year. Moreover, there is no indication that any errors that occurred caused or were likely to cause real harm to the patients. Here, the Court finds that scores of *1* on question #53[60] do demonstrate substantial compliance with standards 13.2.8.3 and 13.3.2.3. There were no scores of *0* on this question, so the new total score is 100 percent.[61]

Defendants have shown substantial compliance with standards 13.2.8.3 and 13.3.2.3.

### Standard 13.2.13 Monitoring, Oversight, and On-Call Nursing

This standard focuses on monitoring and on call duties for all individuals with a high e-Chat acuity level. Defendants used 25 questions,[62] which resulted in a score of 83.1 percent.

Plaintiffs averaged 77.7 percent on this score based on two questions: #54 and #57. *See* Doc. 2518-3 at 5.

Standard 13.2.13 is also included in the text of disengaged Paragraph 11a. In the Paragraph 11 contested proceedings, after evaluating both the standard and the Defendants' evidence, the Court found that Defendants had demonstrated substantial compliance with the 11a requirements,

---

[60]Because Plaintiffs used only #53 for this standard, Court applied a score of 100 percent for this standard alone. On all other scoring, the total score applied was 63.9 percent.

[61]The question shows 33.8 percent *3s,* 30.1 percent *2s,* and 36.1 percent *1s.* The question did not receive any *0* scores. *See* Doc. 2489-7 at 11.

[62] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 10-14, 22, 24, and 35 (text of questions #50, #50a, #50b, #50c, #51, #52, #53, #54, #55, #56, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #103, #113, #118, #164). Question #118 was not scored.

including those requirements of the 13.2.13 standard. *See* Doc. 2447 at 20. Defendants have also introduced evidence demonstrating Defendants' ongoing compliance with 13.2.13.

The Court finds that Defendants have met their burden and demonstrated that they have substantially complied with standard 13.2.13.

### All other Chapter 13 Standards

Plaintiffs contend that Defendants failed to provide evidence of compliance with 13 of the Chapter 13 standards.[63] Defendants explain that they did support their allegation of compliance with twelve of the standards cited by Plaintiffs with evidence from the 2019 IQR Report or from disengaged Paragraph 11a. Defendants declare that the remaining standard is not relevant to Paragraph 12 as it does not address any right to specific healthcare.

### Standard 13.2.1 Licensing and Supervision

A registered nurse (RN) or a licensed practical nurse (LPN) must provide all DD Waiver nursing services. *See* Doc. 2489-3 at 2. As further explained in this standard, only nurses with RNs may perform face-to-face supervision and oversight of LPNs. Notably this standard is a licensing requirement and is ancillary to providing healthcare related services.

Although Plaintiffs alleged that Defendants did not furnish evidence of this standard, Defendants attached standard 13.2.1 to eight questions,[64] averaging 84.7 percent.

Plaintiffs did not tabulate this standard.

---

[63]*See* Doc. 2518 at 24-25 (stating that the following standards were missing: 13.2.1 (licensing and supervision of nurses), 13.2.8.1 (self-administration of medication), 13.2.8.2 (self-administration of medication with physical assistance by staff), 13.2.8.4 (medication administration by licensed/certified personnel), 13.2.14 (nurse delegation), 13.3 (adult nursing services), 13.3.2 (scope of ongoing adult nursing services), 13.3.2.3 (nurse delegation), 13.3.2.5 (medication administration by licensed nurse), 13.3.2.6 (nurse coordination of complex conditions), 13.3.3 (ANS service limitations), 13.3.4 (ANS service requirements), 13.3.5 (ANS agency requirements)).
[64]*See* Doc. 2532 (Defendants' table); 2489-7 at 11-13, 35 (text of questions #53, #57, #57a #57b, #57c, 57d, #57e, #164).

The Court finds that standard 13.2.1 is ancillary to the provision of health care services, but nonetheless, Defendants met the presumptive threshold with their scoring of standard 13.2.1.

### Standard 13.2.2 Collaboration
### Standard 13.3.2.6 Coordination of Complex Conditions

Defendants grouped these two standards together. Both standards outline the importance of communication and collaboration within the DD Waiver community. For individuals with complex conditions, Standard 13.3.2.6 lists the tasks nurses must perform as needed for all JCMs and individuals in Family Living with surrogate/host families. Doc. 2489-3 at 21. These tasks include "frequent and ongoing assessment," and "communication." *Id.*

Defendants applied 26 scored questions to both standards,[65] resulting in an 83.2 average. Defendants also assert that 11a and 11c visits demonstrate Defendants' substantial compliance with standard 13.3.2.6.

Nurses conduct 11a visits under the nurse monitoring standard 13.2.13. This standard requires nurses to "Refer to 13.3 Part 2---Adult Nursing Services of this Chapter for information about ANS with family living." In this way, 13.2.13 incorporates all 13.3 standards, including standard 13.3.2.6. Doc. 2489-3 ¶ 13.2.13. When disengaging Paragraph 11, Defendants showed substantial compliance with 13.2.13. In this proceeding, as tallied by Defendants, standard 13.2.13 scored 82.4 percent.

Plaintiffs scored standard 13.2.2 with 5 questions,[66] averaging 84.0.  Plaintiffs did not score 13.3.2.6.

---

[65] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 10-14, 35 (text and scores of questions #48, #49, #50, #50a, #50b, #50c, #51, #52, #53, #54, #55, #56, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #113, #164). Defendants also applied #118, but it was not included in the scoring.

[66] *See* Doc. 2518-3 at 3 (table with text of questions and scores, 27, 34, 43, 56, and 57e).

The Court finds that based on the scores and evidence from Paragraph 11, Defendants have demonstrated substantial compliance with standard 13.2.2 and 13.3.2.6.

### Standard 13.2.3 General Requirements

This standard specifies that all individuals must be cared for by certain licensed personnel. Nurses must oversee and monitor DSP in "accordance with healthcare provider orders, HCPs and prudent nursing practices." Doc. 2489-3 at 3. Also enumerated in the standard are documentation requirements, including those stated in standard 13.2.4. Defendants applied seven questions to this standard,[67] averaging 87.6 percent.

Plaintiffs applied two different questions, both of which tested the ability of the DSP to describe the individual's health-related needs. Plaintiffs' average score was 84.7.

The Court finds that the monitoring requirements described in this standard are supported by evidence from nurse monitoring visits under Paragraph 11a.

Defendants have demonstrated substantial compliance with standard 13.2.3.

### Standard 13.2.5 Electronic Nursing Assessment and Planning Process
### Standard 13.2.6 The Electronic Comprehensive Health Assessment Tool (e-Chat)
### Standard 13.2.7 Aspiration Risk Management Screening (ARST)
### Standard 13.2.8 Medication Administration Assessment Tool (MAAT)

Defendants grouped these four standards together. All four address the use of "several DDSD mandated tools: e-Chat, ARST and MAAT. *See* Doc. 2489-3 ¶ 13.2.5. Defendants tested these standards with 20 questions,[68] which averaged 82.4 percent. The lowest score was 61.4 percent (#54), and the highest score was 96.2 (#57d) percent. Defendants also offered evidence from 11a monitoring visits to support substantial compliance with these standards.

---

[67] See Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 12-13, 35 (text and scores of questions #57, #57a, #57b, #57c, #57d, #57e, and #164).
[68] *See* Doc. 2532-8 (Defendants' table); Doc 2489-7 at 10-14, 24 (text of questions #50, #50a, #50b, #50c, #53, #54, #55, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #113).

Of these four standards, Plaintiffs provided scoring for only one, 13.2.6. Plaintiffs evaluated standard 13.2.6 with four of the same questions used by Defendants.[69] All four of the questions addressed the use of the e-Chat alone. The scores ranged from 77.1 percent to 86.8 percent. The final score was 83.5 percent.

The Court finds that Defendants have demonstrated substantial compliance with standards 13.2.5, 13.2.6, 13.2.7, and 13.2.8.

### Standard 13.2.7 Aspiration Risk Management Screening Tool (ARST)[70]
### Standard 13.3.2.2 Aspiration Risk Management (ARM)

In Defendants' table, standards 13.2.7 and 13.3.2.2 are grouped with four of the Chapter 5 standards.[71] *See* Doc. 2489-3. Both Chapter 13 standards cross reference standard 5.5, which describes the proper use of the ARST and the ARM. *Id.* Defendants offered supplementary support for standard 5.5 through 11a monitoring visits, which therefore offer additional support here. Defendants associated 15 questions with this standard,[72] achieving an average score of 86.9 percent. Three of the questions fell below the 80 percent range with 70 percent as the lowest score. Seven questions were above 90 percent. The highest score was 96.2 (#57d) percent.

Plaintiffs did not provide a score for either of these standards.

The Court finds that Defendants have shown substantial compliance with 13.2.7 and 13.3.2.2.

---

[69] *See* Doc. 2518-3 (Plaintiffs' table, text, and score of questions #50, #50a, #50b, and #50c).

[70] Defendants' table includes this standard in two different groupings of standard. In addition to the one here, it is grouped with standards 13.2.5, 13.2.6 and 13.2.8. *See* Doc. 2532-8.

[71] *See* Doc. 2489-2 at 2-6 (standards 5.5, 5.5.1, 5.5.2, and 5.5.3).

[72] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-14, 23 (text and score of questions #55, #56, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #109).

> *Standard 13.2.8.1 Self-Administration of Medication*
> *Standard 13.2.8.2 Self-Administration of Medication with Physical*
> *Assistance by Staff*
> *Standard 13.2.8.4 Medication Administration by Licensed/Certified Personnel*
> *Standard 13.3.2.5 Medication Administration by Licensed Nurse*

These are four standards Plaintiffs declared missing, but were included in Defendants'

table. *See* Doc. 2532-8 at 1. All four standards establish parameters for the administration of

medication. To each, Defendants attached eight IQR questions,[73] resulting in a score of 84.7

percent. The scores ranged from 61.4 percent (#54) to 96.2 percent (#57d). Significantly,

Defendants' scoring of these standards included question #53. The findings of the Court on that

IQR question—namely, that the question imposed a higher standard than the DD Waiver

Standards—provides further evidence of substantial compliance with this question.

These standards did not appear in Plaintiffs' tables.

The Court finds that Defendants showed substantial compliance with standards 13.2.8.1,

13.2.8.2, 13.2.8.4 and 13.3.2.5.

> *Standard 13.2.9 Healthcare Plans (HCP)*
> *Standard 13.2.10 Medical Emergency Response Plan (MERP)*

Standards 13.2.9 and 13.2.10 provide guidance about two types of plans that are the

responsibility of nurses: healthcare plans (HCP) and medical emergency response plans (MERP).

If necessary, as explained by standard 13.2.9, a nurse may develop an interim HCP to

accommodate changed circumstances. For any specially marked condition, standard 13.2.10

requires nurses to develop a MERP. Defendants scored both standards with the same 17

---

[73] *See* Doc. 2532-8 (Defendants' table); Doc 2489-7 at 11-14 (text of questions #53, #54, #57, #57a, #57b, #57c, #57d, #57e, #58).

questions,[74] averaging 83.6 percent. The lowest score was 61.4 percent (#54) and the highest was 96.2 (#57d) percent.

Interestingly, although the parties used completely different questions, their average scores varied only by 0.3 percent. Plaintiffs applied five questions to standard 13.2.9.[75] Three questions ask whether CMs and direct service providers (DSPs) can communicate the "health related needs of the patients." *See* Doc. 2489 at 4-8 (questions #27, #34, and #43). One question focused on the CARMP. *Id*. The last question asked about the availability and accuracy of HCP. Plaintiffs' cumulative score for standard 13.2.9 was 83.3 percent.

To standard 13.2.10, Plaintiffs applied only IQR question #80, resulting in an 80.6 percent average.[76] Defendants also used this question, which is strongly related to the standard; the question specifically asks whether the ISP contains a MERP.

The Court finds that Defendants have demonstrated substantial compliance with standards 13.2.9 and 13.2.10.

### *Standard 13.2.11 Training and Implementation of Plans*

This standard requires RNs and LPNs to provide annual Individual Specific Training (IST) on HCPs to providers. Defendants used sixteen questions to score this standard,[77] with a final average of 86.1 percent. Some of these questions focused on the DSP's ability to articulate their knowledge and responsibilities regarding the individual in their care. The scores ranged from 61.4 percent (#54) to 98.8 percent (# 31 and #39).

---

[74] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-14, 17, 22, 24 (questions #54, #55, #57, #57a, #57b, #57c, #57d, #57e, #58, #59, #59a, #59b, #59c, #59d, #80, #103 and #113).

[75] *See* Doc. 2532-8 (Plaintiffs' table and text of questions #27, #34, #43, #56, #57e). In their table, Plaintiffs have a typo in the listing of the score for #57e. In the official report, #57e has 26.2% for full compliance, not 22.6%.

[76] *See id.* at 4 (question #80).

[77] *See* Doc. 2532-8 (Defendants' table); *see* Doc. 2487 at 6-8, 11-13, 19, 22, and 24 (text and scores of questions #31, #34, #39, #43, #54, #55, #56, #57, #57a, #57b, #57c, #57d, #57e, #89, #103, #113).

Plaintiffs used three questions, with an average of 86.8 percent to rank this standard.[78] All three questions applied by Plaintiffs were also used by Defendants.

The Court finds that Defendants have shown substantial compliance with standard 13.2.11.

### Standard 13.2.12 Medication Delivery

Standard 13.2.12 requires nurses to be aware of both the New Mexico Nurse Practice Act, and the Board of Pharmacy standards and regulations. Among other things, this standard requires the nurse to administer medications, monitor the individual's response to medication, and assure clear documentation. *See* Doc. 2489-3. Defendants applied 11 questions[79] to this standard, which resulted in an overall score of 82.6 percent. As scored by Defendants, the highest score for this standard was 96.2 percent (#57d) and the lowest was a 61.4 percent (#54).

For this standard, Plaintiffs used only question #82, which asks "Does the ISP reflect how the person will obtain prescribed medication?" This question scored 88 percent. Defendants never used this question, and Plaintiffs only used it here.

The Court finds that Defendants have substantially complied with standard 13.2.12.

### Standard 13.2.14 Nurse Delegation
### Standard 13.3.2.4 Nurse Delegation

Standard 13.2.14 permits a nurse to delegate her authority to a DSP when a nurse decides it is safe to do so. The delegating nurse must both train and monitor the individual that she has permitted to perform specified nursing functions. Standard 13.3.2.4 further clarifies when delegation is appropriate and delineates additional delegation standards.

---

[78] See Doc. 2518-3 (Plaintiffs' table with text and scores of questions #35, #44, and #57e).
[79] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-14, 24, 35 (text of questions #53, #54, #57, #57a, #57b, #57c, #57d, #57e, #58, #113, and #164).

Defendants associated both standards with the same eight questions.[80] Defendants' score for this standard was 84.4 percent. The highest score was 96.2 (#57d) and the lowest was 61.4 (#54) percent.

Plaintiffs did not score either of these standards.

The Court finds that Defendants have shown substantial compliance with standards 13.2.14 and 13.3.2.4.

### Standard 13.3 Part 2 – Adult Nursing Services

Standard 3.3 initiates Part 2 of the Chapter 13 nursing standards and describes Adult Nursing Services (ANS). The standard does not describe any nursing duties, rather it defines which individuals qualify for ANS.

Although standard 13.3 does not really impose any health-related service obligations, Defendants attached 7 questions[81] to standard 13.3. *See* Doc. 2532 at 14. This standard received a score of 84.9 percent.

Plaintiffs did not score this standard.

The Court finds that Defendants have shown substantial compliance with standard 13.3.

### Standard 13.3.1 Scope of Nursing Assessment and Consultation Services

Standard 13.3.1 explains that a nurse must complete first an initial and then, an annual comprehensive health assessment. After conducting the assessment, the nurse must meet with the individual's guardian and CM and review the results. Subsequently, the nurse must follow up with

---

[80]*See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-14, 35 (text and scores of questions #54, #57, #57a, #57b, #57c #57d, #57e, and #164).

[81]*See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-14, 35 (text and scores of questions #54, #57, #57a, #57b, #57c, #57d, #57e, 58, and #164).

any needed interim plans. Defendants associate 14 questions with this standard,[82] averaging 83.5 percent. Most of the questions Defendants used directly addressed assessments. The scores ranged from a low of 61.4 (#54) percent to 96.2 percent (#57d).

Plaintiffs applied four questions[83] to this standard, which averaged a score of 85 percent. Three of Plaintiffs' questions evaluated the use of the e-Chat and the fourth addressed assessments.

The Court finds that Defendants have substantially complied with standard 13.3.1.

> ### Standard 13.3.2 Healthcare Planning and Coordination
> ### Standard 13.3.4 ANS Service Requirements
> ### Standard 13.3.5 ANS Agency Requirements

All three standards address aspects of ANS services. Standard 13.3.2 requires nurses to complete an ANS parameter tool to determine needed nursing hours. Although included in the paragraph by title only, this standard incorporates other Chapter 13 standards, which have been separately rated by the parties including: Healthcare Planning and Coordination (13.3.2.1), Aspiration Risk Management (ARM) (13.3.2.2), Medication Oversight (13.3.2.3), Nurse Delegation (13.3.2.4), Medication Administration by a Licensed Nurse (13.3.2.5), and Coordination of Health Care Conditions (13.3.2.6). *See* Doc. 2489-3 at 17-18.

Standard 13.3.4 mandates that New Mexico licensed RNs and LPNs provide ANS. It also requires that ANS providers comply with all standards in both Part 1 and Part 2 of Chapter 13 Nursing Services. *Id.* at 22

Standard 13.3.5 describes certain requirements that agencies must maintain to be providers of ANS. *Id.* at 22.

---

[82] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 10-14, 35 (text and scores of questions #50, #50a, #50b, #50c, 54, #57, #57a, #57b, #57c #57d, #57e, #58, and #164).
[83] *See* Doc. 2518-3 (Plaintiffs' table and text and scores of questions #50, #50b, #50c, and #59).

Defendants aligned all three IQR questions with 9 questions,[84] which resulted in an average of 85.3 percent. The scores ranged from 61.4 percent (#54) to 96.2 percent (#57d).

Plaintiffs did not separately score any of these standards.

The Court finds that Defendants' evidence including both the scores on these standards and evidence from all incorporated standards demonstrates substantial compliance with standards 13.3.2, 13.3.4, and 13.3.5.

### Standard 13.3.3 ANS Service Limitations

Standard 13.3.3 describes the eligibility of those in ongoing adult nursing services (OANS). Doc. 2489-3 at 22. The standard further provides billing information for medication administration.[85]

Plaintiffs correctly observe that Defendants did not score this standard. Defendants counter that this standard creates "no affirmative right to health care services." Doc. 2532 at 14. The Court agrees.

After reviewing the questions, the scores, the briefing and exhibits as well as the arguments of the parties, the Court finds that Defendants have shown substantial compliance with all Chapter 13 standards.

### d)  Chapter 20, Provider Documentation and Client Records

In the DD Waiver Standards, Chapter 20 is in Section III, Quality Assurance and Continuous Quality Improvement. Chapter 20 focuses on documentation. Each standard pertains to some form of record keeping by DSPs.

---

[84] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-14, 35 (text and scores of questions #54, #57, #57a, #57b, #57c, #57d, #57e, #58, and #164).

[85] Standard 13.3.3 does require "Supported Living, IMLS and CCS-Group nurses . . .to administer specific medications if needed during delivery of that service." But this too, is a billing standard as it goes on to provide "[b]illing separately for Medication Administration by a licensed nurse is not allowed." Doc. 2489-3 at 22.

Paragraph 12 incorporates all standards between 20.2 to 20.6. Both Defendants and Plaintiffs scored five standards,[86] but not all were the same. Plaintiffs allege that Defendants improperly did not score three standards: 20.3, 20.5.1, and 20.5.3.[87] Defendants counter that they did score 20.3 and that evidence from Defendants' 11a and 11c visits supports a finding of substantial compliance with the remaining two standards.

Both parties scored one of the Chapter 20 standards below 80 percent.

### Standard 20.1 HIPAA

This standard, which was not directly incorporated into Paragraph 12, clarifies provider agencies' responsibility to comply "with all applicable requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and with the Health Information Technology for Economic and Clinical Health Act of 2009 (HITECH)." Doc. 2489-4 at 1. Defendants applied eight IQR questions to standard 20.1,[88] which resulted in a score of 84.3 percent.

Plaintiffs did not score this question.

Defendants have demonstrated substantial compliance with standard 20.1.

### Standard 20.2 Client Records Requirements
### Standard 20.3 Record Access for Direct Support (DSP) during
### Service Delivery
### Standard 20.4 (Timely Distribution and Sharing of Records)

All three standards give provider agencies directions about how to handle records. As delineated by standard 20.2, DD provider agencies must "create and maintain records." Doc. 2489-

---

[86] *See* 20.1 (HIPAA), *20.2 (Client Records-Appendix A), 20.3 (DSP Access to records), *20.4 (Timely Distribution and Sharing of Records), 20.5.2 (Health Tracker). Defendants state that three standards from Chapter 20 do not have specific IQR questions that correlate. *See* *20.5 (Creating and Maintaining Records in Therap), 20.5.1 (Individual Data Form (IDF)), and 20.5.3 (Health Passport and Physician Consultation Form). Doc. 2489-4 at 1-6.

[87] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-13, 35 (score and text of questions #54, #57, #57a, #57b, #57c, #57d, #57e, and #164

[88] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-13, 35 (score and text of questions #54, #57, #57a, #57b, #57c, #57d, #57e, and #164.

4 at 1. According to standard 20.3, all "DSP must have access to records, plans and forms needed to adequately provide and document the type of service and specific scope of service being provided at the time." *Id.* at 2. Standard 20.4 mandates that provider agencies confer about "meet[ing] timelines for producing and distributing documents related to a person's DD Waiver Services." *Id.* Defendants applied seven questions to all three standards[89] which resulted in a score of 84.9 percent.

Plaintiffs scored only two of the three standards: 20.2 and 20.4. Plaintiffs used different questions to evaluate both. To score standard 20.2, Plaintiffs used two questions about the individual's ISP.[90] The result was an average score of 93.4 percent, Plaintiffs' highest scored standard and the one with the biggest difference between standards scored by the parties.

Plaintiffs scored standard 20.4 with two different IQR questions,[91] which resulted in an 83.8 percent average.

The Court finds that Defendants have shown substantial compliance with standards 20.2, 20.3 and 20.4.

### Standard 20.5 Creating and Maintaining Records in Therap
### Standard 20.5.1 Individual Data Form (IDF)
### Standard 20.5.3 Health Passport and Physician Consultation Form

Therap is a secure online documentation system that certain DD provider agencies must use. Doc. 2489-4 ¶ 20.5. Standard 20.5 describes Therap and delineates how it must be used. *Id.* at 2. An individual data form (IDF) summarizes key demographic and medical information. Requirements concerning the IDF form appear in standard 20.5.1. *Id.* The third standard, 20.5.3,

---

[89] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 11-13 (scores and texts of questions #54, #57, #57a, #57b, #57c, #57d, #57e).
[90] *See* Doc. questions #81 and 86.
[91] *See* questions #50 and #50a.

describes the Health Passport and Physician Consultation Form, which is generated by e-Chat through the Therap system. Because the Health Passport populates with information contained in the IDF, the IDF is incorporated into Standard 20.5.3. *Id.* at 4 (stating that the IDF must be continuously updated so that "accurate data may populate other documents like the Health Passport and Physician Consultation Form.").

Defendants did not align these three standards with IQR questions on the basis that there are no IQR questions that directly correlate. Defendants state that 11a and 11c visits, which require monitors to document that the named records are present, are evidence that they have substantially complied with these standards. During monitoring visits, Paragraph 11a nurses must verify that the Health Passport is present. *See* Doc. 2532-6 at. 2. Both 11a nurses and 11c CM coordinators must verify that information kept in Therap, such as the ARST, MAAT, and the ISP, is current and accurate. *See id.*; *see also* Doc. 2532-7 at 2-5.

Plaintiffs did not score any of these standards.

The Court finds that Defendants' evidence regarding 11a and 11c visits shows that they have substantially complied with standards 20.5, 20.5.1, and 20.5.3.

### Standard 20.5.2 Health Tracker

The Health Tracker "contains multiple required elements designed to support the Healthcare Coordinator, DSP, supervisors, nurses, CMs (case managers) in tracking, communicating and acting upon changes in health status." Doc. 2489-4 at 3-4. The standard lists information that must be entered within Therap and/or the Health Tracker. *Id.* To this standard, Defendants applied 20 questions,[92] which resulted in a score of 81.9.

---

[92] *See* Doc. 2532-8 (Defendants' table); Doc. 2489-7 at 6, 8, 11-14, 24, 35 (text and scores of questions #34, #43, #53, #54, #57, #57a, #57b, #57c, #57d, #57e, #59, #59a, #59b, #59c, #59d, #61, #103, #113, #118, and #164). Question #118 was not scored.

Plaintiffs did not score this question.

The Court finds that Defendants have demonstrated substantial compliance with this standard.

### Standard 20.5.4 Nursing Assessment Tools

This standard requires nurses to use several assessment tools, including ARST, MAAT, and e-Chat. Doc. 2489-4 at 5. Defendants did not apply any questions to this standard but assert that Paragraph 11 visits support all Chapter 20 standards. Notably, the nurse monitoring form specifically asks nurses to consider DD Waiver Standard 20.5.4 when reviewing e-Chat, ARST, and MAAT.

Plaintiffs applied three questions to this standard,[93] averaging 85.3 percent.

The Court finds that Defendants' substantial compliance with Paragraph 11 coupled with their more recent evidence of ongoing compliance with Paragraph 11 shows that they have substantially complied with standard 20.5.4.

### Standard 20.6 Medication Administration Record (MAR)

Standard 20.6 demands that all providers[94] maintain a MAR in every location that medication is dispensed. Doc. 2489-4 at 6. For prescribed medication, the MAR must include the dosage frequency and method of administration. As needed, over the counter or comfort medications, time limited and discontinued medications or treatments must also be included in the MAR. *Id.*

Both Defendants and Plaintiffs attached only question #53 to standard 20.6. *See* Doc. 2518 at 6 (Plaintiffs' Table); Doc. 2532 at 19. Defendants allege that question #53 does not accurately

---

[93] *See* Doc. 2518-3 at 4, 6 (table, text and scores of questions, #50, #50a, and #50b).

[94] There is an exception for Family Living Providers who may opt out of the MAR but only if they "are the sole provider who supports the person with medications or treatments." Doc. 2489-4 at 6.

reflect standard 20.6 because the standard "speaks to medication tracking," while the question asks whether the individual received the medication, not just whether the MAR was updated. *See* Doc. 2584 at 8. The Court agrees.

The evidence demonstrates that question #53 included negative indicators for discrepancies between the MAR and physician orders. Only one individual in the case histories provided to the court, AO, did not receive all medication appropriately—AO received half the prescribed dosage of one medication. Doc. 2532-3 at 6. Most other MAR documentation omissions or discrepancies were for comfort or as needed medications. *Id.* at 4-6. Significantly, MAR mistakes were uncovered by comparing physician orders to the MAR.

As previously observed, question #53 is another example of the difficulties presented by questions that are associated with more than one standard. Question 53 includes both negative indicators for missing medication and for mistakes with MAR documentation. Unanswered by the question is how to divide the evidence so the score reflects only the standard to which the question has been applied.

Defendants do not rely solely on IQR question #53. They also state that Paragraph 11 visits which ask the monitors to verify the accuracy of the information in Therap also show their substantial compliance with Paragraph 12. Defendants further contend that "the ability to conduct these audits demonstrate the availability of documentation" as required by all Chapter 20 standards. Doc. 2489 at 18.

The Court finds that Paragraph 11 visits do provide support here.  While question #53 scored low, there is no evidence that any JCM was significantly harmed by the absence of a MAR at a location where medications were administered. Furthermore, Defendants have shown substantial compliance with all other medication administration standards in Chapter 13.

The Court finds that the evidence, including all exhibits and IQR scores, and the parties' briefing supports Defendants' claim that they have substantially complied with all Chapter 20 standards.

### 3. Preliminary 2020 IQR scores

Plaintiffs argue that selected 2020 IQR findings demonstrate that "Defendants' performance is getting worse."[95] Doc. 2518 at 33. Using preliminary data from two of the five state regions, Plaintiffs examine the scores of four IQR questions, #53, #54, #55, and #57. Plaintiffs assert that these preliminary scores demonstrate that Defendants' level of compliance decreased between 2019 and 2020. All four questions demonstrated a decrease in the percentage of *3* or full compliance scores.[96] According to Plaintiffs, the "decrease in compliance demonstrated by the 2020 scores is a continuation of both a downward trend from 2018 and repeated recommendations by IQR reviewers that have gone unaddressed over the years." Doc. 2518 at 34.

Defendants respond that regional reports do not present "a sufficient picture of compliance." Doc. 2532 at 19. First, they argue that the disparities in sample size skew the preliminary results. The 2019 IQR Report included 87 JCMs or 37 percent of all JCMs. In contrast, the regional reports had a larger proportionate number of JCMs in the samples (10 or 14 percent in the Metro region and 10 or 40 percent in the Southeast region.). *Id.* Next, they indicate that these

---

[95] Plaintiffs also assert that Defendants had an obligation to submit the 2020 scores with their disengagement motion. *See* Doc. 2518 at 33. But Plaintiffs do not explain why Defendants would have an obligation to proffer an incomplete report.

Defendants issue their report approximately one year after they obtain the IQR data. For example, they issued the 2019 IQR Report in August 2020. On December 4, 2020, when Defendants submitted their Motion, the report would not have been complete. Nor would the report have been completed by February 12, 2021, the date of Defendants' reply and the conclusion of initial briefing. While the Court reopened briefing so that Defendants could respond to an affidavit filed by Plaintiffs on July 28, 2021, the Court restricted Plaintiffs' surreply to the issues raised by Plaintiffs' affidavit.

[96] In 2019, the percentage of *3*s or full compliance on each question was: #53, 33.8%, #54, 12.0%, #55, 28.4%, and #57, 26.2%. The 2020 scores reaching full compliance in the Metro area was #53, 10%; #54, 0%; #55, 30%, and #57, to 0%. In the Southeast Region, scores decreased similarly: #53, 20%, #54, 10%, #55, 0%, and #57, 0%.

two reports represent less than one quarter of the overall IQR sample. Finally, they point out that the table does not demonstrate a downward trend as there is less incidence of non-compliance than the annual report. *Id.* The Court agrees.

The regional reports present a limited view of Defendants' substantial compliance. Only 2 of the 5 regions are represented. Little information is provided by comparing the overall average score achieved in 2019 to the individual Metro score or the individual Southeast score. Because the final score is an average of all scores, the scores achieved by these regions in 2020, when finally averaged with the other regions, could have presented a very different picture. Until the 2020 report has issued, the Court cannot gauge the significance of these samples.

Moreover, even if the scores do show a decline, the score on a single IQR question is not enough evidence to demonstrate substantial compliance or noncompliance. Three of the four questions selected by Plaintiffs were among the lowest scoring questions of all 2019 IQR Report questions used by the parties. *See* Doc. 2489-7 at 11-12 (#53, 63.9%, #54, 61.4%, #55, 70.2%). As the Court has found, scored IQR questions must be considered within their context, which includes all IQR questions applied to a certain standard, and evidence of compliance or noncompliance within Defendants' additional quality control measures.

The Court finds that Defendants have shown substantial compliance with all Chapter 20 standards.

## V. CONCLUSION

Paragraph 12 requires Defendants to provide health related services under relevant DD Waiver Standards, and specifically Chapters 5, 13, and 20. The IQR audit results indicate that both Defendants and Plaintiffs achieved an 80 percent score on all Chapter 5 standards. On scored

Chapter 13 standards, Defendants' scores exceeded 80 percent. Defendants did not score one Chapter 13 standard, 13.3.3, which the Court agrees does not pertain to any health-related services. Plaintiffs' scores met the presumptive threshold on most Chapter 13 standards, but five standards scored lower than 80 percent. After examining the scores, the standards, and the negative indicators, the Court finds that Defendants' scores more accurately reflect those five standards.

Defendants scored six of the ten Chapter 20 standards, averaging 80 percent on five of them. Defendants met their evidentiary burden on the four standards not aligned with IQR questions, 20.5, 20.5.1, 20.5.3 and 20.5.4, with evidence of substantial compliance with similar requirements in Paragraph 11.

One standard, 20.6, as scored by both Defendants and Plaintiffs fell below the 80 percent presumptive threshold. The Court's examination of the evidence indicates that the IQR question #53 that both parties aligned with that standard, includes factors unrelated to the standard, and so does not accurately express the demands of that standard. Defendants' substantial compliance with other medication standards, as well as 11a visits, show a general threshold of substantial compliance on this standard.

The Court further finds that other evidence, including evidence from disengaged paragraphs and Defendants' quality assurance programs, also demonstrates substantial compliance with Paragraph 12 and its mandate that Defendants provide health related services as required by the DD Waiver Standards.

Accordingly,

IT IS ORDERED that Defendants' Motion to Disengage Paragraph 12 of the Settlement

Agreement is GRANTED.


_____
HON. JOHN F. ROBBENHAAR
United States Magistrate Judge
Presiding by Consent