**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

WALTER STEPHEN JACKSON, et al.,

      Plaintiffs,

      vs.                            CIV No. 87-0839 JFR/KBM

LOS LUNAS CENTER FOR PERSONS
WITH DEVELOPMENTAL DISABILITIES, et al.,

      Defendants.

and

THE ARC OF NEW MEXICO,

      Intervenors,

and

MARY TERRAZAS, et al.,

      Intervenors.

# <u>MEMORANDUM OPINION AND ORDER</u>

# Table of Contents

I.    INTRODUCTION .................................................................................... 1

II.   HISTORY OF THE LITIGATION ........................................................... 2

      A.   *Jackson I* ......................................................................................... 3

      B.   Consent Decrees: JSD, POA, Appendix A ....................................... 6

      C.   2012 Opinion & Second 60(b)(5) Motion ........................................ 8

      D.   2015 Revised Table IV ..................................................................... 9

      E.   Third 60(b)(5) Motion & 2016 Opinion ......................................... 10

      F.   *Jackson III* .................................................................................... 11

      G.   The Settlement Agreement ............................................................. 12

III.  APPLICABLE LAW .............................................................................. 12

IV.   ANALYSIS ............................................................................................. 14

      A.   Whether Defendants Have Substantially Complied With the Requirements of the SA
           ......................................................................................................... 14

           1.   The SA's Terms ...................................................................... 14

           2.   Defendants' Evidentiary Burden ........................................... 17

           3.   The Motion to Dismiss ........................................................... 22

                i.   Compliance and Action Items in Paragraphs 8, 10, 11b, 11c, 14, And 16 .......... 22

                     Paragraphs 8 and 10 ........................................................ 22

                     Paragraphs 11b and 11c ................................................... 23

                     Paragraph 14 .................................................................... 26

                     Paragraph 16 .................................................................... 27

                ii.  Compliance and Plaintiffs' Objections to Action Items in Paragraphs 7, 9, 11a, 12, 13, and 15 ...... 27

                     Paragraph 7 ...................................................................... 27

                     Paragraph 9 ...................................................................... 32

                     Paragraph 11(a) ............................................................... 35

                     Paragraph 12 .................................................................... 43

                     Paragraph 13 .................................................................... 51

       Paragraph 15 .............................................................................................56

    4.   Substantial Compliance ...............................................................59

B.   Whether Defendants May Demonstrate Substantial Compliance When Not All Action Items Have Been Met ..........................................................................................60

C.   Whether There Are Ongoing Constitutional or Federal Statutory Violations .............65

    1.   Constitutional Violations .............................................................65

    2.   Federal Law Violations ...............................................................66

D.   Whether Defendants Have Established a Durable Remedy ........................................69

V.   CONCLUSION ...........................................................................................................71

# I.    INTRODUCTION

In 1990,[1] the Court found that certain conditions at state-operated facilities for the developmentally disabled, Fort Stanton Hospital and Training School and Los Lunas Center for Persons with Disabilities,[2] violated the constitutional and statutory rights of their residents, the Jackson Class Members (JCMs).[3]  The identified violations clustered around the exclusion of the institutions' residents from community programs and harm to their substantive due process rights.  From the entry of the Court's first memorandum opinion and order until today, Defendants, Los Lunas Center for Persons with Developmental Disabilities, et al.,[4] Plaintiffs, Walter Stephen Jackson et al., and Intervenor, the Arc of New Mexico have worked together to remedy those violations.  Their recent efforts culminated in a Settlement Agreement (SA) (Doc. 2299-1), which the Court approved after a fairness hearing on June 21, 2019.  *See* Doc. 2304. The SA reflected the parties'[5] agreement that once the State implemented 12 actions described in the SA, the litigation would end.

The SA had a contemplated duration of 18 months.  On December 4, 2020, approximately two weeks before the 18-month deadline, Defendants filed a Motion to Dismiss. Doc. 2491.  Defendants' motion asserts that Defendants have met the SA's demands and asks the

---

[1] *See Jackson v. Fort Stanton Hosp. & Training Sch.*, 757 F. Supp. 1243 (D. N.M. 1990) *rev'd in part*, 964 F.2d 890 (10th Cir. 1992) ("*Jackson I*")

[2] The Court will refer to both jointly as "institutions."

[3] "JCMs" are "the plaintiff class, as revised by the Court in its Order on Class Reconfiguration."  *See* Settlement Agreement ("SA") Doc. 2299-1 II.5(9).  The *Jackson* class consists of all persons who at the date of the filing of the Complaint were residents at Fort Stanton and Los Lunas, all persons who became residents of those institutions while the litigation was pending, and all those who were transferred from those institutions to skilled nursing facilities, intermediate care facilities, homes for the aged and similar facilities and whose services were funded in whole or part by Defendants.  *See Jackson I*, 757 F. Supp. at 1257.

[4] The SA identifies "Defendants" as "the Departments of Health (DOH), the Human Services Department (HSD) and the Division of Vocational Rehabilitation (DVR) of the Public Education Department."  *See* Doc. 2299-1 II.5(6).

[5] " 'Parties' means the Plaintiffs, the Intervenor Arc of New Mexico, and the Defendants."  *See* SA II ¶ 5(8).

1

Court to end the litigation and terminate all outstanding orders.[6]  Doc. 2491 at 25.  Plaintiffs[7] object to dismissal, arguing that Defendants have not shown sustained compliance with 6 of the SA's 12 requirements.  Following the filing of the Motion to Dismiss, but before oral argument, the Court asked the parties for supplementary briefing on the question of how the Court should define the term "durable remedy" when "assessing whether further oversight is equitable."  Once that question was fully briefed,[8] a hearing on the Motion to Dismiss was held, on December 15, 2021.[9]

In examining the merits of Defendants' motion, the Court must decide whether vacatur is appropriate by resolving three questions.  First, have Defendants shown sustained compliance with the terms of the SA?  Second, are any of the statutory and constitutional violations recognized in *Jackson I* still occurring?  Third, is a durable remedy in place?  After carefully considering the briefs, the exhibits, the record, and the arguments of counsel, the Court will GRANT the Motion to Dismiss.

## II.    HISTORY OF THE LITIGATION

On July 8, 1987, 21 persons with developmental disabilities who lived in two state-supported institutions together with Supports of Developmentally Disabled New Mexicans, Inc. filed a civil rights action alleging violations of their substantive due process rights and § 504 of

---

[6] The Motion is fully briefed.  *See* Plaintiffs' and the Arc of New Mexico's Response in Opposition to Defendants' Motion to Dismiss [Doc. 2491] and Request for Hearing (Doc. 2540); Reply in Support of Defendants' Motion to Dismiss (Doc. 2545).

[7] As used here, "Plaintiffs" refers to the JCMs and the Intervenors.

[8] *See* Defendants' Supplemental Brief on a Durable Remedy (Doc. 2596); Plaintiffs' and the Arc of New Mexico's Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss (Doc. 2597); and Defendants' Reply in Support of Their Supplemental Brief on a Durable Remedy (Doc. 2598).

[9] Present for the Plaintiffs were Steven Schwartz, Cathy Costanzo, Sara Sanchez, Philip B. Davis, Tim Gardner, and Ann T. McCartney.  Appearing for the Intervenors was Maureen A. Sanders.  Present for Defendants were Taylor Sauer Rahn and James J. Grubel.  Also present were Jacquie Mader, Scott Doan, Kathy Kunkel, Ava Peets, Shadee Brown, Sally Karingada, Jason Cornwell, Billy Jimenez, and Jennifer Rodriquez.

the Rehabilitation Act.[10]  The institutions had an intermediate care classification under Title XIX

of the Social Security Act and received federal funds.  *Jackson I*, 757 F. Supp. at 1255.

Defendants were the entities and individuals operating the institutions on behalf of the State.

Plaintiffs sought both declaratory and injunctive relief, challenging their conditions of

confinement, and asking the Court to find that they had a right to "habilitation in integrated

community settings."  *Id.* at 1250.

On June 27, 1988, the Court granted parents and guardians of some of the residents of the

institutions leave to intervene, which they did on July 6, 1988.  *See* Doc. 171.  Intervenors

supported Plaintiffs' efforts to require Defendants to bring the institutions into compliance with

constitutional and statutory mandates but opposed Plaintiffs' efforts to close the institutions and

transfer their residents to community settings.  *Jackson I*, 964 F.2d at 1255.  On May 23, 1989,

the Court certified the class,[11] and then, on February 24, 1995, reconfigured it.  *See* Docs. 395,

889.

A.      *Jackson I*

The trial began on October 16, 1989, and occurred in segments, ending on April 27,

1990.  *Jackson I*, 757 F. Supp. at 1252.  Numerous witnesses testified and over eight hundred

exhibits were admitted as evidence.  The Court entered its Memorandum Order and Opinion on

December 28, 1990.

---

[10] The lawsuit also alleged statutory violations under the Education of the Handicapped Act and the Social Security Act.  The Court considered these claims and ruled against them.  Plaintiffs also pled constitutional claims under the First, Fourth, and Ninth Amendments, as well as an additional freedom of association claim under the Fourteenth Amendment.  *See Jackson I*, 757 F. Supp. at 1304 n.44.  Plaintiffs did not seek relief for these claims, and the Court deemed the additional constitutional claims abandoned.  *Id.*

[11] Within the initial class, there were two subclasses: 1) those that sought community placement and closure of the institutions; and 2) those that opposed closure of the institutions but sought to upgrade them.  *See Jackson I,* 757 F. Supp. at 1258.

The Court ruled that Defendants had violated § 504 of the Rehabilitation Act, which prohibits discrimination against the handicapped by federal grant recipients. The Court found that "Defendants' failure to accommodate the severely handicapped in existing community programs while serving less severely handicapped peers is unreasonable and discriminatory." *Id.* at 1299. The Court also ruled that Defendants had violated the JCMs' Fourteenth Amendment substantive due process rights (1) to minimally adequate medical care, (2) to "reasonable conditions of safety for the residents," (3) by physically restraining residents resulting from understaffing, (4) by failing to provide 'minimally adequate training' to the residents of the institutions, and (5) by not implementing recommendations for community placement. *Id.* at 1306-12.

To correct the statutory violations, the Court enjoined the JCMs' interdisciplinary treatment teams (IDT) from considering the availability of community placement when recommending whether a resident should be within a community setting.[12] *Id.* at 1317. The IDTs were to reconsider community placement and then to make recommendations. *Id.* The Court further ordered Defendants to "prepare a written plan of transfer to an appropriate community setting for each resident whose IDT has recommended placement in a community setting." *Id.*

To address the substantive due process violations, the Court ordered Defendants to prepare a plan no later than April 1, 1991 to correct deficiencies in the following 18 areas:

    (1) Individual program plans,
    (2) Medical records,
    (3) Discharge plans,
    (4) Data collection;

---

[12] On May 18, 1992, the Tenth Circuit reversed this part of the ruling, holding that substantive due process required only that the State's qualified professionals use professional judgment when evaluating whether community placement was appropriate. *See Jackson by Jackson v. Fort Stanton Hosp. & Training School*, 964 F. 2d 980, 992 (10th Cir. 1992) (*Jackson II*).

(5) Qualified mental retardation professional services,
(6) Behavior management,
(7) Use of physical restraints,
(8) Prevention of abuse of residents,
(9) Reduction of accidents and injuries to residents,
(10) Reports of abuse, accidents and injuries,
(11) Staff supervision,
(12) Preservice training of staff,
(13) In-service training of staff,
(14) Sufficiency of professional staff,
(15) Adaptive equipment,
(16) Functional and chronologically age appropriate programming,
(17) Coordination between residential areas and training program areas,
(18) Inadequate space in training program areas.

*Id.* at 1315-16.  The plan of correction was to "establish a timetable that will lead to complete correction of all deficiencies by not later than September 10, 1991."  *Id.* at 1316.  The Court also ordered the parties to provide a "[m]eans of assuring continued compliance with appropriate standards after correction of the deficiencies."  *Id.*

The parties did not meet this deadline.

On September 27, 1991, Defendants completed a Systemic Plan, which was amended on November 19, 1993.  *See* Doc. 809.  On February 17, 1993, the parties reported to the Court that Defendants had promulgated new policies and procedures for institutions.  Doc. 769.

On January 27, 1994, the Court granted Plaintiffs leave to amend their Complaint to include a claim under the American with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA).[13] *See* Doc. 831.  The ADA claim paralleled Plaintiffs' § 504 of the Rehabilitation Act claim but applied to "public entities regardless of whether the public entity receives federal funds."  *Id.* at 14.

In April 1994, the parties filed a joint motion under Rule 60(b)(5) to modify *Jackson I* as applied to Fort Stanton, because it would soon close and would no longer house JCMs.  The

---

[13] After the Court entered *Jackson I*, on July 26, 1992, the ADA became effective.

Court granted the motion on June 27, 1994, relieving Defendants from making further improvements to Fort Stanton.  *See* Doc. 853.  In March 1995, Defendants closed Fort Stanton, transferring all residents to community-based services.  Two years later, in July 1997, Defendants also moved all Los Lunas residents to community based services.

**B.   Consent Decrees: JSD, POA, Appendix A**

After *Jackson I*, the Court entered various remedial orders and actively oversaw their enforcement.  In October 1997, the parties presented the Court with a joint motion requesting the Court approve their proposed stipulation on disengagement (JSD) with a Plan of Action (POA). *See* Doc. 1047.  The JSD served to define "a series of activities which the [D]efendants must complete in order to fulfill their obligations to plaintiff classmembers and provides an orderly method for disengagement of the Court's active supervision over this litigation." *Id.* 1-2.[14] Because both institutions had closed, the JSD focused on preventing future harm to Plaintiffs' rights in community settings.  *See* Doc. 1047-1 at 2, 14, and 31.  Toward this end, the JSD groups a specific area of obligations, identified as "Continued Improvement of Community Services," for a different disengagement procedure.  To disengage from the community service obligations, the JSD required Defendants to conduct an annual community audit and achieve a certain score for four years.  *Id.* at 14-17.  After a fairness hearing on the JSD on November 20, 1997, the Court entered an Order approving the JSD.  *See* Doc. 1064.  The JSD set a December 31, 1998 deadline for disengagement of most obligations, but indicated that certain requirements would not be met until December 31, 2000.  Doc. 1047-1 at 20.

Those deadlines were not met.

---

[14] All citations to page numbers are to the time stamped number in the upper right hand corner of the document.

The parties attached to the JSD a POA[15] which provided a structure to enhance the community services system. *See* Doc. 1047-1 at 28.[16] The POA included 13 components which appeared as appendices of the community service obligations. Each appendix listed specific activities with desired outcomes. Later, two additional appendices were added to the POA, bringing the total number of components to 15.[17] The POA was revised on April 29, 1999, and on May 31, 2000. *See* Doc. 1930 at 12.

On May 20, 2005, the parties filed a second joint stipulation, Appendix A. Doc. 1473. The second stipulation sought to resolve pending motions and to detail actions that would bring Defendants into compliance with the JSD.[18] Appendix A contains a list of over 100 additional agreed actions meant to "facilitate compliance with the JSD, to promote completion of certain 1998 Audit Recommendations, to further address Case Management even though [POA] Desired Outcomes related to Case Management have been previously disengaged by an order of the Court and to address certain aspects of Vocational Rehabilitation." Doc. 1473 at 1-2. Each obligation had a deadline, with a final deadline of fiscal year 2007. Doc. 1930 at 14. The Court approved the stipulation on May 20, 2005. Doc. 1474. The obligations in Appendix A were separate from those listed in the JSD and the POA, but like the JSD and POA had a final completion deadline of fiscal year 2007. Doc. 1930 at 14.

---

[15] The thirteen components were: (1) quality enhancement, (2) community incident management system, (3) training, (4) management information systems, (5) individual service planning, (6) case management, (7) behavioral services, (8) crisis response, (9) sexuality, (10) supported employment, (11) assistive technology, (12) medical services, and (13) regional offices.

[16] The POA was not separately docketed.

[17] The two additional components were 1996 Audit Recommendations and the Ashton Recommendations. *See* Doc. 1930.

[18] Appendix A contained required actions in the following areas: (1) case management, (2) quality enhancement, (3) incident management, (4) behavior, (5) crisis, (6) sexuality, (7) supported employment, (8) vocational rehabilitation and day services. Doc. 1473.

Between 2007 and 2010, Plaintiffs filed motions asserting that Defendants were noncompliant with the JSD, the POA, and Appendix A.  Plaintiffs asserted that Defendants were not providing the JCMs with adequate health care, a reasonably safe environment, and supported employment services.  In response to these motions, and after Defendants did not meet the 2007 fiscal year deadline, on September 6, 2007, the Court appointed Dr. Sue Gant, Ph.D. as the Rule 706 Expert.  Doc. 1610.  Dr. Gant retained this position from 2008 to 2012.

### C.      2012 Opinion & Second 60(b)(5) Motion

On July 15, 2010, Plaintiffs filed a motion for relief asking the Court to remediate the Defendants' failure to comply with the Court's Orders approving the JSD, the POA, and Appendix A.  Doc. 1731.  Plaintiffs claimed that "Defendants continue to fail to exercise effective control over the provider agencies with which they contract, resulting in a continuation of avoidable threats to class members' health and safety."  Doc. 1731 at 6.  Plaintiffs alleged that Defendants continued to violate § 504 of the Rehabilitation Act and the ADA.  *Id.* at 1-2.  They posited that a special master could help resolve the identified problems.  *Id.* at 39-42.

The day before the pretrial conference on Plaintiffs' motion for relief, Defendants filed a Rule 60(b)(5) motion to terminate all remaining orders in *Jackson I*.  Doc. 1830.  At the pretrial conference, the Court informed Defendants that any further briefing on the Rule 60(b)(5) motion would be suspended until after the evidentiary hearing on Plaintiffs' motion.  *See* Doc. 1831 at 2. The three-day evidentiary hearing occurred July 13-17, 2011.

After the evidentiary hearing, but before issuance of the Court's November 14, 2011 ruling, Plaintiffs filed a renewed motion for remedial relief and remedy for noncompliance.  Doc. 1888.  In this motion Plaintiffs reiterated their allegations, but now, instead of a special master, asked the Court to appoint a Jackson Compliance Administrator (JCA).

8

On October 12, 2012, the Court entered findings and conclusions.  Doc. 1930 (*2012 Opinion*).  In the *2012 Opinion*, the Court found instances of noncompliance.  Nonetheless, the Court found that "[a]lthough there are certainly issues regarding substantial compliance with the JSD, POA, and APPENDIX A in the areas of health care, safety, and supported employment, the Court is unable to conclude that Defendants have violated the Rehabilitation Act and ADA." Doc. 1930 at 203.[19]  The Court granted Plaintiffs' request to appoint a JCA, stating that the JCA would function as an agent of the Court with the authority to facilitate and assist Defendants to achieve substantial compliance with their remaining obligations.  *Id.* at 199.  Subsequently, the Court vacated the order that appointed Dr. Gant as the Rule 706 expert and appointed Dr. Gant as JCA.  Doc. 1942.

To address violations identified in the *2012 Opinion*, the JCA, Plaintiffs, and Defendants were to develop a consolidated plan in the areas of health, safety, and supported employment. The parties set a new deadline, July 11, 2014, for Defendants to substantially comply with all obligations.  *See* Doc. 1942 at 2.

Later, the Court terminated the 60(b)(5) motion without deciding its merits.

### D.     2015 Revised Table IV

The *2012 Opinion* began a process in which the parties worked together to develop a consolidated plan to address the identified violations in the areas of health, safety, and supported employment.  After two years, on June 12, 2015, the parties filed a final list of objectives, the 2015 Revised Table IV (2015 Table).  Doc. 2046.  In the 2015 Table, the parties included

---

[19] Plaintiffs also alleged that Defendants violated the Rehabilitation Act and ADA by "intentionally denying severely disabled class members supported employment services equivalent to those received by less severely disabled persons."  Doc. 1930 at 203.  The Court found that without additional evidence and further briefing it did not have enough information to analyze that issue.  *Id.* at 204.

evaluative and disengagement criteria for each objective with a projected completion date. Defendants challenged on multiple grounds the 2015 Table, which added 200 obligations.  Doc. 2103 at 12.  Overruling Defendants' objections, the Court found that the 2015 Table "d[id] not replace or modify existing obligations" and that Defendants "still had to demonstrate substantial compliance with the earlier outstanding obligations."  Doc. 2103 at 13.

### E.     Third 60(b)(5) Motion & 2016 Opinion

In August 2015, Defendants again moved for relief under Rule 60(b)(5), asking the Court to vacate all existing orders and to end oversight of the case.  *See* Doc. 2053.  To support their motion, Defendants listed four changed factual circumstances: (1) Defendants' decree obligations had grown substantially and compliance had become increasingly difficult because of the numerosity of the obligations and because they were not subject to objective measurement; (2) many of Defendants' obligations had become outdated; (3) Defendants had remedied all constitutional violations; and (4) increased litigation costs inhibited New Mexico's ability to fund other important programs.  *See id.* at 16-17.  Plaintiffs opposed the motion, contending that the motion was an attempt to avoid compliance.  Doc. 2063 at 8.

In 2016, the Court denied relief.  Doc. 2103 (*2016 Opinion*).  Although the Court recognized that Defendants' obligations had become substantial, the Court found that Defendants had not shown that there had been a significant change in fact that would warrant vacatur of all orders and decrees and termination of the case.  In response to Defendants' arguments, the Court found: (1) Defendants never pinpointed a moment in the case when circumstances had changed; (2) Defendants did not show that they had provided the JCMs with the essential purposes of the obligations, specifically adequate health care, a reasonably safe environment, and supported employment opportunities; (3) Defendants had not established that they had remedied all federal

statutory and constitutional violations because, as Defendants conceded, they had not complied

with all consent decree obligations which flowed directly from the violations found by *Jackson I*;

and finally (4) federalism concerns did not mandate the Court's termination of its oversight

because the State had not fulfilled its obligations under federal law.  *Id.* at 27-32.  The Court

further observed that it "was not in the position to assess, and therefore cannot conclude that

Defendants are no longer violating constitutional or federal law."  Doc. 2103 at 31 (internal

quotation marks and citation omitted).  Because Defendants had not yet met numerous

obligations,[20] the Court held that Defendants could not demonstrate that a durable remedy was in

place.  *Id.* at 36.

   Defendants appealed.

### F.  *Jackson III*

   The Tenth Circuit Court of Appeals reversed, finding that the Court improperly focused

on whether Defendants had substantially complied with consent decrees when it should have

considered the broader question of whether "the State is meeting the requirements of the

Fourteenth Amendment and the Rehabilitation Act by means other than those stated in the

consent decrees."  *Jackson v. Los Lunas Community Program et* al., 880 F.3d 1176, 1206 (10th

Cir. 2018) (*Jackson III*).  The Tenth Circuit found that two aspects of the Court's ruling required

it to vacate the 2016 Opinion and to remand for further proceedings.  *Id.* at 1204.  First, the

Tenth Circuit found that "the district court's determination that there are no changed

circumstances appears to be inconsistent with its factual findings."  *Id.*  Second, the Tenth Circuit

observed that "federalism concerns are heightened here because the decrees and the court's

---

[20] The *2016 Opinion* estimated that Defendants still needed to show substantial compliance with approximately 307 obligations, including: 1) 96 obligations in the POA and Appendix A; 2) 14 (of 70) obligations in the JDS; 3) an unspecified number of POA recommendations; and 4) 197 obligations in the 2015 Table.  Doc. 2103 at 17.

continued oversight have 'the effect of dictating state . . . budget priorities.'" *Id.* at 1205 (quoting *Horne v. Flores*, 557 U.S. 433, 448 (2009)).

The Tenth Circuit gave the Court three issues to examine on remand: 1) Are the Defendants currently violating class members' rights under the Fourteenth Amendment and the Rehabilitation Act? 2) If Defendants are not violating the class members' rights under federal law, then is the Defendants' remedy durable? and 3) If Defendants have implemented a durable remedy, is vacatur of all pertinent orders and termination of this case appropriate? *Id.* at 1207.

On April 2, 2018, Defendants supplemented their Rule 60(b)(5) motion. *See* Doc. 2188. Subsequently, from April 2018 through January 2019, the parties conducted fact discovery related to the motion.

### G.    The Settlement Agreement

On April 17, 2019, the parties jointly filed a motion asking the Court to give preliminary approval to a settlement agreement. *See* Doc. 2289. After a hearing, on April 19, 2020, the Court granted the motion. Doc. 2292. The Court held a fairness hearing on June 12, 2019, and gave final approval to the SA on June 21, 2019. *See* Doc. 2304.

## III.   APPLICABLE LAW

To determine if Defendants have complied with the SA, the Court must first interpret the SA's terms, and then scrutinize whether Defendants' performance constitutes substantial compliance. "A settlement document is a contract and is construed using ordinary principles of contract interpretation." *Anthony v. United States*, 987 F.2d 670, 673 (10th Cir. 1993) (further citation omitted). "Issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law.'" *Walters v. Wal-Mart Stores, Inc*., 703 F.3d 1167, 1172 (10th Cir. 2013) (quoting *Schoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir.

2004) (alteration in original)).  The parties created and entered the SA in New Mexico, so New Mexico contract law applies.

The SA is a contract, but functionally, it is also a consent decree.[21]  *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 n.10 (1975) ("Consent decrees and orders have attributes both of contracts and of judicial decrees.").  A private settlement agreement is "generally not subject to judicial enforcement" whereas a consent decree provides "relief entered by the court that is based in whole or in part upon the consent and acquiescence of the parties."  *Duran v. Grisham*, 853 Fed. Appx. 252, 257 (10th Cir. 2021).  While consent decrees are construed like contracts, they are enforceable as "a judicial decree that is subject to the rules generally applicable to other judgments and decrees."  *Ruffo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 378 (1992).  In deciding the Motion to Dismiss, the Court must both measure Defendants' substantial compliance with the SA as a contract, but it must also evaluate it as a consent decree.

Substantial compliance is a contract doctrine meant "'to assist the court in determining whether conduct should, in reality, be considered the equivalence of compliance under the contract.'"  *Joseph A. by Wolf v. New Mexico Dep't of Human Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995) (citing John D. Calamari & Joseph M. Perillo, the Law of Contracts § 11-15 at 454 (3d ed. 1987)).  When a consent decree "sets forth specific criteria to be met, those criteria must be respected unless a deviation can be shown not to have a material effect upon the overall performance . . .."  *Id.* at 1087.  When evaluating whether a defendant has met its substantial compliance obligations, a court should "begin with the essential purposes of the consent decree .

---

[21] Consent decrees and settlement agreements are different in many ways.  One commentator suggests that there are six differences.  *See* DiDarro, Anthony (2010), "Six Decrees of Separation: Settlement Agreement and Consent Orders in Federal Civil Litigation," American University Law Review: Vol. 60: Iss. 2, Article 1.  He states that the differences are in 1) how they are enforced, 2) whether they are public or private documents, 3) whether they provide attorney fees, 4) whether they can be modified, 5) whether a federal court retains jurisdiction over the document, and 6) the required specificity of the document.

. . and it should then consider the specific steps set forth in the consent decree by which those purposes may be satisfied." *Id.* at 1086.

## IV.   ANALYSIS

### A.   Whether Defendants Have Substantially Complied With the Requirements of the SA

#### 1.   The SA's Terms

"The purpose and intent [of the SA] is to identify those services, safeguards, and protections from harm that will be provided to the plaintiff class and to ensure that a durable remedy is in place when this litigation ends and this case is dismissed."  Doc. 2299-1 I.1.  The SA conditions dismissal of the case on substantial compliance with enumerated "Actions to Resolve the Litigation" (Action Items), which describe Defendants' obligations to the JCMs.  Doc. 2299-1 III.  The Actions are comprised of seven alphabetical sections[22] further divided into twelve paragraphs.[23]  All but one of the paragraphs[24] specifically incorporate Division of Health Improvement (DHI)[25] Policies and Procedures and/or the DD Waiver Standards[26] (jointly, state policies).  These state policies, coupled with the language of the Action Items, describe what Defendants must do to show substantial compliance.  Doc. 2299-1 I.4.

---

[22] The seven alphabetical sections and paragraphs in Section III are as follows: A. *Removal of the Jackson Compliance Administrator*, Paragraph 6, B. *Incident Management*, Paragraph 7, Paragraph 8, C. *Mortality Review*, Paragraph 9, D. *Health*, Paragraphs 11a, 11b, 11c, and Paragraph 12, E. *Provider Oversight*, Paragraph 13, F. *Supported Employment*, Paragraph 14, and G. *Individual Quality Review (IQR)*, Paragraph 15.  Although Paragraph 16 is in a separate section from the Action Items, specifically, Section IV, DOH Consultant, the parties include it as an Action Item and so, the Court will too.

[23] For clarity, the Court will refer to each numbered paragraph as an Action Item.

[24] Paragraph 6, which is the first Action Item paragraph, addresses the termination of the position of the JCA and does not reference a policy or a standard.  Doc. 2299-1 ¶ 6.

[25] DHI is the regulatory agency providing oversight for the DD Waiver.  *See* Doc. 2600 at 5 ¶ 5.

[26] *See* Developmental Disabilities Waiver Service Standards (Effective Date January 1, 201), https://www.nmhealth.org/about/ddsd/pgsv/ddw/publications?size=20&page=4 (DDSWD Manual).  The Court will take judicial notice of the DDSWD Manual.  *See* Fed. R. Evid. 201.

Disengagement from individual Action Items does not end the Defendants' obligations on that paragraph.  Until the SA is terminated, Defendants must demonstrate sustained compliance with all disengaged Action Items.  *Id.* ¶ 21.  Since the SA's final approval, Defendants have disengaged all paragraphs either by stipulation,[27] contested motion,[28] or by completion of all directives in the paragraph.[29]

Plaintiffs contend that the SA's character as a consent decree means that Defendants must "demonstrate *ongoing high levels of compliance* in order to establish that [the] Standards have been met and thus, a durable remedy is in place."  Doc. 2597 at 11 (emphasis added).  Plaintiffs' argue that before the Court may grant Defendants' Motion to Dismiss, Defendants must demonstrate something more than substantial compliance.  This is not the first time Plaintiffs have made this assertion.  In several of the SA's contested disengagement procedures, Plaintiffs have urged the Court to adopt a higher, undefined threshold.[30]  Repeatedly, the Court has observed that the SA's terms make it "the sole source of Defendants' remaining obligations to class members" and "constitute[s] the entirety of the agreement between the parties."  Doc. 2447 at 11.  Now, Plaintiffs assert that the Court must consider both the plain meaning of the SA's terms and "'the purpose statements' of the State's policies incorporated therein."  Doc. 2540 at 10.

---

[27] The parties stipulated to disengagement of Paragraphs 8 (Doc. 2339), 10 (Doc. 2351), 13 (Doc. 2587), 14 (Doc. 2434), 15 (Doc. 2525) and 16 (Doc. 2322).

[28] Defendants' motions to disengage Paragraphs 7, 9, 11, and 12 were contested.

[29] All actions in Paragraph 6 occurred upon the Court's final approval of the SA.

[30] In their response to Defendants' motion to disengage Paragraph 7, Plaintiffs contended that the "more fundamental the interest at stake, the higher the degree of compliance required."  Doc. 2352 at 10.  Plaintiffs suggested that the Court consider "the overarching purpose of the lawsuit and to contemplate all Defendants' specified policies, Medicaid Waiver Service Standards and regulations" before disengaging Paragraph 11.  Doc. 2447 at 9 (internal citations omitted).  Before disengaging Paragraph 12, "Plaintiffs ask[ed] the Court to impose a supplementary layer to the DD Waver substantial compliance standard—one that examines 'the interests at stake.'"  Doc. 2600 at 20.

The "purpose" statements in state policies explain the reason behind the policy.  But how to implement the policy is within the policy's procedural steps.  For example, DIV.DDSD.13.01 (Policy 13) grants DDSD [Developmental Disabilities Support Division of the Department of Health] the authority "to assure compliance with any DDSD funded program . . . thereby assuring that quality services are provided to individuals with developmental disabilities."  Doc. 2426-6 at 1.  As written, this purpose statement could be in many policies.  But Policy 13 focuses on how to bring a provider agency into compliance.  When a provider has failed to adhere to any of Defendants' policies and procedures, Policy 13 authorizes the DDSD to sanction the provider with one of its listed intermediate sanctions.  Importantly, Policy 13 also gives Defendants' discretion as to which sanctions to apply.

Plaintiffs' suggestion that the Court evaluate the procedural steps of a state policy such as Policy 13 in the framework of its "purpose" would require the Court to engage in three steps. First the Court would have to define the terms "assure compliance" and "quality services" in the context of the provider's infraction.  Then the Court would have to evaluate DDSD's exercise of its discretion in selecting a sanction.  Finally, the Court would have to consider the efficacy of the sanction.  The SA does not include this process.  Rather it presumes that when Defendants exercise their discretion according to the procedural steps within each policy, Defendants will have done what the policy requires.  *See* Doc. 2299-1 I.4 ("This [SA] sets forth ***the actions*** which the Defendants must take in order to terminate the litigation.") (emphasis added).

"[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties of it."  *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).  The SA begins with the premise that Defendants' existing system has established a durable remedy.  In clear language it describes the precise steps

Defendants must take to show substantial compliance.  With that in mind, the Court has approached each disengagement proceeding by examining whether Defendants have complied with the steps delineated in each Action Item.  Accordingly, the Court declines to read terms, practices, or intentions into the SA based on Plaintiffs' assertions of prior practice, the "spirit" of the SA, the "interests at stake" or the "purpose" of a state policy. [31]  The SA does not focus on reforming a system.  Rather, it is an agreement to act within the confines of the SA's terms and the state policies to demonstrate the durability of the existing system.

### 2.    Defendants' Evidentiary Burden

At the onset, the parties disagree about the measure of evidence Defendants must submit to support its Motion to Dismiss.  Plaintiffs maintain that to meet their burden, Defendants must provide evidence of compliance with each Action Item from disengagement to dismissal.  Defendants disagree, contending that they must only supply evidence of compliance up to the filing of the motion to dismiss.  To support their positions, both point to language in the SA.

When interpreting a contract, a Court must determine first if the contract is ambiguous.  Generally, a contract is ambiguous when it is "'reasonably and fairly susceptible of different constructions.'"  *LensCrafters, Inc. v. Keho*, 282 P.3d 754, 763 (N.M. 2012) (quoting *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 976 P.2d 1, 12 (N.M. 1998)); *Lucero, Jr. v. Northland Ins. Co*, 346 P.3d 1154, 1159–60 (N.M. 2015) (holding that a contract is ambiguous when it may have two reasonable but conflicting meanings).  A contract with clear terms is conclusive.  *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993) ("The purpose, meaning and intent of the parties to a contract is to be deduced from the language

---

[31] Notably, in the *2012 Opinion*, the Court stated that one of the barriers to achieving compliance was that "obligations are described in language that is more aspirational in nature than operational."  Doc. 1930 at 203.

employed by them; and where such language is not ambiguous, it is conclusive" (citations

omitted)). "The question whether an agreement contains an ambiguity is a matter of law to be

decided by the trial court." *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993) (citation

omitted). A mere disagreement between the parties about the construction of the contract does

not make it ambiguous. *LensCrafters*, 828 P.3d at 763.

For their argument, Plaintiffs rely on terms in Section V of the SA, "Compliance and

Disengagement." That section describes the procedure for disengagement. Paragraph 17 states

that to terminate the SA, Defendants must show that they have "maintain[ed] compliance *with all

of these Actions for the Term* of this [SA] *and until this case is dismissed*" (compliance sentence)

(emphasis added). Plaintiffs interpret the compliance sentence to require Defendants to provide

evidence of compliance with all 12 Action Items until the moment of dismissal, or until the date

of a hearing on the Motion to Dismiss. *See* Doc. 2597 at 1-2 n.1. Because Defendants' Motion

to Dismiss contains no information about compliance after the filing of their Motion to Dismiss

over a year ago, Plaintiffs argue that Defendants' motion is deficient.

Defendants counter that Paragraph 17 also stipulates that "Defendants will implement all

of the Actions set forth in Section III, *supra*, within eighteen months of the date of the Court's

final approval of this [SA]." *See* Doc. 2299-1 ¶ 17. As Defendants' Motion was filed 16 days

before the deadline, Defendants' conclusion is that, at most, Defendants must provide evidence

that shows compliance only for the 18-month term of the SA.[32]

---

[32] There is some evidence that prior to approval of the SA Plaintiffs also believed the compliance period confined to
the 18-month term within the SA. In the preliminary approval hearing, counsel for the Plaintiffs, Mr. Schwartz
stated:

> We believe that compliance -- as I said earlier, you know, the overall framework that was used to
> develop the entire agreement is that compliance with existing policies in a documented way, in a
> reliable way, represents the durable remedy that we've been seeking for some time and that the
> higher courts have required. So if the defendants do *within the 18-month period* demonstrate

As further support of this argument, Defendants refer to the language in Section VI, "Modification and Termination." *See* Doc. 2299-1 ¶ 21.  Here, the SA states, *"[t]he motion [to dismiss] will include sufficient information* to allow the Plaintiffs to make an informed judgment concerning compliance and sustained compliance" (termination sentence) (emphasis added).  By requiring Defendants to include "sufficient information" *in the motion*, the termination sentence suggests that once Defendants submit a motion with the sufficient information, Defendants have done all that they need to do.  Some support for this interpretation is provided by the SA's definition of the "Term of the Settlement Agreement" as "the period of time from Court approval of this [SA] until final dismissal as specified in Section VI ¶ 21."  Final dismissal is defined in Paragraph 21 in the section where the termination sentence appears.  Doc. 2299-1 II.5(12).

When read separately, the compliance sentence and the termination sentence include mandatory language and appear straightforward.  Both parties' interpretations are reasonable.  But the juxtaposition of those two sentences coupled with the specified 18-month term of the SA create an ambiguity.

Other paragraphs in the SA's Compliance and Termination Section complicate the matter further.  Plaintiffs appear to define "sufficient information" as information of the type and quality they obtained during the monitoring process that preceded disengagement.  *See* Doc. 2597 at 10 (arguing that Defendants' failure to provide mortality reviews after disengagement defeats substantial compliance).  Until an Action Item was disengaged, in quarterly meetings, Plaintiffs monitored Defendants' progress toward compliance.[33]  But after disengagement of an Action

---

compliance with all the paragraphs you have just been through, the standards, the policies that have been identified in the agreement, then they will have established the durable remedy.

*See* Doc. 2298 at 31:8-17 (emphasis added).

[33] Paragraph 18 states: "The Defendants will provide data specific to the actions described in this [SA] to the Plaintiffs and Intervenor ARC to demonstrate that they are making reasonable progress in implementing the Actions

Item, the Court "terminates its oversight of that Action(s)" and "Defendants *will no longer be required to report* on these Action(s) *or compensate* the Plaintiffs for attorney time spent monitoring such Action(s)" (emphasis added).  Doc. 2299-1, ⁋ 19.  If Plaintiffs' definition of "sufficient information" is correct, then, a motion to dismiss would arguably revive an explicitly discontinued monitoring process by requiring Defendants both to report and possibly to compensate for any reviewing activities related to disengaged Action Items for the period between disengagement and dismissal.[34]  That reading would nullify or make superfluous the clause that terminates the monitoring process.  *See* Doc. 2593.  It is axiomatic that the Court must "view the contract as a harmonious whole, give meaning to every provision, and accord each part of the contract its significance in light of other provisions."  *Public Serv. Co. of N.M. v. Diamond D. Const. Co., Inc.*, 33 P.3d 651, 659 (N.M. 2001) (citing *Ponder v. State Farm Mut. Auto Ins. Co.*, 12 P.3d 960, 964 (N.M. 2000)).  Unless there is no other reasonable interpretation, a court should not interpret a contract so that the interpretation of "a particular clause or provision will annul other parts of the document."  *Id.*

A third difficulty arises from the way the SA structures the disengagement procedure.  On the date Defendants filed their Motion to Dismiss, four paragraphs, 9, 12, 13, and 15 had not yet been disengaged.  The SA permits Defendants to file a motion to disengage at any time, which means Defendants are not obligated to maintain compliance with a disengaged Action

---

set forth in Section III of this [SA].  The specific actions taken to meet the terms of the [SA] will be provided on a quarterly basis on the 15th of the month following the end of each quarter.  The parties will meet quarterly with the Court, at least two weeks after the production of the specific data, to discuss this information, the Defendants' progress, and any obstacles to implementing the Actions set forth in Section III."  Doc. 2299-1 ¶ 18.

[34] The term "monitoring" is not defined in the SA.  However, in its Memorandum Opinion and Order, partially granting and denying Defendants' Motion for Leave to Amend Defendants' Opposition to Plaintiffs' Motion for Attorneys' Fees (Doc. 1561), the Court indicated that reviewing reports, such as mortality review documents, are compensable monitoring activities.  *See Jackson v. Los Lunas Center*, 489 F.Supp.2d 1267, 1273 (D.N.M. 2007).

Item for a specific period before filing a motion to dismiss.  Thus, under the SA's terms, disengagement of all Action Items and dismissal of the litigation could occur simultaneously.

Because Defendants filed the Motion to Dismiss the same day they filed motions to disengage Paragraphs 12 and 13, Defendants could not have included information about sustained compliance with those paragraphs.  Similarly, because the Court had not yet disengaged Paragraphs 9 or 15, Defendants did not yet have an obligation to show sustained compliance with them either.  For this reason, Defendants argue that Paragraphs 9, 12, 13, and 15 should not be subjected to any sustained compliance period, because when they filed their Motion to Dismiss, the Court had not yet assessed initial compliance.

Plaintiffs oppose this approach.  Relying on the compliance sentence, Plaintiffs argue that the SA requires Defendants to supplement their Motion to Dismiss on all Action Items, including those that have not yet been disengaged, with all relevant information through the date of a hearing on the Motion to Dismiss.  The SA is silent on this issue.

If the course of this litigation had proceeded as contemplated, the effect of these contractual ambiguities would have been minimal and may not have prompted any debate. Defendants would have filed their Motion to Dismiss, the hearing would have occurred shortly thereafter, and the Court would have rendered a decision within a few months.  But circumstances created a situation that resulted in a year between the filing of the Motion to Dismiss and a hearing on the motion.  While some of the delay was due to the Plaintiffs, the pandemic, which began six months after the Court's approval of the SA, also contributed substantially to the delay.  Also, the parties recently consented to the undersigned judge, who required some time to become acquainted with this complex and decades-old case.

As acknowledged in the SA, "[t]he Court retains the inherent authority to interpret, clarify, modify or enforce this [SA]."  To resolve the SA's ambiguities about what constitutes "sufficient evidence" and the uncertainty of the length of a compliance period, the Court will scrutinize the requirements of each Action Item.  In the Court's examination of Defendants' substantial compliance with an Action Item's terms, the Court will balance Plaintiffs' objections against 1) Defendants' proffered evidence; 2) the length of time that has passed since the Court disengaged the Action Item, and 3) whether a disengagement procedure was pending at the time Defendants filed the Motion to Dismiss.

### 3.    The Motion to Dismiss

With that in mind, the Court will now turn to the substantive Motion to Dismiss.  There are twelve Action Items.  Plaintiffs have offered no objections to Defendants' evidence of sustained compliance with Paragraphs 8, 10, 11b, 11c, 14, and 16.  But Plaintiffs argue that Defendants have not demonstrated sustained compliance with Paragraphs 7, 9, 11(a), 12, 13, and 15.[35]

### i.    Compliance and Action Items in Paragraphs 8, 10, 11b, 11c, 14, And 16 [36]

Paragraphs 8 and 10

Paragraph 8 requires Defendants "to eliminate the backlog of outstanding or overdue IMB investigations by December 31, 2019."  On November 15, 2019, Defendants submitted

---

[35] Plaintiffs' response to Defendants' Motion did not argue that Defendants had not complied with Paragraph 15. Rather Plaintiffs included it in their Supplemental Memorandum.  *See* Doc. 2597.  Although the Court had asked the parties only to address the meaning of the term "durable remedy," the Court will consider Plaintiffs' Paragraph 15 arguments in their supplemental briefing.

[36] The SA includes Paragraph 6 as an Action Item.  As it simply provides for the discharge of the JCA and makes no demands on Defendants, the Court will not further consider it.

evidence that they met that deadline.  On December 4, 2019, the Court granted Defendants' unopposed motion to disengage Paragraph 8.  *See* Doc. 2339.

Paragraph 10 requires Defendants to eliminate a backlog of mortality reviews by December 31, 2019.  Defendants completed this task, and the Court granted Defendants' unopposed motion to disengage Paragraph 10 on January 24, 2020.  *See* Doc. 2351.  Plaintiffs have not contested Defendants' compliance with Paragraphs 8 and 10.[37]  *See* Doc. 2540 at 4-5. Because disengagement of Paragraphs 8 and 10 occurred only after Defendants completed all necessary actions and no further actions remain, the Court finds that Defendants have shown sustained compliance with Paragraphs 8 and 10.

Paragraphs 11b and 11c

Paragraphs 11b and 11c are two of the four Action Items under the subtitle "Health."  The three subparagraphs that fall within Paragraph 11 require state-employed nurses (11a), state-behavioral specialists (11b), and case managers (11c) to monitor and manage the medical and behavioral care of "High Acuity" and "At Risk" JCMs.  Paragraph 11 monitoring duties require monthly or quarterly visits.  Paragraphs 11a, 11b, and 11c explain the requirements for these visits.

Paragraph 11b focuses on behavior.  To evaluate the behavioral plans for JCMs, a behavioral specialist employed by Defendants collects data on JCMs who fall within the "At Risk" criteria used "to identify class members who demonstrate high behavioral needs."  Doc. 2299-1 ¶ 11b.  JCMs who are At Risk are reviewed under the DD Waiver Standard, Ch. 10 ¶

---

[37] Plaintiffs expressed one concern about Paragraph 10, observing that "Defendants' increasing delays in completing mortality reviews risks a return to the backlog that necessitated Paragraph 10."  Doc. 2540 at 5 (internal citation omitted).  Nonetheless, they did not object to disengagement of Paragraph 10 on that basis.  The Court further observes that as demonstrated in the 2021 MRC Annual Report, the MRC has increased the number of reviews they complete annually from 55 in 2018 to 145 in 2021.  *See* Doc. 2605-1 at 6.

10.1, to determine if there is a need for higher living supports.  If so, the JCM's budget is revised to accommodate the additional support.  The state behavioral specialists review and analyze the Positive Behavioral Support Plans (PBSP) of the At Risk JCMs.  *Id*.  During a mandated unannounced monthly face-to-face visit, the state behavioral specialist reviews documents that are required to be present at the JCM's residence and then, record on an electronic form the effectiveness of the PBSP and any recommended adjustments.  Providers who do not "adhere to the applicable standards [are reported and referred] for contract management."

There are many forms of contract management, including technical assistance and other administrative actions.  A regional office request for assistance (RORA) is one of these steps.  *See* Doc. 2447 at 24.  State employees use RORAs to inform DDSD of gaps in service for issues at the system level, issues with a provider agency, or issues with an individual.  *Id*.  If the behavioral specialist encounters a situation where a JCM has suffered or is likely to suffer "serious harm," the behavioral specialist must take immediate action to protect the JCM.  Although not required by 11b or the incorporated standards, in January 2020, Defendants began making additional monthly 11b calls to discuss the process for 11b visits.  Doc. 2491-2 ¶ 38.

On February 28, 2020, Defendants filed a motion to disengage Paragraph 11.  On July 23, 2020, the Court granted Defendants' motion.  *See* Doc. 2447.

In March 2020, because of the threat presented by the COVID-19 pandemic, Defendants began conducting the 11b visits telephonically.  Doc. 2491-2 ¶ 34.  Between April 2020 and October 2020, all At Risk JCMs received a monthly visit.  *Id*.  Defendants continued to use the PBSP as a monitoring tool.  Between January and October 2020, seven of the nine PBSPs were adequate.  *Id*. ¶ 41.  DOH followed up with the providers on the two plans found to be inadequate.  *Id*.. ¶ 42.  Between January and October 2020, there were 6 RORAs submitted as the

result of an 11b visit.  *See* Doc. 2491-3 ¶ 26.  During that period, the DOH did not take any

formal contract management actions because of 11b visits.  *Id.* ¶ 33.  Behavioral specialists did

not identify any situations that required immediate action.  Doc. 2491-3 ¶ 46.

Plaintiffs have not challenged Defendants' compliance with Paragraph 11b.  *See* Doc.

2540 at 5.  Accordingly, the Court finds that Defendants have shown compliance with Paragraph

11b.

Paragraph 11c focuses on case management for High Acuity[38] and/or At Risk JCMs.[39]  It

incorporates DD Waiver Standard 8.2 of Chapter 8.0, Case Management.  There are

approximately 115 to 120 JCMs who qualify as At Risk.  State-employed case managers make

an unannounced quarterly visit to the case management agency for each High Acuity and/or At

Risk JCM.  Doc. 2299-1 ¶ 11c.  At the case management agency, the case management

coordinator reviews "site visit forms and any other medical, health or behavioral record relating

to those high acuity/high behavioral services" to determine "if the case manager is meeting the

health/medical/behavioral requirements of the high acuity/high risk individuals" as defined in the

2018 DD Waiver Standards.  *Id.*  Case manager coordinators record their visit with an electronic

"Smartsheet Form," which is then reviewed by the Statewide Case Management Coordinator or

his designee.  Doc. 2491-2 ¶¶ 25, 26.

Defendants continue to use the High Acuity and At Risk lists to determine which JCMs

should receive an 11c visit.  Doc. 2491-2 ¶ 45.  In January 2020, DOH began using a monthly

call to discuss 11c visits as part of the 11c monitoring process.  *Id.* ¶ 50.  In March 2020, because

of the COVID-19 pandemic, case management coordinators discontinued in-person visits and

---

[38] Nurses use a tool, the Electronic Comprehensive Health Assessment Tool (e-CHAT), to assess each JCM's acuity level.  *See* DD Waiver Service Standards ¶¶ 13.2.6, 13.2.13.
[39] High Acuity is a designation that is based on an individual's aspiration risk.

began conducting their visits telephonically.  *Id.* ¶ 46.  All visits are still conducted under the

guidelines described in Paragraph 11c.  *Id.* ¶¶ 47-48.  Between April 2020 and the December

filing of the Motion to Dismiss, a supervisor had reviewed and approved all 257 of the 11c visit

forms.  *Id.* ¶ 49.  Paragraph 11c visitors noted that the JCM's case managers indicated health

concerns 59 times during their twice monthly case management visits.  *See* Doc. 2491-3 at 10.

When the CM noted health concerns, 93.22 percent of the time, the CM, or the IDT took

appropriate action.  *Id.*  Between January and October 2020, because of an 11c visit, 10 RORAs

were submitted.  Doc. 2491-3 ¶ 27.  These visits did not result in any formal contract action.  *Id.*

¶ 34.  Between February 2020 and October 2020, Paragraph 11c visits found that the Health and

Safety section of the ISP provided a summary of significant medical, health, and behavioral

concerns 98.49 percent of the time.  *Id.*  The 11c visits also found 92.19 percent compliance with

follow up appointments and addressed needs.  *Id.* at 12.

Plaintiffs have not disputed Defendants' ongoing compliance with Paragraph 11c.  *See*

2540 at 5.  The Court finds that Defendants have demonstrated sustained compliance with

Paragraph 11c.

Paragraph 14

Paragraph 14 requires Defendants to "ensure that person-centered assessments [PCA]

address the individual's interests and abilities" as required by the State's policies and procedures

and the DD Waiver Standards.  Plaintiffs initially opposed the motion to disengage Paragraph 14,

but later withdrew their objections.  Doc. 2430.  On May 6, 2020, the Court granted Defendants'

motion to disengage.  Doc. 2434.

From May 6, 2020, through December 4, 2020, the State maintained compliance with the

SA's mandate to complete a PCA for each JCA.  *See* Doc. 2491-4 at 1-7.  Defendants state that

due to the pandemic, conferences that would have occurred in-person have been conducted either with the telephone or with video conferencing software.  *Id.* ¶ 12.  As of October 30, 2020, 59 JCMs required a PCA.  *Id.* ¶ 25a.  Using a checklist, a form within the Strikeforce software, Defendants have ensured that the PCA is completed and contains information about each JCMs' strength and interests.  *Id.* ¶ 25.  Defendants involve the JCM's guardian and family, if applicable, when developing the PCA.  *Id.*  Ninety-seven percent of the time, the PCAs were completed timely, and all were signed and dated.  *Id.*  Plaintiffs do not challenge Defendants' compliance with Paragraph 14.  Doc. 2540 at 6.  In view of the evidence submitted by Defendants and in the absence of any objections, the Court finds that Defendants have maintained sustained compliance with Paragraph 14.

Paragraph 16

Paragraph 16 is not specifically included in Section III, which lists the Action Items but appears as a single paragraph in Section IV, Consultant.  This paragraph requires Defendants to hire a consultant to "assist in the implementation of the [SA]."  Doc. 2299-1 ¶ 16.  The evidence shows that Defendants did hire a consultant.  The terms of the employment contract with that consultant extended through March 2020.  Doc. 2321-2.  The Court granted disengagement of Paragraph 16 on October 9, 2019.  *See* Doc. 2322.  Plaintiffs do not challenge Defendants' compliance with Paragraph 16.  Doc. 2540 at 6.  The Court finds that Defendants have shown sustained compliance with Paragraph 16.

ii.   **Compliance and Plaintiffs' Objections to Action Items in Paragraphs 7, 9, 11a, 12, 13, and 15**

Paragraph 7

Paragraph 7 focuses on Incident Management and outlines the process for investigating Abuse, Neglect, and Exploitation (ANE) of JCMs. The paragraph directs Defendants to (1)

27

"conduct timely and adequate investigations" and (2) "take necessary remedial actions as required by current DHI policies and procedures."  The paragraph lists four state policies.

Two of the state policies delineate the process the DOH must take to investigate ANE: Immediate Action and Safety Plan: Procedures and Guidelines, IMB [Incident Management Bureau] Conducting Investigations of Abuse, Neglect, and Exploitation.  The IMB investigations of ANE result in findings of substantiated or unsubstantiated.  The "ANE: Corrective Action Plan," explains the procedures the IMB must take following a finding of substantiated ANE.

As a means of examining the quality of the IMB investigation, Paragraph 7 incorporates the "IMB Investigation Quality Assurance Review, including its operational Procedure Detail." This policy describes and implements a Quality Assurance Tool (QA tool).  The purpose of the QA tool "is to ensure the accuracy, thoroughness, quality, and completeness of IMB investigations and identify and remedy any areas found deficient."  Doc. 2342-1.  The QA tool provides two scores: a quality score and a process score.  The scores are equally weighted and combined for a total score.  To show compliance, the final QA score must be 90 percent or more.

On April 5, 2020, the Court disengaged Paragraph 7.  *See* Doc. 2415.

Between July 1, 2019, and September 2020, a period that preceded the motion to disengage Paragraph 7 by two months and the period following disengagement of Paragraph 7 until the Motions to Dismiss, Defendants' showed compliance on all quarters but one.  The audit for the second quarter of fiscal year 2020, resulted in an 85.6 percent score.  Following the non-compliant audit, IMB conducted a follow-up audit on February 20, 2020, which included reports from December 2019 to January 2020.  The result of that audit was a score of 91.45 percent.  All subsequent scores through September 2020 were over 93 percent.  Through September 2020, Defendants have maintained compliance with the policy timelines.

Plaintiffs argue that Defendants have failed to meet their burden and shown that they have sustained compliance with Paragraph 7.  They support this argument with three points: (1) Defendants have not provided evidence that they have implemented and sustained Corrective and Preventative Action Plans (CPAP); (2) Defendants have at least one quarter where the QA scores fell beneath the 90 percent compliance threshold; and (3) Defendants have not shown sustained compliance for the period between September 2020 and December 2021.  *See* Doc. 2540 at 35; Doc. 2597 at 1-2.

Defendants counter that (1) in the order disengaging Paragraph 7, the Court found that the QA tool was the sole measure of Paragraph 7 compliance, so CPAP evidence is irrelevant; (2) falling below the 90 percent threshold in one quarter does not defeat substantial compliance; and (3) the SA does not require Defendants to provide evidence of compliance after filing their Motion to Dismiss.  *See* Doc. 2491 at 17-18.  Doc. 2545 at 13.

As the Court observed in the Memorandum Opinion and Order disengaging Paragraph 7, the parties jointly developed and refined the QA tool with the intent that the QA tool would measure compliance with the IMB policies in Paragraph 7.  *See* Doc. 2415 at 8.  Although the QA tool does not evaluate the substance of CPAPs, it does evaluate whether a CPAP is present following an investigation of substantiated ANE.  An IMB substantiated case cannot be closed until there is an "adequate written" CPAP.  Doc. 2342 ¶ D.4.  By including as a policy requirement that an "IMB findings (Closure Letter)" must be sent, the QA evaluates whether there is evidence of a CPAP in each IMB investigation.  Doc. 2342-6 ¶ 8.b-c.  In this way, the QA scores do provide evidence of CPAPs.  As the Court previously stated, "[a]lthough the QA tool may not include everything the Plaintiffs now want, they cannot now change the criteria."  Doc. 2415 at 8.

Next, Plaintiffs make much of the fact that within the four quarters that followed their motion to disengage Paragraph 7, Defendants had one quarter where their QA score fell below 90 percent.  Defendants respond that a failure to achieve compliance on one quarter should not defeat Paragraph 7 compliance.  Defendants' argument hinges on the fact that the SA permits them to move for an order of disengagement at any time.  Defendants posit that if the Court were to find non-compliance based on a single quarter, Defendants could simply file a second motion based on the three subsequent compliant quarters and obtain disengagement based solely on that information.  Doc. 2545 at 13.

The SA does not state how long a compliance period must be.  At the preliminary approval hearing, Plaintiffs conceded that the SA does not have a "waiting period for compliance."  *See* Doc. 2298 at 32:4-10.  Of course, because Paragraph 7 relies on the QA tool, which can only be employed quarterly, to show compliance with Paragraph 7, Plaintiffs must demonstrate a minimum of three months, or one quarter of compliance.  But there is an additional component to the substantial compliance inquiry, and that is the demonstrated commitment of the Defendants.

Although Defendants fell below the 90 percent threshold on one quarter, it is also significant that they immediately worked to remedy the identified deficiencies.  Not only did Defendants cure the problem, but they maintained a score of 93 percent or above through September 2020.  This shows the dedication of Defendants to the IMB and QA process.  The Court finds that a QA score that does not meet the compliance threshold in one quarter out of four, by itself, does not defeat substantial compliance.

In their final objection, Plaintiffs argue that Defendants have not met their burden and produced sufficient evidence of sustained compliance from September 2020 to the present.

Defendants counter that in its Paragraph 12 Order, the Court found that Defendants had complied with Paragraph 7 up until the Motion to Dismiss, and that because neither party addressed Paragraph 7 compliance in the supplemental briefing the Court had conclusively determined the issue of compliance. *See* Transcript, December 15, 2021, at 20:17-23. The Court disagrees.

In their supplemental briefing, Plaintiffs did argue that the SA obligates Defendants to show sustained compliance with Paragraph 7 through December 2021. On the first page of their brief, Plaintiffs clearly state Defendants had not "provided the Court with any evidence that they have maintained sustained compliance with [Paragraph 7]." Doc. 2597 at 1-2 n.1. Defendants' failure to provide the QA scores for these additional quarters gives the Court pause.

The parties agreed that the state policies created a durable remedy. To show sustainability of that remedy, Defendants agreed to implement the policies incorporated into the SA, which includes those within Paragraph 7, and maintain compliance for the period of the SA. The Court acknowledges Defendants' argument that the SA does not cover the period between December 2020 and December 2021. But the Court also observes that Paragraph 7 was among the first paragraphs disengaged and so has not been monitored by Plaintiffs. Moreover, the Court ruled that the QA scores alone demonstrate compliance. For that reason, the Court cannot understand Defendants' reticence to provide the scores. The QA scores for the three quarters that followed the Motion to Dismiss should not have been unduly burdensome to produce. Significantly, because Paragraph 7 focuses on the State's own investigative procedures, there is no ancillary evidence that demonstrates Defendants' sustained compliance with Paragraph 7.

In the absence of current QA scores, and because Defendants had at least one failing score after disengagement, the Court concludes that Defendants have not provided the Court with sufficient evidence to demonstrate sustained compliance with Paragraph 7.

Paragraph 9

Paragraph 9 focuses on mortality review, which examines the circumstances surrounding the deaths of JCMs to promote system wide improvement.  Doc. 2554 at 5 ¶ 5.  Toward that end, the Mortality Review Committee (MRC) must (1) "conduct timely [mortality reviews], (2) conduct "adequate mortality reviews," and (3) "take necessary remedial action.  *See* Doc. 2554 at 4 ¶ 1.  Three DOH policies outline the 13 procedural steps to a mortality review.  These steps require the MRC to evaluate whether necessary and reasonable medical, social, and psychological interventions were provided prior to death.  If during the review, the MRC finds a problem or a failure to comply with certain standards, the MRC must make recommendations and present them in an annual report to the Developmental Disabilities Systems Quality Improvement Committee (DDSQI).

On January 30, 2020, Defendants filed their first motion to disengage Paragraph 9.  That motion was denied because Defendants had not completed two of the necessary steps in the mortality review process: (1) presentment of an annual report to the DDSQI and (2) a meeting to review that report.  *See* Doc. 2436.  Those two steps were integral to demonstrate that the MRC was complying with the third component of Paragraph 9, "necessary remedial action."

On September 15, 2020, Defendants filed a second motion to disengage Paragraph 9 (Doc. 2451).  Twelve mortality reviews occurred between April 19, 2019, when the Court granted preliminary approval of the SA, through September 15, 2020, when Defendants filed their second motion to disengage Paragraph 9.  In their second motion to disengage, Defendants proffered evidence of the 2020 Annual Mortality Review report.  The Court granted Defendants' second motion to disengage Paragraph 9 on June 8, 2021.  Doc. 2554.

Plaintiffs argue that Defendants have not submitted adequate evidence of sustained compliance with the requirements of Paragraph 9 for three reasons: (1) at the time of the hearing on the Motion to Dismiss, the MRC had not provided Plaintiffs with the Annual Report for fiscal year 2021; (2) Plaintiffs did not provide the actual mortality reviews that show the MRC's progression through each step; and (3) Defendants had not presented the 2021 Annual Report to the ACQ and DDSQI.[40]

Prior to the hearing on the motion to dismiss, Plaintiffs filed a motion asking the Court to order Defendants to give them a copy of the 2021 Annual Report.  On November 2, 2021, DOH issued their Mortality Review Process Annual Report ("2021 Annual Report").  Doc. 2605-1. Based on language in the SA, the Court denied that motion, finding that the monitoring period ended Defendants' duty to supply Plaintiffs with information.  Doc. 2593 at 2.  In the Order, the Court stated that it was "mindful of the SA's requirement that a motion to dismiss must include 'sufficient information to allow Plaintiffs to make an informed judgment concerning compliance and sustained compliance.  While Defendants must demonstrate that dismissal is appropriate, how to make that showing is at their discretion.  If Plaintiffs determine that Defendants have not met their obligation to give them sufficient information, that is an argument that goes to the adequacy of Defendants' evidence." *Id.* at 3.  At the hearing on the Motion to Dismiss, Defendants reiterated that they did not believe that it was incumbent on them to deliver the 2021 Annual MRC Report.

---

[40] In Plaintiffs' response to Defendants' Motion to Dismiss, which Plaintiffs filed before the entry of the Court's opinion disengaging Paragraph 9, Plaintiffs make many of the same arguments they did prior to the Court's order disengaging Paragraph 9.  For example, Plaintiffs argue that the SA required Defendants to do the fishbone form of structured problem analysis (SPA).  The fishbone form of analysis is not mandated by the SA, nor was it even specifically identified as required in Defendants' training materials.  Doc. 2554 at 20-21.  Plaintiffs also argue that an external reviewer's findings demonstrate that the MRC is not adequately conducting mortality reviews.  The Court has rejected this argument and so will not further address it here.  *See id.* at 23.

Following the hearing, the Court ordered Defendants to file the 2021 Annual Report, which they did.  *See* Docs. 2604 (order), 2605 (report).  The 2021 Annual Report includes the 145 reviews that were finalized during the State's 2021 fiscal year which began on July 1, 2020 and ended on June 30, 2021.  But the included MRC reviews happened during fiscal years 2018 through 2021.  Fifteen of the deaths reviewed, or approximately 10.3 percent,[41] were JCMs. Doc. 2605-1 at 7.  The 2021 Annual Report lists both provider level and systemic level findings. The report also includes recommendations that address findings previously identified in the 2020 Annual Report and their status as of October 29, 2021.  Doc. 2605-1 at 33.  The Annual Report indicates that the MRC has been meeting, conducting mortality reviews, and making findings and recommendations.

Plaintiffs' next objection is that Defendants "have not provided mortality reviews since April. 21, 2021, nor have they cited or attached any to their supplemental brief."  Doc. 2597 at 10.  Nothing in the SA states the type of documentation Defendants must submit to demonstrate compliance after disengagement.  What the SA requires is "sufficient information to allow Plaintiffs to make an informed judgment concerning compliance and sustained compliance." Doc. 2299-1 ¶ 21.  In their supplemental briefing, Defendants submitted an MRC tracking sheet that lists the status of various mortality reviews, beginning in 2019 and ending on November 25, 2021.  *See* Doc. 2598-1 at 1-4.  These sheets sufficiently demonstrate that the MRC is engaged in the process described in Paragraph 9.

The MRC recommendations are the focus of Plaintiffs' last objection.  Plaintiffs assert that because Defendants have not demonstrated that they have submitted the MRC's recommendations to the DDSQI they have not shown substantial compliance.  In their

---

[41] Some of these mortality reviews were included in the 12 mortality reviews examined by the Court when disengaging Paragraph 9.

supplemental briefing, Defendants stated that in early December they intended to present the

2021 Annual Report to the DDSQI and ACQ.  As the Court observed in the Memorandum

Opinion and Order disengaging Paragraph 9, there is nothing within either the paragraph or the

State's policies and procedures that establishes a deadline for the MRC to present its findings to

the DDSQI and the ACQ.  *See* Doc. 2554 at 27 ("Just as the Court will not put a date on when an

annual report is due, the court will not create a deadline for the DDSQI to complete its

assessment of the MRC's findings and recommendations.").  When the Court denied Defendants'

first motion to dismiss Paragraph 9, it was on the grounds that Defendants had not once shown

that they had completed either step at any point after the execution of the SA.  Now they have.

Moreover, the 2021 Annual Report includes the status of the systemic recommendations made by

the MRC in the previous year and demonstrates that Defendants are actively acting on the MRC's

recommendations.

The Court finds that Defendants have shown sustained compliance with Paragraph 9.

Paragraph 11(a)

The aim of Paragraph 11a is to assure that state employees accurately monitor the care

given to High Acuity JCMs by agency nurses.  DOH employs four visiting nurses to conduct

unannounced monthly face-to-face visits to JCMs designated high acuity.  Docs. 2299-1 ¶ 11a;

2491-2 ¶ 24.  Each nurse has a registered nurse work license and a regulation-required basic

certificate.

To fulfill their monitoring duties, 11a nurses examine provider nurses' care against the

standards in Ch. 13 ¶ 13.2.13.  Until March 2020, all 11a visits were in person.  After that date,

because of the threat presented by the COVID-19 pandemic, 11a nurses began conducting their

visits telephonically.

DOH has continued to use the same methodology to generate the High Acuity List since disengagement of Paragraph 11a. Doc. 2491-2 ¶ 22. The IDT reviews the JCM's living supports category to determine whether a higher level of supports is needed, and then if needed, raises the supports. Doc. 2491 ¶ 20.

Almost half of the JCMs, approximately 115-120 individuals, qualify for monthly 11a visits. Doc. 2491-3 ¶¶ 7, 8. Prior to the 11a visit, nurses must review documents. During the 11a visits, among other things, the nurses examine whether certain health records are current, including e-Chat, Aspiration Risk Screening Tool (ARST), Medication Administration Assessment Tool (MAAT), Individual Service Plan (ISP), Medication Administration Record (MAR), and Comprehensive Aspiration Risk Management Plan (CARMP). *See* 2299-1 ¶ 11a; Doc. 2489-3; DDS Standard ¶ 13.2.13; Doc. 2532 at 1-5 (nurse monitoring form).

After the visit, Paragraph 11 requires 11a nurses to speak with an agency nurse within five days of the visit about any concerns resulting from the visit. Nurses must record the date of their contact with the agency nurse. Although Paragraph 11a does not require 11a nurses to document most required activities, Defendants have created an 11a form that Defendants maintain in their Smartsheet software. The State requires Paragraph 11a nurses to use this form to document their monitoring activities. *See* Doc. 2600 at 37. If during the visit, 11a nurses observe something that does not comport with state policies and that infraction is not corrected prior to the nurse's departure, nurses must complete a RORA. The Regional Director or his/her designee reviews all 11a visit forms for quality and completeness. *Id.* ¶ 26. Between April 2020 and November 2020, 763 11a visit forms were reviewed and approved by a supervisor. *Id.* ¶ 27; *see also* Doc. 2491-3 at 15-17.

On July 23, 2020, the Court found that Defendants had substantially complied with Paragraph 11 and ordered it disengaged.  *See* Doc. 2447.

In their Motion to Dismiss, Defendants have supplied 11a data that encompasses visits that followed the filing of their motion to disengage on February 28, 2020, through November 2020.  From April 2020 to October 30, 2020, 11a nurses spoke with agency nurses within five business days 98 percent of the time.  Between January 2020 and October 2020, 11a visitors noted that e-Chat was current 99.2 percent of the time.  The ARST was current 99.22 percent of the time.  The ISP was current 97.26 percent of the time.  The CARMP was current 90.32 percent of the time and available on-site 96.4 percent during this time.  *See* Doc. 2491-3 at 7-8. Between January and October 2020, nurse 11a visits resulted in the submission of 291 RORAs. Between April 2020 and October 2020, three formal contract management actions were taken in response to 11a visits.  Between April 2020 and November 2020, all 763 11a visit forms were reviewed and approved by a supervisor.  *Id.* ¶ 27; *see also* Doc. 2491-3 at 15-17.

Plaintiffs contend that Defendants have not shown sustained compliance with Paragraph 11a for two reasons.  First, Plaintiffs argue that Defendants wrongfully discontinued face-to-face visits after March 2020.  Doc. 2540 at 23.  The lack of visual monitoring, Plaintiffs suggest, led to poor health outcomes for JCMs.  *Id.* at 26.  Second, Plaintiffs assert that the 11a nurses did not "monitor class members' health care status and qualitatively assess provider care as required by Paragraph 11[a]."  *Id.* at 27.

Defendants admit that from March 2020 through May 2021, they discontinued the face-to-face visits, but they assert that their reasons for doing so were to safeguard the health of the JCMs.  After Defendants filed their motion to disengage Paragraph 11 on February 28, 2020, but before a hearing on the contested motion, on March 11, 2020, the State declared a Public Health

Emergency because of the newly identified COVID-19 virus.  Within two days, on March 13, 2020, the State issued a Public Health Emergency Order to Temporarily Limit Nursing Home Visitation Due to COVID-19.[42]

Defendants state they discontinued 11a visits because of the danger face-to-face contact posed to the JCMs.  Their actions were prompted by data that suggested the JCMs were particularly susceptible to COVID-19.  The Center for Disease Control and Prevention reported that those who contracted COVID-19 while in assisted living homes, had a fatality rate of 21 percent which was significantly higher than the 3 percent rate of those living in the general population.  Doc. 2491 at 20 (quoting Yi SH, See I, Kent AG, et. al., Characterization of COVID-19 in Assisted Living Facilities — 39 States, October 2020. MMWR Morb Mortal Wkly Rep 2020;69:1730–1735.  DOI: http://dx.doi.org/10.15585/mmwr.mm6946a3external icon).[43]  In determining how to address the significant risk to those, like the JCMs, who are medically fragile, Defendants considered "the extremely high rate of spread [of the pandemic] which suggested that one-on-one contact "would create an unnecessary risk."  Both Medicare and Medicaid promoted telehealth as an option to face-to-face conducts.[44]

Plaintiffs counter that "Defendants cannot unilaterally alter their obligations under the [SA]."  Doc. 2540 at 23.  Plaintiffs suggest that Defendants had an obligation to ask the Court to

---

[42] *See* https://cv.nmhealth.org/public-health-orders-and-executive-orders/

[43] The data in the CDC report does not include all fifty states.  New Mexico is listed in one table, but not all data is included.

[44] Plaintiffs argue that the State's own policy prohibits the use of telehealth without the video component.  During the pandemic, both the State and Federal Government's made an exception and permitted audio only telehealth visits.  *See* HHS Gov: Telehealth: Delivering Care Safely During COVID-19 at https://www.hhs.gov/coronavirus/telehealth/index.html; https://www.medicaid.gov/medicaid/benefits/telemedicine/index.html; https://telehealth.hhs.gov/patients/understanding-telehealth/ (Medicare site explaining that telehealth is a live discussion with your doctor over the "phone or video chat"); *see* https://www.cchpca.org/new-mexico/?category=covid-19&topic=originating-site (stating that New Mexico Medicaid reimburses for "limited professional services delivered by telephone without video").

modify Paragraph 11a to change the face-to-face visit requirement.  They state further that reliance on telephonic visits for 11a nurses' monitoring duties resulted in Defendants' failure to flag extreme weight loss and other health concerns in several JCMs.  *See* Doc. 2540 at 26.

While Plaintiffs correctly observe that Defendants could have asked the Court to modify the SA's face-to-face visit requirement, Plaintiffs also could have formally objected to the change.  Notably, Defendants moved from face-to-face visits after filing their motion to disengage Paragraph 11, but before Paragraph 11 was disengaged, five months later.  Until an Action Item was disengaged, in quarterly meetings, Plaintiffs monitored Defendants' performance.  *See* Doc. 2299-1 ¶ 18.  Two quarterly meetings occurred in the interim after Defendants filed their motion to disengage but before the Court entered its opinion.  *See* Doc. 2424 (text only entry for quarterly meeting on April 20, 2020); Doc. 2446 (text only entry for quarterly meeting on July 21, 2020).  Indeed, the Court permitted Plaintiffs to hold a roundtable discussion with an employee of the DDSD to obtain additional information to support their objections to Defendants' motion to disengage Paragraph 11a.

Plaintiffs suggest that they did not understand that the telehealth visits were telephonic, which did not include a video component.  They further assert that although Defendants issued directives that ordered residential supporters to "initiate change . . . that cause barriers to internet access," Defendants did not follow through on ensuring that the ordered changes happened.  Doc. 2540 at 25.  Plaintiffs further indicate that other directives "request[ed] that case managers and residential providers perform at least one monthly site visit each month," but did not make similar requirements of the 11a nurses.  *Id.*  Plaintiffs conclude that the resumption of some visits demonstrates that 11a visits could also have resumed.  *Id.* at 26.

39

Defendants do not disagree that video visits have advantages over telephonic visits. They state that they cannot conduct video visits for all JCMs because "Defendants and provider agencies lack the infrastructure to ensure video visits on a monthly basis for all 11a class members." In response to Plaintiffs' argument that it is now safe for face-to-face visits to resume, Defendants observe that "not all JCMs have received the vaccine nor have all DOH staff members," and that "the effectiveness of vaccines given temporary approval is still subject to much debate." Doc. 2545 at 15.

Undeniably the pandemic has changed the ways in which people have received healthcare and interacted with each other. Because of the pandemic, States have invoked their emergency powers to safeguard the health of residents. In a discussion of state authority during a pandemic, Chief Justice Roberts observed:

> Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' When those officials 'undertake [] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad. Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competency, and expertise to assess public health and is not accountable to the people.

*South Bay United Pentecostal Church v. Newsome*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, J) (concurring in denial of application for injunctive relief). Although the discontinuation of the face-to-face 11a visits was inconsistent with the terms of the SA, the State had a legitimate reason based on the health and welfare of the JCMs. Cf. *Sveen v. Melin*, 138 S.Ct. 1815, 1822 (2018) (discussing how laws substantially impairing a preexisting contract will not violate the Contracts Clause if the state law is drawn in an appropriate and reasonable way to advance a "significant and legitimate public purpose"). The Court concludes that the State's actions on this issue do not defeat substantial compliance with Paragraph 11a.

Plaintiffs also argue that Defendants have not complied with Paragraph 11a because the 11a nurses have not always reviewed necessary documents nor have they included a qualitative assessment of a JCM's care in nurse monitoring forms.  Defendants' evidence suggests that the 11a nurses have substantially complied and reviewed the necessary documents.

Approximately 115 to 120 JCMs are on the High Acuity List.  That means for the period between January and October 2020, 11a nurses completed 1,089 five-to-six page forms documenting an 11a visit.  Doc. 2491-3 at 7.  A total of 763 of 11a visits occurred between April and October 2020.  Doc. 2491-2 at 4, ¶ 27.[45]  Defendants concede that there are two visits out of nearly 1,000 where an 11a nurse affirmatively stated an inability to review documents.  The evidence suggests that this resulted from the necessity of conducting visits telephonically.  The Court agrees with Defendants that those two instances in the context of the numerous completed reviews are not significant.  The error rate, when considering all factors, is within the compliance threshold.

Plaintiffs' next objections target alleged deficiencies in the 11a nurse monitoring forms. These forms, Plaintiffs assert, show that the 11a visits to five JCMs did not meet the requirements of incorporated DD Waiver Standard ¶ 13.2.13.  Doc. 2540 at 27.  Defendants respond that Plaintiffs' arguments rely on allegations about 11a duties that are not within the standards.  The Court agrees.

In the 11a disengagement proceedings, Plaintiffs objected to (1) the substance of Defendants' 11a forms, (2) the lack of instruction for those forms, and (3) 11a nurses' failure to

---

[45] Even if the 11a nurses failed to track weight or document GERs for all five patients for all five months, that would still show only a mistake ratio of 90 out of 763 forms, or a 11.9 percent error rate, which means an 88.1 percent compliance rate.  Notably, the denominator in this equation is forms, and does not take into consideration the list of tasks the 11a nurse must complete.  If each item on the five-to-six page form were included in the denominator, the ratio of noncomplying events with the complying events would shrink significantly.

document a qualitative assessment of provider nurses.  Doc. 2447 at 18-19.  At that time, the

Court explained that 11a did not require Defendants to create forms nor did it mandate a

documented qualitative assessment.  *Id.* at 18.  After the Court disengaged Paragraph 11, on

August 3, 2020, Defendants updated an existing form.  The new form now includes detailed

instructions about how to complete the form as well as additional documentation requirements.

Now, Plaintiffs argue that because Defendants' new nurse monitoring form requires

documentation and narratives, a failure to complete the form with that information, demonstrates

noncompliance with Paragraph 11a.  The deficiencies noted by Plaintiffs in the five JCM charts,

include, (1) failure to provide a narrative of a General Events Report (GER) which documents a

significant health event, (2) failure to track weight and (3) failure to affirmatively assert that the

nurse reviewed the MAR.  Doc. 2540 at 31, 34.

Although the form requires the 11a nurse to document GER observations and weight

tracking, that documentation is not mandated by Paragraph 11a.  Rather, Paragraph 11a instructs

11a nurses to review documents and discuss deficiencies in the documentation with the agency

nurses.  The Court applauds Defendants' ongoing efforts to improve their system and will not

penalize them for not complying with a standard not in the SA.

Plaintiffs also claim that 11a nurses repeatedly failed to document medication

information for 15 patients, failed to determine if medications were available at the provider

agency for 14 patients, and failed to determine if MARs and medications matched for 17

patients.  To reinforce this argument, Plaintiffs use an exhibit prepared by an unknown person or

persons.  The exhibit is the result of an examination of the five-to-six page 11a nurse monitoring

forms of 12 to 18 JCMS and alleges that these forms show 68 errors.[46]  Unfortunately, Plaintiffs

---

[46] The Court acknowledges that some of the 68 errors Plaintiffs indicated occurred on more than one occasions but were included on the table as only one error.

did not provide the Court with any information about this exhibit.  The exhibit does not explain

who put it together, how many forms were examined, and how Plaintiffs chose their sample.

In contrast, the State's evidence includes sworn affidavits from Sally Karingada, the

State's Jackson Compliance Officer and Scott Doan, Deputy Director of the DDSD.  Ms.

Karingada prepared a chart based on her examination of 1089 nurse monitoring forms.[47]  She

concluded the following about the nurses review' of medication information: 95.32 percent of

relevant forms indicated that the MAR matched patient medications; 94.5 percent of the forms

showed that 11a nurses reviewed and documented whether the MAR was complete; 99.39

percent of the forms documented that 11a nurses examined whether medication was available;

99.32 of the relevant 11a forms addressed whether the MAAT was current.[48]

On this issue, the Court finds Defendants' sworn evidence more credible.

Finally, Plaintiffs suggest that Defendants have not provided "sufficient evidence" of

substantial compliance.  Plaintiffs do not explain what 11a evidence would have been "sufficient

evidence" nor do they indicate how that evidence would have supported their arguments.

Defendants argue that they have provided Plaintiffs with everything they needed.  The Court

agrees.

 The Court finds that Defendants have demonstrated sustained compliance with

paragraph 11a.

Paragraph 12

---

[47] The Court did not include in this number Plaintiffs' observations that certain patients did not receive face-to-face visits.

[48] Ms. Karingada's chart indicates that the nurse monitoring forms provide the following answers:" yes," "no," "N/A" or blank.  She attests that she reviewed the date of each visit and the forms and created a chart based on her review.  *See* Doc. 2491-3 at 3.

Paragraph 12 focuses on the health of the JCMs.  It requires Defendants to "provide health related services as required by the DD Waiver Standards."  Doc. 2299-1 ¶ 12.  Most JCMs received services under the DD Waiver or the Mi Via Waiver, which are two home and community-based Medicaid waiver programs overseen by the DDSD.  Doc. 2600 at 4 ¶ 2.  Defendants do not directly provide healthcare related services.  They contract with third parties to deliver these services.  *Id.* ¶ 3.  The DD Waiver Standards apply to all provider agencies and their staff and delineate how providers deliver services.  *Id.* ¶ 4.  Paragraph 12 names three chapters from the DD Waiver Standards: Chapter 5, Health, Chapter 13, Nursing Services, and Chapter 20, Provider Documentation and Client Records.  The parties assess compliance with Paragraph 12 through the Internal Quality Review (IQR) and providers' adherence to state policies.

On the same date Defendants filed their Motion to Dismiss, December 4, 2020, Defendants filed a motion to disengage Paragraph 12.  One year later, on December 10, 2021, the Court entered a Memorandum Opinion and Order (Paragraph 12 Order) disengaging Paragraph 12, five days before the hearing on Defendants' Motion to Dismiss.  Doc. 2600.  The proximity between disengagement of Paragraph 12 and that hearing meant that Defendants' brief could not and did not contain evidence of sustained compliance for the intervening year.

Plaintiffs contend that the lack of evidence about compliance between December 2020 until December 2021 defeats Defendants' Motion.  This argument does not acknowledge the wealth of information Plaintiffs obtained during the monitoring period, which did not end until the Court entered its Paragraph 12 Order.  From July 2019 until December 2021, every quarter, Plaintiffs monitored Defendants' compliance with Paragraph 12.  That process included

receiving current written data prior to each meeting about Paragraph 12's implementation.  At the meeting, Plaintiffs discussed the information they received with Defendants.  *See* Doc. 2588.

Finally, the Court ordered supplemental briefing on Defendants' Motion to Dismiss.[49] Although the Court restricted the scope of the supplemental briefing to argument about what constituted a "durable remedy," Plaintiffs took the opportunity to provide yet more evidence that the Court should not grant the Motion to Dismiss, including information regarding Paragraph 12. The Court finds that under these circumstances Plaintiffs possessed sufficient information to evaluate Defendants' compliance with Paragraph 12.

To assess sustained compliance with Paragraph 12, in addition to the regional 2020 and 2021 IQR reports,[50] Plaintiffs reviewed four categories of documents: (1) medical records maintained in the THERAP system; (2) RORAs filed by Paragraph 11a nurses; (3) monthly reports of ANE allegations; and (4) Out of Home Placement (OOHP) reports produced weekly by DOH.  Doc. 2597 at 12.  Plaintiffs argue that Defendants have not shown sustained compliance with Paragraph 12 because (1) in the absence of the 2021 Annual Review, Plaintiffs cannot assess the care of the JCMs; (2) the IQR scores have gone down, and (3) the RORAs submitted by 11a nurse monitors "frequently find issues that related to Paragraph 12 Standards." *Id.* at 12-16, 18.

Plaintiffs' argument that Defendants have not shown sustained compliance in the absence of a statewide report creates a requirement not in the SA.  Nothing in Paragraph 12 obligates

---

[49] In fact, the 9-month delay between the filing of the contested motion to disengage Paragraph 12 and the hearing on the motion, gave Plaintiffs the opportunity to submit an affidavit by the former Community Monitor.  *See* Doc. 2563.  Because of her contractual status with Defendants did not end until June 2021, Ms. Rucker had declined Plaintiffs' request for an affidavit before that date.  *See also*, Doc. 2550 (denying Plaintiffs' request to take the deposition of Lyn Rucker).

[50] In the Paragraph 12 Order, the Court found that the "regional reports presented a limited view of Defendants' compliance" because when the regional scores are averaged the results may be different.  *See* Doc. 2600 at 70. Because these scores offer some information about sustained compliance, the Court will examine them here.

Defendants to complete a statewide report by a certain time or date.  In fact, the SA does not even require a statewide report; it requires only that Defendants "continue an individual quality review process, as a component of DHI's quality program management consistent with DD Waiver Standards."  *See* Doc. 2299-1 ¶ 15.  Although Plaintiffs have not completed a statewide IQR report for 2020 or 2021, final reports for three areas,[51] Metro 1, Metro 2 and Southeast are on Defendants' website.  In their supplemental briefing, Plaintiffs used evidence from those reports to support their argument that Defendants have not demonstrated sustained compliance with Paragraph 12.

Next, Plaintiffs allege that Defendants have not substantially complied with Paragraph 12 because the IQR scores have decreased.  In making their argument, Plaintiffs rely on ten IQR questions that they assert are the most "probative of Defendants' level of compliance with several Paragraph 12 standards."  Doc. 2597 at 13.  Plaintiffs argue that the "average of the 'yes' scores for 2020 for these ten questions is 23.4 %, substantially below the average of the 'yes' scores of 2019, which was 33.5%."  *Id.* at 15.  This argument relies on an assumption that the "yes" score is the only IQR score that demonstrates compliance.

In the Paragraph 12 Order, the Court found that answers to IQR questions of "yes" did not accurately reflect the true measure of Defendants' compliance.  After examining the IQR questions, the factors that impacted the scoring, and the DD Waiver Standards, the Court concluded that a combination of the "yes" answers and the "many factors met" answers more accurately weighed Defendants' compliance.  *See* Doc. 2600 at 32.  Thus, Plaintiffs' tabulation of the recent regional reports does not fully express Defendants' sustained compliance.

---

[51] The State has five regions: metro, northeast, northwest, southeast, southwest.  *See* Doc. 2600 at 14 ¶ 68. There are two reports for Metro region. Generally, the final report includes all regions.  Only the final PowerPoint reports for Metro 1, Metro Region 2 and the Southeast Region current appear on Defendants' website.

The Court has examined the same regional reports,[52] focusing on the ten questions Plaintiffs contend are most important.  Scores of both "yes" and "many factors met" demonstrate that Defendants have not only met the compliance threshold but have improved their scores in most areas.  That conclusion is buttressed by the average of those ten questions for 2019, 2020, and 2021.

Metro 1

| Question | 2019 Scores | 2020 Scores | 2021 Scores |
|---|---|---|---|
| 50. Was the eCHAT (electronic Comprehensive Tool) updated timely? | 90% | 97% | 100% |
| 50a. Is the eCHAT updated timely with the ISP (Individual Service Plan) and other changes in condition? | 84% | 94% | 90% |
| 50b. Is the eCHAT complete? | 92% | 93.9% | 100% |
| 52. Does the individual receive all age and gender appropriate health screening/immunizations in accordance with national best practice standards? | 79% | 81.8% | 90% |
| 53. Does the individual receive medication as prescribed? | 65% | 63.6% | 70% |
| 54. Are nursing services provided as needed for the individual? | 61% | 78.8% | 100% |
| 55. Is the CARMP (Comprehensive Aspiration Risk Management Plan) consistent with recommendations in other healthcare documents? | 69% | 72.4% | 90% |
| 56. Is the CARMP consistently implemented as intended? | 90% | 89.7% | 100% |
| 57e. Were Health Care Plans available, accurate and consistently implemented? | 65% | 87.9% | 90% |
| 58. Did the team arrange for and obtain the needed, relevant assessments? | 98% | 97% | 100% |
| Average Scores | 79.3% | 85.6% | 93.0% |

Metro 2

| Question | 2019 Scores | 2020 Scores | 2021 Scores |
|---|---|---|---|
| 50. Was the eCHAT (electronic Comprehensive Tool) updated timely? | 90% | 97% | 100% |
| 50a. Is the eCHAT updated timely with the ISP (Individual Service Plan) and other changes in condition? | 84% | 94% | 100% |
| 50b. Is the eCHAT complete? | 92% | 93.9% | 100% |
| 52. Does the individual receive all age and gender appropriate health screening/immunizations in accordance with national best practice standards? | 79% | 81.8% | 90% |
| 53. Does the individual receive medication as prescribed? | 65% | 63.6% | 70% |
| 54. Are nursing services provided as needed for the individual? | 61% | 78.8% | 100% |
| 55. Is the CARMP (Comprehensive Aspiration Risk Management Plan) consistent with recommendations in other healthcare documents? | 69% | 72.4% | 90% |
| 56. Is the CARMP consistently implemented as intended? | 90% | 89.7% | 100% |

---

[52] For the reports and scores, *see* NM DOH, Individual Quality Review, at https://www.nmhealth.org/about/dhi/cbp/qmb/iqr/

| | | | |
|---|---|---|---|
| 57e. Were Health Care Plans available, accurate and consistently implemented? | 65% | 87.9% | 90% |
| 58. Did the team arrange for and obtain the needed, relevant assessments? | 98% | 97% | 100% |
| Average Scores | 79.3% | 85.6% | 94.0% |

Southeast Region

| Question | 2019 Scores | 2020 Scores | 2021 Scores |
|---|---|---|---|
| 50. Was the eCHAT (electronic Comprehensive Tool) updated timely? | 80% | 90% | 100% |
| 50a. Is the eCHAT updated timely with the ISP (Individual Service Plan) and other changes in condition? | 70% | 90% | 100% |
| 50b. Is the eCHAT complete? | 80% | 100% | 85.7% |
| 52. Does the individual receive all age and gender appropriate health screening/immunizations in accordance with national best practice standards? | 50% | 80% | 87.5% |
| 53. Does the individual receive medication as prescribed? | 80% | 60% | 87.5% |
| 54. Are nursing services provided as needed for the individual? | 70% | 60% | 100% |
| 55. Is the CARMP (Comprehensive Aspiration Risk Management Plan) consistent with recommendations in other healthcare documents? | 76.9% | 57.1% | 85.7% |
| 56. Is the CARMP consistently implemented as intended? | 88% | 100% | 71.5% |
| 57e. Were Health Care Plans available, accurate and consistently implemented? | 80% | 100% | 100% |
| 58. Did the team arrange for and obtain the needed, relevant assessments? | 80% | 100% | 100% |
| Average Scores | 75.5% | 83.7% | 91.8% |

When disengaging Paragraph 12, the Court found that a score of 80 percent showed compliance. In 2019, in all three regions, the average score for just these ten questions was below 80 percent. But in 2020, all three regions had achieved compliance with scores in the 80th percentile or above. By 2021, all three average scores had once again risen, and are now in the 90th percentile.

To be sure, not every question meets the 80 percent compliance standard. Plaintiffs single out two questions as particularly alarming indicators of a decrease in adherence to the health standards: questions 53 and 54. The scores for these two questions are lower than the scores on the others. In two regions, on question 53, Defendants have not achieved a score above 70 percent. In contrast, on question 54, Defendants improved their score, rising above 80 percent in all three regions. Nevertheless, as the Court found in the Paragraph 12 Order, the

scores for question 53, and 54 do not present an accurate picture of compliance or sustained compliance.

First, although Plaintiffs present these scores as individually corresponding to specific health standards, that is not how they were tabulated by the parties in the Paragraph 12 briefing. Generally, with some exceptions, both parties aligned several IQR questions with one DD Waiver Standard.[53]  *See* Doc. 2600 at 70.  Each standard corresponded to multiple questions. The final IQR score for a particular standard was an average of the scores of those questions.

More importantly, in the Paragraph 12 Order, the Court found that questions 53 and 54 did not correspond directly with the DD Waiver Standards.  The IQR improperly weighs question 53 because the IQR deducts points from that question for multiple negative indicators[54] that are not closely associated with the question or the standard with which Plaintiffs aligned the question.  Doc. 2600 at 68.  Question 54 was imperfectly aligned because its language was broad, and it also tested adherence to requirements not within the standard.  *Id.* at 47.  The Court finds that the recent IQR scores show that Defendants have sustained compliance with Paragraph 12.

Next, Plaintiffs argue that RORAs submitted by 11a nurses demonstrate that there are deficiencies in the provision of healthcare as required by Paragraph 12.  Doc. 2597 at 16.  For this argument, Plaintiffs examined all RORAs submitted after December 4, 2020.  *See* Doc. 2597-1 at 2.  Plaintiffs found that 166 RORAs related to healthcare issues.  Within those RORAs, Plaintiffs identify five categories of concern: 1) Health care plans (HCP) not available

---

[53] In the briefing on Defendants' motion to disengage Paragraph 12, the parties provided their own tables for how the IQR questions and scores aligned.  Usually, Defendants applied multiple questions to a single standard.  Plaintiffs used fewer questions and aligned a few standards, approximately five, with a single question.  Significantly, Plaintiffs also admitted that the IQR questions did not correlate with the DD Waiver Standards, so the Court found that Defendants' comprehensive alignment of standards and questions was more accurate.

[54] "Negative indicators are expected elements unmet by a provider that justify a question's score."  Doc. 2600 at 46.

or current, 2) HCPs not implemented, 3) medications not delivered as prescribed to the class member, 4) Health passports (documents taken to the doctor to communicate current diagnoses and medications) not current, and 5) staff working with class members untrained on HCPs.  Doc. 2597 at 17.  Defendants counter that Plaintiffs "misinterpret the RORA data upon which they rely" as it "does not evidence a decline in the quality of care provided."  Doc. 2598 at 10.  The Court agrees.

The purpose of the State's DD Waiver Standards is "to guide service delivery and promote the health and safety of people supported by DD Waiver Provider Agencies."  DD Waiver Standards ¶ 1.6.  Thus, the RORA system is used to improve the quality of care and to assure compliance with the standards.  Defendants contend that Plaintiffs' categories ignore that while compliance is important, a failure in compliance does not always equate to a failure of care.  Focusing on the 98 RORAs filed between July 1, 2021, and October 31, 2021, Defendants state that only 20 were about care issues and 78 were about compliance issues.

Like Defendants, the Court is puzzled by Plaintiffs' categories.  Plaintiffs' 11a RORA categories are like the IQR categories.  In their Paragraph 12 briefing, Plaintiffs repeatedly rejected 11a evidence as evidence of compliance with Paragraph 12.  Tellingly, except for the medication category, all of Plaintiffs' RORA categories received IQR scores above 80 percent.  As for the medication category, there are several medication standards, most of which scored above 80 percent and only one which scored below.

The Court finds that the 11a RORAs do not show that Defendants are not complying with Paragraph 12.  The RORA system is in place to monitor provider agencies and to ensure that they adhere to the State's standards.  Rather than showing a lack of care, the RORAs

demonstrate that Defendants are actively monitoring provider agencies to ensure that the JCMs receive quality care.

The Court finds that Plaintiffs have shown sustained compliance with Paragraph 12.

Paragraph 13

Paragraph 13 implements the Qualified Provider Agreement Initiative (QPAI).  As defined by the SA, the QPAI is "the revised provider agreement between DDSD and community providers of developmental disability services, including the process for reviewing provider applications, and ensuring compliance with the terms of the revised provider agreement."  Doc. 2299-1 II. 5(10).  Paragraph 13 requires Defendants to implement the [QPAI] and to "enforce the terms of the revised provider agreement through DOH contract management and IRC policies."  The parties agree that this sentence creates two obligations: implementation and enforcement.  Although the language in Paragraph 13 refers to a revised "provider agreement," the parties concur that the QPAI is not a revised agreement, but a revised application.

Plaintiffs suggest that this language requires Defendants to enforce the application through contract management.  They further contend that Defendants have neither implemented or enforced the QPAI.  Defendants counter that there is no way in which they can enforce an application under the state policies included in Paragraph 13.  Their options are limited to either accepting or denying a contract.  Defendants suggest that Paragraph 13 requires them to enforce their actual agreement or contract with provider agencies.  The Court finds that Defendants' interpretation better comports with the language in Paragraph 13.

The new QPAI is meant to describe and clarify Medicaid and DD Waiver policies and assess an applicant's suitability to become a DD Waiver provider.  *See* 2490-1 at 2.  The policies included in Paragraph 13 do not create a new connection between a revised application and the

existing contract used by Defendants.  Rather, the policies authorize Defendants to enforce the state standards.

After much negotiation and revision, in October 2020, Defendants completed a draft QPAI acceptable to Plaintiffs.  As of September 1, 2021, 33 agencies had completed the September/October QPAI version.  Sixty-seven agencies used the September/October version as revised on January 1, 2021.

The second requirement in Paragraph 13, enforcement, occurs within the confines of the incorporated DIV.DDSD policies and three DDSD Waiver Standards: "DIV.DDSD.13.01- Regional Office Contract Management ("Policy 13"); DIV.DHI.DDSD.13.GENADMIN.06.21 – Imposition of Administrative Actions, Penalties and Sanctions Against Community-Based Agency Providers: and DDSD Waiver Standards, Ch. §§ 16.9, 18.8, and 19.2."  *See* Doc. 2299-1 ¶ 13.  The state policies correlate with New Mexico law and regulations.  *See e.g.,* NMSA 1978, Public Health Act § 24-1-1 et seq.; DOH 7 NMAC 1 et seq (regulations describing the imposition of monetary penalties and intermediate sanctions for not complying with licensing requirements).

DDSD Policy 13 establishes and delineates Defendants' enforcement authority "to impose administrative actions, CMPs [civil monetary penalties] and sanctions for DDSD State Funded providers that have been identified as out of compliance with or in violation of regulations, service standards, policies, procedures, and/or Provider Agreement requirements." Doc. 2426-6 at 2; *see also* NMAC 7.1.8.8.3 (describing the intermediate sanctions Defendants may take to bring licensed health care facilities into alignment when the facility has violated licensing requirements).  Before imposing sanctions, such as revoking or suspending a license, DDSD Policy 13 permits Defendants to "engage in activities that are less than sanctions to

resolve the issue and/or concern.  These activities may include but are not limited to technical

assistance or administrative actions as defined in this policy and procedure."  Doc. 2426-6 at 3;

*see also* NMAC 7.1.8.6 (stating that intermediate sanctions" are intended as alternatives to

implementation of more drastic measures such as revocation or suspension of license).

Defendants must document all "efforts taken to resolve the situation and/or concern."  Evidence

that will fulfill the documentation requirement includes:

|  |  |  |
|---|---|---|
| a. | DDSD Technical Assistance Form. |
| b. | DDSD Site Visit Monitoring Form. |
| c. | DDSD Regional Office Request for Assistance (RORA) Form. |
| d. | Documented attendance at IDT and/or ISP/Service Plan meetings. |
| e. | Written request for a Performance Improvement Plan [PIP] from the agency. |
| f. | Monitoring of a Performance Improvement Plan. |
| g. | Correspondence such as letters, memorandums, emails, secure communications (scomm), etc. sent to the agency that specifically addresses the situation and/or concern and required follow up by the agency. |
| h. | Documented request for a quality assurance review of agency policy, procedures, guidelines, or practices as approved in provider application or updated as relevant. Results of a DHI-QMB routine or focused survey as requested by the relevant Regional Office. |
| i. | Documented referral to another oversight agency such as the Office of Internal Audit (OIA), Medicaid Fraud Unit (MFU), Social Security Administration (SSA) etc. |

*See* Doc. 2426-6 at 3.[55]  In coordination with New Mexico regulations, the terms of Policy 13

stride toward resolving infractions informally rather than employing permanent sanctions, such

as termination of a contract.

---

[55] The DD Waiver Standards correlate with Policy 13. It articulates a sanction standard like Policy 13 and the state laws and regulations:

> The DDSD is authorized, by agreement with the HSD, to enforce DD Waiver Service Standards and service regulations with DD Waiver Provider Agencies and to impose sanctions on Provider Agencies for failure to perform in accordance with standards applicable under statute, regulation and contract.

On December 4, 2020, after providing notice of compliance with Paragraph 13,

Defendants filed an opposed motion to disengage Paragraph 13.  Doc. 2490.  Initially, Plaintiffs

contested disengagement of Paragraph 13.  They argued that Defendants had provided no

evidence that they had enforced the new QPAI with contract management.  For a year, while the

disengagement motion was pending, Defendants provided Plaintiffs with quarterly updates on

implementation and enforcement of the QPAI.  *See, e.g.,* Doc. 2561 (clks. min documenting

quarterly meeting held on Zoom).  After the Court scheduled a hearing on the disengagement

motion in October 2021, Plaintiffs "ultimately assented [to disengagement of Paragraph 13]

based exclusively upon the facts that existed as of the date of the filing of the motion."  *See* Doc.

2583.  On October 14, 2021, the Court entered a stipulated order granting Defendants' motion.

*See* Doc. 2587.  Nonetheless, Plaintiffs "reserved their right to challenge Defendants' compliance

with Paragraph 13 in the context of the Motion to Dismiss."  Doc. 2597 at 20.

In their supplemental briefing, Defendants have provided a tracking sheet that shows that

between September 1, 2020, and September 1, 2021, 100 agencies completed applications.

Thirty-three of the listed applicants used the September 1, 2021 QPAI agreement and sixty-seven

used a previous version of the QPAI.  Three applications were denied, and 20 providers received

shortened contract lengths.  Of those receiving shortened contract periods, seven were new and

seven needed to align with a current accreditation or obtain accreditation.  The remaining six had

---

As such, DDSD Regional Directions (in collaboration with Bureau Chiefs as needed) initially provide technical assistance or administrative actions (such as a Performance Improvement Plan (PIP) to assist Provider Agencies.

If the technical assistance and/or administrative actions taken are unsuccessful in resolving the concern, the DDSD Regional Director (in collaboration with Bureau Chiefs as needed) will refer the issue to the Regional Office Bureau Chief and respective Deputy Director for further action. Any determination of a High Impact violation will be referred to the Internal Review Committee (IRC) for consideration of action.

DDS Waiver Standards ¶ 16. 8.

shortened contracts because of a violation: five because of contract management action, and one

for a failure to follow the DD Waiver Standard governing secondary freedom of choice.

Plaintiffs dispute that Defendants have provided evidence of sustained compliance with

Paragraph 13's implementation and enforcement of the QPAI requirements.  After requesting

and analyzing data[56] on four of Defendants' providers, Plaintiffs assert that Defendants have not

met their burden because the collected data "revealed serious and persistent deficiencies with

certain provider agencies, several of which had long histories of poor performance, repeated

incidents of abuse and neglect, and protracted failure to remedy identified violations of DOH

Standards."  Doc. 2597 at 20.  To demonstrate these deficiencies, Plaintiffs created two tables.

The first table described reported ANE incidents that happened at these four agencies.  The

second table included descriptions of RORAs reported before and after each of the four agencies

received a new provider agreement.  *Id.* at 21.  Plaintiffs assert that the number and type of

RORAs for each agency should have prevented them from receiving new contracts and "reveals

a startling failure to implement the QPAI and to enforce the new provider agreement."  *Id.*

Defendants argue that Plaintiffs have presented flawed evidence because they selectively

isolated certain alleged inadequacies "while ignoring the multiple other examples where contract

management occurred."  Doc. 2598 at 10.  Defendants also contend that Plaintiffs' argument

misconstrues "what actions constitute contract management and the purpose of such actions."  *Id.*

Contract management, Defendants explain, "is not intended to be punitive [but] seeks to provide

assistance to providers to bring them back into compliance with the DD Waiver Standards

---

[56] Plaintiffs received information about QPAI, contract management, and incident management for Tresco, Los
Lunas Community Program, New Beginnings, and Community Options.  Plaintiffs selected these providers based on
Defendants' data that these four had "long-standing, unresolved problems in providing care to class members
consistent with the DD Wavier Standards."

whenever possible." *Id.*  The policies incorporated into Paragraph 13 support Defendants'

argument.

New Mexico law and regulations as implemented by Policy 13 and the DD Waiver

Standards give Defendants' discretion on what actions they may take when there is evidence that

an agency provider has not performed in accordance with their agreement.  Plaintiffs have not

proffered nor has the Court found any rule that requires Defendants to deny the renewal of a

contract based on disciplinary actions.  Confronted with a provider's violation(s) of state

policies, Defendants may take any one of nine actions.  The evidence provided by Defendants

shows that they have acted when they believe it is warranted by giving certain agencies shorter

contracts, putting them on performance improvement plans, or denying an application.

Defendants' evidence shows sustained compliance with Paragraph 13.

<u>Paragraph 15</u>

The IQR is an audit that evaluates compliance with the DD Waiver Standards.  A

succession of Jackson Community Monitors developed the IQR.  *See* Doc. 2563-1 at 3.  Before

June 30, 2020, Ms. Rucker served as Community Monitor and oversaw the IQR process and the

independent contractors who conducted the IQR.  Paragraph 15 discusses the transfer of the IQR,

from Ms. Rucker, to DHI.

After Ms. Rucker ceased her role as Community Monitor on June 30, 2020, Ms. Rucker

assumed a new role in the IQR process, serving as a technical assistant for Defendants.  During

the transfer through June 30, 2021, Defendants agreed "to conduct the IQR process, with

technical assistance from Lyn Rucker, using a substantially similar sampling, protocol

instrument, review and data reporting methodology."  Following the transfer, Defendants agreed

to "continue an individual quality review process, as a component of DHI's quality program

management, consistent with DD Waiver Standards."  Now, the IQR, administered entirely by Defendants, continues as a quality component of the DD Waiver Standards.

Throughout the term of the SA, there has been disagreement between the parties about how to interpret Paragraph 15 and the role of Ms. Rucker.  Shortly after the Court gave final approval to the SA, a debate began between the parties about whether Ms. Rucker or Defendants controlled Paragraph 15's three-step process for evaluating state employees' qualifications to conduct the IQR.  The Court resolved that issue on November 6, 2019, finding that Defendants controlled the three-step reviewer qualification process.  *See* Doc. 2334 at 10.

The next disagreement questioned whether Defendants could file a final motion to dismiss prior to June 30, 2021.  Plaintiffs asserted that Defendants could not file a motion to dismiss until June 30, 2021, when Ms. Rucker completed her work as a technical assistant on the IQR process.  Defendants argued that they could file their motion to dismiss anytime during the term of the SA, which ended on December 20, 2020.  The Court resolved this issue on November 18, 2020, finding that the plain language of the SA permitted Defendants to file a motion to dismiss at any time.  *See* Doc. 2473 at 4-5.[57]

Initially, Plaintiffs did not offer any objections based on Paragraph 15.  *See* Doc. 2540. In supplemental briefing ordered by the Court prior to the hearing and specifically limited to

---

[57]A third controversy not relevant to Paragraph 15 arose over the IQR process described there.  The issue was whether Plaintiffs could depose Ms. Rucker about the IQR scores in preparation for responding to Defendants' motion to disengage Paragraph 12.  Plaintiffs argued that Ms. Rucker's testimony was essential to support Plaintiffs' arguments opposing disengagement of Paragraph 12.  Defendants countered by indicating a previous ruling of the Court that the SA did not contemplate formal discovery.  The Court reiterated its ruling that the SA did not contemplate sworn depositions or evidentiary testimony.  *See* Doc. 2504.  The Court also denied Plaintiffs' subsequent motion for reconsideration.  Doc. 2550.  Ultimately, when Ms. Rucker's contract with Defendants ended on June 30, 2021, Ms. Rucker completed an Affidavit that Plaintiffs used as evidence to support their opposition to Defendants' motion to disengage Paragraph 12.

whether Defendants have established a durable remedy,[58] Plaintiffs took the opportunity to

object to dismissal based, in part, on asserted noncompliance with Paragraph 15.  *See* Doc. 2597

at 9.  Plaintiffs contend that Defendants have failed to show sustained compliance, because (1)

the IQR is not being completed in a substantially similar manner and (2) Defendants have not

publicly disseminated regional reports delineating the results of the IQR regional reviews.[59]  *See*

Doc. 2540 at 6 n.2.

The Court has interpreted Paragraph 15 and held that Paragraph 15 requires Defendants

to continue the IQR process "as a component of DHI's quality program management, consistent

with DD Waiver Standards."  In so doing, the Court rejected Plaintiff's contention that

substantial compliance relied on Defendants using a "substantially similar" process after June 30,

2021.  *See* Doc. 2473 at 5.  Other than the language of the SA, Plaintiffs have not offered any

other support for this argument.

Plaintiffs submit that without the regional or statewide IQR reports, neither the public nor

Plaintiffs will "have access to the Defendants' identification of trends and patterns, and whether

Defendants intend to make and implement recommendations for improvement, all critical

information to assess Defendants' sustained compliance with Paragraph 15."  Doc. 2597 at 9 n.9.

While this statement may be true, Plaintiffs do not indicate anything in the SA or the state

policies that creates that requirement.  Nothing in Paragraph 15 refers to "trends," "patterns" or

---

[58] In the Order for Supplemental Briefing, the Court rejected Plaintiffs' request that the Court order Defendants to produce additional information.  The Court ordered supplemental briefing confined to the question of whether "Defendants [have] come into compliance with federal constitutional statutory law and, if so, have Defendants established a 'durable remedy' to demonstrate sustained compliance."  *See* Doc. 2593 at 2.

[59] Plaintiffs' objection was a reassertion of a previous objection resolved by the Court.  *Compare* Doc. 2540 at 6 (stating "based on the Court's ruling (Doc. 2473) that Defendants need not demonstrate substantial compliance with the seventh sentence of Paragraph 15 [which requires Defendants to conduct the IQR in a substantially similar manner] Plaintiffs understand that the Court will not consider this evidence as a basis for denying the Motion to Dismiss] *with* Doc. 2597 at 9 (arguing that Defendants have not shown sustained compliance with the requirement that Defendants "continue to conduct the IQR process in a substantially similar form.").

"recommendations," much less makes access to them through a publicly available statewide report a condition precedent for sustained compliance. Rather, the focus of Paragraph 15 is not on the substance of the IQR but on transitioning the process from the Community Monitor to DHI. The Court will not import requirements into the SA which is "the sole source of Defendants' remaining obligations to class members during the Term of this Settlement Agreement." *See* Doc. 2299-1 I.4.

Before disengaging Paragraph 15, Defendants produced evidence that the IQR process was transferred to DHI. After the IQR transfer, there is undisputed evidence that Ms. Rucker gave technical support to the Defendants until June 30, 2021. *See* Doc. 2563 ¶ 3. (Ms. Rucker's affidavit acknowledging work as technical assistance through June 30, 2021). Plaintiffs do not debate that Defendants are still conducting the IQR. *See* Doc. 2597 at 12-14.

The Court concludes that Defendants have demonstrated sustained compliance with Paragraph 15.

### 4. Substantial Compliance

As a condition of dismissal, the SA requires Defendants to demonstrate substantial compliance with all Action Items. The Court has found that Defendants have provided sufficient information that they have satisfied 11 of the 12 Action Items. But, as discussed supra, Defendants did not provide the Court with sufficient information to allow the Court to decide whether Defendants have demonstrated sustained compliance with Paragraph 7's requirement to "conduct timely and adequate [ANE] investigations and take necessary remedial actions." Because Defendants have not shown sustained compliance with Paragraph 7, Defendants have not demonstrated substantial compliance with all of the SA's terms.

**B.      Whether Defendants May Demonstrate Substantial Compliance When Not All Action Items Have Been Met**

Plaintiffs argue that if not all Action are met, the Court must find that the SA will remain in effect until Defendants meet each obligation.  Defendants counter that the SA does not provide guidance for how to proceed in the event the Court denies their motion.  They argue that the absence of a defined procedure coupled with the SA's specified 18-month term means that a denial of Defendants' Motion to Dismiss would effectively void the SA.  Accordingly, Defendants ask the Court to consider the totality of the circumstances and examine whether there is a durable remedy outside of the SA and whether continuing oversight is equitable.

The SA is silent on what happens in the event the Court does not find that Defendants sustained compliance with each Action Item.  Under the SA's terms, all obligations were to be met in 18 months.  Therefore, the SA vacated all previous orders but three: *Jackson I* (Doc. 679), Memorandum Opinion and Order permitting ADA Amendment (Doc. 831), and Memorandum Opinion and Order on class configuration (Doc. 890).  *See* Doc. 2299-1 II.5(11).

The vacatur of the previous orders in tandem with the silence of the SA as to the consequences of a denial of a motion to dismiss leaves many questions open.  These questions include: Do Plaintiffs return to active monitoring of Paragraph 7?  Does Defendants' failure to maintain sustained compliance with Paragraph 7 mean that Defendants only need to provide evidence on that one paragraph, or will the Court need to oversee another motion to dismiss?  If so, what will Defendants need to show on Action Items that have sustained compliance?  The resolution of these questions undoubtedly would result in more litigation and potentially require yet another agreement.

The Court is mindful that this litigation has continued for almost 35 years.  During that period there have been numerous consent decrees which have evolved into a labyrinth of

requirements that has obscured the real goal of achieving a durable remedy.  Doc. 2304 at 24.

And, when Defendants had difficulty meeting their obligations, revisions that were meant to

clarify and simplify, ultimately made the task more difficult by imposing yet more obligations.

In the June 2019 Memorandum Opinion and Order Approving the SA, the Court observed:

> Since the inception of this case in 1987, there have been numerous evidentiary
> hearings, two appeals, four consent decrees, and four Rule 60(b)(5) motions.
> Rulings adverse to a party have resulted in additional litigation, which has not
> clarified the case, but instead has expanded it in complexity and scope.  While the
> Tenth Circuit has delineated the appropriate inquiry for the Court's analysis of
> Defendants' Rule 60(b)(5) Motion and Supplement, the factual issues surrounding
> questions such as the nature and scope of a durable remedy would inevitably lead
> to more litigation.

Doc. 2304 at 23.  The Court further noted the "ancillary costs" of the litigation, which include

expenses that have had a detrimental impact to both the State's interest as well as the public's.

*Id.*  Monies spent on this litigation "might be better spent on State programs that ultimately

benefit the JCMs and other state citizens."  *Id.*, citing *Jackson III*, 880 F.3d at 1204-05.

An additional consideration is the important federalism concerns in this case.  Federalism

is the recognition that under the Constitution, "states retain a significant amount of sovereign

authority."  *See State of Okl. ex rel. Oklahoma Dept. of Public Safety v. United States*, 161 F.3d

1266, 1269 (10th Cir. 1998).  "[I]nstitutional reform injunctions often raise sensitive federalism

concerns" as "such litigation commonly involves areas of core state responsibility."  *Horne*, 557

U.S. at 448.

For years, this litigation has demanded the services of this Court, counsel for Plaintiffs,

Intervenors, and Defendants, a Rule 706 Expert, a JCA, a Community Monitor and all their staff.

By 2018, Defendants had paid more than $50 million in costs related to this case.  Doc. 2304 at

23.  Undoubtedly that sum has increased.[60]  Not only have those costs impacted the State's

coffers, but the expenses have prevented the State from making choices about its budget.

Budgetary affects are not the only federalism concern.  When a "decree in effect

mandates the State, through its named officials, to administer a *significant federal program*,

principals of federalism require that state officials with front-line responsibility for administering

the program be given latitude and substantial discretion."  *Frew ex rel. Frew v. Hawkins*, 540

U.S. 431, 442 (2004) (emphasis added).  In *Jackson*, these federalism principles are in perpetual

tension as each consent decree governs, in part, not the State's implementation of a federal

program, but the State's implementation of *its own program*.  *See Pennhurst State School &*

*Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on

state sovereignty than when a federal court instructs state officials on how to conform their

conduct to state law.").

The SA was meant to end this lamentable cycle.  When the Court approved the SA, it

found that "on balance the value of an immediate recovery to the Plaintiffs outweighs the

possibility of future relief after protracted litigation."  *Id.* at 24.  The question confronting the

Court now is whether Defendants' failure to provide "sufficient evidence" on compliance with a

single Action Item—Paragraph 7—should unravel the SA's anticipated resolution by putting the

parties back where they began.

Plaintiffs suggest that it is improper to revisit the question of whether there are any

ongoing violations at this stage in the proceedings because the SA "suspended" that question.

Doc. 2597 at 6.  According to Plaintiffs, the Court's examination of whether there is compliance

---

[60] Even after 2019, when court-appointed expert costs significantly decreased, Defendants reported that they "continue to expend well over $1 million per year in attorneys' fees, both their own counsel and for the twelve (12) attorneys actively involved as class counsel."  Doc. 2491 at 23.

with federal law "would effectively repudiate the benefit of the bargain both parties reaped in entering the SA." *Id.* Plaintiffs argue that, to resurrect the factual debate about the status of compliance with federal law", would "seriously prejudice Plaintiffs, who have far less access to information concerning Defendants' community service systems for persons with intellectual and developmental disabilities (IDD) than do Defendants." *Id.*

But Plaintiffs' argument does not acknowledge that the SA is both a contract and a consent decree. Because the Court's judicial authority animates the consent decree, the Court must examine its ongoing jurisdiction. *Firefighters v. Cleveland*, 478 U.S. 501, 519 (1986). "A consent decree 'entered in federal court must be directed to protecting federal interests.'" *Jackson III*, 880 F.3d at 1192 (quoting *Frew*, 540 U.S. at 437).

Plaintiffs further suggest that the parties agreed that the SA constitutes the durable remedy. Therefore, a failure to meet all of the SA's obligations conclusively establishes the matter. To be sure, the parties decided that if Defendants met the requirements of the SA, they would have demonstrated the necessary durable remedy. Yet that agreement does not settle the issue whether, outside the SA, Defendants have established a durable remedy for the actual violations recognized in *Jackson I*. To do as Plaintiffs suggest, would ask the Court to proceed with the premise that the SA is the single path to substantial compliance. The Tenth Circuit specifically rejected that premise.

In *Jackson III*, after describing the length and costs of this case and the federalism concerns, the Tenth Circuit observed that when considering an institutional reform decree, a court must keep in mind that the "obligations are merely a means of accomplishing that goal, not the end." *See Jackson III*, 880 F.3d at 1206-07. The Tenth Circuit advised that even when not every obligation within the decree has been met, the Court must then "consider the broader

question of whether the State is meeting the requirements of the Fourteenth Amendment and the Rehabilitation Act by means other than those stated in the consent decrees." *Id.* at 1206.  The Tenth Circuit counselled that if there are not any ongoing constitutional or federal law violations, and a durable remedy is in place, court oversight should end.  *Id.* at 1207.  When examining whether it is appropriate to dismiss a consent decree in the context of a 60(b)(5) motion, the Tenth Circuit advised the Court to take a flexible approach.

The flexible approach asks the court to "consider the totality of the moving party's efforts to demonstrated sustained compliance with federal law."  The flexible approach rejects focusing on a "single path" but asks the court to consider "the party's commitment to compliance, the duration of the party's compliance with federal law, and whether or not the effects of the violation of federal law persist." *Jackson III*, 880 F.3d at 1200 (quoting *Freeman v. Pitts*, 503 U.S. 467, 490 (1992).  Using this approach, a court examines the totality of the moving party's efforts to demonstrate sustained compliance with federal law.  *Id.* at 1200.  The Tenth Circuit explained that the flexible approach "seeks to return control to state and local officials as soon as a violation of federal law has been remedied."  *Id.* at 1197, citing *Horne*, 557 U.S. at 451.

Mindful of the Tenth Circuit's counsel that the Court must not rely on a single path to substantial compliance but must take a "flexible approach" when examining whether vacatur of a consent decree is appropriate, the Court finds that Defendants' failure to meet all obligations does not decide the outcome of their Motion to Dismiss.  To determine whether vacatur is appropriate, the Court will examine whether Defendants have established a durable remedy outside the SA and whether continuing oversight is equitable.  To do so, the Court will examine the two questions the Tenth Circuit identified as determinative of whether vacatur is appropriate:

(1) Are there any ongoing constitutional or federal statutory violations? and (2) If there are no ongoing violations, is a durable remedy in place? *Jackson III*, 880 F.3d at 1207.

### C.       Whether There Are Ongoing Constitutional or Federal Statutory Violations

In 1990, the Court found that Defendants had violated the JCMs' substantive due process rights and § 504 of the Rehabilitation Act.  Defendants argue that since 1997, the Court has not found any ongoing constitutional or statutory violations.  The Court agrees.

### 1.       Constitutional Violations

The Fourteenth Amendment's Due Process clause "generally confer[s] no affirmative right to governmental aid." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).  But there is an exception "when a State takes a person into its custody." *Id.* at 199-200. "Under the Fourteenth Amendment, institutionalized developmentally disabled individuals have a right to (i) safe conditions of confinement; (ii) freedom from bodily restraints; and (iii) training or habilitation." *Jackson I*, 757 F. Supp. at 1305 (quoting *Youngberg v. Romeo*, 457 U.S. 307 (1982)).  "Specifically, a state is required to provide food, shelter, clothing, medical care, reasonable safety for all residents and personnel within the institution, and minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.*  In *Jackson I*, the Court found that Defendants had violated the substantive due process clause of the Fourteenth Amendment by not providing the JCMs with minimally adequate medical care or training, reasonable conditions of safety, by physically restraining residents, and by failing to implement recommendations by the IDTs for community placement." *Id.* at 1306-07, 1312.

The Court premised its ruling that Defendants had violated the JCMs' substantive due process rights on the special relationship created by the institutionalization of the JCMs.  Today, none of the JCMs remain in an institution.  All are in community placement.  Because the JCMs

are no longer institutionalized, the prerequisite special relationship does not exist.  *Cf. DeShaney*, 489 U.S. at 201 (noting that when the State returned a child it had previously placed in State custody back to father's custody, the State thereby shed its constitutional duty to protect child). The Court concludes that the substantive due process violations found in *Jackson I* are not ongoing.

### 2.      Federal Law Violations

In *Jackson I*, the Court also found that Defendants violated the JCMs' rights under § 504 of the Rehabilitation Act.  To prevail on their § 504 claim, Plaintiffs had to show that (1) the JCMs were handicapped individuals; (2) the JCMs were "otherwise qualified" to receive the benefit or participate in the activity at issue; (3) the JCMs were excluded from the benefit or program solely because of their handicap, and (4) the program received federal funding.  *Jackson I*, 757 F. Supp. at 1296-97.  In 1990, the Court found that Plaintiffs met all four parts of the § 504 test.  Specifically, the Court found that the JCMs who were qualified to reside in a community setting had been "precluded from living in community settings because the programs lack amenities that could reasonably be furnished without substantial program changes, necessary to accommodate the needs of the severely handicapped."  *Id.* at 1316.

In the JSD fairness proceedings on November 20, 1997, the parties addressed whether a § 504 Rehabilitation Act claim remained.  In the hearing, Plaintiffs conceded that the transfer of the JCMs to community settings had changed the nature of their claim against Defendants. Plaintiffs' counsel, Mr. Cubra, stated:

> [W]hen we filed the Jackson lawsuit in July 1987, our purposes were essentially two.  They were to ensure that all of our clients would receive adequate care, that they would be safe and healthy.  We posed those issues as Fourteenth Amendment rights.  We also had a second purpose, and that was to ensure that the rights of people with developmental disabilities in New Mexico to not be unnecessarily

segregated would be honored by the State of New Mexico.  We brought those claims under Section 504.

As you found in 1990, there have been serious problems in both of those areas in the past in the state of New Mexico, particularly at the two institutions that used to house our clients.  Now those institutions do not house our clients, but our goals as plaintiffs remain the same.  We believe that this lawsuit is the appropriate vehicle to ensure that our clients are safe and healthy and that they get adequate services and to ensure that they are not unnecessarily segregated and that they become increasingly part of our community.

We are pleased to say that the Department of Health and all the defendants in this action have agreed with us that now is the time for our energy to be focused on ensuring that all of our clients who now live in the community have their federal rights protected.  We believe that the stipulation is a fair and adequate and reasonable approach to ensure the protection of those federal rights."

Doc. 2066 at 10:15-25, 11:1-18.  As explained by Mr. Cubra, the JSD manifested the parties' intent to move beyond the original violations, which ended when the institutions no longer housed residents.  Thus, the JSD embodied a new goal to implement a system to protect the JCMs' future rights.

Subsequently, in 2012, Plaintiffs alleged new violations of § 504 of the Rehabilitation Act and the ADA.  After admitting that Defendants no longer prevented JCMs from using community services, Plaintiffs asserted that Defendants were committing new harms.  According to Plaintiffs, "Defendants' failure to provide adequate health care to severely disabled class members and to afford those class members supported employment opportunities violate[d] § 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act (ADA) by discriminating against persons with severe disabilities."  Doc. 1930 at 5.  The Court rejected that argument, finding that Plaintiffs had proffered no evidence to support their claims:

There is simply no direct proof of discriminatory intent or proof that severely disabled class members are treated differently than less severely disabled persons in receiving health care services.  In fact, it appears that severely disabled class members receive better health care services than developmentally disabled non-class members do.

*Id.* at 181.  With respect to Plaintiffs' supported employment claim, the Court concluded that

Defendants did not "consign" severely disabled class members to segregated, congregate settings

while other less disabled persons obtain supported employment.  The Court further found that

Plaintiffs had not provided any evidence of Defendants' alleged intent to discriminate against the

JCMs.  *Id.* at 179-180.

In 2016, the Court again touched on the issue of whether there were ongoing violations of

statutory or constitutional law.  The Court explained its statements in the *2012 Opinion* regarding

§ 504 of Rehabilitation Act and the ADA by differentiating between making a finding of "no

statutory violations" and a finding of "no evidence."  Doc. 2103 at 29.  The Court further noted

that in the *2012 Opinion*, it had not assessed whether there were ongoing violations of the JCMs'

substantive due process rights.  *Id.* at 29-30.  Without addressing further the issue of whether

there were ongoing violations, the Court observed that in a consent decree "[p]arties may agree

to a series of measures designed to remedy constitutional violations even if those measures

involve more extensive relief than the Constitution itself requires."  *Id.* at 30.

Plaintiffs suggest that the Court's discussion in the *2016 Opinion* about the difference

between a factual finding and a lack of evidence indicates that Defendants cannot conclusively

argue that there are no ongoing violations of § 504 of the Rehabilitation Act or the ADA.  In

response, Defendants explain that Plaintiffs' 2012 claims relied on factual allegations unrelated

to the original violations.  Tellingly, the record shows that by 1997 both the parties and the Court

assumed that the closure of the institutions had changed the focus of the consent decrees.

Importantly, if Plaintiffs had succeeded in presenting sufficient evidence of their 2012

claims, that evidence would have been unrelated to the facts that were the basis of the Court's

rulings in *Jackson I*.  Plaintiffs' 2012 claims targeted deficiencies in the provision of community

services, not access to them.  Although the consent decrees flowed from *Jackson I*, Defendants'

failure to comply with obligations delineated within the decrees could not, alone, serve as

evidence that the past violations were ongoing.

Given this history and the record in this case, the Court finds that the substantive due

process and the § 504 of the Rehabilitation Act violations described in *Jackson I* are not ongoing.

### D.     Whether Defendants Have Established a Durable Remedy

The absence of ongoing constitutional and statutory violations does not end the Court's

inquiry.  The Court must next examine whether the parties have achieved a durable remedy.

While Defendants' failure to meet the requirements of Paragraph 7 means that Defendants have

not met all the contractual terms of the SA, the Court must still consider whether Defendants

have otherwise fulfilled their obligations.  In *Jackson III*, the Tenth Circuit stated that when

evaluating whether "a moving party [has] implemented a durable remedy, a district court must

consider the totality of the moving party's efforts to demonstrate sustained compliance with

federal law" and "defendants' commitment to remaining in compliance with federal law."

*Jackson III*, 880 F.3d at 1200, 1202-03.  Relevant factors include (1) whether the effects of

violation of federal law persist, (2) a party's commitment to compliance, and (3) the duration of

the party's compliance with federal law.  *Jackson III*, 880 F.3d at 1200 (citing *Freeman v. Pitts*,

503 U.S. 467, 490 (1992)).

Plaintiffs have not asserted, and the Court cannot find, any lingering effects from the

original violations.  In fact, Defendants remedied the violations occurring at the institutions, and

then ventured beyond that initial commitment and applied themselves to these new goals.  In the

1997 JSD, Defendants assumed obligations that did not stem from ongoing constitutional

violations but formed the basis for a community system that would serve the needs of the JCMs.

Together the parties envisioned a community system that would provide adequate health, a reasonably safe environment, and supported employment opportunities.  Since that time, Defendants have worked to comply with these additional obligations.  For more than 30 years, Defendants have remained dedicated to that goal.

In moving toward that goal, Defendants have designed state policies to ensure the provision of quality services to the JCMs.  Among other things, Defendants have developed the DDS Waiver Standards, the IQR, regulations regarding abuse and neglect, and the Quality Management Bureau.  Since the closure of the institutions, Defendants have continually refined and tested these systems.

Through its procedural and regulatory authority, the State ensures that the JCMs have access to residential services, nursing services, case management and supported employment.  Doc. 2596 at 9.  The JCMs now have access to 79 community providers, 134 therapy providers and behavioral support consultants.  *Id.*  Defendants require those individuals who work with the JCMs meet minimum training standards.  Defendants also mandate that providers and their staff complete additional training on safety, ANE, and person-centered planning.  *Id.* at 11.

Defendants use a health tracking module to track health data and create monthly reports.  The tracking module also allows providers to record and follow the JCMs' medical care.  Defendants also use other forms of data collection, such as RORAs, 11a nurse monitoring forms, and mortality review, as a means both to oversee the providers who render services to the developmentally disabled but also to help Defendants improve its services.  In sum, Defendants have committed considerable resources to creating a viable, healthy community service system.

Finally, it is significant that Defendants have shown sustained compliance with 11 of the 12 obligations described in the SA.  These obligations specifically address quality health care, a

reasonably safe environment, and supported employment.  The single unmet obligation addresses the timeliness and adequacy of the State's internal investigations.  Although the State did not provide evidence of sustained compliance with this obligation, the Court has found that the State has shown a commitment toward meeting its requirements.  That commitment has resulted in a durable remedy.

## V.   CONCLUSION

It is unlikely that anyone could have predicted that the present litigation would have persisted for more than three decades, but over the course of those many years and throughout the different phases of the case, much change has occurred.  The system now in place has been developed over the course of decades, and the totality of Defendants' efforts, beyond those focused on meeting the Action Items of the SA, include all the data systems, numerous training requirements, various programs and extensive oversight that have been implemented since the Court issued its opinion in 1990.  The Court's decision to terminate this case acknowledges the long history and deep impact of the litigation.  This case matters to many New Mexican families, some of whom would prefer to see federal oversight continue, with others accepting that the State will now chart its own course.  But after careful consideration of the record, the Court concludes that the violations that existed at the commencement of this suit have been rectified, that the parties have crafted a durable remedy, and that the Defendants have demonstrated a clear intent to safeguard in the long-term the constitutional and statutory rights of the JCMs and of the developmentally disabled in the State of New Mexico.

The Court would be remiss if it failed to acknowledge the parties' commitment to the improvement of all developmentally disabled individuals in the State of New Mexico. Ultimately, New Mexico is better off because of this lawsuit, and the Court commends the

parties, the many lawyers, and the countless individuals who have worked behind the scenes to create the system now in place.  Finally, special acknowledgment is due retired Senior United Stated District Judge James A. Parker, who presided over this case from its outset, and United States Magistrate Judge Karen B. Molzen, who worked diligently with the parties for over 14 years, most recently throughout the pendency of the SA; these Judges' steady hands and wise leadership helped steer this case to its present resolution.

The Court finds, therefore, that termination of the SA and dismissal of this lawsuit are warranted.  IT IS ORDERED that:

1.  The Court GRANTS Defendants' Motion to Dismiss (Doc. 2491);

2.  The Court VACATES the following Orders: Memorandum Opinion and Order (Doc. 679); Memorandum Opinion and Order (Doc. 831) and Memorandum Opinion and Order (Doc. 890).

HON. JOHN F. ROBBENHAAR
United States Magistrate Judge
Presiding by Consent